# EXHIBIT – A

DATE RECEIVED 3/25/21 @ 10:25am by Sheriff VanMeter

RECEIVED BY RCC-Carson

## IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA AT BECKLEY

MATTHEW GIBSON,

        Plaintiff,

vs.                                Civil Action No. __5:21-cv-00181__

LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision,
JEFF MCPEAKE, individually,
BRIAN WHITE, individually,
BOBBY STUMP, individually,
KYLE LUSK, individually,

        Defendant.

## COMPLAINT

This complaint, brought pursuant to 42 U.S.C. Section 1983, the Fourth Amendment, First Amendment and 14th Amendment to the United States Constitution, arises out of the defendants' commission of an unreasonable search and seizure against the Plaintiff, and other violations, at his home on March 4, 2020, pursuant to an official policy and practice engaged-in by the defendants, occurring in Raleigh County, West Virginia, within the Beckley Division of the Southern District of West Virginia.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. 1331 and 1343.

## PARTIES

1.     The Plaintiff, Matthew Gibson, was at all times relevant hereto a resident of Raleigh County, West Virginia.

2.      Defendant Louise E. Goldston was at all times relevant hereto a Judge of the 13th Family Court Circuit, and has served in that capacity for approximately 26 years. At all times relevant to the allegations herein she was acting under color of law. She is named herein as a defendant in her individual capacity.

3.      Defendant Raleigh County Commission ("RCC") is a political subdivision of the State of West Virginia, located within the Southern District of West Virginia.

4.      Defendant Jeff McPeake is named herein as an individual. At all times relevant hereto he was acting in the capacity as an employee of the RCC through the Raleigh County Sheriff's Office, and more specifically as a bailiff for Defendant Louise E. Goldston in the 13th Family Court Circuit.

5.      Defendant Brian White is named herein as an individual. At all times relevant hereto he was acting in the capacity as an employee of the RCC through his employment with the Raleigh County Sheriff's Office, as a sworn member of law enforcement in the Raleigh County Sheriff's Office.

6.      Defendant Bobby Stump is named herein as an individual. At all times relevant hereto he was acting in the capacity as an employee of the RCC through his employment with the Raleigh County Sheriff's Office, as a sworn member of law enforcement in the Raleigh County Sheriff's Office.

7.      Defendant Kyle Lusk is named herein as an individual. At all times relevant hereto he was a resident of Raleigh County, West Virginia.

## FACTS

8.      Over the past twenty years as a Family Court Judge, Defendant Goldston has been engaging in the practice of visiting homes of litigants appearing in front of her. Defendant Goldston went to the litigants' homes to either determine if certain disputed marital property was present and/or to supervise the transfer of disputed property. Defendant Goldston admitted to conducting these home visits in her capacity as a Family Court Judge on twelve separate occasions in different cases.

9.      On September 18, 2020, the West Virginia Judicial Investigation Commission filed a Formal Statement of Charges against Defendant Goldston following the commission of one of these so-called home visits at the home of the Plaintiff, Matthew Gibson. The Formal Statement of Charges alleged that probable cause existed to formally charge Defendant Goldston with violations of the Code of Judicial Conduct and that formal discipline was appropriate.

10.     The Formal Statement of Charges alleged, as is also alleged hereby by the Plaintiff, that on March 4, 2020, during a contempt hearing in the Plaintiff's divorce case, Defendant Goldston, along with her Co-Defendants herein, entered the Plaintiff's home to search and seize items of personal property which Mr. Gibson was alleged to have failed to turn over to his ex-wife following the finalization of his divorce more than one year earlier.

11.     Plaintiff appeared before Judge Goldston on September 18, 2018, for the final hearing in his divorce action. Plaintiff's s ex-wife was represented by Defendant Kyle Lusk, Esq. The Court granted the divorce at the request of the parties, adopting a settlement agreement between the parties.

3

12.     The final order in the divorce action provides, in-part, that "the parties divided their household furnishings by agreement which is represented by a four page exhibit entered before the Court and attached hereto." The final order further provided that, "The circled items are Respondents" and "The items not circled are the Petitioners."

13.     Contrary to the representations contained in the order itself, the original personal property disbursement agreement list document was not actually attached to the order, as it was represented to be verbally by the Court on the record. In the Investigative Panel Findings and Conclusions of the Lawyer Disciplinary Board in Complaint No. 20-05-104 against Defendant Kyle Lusk, in a footnote on page 15 of the said document, the Board noted that "The Court noted the original property form was not attached to the Order from the September 2018 hearing in the divorce."

14.     Just over a year after the final divorce hearing, on or about September 26, 2019, the Plaintiff's ex-wife, by Defendant Lusk, filed a Petition for Contempt against the Plaintiff, alleging that she did not receive all of the items of personal property from the original personal property disbursement list, or alternatively she alleged that items received by the Plaintiff were allegedly damaged. The ex-wife's petition, as drafted by Defendant Lusk, alleged that "many of the items had great sentimental value to the Petitioner" and that Mr. Gibson's actions "were carried out to inflict emotional harm and suffering to the Petitioner."

15.     Pursuant to the filing of the Petition for Contempt, Defendant Lusk submitted an altered property disbursement agreement list to the Court, as the original had not been attached to the final order. The altered personal property agreement list submitted by Defendant Lusk

contained numerous discrepancies with the original property list document introduced to the Court at the final hearing.

16.     On March 4, 2020, the parties appeared before Judge Goldston for a hearing on the petition for contempt. During the hearing, Judge Goldston suddenly and without explanation asked Mr. Gibson, who was representing himself *pro se*, for his home address. Judge Goldston *sua sponte* stopped the hearing and ordered the parties to meet at Mr. Gibson's house in ten minutes. She failed to explain the reason for the spontaneous visit to the Plaintiff's home. Because of Judge Goldston's failure to explain the reason for the home visit, Mr. Gibson was unable to raise any objection while still at the hearing.

17.     The act of Judge Goldston visiting Mr. Gibson's home was threatened by Mr. Lusk, as recorded in a conversation he had with Mr. Gibson's then-attorney, back during the divorce final hearing on September 18, 2018. The parties and their counsel had been discussing the division of marital personal property between the parties, which was alleged to have been located at Mr. Gibson's home. Speaking to Mr. Gibson's attorney, in the presence of the parties, Defendant Lusk stated:

> *I'm gonna tell you right now - and the Judge is big on that - I want [Mr. Gibson] to say certain things aren't there, and we'll get the Bailiff, and the Judge, and we'll go there and see.*

After the search threat leveled by Defendant Lusk, the parties came to an agreement on the separation of all items of marital personal property, which was listed on a typed form with particular items circled, which was tendered to the Court for inclusion into the final order.[1]

---

[1] However, the original personal property list form was never attached to the final order.

18. The night prior to the contempt hearing - a year and a half after the final hearing -

Defendant Lusk called Mr. Gibson directly on the telephone and again made a threat towards Mr.

