# EXHIBIT - D

Page 30

1  -- about getting a search warrant.
2  And then it became a little what I would call
3  contentious back and forth. And I went ahead
4  and called for a backup officer at that
5  point. And typically I do that as I pull
6  into a restaurant -- or a restaurant -- or a
7  residence. Can you tell it is lunch time?
8      When I pull into a residence -- I
9  should have gone out on the radio and
10 informed EOC that I was at a residence with
11 the judge.
12     Q. Which is not -- hang on. Which is
13 not something that you would do in a hearing
14 at the courthouse?
15     A. Right. Correct.
16     Q. Okay. So at some point you called
17 for other officers. And why? What is the
18 reason that you would want other police
19 officers?
20     A. There were a lot of people there.
21 And it is a smart thing to do, I think, to
22 get other officers there.
23     Q. At that point --
24     A. Anytime you have people disagreeing

Page 31

1  over certain things, you want -- you know, I
2  want EOC to know I am there. And if there is
3  somebody available, they can send a backup
4  officer.
5      Q. And who is EOC?
6      A. The emergency operations center.
7      Q. So at some point, did additional
8  officers show up?
9      A. Yes.
10     Q. And who was that that showed up?
11     A. Stump and Brian White, I believe.
12     Q. But you didn't call them right when
13 you showed up at the property? You called
14 them well into the interaction, right?
15     A. Correct. I called EOC, and EOC
16 called them. It wasn't like me calling them
17 directly.
18     Q. So you requested additional police
19 officers to be at the scene via EOC?
20     A. Correct.
21     Q. And you did that after Mr. Gibson
22 voiced objections to you and Judge Goldston
23 being on his property?
24     A. Correct.

Page 32

1      Q. In fact, you did that after you
2  seized Mr. Gibson's cell phone?
3      A. I didn't seize Mr. Gibson's cell
4  phone.
5      Q. All right. Well, let's talk about
6  that. At some point, did you come into
7  possession of Mr. Gibson's cell phone?
8      A. I did.
9      Q. Well, how did Mr. Gibson's cell
10 phone get into your possession?
11     A. He handed it to me, and I stuck it
12 in my shirt pocket.
13     Q. And why did Mr. Gibson hand you
14 Mr. Gibson's cell phone?
15     A. The judge told him that it was
16 against the law to record a court hearing,
17 and we were in the middle of a court hearing.
18     Q. And when this took place, as you
19 say in the middle of a court hearing,
20 physically where were you standing at that
21 time?
22     A. On the gazebo, as I recall.
23     Q. And where was the gazebo located?
24     A. In the front yard of his home.

Page 33

1      Q. So you were standing in the front
2  yard of Mr. Gibson's home at the time that
3  his cell phone was handed to you?
4      A. Correct.
5      Q. And Mr. Gibson handed you his cell
6  phone because the judge ordered him to,
7  right?
8      A. Correct.
9      Q. And the judge ordered him to
10 because Mr. Gibson had been attempting to
11 record what was happening, right?
12     A. Correct.
13     Q. And he was told by the judge that
14 he could not record what was happening --
15     A. Yes.
16     Q. -- right?
17     And so he had to give over his cell
18 phone to you?
19     A. Yes.
20     Q. He had to stop recording?
21     A. Yes.
22     Q. Even though he was standing on his
23 own property?
24     A. Yes.