# EXHIBIT - E

Page 29

1 that because that's how we conducted all of our
2 hearings.
3       So, yes, the first thing I'd have done is
4 take all the cellphones and make sure nobody was
5 recording before anyone ever even got out of their
6 vehicle.
7    Q. In which case, even the Supreme Court,
8 nobody would be able to look at any sort of
9 recording, any sort of video footage, in order to
10 see what happened that day and what didn't happen.
11    A. I guess if there's no recording, no one
12 could look at a recording. I mean, if they didn't
13 record, they couldn't look at the recording that
14 wasn't recorded.
15    Q. And that's how you would've done it?
16    A. Correct. Yes, sir.
17    Q. And that's how you did it in the past as
18 bailiff for Judge Goldston?
19    A. That's how I did it in every single hearing
20 I've ever been in with Judge Goldston and every
21 Family Court judge.
22    Q. So all those prior visits to the homes of
23 litigants that you went with Judge Goldston to,
24 there are -- there's no recordings that anyone

Page 30

1 could look at, including disciplinary authorities
2 or the Supreme Court or whomever, to see what
3 happened or what did not happen?
4       MR. ROBINSON: Object to the form.
5 Also, lacks the proper foundation as you have not
6 asked him whether or not anybody ever tried to
7 record other hearings.
8       You understand why I'm objecting your
9 form? I'm not understanding what your questions --
10       MR. BRYAN: I understand. You're
11 keeping me -- you're keeping me logical here.
12       MR. ROBINSON: Okay.
13       MR. BRYAN: Let me back it up.
14       MR. ROBINSON: Can you understand me
15 with that mask on?
16       COURT REPORTER: Sure.
17       MR. ROBINSON: Okay. Just wanted to
18 make sure.
19 BY MR. BRYAN:
20    Q. During the -- during the time period in
21 which you served with -- for Judge Goldston --
22    A. Yes, sir.
23    Q. -- during these home visits that you've
24 testified about, there were no recordings

Page 31

1 documenting what happened during those home visits.
2    A. To my knowledge, there was no recordings.
3    Q. And, in fact, it was your -- your policy,
4 your practice, to make sure that there were no
5 recordings.
6    A. It was not my policy. It was the Family
7 Court rules policy and Judge Staton informed me of
8 that Day 1 -- I'm sorry -- forgive me. Judge
9 Goldston --
10       MS. GOLDSTON: You used to be right.
11    A. -- informed me, you know, that was Bailiff
12 101. So it wasn't my policy. It was the Family
13 Court's policy. So, therefore, it was their
14 policy. I was going to enforce whatever policy any
15 of my judges told me. No questions asked.
16    Q. But the Family Court's policy is that the
17 hearings are recorded.
18    A. Correct. By the judge and the judge only.
19    Q. Okay. And you knew that these other
20 visits, that the judge was not recording them?
21    A. I didn't physically see her recording them
22 but I never asked her, "Hey, are you recording this
23 hearing?" Because I would never question a judge.
24    Q. Did you -- did you ever -- well, let me ask

Page 32

1 you first: During the period of time in which you
2 served as a bailiff for Judge Goldston, did you
3 have a supervisor or were you basically your own
4 supervisor?
5    A. I was usually the second in charge but,
6 yeah, I usually had a supervisor.
7    Q. Who was that?
8    A. Let's see. Skee Barley. Jimmy Miller.
9    Q. Well, rather than going through them --
10    A. I mean, I just -- I've had so many
11 different --
12    Q. Hang on. Rather than going through all
13 those, do you recall ever having any conversations
14 with any of your supervisors about what you should
15 or shouldn't do on these home visits with the
16 judge?
17    A. No. It was none of their business what I
18 was doing. If the judge told me to do it, I was
19 doing it. I didn't care. I mean, if they told me
20 not to do it, I'd have done it anyway if the judge
21 directed me to, and she knows that and all my other
22 judges know that. I work for the judge.
23    Q. So what do you recall of that, as far as
24 your own personal involvement, on March 4th, 2020?



