# EXHIBIT - H

IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2021 Term

**FILED**
**November 18, 2021**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 20-0742

IN THE MATTER OF:

THE HONORABLE LOUISE E. GOLDSTON,
JUDGE OF THE THIRTEENTH
FAMILY COURT CIRCUIT

JUDICIAL DISCIPLINARY PROCEEDING
No. 30-2020
No. 33-2020

PUBLIC CENSURE AND FINE

Submitted: September 15, 2021
Filed: November 18, 2021

Teresa A. Tarr, Esq.
Brian J. Lanham, Esq.
Judicial Disciplinary Counsel
Charleston, West Virginia
Attorneys for West Virginia Judicial
Investigation Commission

Andrew S. Nason, Esq.
Pepper & Nason
Charleston, West Virginia
Attorney for Respondent Goldston

Susan Shelton Perry, Esq.
Logan, West Virginia
Attorney for Amicus Curiae, Family
Judicial Association

JUSTICE ARMSTEAD delivered the Opinion of the Court.

JUSTICE WOOTON dissents and reserves the right to file a separate Opinion.

JUSTICE HUTCHISON deeming himself disqualified, did not participate in the decision of this case.

JUDGE JENNIFER P. DENT, sitting by temporary assignment.

### SYLLABUS BY THE COURT

1.    "The purpose of judicial disciplinary proceedings is the preservation and enhancement of public confidence in the honor, integrity, dignity, and efficiency of the members of the judiciary and the system of justice." Syl. Pt. 1, in part, *In re Cruickshanks*, 220 W. Va. 513, 648 S.E.2d 19 (2007).

2.    The West Virginia Constitution forbids a judicial officer to participate in a search because a search is an exercise of executive power.    W. Va. Const. art. 5, § 1.

3.    "Under [Rule 4.5 of the West Virginia Rules of Disciplinary Procedure], the allegations of a complaint in a judicial disciplinary proceeding must be proved by clear and convincing evidence." Syl. Pt. 2, in part, *Matter of Ferguson*, 242 W. Va. 691, 841 S.E.2d 887 (2020) (internal quotation marks omitted).

4.    "Stipulations or agreements made in open court by the parties in the trial of a case and acted upon are binding and a judgment founded thereon will not be reversed." Syl. Pt. 3, in part, *Matter of Starcher*, 202 W. Va. 55, 501 S.E.2d 772 (1998).

5.    "In a disciplinary proceeding against a judge, in which the burden of proof is by clear and convincing evidence, where the parties enter into stipulations of fact, the facts so stipulated will be considered to have been proven as if the party bearing the burden of proof has produced clear and convincing evidence to prove the facts so stipulated." Syl. Pt. 4, *Matter of Starcher*, 202 W. Va. 55, 501 S.E.2d 772 (1998).

6.    In determining what sanction or sanctions, if any, to impose under Rule 4.12 of the West Virginia Rules of Judicial Disciplinary Procedure [eff. 2019], this

i

Court will consider various factors, including, but not limited to, (1) whether the charges of misconduct are directly related to the administration of justice or the public's perception of the administration of justice, (2) whether the circumstances underlying the charges of misconduct are entirely personal in nature or whether they relate to the judicial officer's public persona, (3) whether the charges of misconduct involve violence or a callous disregard for our system of justice, (4) whether the judicial officer has been criminally indicted, and (5) any mitigating or compounding factors which might exist.

**Armstead, Justice:**

In this judicial disciplinary proceeding, a family court judge searched a self-represented party's home for marital property. When the homeowner protested, the judge responded to the homeowner's resistance by threatening to jail him for contempt. This interaction was recorded, and the recording soon appeared on the internet.

The judge was reported to the West Virginia Judicial Investigation Commission, and after investigation, the Judicial Investigation Commission charged the judge with violating the West Virginia Code of Judicial Conduct ("Code of Judicial Conduct"). The judge professed remorse and entered into a settlement agreement with Judicial Disciplinary Counsel. Under the agreement, the judge admitted to both the conduct in question and to the fact that it violated the Code of Judicial Conduct; both parties agreed to recommend that the judge be censured and fined $5,000. The Judicial Hearing Board, however, rejected the parties' recommendation. The Hearing Board recommended that the judge be *admonished* and fined $1,000, and—believing that a judge's "inherent authority" to conduct "judicial views" is "uncertain"—requested guidance from this Court.

Both Judicial Disciplinary Counsel and the judge object to the Judicial Hearing Board's recommendation. Seizing on the Judicial Hearing Board's uncertainty about "judicial views," the judge now attempts to persuade us that her search of the residence was lawful—even as she professes to remain bound by the settlement agreement.

1

After considering the record and the parties' written[1] and oral arguments, we reject the judge's attempt to reframe her conduct.  We find that she led a *search* of the homeowner's residence, not a "judicial view," and that, in so doing, she exercised executive powers forbidden to her under the West Virginia Constitution.  We find, further, that the judge compounded her error by the manner in which she conducted the search.  Accordingly, we disagree with the Judicial Hearing Board and publicly censure the judge for her serious misconduct.  In addition, we order the judge to pay a total fine of $1,000.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Honorable Louise E. Goldston is a family court judge who presides in Raleigh, Summers, and Wyoming Counties.  She has served since 1994,[2] and until now, she has never been disciplined for judicial misconduct.

