IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

MATTHEW GIBSON,

        Plaintiff,

v.                                **CIVIL ACTION NO.: 5:21-cv-00181**
                                     **HONORABLE FRANK W. VOLK**

LOUISE E. GOLDSTON, individually,
COUNTY COMISSION OF RALEIGH
COUNTY, a political subdivision,
JEFF MCPEAKE, individually,
BRIAN WHITE, individually,
BOBBY STUMP, individually,
KYLE LUSK, individually,

        Defendants.

## DEFENDANTS COUNTY COMMISSION OF RALEIGH COUNTY, JEFF MCPEAKE, BRIAN WHITE, AND BOBBY STUMP'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

        NOW COME the Defendants, County Commission of Raleigh County, Jeff McPeake, Brian White, and Bobby Stump, by and through counsel, J. Victor Flanagan, Kevin J. Robinson and the law firm of Pullin, Fowler, Flanagan, Brown & Poe, PLLC, and hereby submit Defendants' Memorandum of Law in Support of their Motion for Summary Judgment. For the reasons set forth herein below, the Defendants respectfully request that this Honorable Court grant their Motion for Summary Judgment.

## STATEMENT OF FACTS AS ALLEGED IN THE COMPLAINT

        Plaintiff, Matthew Gibson alleges that he was subjected to an unreasonable search and seizure by the Defendants. (See Plaintiff's Complaint, attached to the Motion for Summary Judgment as Exhibit A). Particularly, the Plaintiff alleges that over the past twenty years as a Family Court

Judge, Defendant Goldston has been engaging in the practice of visiting homes of litigants appearing in front of her. (*Id.* at ¶ 8). Plaintiff avers that Defendant Goldston went to litigants' homes to either determine if certain disputed marital property was present and/or to supervise the transfer of disputed property. (*Id.*). Plaintiff further avers that Defendant Goldston admitted to conducting these home visits in her capacity as a Family Court Judge on twelve separate occasions. (*Id.*).

Plaintiff alleges that on September 18, 2020, the West Virginia Judicial Investigation Commission filed a Formal Statement of Charges against Defendant Goldston following the commission of one of the home visits at the home of Plaintiff, Matthew Gibson. (*Id.* at ¶ 9). Plaintiff also alleges that the Formal Statement of Charges alleged that probable cause existed to formally charge Defendant Goldston with violations of the Code of Judicial Conduct and that formal discipline was appropriate. (*Id.*).

In addition, Plaintiff avers that on March 4, 2020, during a contempt hearing in the Plaintiff's divorce case, Defendant Goldston, along with her Co-Defendants, entered the Plaintiff's home to search and seize items of personal property which the Plaintiff was alleged to have failed to turn over to his ex-wife following the finalization of his divorce more than one year earlier. (*Id.* at ¶ 10).

Plaintiff appeared before Judge Goldston on September 18, 2018, for the final hearing in his divorce action. (*Id.* at ¶ 11). Plaintiff's ex-wife was represented by Defendant Kyle Lusk, Esq. (*Id.*). The Court granted the divorce at the request of the parties, adopting a settlement agreement between the parties. (*Id.*). Plaintiff further avers that the final order in the divorce action provides, in-part, that "the parties divided their household furnishings by agreement which is represented by a four page exhibit entered before the Court and attached hereto." (*Id.* at ¶ 12). The final order further provided that, "The circled items are Respondents" and "The items not circled are the Petitioners."

(*Id*.).

Furthermore, Plaintiff avers that, contrary to the representations contained in the order itself, the original personal property disbursement agreement list document was not actually attached to the order, as it was represented to be verbally by the Court on record. In the Investigative Panel Findings and Conclusions of the Lawyer Disciplinary Board in Complaint No. 20-05-104 against Defendant Kyle Lusk, in a footnote on page 15 of the said document, the Board noted that "The Court noted the original property form was not attached to the Order from the September 2018 hearing in the divorce." (*Id*. at ¶ 13).

