# EXHIBIT C

## Page 1

```
 1      IN THE UNITED STATES DISTRICT COURT FOR THE
 2          SOUTHERN DISTRICT OF WEST VIRGINIA
 3                    AT BECKLEY
 4    * * * * * * * * * * * * * * * * * * * * * * * *
 5   MATTHEW GIBSON,
 6          Plaintiff,
 7     vs.                CIVIL ACTION NO.
 8                        5:21-cv-00181
     LOUISE E. GOLDSTON, Individually,
 9   COUNTY COMMISSION OF RALEIGH
     COUNTY, a political subdivision,
10   JEFF MCPEAKE, Individually,
     BRIAN WHITE, Individually,
11   BOBBY STUMP, Individually,
     KYLE LUSK, Individually,
12
            Defendants.
13
     * * * * * * * * * * * * * * * * * * * * * * * *
14
15
16          Deposition of LOUISE E. GOLDSTON taken by
     the Plaintiff under the Federal Rules of Civil
17   Procedure in the above-entitled action, pursuant to
     notice, before Bradford L. Cooper, a Notary Public,
18   at Pullin, Fowler, Flanagan, Brown, and Poe, PLLC,
     252 George Street, Beckley, West Virginia, on the
19   1st day of March, 2022.
20
21       REALTIME REPORTERS, a Huseby Company
        BRADFORD L. (Brad) COOPER, Notary Public
22             713 Lee Street
             Charleston, WV  25301
23              (304) 344-8463
              realtimereporters.net
24
```

## Page 2

```
 1          APPEARANCES:
 2
     APPEARING FOR THE PLAINTIFF:
 3
         John H. Bryan, Esquire
 4       JOHN H. BRYAN, ATTORNEYS AT LAW
         411 Main Street
 5       P.O. Box 366
         Union, West Virginia 24983
 6       jhb@johnbryanlaw.com
 7
     APPEARING FOR THE DEFENDANTS STUMP, MCPEAKE, AND
 8   WHITE:
 9       Kevin J. Robinson, Esquire
         PULLIN, FOWLER, FLANAGAN, BROWN,
10         AND POE, PLLC
         252 George Street
11       Beckley, West Virginia 25801
12
     APPEARING FOR THE DEFENDANT, LOUISE E. GOLDSTON:
13
         Jennifer E. Tully, Esquire
14       BAILEY & WYANT, PLLC
         500 Virginia Street East, Suite 600
15       P.O. Box 3710
         Charleston, West Virginia 25337-3710
16
17   APPEARING FOR THE SUPREME COURT OF APPEALS OF WEST
     VIRGINIA:
18
         Bradley Schmalzer, Esquire (via telephone)
19       Julianne Wisman, Esquire (via telephone)
20
     ALSO PRESENT:
21
         Bobby Stump, Defendant
22       Matthew Gibson, Plaintiff
         J.R. Morgan
23
24
```

## Page 3

```
 1              EXAMINATION INDEX
 2
 3       BY MR. BRYAN                   6
 4
 5
 6
                   EXHIBIT INDEX
 7
 8   Exhibit 1  Louise Goldston Judicial       6
                Disciplinary Proceeding
 9
     Exhibit 2  Public Admonishment of the     23
10              Honorable Eric Shuck, Judge of the
                13th Family Court Circuit
11
     Exhibit 3  Louise Goldston Judicial       43
12              Disciplinary Counsel Agreement
13   Exhibit 4  Formal Statement of Charges    44
14   Exhibit 5  Transcript of Judicial Board   56
                Hearing of Louise Goldston dated
15              January 15, 2021
16   Exhibit 6  Audio Recording Recorded by    65
                Plaintiff Matthew Gibson
17
     Exhibit 7  Video of the Incident at the Home  82
18              of Matthew Gibson
19   Exhibit 8  Divorce Hearing Video dated April  84
                19, 2018
20
     Exhibit 9  Recording of Kyle Lusk at Hearing  90
21              re: Search
22   Exhibit 10 Voicemail Recording of Kyle Lusk   95
23
24
```