Gibson to utilize the Family Court against him:

> *This is Kyle Lusk. I'm calling for Matthew Gibson. The Court has asked me to convey to you any settlement proposal I may have. Ms. Gibson would settle tomorrow's matter for a fee of $5,000.00. That would cover her damages and her attorney fees and costs. I believe there are a few personal items she still wants, which are mainly pictures, diplomas, certificates and the like. And that's that. That's non-negotiable. That's what she'd take. Otherwise we'll see you tomorrow...."*

19. Once everyone arrived at Mr. Gibson's home on March 4, 2020, and the purpose

of the visit became clear, the Plaintiff moved to recuse Defendant Goldston on the grounds that

she had become a potential witness in the case. Judge Goldston denied the motion as untimely.

20. Plaintiff then verbally refused to allow Defendant Goldston or anyone else in his

house without a search warrant. Defendant Goldston threatened to put Mr. Gibson in jail if he

denied them entry into his house. Plaintiff felt he had no choice but to relent.

21. Upon Judge Goldston's arrival at Plaintiff's property, Plaintiff instructed a third

party to video record the initial interactions outside the house between Defendant Goldston and

the parties. Plaintiff also recorded several minutes of audio of the initial interaction on his cell

phone before being forced to turn it off.

22. When the video and audio recording were discovered by Defendant Goldston, she

ordered both recordings stopped, following her threat of arrest and incarceration. However, once

inside the house, Defendant Goldston's bailiff, Defendant McPeake, used his personal phone to

record both video and audio of the separation of alleged marital assets. Plaintiff was unaware at

the time that Defendant McPeake was recording video inside his home. He observed a phone in

McPeake's hand at the time, but did not observe that he was recording. McPeake recorded for a total of 7 minutes - though the total search lasted 20 to 30 minutes.[2] McPeake never disclosed to the Plaintiff that he had been recording video in his home. McPeake did however, provide the video to Defendant Judge Goldston, which she disclosed in the ensuing judicial disciplinary investigation. Neither McPeake, nor Goldston disclosed the existence of the video, nor provided a copy of the video, to the Plaintiff. Nor did McPeake enter the video into any investigative file with the Raleigh County Sheriff's Office, his employer. Nor did any of the defendant deputies complete a report, nor any sort of documentation, of having been in Plaintiff's house and participated in a search and seizure thereon on March 4, 2020.[3]

23.    After the Plaintiff was forced by Defendant Goldston to stop recording the incident, while standing in the front yard of his residence, Defendant Goldston stated, "Now are you gonna let me in, or am I gonna have to put you in jail!" At that point, Defendant Deputy McPeake signaled on his radio for law enforcement assistance and seized the Plaintiff's phone. Due to Plaintiff being a federal law enforcement officer, he was aware that McPeake had signaled for assistance for other law enforcement officers, as well as the significance of his doing so, which was for the purpose of taking Plaintiff into custody and/or possibly engaging in a use of force against him, should he choose to attempt to refuse to stop recording and/or deny the defendants entry into his home.

24.    Defendant Judge Goldston then led defendants McPeake, Lusk, and Plaintiff's ex-wife, from the gazebo in the yard towards Plaintiff's house. Plaintiff felt under immense duress

[2] JIC Brief at 9.

[3] Plaintiff served a FOIA request on the Raleigh County Sheriff's Office, which was returned with with a response that the RCSO had no copy of the video, nor any report or documentation of any incident occurring at Plaintiff's property that day.

7

following the threat to incarcerate him, after which he anticipated that he would most likely lose custody of his children to his ex-wife, should he offer resistance or continued objection. Defendant Goldston threatened Plaintiff with incarceration approximately seven times on March 4, 2020. Defendant Goldston also threatened to have the third party bystander who was filming video footage arrested if she did not turn off the camera. Despite being Plaintiff's significant other, and despite acting under the directions of the Plaintiff, the third party bystander had no choice but to comply with Defendant Goldston's orders. At all relevant times, the third party bystander was located on the Plaintiff's private property.

25.     Defendant Lusk assisted Defendant Judge Goldston in ensuring that Plaintiff was not able to acquire audio or video footage of what was occurring on his property. Judge Goldston instructed the third party recording video for Mr. Gibson to stop recording. At all relevant times, she was located on Plaintiff's private property and acting pursuant to his direction. Defendant Lusk then advised Judge Goldston that the third party who had been recording for the Plaintiff still had the phone in her hand - implying that she was still recording. Judge Goldston turned towards the third party and told her that - not only did her phone have to be turned off, but that she also had to put it away, or else she was going to jail. Defendant Lusk also advised Judge Goldston that he didn't think Plaintiff's phone was off, which was recording audio at that time, after which Judge Goldston ordered Deputy McPeake to seize Plaintiff's phone. At that time, Defendant McPeake physically seized the Plaintiff's phone from his person, all the while standing on Plaintiff's private property outside his residence.

26.     At no time did Plaintiff voluntarily grant consent to any defendant herein to enter his property, including his residence. At no time did Plaintiff voluntarily grant consent to

8

Case 5:21-cv-00181   Document 1   Filed 03/22/21   Page 9 of 38 PageID #: 9


participating in Family Court proceedings outside the courtroom, and especially not on his property and inside of his home. At no time did Plaintiff voluntarily grant consent to stop filming video and audio footage of the events which were transpiring on his property. At no time did Plaintiff voluntarily grant consent to the seizure of his phone. At no time did the Plaintiff voluntarily grant consent to the seizure of items removed from the inside of his residence at the direction of Defendant Goldston.

27.     Once inside the Plaintiff's home, Judge Goldston directed the deputies to assist Plaintiff's ex-wife and Defendant Lusk in searching and seizing the home's contents. The search of Plaintiff's home lasted a total of 20 to 30 minutes.[4] During the search and seizure, Respondent acknowledged that Mr. Gibson had already turned over most of the disputed items on the list. She also told the ex-wife that "I can't let you search [for particular items] unless you have some idea of where they might be." When they went downstairs to go through DVDs, Respondent sat down in a rocking chair uninvited and remained there while Mr. Gibson and the bailiff went into another room to look at the gun cabinet for other items.[5] Plaintiff was forced by Defendant Goldston to open his combination gun safe for inspection by his ex-wife and the deputies.

28.     During the search, the Plaintiff's ex-wife removed many different items of personal property - much of which was never listed on the original four page property agreement list, which was supposed to have been attached to the divorce order, but which was never actually attached. Numerous items were seized from Mr. Gibson's home without his consent. During the search, defendant police officers Stump and White arrived and entered Plaintiff's

---

[4] JIC Brief at 9.

[5] JIC Brief at 8-9.

residence, after being called by Defendant McPeake. Thereafter they began to jointly participate in the search and seizure occurring inside Plaintiff's home. Shortly after arriving, Defendant Stump went back outside and instructed Plaintiff's witnesses to leave the property. Meanwhile, Defendant Goldston allowed Plaintiff's ex-wife's boyfriend, father and brother to remain on Plaintiff's property without Plaintiff's consent.