Page 33

1   A.  Is that the date of the hearing?

2   Q.  Yes.

3   A.  I was road patrol supervisor and I usually

4  do not get dispatched to 911 calls.  Usually,

5  whoever is working with me that day gets dispatched

6  and I just kind of organize them going to calls.

7       So I don't think I was dispatched but

8  either one of my guys was dispatched or I was

9  dispatched to assist on a -- from a Family Court

10  judge.  So the 911 dispatcher come over the radio

11  and said that the officer wanted some backup, so I

12  went.  I keyed up the radio and I think -- and

13  Corporal White keyed up the radio and said we was

14  on our way, and I think I was the closest one so I

15  beat everybody there.

16       But I was going to back up the officer.  At

17  the time, I had no clue it was Judge Goldston until

18  I arrived on scene.

19   Q.  And when you arrived on scene, what did you

20  observe?

21   A.  Numerous people in the road, numerous

22  people in the driveway, and as soon as I got on the

23  scene I knew that I was going to clear the crowd

24  out.  So I walked in and, as soon as I walked in,

Page 34

1  Mr. Gibson approached me and I was just -- "Hey,

2  hold on."

3       And he was just complaining that they were

4  there -- that everyone was there.  So I went

5  directly to Judge Goldston and I said, "I don't

6  feel comfortable with the environment and

7  everyone's here.  I'm going to start clearing out

8  people and make everyone leave."

9       And she goes, "I didn't even think about

10  that.  I'm sorry."

11       And I was like, "Well, I'm going to do

12  that."

13       So I went outside and had everyone leave,

14  and then I went back inside and stood beside the

15  judge for the rest of the time.

16   Q.  So when you first got there, you went

17  straight in the house?

18   A.  Yes.  Well, I mean, I looked at everyone

19  and, you know, made sure nobody was armed or

20  anything like that, nothing obvious, and then I

21  walked into the garage and I think Mrs. Gibson had

22  the chainsaw in her hand, and she was making a trip

23  down to her family, down to their vehicle.  Her

24  brother was there, meeting him halfway to get the

Page 35

1  chainsaw.

2       And then I walked on in to another little

3  foyer and that's where Mr. Gibson approached me and

4  I seen the judge and Officer McPeake and Kyle Lusk.

5   Q.  At what point did you understand what was

6  going on there?

7   A.  When I went in and spoke to Judge Goldston.

8   Q.  As far as getting called there, there was

9  no 911 call by anybody, right?

10   A.  911 call?  I don't understand.

11   Q.  Nobody had called 911 asking for police to

12  arrive at that residence.

13   A.  I have no idea whether Officer McPeake

14  called 911 or whether he -- I know he -- he had to

15  have called 911.  Yes.  Officer McPeake called 911

16  because I remember him stating that he couldn't

17  figure out how to switch his radio, the band, from

18  the bailiff band to the 911 frequency.

19       So, yes, I'm sure Officer McPeake called

20  911.

21   Q.  Do you recall what he communicated?

22   A.  No.  I didn't speak to him about it.  It

23  was just dispatched that an officer needed backup

24  on a Family Court hearing, so that's what I --

Page 36

1  that's what I responded to.

2   Q.  Okay.  So you don't recall any more

3  information other than that?

4   A.  There could've been.  No.  I mean, when you

5  hear the words "officer needs backup", you don't

6  really -- you go, no matter what.  So, I mean, if

7  there was more info, I didn't really listen.  I

8  just turned the blue lights on and went.

9   Q.  So at the time that you arrived, you didn't

10  -- you didn't hear any allegations or receive any

11  allegations that any individual had committed any

12  criminal act?

13   A.  No.

14   Q.  All you -- all you knew was that another

15  police officer had asked for backup?

16   A.  Correct.

17   Q.  At a Family Court hearing.

18   A.  Correct.

19   Q.  And when you arrived there, you saw people

20  outside the house.

21   A.  Correct.  I was familiar with everyone

22  there.

23   Q.  You were familiar?

24   A.  Yeah.  Yes, sir.