Judge Goldston admits that she had a 20-year practice of going to parties' homes "to either determine if certain disputed marital property was present and/or to supervise the transfer of disputed property."  In almost every instance, these searches were requested by counsel and were performed without objection.  In most cases, the search followed counsel's request immediately, indeed while the hearing was taking place.

---

[1] We acknowledge the contribution of the Family Judicial Association, which filed a brief in this case as amicus curiae.  We value the Family Judicial Association's participation and have considered the Family Judicial Association's brief in conjunction with the parties' arguments.

[2] Judge Goldston began her career as a "family law master."  In 2001, the Legislature made several changes to the law governing family court proceedings, including changing the title of "family law master" to "family court judge."  W. Va. Code § 51-2A-23(c) (2001).

The search that led to this disciplinary matter happened on March 4, 2020, in the context of a contempt hearing. One of the parties, an ex-wife, claimed that her former husband had damaged items of property and had refused to turn over other items of sentimental value that she was entitled to receive.

For this proceeding the ex-wife was represented by counsel. The ex-husband was not represented by counsel. During the ex-wife's testimony, Judge Goldston asked the ex-husband for his address. Upon learning his address, Judge Goldston stopped the hearing, *sua sponte*, and ordered the parties to meet her in ten minutes at the ex-husband's house. Judge Goldston admits that she failed to tell the ex-husband why the parties were going to his home and that she gave the ex-husband no opportunity to object.

Judge Goldston's intent became clear, however, when everyone arrived at the residence. The ex-husband voiced his objections, requesting that Judge Goldston recuse herself because she had placed herself in a "witness capacity." Judge Goldston denied his request as not timely filed.

After the ex-husband stated that he needed a search warrant to allow Judge Goldston to enter his house, Judge Goldston told the ex-husband that he was either going to let her in the house or her bailiff, who had accompanied her to the house, was going to arrest the ex-husband. Judge Goldston also asked the ex-husband if he was recording her attempt to enter his home and when he confirmed that he was, she directed that he stop recording and told him (and apparently his girlfriend who was also attempting to record their conversation) to turn off their phones. Judge Goldston also indicated that if they did

3

not turn off their phones and stop recording she would take the ex-husband, or perhaps both he and his girlfriend, to jail. Although the conversation between Judge Goldston and the ex-husband was not transcribed, the recording of the conversation appears to include Judge Goldston stating: "I am the judge *trying to effect equitable distribution*. We're having a hearing. Now, you let me in that house or he [the bailiff] is going to arrest you for being in direct contempt of court."

Faced with these threats, the ex-husband relented, and Judge Goldston agrees that the ex-husband felt he had no choice to do otherwise. Judge Goldston brought with her into the house the bailiff, the ex-wife, and the ex-wife's attorney and personally supervised the search for and recovery of items. Several items were located and recovered, including photographs, yearbooks, DVDs, recipes, and a chainsaw. While the home was being searched, a dispute emerged about an umbrella stand. After a brief colloquy with the ex-husband, the judge awarded the stand to the ex-wife, who removed it from the home with the other items.

Judge Goldston, herself, made no arrangement to record what went on inside the home (or outside the home). Indeed, when she found out afterward that her bailiff had made his own cell-phone recording of the search inside the home, she believed that making the recording was improper and told him not to do it again.

After the search, the parties reconvened in the courtroom. On the record, Judge Goldston listed the items that had been recovered and some items that remained to

be exchanged. However, no written order was entered regarding either the search of the home or the items recovered.

Though Judge Goldston may have stopped the ex-husband (and a bystander) from recording what went on outside the home, she did not order the recordings destroyed. Audio and video footage of what took place was uploaded to the internet. Some online comments were deeply critical of the judge and her conduct.

Judicial Disciplinary Counsel became aware of these matters, and on March 11, 2020, Judicial Disciplinary Counsel filed a complaint with the Judicial Investigation Commission.[3] Judge Goldston responded to the complaint on March 18, 2020. In her letter, she explained that, during the March 4, 2020 hearing, the ex-wife showed that the ex-husband had left the ex-wife's property outside in the rain, causing it to be damaged, and, further, that the ex-husband admitted that certain items awarded to the ex-wife remained in the house. Judge Goldston went on to explain that

> [a]t that point, because of the alleged damage to the other items, I felt it imperative *to secure those remaining items* before they were either damaged or ruined. It was at that time that I informed the parties we would meet at the residence *to effectuate the return of the remaining items*. The situation was volatile[,] and I didn't want either party to decide between themselves or *place the burden on a Law Enforcement Officer* of determining what was the [ex-wife]'s and what was not.

(Emphasis added.)

---

[3] Judicial Disciplinary Counsel's filing was designated Complaint No. 30-2020. A week later, the ex-husband filed a second complaint regarding the same incident and regarding other incidents that are not relevant to the matter before the Court. This filing was designated Complaint No. 33-2020.