Just over a year after the final divorce hearing, on or about, September 26, 2019, the Plaintiff's ex-wife, by Defendant Lusk, filed a Petition of Contempt against the Plaintiff, alleging that she did not receive all of the items of personal property from the original personal property disbursement list, or alternatively she alleged that the items received by the Plaintiff were allegedly damaged. (*Id*. at ¶ 14). The ex-wife's petition, as drafted by Defendant Lusk, alleged that "many of the items had great sentimental value to the Petitioner" and that Mr. Gibson's actions "were carried out to inflict emotional harm and suffering to the Petitioner." (*Id*.). Plaintiff further alleges that pursuant to the filing of the Petition for Contempt, Defendant Lusk submitted an altered property disbursement agreement list to the Court, as the original had not been attached to the final order. (*Id*. at ¶ 15). Plaintiff avers that the altered personal property agreement list submitted by Defendant Lusk contained numerous discrepancies with the original property list document introduced to the Court at the final hearing. (*Id*.).

On March 4, 2020, the parities appeared before Judge Goldston for a hearing on the petition for contempt. (*Id*. at ¶ 16). Plaintiff alleges that during the hearing, Judge Goldston suddenly and

without explanation asked Mr. Gibson, who was representing himself *pro se*, for his home address. (*Id.* at ¶ 16).  Plaintiff further alleges that Judge Goldston *sua sponte* stopped the hearing and ordered the parties to meet at Mr. Gibson's house in ten minutes.  (*Id.*).  Moreover, Plaintiff alleges that because she failed to explain the reason for the home visit, Mr. Gibson was unable to raise any objection while still at the hearing. (*Id.*).

Plaintiff avers that once everyone arrived at Mr. Gibson's home on March 4, 2020, and the purpose of the visit became clear, the Plaintiff moved to recuse Defendant Goldston on the grounds that she had become a potential witness in the case. (*Id.* at ¶ 19).  Judge Goldston denied the motion. (*Id.*).

Plaintiff avers that he then verbally refused to allow Defendant Goldston or anyone else in his house without a search warrant. (*Id.* at ¶ 20).  Plaintiff also avers that Defendant Goldston threatened to put Mr. Gibson in jail if he denied them entry into his house.  (*Id.*).  Plaintiff avers he had no choice but to relent.  (*Id.*).

Upon Judge Goldston's arrival to the property, Plaintiff alleges that he instructed a third party to video record the initial interactions outside the house between Defendant Goldston and the parties. (*Id.* at ¶ 21).  Plaintiff alleges he also recorded several minutes of audio of the initial interaction on his cell phone before being forced to turn it off. (*Id.*).

Plaintiff alleges that when the video and audio recordings were discovered by Defendant Goldston, she ordered both recordings stopped, following her threat of arrest and incarceration. (*Id.* at ¶ 22).  However, once inside the house, Defendant Goldston's bailiff, Defendant McPeake, used his personal phone to record both video and audio of the separation of marital assets. (*Id.*).  Plaintiff avers that he was unware at the time that Defendant McPeake was recording video inside his home.

(*Id*.).

Moreover, Plaintiff avers that he observed a phone in McPeake's hand at the time, but did not observe that he was recording. (*Id*.). Plaintiff avers that McPeake recorded for a total of 7 minutes – though the total search lasted 20 to 30 minutes. (*Id*.). Plaintiff also avers that McPeake never disclosed to the Plaintiff that he had been recording video in his home. (*Id*.).

Plaintiff alleges that McPeake provided the video to Defendant Judge Goldston, which she disclosed in the ensuing judicial disciplinary investigation. (*Id*.). Plaintiff also alleges that neither McPeake nor Goldston disclosed the existence of the video, nor provided a copy of the video, to the Plaintiff. (*Id*.). Moreover, Plaintiff avers that McPeake did not enter the video into any investigative file with the Raleigh County Sheriff's office, his employer. (*Id*.). Plaintiff also avers that none of the defendant deputies completed a report, nor any sort of documentation, of having been in Plaintiff's house and participating in a search and seizure on March 4, 2020. (*Id*.)