## Page 4

```
 1            OBJECTION INDEX
 2   BY MS. TULLY                13
     BY MS. TULLY                13
 3   BY MS. TULLY                24
     BY MS. TULLY                25
 4   BY MS. TULLY                26
     BY MS. TULLY                26
 5   BY MS. TULLY                28
     BY MS. TULLY                45
 6   BY MS. TULLY                45
     BY MS. TULLY                51
 7   BY MS. TULLY                52
     BY MS. TULLY                53
 8   BY MS. TULLY                53
     BY MS. TULLY                54
 9   BY MS. TULLY                54
     BY MS. TULLY                54
10   BY MS. TULLY                57
     BY MS. TULLY                58
11   BY MS. TULLY                62
     BY MS. TULLY                75
12   BY MS. TULLY                76
     BY MS. TULLY                79
13   BY MR. ROBINSON             91
     BY MS. TULLY                94
14   BY MS. TULLY                96
     BY MS. TULLY                98
15   BY MS. TULLY                99
     BY MS. TULLY               100
16   BY MS. TULLY               103
     BY MS. TULLY               103
17
18
19
20
21
22
23
24
```

Page 9

1 they used it.
2    A. They used it. I disagree with it.
3    Q. The Supreme Court found that you led a
4 search of the homeowner's residence, not a judicial
5 view.
6    A. That's what they found.
7    Q. The West Virginia Supreme Court further
8 found that in so doing, that you "exercised
9 executive powers forbidden to you under the West
10 Virginia Constitution". Is that true?
11    A. That is what they found.
12    Q. Okay. Do you disagree with that?
13    A. Yes.
14    Q. The Court further held in that Opinion that
15 you did not go to the property to observe the
16 ex-husband's house but that you went there to
17 locate and seize certain of its contents:
18 Pictures, DVDs, and other items of personal
19 property. Is that true?
20    A. That is true.
21    Q. Do you disagree with the Supreme Court's
22 holding?
23    A. Which holding?
24    Q. That you went to the house to locate and

Page 10

1 seize certain contents - personal property - in the
2 house.
3    A. I disagree that I went there personally to
4 locate them. I do agree that I went there to seize
5 them.
6    Q. And why do you -- why do you disagree that
7 you went there to locate them?
8    A. Because, as is clear on the tape taken by
9 Officer McPeake, I did not look for nor try to
10 locate anything. I asked Mrs. Gibson where those
11 items that she was not given, as awarded in the
12 order -- where they were located when she lived
13 there. I told her to look there. She asked to
14 look other places. I denied that request.
15      So I did not attempt to locate anything.
16 The things that she was awarded that were in the
17 same place that they'd been when the couple lived
18 there together, I allowed her to take.
19    Q. However, the Supreme Court stated that "the
20 record is clear that Judge Goldston went to the
21 property to locate things, not simply to observe
22 them." Right?
23    A. That is what they found.
24    Q. Okay. That's -- that's what the Supreme

Page 11

1 Court found but you disagree.
2    A. I think I've already answered that but yes.
3 I did not go there to locate them. I went there to
4 allow Mrs. Gibson to retrieve the items she had
5 been awarded.
6    Q. Did you --
7    A. And Mister -- and only the items that
8 Mr. Gibson had previously testified were still
9 there.
10    Q. Okay. But you -- you didn't know where
11 they were inside his house, did you?
12    A. I did not, and I did not look.
13    Q. So they -- somebody had to locate them
14 inside the house.
15    A. That's correct.
16    Q. Okay. And nobody asked Mr. Gibson to go in
17 his house and bring the items outside.
18    A. No.
19    Q. You went in, right?
20    A. I did.
21    Q. And the bailiff -- your bailiff went in.
22    A. He did.
23    Q. Mrs. Gibson went in.
24    A. She did.