29.     Many different items of personal property were taken out of Mr. Gibson's home during the search, some of which belonged to Mr. Gibson's children, as well as Mr. Gibson's significant other. Some items which were taken were later returned. Some of the items were never returned. None of the items were documented in writing by the Defendants. They were merely handed over to the possession of Plaintiff's ex-wife. Following the search, there was no inventory made of the items taken from Mr. Gibson's home. Following the search, there was no court order issued, establishing and describing what had occurred at Mr. Gibson's home, nor listing an inventory or description of the items which had been seized from inside the home. Defendant Judge Goldston did recite for the record, following the search and seizure, what had been seized from Plaintiff's home, "to the best of her recollection." Some of what she listed for the record were not items of personal property listed in the original property disbursement list which was supposed to have been attached to the final order.

30.     Following the public release of the video footage showing Defendant Goldston on Plaintiff's property on March 4, 2020, two complaints were opened with Judicial Disciplinary Counsel. Following the opening of the two complaints, on or about July 22, 2020, Judicial Disciplinary Counsel took Defendant Goldston's sworn statement. She admitted to investigators that she failed to inform Mr. Gibson of the purpose of the home visit while the parties were in the

10

courtroom and that she did not give him any opportunity to object thereto until everyone was at his house.

31.     Defendant Goldston opined to Judicial Disciplinary Counsel that she believed it was proper to visit litigants' homes in her role as a Family Court Judge. During the March 4, 2020 hearing in the matter, Defendant Goldston stated that "I do this probably two or three times a year and we have jury views all the time." During her questioning by Judicial Disciplinary Counsel, Defendant Goldston claimed to have made visits into litigants' homes on at least 11 different occasions.[6]

32.     When asked by Judicial Disciplinary Counsel, Defendant Goldston could provide no statute, rule or case that gave her the authority to conduct what she described as "home visits." She also acknowledged that there was nothing in the Family Court's contempt powers that gave her the authority to conduct a so-called "home visit." Defendant Goldston admitted that in the past twenty years of engaging in these behaviors, she never held anyone in contempt prior to going to the litigants' homes and that she failed to enter orders subsequent to the visits to litigants' homes reflecting what had occurred at the litigants' residences, including whether items of personal property had been seized from the homes. Nor did she reflect in subsequent court orders whether or not a party was in contempt of any court order.

33.     Defendant Goldston admitted to Judicial Disciplinary Counsel that she never had any clear or written procedures for conducting a so-called "home visit," including but not limited to, when the proceedings should be utilized and how the process should take place. She also

---

[6] JIC Brief at 4.

11

acknowledged that she never took a court reporter to the scene, or otherwise preserved a record of proceedings during the "home visits."

34.     Defendant Goldston admitted to Judicial Disciplinary Counsel that the practice could make her a potential witness to a future proceeding which could then result in her disqualification as a judge.

35.     Defendant Goldston also admitted that pursuant to West Virginia law, as well as the Rules of Practice and Procedure for Family Courts, the burden of proof in a contempt proceeding rests not with the Family Court Judge but with the moving party. She agreed that it is the moving party's responsibility to provide evidence in support of his or her contention that the other side has failed to produce the items in question. Defendant Goldston admitted to improperly putting herself in the role of litigant during the Plaintiff's contempt proceedings.

36.     On or about September 18, 2020, the West Virginia Judicial Investigation Commission issued a Formal Statement of Charges, filed with the West Virginia Supreme Court of Appeals. Subsequent to the issuance and filing of the Formal Statement of Charges against Defendant Goldston, the Judicial Disciplinary Counsel and Defendant Goldston reached a Settlement Agreement, which admitted the factual allegations in the Formal Statement of Charges and which admitted to violations of Rules 1.1, 1.2, 1.3, 2.2, 2.4(A), 2.4(B) and 2.5 of the West Virginia Code of Judicial Conduct.

37.     As further part of the Settlement Agreement which she signed, Defendant Goldston "admitted her wrongdoing" and jointly agreed to recommend to the Judicial Hearing Board and the State Supreme Court that she be censured and fined $5,000.00 as an appropriate sanction for her violations.

12

38.     On August 25, 2020, the Judicial Investigation Commission issued a public admonishment against another Family Court Judge, Eric Shuck, also of the 13th Family Court Circuit, following an investigation of judicial misconduct. The "gravamen of the complaint was that Respondent was going to the homes of litigants to determine if certain disputed marital personal property was in the possession of the occupant and/or to supervise the transfer of said items."

39.     The public admonishment of Judge Shuck stated that, "Respondent opined that he believed it was proper to visit litigants' homes because a colleague had engaged in the same practice for several years." A footnote following that statement noted that Judge Shuck was referring to Judge Goldston, who was at that time, also the subject of a judicial disciplinary proceeding for visiting a litigant's home.

40.     The public admonishment of Judge Shuck further stated that, "The Commission further found that formal discipline was not essential as Respondent had no prior disciplinary actions and had been led astray, in part, by another colleague's actions. It further noted that "Home visits by a Family Court Judge to locate and/or secure personal property in a contempt proceeding are ill-advised and inappropriate" and that "Such visits are not authorized by any statute, rule or case law...."

41.     Following public disclosure and media reports about the defendants' visit to the Plaintiff's home, Plaintiff became aware of other prior litigants who had appeared before Judge Goldston who had either been subjected to a "home visit" by Defendant Goldston, or who had been threatened with such an event during negotiations.

13

42.     One such prior litigant relayed to the Plaintiff that, in her divorce proceeding, she

had been advised by her lawyer that Judge Goldston, the presiding judge in her divorce, was well

known for "packing everybody up from a hearing and taking them to go through the house."

Such a possibility caused severe anxiety in the woman because she did not want her husband in

her private home, which had not been the marital residence. The woman stated that she was a

victim of abuse during the marriage and absolutely did not want her ex-husband in her home.

The woman's lawyer and her ex-husband's lawyer talked with Defendant Judge Goldston outside

of her presence. The woman's lawyer returned and said that she could either pay a certain

amount of money to her ex-husband, or else Judge Goldston would take the lawyers and her ex-

husband into her private residence to search for items sought by the ex-husband. The woman

stated that in order to avoid the Judge and ex-husband going into her home, she was forced to

literally write a check payable to her husband right there in the Family Court. The woman never

personally saw Judge Goldston that day. Her mother and her daughter were present and also

witnessed the disturbing events.

43.     Another prior litigant who had appeared in the 13th Family Court Circuit, in a

divorce action pending before Judge Eric Shuck, advised that his ex-wife's lawyer was

Defendant Kyle Lusk. He advised that Defendant Lusk requested Judge Shuck to go to his home

in order to search for personal property, which in fact occurred. He stated that Defendant Lusk

was "pushing" Judge Shuck to take the action. He recalled that Lusk said, "I think we just need

to make a trip over to [his] house and have a look," to which the Judge responded, "I think that's

a good idea, that way we'll know who's lying." The litigant recalled that many of the items

subsequently seized during the "home visit" search were items which had never been discussed before in the divorce action, such as pots and pans and Christmas decorations.