On July 22, 2020, Judge Goldston provided a sworn statement to Judicial Disciplinary Counsel. In her statement, Judge Goldston likened the search to a "jury view," explaining that she was both "judge and jury," yet she claimed that she "never took any testimony." Though she agreed that such proceedings were a "continuation" of the court matter and should have been recorded, she admitted that she had not done so and that her failure to record these searches had "always been a concern[.]" She also agreed that in "some cases, probably" she was "enforcing an order, a contempt order[.]" Nevertheless, she could not remember a single time when she had found someone in contempt before she went to the home "because [she] wasn't sure if they were in contempt." Ultimately, her guiding rationale seems to have been that going to a party's home, searching for items of personal property, and seizing them was "necessary to preserve the marital assets" from destruction, particularly irreplaceable items of "sentimental" value. "I guess it comes down to me thinking if we don't go, they're not going to get it back." With respect to the March 4, 2020 search, she explained:

> And so what made me do it was I just thought, well, if we go now and *get the stuff*, he admits that is there, then that— those assets are preserved. She can't claim he ruined them. He can't claim she ruined them, and I guess judicial economy was that was the easiest and quickest way to get *to retrieve those assets*.

(Emphasis added.)

Judge Goldston agreed that the task of enforcing her orders is an "executive branch" function, and she knew that she could dispatch law enforcement to search for and

seize property that a party retained in violation of her order. She simply believed that this method was ineffective:

> I have been told by every sheriff that I've worked with over the 26 years that that's not something they do [i.e., sending law enforcement, or a party accompanied by law enforcement, to look for property], that they're not going for more than 15 minutes to anything, to do anything.

In this particular instance, she explained, "I knew that law enforcement wouldn't know what to do with the [umbrella] stand. I just—wrongly or rightly, I thought it was important for me to be there and make sure that stuff was safely gathered and not damaged."

On September 18, 2020, the Judicial Investigation Commission issued a formal statement of charges. The statement of charges described Judge Goldston's longstanding "practice of visiting homes of litigants" and the events that occurred on March 4, 2020. Significantly, the statement of charges alleged that Judge Goldston "could provide no statute, rule, or case that gave her the authority to conduct home visits"; "acknowledged that there was nothing in the contempt powers that gave her the authority to conduct a home visit"; and "confessed that she never held anyone in contempt prior to going to the home[.]" The statement of charges further alleged that Judge Goldston "confessed . . . that she failed to enter any order subsequent to the visit reflecting what had happened at the residence"; "admitted that she never had any clear or written procedures for conducting a home visit"; and "acknowledged that she never took a court reporter to the scene." Finally, the statement of charges alleged Judge Goldston "agreed that the practice could make her a potential witness to a future proceeding which could then result in her disqualification";

and "admitted to improperly putting herself in the role of litigant [i.e., a litigant who had the burden of proof in a contempt proceeding]."

On September 30, 2020, Judge Goldston signed an agreement with Judicial Disciplinary Counsel. Pursuant to the agreement, she admitted the allegations of fact set forth in the formal statement of charges. She further admitted that, by engaging in such conduct, she had violated the following Rules of the Code of Judicial Conduct:

(a) Rule 1.1, which states that "[a] judge shall comply with the law, including the West Virginia Code of Judicial Conduct";

(b) Rule 1.2, which states that "[a] judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety";

(c) Rule 1.3, which states that "[a] judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so";

(d) Rule 2.2, which states that "[a] judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially";

(e) Rule 2.4(A), which states that "[a] judge shall not be swayed by public clamor or fear of criticism";

(f) Rule 2.4(B), which states that "[a] judge shall not permit family, social, political, financial, or other interests or relationships to influence the judge's judicial conduct or judgment"; and

8

(g) <u>Rule 2.5</u>, which states that "[a] judge shall perform judicial and administrative duties, competently and diligently . . . [and] shall cooperate with other judges and court officials in the administration of court business."

In addition, Judge Goldston agreed to join Judicial Disciplinary Counsel's recommendation that she be censured and fined $5,000.[4]  Both sides agreed, however, that "the decision to accept the recommendation concerning discipline rests solely within the purview of the Judicial Hearing Board and the State Supreme Court."

Judge Goldston appeared before the Judicial Hearing Board on January 15, 2021, and ratified the agreement under oath.  One Judicial Hearing Board member,[5] however, expressed doubt about the charges, suggesting that a power to conduct "views" falls within the family court's inherent powers or its express statutory authority to seize

---

[4] The agreement also required Judge Goldston to pay costs resulting from the investigation and prosecution of the complaints against her, but the agreement further stipulated that Judicial Disciplinary Counsel and the Judicial Investigation Commission had not incurred any costs.

[5] In its brief to this Court, Judicial Disciplinary Counsel contends that the member's comments and subsequent actions "are an extreme example of bias" and that the member should have disqualified himself from this matter.  The Judicial Hearing Board member, however, is not presently before this Court; therefore, we decline to address this argument.