Plaintiff avers that after he was forced by Defendant Goldston to stop recording the incident, while standing in the front yard of his residence, Defendant Goldston stated, "Now are you gonna let me in, or am I gonna have to put you in jail!" (*Id*. at ¶ 23). Plaintiff alleges at that point, Defendant McPeake signaled on his radio for law enforcement assistance and seized the Plaintiff's phone. (*Id*.)

Furthermore, Plaintiff alleges at no time did Plaintiff voluntarily consent to any defendant to enter his property, including his residence. (*Id*. at ¶ 26). Also, Plaintiff alleges that at no time did he voluntarily grant consent to participate in Family Court proceedings outside the courtroom. (*Id*.). Plaintiff avers that he did not grant consent to stop filming video and audio footage of the events which were transpiring on his property. (*Id*.). Plaintiff avers that at no time did he voluntarily grant consent to the seizure of his phone. (*Id*.). Moreover, Plaintiff avers that at no time did he grant

consent to the seizure of items removed from the inside of his residence at the direction of Defendant Goldston. (*Id.*).

Plaintiff avers that once inside his home, Judge Goldston directed the deputies to assist Plaintiff's ex-wife and Defendant Lusk in searching and seizing the home's contents. (*Id.* at ¶ 27). Plaintiff avers that the search lasted a total of 20 to 30 minutes. (*Id.*).

Plaintiff alleges that during the search, defendant police officers Stump and White arrived and entered Plaintiff's residence, after being called by Defendant McPeake. (*Id.* at ¶ 28). Plaintiff avers that they began to jointly participate in the search and seizure occurring inside Plaintiff's home. (*Id.*). In addition, Plaintiff alleges that shortly after arriving, Defendant Stump went back outside and instructed Plaintiff's witnesses to leave the property and Defendant Goldston allowed the Plaintiff's ex-wife's boyfriend, father, and brother to remain on Plaintiff's property without Plaintiff's consent. (*Id.*).

Plaintiff avers that many different items of personal property were taken out of Mr. Gibson's home during the search, some of which belonged to Mr. Gibson's children, as well as Mr. Gibson's significant other. (*Id.* at ¶ 29). Plaintiff also avers that some of the items which were taken were later returned but some items were never returned. (*Id.*). In addition, Plaintiff avers that none of the items were documented in writing by the Defendants. (*Id.*).

Moreover, Plaintiff alleges that following the search, there was no court order issued, establishing and describing what had occurred at Mr. Gibson's home, nor listing an inventory or description of the items which had been seized from inside his home. (*Id.*). Plaintiff alleges that Defendant Judge Goldston did recite for the record, following the search and seizure, what had been seized from Plaintiff's home, "to the best of her recollection." (*Id.*). Plaintiff avers that some of what

she listed for the record were not items of personal property listed in the original property disbursement list which was supposed to have been attached to the final order. (*Id*.).

Finally, Plaintiff alleges six (6) counts for recovery in his Complaint: (1) Unreasonable Search and Seizure in violation of the Fourth Amendment (2) Violation of the First Amendment, (3) Monell claim against the RCC, (4) 14th Amendment Due Process, (5) 14th Amendment Equal Protection, and (6) Conspiracy with State Official.

## SUMMARY JUDGMENT STANDARD

A Motion for Summary Judgment is to be granted to a Defendant if the pleadings, depositions, answers to Interrogatories, and admissions on file, together with the Affidavits, if any, show that there is no genuine issue as to any material fact and that the Defendant is entitled to a judgment as a matter of law. F. R. Civ. P. 56; *Bellomy v. Union Concrete Pipe Co.,* 297 F. Supp. 261 (S.D.W. Va. 1969), *aff'd* 420 F.2d 1382 (4th Cir.), *cert. denied* 400 U.S. 904, 91 S. Ct. 144, 27 L. Ed. 2d 142 (1970); *Bowen v. Union Concrete Pipe Co.,* 299 F. Supp. 1109 (S.D.W. Va. 1969).