Page 12

1    Q. And Mr. Lusk went in.
2    A. Yes.
3    Q. To locate the items.
4    A. Yes. I would say retrieve the items but --
5    Q. In fact, the Supreme Court noted in their
6 Opinion that when Mr. Gibson demanded a list of
7 what you were seeking, you replied, "You have a
8 list of everything attached to the order."
9      And when he professed not to know where
10 some of it's at, you replied, "Well, we're going to
11 find it."
12    A. I did.
13    Q. Okay. So as the Supreme Court noted, you
14 told Mr. Gibson that you would be going inside his
15 house to find items.
16    A. Correct.
17    Q. But you disagree with the categorization of
18 that is a search.
19    A. That that is a search by me, yes.
20    Q. You would admit that it's a search by
21 somebody.
22    A. Again, I told Mrs. Gibson she could look
23 only in places where the items she had been awarded
24 were located and that if they were not there she

Page 17
1  others inside his house.  Is that true?
2     A.  Can you show me where that is?
3         MS. TULLY:  Where does it say that?
4         THE DEPONENT:  Right here.
5     A.  I would agree that he probably felt he had
6  no choice, unless he wanted to be arrested.
7     Q.  Also referring to Page 4, the Court noted
8  that you brought with you into Mr. Gibson's house
9  "the ex-wife, the ex-wife's attorney, and
10 personally supervised the search for and recovery
11 of items."  Is that true?
12    A.  That's true what they said.  Again, I
13 disagree with the word "search".
14    Q.  Also on Page 4, the Court noted that:
15 "Several items were located and recovered,
16 including photographs, yearbooks, DVDs, recipes,
17 and a chainsaw."  Is that true?
18    A.  That's correct.
19    Q.  And the Court noted that you "made no
20 arrangements to record what went on inside the home
21 or outside the home."  Is that true?
22    A.  That is true.  Can I speak to that?
23    Q.  Sure.
24    A.  The Supreme Court talks about, in this

Page 18
1  Opinion, that I did not take a court reporter with
2  me.  I do not have a court reporter.  That's why it
3  has always been my practice, and Rule 8 of the West
4  Virginia Rules of Practice and Procedure for Family
5  Courts specifically states that I am the only one
6  who has the authority to film that -- to record
7  those proceedings.
8         So that -- that is why when we returned to
9  the home -- to the courtroom, I made every effort
10 to set forth everything that happened at the house
11 and gave both Mr. Gibson and Mr. Lusk an
12 opportunity to add to, detract from, or correct
13 anything that I said that had happened at the
14 scene.
15        But I have no way to record those
16 proceedings.
17    Q.  How do you usually record proceedings?
18    A.  With a computer.
19    Q.  And that takes place in your courtroom?
20    A.  Yes.
21    Q.  Other than these so-called visits over the
22 course of your 20 years as a family court judge,
23 did you ever have proceedings anywhere else, other
24 than the courtroom or inside a litigant's home?

Page 19
1     A.  Yes and no.  There have been times when
2  repairs or renovations to courtrooms were being
3  made and I had them in jury rooms or conference
4  rooms or that kind of thing.  Those all occurred
5  prior to my recording things on -- by video and
6  then recording.  Those were back in the days when I
7  did it on cassette tape.
8     Q.  In fact, the Court noted in the Opinion
9  that your bailiff had made his own cellphone
10 recording inside Mr. Gibson's home.
11    A.  That's correct.
12    Q.  Were you aware of that at the time that
13 Deputy McPeake was filming with his cellphone?
14    A.  No.
15    Q.  When did you first find out about that?
16    A.  When I got back to the office, he sent it
17 to me on my phone.
18    Q.  So he provided that directly to you?
19    A.  Yes.
20    Q.  So when he testified that he did not
21 provide that directly to you, that was incorrect?
22    A.  He was mistaken.
23    Q.  And when he sent you that video, what did
24 you do?