44.    Reports were received by the Plaintiff of other prior litigants in the 13th Family Court Circuit who had either experienced the "home visits," or who had been threatened with "home visits" during negotiations, who did not want to further discuss the experiences, or testify as witnesses. Upon information and belief, the 13th Family Court Circuit, in Raleigh County, West Virginia, was the only Family Court Circuit subjecting litigants to the so-called "home visits" and threatened "home visits."

45.    Upon information and belief, defendants Goldston and Lusk had long conspired with each other to engage in the unlawful practice of so-called "home visits," thereby violating the federal constitutional rights of litigants appearing in the 13th Family Court Circuit. Upon information and belief, Defendant Lusk profited from the conspiracy, in that he received the material benefit of the ability to leverage Judge Goldston's "home visits" against opposing litigants and counsel, as he had done to the Plaintiff. Likewise, upon information and belief, Judge Goldston profited from the conspiracy in that she received campaign donations and political and social support from Defendant Lusk, partially enabling her to stay in office for over 26 years.

## COUNT ONE - UNREASONABLE SEARCH AND SEIZURE
## IN VIOLATION OF THE FOURTH AMENDMENT

46.    Defendants Goldston, McPeake, White and Stump acted under color of law when they entered the Plaintiff's home and property as alleged herein on March 4, 2020. Acts are done under color of law when a person acts in the performance of official duties under any state,

15

county, or municipal law, ordinance or regulation. *See* Monroe v. Pape, 365 W.S. 167 (1961), *overruled in part*, Monell v. Department of Social Services, 436 U.S. 658 (1978).[7]

47.     While acting under color of state law, Defendants Goldston, McPeake, White and Stump deprived Matthew Gibson of a federal constitutional right under the Fourth Amendment of the U.S. Constitution, to be free from unreasonable searches and seizures.

48.     Amendment IV of the U.S. Constitution provides that "The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized. Article III, Section 6 of the West Virginia Constitution provides for the same protections, almost verbatim.

49.     The said defendants acted unreasonably and therefore unlawfully by failing to obtain a warrant prior to entering and searching the Plaintiff's home on March 4, 2020. The Fourth Amendment requires that law enforcement and government officials seeking to execute a search inside the Plaintiff's home must apply under oath to a neutral magistrate or judge for a warrant, supported by probable cause, prior to entering and searching a home. Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The said defendants furthermore acted unreasonably in not just searching the Plaintiff's home, but also by seizing items therein, some of which were never mentioned in the parties' divorce settlement agreement, and also by seizing the Plaintiff's phone while he attempted to record the events which were transpiring.

---

[7] *See also* Third Circuit Model Jury Instructions 4.4.1 Section 1983 - Action under Color of State Law.

50.     An individual's home is highly protected under the Fourth Amendment. When searches and seizures take place in an individual's home, there is no reasonableness analysis, since such actions are a "search" *per se* under the Fourth Amendment. As such, the only applicable analysis is whether a warrant was obtained by the defendants, and if not, whether an exception applies. Id.

51.     The 4th Amendment also applies to civil cases, as well as criminal. *See* The Emergency Doctrine, Civil Search and Seizure and the Fourth Amendment, 43 Fordham Law Review 571 (1972); The Civil and Criminal Methodologies of the Fourth Amendment, 93 Yale Law Journal 1126 (1984); and Applicability of the Fourth Amendment in Civil Cases, 1963 Duke Law Review 473 (1963). For instance, in 1967, the United States Supreme Court held that administrative inspections to detect building code violations must be undertaken pursuant to a warrant if the occupant objects to the search. *See* Camara v. Municipal Court, 387 U.S. 523 (1967) (search involving home) and City v. Seattle, 387 U.S. 541 (1967) (search involving warehouse).

52.     The defendants herein did not seek, nor obtain, a valid search warrant prior to entering, searching and seizing the Plaintiff's home on March 4, 2020. Plaintiff stated to Defendant Judge Goldston on March 4, 2020 that she was not getting inside his home without a warrant, to which Defendant Goldston responded, "Oh yes I will." She then threatened the Plaintiff with arrest if he tried to prevent her from going inside his home and performing a search and seizure therein.

53.     The said defendants did not obtain voluntary consent to enter, nor to search, the Plaintiff's residence on March 4, 2020. Nor did they obtain voluntary consent to seize items of personal property, nor his cell phone, from his residence on March 4, 2020.

54.     The said defendants did not allege that exigent circumstances existed on March 4, 2020 as justification for their entry and search of the Plaintiff's residence. Nor did exigent circumstances objectively exist on March 4, 2020.

55.     No state or federal law or rule of procedure authorizes a West Virginia Family Court judge to enter or search a litigant's home, nor to verbally authorize law enforcement to do so, as occurred on March 4, 2020 at the Plaintiff's home. Nor would any such state law or rule of procedure be constitutional under the Fourth Amendment.

56.     As a court of limited jurisdiction under West Virginia law, a family court has no authority to conduct home "views" or searches. *See* W. Va. Code § 51-2A-2(e). The jurisdiction of family courts is limited to only those matters specifically authorized by the Legislature." Syl. pt. 5, *in part*, Lindsie D.L. v. Richard W.S., 214 W. Va. 750 (2003).

57.     Even if there were some colorable state law or authority for a search and seizure to be conducted under the circumstances alleged herein, searches and seizures are an executive branch function, and not a function of the judicial branch, which is a fundamental concept of law, of which an objectively reasonable government official or law enforcement officer should know.

58.     The said defendants' actions as alleged herein were performed under color of law, objectively unreasonable, willful, wanton, intentional and done with a callous and reckless disregard for the Plaintiff's Fourth Amendment rights to be free from unreasonable search and seizure.

18

Case 5:21-cv-00181   Document 1   Filed 03/22/21   Page 19 of 38 PageID #: 19

59.     The West Virginia Code of Judicial Conduct precludes a judge from engaging in
independent investigations of cases. Defendant Goldston engaged in an inappropriate judicial
investigation of facts. Rule 2.9(C) of the Code of Judicial Conduct states that "[a] judge shall not
investigate facts in a matter independently and shall consider only the evidence presented and
any facts that may be properly judicially noticed."

60.     Defendant Goldston engaged in nonjudicial actions which were not taken in a
judicial capacity. She engaged in functions and behaviors which are not normally performed by a
judge and which are wholly outside the expectations of litigants in Family Court. Defendant
Goldston's personal direction of, and personal participation in, the search and seizure inside the
Plaintiff's home, consisted of an executive act, rather than a judicial act in nature. As a
consequence, Judge Goldston does not enjoy judicial immunity for her actions taken on the
property of the Plaintiff on March 4, 2020, as alleged herein in detail. *See* Mireles v. Waco, 502
U.S. 9, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991).