9

property[6] and supervise the production of evidence.[7] Judicial Disciplinary Counsel responded that the question was "whether [Judge Goldston] followed an appropriate procedure or not." Judge Goldston's counsel appeared to agree, stating, "[T]he procedures and the due process is the problem that she is admitting to."

The Judicial Hearing Board requested post-hearing briefs, which were filed, and on March 15, 2021, the Judicial Hearing Board issued its recommended decision. The Judicial Hearing Board adopted the parties' stipulations but chose to recommend that Judge Goldston "be admonished and fined $1,000 as an appropriate sanction for her stipulated violations of the Code of Judicial Conduct." In support of this recommendation, the Judicial Hearing Board invoked Judge Goldston's "unblemished disciplinary record and cooperation[,]" and "the absence of any aggravating factors" and the "extensive record" Judge Goldston made "after the incident as to what had occurred at the complainant's residence."[8] The Judicial Hearing Board further cited the fact that another judge, in an

---

[6] *See* W. Va. Code § 51-2A-9(b) (eff. 2012) ("A family court judge may enforce compliance with his or her lawful orders with remedial or coercive sanctions designed to compensate a complainant for losses sustained and to coerce obedience for the benefit of the complainant. . . . Sanctions may include, but are not limited to, seizure or impoundment of property to secure compliance with a prior order.").

[7] *See* W. Va. Code § 51-2A-7(a) (eff. 2013) ("[T]he family court judge has the authority to . . . (4) Compel and supervise the production of evidence . . . .").

[8] Because no written order was entered regarding the search, we assume that the Hearing Board is referring to what Judge Goldston put on the record when the parties returned to the courtroom.

unrelated disciplinary action,[9] had been admonished for accompanying law enforcement to a litigant's residence to execute a warrant of seizure, but acknowledged the uncertainty regarding "the scope of a judicial officer's inherent authority relative to judicial views[,]" and the need for "guidance to judicial officers from the Supreme Court of Appeals through rule-making or otherwise regarding the proper scope of conducting judicial views[.]"

Both Judicial Disciplinary Counsel and Judge Goldston filed objections to the Judicial Hearing Board's recommended decision.  Despite her admissions under oath, Judge Goldston now argues that "[i]t is inexplicable . . . how she could be fined or sanctioned for violating ethical canons when the Hearing Board itself found that the law is unclear regarding [her] inherent authority to conduct a judicial view."  Nevertheless, she claims that she "is not seeking to abrogate her agreement."

## II. STANDARD OF REVIEW

The standard of review in this matter flows from our "inherent rule-making power" to "promulgate and amend rules prescribing a judicial code of ethics" and "to censure or temporarily suspend any justice, judge[,] or magistrate having the judicial power of the state . . . for any violation of any such code of ethics[.]"  W. Va. Const. art. VIII, § 8.[10]  This power to sanction is "exclusive."  Syl. Pt. 5, in part, *State ex rel. Workman v. Carmichael*, 241 W. Va. 105, 819 S.E.2d 251 (2018).  Therefore, our review is "plenary"

---

[9] *See In the Matter of Aboulhosn*, JIC Complaint No. 91-2013.

[10] Family court judges were created and placed under our "general supervisory control" in 2000.  W. Va. Const. art. VIII, § 16.

11

and "independent." *Matter of Starcher*, 202 W. Va. 55, 60, 501 S.E.2d 772, 777 (1998). The standard of proof is clear and convincing evidence. Syl. Pt. 2, *Matter of Ferguson*, 242 W. Va. 691, 841 S.E.2d 887 (2020).

Our constitutional power to sanction necessarily includes the power to select the particular form of lawful discipline that we will impose. Accordingly, we have "the right to accept or reject the disciplinary sanction recommended by the [Judicial Hearing] Board." *Matter of Crislip*, 182 W. Va. 637, 638, 391 S.E.2d 84, 85 (1990). In all such cases, our goal and "[t]he purpose of judicial disciplinary proceedings is the preservation and enhancement of public confidence in the honor, integrity, dignity, and efficiency of the members of the judiciary and the system of justice." Syl. Pt. 1, in part, *In re Cruickshanks*, 220 W. Va. 513, 648 S.E.2d 19 (2007).

With these principles in mind, we will consider Judge Goldston's alleged violations of the Code of Judicial Conduct and what discipline, if any, is appropriate.

## III. ANALYSIS

Judicial Disciplinary Counsel argues that Judge Goldston is bound by the findings of fact and conclusions of law set forth in her agreement, namely that Judge Goldston's "view" of the home was unlawful, unconstitutional, and unethical; and that the Court should impose the censure and fine that the parties agreed to recommend.

For her part, Judge Goldston agrees that she remains bound by her prior statements of fact, yet she contends that "what constitutes a violation, and the effect of a violation, w[ere] always to be reviewed by the [Judicial Hearing Board] and this Court."