Once the moving party has met the burden of initially showing the absence of a genuine issue concerning any material facts, the burden shifts to the nonmoving party to produce sufficient evidence for a jury to return a verdict for that party. *Holland v. Double G. Coal Co.,* 898 F. Supp. 797 (S.D.W.Va. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of the pleading, but must set forth specific facts showing that there is a genuine issue for trial. *Sprenkle v. Hartford Life Ins. Co.*, 84 F. Supp. 2d 751 (N.D.W. Va. 2000). Also, a non-movant cannot create a genuine issue of fact through mere speculation or the building of one inference upon another. *CSX Transp. Inc. v. Madison Group, Inc.*, 42 F. Supp. 2d 624 (S.D.W. Va. 1999).

"To meet its burden, the nonmoving party must offer 'more than a mere "scintilla of evidence" and must produce evidence sufficient for a reasonable jury to find in a non-moving party's favor.'" *Gooch v. West Virginia Department of Public Safety*, 195 W.Va. 357, 365; 465 S.E.2d 628, 636 (1995), *quoting, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).   Stated alternatively, if the movant makes a properly supported motion for summary judgment and shows by affirmative evidence that there is no genuine issue of a material fact, the burden of production shifts to the nonmoving party who must then either "(1) rehabilitate the evidence attacked by the moving party, (2) produce additional evidence showing the existence of a genuine issue for trial, or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f) of the West Virginia Rules of Civil Procedure." Syl. Pt. 3, *Williams v. Precision Coil, Inc.*, 194 W.Va. 52; 459 S.E.2d 329 (1995).

## ARGUMENT OF LAW

**I.    Defendants Jeff McPeake, Brian White, and Bobby Stump are entitled to qualified immunity on all counts in the Plaintiff's Complaint.**

Defendants Jeff McPeake, Brian White, and Bobby Stump are immune from suit as governmental employments entitled to qualified immunity. Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The privilege is an immunity from suit, not merely a defense to liability. *Id*. "A federal civil rights claim based upon § 1983 has two essential elements: '[A] plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of State law. *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011).

Government officials are entitled to qualified immunity as a matter of law so long as they have not violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In other words, courts ask "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

"It operates to ensure that before they are subject to suit, officers are on notice that their conduct is unlawful." *Braun v. Maynard*, 652 F.3d 557, 560 (4th Cir. 2011). "[Q]ualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012). "Hence, our qualified immunity defense involves a 'two-step' inquiry, asking 'first whether a constitutional violation occurred and second whether the right violated was clearly established.'" *Id.* at 188 (quotation omitted). "In analyzing whether the defendant has violated a constitutional right of the plaintiff, the court should identify the right 'at a high level of particularity.'" *Bland*, 730 F.3d at 391 (quotation omitted). "For a plaintiff to defeat a claim of qualified immunity, the contours of the constitutional right 'must be sufficiently clear that a reasonable person would understand that what he is doing violates that right.'" *Id.* at 391 (Quotation omitted.).

In this matter, the Defendants contend that they did not violate the Plaintiff's Constitutional rights. Deputy McPeake was acting as bailiff for Judge Goldston during all times relevant in the Plaintiff's Complaint. Deputies White and Stump was responding to a call for back up at the Plaintiff's residence when the incident occurred. None of the deputies unlawfully searched or unlawfully seized any of the Plaintiff's property. However, if the Court were to find a violation of the

Doc. No. 432

Plaintiff's constitutional rights, then the Defendants are entitled to qualified immunity and thus entitled to summary judgment.

i.    **Defendant Jeff McPeake's presence with the Judge was objectively reasonable under the circumstances and therefore protected by Qualified Immunity.**

The Plaintiff alleges in his Complaint that on March 4, 2020, during a contempt hearing in the Plaintiff's divorce case, Defendant Goldston, along with her Co-Defendants, entered the Plaintiff's home to search and seize items of personal property which the Plaintiff was alleged to have failed to turn over to his ex-wife following the finalization of his divorce more than one year earlier. (*Id.* at ¶ 10).

The qualified immunity defense "protects all but the plainly incompetent or those who knowingly violate the law," and it "protects law enforcement officers from bad guesses in gray areas and ensures that they are liable only for transgressing bright lines." *Waterman* v. *Batton*, 393 F.3d 471, 476 (4th Cir. 2005) (citation and internal quotation marks omitted). Qualified immunity extends to government officials' objectively reasonable mistakes, "regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "[T]he immunity inquiry must be filtered through the lens of the officer's perceptions at the time of the incident in question." *Rowland*, 41 F.3d at 173.