Page 20
1     A.  I sent it immediately to my case
2  coordinator and I deleted it from my phone.
3     Q.  But you never realized, at the time at
4  Mr. Gibson's house, that Deputy McPeake was
5  recording?
6     A.  No.
7     Q.  And you didn't ask him to record at the
8  house?
9     A.  No.
10    Q.  Had he been with you on prior visits to
11 litigants' homes?
12    A.  No.
13    Q.  So that was the first for McPeake?
14    A.  Yes.
15    Q.  So the Supreme Court Opinion was accurate
16 when it stated that you believed that McPeake
17 "making the recording was improper and that you
18 told him not to do it again"?
19    A.  Yes.  I have since reviewed Rule 8 and do
20 now realize that I have the authority to authorize
21 somebody to record it but I did not realize that at
22 the time.
23    Q.  Do you still believe that Rule 8, or any
24 other rule, authorizes you told proceedings in the

Page 57
1  voluntary?
2    A.  Yes.
3    Q.  And what was your answer --
4    A.  Yes.
5    Q.  -- during that hearing?
6    A.  Yes.
7    Q.  Okay.  Do you recall whether that testimony
8  was taken under oath?
9    A.  To my knowledge, it was.  Yes.
10   Q.  And was your testimony truthful that day?
11   A.  Yes.
12        MS. TULLY:  She's not denied that this
13 is her signature on the agreement.
14        MR. BRYAN:  Right.  But she's denied
15 that -- she says she was coerced and she testified
16 during that hearing that she voluntarily entered
17 that agreement, knowingly.
18   A.  With the knowledge that I had at the time,
19 yes.
20 BY MR. BRYAN:
21   Q.  Okay.  So at the time you entered the
22 agreement, you did so knowingly, voluntarily, and
23 intelligently, right?
24        MS. TULLY:  Objection.  Asked and

Page 58
1  answered.
2    Q.  But later changed your mind.
3    A.  I didn't change my mind.  I learned more
4  about the law and realized that some of those
5  canons I do not believe were violated.
6    Q.  Of course, the Supreme Court rejected your
7  --
8         MS. TULLY:  Objection.
9    Q.  -- your belief, right?
10   A.  Obviously.
11   Q.  Okay.  So rather than saying you were
12 coerced, wouldn't it be more accurate to say that
13 you had regret?
14   A.  I think it would be more accurate to say
15 that I think I made a mistake.
16   Q.  As we sit here today, do you believe that
17 you made any mistakes on March 4th, 2020 when you
18 visited Mr. Gibson's home?
19   A.  Yes.
20   Q.  And what -- what mistakes did you make?
21   A.  One mistake I think I made was I should
22 have informed Mr. Gibson before we left, while we
23 were going to his house.  I could not imagine at
24 the time that he did not know why we were going to

Page 59
1  the house, in that we were talking about stuff that
2  he testified under oath were still at the house.
3         But if I had to do it again, I would say,
4  "We are going to your house to get those items."
5         And, quite frankly, I would have made it
6  more clear to him that I was not doing it
7  punitively to him, but I did not want to put
8  Mr. Gibson in jail for not returning those items.
9         He's a corrections officer.  I did not
10 think he would be treated well if he went to jail,
11 and in my mind, if we could just go get those items
12 that he admitted were there, that he admitted she
13 was awarded, then that would solve everybody's
14 problem.
15        He would not be able to say that Ms. Gibson
16 destroyed the items after she got them.  Ms. Gibson
17 would not then be able to say that he destroyed or
18 he damaged the items after we retrieved them.  It
19 was the -- in my mind, it was the fairest, most
20 efficient way to resolve the case.
21   Q.  So what was your mistake?
22   A.  Not setting forth that clearly on the
23 record.
24   Q.  Is that it?

Page 60
1    A.  My mistake?  That's all I can think of.  I
2  think -- well, I'm not going to volunteer.
3    Q.  No, that's okay.  What?
4    A.  I think if I'd had a more experienced
5  bailiff -- I can think of another mistake I made.
6  If I'd had a more experienced bailiff that had done
7  this with me before, that that bailiff would not
8  have called for backup.
9         I had not known Deputy McPeake had called
10 for backup.  I knew he had said something on the
11 radio.  I always kind of assume they're saying
12 they're out of their vehicle or whatever.
13        The other mistake I made was when I arrived
14 there -- and I'm not saying he did it intentionally
15 but Mr. Gibson immediately came toward me, making
16 his motions, which he certainly was entitled to do
17 but it rattled me a little bit and I did not notice
18 all the other cars that were there.
19        And had I had the chance to get my
20 bearings, I would've had all those cars leave and
21 all those people leave because, as you know, Family
22 Court hearings are confidential, no one is allowed
23 in the hearing except the parties and any
24 witnesses.  None of those other people had been