61.     No objectively reasonable government official or law enforcement officer would
have a reason to believe that they possessed authority to conduct a warrantless search and seizure
of a Family Court litigant's residence to ascertain whether certain items of personal property
sought in a contempt petition is located in his home and to seize any such items therein. Any
reasonable person would have known that Plaintiff possessed a clearly established constitutional
right to deny entry to his home to government officials and law enforcement in the absence of a
search warrant as occurred on March 4, 2020. Such a basic and fundamental constitutional
question is "beyond debate" under existing federal legal precedent. Therefore, neither Judge
Goldston, nor the law enforcement officer defendants, are entitled to qualified immunity for their

19

actions taken on the property of the Plaintiff on March 4, 2020. *See generally* Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted).

62.    As a direct and proximate result of the defendants' violation of the Plaintiff's Fourth Amendment rights, the Plaintiff was damaged, for which he is entitled to recover.

## COUNT TWO - VIOLATION OF THE FIRST AMENDMENT

63.    The First Amendment, in relevant part, provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. The Fourteenth Amendment makes this prohibition applicable to the states. *See* Fisher v. King, 232 F.3d 391, 396 (4th Cir. 2000).

64.    The Plaintiff engaged in protected First Amendment speech and activity when he began to video and audio record the defendants on his property engaging in a search and seizure on March 4, 2020, both through the audio recording device on his person, as well as through the video being filmed at his direction and on his private property with the assistance of the third party bystander at his home.

65.    The First Amendment, in relevant part, provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. The Fourteenth Amendment makes this prohibition applicable to the states. *See* Fisher v. King, 232 F.3d 391, 396 (4th Cir. 2000).

66.    Not only does the First Amendment protect freedom of speech, it also protects "the right to be free from retaliation by a public official for the exercise of that right." Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000).

67.    The First Amendment protects the public's right of access to information about their officials' public activities. It "goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members

of the public may draw." First Nat'l. Bank of Bos. v. Bellotti, 435 U.S. 765, 783, 98 S.Ct. 1407,

55 L.Ed.2d 707 (1978). Access to information regarding public police activity is particularly

important because it leads to citizen discourse on public issues, "the highest rung of the hierarchy

of First Amendment values, and is entitled to special protection." Snyder v. Phelps, 562 U.S. 443,

452, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) (quoting Connick v. Myers, 461 U.S. 138, 145, 103

S.Ct. 1684, 75 L.Ed.2d 708 (1983) ); Garrison v. Louisiana, 379 U.S. 64, 77, 85 S.Ct. 209, 13

L.Ed.2d 125 (1964) (recognizing the "paramount public interest in a free flow of information to

the people concerning public officials, their servants"). That information is the wellspring of our

debates; if the latter are to be " 'uninhibited, robust, and wide-open,' " Snyder , 562 U.S. at 452,

131 S.Ct. 1207 (quoting N. Y. Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.

2d 686 (1964) ), the more credible the information the more credible are the debates (quoting

Fields v. City of Phila., 862 F.3d 353, 359 (3rd Cir. 2017)).

     68.    By Plaintiff personally recording, and by also directing a third party to record, the

actions of the defendants intruding onto his private property on March 4, 2020, and engaging in a

search and seizure thereon, Plaintiff was engaging in the protected First Amendment activity of

documenting the actions of government officials who he believed were acting outside of the law

and in violation of his constitutional rights, so as to expose their actions to the public at large, as

well as for the purpose of preserving evidence for use in subsequent civil and/or criminal

litigation necessary as a consequence of their actions.

     69.    To record what there is for the eye to see, or the ear to hear, corroborates or lays

aside subjective impressions for objective facts. Hence to record is to see and hear more

accurately. Recordings also facilitate discussion because of the ease in which they can be widely

distributed via different forms of media. Accordingly, recording police activity in public falls

squarely within the First Amendment right of access to information. As no doubt the press has

this right, so does the public. *See* PG Publ'g. Co. v. Aichele, 705 F.3d 91, 99 (3d Cir. 2013);

Branzburg v. Hayes, 408 U.S. 665, 684, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (*quoting* Fields v.

City of Phila., 862 F.3d 353, 359 (3rd Cir. 2017)).

  70. Under the First Amendment's right of access to information the public has the

commensurate right to record—photograph, film, or audio record—police officers conducting

official police activity in public areas. Fields v. City of Phila., 862 F.3d 353, 360 (3rd Cir. 2017)

("The First Amendment protects actual photos, videos, and recordings, and for this protection to

have meaning the Amendment must also protect the act of creating that material." (citation

omitted)); *See also* ACLU v. Alvarez, 679 F.3d 583, 599–600 (7th Cir.), cert. denied, —— U.S.

——, 133 S.Ct. 651, 184 L.Ed.2d 459 (2012) (holding that an Illinois eavesdropping statute did

not protect police officers from a civilian openly recording them with a cell phone); Turner v.

Lieutenant Driver, 848 F.3d 678, 689 (5th Cir. 2017) ("[T]he First Amendment protects the act of

making film, as there is no fixed First Amendment line between the act of creating speech and

the speech itself." (quotation omitted); W. Watersheds Project v. Michael, 869 F.3d 1189 (10th

Cir. 2017) (agreeing with several sister circuits that recording the conduct of officials in general

is protected First Amendment speech); Glik v. Cunniffe, 655 F.3d 78, 79 (1st Cir.2011) (holding

there is an "unambiguous[ ]" constitutionally protected right to videotape police carrying out

their duties in public); Smith v. Cumming, 212 F.3d 1332, 1333 (11th Cir.2000) (finding

plaintiffs "had a First Amendment right, subject to reasonable time, manner and place

restrictions, to photograph or videotape police conduct"); Fordyce v. City of Seattle, 55 F.3d 436,

439 (9th Cir. 1995) (recognizing plaintiff's videotaping of police officers as a "First Amendment right to film matters of public interest"). Furthermore, there can be no doubt that the public has the right to record police officers and government officials from the vantage point of standing on their own private property - and indeed, standing in their own front yard, or within their home.

71.     Recently, the Fourth Circuit observed in the context of a claim of seizure of cell phone video footage by law enforcement, that we live "[i]n an era in which cell phones are increasingly used to capture much of what happens in daily life" and that such recordings are protected from seizure by law enforcement under the Fourth Amendment. Hupp v. State Trooper Seth Cook, 931 F.3d 307, 329 (4th Cir. 2019).

72.     Plaintiff and the third party bystander acting pursuant to his direction, were located on his private property at the time the protected First Amendment actions of recording the defendants was taking place on March 4, 2020. They were subject to no time, place or manner restrictions purporting to limit their ability to record the actions of the defendant government officials on March 4, 2020 which would have lawfully restricted them from recording from the Plaintiff's private property.