Accordingly, she contends that the parties remain free to "argue questions of law[.]"  She denies that the Judicial Investigation Commission ever charged her with, or that she has ever confessed to, any constitutional violations.   On the contrary, she contends that "[s]ubsequent research . . . revealed a body of law that supports" her actions.  In particular, she claims that she had "inherent authority to conduct an onsite visit" and that "view[ing] the division of property" allowed the ex-husband to "purge his contempt."  She contends that, "[u]nlike the execution of a search warrant, the view was conducted with judicial oversight.  Therefore, it was not *per se* unreasonable."  Ultimately, Judge Goldston believes that her conduct was lawful and that, if she is mistaken, her mistake was error, not an ethical violation.  She urges the Court to "clarify the law and either affirm the ruling of the [Judicial Hearing Board] or as the final arbiter conclude that there [wa]s no wrongdoing[.]"

## A. Judge Goldston Searched the Ex-Husband's Home.

We begin with a threshold question:  Did Judge Goldston view the ex-husband's home, or did she search it?  We find that she searched it.  A "view" is "the act or proceeding by which a tribunal goes to *observe* an object that *cannot be produced in court because it is immovable or inconvenient to remove*."  *View*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added); *accord Barron v. United States*, 818 A.2d 987, 990 (D.C. 2003) ("A jury view is proper when 'an object in question cannot be produced in court because it is immovable or inconvenient' and, therefore, it is necessary for the fact-finder 'to go to the object in its place and there observe it.'  *Dailey v. District of Columbia*, 554 A.2d 339, 340–41 (D.C.1989) (quoting IV WIGMORE ON EVIDENCE

13

§ 1162 at 362 (1972 & 1988 Supp.)).”); *State v. Pauline*, 100 Haw. 356, 374, 60 P.3d 306, 324 (2002) *overruled on other grounds as stated in State v. Abdon*, 134 Haw. 114, 334 P.3d 777 (Ct. App. 2014), *as corrected* (Oct. 27, 2014), *aff'd*, 137 Haw. 19, 364 P.3d 917 (2016) (“The very definition of a view favors treating it as evidence. *Black's Law Dictionary* defines a 'view' as 'the act or proceeding by which [a] tribunal goes to an object which cannot be produced in court because it is immovable or inconvenient to remove, and there observes it.' *Black's Law Dictionary* 1568 (6th ed.1990).”); § 219. *Views*, 2 McCORMICK ON EVID. § 219 (8th ed.) (“Courts have sensibly recognized that if a thing cannot be brought to the observer, the observer must go to the thing. Venturing forth to observe places or objects that are material to litigation but which cannot feasibly be brought, or satisfactorily reproduced, within the courtroom, is termed a 'view.'”); *see, e.g., State v. Thomas*, 179 W. Va. 811, 374 S.E.2d 719 (1988) (view of parking lot); *Bennett v. Walton*, 170 W. Va. 283, 294 S.E.2d 85 (1982) (view of roadway); *State Rd. Comm'n v. Bowling*, 152 W. Va. 688, 166 S.E.2d 119 (1969) (view of land acquired for highway); *Moore, Kelly & Reddish, Inc. v. Shannondale, Inc.*, 152 W. Va. 549, 165 S.E.2d 113 (1968) (view of swimming pool).

   We agree that the ex-husband's home was “immovable” and certainly “inconvenient” to produce in court. *View*, BLACK'S LAW DICTIONARY (11th ed. 2019). However, Judge Goldston did not go to the property to *observe* the ex-husband's house; she went there to locate and seize certain of its contents—pictures, DVDs, and other items of personal property. These items of personal property were not “immovable or

14

inconvenient to remove" from the home. *Ibid.* In fact, the ex-wife removed many of these items during the so-called "view." Accordingly, we find that Judge Goldston's actions at the residence were not a view. [11]

On the contrary, the record is clear that Judge Goldston went to the property to *locate* things, not simply to observe them. Her own words support this conclusion. When the ex-husband demanded a list of what she was seeking, she appeared to reply, "[y]ou have a list of everything [unintelligible] attached to the order." When the ex-husband professed not to "know where some of it's at[,]" she replied, "Well, *we're gonna find it.*" (Emphasis added.)

Looking for things is a "search" by any sensible definition of the term. As the United States Supreme Court stated in *Terry v. Ohio*, 392 U.S. 1, 16 (1968), "it is nothing less than sheer torture of the English language to suggest that a careful *exploration* of the outer surfaces of a person's clothing all over his or her body *in an attempt to find* weapons is not a 'search'" (emphasis added). *Accord Kyllo v. United States*, 533 U.S. 27, 32 n.1 (2001) ("When the Fourth Amendment was adopted, as now, to 'search' meant '[t]o look over or through for the purpose of finding something; to explore; to examine by inspection; as, to *search* the house for a book; to *search* the wood for a thief.' N. Webster,

---

[11] Because we find that Judge Goldston's conduct at the residence was a search, not a view, we refuse to decide whether a family court judge, or other judicial officer, has the inherent or other authority to conduct a true view under different circumstances. We are not in the business of "making advisory decrees or resolving academic disputes." Syl. Pt. 1, in part, *State ex. rel. Perdue v. McCuskey*, 242 W. Va. 474, 836 S.E.2d 441 (2019) (quoting Syl. Pt. 2, in part, *Harshbarger v. Gainer*, 184 W. Va. 656, 403 S.E.2d 399 (1991)).