Deputy McPeake was acting as Judge Goldston's bailiff on March 4, 2020. Deputy McPeake is responsible for the judge's safety and should be with her at all times. "A bailiff is an officer of the court to which he or she is assigned, subject to its control and supervision, and responsible for preserving order and decorum, taking charge of the jury, guarding prisoners, and other services

which are reasonably necessary for the court's proper functioning." Syllabus Point 2, *In re Pauley* 173 W.Va. 228, 314 S.E.2d 391 (1983).

The alleged search and seizure happened during what the Defendant Jeff McPeake believed was a continuation of a contempt hearing. (See Deposition of Defendant Jeff McPeake p. 25 lines 1-4 attached hereto as Exhibit B). Defendant McPeake, acting as bailiff for Defendant Judge Goldston, went to the Plaintiff's residence with Judge Goldson. Defendant McPeake had an objectively reasonable belief that he could go to the Plaintiff's residence with the judge as she continued the contempt hearing. Defendant McPeake's presence with Judge Goldston at the Plaintiff's home does in no way infer that he searched the Plaintiff's residence. It should also be noted that the record is devoid of any evidence that Deputy McPeake searched or seizure any items from the Plaintiff's home. (See Deposition of Deputy McPeake p. 59 lines 14-19 attached hereto as Exhibit C).

Therefore, all actions taken by Deputy McPeake on March 4, 2020, were reasonable in his capacity as bailiff for Judge Goldston. As such, Defendant McPeake's presence with the judge was reasonable under the circumstances and therefore, Defendant McPeake is entitled to qualified immunity.

### ii.    Defendant Jeff McPeake is entitled to Qualified Immunity for the seizure of the Plaintiff's cell phone.

As stated before, acting as bailiff for Defendant Judge Goldston, Defendant McPeake went to the Plaintiff's home with Judge Goldston after she stopped a contempt hearing to go to the Plaintiff's residence. While the parties were at the Plaintiff's residence, Judge Goldston did not want the Plaintiff to record the contempt hearing. The following colloquy occurred between Plaintiff's Counsel and Defendant McPeake:

Q:      In fact, you did that after you seized Mr. Gibson's cell phone?

A:      I did not seize Mr. Gibson's cell phone.

Q:      All right.  Well, let's talk about that.  At some point, did you come into possession of Mr. Gibson's cell phone?

A:      I did.

Q:      Well, how did Mr. Gibson's cell phone get into your possession?

A:      He handed it to me, and I stuck it in my shirt pocket.

Q:      And why did Mr. Gibson hand you Mr. Gibson's cell phone?

A:      The judge told him that it was against the law to record a court hearing, and we were in the middle of a court hearing.

(See Deposition of Defendant Jeff McPeake, p. 32 lines 1-17 attached hereto as Exhibit D).

As one can analyze, Deputy McPeake only came into possession of the Plaintiff's phone after the judge instructed the Plaintiff to give it to him.  Judge Goldston had informed the Plaintiff that it was against the law to record a court hearing.  As such, Defendant Jeff McPeake had an objectively reasonable belief that he was in the middle of a court hearing when he came into possession of the Plaintiff's phone. Therefore, Defendant McPeake is entitled to qualified immunity on all counts in the Plaintiff's Complaint.

### iii.    Defendants Brian White and Bobby Stump are entitled to Qualified Immunity for the alleged search of Plaintiff's home.

Plaintiff's Complaint also alleges that deputies Brian White and Bobby Stump deprived him of a federal constitutional right to under the Fourth Amendment of the U.S. Constitution, to be free from unreasonable searches and seizures.  However, the record is devoid of any evidence that

Defendants White or Stump searched the Plaintiff's home or seized any items from his residence. Even if this Honorable Court were to determine that the deputies' actions constituted an unreasonable search and seizure on the day of the incident, both Deputies White and Stump are still entitled to qualified immunity.