Page 61

1 called as witnesses.
2     I did tell Ms. Gibson as we were leaving,
3 if she had a vehicle that she did not believe she
4 could fit the items that Mr. Gibson had admitted
5 were there that her father could come for the sole
6 purpose of hauling the items, but I would've
7 immediately had my bailiff clear out all the other
8 people because my experience is the more people you
9 have there, the more dangerous and out of hand it
10 can get.
11     But I did not do that because I was
12 immediately confronted with all these other
13 motions, which I was happy to rule on but it did
14 not give me the time I needed to assess the
15 situation and do the safety things I normally -- or
16 my bailiff normally would have done.
17   Q. You would agree with me that your physical
18 safety was never in jeopardy at any point at
19 Mr. Gibson's house.
20   A. I did not feel threatened. No. But as far
21 as speculating what could've happened, I don't
22 know.
23   Q. Okay. Mr. Gibson never threatened you in
24 any way, did he?

Page 62

1   A. No. As I said, he approached me quickly
2 when I got out of the vehicle and that rattled me.
3     Did it scare me? No.
4   Q. And, to the contrary, you threatened
5 Mr. Gibson with arrest, even though you knew he was
6 a federal correctional officer.
7     MS. TULLY: Object to form.
8   A. Again, I did not just threaten him with
9 arrest. I told him that I was instructing him to
10 let us in the house so that we could retrieve the
11 items and that that was an order of the Court. If
12 he refused to do that, he would be held in contempt
13 and one of the remedies for direct contempt of a
14 court order is arrest.
15   Q. And Deputy McPeake was present as your
16 bailiff when you made these statements to
17 Mr. Gibson.
18   A. Correct.
19   Q. Okay. And you were here when he testified
20 a few days ago during his deposition.
21   A. I was.
22   Q. Okay. And I believe that he testified that
23 he heard you threaten to arrest Mr. Gibson.
24   A. I just said that I -- what I said, which I

Page 63

1 am sure can be perceived as a threat.
2   Q. And had you ordered the arrest of
3 Mr. Gibson, it would've been Deputy McPeake that
4 made the arrest, right?
5   A. I assume so, yes.
6   Q. And, in fact, you wanted to make sure that
7 bailiffs who traveled with you to the home -- homes
8 of litigants had arrest powers.
9   A. That's a misstatement. When I asked --
10 because Deputy McPeake is a retired bailiff and
11 came in under this statute, they had been supplying
12 me with officers who were not certified.
13     I asked -- one of my requirements, as I am
14 entitled under the code, is to have a deputy with
15 arrest powers. I have never arrested anybody at a
16 scene. I have had people arrested in the courtroom
17 or outside the courtroom for direct contempt of
18 court. So I wanted a bailiff that if the courtroom
19 got out of control, that person could effect an
20 arrest. The two requests were not related.
21   Q. At some point in Mr. Gibson's front yard,
22 did you threaten to arrest any other third party,
23 other than Mr. Gibson?
24   A. Not to my memory, and I know what you're

Page 64

1 talking about. Mr. Lusk pointed out to me that
2 Mister -- and I didn't know she was his girlfriend
3 -- that there was a woman at the top of the
4 driveway recording.
5     My memory is I said, "Stop recording.
6 You're not allowed to record."
7     I do not believe I threatened to arrest
8 her.
9   Q. She was at the top of Mr. Gibson's
10 driveway.
11   A. Correct.
12   Q. And you're aware that that was somebody who
13 was with Mr. Gibson.
14   A. I assume so. I had never laid eyes on her
15 before.
16   Q. All right. Let me play some audio.
17     MR. BRYAN: Which I have some
18 electronic exhibits on this thumb drive and I'll
19 provide that to the court reporter.
20     MS. TULLY: Okay.
21   Q. I think this would be Exhibit 6. If I
22 click the right button here, this would be, I
23 believe, the audio recorded by Mr. Gibson
24 personally.