73.     Defendant Goldston engaged in nonjudicial actions which were not taken in a judicial capacity. She engaged in functions and behaviors which are not normally performed by a judge and which are wholly outside the expectations of litigants in Family Court. Defendant Goldston's personal direction of, and personal participation in, the violation of Plaintiff's First Amendment rights by stopping him from recording her and other government officials searching and seizing his home, under threat of arrest, including the actual seizure of the Plaintiff's phone, all the while taking place on the Plaintiff's private property, consisted of an executive act, rather

23

than a judicial act in nature. As a consequence, Judge Goldston does not enjoy judicial immunity for her actions taken on the property of the Plaintiff on March 4, 2020, as alleged herein in detail. *See* Mireles v. Waco, 502 U.S. 9, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991).

74.     No objectively reasonable government official or law enforcement officer would have a reason to believe that they possessed authority to forcibly stop the Plaintiff and those acting under his direction, from recording the events occurring on the Plaintiff's property on March 4, 2020. Any reasonable person would have known that Plaintiff possessed a clearly established constitutional right, both to deny the defendants entry onto his property and into his home, in the absence of a search warrant, but also to record the events which were transpiring and which actually occurred on March 4, 2020. Such a basic constitutional question of the sanctity of one's home under the Fourth Amendment, as well as the First Amendment right to record government officials trespassing on one's property and engaging in a warrantless search and seizure therein, is "beyond debate" under existing federal legal precedent. Therefore, neither Judge Goldston, nor the law enforcement officer defendants, are entitled to qualified immunity for their actions taken on the property of the Plaintiff on March 4, 2020. *See generally* Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted).[8]

75.     As a direct and proximate result of the defendants' violation of the Plaintiff's First Amendment rights, the Plaintiff was damaged, for which he is entitled to recover.

---

[8] For the reasons discussed in paragraph 60 above, Defendant Goldston cannot claim judicial immunity, but rather only qualified immunity for the constitutional violations occurring during her personal participation of a search and seizure on the Plaintiff's property.

## COUNT THREE - MONELL CLAIM AGAINST THE RCC

76.     The Raleigh County Commission, which is the political subdivision under which
the Raleigh County Sheriff's Office operates, instituted an official policy, custom, and practice of
assisting Defendant Judge Goldston with searches and seizures of the homes of litigants
appearing before her. This official policy, custom, and practice continued over the course of at
least twenty years, until such time as the Plaintiff's March 4, 2020 video was released to the
public, after which, upon information and belief, the RCC terminated the official policy, custom
and practice.

77.     The actions of the defendant employees of the Raleigh County Commission -
defendants McPeake, White and Stump - of engaging in and assisting in the search and seizure of
the Plaintiff's home on March 4, 2020, were taken in furtherance of the said official policy,
custom, and practice of assisting Defendant Judge Goldston with her search and seizure of the
homes of litigants appearing before her.

78.     As a direct and proximate result of the said policy, custom and practice, the
Plaintiff was damaged as described herein, for which he is entitled to recover.

## COUNT FOUR - 14TH AMENDMENT DUE PROCESS

79.     The U.S. Constitution, the Supreme Law of the Land, prohibits government from
depriving the plaintiffs of their life, liberty and property interests, without due process of law.
The plaintiffs and their constituents owned protected liberty interests in the right to live without
arbitrary governmental interference with his liberty and property interests. County of Sacramento
v. Lewis, 523 U.S. 833, 845 (1988). Liberty "denotes not merely freedom from bodily restraint
but also the right of the individual to contract, to engage in any of the common occupations of

life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized ... as essential to the orderly pursuit of happiness by free men." Board of Regents of State Colleges v. Roth, 408 U.S. 564, 572 (1972).

80.    Likewise, Article III, § 10 of the West Virginia Constitution provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers. In Syl. pt., Crone v. Crone, 180 W. Va. 184, 375 S.E.2d 816 (1988), the State Supreme Court stated that "[t]he due process of law guaranteed by the State and Federal Constitutions, when applied to procedure in the courts of the land, requires both notice and the right to be heard." See Crone at 185-186, 375 S.E.2d at 817-818; see also Henry v. Johnson, 192 W. Va. 82, 450 S.E.2d 779 (1994) ("Divorce and custody proceedings are subject to traditional standards of procedural and substantive due process....").

81.    "[T]here can be no doubt that at a minimum [procedural due process] require[s] that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950).  "A fair trial in a fair tribunal is a basic requirement of due process." In re Murchison, 349 U.S. 133, 136 (1955).

82.    "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property. Thus, in deciding what process constitutionally is due in various contexts, the Court repeatedly has emphasized that "procedural due process rules are shaped by the risk of error inherent in the

truth-finding process...." <u>Carey v. Piphus</u>, 435 U.S. 247, 259 (1978) (*citing* <u>Mathews v. Eldridge</u>, 424 U.S. 319, 344 (1976)).

83.    At its core, procedural due process requires "notice and an opportunity to be heard at a meaningful time and in a meaningful manner." <u>Garcia v. Fed. Nat'l Mortg. Ass'n</u>, 782 F.3d 736, 741 (6th Cir. 2015).

84.    The West Virginia Judicial Investigation Commission submitted a brief in support of discipline against Defendant Goldston, arguing that she had engaged in due process violations against the Plaintiff:

> Respondent violated Mr. Gibson's due process rights in two ways. First, she never let him present his case during the contempt hearing. She only heard from one witness - the wife - before suddenly deciding to go to the home. Mr. Gibson was not allowed to present his case. He was never given his opportunity to be heard or to present his witness. Therefore, Respondent denied Mr. Gibson his right to be heard during the hearing. Secondly, Respondent did not afford Mr. Gibson any opportunity to be heard about the search of his home until after the damage had already been done. She never told him in the courtroom why she was going to his house and once there, she patently ignored his right to object by saying it was not timely made. Accordingly, Respondent clearly violated Mr. Gibson's right to due process.

JIC Brief at 36.

85.    Defendant Goldston did not provide the Plaintiff basic due process to which he was entitled under the state contempt laws in the contempt proceedings on March 4, 2020.[9] A judge must afford parties notice and an opportunity to be heard in contempt cases. <u>PG&H Coal v. International Union, United Mine Workers of America</u>, 182 W. Va. 569,390 S.E.2d 551 (1988) (union cannot be held in civil contempt when it was not given adequate notice of contempt charges). In civil contempt proceedings that don't involve child support arrearage, the general

---

[9] *See* W. Va. Code §51-2A-9 and W. Va. Code §48-1-304 for contempt provisions applicable to Family Court in West Virginia.

rule is that the burden of proof rests with the complaining party to demonstrate that the defendant is in noncompliance with a court order. Carpenter v. Carpenter, 227 W. Va. 214, 707 S.E.2d 41 (2011). The moving party is also required to prove that the alleged contempt prejudiced his or her rights. Id. When the moving party establishes such, the burden then shifts to the nonmoving party to establish any defense he or she may have. Id. At the conclusion of the proceedings, either a final order or an interlocutory order approximating a final order in its nature and effect must be entered. See Guido v. Guido, 202 W. Va. 198, 503 S.E.2d 511 (1998) (order finding divorced father in civil contempt for not paying child support pursuant to divorce decree, but which reserved imposition of a sanction was not a final appealable order).[10]

86.    The Judicial Investigation Commission also argued in their brief to the Judicial Hearing Board that Defendant Judge Goldston improperly entered and searched the Plaintiff's home, purporting to be acting within the context of a petition for contempt, in a manner wholly absent of due process to which litigants are entitled in contempt proceedings, and in a manner wholly inconsistent with the nature of judicial proceedings generally:

> The March 4, 2020 hearing involved a contempt petition. Respondent failed to hear all of the wife's evidence. She heard none of Mr. Gibson's evidence. Respondent made no findings or conclusions. She never gave Mr. Gibson an opportunity to purge himself of the contempt. She also never entered an order granting or denying the wife's contempt petition. As the State Supreme Court has repeatedly stated and Respondent clearly recognized during the March 4, 2020 hearing, "[i]t is a paramount principle of jurisprudence that a court speaks only through its orders."