An American Dictionary of the English Language 66 (1828) (reprint 6th ed.1989)."); *Doe v. Heck*, 327 F.3d 492, 510 (7th Cir. 2003), *as amended on denial of reh'g* (May 15, 2003) ("[T]he defendants went to the school *for the specific purpose of gathering information*, an activity that most certainly constitutes a search under the Fourth Amendment." (emphasis added)); *§ 2.1(a) Definition of "searches" and "seizures,"* 1 SEARCH & SEIZURE § 2.1(a) (6th ed.) ("Under the traditional approach, the term 'search' is said to imply 'some exploratory investigation, or an invasion and quest, a looking for or seeking out.'" (quoting C.J.S., *Searches and Seizures* § 1 (1952)).

Searches are an activity of the executive department. *State ex rel. Parma Cmty. Gen. Hosp. v. O'Donnell*, 2013-Ohio-2923, ¶ 7 (stating that "searches are executive in nature."). "Indeed, searches are so quintessentially executive in nature that even a judge who participates in one acts 'not * * * as a judicial officer, but as an adjunct law enforcement officer.'" *State ex rel. Hensley v. Nowak*, 52 Ohio St. 3d 98, 99, 556 N.E.2d 171, 173 (1990) (per curiam) (quoting *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 327 (1979)) (holding that a writ of prohibition would not issue to restrain administrative searches because they are neither judicial nor quasi-judicial acts).

To say that searches are an executive activity is to announce no new principle of law. The United States Supreme Court assumed as much in 1979 when it rejected a conviction resulting from a search led by a town justice. According to the Supreme Court, the town justice in question "allowed himself to become a member, if not the leader, of the search party *which was essentially a police operation*." *Lo-Ji Sales, Inc.* at 327 (emphasis

16

added). The Supreme Court found that, in doing so, the town justice "*was not acting as a judicial officer* but as an adjunct law enforcement officer[,]" *ibid.*, and that "[i]t [wa]s difficult to discern when he was acting as a 'neutral and detached' judicial officer and when he was one with the police and prosecutors *in the executive seizure*," *id.* at 328 (emphasis added). Other courts, often following *Lo-Ji Sales*, routinely assume that searching is a law enforcement activity. *United States v. Barnes*, 895 F.3d 1194, 1202 (9th Cir. 2018) (noting that "*Lo-Ji Sales* was an extreme case where the judicial officer allowed himself to become a member, if not the leader, of the search party which was essentially a police operation." (internal quotation marks removed)); *United States v. Clyburn*, 806 F. Supp. 1247, 1252 (D.S.C. 1992), *aff'd*, 24 F.3d 613 (4th Cir. 1994) (noting that, "[i]n *Lo Ji Sales,* the Court held that the judge who issued the warrant did not manifest that neutrality and detachment demanded of a judicial officer because the judge took an active law enforcement type role in conducting the search" (internal quotation marks removed)).

Under our system of government, judges may not exercise executive powers. The West Virginia Constitution declares that "[t]he legislative, executive and judicial departments *shall be separate and distinct*[.]" W. Va. Const. art. V, § 1 (emphasis added). The Constitution further specifies, in unmistakable terms, that no department "shall exercise the powers properly belonging to either of the others" and forbids "any person [to] exercise the powers of more than one of them at the same time[.]" *Ibid.*[12] In light of these

---

[12] Article V, Section 1 provides a single exception for justices of the peace, who may serve in the Legislature. *Ibid.* "Justices of the peace" are now called "magistrates." W. Va. Code § 50-1-17 (eff. 1976).

17

clear prohibitions, we hold that the West Virginia Constitution forbids a judicial officer to participate in a search because a search is an exercise of executive power.    W. Va. Const. art. 5, § 1.  Because Judge Goldston plainly engaged in such a search, we find that the so-called "view" was improper.

### B. Judge Goldston Violated the Code of Judicial Conduct.

Having resolved the threshold question, we turn to the question of whether Judge Goldston violated the Code of Judicial Conduct.  "Under [Rule 4.5 of the West Virginia Rules of Disciplinary Procedure], the allegations of a complaint in a judicial disciplinary proceeding must be proved by clear and convincing evidence." *Ferguson*, 242 W. Va. at ___, 841 S.E.2d at 888, syl. pt. 2, in part (internal quotation marks removed). However, we note that Judge Goldston has admitted, under oath, the allegations of fact set forth in the formal statement of charges.  Under oath, she has further admitted that those facts are clear and convincing evidence that she violated Rules 1.1, 1.2, 1.3, 2.2. 2.4(A), 2.4(B), and 2.5 of the Code of Judicial Conduct and that she did, *in fact*, violate those rules.

We have held that "[s]tipulations or agreements made in open court by the parties in the trial of a case and acted upon are binding and a judgment founded thereon will not be reversed." Syl. Pt. 3, in part, *Matter of Starcher*, 202 W. Va. 55, 501 S.E.2d 772 (1998).  We have further held that

> [i]n a disciplinary proceeding against a judge, in which the burden of proof is by clear and convincing evidence, where the parties enter into stipulations of fact, the facts so stipulated will be considered to have been proven as if the party bearing the burden of proof has produced clear and convincing evidence to prove the facts so stipulated.