A fundamental justification for the qualified immunity defense is that public employees are free to perform discretionary functions without fear of punitive ligation except when they fairly can anticipate that their conduct will give rise to liability for damages. *Savad v. Rhode Island*, 338 F.3d 23, 28 (1st Cir. 2003). In this matter, both deputies White and Stump where simply performing their duties as officers on road patrol when they were dispatched to Plaintiff's home.

The following colloquy occurred between Plaintiff's Counsel and Deputy Bobby Stump:

Q:    So what do you recall of that, as far as your own personal involvement, on March 4th, 2020?

A:    Is that the day of the hearing?

Q:    Yes.

A:    I was road patrol supervisor and I usually get dispatched to 911 calls. Usually, whoever is working with me that day gets dispatched and I just organize them going to calls.

So I don't think I was dispatched but either one of my guys was dispatched or I was dispatched to assist on a - from a Family Court judge. So the 911 dispatcher come over the radio and said that the officer wanted some back up, so I went. I keyed up the radio and I think – Corporal White keyed up the radio and said we was on our way, and I think I was the closet one so I beat everybody there.

But I was going back up to the officer. At the time, I had no clue it was Judge Goldston until I arrived on scene.

(See Deposition of Bobby Stump p. 32 lines 23-24 and p. 33 lines 1-18 attached hereto as Exhibit E).

Deputy White also testified that he was dispatched to the scene. The following colloquy occurred between Plaintiff's Counsel and Deputy Brian White:

Q:     Do you recall the incident on March 4th, 2020, where Judge Goldston traveled to the home of the Plaintiff, Matthew Goldston?

A:     I remember being dispatched there. I remember my involvement with it as far as, you know, me being dispatched and me showing up, I mean vaguely. I don't remember everything.

Q:     All right. Well, I just want to ask you about what you remember about that day. Okay?

A:     Okay.

Q:     What's – do you remember why you were dispatched or what you were told?

A:     A deputy needed backup. There was a situation going on. They were getting tense or afraid there was going to be a disturbance or fight, basically, was my take on it.

(See Deposition of Brian White p. 6 lines 17-24 and p. 7; lines 1-8 attached hereto as Exhibit F).

As one can analyze from both of the deputies testimony, they were dispatched to the Plaintiff's residence on the day in question to give back up assistance to another deputy. Deputy White even believed a disturbance was taking place. Both of these officers were performing their basis duties as officers as they were working road patrol and responding to an officer's call for backup.

Now, Plaintiff avers that Deputies White and Stump helped with the search and seizure of the Plaintiff's property on the day of the incident. However, the record is devoid of any evidence that either White or Stump searched the Plaintiff's residence or seized any items or even helped to search and seizure any items. The following colloquy occurred between Plaintiff's Counsel and Deputy

Stump:

Q:      But you were helping to locate items?

…

A:      No. No. I was not. I was there for the strict safety of the judge. Mrs. Gibson and Mr. Gibson

were locating items. I didn't search for nothing. There wasn't – any of the deputies didn't search for

anything.

(See Deposition of Deputy Bobby Stump p. 46 lines 23-24 and P. 47 lines 1-5 attached hereto as

Exhibit G).

 As one can analyze from Deputy Bobby Stump's testimony, none of the deputies on the scene

on the day of the incident searched or seized any property from the Plaintiff's home. The record is

devoid of any evidence that either White, Stump, or even McPeake for that matter searched the

Plaintiff's residence or seized any items from the Plaintiff's abode. Therefore, there are no genuine

issues of material fact and these Defendants are entitled to qualified immunity.

  **iv. Even if the Court were to find that the Plaintiff's Constitutional rights were
violated, the Defendants are still entitled to qualified immunity as the Plaintiff's
rights were not clearly established at the time.**

 Qualified immunity shields government officials from liability for civil damages "insofar as

their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person should have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Put

another way, there must be sufficient precedent at the time of the action, factually similar to the

plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally

protected." Clearly established precedent for purposes of qualified immunity has required a showing

that a "robust consensus of cases or persuasive authority" delineates the right "beyond debate."

Doc. No. 432      15

*Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2084 (2011)(quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)) (internal quotation marks omitted).