> Without an order finding Mr. Gibson in contempt, Respondent inappropriately went into his home, searched his house and seized property. As such, Respondent failed to apply an appropriate statutory remedy and violated the Code of Judicial Conduct by engaging in an improper search and seizure. Had, she applied the contempt statutes as written, Respondent would have avoided judicial discipline.

---

[10] Quoting JIC Brief at 40.

JIC Brief at 41 (citations omitted).

87.     Defendant Goldston engaged in nonjudicial actions which were not taken in a judicial capacity. She engaged in functions and behaviors which are not normally performed by a judge and which are wholly outside the expectations of litigants in Family Court. Defendant Goldston's personal direction of, and personal participation in, the violation of Plaintiff's Fourteenth Amendment rights as discussed herein in detail, consisted of an executive act, rather than a judicial act in nature. As a consequence, Judge Goldston does not enjoy judicial immunity for her actions taken on the property of the Plaintiff on March 4, 2020, as alleged herein in detail. See Mireles v. Waco, 502 U.S. 9, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991).

88.     No objectively reasonable government official or law enforcement officer would have a reason to believe that they possessed authority to engage in the events occurring on the Plaintiff's property on March 4, 2020, including the Fourteenth Amendment violations which occurred thereby and therein. Any reasonable person would have known that Plaintiff possessed a clearly established constitutional right to basic Due Process as guaranteed by the Fourteenth Amendment and as outlined herein. Such a basic constitutional question of the sanctity of one's home under the Fourth Amendment, as well as the First Amendment right to record government officials trespassing on one's property and engaging in a warrantless search and seizure therein in the absence of Due Process and Equal Protection, is "beyond debate" under existing federal legal precedent. Therefore, Judge Goldston is not entitled to qualified immunity for their actions taken on the property of the Plaintiff on March 4, 2020, nor for those violations leading up to the

search and seizure which deprived Plaintiff of his Fourteenth Amendment rights. *See generally*

Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted).[11]

## COUNT FIVE - 14TH AMENDMENT EQUAL PROTECTION

89.     The Equal Protection Clause of the Fourteenth Amendment forbids the states to

"deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. 14th

Amend. Where a plaintiff in an equal protection claim does not allege that distinctions were

made on the basis of a suspect classification such as race, nationality, gender or religion, the

claim arises under the "class of one" theory. Village of Willowbrook v. Olech, 528 U.S. 562, 564

(2000). To prevail on such a claim, the plaintiff must demonstrate: 1) the defendant treated him

differently than others similarly situated, 2) the defendant did so intentionally, and 3) there was

no rational basis for the difference in treatment. Hill v. Borough of Kutztown, 455 F.3d 225, 239

(3d. Cir. 2006). As explained above, the rational basis test is forgiving, but not without limits in

its deference. Distinctions cannot be arbitrary or irrational and pass scrutiny. "The State may not

rely on a classification whose relationship to an asserted goal is so attenuated as to render the

distinction arbitrary or irrational." City of Cleburne v. Cleburne Living Center, 473 U.S. 432,

446(1985).

90.     The West Virginia Constitution also provides a guarantee of equal protection to

West Virginians. With respect to equal protection, the State Supreme Court has stated:

> Where economic rights are concerned, we look to see whether the classification is a
> rational one based on social, economic, historic or geographic factors, whether it bears a
> reasonable relationship to a proper governmental purpose and whether all persons within
> the class are treated equally. Where such classification is rational and bears the requisite

---

[11] For the reasons discussed in paragraph 60 above, Defendant Goldston cannot claim judicial immunity, but rather only qualified immunity for the constitutional violations occurring during her personal participation of a search and seizure on the Plaintiff's property.

reasonable relationship, the statute does not violate Section 10 of Article II of the West Virginia Constitution, which is our equal protection clause.

Syl. pt. 1, State ex rel. Boan v. Richardson, 198 W. Va. 545, 482 S.E.2d 162 (1996).

91.    Defendant Goldston violated equal protection as it relates to unrepresented parties appearing before her in the 13th Family Court Circuit of West Virginia. By her own admission, as noted by the Judicial Investigation Commission in their findings, Respondent's practice of going to litigant's home is designed largely to benefit those represented by counsel. It creates two classes: represented parties who get the "benefit" of a home visit, or the negotiation leverage of being able to threaten doing so, and unrepresented parties who don't receive the same beefit and tactical advantage. Thus, Respondent violated Mr. Gibson's right to due process and equal protection. [12]

92.    Defendant Goldston admitted to personally searching the homes of litigants on numerous occasions over the course of 20 years during her time on the bench as a Family Court Judge.

93.    According to Defendant Goldston, the majority of the home visits were prompted at hearing upon an oral motion by one party's attorney without objection from the opposing attorney. After granting the motion, Respondent would meet the parties at the home.

94.    Defendant Goldston acknowledged that the sole criteria for going to a party's home was largely based on the consent of both parties and/or the loss of items of sentimental value. Concerning the lawyer's request, Respondent testified:

Q. You said the word was out after you'd done this a few times that you better be truthful or else:

---

[12] JIC Brief at 36.

**A. Well, let me rephrase that –**

Q. Okay

**A. – the lawyers – the lawyers love that I do this because it enables them to say, you know, be truthful in your disclosure because if you try to hide something, she might go out and look for it.**

Q. Doesn't that put the lawyer, the parties who are represented by lawyers at an unfair advantage because they're aware of this while the pro se litigants are not.

**A. Possibly. But again, that's only happened twice that the pro se's have been –**

Q. And how do you decide when it's appropriate to do when it's not appropriate? You say 95 percent of the cases, you don't do it. In five percent of the - or 11 cases, you've decided to do it. What are the criteria for doing it versus not doing it?

**A. Generally, it's the attorney asks me to do it, and there appears to me - and, again, it's generally agreed to that if I don't do it, the party without the asset they are awarded is not going to get it any other way.**

Q. So just by what I am hearing you say, it does put individuals with lawyers at an advantage because they know to ask while pro-se litigants do not know to ask. Would you agree with that statement?