18

*Id.* at 56-57, 501 S.E.2d at 773-74, syl. pt. 4. Based on our review of the record in this matter, we agree that the above-mentioned violations have been proven by clear and convincing evidence, and we see no reason, in the context of our plenary review, to reject or qualify Judge Goldston's admissions. *Law. Disciplinary Bd. v. Sidiropolis*, 241 W. Va. 777, 785, 828 S.E.2d 839, 847 (2019) ("Because the relevant facts underlying this disciplinary proceeding are not disputed and Mr. Sidiropolis has voluntarily stipulated to his violation of Rule 8.4(b), we focus our analysis of this matter on the proper sanctions to be imposed.").

### C. Judge Goldston's Misconduct Warrants Censure and a Fine.

The question now becomes what sanction or sanctions, if any, we should impose. Rule 4.12 of the West Virginia Rules of Judicial Disciplinary Procedure [eff. 2019] authorizes us to "impose *any one or more* of the following sanctions for a violation of the Code of Judicial Conduct: (1) admonishment; (2) reprimand; (3) censure; (4) suspension without pay for up to one year; (5) a fine of up to $5,000; or (6) involuntary retirement" (emphasis added);[13] *see also* Syl. Pt. 5, in part, *In re Toler*, 218 W. Va. 653, 625 S.E.2d 731 (2005) (holding that "it is clearly within this Court's power and discretion to impose multiple sanctions . . . for separate and distinct violations"). Rule 4.12 further explains that "[a]n admonishment constitutes *advice or caution* to a judge to refrain from

---

[13] Involuntary retirement may only be imposed in the case of "a judge . . . of advancing years and attendant physical or mental incapacity . . . who is eligible to receive retirement benefits under the judges' retirement system or public employees retirement system." *Ibid.*

19

engaging in similar conduct which is deemed to constitute a violation of the Code of

Judicial Conduct"; "[a] censure constitutes *formal condemnation*" for such a violation.  W.

Va. R. Jud. Disc. P. 4.12 (emphasis added).

> We have held that
>
>> in determining *whether to suspend a judicial officer with or without pay*, [we] should consider various factors, including, but not limited to, (1) whether the charges of misconduct are directly related to the administration of justice or the public's perception of the administration of justice, (2) whether the circumstances underlying the charges of misconduct are entirely personal in nature or whether they relate to the judicial officer's public persona, (3) whether the charges of misconduct involve violence or a callous disregard for our system of justice, (4) whether the judicial officer has been criminally indicted, and (5) any mitigating or compounding factors which might exist.

Syl. Pt. 3, in part, *In re Cruickshanks*, 220 W. Va. 513, 648 S.E.2d 19 (2007) (emphasis

added).  Though *Cruickshanks* speaks in terms of suspension, we believe that *Cruickshanks*

provides an appropriate guide that may be applied whenever we contemplate imposing

sanctions under Rule 4.12.  Accordingly, we hold that in determining what sanction or

sanctions, if any, to impose under Rule 4.12 of the West Virginia Rules of Judicial

Disciplinary Procedure [eff. 2019], this Court will consider various factors, including, but

not limited to, (1) whether the charges of misconduct are directly related to the

administration of justice or the public's perception of the administration of justice, (2)

whether the circumstances underlying the charges of misconduct are entirely personal in

nature or whether they relate to the judicial officer's public persona, (3) whether the

charges of misconduct involve violence or a callous disregard for our system of justice, (4)

20

whether the judicial officer has been criminally indicted, and (5) any mitigating or compounding factors which might exist.

In this case, the parties have agreed to recommend a *censure* and a $5,000 fine. The Judicial Hearing Board recommended an *admonishment* and a $1,000 fine. Neither recommendation binds us. Rather, applying *Cruickshanks* as a guide, we note the following.

*First*, Judge Goldston's misconduct was directly related to the administration of justice. She forced her way into the ex-husband's home—over his reasonable objections—by threatening to jail him for contempt. She said, "I am the judge trying to effect equitable distribution. We're having a hearing. Now, you let me in that house or he [the bailiff] is going to arrest you for being in direct contempt of court."

*Second*, Judge Goldston's misconduct was carried out in her public persona and seriously undermined the public's perception of the administration of justice. Public comments show that many who viewed her conduct on the internet were justly and deeply offended. Without question, Judge Goldston's conduct cast doubt in the minds of the citizens who viewed the recording of the incident as to whether the parties were being treated with justice and fairness.

*Third*, Judge Goldston's misconduct displayed a callous disregard for our system of justice. Even setting aside the inappropriateness of the search, Judge Goldston went about the search in a highhanded and procedurally flawed manner. Instead of receiving both sides' testimony and evidence and rendering a decision, she interrupted the

ex-wife's testimony and directed the parties to meet her at the ex-husband's residence, affording the ex-husband no explanation and no opportunity to object until she arrived at the scene. Though she claimed she was "having a hearing[,]" she made no attempt of any kind to contemporaneously record what transpired. Indeed, she forbade others to make a recording, at risk of incarceration. Failing to record what transpired made her a potential witness. Most significantly, though she seems to have been well-aware of the lawful procedures at her disposal to enforce her order,[14] she chose not to use them because she deemed them ineffective.