At the time of this incident, the law was unclear on whether or not a family court judge could perform "judicial views." In fact, the Judicial Hearings Board requested guidance from the Supreme Court of Appeals of West Virginia on that issue. "The Hearing Board recommended that the judge be *admonished* and fined $1,000, and – believing that a judge's "inherent authority" to conduct "judicial views" is uncertain" – requested guidance from this Court." (See Opinion of the Supreme Court of Appeals of West Virginia at p. 1 attached hereto as Exhibit H).

At the time of the incident that is the subject of this litigation, it was uncertain if a family court judge could conduct judicial views. The law was not clearly established at the time of the incident. Therefore, it would not be clear to these officers that their conduct was unlawful at the time of the incident.

As stated before, Deputy McPeake had an objectively reasonable belief that he could accompany the judge to the Plaintiff's home on March 4, 2020 as he believed they were continuing the contempt hearing at the Plaintiff's residence. Furthermore, Deputy McPeake had an objectively reasonable belief that he could keep the Plaintiff's cell phone as the judge continued the contempt hearing. Defendants White and Stump had an objectively reasonable belief that they could enter the Plaintiff's home after being dispatched to the Plaintiff's residence. Moreover, all of the Defendants had an objectively reasonable belief that they could accompany the judge while they were at the Plaintiff's home. Therefore, because the law was not clearly established at the time of the incident, these Defendants are entitled to qualified immunity as the law was not clearly established at the time of the incident.

Doc. No. 432

II. **The Raleigh County Commission is entitled to summary judgment because the record is devoid of any evidence that the Raleigh County Commission has a policy or custom of violating the Plaintiff's rights.**

"[A] municipality cannot be held liable solely because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (U.S. 1978). Local government, therefore, may not be sued under 1983 solely on a respondeat theory, but rather only when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury for which the government as an entity is responsible under § 1983. *Id.* at 694; See also *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. W.Va. 1999)(holding plaintiffs seeking to impose liability on a municipality must adequately plead and prove existence of an official policy or custom that is fairly attributed to the municipality and that proximately caused the deprivation of their civil rights). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-824 (U.S. 1985); See also *Semple*, F.3d at 713-14 (proof of single incident of the unconstitutional activity charged is not sufficient to prove the existence of a municipal custom).

In this case, the Plaintiff failed to put forth any evidence of a policy or custom of the Raleigh County Commission that would be attributable to the Plaintiff's injuries. West Virginia state law establishes the duty of the sheriff to provide bailiff services to judges within the state of West Virginia. W.Va. § 51-3-5. Any bailiff who would have accompanied Judge Goldston on the day of the incident would have accompanied her pursuant to his or her statutory duties as bailiff.

Doc. No. 432

17

Municipal entities cannot be held liable under section 1983 solely because they employed a tortfeasor.  Rather, when a municipal entity is sued-directly or in an official-capacity suit-the plaintiff must plausibly allege that a "policy or custom" attributable to the municipal entity caused the violation of the plaintiff's federally protected rights.  See *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L. Ed. 626 (1997); *Hafer*, 502 U.S. at 25 (1991); *Graham*, 473 U.S. at 166; *Monell*, 436 U.S. 658, 690-94, 98 S.Ct. 2018, 56 L. Ed. 2d 611 (1978); *King v. Rubenstein*, 825 F.3d 206, 223 (4th Cir. 2016); *Santos*, 725 F.3d at 469-70; *Carter v. Morris*, 164 F.3d 215, 218-19 (4th Cir. 1999).  A violation results from a municipal entity's "policy or custom" if the violation resulted from "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690-91, 694; see *St. Louis v. Praprontnik*, 485 U.S. 112, 121, 108 S.Ct. 915, 99 L. Ed. 2d 107 (188).