**A. Yes, Except I'll make this caveat, the two pro se cases where I've been, one being Gibson and one being -I can't believe I can't remember that name - I don't see it – anyway, both had been represented by counsel at one time.**

Q But you would agree that if pro-se litigants came before you and knew about this, you might've been doing it more than 11 times, correctly - I mean is that correct?

**A. Maybe, but I doubt it.**

Q. So, it's only when lawyers - so the benchmark for deciding when to go and when not to go is when the lawyers ask for it?

**A. The benchmark, generally, is if the lawyers agree to go, agree that I should go-**

JIC Brief at 4-5.

95.     The stated and obvious purpose for litigants appearing in divorce actions pending in Family Court is the division of marital assets and debts, such as items of personal property which may be in the possession of either party after the date of separation.

96.     Defendant Goldston's actions of favoring litigants represented by lawyers over *pro se* litigants in her Court did not rationally relate to this end of ensuring equitable distribution of assets between the parties. Rather, her actions rationally relate to a practice of engaging in *quid pro quo* behavior or other inappropriate impartial favorable treatment between attorneys and Defendant Goldston - to the disadvantage of litigants appearing before her who were unable to afford counsel or who were otherwise acting *pro se*.

97.     Defendant Goldston and Defendant Lusk had a long-standing *quid pro quo* relationship, where Defendant Goldston allowed Defendant Lusk to exercise unfair, inappropriate and unlawful leverage over his opponents. In exchange, upon information and belief, Defendant Lusk contributed the maximum amount of money to Defendant Goldston's campaigns for reelection and otherwise supported her socially and politically so as to partially enable her to retain her position as Family Court Judge in the 13th Circuit. Upon information and belief, Defendant Goldston also shared this relationship with other local attorneys who were in her inner-circle, to the disadvantage of both *pro se* litigants, as well as litigants represented by other counsel.

98.     Defendant Goldston's favorable treatment of select attorneys, including Defendant Lusk, to the disadvantage of *pro se* litigants was arbitrary in both origin and application. She had no rational basis for such treatment. Her disparate treatment did not rationally relate to any legitimate effort at achieving an unbiased and fair equitable distribution

between divorce litigants appearing before her. Moreover, giving preferential, favorable, or special treatment to litigants who could afford to hire lawyers like Defendant Lusk, as opposed to those who could not afford to hire any lawyer, discriminates along social and economic lines. It therefore violates the Equal Protection Clause of the 14th Amendment.

99.     Defendant Goldston engaged in nonjudicial actions which were not taken in a judicial capacity. She engaged in functions and behaviors which are not normally performed by a judge and which are wholly outside the expectations of litigants in Family Court. Defendant Goldston's personal direction of, and personal participation in, the violation of Plaintiff's Fourteenth Amendment rights as discussed herein in detail, consisted of an executive act, rather than a judicial act in nature. As a consequence, Judge Goldston does not enjoy judicial immunity for her actions taken on the property of the Plaintiff on March 4, 2020, as alleged herein in detail. *See* Mireles v. Waco, 502 U.S. 9, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991).

100.    No objectively reasonable government official or law enforcement officer would have a reason to believe that they possessed authority to engage in the events occurring on the Plaintiff's property on March 4, 2020, including the Fourteenth Amendment violations which occurred thereby and therein. Any reasonable person would have known that Plaintiff possessed a clearly established constitutional right to basic Equal Protection as guaranteed by the Fourteenth Amendment and as outlined herein. Such a basic constitutional question of the sanctity of one's home under the Fourth Amendment, as well as the First Amendment right to record government officials trespassing on one's property and engaging in a warrantless search and seizure therein in the absence of Due Process and Equal Protection, is "beyond debate" under existing federal legal precedent. Therefore, Judge Goldston is not entitled to qualified

immunity for their actions taken on the property of the Plaintiff on March 4, 2020, nor for those

violations leading up to the search and seizure which deprived Plaintiff of his Fourteenth

Amendment rights. *See generally* <u>Mullenix v. Luna</u>, 136 S. Ct. 305, 308 (2015) (internal

quotation marks omitted).[13]

## COUNT SIX - CONSPIRACY WITH A STATE OFFICIAL

101.    The prior paragraphs are hereby incorporated by reference as though fully restated

herein.

102.    Defendants Lusk and Goldston engaged in a long-term practice, agreement,

relationship and understanding where Defendant Lusk possessed the ability, as well as the

perceived ability, to request that Defendant Goldston illegally visit the homes of opposing

litigants appearing before her in order to search and seize items of personal property therein.

Defendant Lusk would threaten to invoke this ability during settlement negotiations with other

attorneys and *pro se* litigants in order to gain an advantage. This relationship, understanding and

agreement was demonstrated on March 4, 2020 when Judge Goldston searched and seized, and

actually removed items of personal property, from inside the Plaintiff's home on March 4, 2020

as detailed herein. This search and seizure was performed pursuant to a private *ex parte*

agreement between Defendant Lusk and Defendant Goldston. Plaintiff's only means of stopping

Defendants Goldston and Lusk from searching his home was to pay the arbitrary and outrageous

sum of $5,000.00 to his ex-wife.

---

[13] For the reasons discussed in paragraph 60 above, Defendant Goldston cannot claim judicial immunity,
but rather only qualified immunity for the constitutional violations occurring during her personal
participation of a search and seizure on the Plaintiff's property.

107.    In exchange for Defendant Goldston's assistance to Defendant Lusk, she was provided with campaign donations, as well as political and social support from Defendant Lusk. This relationship, agreement and understanding helped secure her position as a Family Court Judge for a period of over 26 years.

108.    Defendant Lusk and Defendant Goldston engaged in an act in furtherance of the conspiracy when the defendants entered onto the Plaintiff's property on March 4, 2020, as alleged in detail herein.

109.    As a direct and proximate result of the conspiracy between defendants Lusk and Goldston, the Plaintiff suffered violations of his federally protected rights, for which he is entitled to recover.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff demands judgment against the Defendants as prayed for, including:

1.    Damages against the Defendants in an amount to be determined at trial which will fairly and reasonably compensate the Plaintiff for:

    a.    Past, present and future counseling or medical expenses;

    b.    Past, present and future pain and/or suffering;

    c.    Loss of enjoyment of life;

    d.    Psychological and emotional distress;

    e.    Any other compensatory damages to be proven at trial;

    f.    Punitive damages against the individual Defendants in an amount to be determined at trial;

g.   Reasonable attorney fees and costs under 42 U.S.C. § 1988;

h.   Any other relief that this Court deems is just and fair;

i.   All other damages provided by law;

j.   Injunctive relief requiring appropriate training, supervision and discipline in

order to remedy all constitutional deprivations which the Plaintiff suffered;

k.   Declaratory judgment relief establishing the Defendants' above-described

conduct violates the Plaintiff's clearly established constitutional rights.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

MATTHEW GIBSON,
By Counsel

/s John H. Bryan
John H. Bryan (WV Bar No. 10259)
JOHN H. BRYAN, ATTORNEY AT LAW
411 Main Street
P.O. Box 366
Union, WV 24983
(304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com