*Fourth*, weighing in her favor, Judge Goldston's actions do not entail any criminal action for which she has been indicted.

*Fifth*, as mitigating factors, we note that Judge Goldston has been forthright about her conduct and that, in her twenty-seven years on the bench, this is the first time she has been disciplined. In addition, we find that Judge Goldston has shown some degree of remorse for her conduct.

Weighing the factors set forth in *Cruickshanks*, we find that the seriousness of Judge Goldston's conduct, coupled with the manner in which such conduct was carried out, has undermined the public's confidence in the administration of justice and justifies imposition of a censure in this matter. As set forth in Rule 4.12 of the West Virginia Rules

---

[14] *See, e.g.*, W. Va. Code § 48-1-304(b) (eff. 2001) (authorizing a family court to incarcerate a person who "fails or refuses to purge himself [or herself] of contempt"); W. Va. Code § 51-2A-9(b) (eff. 2012) (authorizing a family court judge to impose "remedial or coercive sanctions" including "seizure or impoundment of property").

22

of Judicial Disciplinary Procedure, an admonishment, as recommended by the Judicial Hearing Board, merely constitutes "advice or caution" to refrain from further violations, while a censure constitutes "formal condemnation" for such conduct. We find that the nature of the conduct clearly warrants such condemnation by this Court.

As we have stated herein, Judge Goldston's conduct constituted a search, rather than a mere view, of the ex-husband's home. The parties appeared in court for a hearing before Judge Goldston. Undoubtedly, the ex-husband could not have anticipated that the hearing would proceed to an unannounced invasion of the sanctity and privacy of his home. Regardless of whether the ex-husband had failed to provide belongings he was previously directed to provide, Judge Goldston failed to use the appropriate tools available to her under the law to address such failure because she felt such procedures were ineffective. Instead, she, along with her bailiff, the ex-wife, and the ex-wife's attorney, proceeded to enter the ex-husband's home, over his strenuous objections, directed that he stop recording the incident, and began searching for items on the list of items he was to produce. Such an invasion of the ex-husband's home was an egregious abuse of process.

Moreover, Judge Goldston clearly left her role as an impartial judicial officer and participated in an executive function when she entered the ex-husband's home to oversee the search. As we have previously held:

> A Judge is not expected to and should not summarily step from his judicial function and become an investigator, prosecutor, arresting officer, or instigator of legal actions, for when he does, he lessens the public confidence in the impartiality of his office. It is important that the Judge not only actually maintain integrity and impartiality, but that he must

23

> also give the appearance of such. No Judge should take unto
> himself activities or functions which are delegated to other
> branches of the government.

*W. Va. Jud. Inquiry Comm'n v. Dostert*, 165 W. Va. 233, 237, 271 S.E.2d 427, 429–30

(1980) (quoting West Virginia Judicial Review Board findings).

Finally, we find that the parties' previous stipulations in this matter, while

not binding on our decision, are nonetheless relevant to our determination. Judge Goldston

clearly agreed with the Judicial Disciplinary Counsel's recommendation that she be

censured and fined $5,000. Admittedly, however, such agreement was made with the

acknowledgment that "the decision to accept the recommendation concerning discipline

rests solely within the purview of the Judicial Hearing Board and the State Supreme Court."

Ultimately, the decision as to the proper sanction to be imposed rests with

this Court, and we may "accept or reject the disciplinary sanction" recommended by the

Judicial Hearing Board. *Crislip*, 182 W. Va. at 638, 391 S.E.2d at 85. We find that the

facts of this case warrant a censure, as was stipulated by the parties, and to the extent that

the Judicial Hearing Board determined otherwise, we reject such recommendation. An

admonishment is insufficient to address the seriousness of Judge Goldston's conduct and

the impact such violations have on the public's confidence in the judiciary.

However, further exercising our authority to accept or reject the

recommendation of the Judicial Hearing Board, we accept the Board's recommendation

that Judge Goldston be fined $1,000. We believe that the imposition of a censure, rather

than an admonishment, adequately recognizes the seriousness of Judge Goldston's

24

conduct. Such sanction, coupled with the $1,000 fine, will fulfill the disciplinary goals of preserving and enhancing the public's confidence in the "honor, integrity, dignity, and efficiency of the members of the judiciary and the system of justice." *Cruickshanks*, 220 W. Va. at 514, 648 S.E.2d at 20, syl. pt. 1, in part.

Based upon the facts and circumstances of this case, and taking into account the mitigating factors present, as well as the parties' previous stipulations in this matter, we impose a censure and a fine of $1,000.

## IV. CONCLUSION

For the foregoing reasons, the Court orders that Judge Goldston is **censured** and ordered to pay a **fine of $1,000**.

Censure and fine ordered.

25