Not every municipal official's action or inaction represents municipal policy.  Rather, the inquiry focuses on whether the municipal official possessed final policy making authority under state law concerning the action or inaction.  See, e.g. *McMillian v. Monroe Cty.*, 520 U.S. 781, 785-86, 117 S.Ct. 1734, 138 L. Ed. 2d 1 (1997); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L. Ed. 2d 452 (1986); *Riddick v. Sch.Bd.*, 238 F.3d 518, 523 (4th Cir. 2000).  Furthermore, even if a section 1983 plaintiff can identify the requisite final policy making authority under state law, a municipality is not liable simply because a section 1983 plaintiff "is able to identify conduct attributable to the municipality." *Riddick*, 238 F.3d at 524.  Instead, a section 1983 "plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Brown*, 520 U.S. at 404.

The record is devoid of any evidence that the Raleigh County Commission was the moving

force behind any policy or custom to visit litigants' homes during family court proceedings in Raleigh County.  The Plaintiff also failed to produce any statement, ordinance, regulation, or decision officially adopted by the Raleigh County Commission that led to a violation of the Plaintiff's rights. Given this, Defendant Raleigh County Commission is entitled to summary judgment.

**III.     Plaintiff is not asserting any Fourteenth Amendment claims against Defendants Raleigh County Commission, Jeff McPeake, Bobby Stump or Brian White.**

Plaintiff admitted in his response to Defendants' motion to dismiss that he is not asserting any 14th Amendment claims against the Raleigh County Defendants.  (See Doc. No. 16 at p. 11).

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, based upon the foregoing, these Defendants request that this Honorable Court grant their Motion for Summary Judgment and grant Defendants any other and further relief which the Court deems appropriate.

**COUNTY COMMISSION OF RALEIGH COUNTY, JEFF McPEAKE, BRIAN WHITE, and BOBBY STUMP,**

By Counsel,

/s/ Kevin J. Robinson
J. Victor Flanagan, WV State Bar No. 5254
Kevin J. Robinson, WV State Bar No. 10181

***PULLIN, FOWLER, FLANAGAN, BROWN & POE, PLLC***
252 George Street
Beckley, WV  25801
Telephone:     (304) 254-9300
Facsimile:      (304) 255-5519

Doc. No. 432                                      19

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

MATTHEW GIBSON,

      Plaintiff,

v.                                    **CIVIL ACTION NO.: 5:21-cv-00181**
                                          **HONORABLE FRANK W. VOLK**

LOUISE E. GOLDSTON, individually,
COUNTY COMISSION OF RALEIGH
COUNTY, a political subdivision,
JEFF MCPEAKE, individually,
BRIAN WHITE, individually,
BOBBY STUMP, individually,
KYLE LUSK, individually,

      Defendants.

## CERTIFICATE OF SERVICE

The undersigned, counsel of record for Defendants, does hereby certify on this 28th day of March, 2022, that a true copy of the foregoing "**DEFENDANTS COUNTY COMMISSION OF RALEIGH COUNTY, JEFF MCPEAKE, BRIAN WHITE, AND BOBBY STUMP'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**" was served upon opposing counsel through the Court's CM/ECF filing system as follows:

John H. Bryan, Esquire
Law Office of John H. Bryan
611 Main St.
P.O. Box 366
Union, WV  24983
jhb@johnbryanlaw.com
*Counsel for Plaintiff*

Doc. No. 432

Jennifer E. Tully, Esquire
Adam K. Strider, Esquire
Bailey & Wyant, PLLC
500 Virginia Street, East, Suite 600
P. O. Box 3710
Charleston, WV 25337-3710
jtully@baileywvant.com
astrider@baileywvant.com
*Counsel for Defendant Louise E. Goldston*

Arie M. Spitz, Esquire
Kevin A. Nelson, Esquire
Jason L. Holliday
Dinsmore & Shohl, LLP
P. O. Box 11887
Charleston, WV 25339-1887
*arie.spitz@dinsmore.com*
*kevin.nelson@dinsmore.com*
*jason.holliday@dinsmore.com*
*Counsel for Defendant Kyle Lusk*

/s/ Kevin J. Robinson
J. Victor Flanagan, WV State Bar No. 5254
Kevin J. Robinson, WV State Bar No. 10181

**PULLIN, FOWLER, FLANAGAN, BROWN & POE, PLLC**
252 George Street
Beckley, WV  25801
Telephone:      (304) 254-9300
Facsimile:      (304) 255-5519