1        IN THE UNITED STATES DISTRICT COURT FOR THE

2             SOUTHERN DISTRICT OF WEST VIRGINIA

3                      AT BECKLEY

4
    * * * * * * * * * * * * * * * * * * * * * * * *
5
    MATTHEW GIBSON,
6
            Plaintiff,
7
    vs.                              CIVIL ACTION NO.
8                                    5:21-cv-00181
    LOUISE E. GOLDSTON, Individually,
9   COUNTY COMMISSION OF RALEIGH
    COUNTY, a political subdivision,
10  JEFF MCPEAKE, Individually,
    BRIAN WHITE, Individually,
11  BOBBY STUMP, Individually,
    KYLE LUSK, Individually,
12
            Defendants.
13
    * * * * * * * * * * * * * * * * * * * * * * * *
14

15

16          Deposition of LOUISE E. GOLDSTON taken by
    the Plaintiff under the Federal Rules of Civil
17  Procedure in the above-entitled action, pursuant to
    notice, before Bradford L. Cooper, a Notary Public,
18  at Pullin, Fowler, Flanagan, Brown, and Poe, PLLC,
    252 George Street, Beckley, West Virginia, on the
19  1st day of March, 2022.

20

21          REALTIME REPORTERS, a Huseby Company
          BRADFORD L. (Brad) COOPER, Notary Public
22                  713 Lee Street
                Charleston, WV  25301
23                  (304) 344-8463
                realtimereporters.net
24



LOUISE GOLDSTON                                        March 01, 2022
GIBSON V GOLDSTON                                                  2

```
1                      APPEARANCES:

2

  APPEARING FOR THE PLAINTIFF:
3
          John H. Bryan, Esquire
4         JOHN H. BRYAN, ATTORNEYS AT LAW
          411 Main Street
5         P.O. Box 366
          Union, West Virginia 24983
6         jhb@johnbryanlaw.com

7

  APPEARING FOR THE DEFENDANTS STUMP, MCPEAKE, AND
8 WHITE:

9         Kevin J. Robinson, Esquire
          PULLIN, FOWLER, FLANAGAN, BROWN,
10         AND POE, PLLC
          252 George Street
11        Beckley, West Virginia 25801

12

  APPEARING FOR THE DEFENDANT, LOUISE E. GOLDSTON:
13
          Jennifer E. Tully, Esquire
14        BAILEY & WYANT, PLLC
          500 Virginia Street East, Suite 600
15        P.O. Box 3710
          Charleston, West Virginia 25337-3710
16

17 APPEARING FOR THE SUPREME COURT OF APPEALS OF WEST
  VIRGINIA:
18
          Bradley Schmalzer, Esquire (via telephone)
19        Julianne Wisman, Esquire (via telephone)

20

  ALSO PRESENT:
21
          Bobby Stump, Defendant
22        Matthew Gibson, Plaintiff
          J.R. Morgan
23

24
```



1                    EXAMINATION INDEX

2

3          BY MR. BRYAN                              6

4

5

6

                        EXHIBIT INDEX

7

8    Exhibit 1   Louise Goldston Judicial            6
                 Disciplinary Proceeding
9
     Exhibit 2   Public Admonishment of the         23
10               Honorable Eric Shuck, Judge of the
                 13th Family Court Circuit
11
     Exhibit 3   Louise Goldston Judicial           43
12               Disciplinary Counsel Agreement

13   Exhibit 4   Formal Statement of Charges         44

14   Exhibit 5   Transcript of Judicial Board       56
                 Hearing of Louise Goldston dated
15               January 15, 2021

16   Exhibit 6   Audio Recording Recorded by        65
                 Plaintiff Matthew Gibson
17
     Exhibit 7   Video of the Incident at the Home  82
18               of Matthew Gibson

19   Exhibit 8   Divorce Hearing Video dated April  84
                 19, 2018
20
     Exhibit 9   Recording of Kyle Lusk at Hearing  90
21               re: Search

22   Exhibit 10  Voicemail Recording of Kyle Lusk   95

23

24



LOUISE GOLDSTON                                   March 01, 2022
GIBSON V GOLDSTON                                              4

```
 1                    OBJECTION INDEX

 2   BY MS. TULLY                              13
     BY MS. TULLY                              13
 3   BY MS. TULLY                              24
     BY MS. TULLY                              25
 4   BY MS. TULLY                              26
     BY MS. TULLY                              26
 5   BY MS. TULLY                              28
     BY MS. TULLY                              45
 6   BY MS. TULLY                              45
     BY MS. TULLY                              51
 7   BY MS. TULLY                              52
     BY MS. TULLY                              53
 8   BY MS. TULLY                              53
     BY MS. TULLY                              54
 9   BY MS. TULLY                              54
     BY MS. TULLY                              54
10   BY MS. TULLY                              57
     BY MS. TULLY                              58
11   BY MS. TULLY                              62
     BY MS. TULLY                              75
12   BY MS. TULLY                              76
     BY MS. TULLY                              79
13   BY MR. ROBINSON                           91
     BY MS. TULLY                              94
14   BY MS. TULLY                              96
     BY MS. TULLY                              98
15   BY MS. TULLY                              99
     BY MS. TULLY                             100
16   BY MS. TULLY                             103
     BY MS. TULLY                             103
17

18

19

20

21

22

23

24
```



1            P R O C E E D I N G S

2            COURT REPORTER:  This is the

3  deposition of Louise E. Goldston in the matter of

4  Matthew Gibson versus Louise E. Goldston, et al.,

5  taking place at the offices of Pullin, Fowler,

6  Flanagan, Brown, and Poe in Beckley, West Virginia

7  on this 1st day of March, 2022.  The time is

8  10:16 a.m.  We are now on the record.

9            This case is venued in the United

10  States District Court for the Southern District of

11  West Virginia at Beckley, being Civil Action No.

12  5:21-cv-00181.

13            My name is Brad Cooper on behalf of

14  Realtime Reporters, located at 713 Lee Street in

15  Charleston, West Virginia.  I am your court

16  reporter and a Notary Public.

17            At this time, would counsel please

18  state their appearances and whom they represent and

19  then I'll swear in the witness.

20            MS. TULLY:  Jennifer Tully on behalf

21  of Defendant Judge Louise Goldston.

22            MR. BRYAN:  John Bryan on behalf of

23  the Plaintiff, Matthew Gibson.

24            MR. ROBINSON:  Kevin Robinson on



1  behalf of Defendants Stump, McPeake, and White.

2              MS. TULLY:  Hey Brad, we need you-all

3  to state your appearance, please.

4              MR. SCHMALZER:  Bradley Schmalzer and

5  Julianne Wisman with the Supreme Court of Appeals

6  of West Virginia.

7              (The witness was sworn.)

8       GOLDSTON DEPOSITION EXHIBIT NO. 1

9              (Louise Goldston Judicial Disciplinary

10             Proceeding was marked for

11             identification purposes as Goldston

12             Exhibit No. 1.)

13      L O U I S E   E .   G O L D S T O N

14  was called as a witness by the Plaintiff, pursuant

15  to notice, and having been first duly sworn,

16  testified as follows:

17                   EXAMINATION

18  BY MR. BRYAN:

19     Q.  Please state your name.

20     A.  Louise Ellen Goldston.

21     Q.  And have you ever had your deposition taken

22  before?

23     A.  Unless you count the sworn statement I gave

24  to the JDC, no.



LOUISE GOLDSTON                                    March 01, 2022
GIBSON V GOLDSTON                                               7

1      Q.  Have you had an opportunity to review the

2   Supreme Court Opinion that was issued in your

3   judicial disciplinary case?

4      A.  I have.

5      Q.  I'm going to be referring to that, and I

6   went ahead and marked that as Exhibit 1 here.  So

7   if at any point you need to review it.

8      A.  If I review anything, I'll have to have my

9   glasses.  Okay.

10     Q.  All right.  In the Supreme Court Opinion of

11  which you were the Respondent, the issue came up

12  about whether your conduct consisted of a search of

13  a view.  Is that right?

14     A.  Correct.

15     Q.  Okay.  And the Supreme Court in their

16  Opinion held that regarding the threshold question

17  of whether you searched Mr. Gibson's home or

18  whether you viewed it, the Court said we find that

19  she searched it.  Is that true?

20     A.  That's true.

21          MS. TULLY:  Are you saying is it true

22  that that's what the Supreme Court said, or are you

23  asking her if it's true that she searched the home?

24          MR. BRYAN:  Well, I can ask her both.



1                    MS. TULLY:  I'm just trying to clarify

2       what she saying.

3                    THE DEPONENT:  I interpreted it as did

4       the Supreme Court find that.

5       BY MR. BRYAN:

6          Q.  Right.  The Supreme Court found that you

7       searched Mr. Gibson's home, right?

8          A.  Correct.

9          Q.  Do you disagree with that, that you

10      searched Mr. Gibson's home?

11         A.  Yes.

12         Q.  The Supreme Court rejected what they called

13      your attempt to reframe your conduct.  Right?

14         A.  I disagree with the word "reframe".  They

15      disagreed with my argument that it was not a

16      search.

17         Q.  The West Virginia Supreme Court said in

18      their holding:  "We reject the Judge's attempt to

19      reframe her conduct."  Correct?

20         A.  I'm sure that's probably what they said.

21         Q.  Okay.  So the Supreme Court used the word

22      "reframe".

23         A.  They did.

24         Q.  You disagree with the use of that word but



1  they used it.

2      A.   They used it.  I disagree with it.

3      Q.   The Supreme Court found that you led a

4  search of the homeowner's residence, not a judicial

5  view.

6      A.   That's what they found.

7      Q.   The West Virginia Supreme Court further

8  found that in so doing, that you "exercised

9  executive powers forbidden to you under the West

10 Virginia Constitution".  Is that true?

11     A.   That is what they found.

12     Q.   Okay.  Do you disagree with that?

13     A.   Yes.

14     Q.   The Court further held in that Opinion that

15 you did not go to the property to observe the

16 ex-husband's house but that you went there to

17 locate and seize certain of its contents:

18 Pictures, DVDs, and other items of personal

19 property.  Is that true?

20     A.   That is true.

21     Q.   Do you disagree with the Supreme Court's

22 holding?

23     A.   Which holding?

24     Q.   That you went to the house to locate and



1  seize certain contents - personal property - in the

2  house.

3       A.  I disagree that I went there personally to

4  locate them.  I do agree that I went there to seize

5  them.

6       Q.  And why do you -- why do you disagree that

7  you went there to locate them?

8       A.  Because, as is clear on the tape taken by

9  Officer McPeake, I did not look for nor try to

10 locate anything.  I asked Mrs. Gibson where those

11 items that she was not given, as awarded in the

12 order -- where they were located when she lived

13 there.  I told her to look there.  She asked to

14 look other places.  I denied that request.

15      So I did not attempt to locate anything.

16 The things that she was awarded that were in the

17 same place that they'd been when the couple lived

18 there together, I allowed her to take.

19      Q.  However, the Supreme Court stated that "the

20 record is clear that Judge Goldston went to the

21 property to locate things, not simply to observe

22 them."  Right?

23      A.  That is what they found.

24      Q.  Okay.  That's -- that's what the Supreme



1 │ Court found but you disagree.

2 │    A.   I think I've already answered that but yes.

3 │ I did not go there to locate them.  I went there to

4 │ allow Mrs. Gibson to retrieve the items she had

5 │ been awarded.

6 │    Q.   Did you --

7 │    A.   And Mister -- and only the items that

8 │ Mr. Gibson had previously testified were still

9 │ there.

10 │    Q.   Okay.  But you -- you didn't know where

11 │ they were inside his house, did you?

12 │    A.   I did not, and I did not look.

13 │    Q.   So they -- somebody had to locate them

14 │ inside the house.

15 │    A.   That's correct.

16 │    Q.   Okay.  And nobody asked Mr. Gibson to go in

17 │ his house and bring the items outside.

18 │    A.   No.

19 │    Q.   You went in, right?

20 │    A.   I did.

21 │    Q.   And the bailiff -- your bailiff went in.

22 │    A.   He did.

23 │    Q.   Mrs. Gibson went in.

24 │    A.   She did.



1    Q.   And Mr. Lusk went in.

2    A.   Yes.

3    Q.   To locate the items.

4    A.   Yes.  I would say retrieve the items but --

5    Q.   In fact, the Supreme Court noted in their

6    Opinion that when Mr. Gibson demanded a list of

7    what you were seeking, you replied, "You have a

8    list of everything attached to the order."

9         And when he professed not to know where

10   some of it's at, you replied, "Well, we're going to

11   find it."

12   A.  I did.

13   Q.   Okay.  So as the Supreme Court noted, you

14   told Mr. Gibson that you would be going inside his

15   house to find items.

16   A.   Correct.

17   Q.   But you disagree with the categorization of

18   that is a search.

19   A.   That that is a search by me, yes.

20   Q.   You would admit that it's a search by

21   somebody.

22   A.   Again, I told Mrs. Gibson she could look

23   only in places where the items she had been awarded

24   were located and that if they were not there she



 1  could not look further.

 2      Q.  So is it your position that the ex-wife,

 3  Mrs. Gibson, was the one performing the search?

 4      A.  Again, I disagree --

 5              MS. TULLY:  Objection.  Asked and

 6  answered.

 7              MR. BRYAN:  Well, I don't know that

 8  that specific question was answered.  I'm just

 9  trying to clarify.

10  BY MR. BRYAN:

11      Q.  Do you -- do you deny -- you don't --

12  correct me if I'm wrong, if I misunderstand your

13  position.  You don't deny that a search took place.

14  You just deny that you performed the search.

15      A.  I would not --

16              MS. TULLY:  Again, asked and answered.

17      A.  And again, I would not -- I would not

18  characterize it as a search.

19      Q.  By anybody.

20      A.  By anybody.

21      Q.  The West Virginia Supreme Court held in

22  their Opinion that:  "Judge Goldston admits that

23  she had a 20-year practice of going to parties'

24  homes 'to either determine if certain disputed



LOUISE GOLDSTON                                          March 01, 2022
GIBSON V GOLDSTON                                                    14

1  marital property was present and/or to supervise

2  the transfer of disputed property.'"  Is that

3  right?

4       A.  Can you read that for me one more time?

5  I'm sorry.

6            MS. TULLY:  Do you want to show her

7  the Supreme Court order --

8            MR. BRYAN:  It's on -- yeah.

9            MS. TULLY:   -- and you can reference

10  the page numbers?

11            MR. BRYAN:  It's on Page 4.  I'll show

12  you Exhibit 1, if you want to review or open it to

13  Page 4.

14  BY MR. BRYAN:

15       A.  I'm sorry.  What am I looking for?

16       Q.  All right.  Let me rephrase the question.

17  The West Virginia Supreme Court stated in their

18  Opinion that you --

19            MR. BRYAN:  I'm sorry.  Strike that.

20  I'm on my wrong question here.

21       Q.  The West Virginia Supreme Court held -- I'm

22  sorry.  This is Page 2.  I apologize.  I'm

23  butchering that.  The bottom of Page 2.

24            The Court held that:  "Judge Goldston



1  admits that she had a 20-year practice of going to

2  parties' homes 'to either determine if certain

3  disputed marital property was present and/or to

4  supervise the transfer of disputed property.'"

5      A.  I agree that's what's they found.

6      Q.  Okay.  Do you disagree that that is

7  correct, that that is accurate?

8      A.  I would -- I would dispute that I had a

9  20-year practice of doing that.

10     Q.  Well, where did that fact come from?

11     A.  It probably came from my statement in which

12 I said that I had done it on several occasions,

13 probably over 20 years.  But as far as a 20-year

14 practice of going to homes, the 10 or 11 times I

15 did that over 20 years, to me, is not a 20-year

16 practice.

17     Q.  Okay.  The Supreme Court also stated in

18 their Opinion that you said to Mr. Gibson, "Let me

19 in the house or he [the bailiff] is going to arrest

20 you for being in direct contempt of court."

21     A.  Can you tell me where that is?

22     Q.  Page 4.

23     A.  They quote that.  That is not my memory of

24 what I said.



1         My memory of what I said was:  "Mr. Gibson,

2    I am directing you to let me in the house so that

3    Mrs. Gibson can retrieve her property.  If you do

4    not do that, you will be in direct contempt of a

5    court order for which you can be arrested."

6         And I believe that's a correct statement of

7    the law.

8    Q.  Okay.  So you told Mr. Gibson to let you in

9    the house or he would be arrested for being in

10   direct contempt of court?

11   A.  That's a summarization of what I just said.

12   It is not exactly what I said.  But the gist of it,

13   yes.

14   Q.  Okay.  And it's your testimony that the --

15   the quote of you contained in the Supreme Court

16   Opinion at Page 4 is inaccurate?

17   A.  It's not my memory of my exact words.

18   Q.  Well, do you have any idea where they would

19   have obtained that in the record?

20   A.  No, unless it came from my statement given

21   to the JDC.

22   Q.  The Court also noted - this is also on Page

23   4 - that you agreed - you agreed - that Mr. Gibson

24   felt that he had no choice but to let you and the



1  others inside his house.  Is that true?

2      A.  Can you show me where that is?

3           MS. TULLY:  Where does it say that?

4           THE DEPONENT:  Right here.

5      A.  I would agree that he probably felt he had

6  no choice, unless he wanted to be arrested.

7      Q.  Also referring to Page 4, the Court noted

8  that you brought with you into Mr. Gibson's house

9  "the ex-wife, the ex-wife's attorney, and

10 personally supervised the search for and recovery

11 of items."  Is that true?

12     A.  That's true what they said.  Again, I

13 disagree with the word "search".

14     Q.  Also on Page 4, the Court noted that:

15 "Several items were located and recovered,

16 including photographs, yearbooks, DVDs, recipes,

17 and a chainsaw."  Is that true?

18     A.  That's correct.

19     Q.  And the Court noted that you "made no

20 arrangements to record what went on inside the home

21 or outside the home."  Is that true?

22     A.  That is true.  Can I speak to that?

23     Q.  Sure.

24     A.  The Supreme Court talks about, in this



1  Opinion, that I did not take a court reporter with

2  me.  I do not have a court reporter.  That's why it

3  has always been my practice, and Rule 8 of the West

4  Virginia Rules of Practice and Procedure for Family

5  Courts specifically states that I am the only one

6  who has the authority to film that -- to record

7  those proceedings.

8        So that -- that is why when we returned to

9  the home -- to the courtroom, I made every effort

10 to set forth everything that happened at the house

11 and gave both Mr. Gibson and Mr. Lusk an

12 opportunity to add to, detract from, or correct

13 anything that I said that had happened at the

14 scene.

15       But I have no way to record those

16 proceedings.

17    Q.  How do you usually record proceedings?

18    A.  With a computer.

19    Q.  And that takes place in your courtroom?

20    A.  Yes.

21    Q.  Other than these so-called visits over the

22 course of your 20 years as a family court judge,

23 did you ever have proceedings anywhere else, other

24 than the courtroom or inside a litigant's home?



1      A.  Yes and no.  There have been times when

2   repairs or renovations to courtrooms were being

3   made and I had them in jury rooms or conference

4   rooms or that kind of thing.  Those all occurred

5   prior to my recording things on -- by video and

6   then recording.  Those were back in the days when I

7   did it on cassette tape.

8      Q.  In fact, the Court noted in the Opinion

9   that your bailiff had made his own cellphone

10  recording inside Mr. Gibson's home.

11     A.  That's correct.

12     Q.  Were you aware of that at the time that

13  Deputy McPeake was filming with his cellphone?

14     A.  No.

15     Q.  When did you first find out about that?

16     A.  When I got back to the office, he sent it

17  to me on my phone.

18     Q.  So he provided that directly to you?

19     A.  Yes.

20     Q.  So when he testified that he did not

21  provide that directly to you, that was incorrect?

22     A.  He was mistaken.

23     Q.  And when he sent you that video, what did

24  you do?



1      A.  I sent it immediately to my case

2  coordinator and I deleted it from my phone.

3      Q.  But you never realized, at the time at

4  Mr. Gibson's house, that Deputy McPeake was

5  recording?

6      A.  No.

7      Q.  And you didn't ask him to record at the

8  house?

9      A.  No.

10      Q.  Had he been with you on prior visits to

11  litigants' homes?

12      A.  No.

13      Q.  So that was the first for McPeake?

14      A.  Yes.

15      Q.  So the Supreme Court Opinion was accurate

16  when it stated that you believed that McPeake

17  "making the recording was improper and that you

18  told him not to do it again"?

19      A.  Yes.  I have since reviewed Rule 8 and do

20  now realize that I have the authority to authorize

21  somebody to record it but I did not realize that at

22  the time.

23      Q.  Do you still believe that Rule 8, or any

24  other rule, authorizes you told proceedings in the



 1  home of a litigant?

 2     A.  I don't think Rule 8 does, no.

 3     Q.  Do you believe that anything authorizes you

 4  to hold a proceeding in the home of a litigant?

 5     A.  I think there's a statute that allows me to

 6  seize property that has not been turned over.

 7     Q.  Allows you to personally seize property?

 8     A.  It doesn't say anybody else.  It says I

 9  have the authority to seize.

10     Q.  And what statute is that?

11          THE DEPONENT:  You don't have my book

12  with you, do you?

13     A.  §51-2A-9(b)

14     Q.  So it says you have the authority to seize

15  and you take that to mean that -- that that could

16  authorize you to personally make the seizure?

17     A.  It doesn't say I can't.

18     Q.  So you wouldn't take that to mean that you

19  could order law enforcement to seize property?

20     A.  It doesn't say I can't do it either way.

21  It says:  "Sanctions may include, but are not

22  limited to, seizure or impoundment of property to

23  secure compliance with a prior order."

24     Q.  With that in mind, let's turn back to the



1  Supreme Court Opinion.

2        The Supreme Court Opinion said that

3  searches are an activity of the executive

4  department.  Is that true?

5      A.  That's what it says.

6      Q.  Okay.  Do you disagree?

7      A.  No.

8      Q.  The Court noted that:  "Indeed, searches

9  are quintessentially executive in nature that even

10  a judge who participates in one acts not as a

11  judicial officer but as an adjunct law enforcement

12  officer."

13      A.  Again, as -- I was acting as a judge and I

14  did not search.

15      Q.  Okay.  But the Supreme Court says that if

16  you participate in a search, you're acting as an

17  adjunct law enforcement officer.

18      A.  Correct.  I was not acting in a search.

19      Q.  Okay.  So if you believe that a statute

20  authorizes you to seize items, you would agree with

21  me that that does not include you personally

22  participating in a search and seizure.

23      A.  Not in a search, no.  In a seizure, it's

24  silent on that issue.



1      Q.  Okay.  So you would agree that a judge

2   shall not participate in a search but you think

3   possibly could personally participate in a seizure?

4      A.  I don't know of a statute that doesn't

5   allow me to do that as a judge.

6      Q.  Okay.  So you don't believe that the

7   seizure portion of a search and seizure is an

8   executive action?

9      A.  No, and I don't believe that search and

10   seizures go hand-in-hand necessarily every time.

11      Q.  Okay.  The Supreme Court further held that:

12   "Because Judge Goldston plainly engaged in a

13   search, we find that the so-called 'view' was

14   improper."  Is that true?

15      A.  That's what they found.

16      Q.  Do you disagree with that?

17      A.  Yes.

18      Q.  And why do you disagree with that?

19      A.  Because I didn't do a search.

20      Q.  I'll show you what has been marked as

21   Exhibit 2 here.

22          GOLDSTON DEPOSITION EXHIBIT NO. 2

23              (Public Admonishment of the Honorable

24              Eric Shuck, Judge of the 13th Family



1               Court Circuit was marked for

2               identification purposes as Goldston

3               Exhibit No. 2.)

4     Q.  That is a written admonishment of Judge

5  Shuck.  Have you reviewed that before?

6     A.  A long time ago.  I'm fairly familiar with

7  it.

8     Q.  On Page 2 of that document, the Shuck

9  admonishment, it notes that on July 24th, 2020, the

10  Judicial Disciplinary Council took Judge Shuck's

11  sworn statement during which "he opined that he

12  believed it was proper to visit litigants' homes

13  because a colleague had engaged in the same

14  practice for several years."

15               Have you -- have you see where that was

16  written in that?

17     A.  Yes.

18     Q.  Okay.  Do you know who the colleague was

19  that Judge Shuck was referring to?

20               MS. TULLY:  Objection.  Calls for

21  speculation.  Answer, if you know.

22     A.  I don't -- I can't -- I wasn't inside Judge

23  Shuck's mind.

24     Q.  Okay.  Well, did -- you agree with me that



LOUISE GOLDSTON                                    March 01, 2022
GIBSON V GOLDSTON                                              25

 1  it says that he thought he could do it because a

 2  colleague had been doing it.

 3      A.   That's what it says, yes.

 4      Q.   And Shuck was a family court judge.

 5      A.   Did you say Shuck?

 6      Q.   Judge Shuck was a family --

 7      A.   I thought you said Chuck.  I'm sorry.  He

 8  was a family court judge.

 9      Q.   And you are a family court judge.

10      A.   Yes.

11      Q.   So you were a colleague of his at the time

12  he was admonished.

13      A.   I was.

14      Q.   And you were engaging in the same behavior.

15           MS. TULLY:   Objection.

16      A.   I was conducting home visits.

17      Q.   Okay.  So he was --

18      A.   I had conducted them.

19      Q.   He was admonished for conducting what you

20  call these home visits.

21      A.   Correct.

22      Q.   He said that he thought he could do it

23  because a colleague of his had been doing it for

24  many years.



1    A.  Correct.

2    Q.  And my question to you is:  Who was he

3  referring to, if you know?

4              MS. TULLY:  Objection.

5    A.  I do not know.

6    Q.  You don't know if he was referring to you?

7    A.  I do not know.

8    Q.  All right.  Take a look at the footnote.  I

9  believe there's a footnote on Page 2 in the

10  sentence I was just reading to you.

11        Can I see it real quick?

12    A.  Uh-huh.

13    Q.  Footnote 2 on Page 2 of the Shuck

14  admonishment says that the colleague that Shuck was

15  referring to, "who is also the subject of a

16  judicial disciplinary proceeding, recently engaged

17  in a visit to a litigant's ex-husband's home to

18  search for marital property that had been the focus

19  of a contempt proceeding."

20        Does that indicate to you that you were the

21  colleague referenced in the Shuck admonishment?

22              MS. TULLY:  Objection.  Calls for

23  speculation.

24    A.  Again, as I was painfully told many times,



1  judicial investigations are confidential.  I do not

2  know all the judges that may or may not have been

3  under investigation at the time.

4      Q.  You would agree with me that it's

5  referencing you in the document.

6      A.  I don't know.

7      Q.  You don't know.  All right.  Well, let me

8  read some more.

9      A.  I will tell you that under -- I mean, I'm

10  not trying to argue with you.  I will tell you, at

11  the time, I wasn't under an investigation.  If

12  that's referring to me, I don't know it.

13      Q.  Okay.  I mean, it sounds like this case.

14          "The ex-husband was not represented by a

15  lawyer and was not advised of the purpose of the

16  visit prior to the judge, his ex-wife, and her

17  lawyer going to the home.  Once there, the

18  ex-husband moved to disqualify the judge but was

19  told the motion was not timely and would have to be

20  submitted in writing."

21          That's this case, right?

22      A.  Again, the facts are similar.  I do not

23  know.

24      Q.  You're not aware of any other family court



 1  judge who is under a -- subject to a judicial

 2  disciplinary proceeding for visiting litigants'

 3  homes, do you?

 4      A.  They're confidential.  I don't know of them

 5  -- of any.

 6      Q.  So you don't -- you have no idea whether or

 7  not this Shuck admonishment is referring to you as

 8  the colleague?

 9              MS. TULLY:  Objection.  This has been

10  asked and answered now five different times.

11              MR. BRYAN:  All right.

12              MS. TULLY:  Her answer is not

13  changing.

14              MR. BRYAN:  Your objection is noted.

15  BY MR. BRYAN:

16      Q.  Just for the record, you have no idea if

17  this is referring to you?

18      A.  I cannot confirm nor deny.

19      Q.  Did you ever have any conversations with

20  Judge Shuck about visiting the homes of litigants?

21      A.  No.

22      Q.  Never?

23      A.  Prior to the -- prior to either of us

24  going?  No.



1     Q.  At any time.

2     A.  Once his admonishment came out we may have

3  had a conversation.

4     Q.  And what did you discuss?

5     A.  How unfair we thought it was.

6     Q.  And he didn't mention to you bringing you

7  up during his statement?

8     A.  Not that I recall.

9     Q.  Do you know how Judge Shuck would've known

10  that you had engaged in that practice previously?

11     A.  It wasn't a secret.  As far as he and I

12  ever talking about it as a remedy, we did not, to

13  my knowledge.

14     Q.  And why wasn't it a secret?

15     A.  Because I did it.

16     Q.  Over the course of 20 years.

17     A.  And I just want the record clear.  I've

18  been serving 28 years.  Probably did not do it

19  until I was a family court judge, so that would

20  have been about 20, 22 years.

21          And again, over that course I probably did

22  it 11 or 12 times.

23     Q.  Do you recall how many of those approximate

24  11 or 12 times involved Kyle Lusk as one of the



1  lawyers?

2      A.  Zero.

3      Q.  Do you recall who any of the other lawyers

4  were who went on these visits with you?

5      A.  Yes.

6      Q.  And who were they?

7      A.  I don't remember them all.  The ones I can

8  remember are Buck Byron, Thomas Evans, Tim

9  Lupardus.  Those are all the -- the only ones I can

10 remember offhand.  I'm not saying at all that

11 that's an exhaustive list.

12     Q.  Was -- do you remember -- was there always

13 a bailiff with you when you did these?

14     A.  Always.

15     Q.  Do you remember who any of the other

16 bailiffs are, other than McPeake, who went with you

17 on these home visits?

18     A.  The great majority of them were Bobby

19 Stump.  Dave Stafford went with me.  Aaron Lilly

20 went with me.

21     Q.  So that would be Lieutenant Stafford?

22     A.  Yes.

23     Q.  And Greg Lilly would be --

24     A.  Not Greg Lilly.  Aaron Lilly.



```
 1     Q.  Aaron Lilly.  Is that Sergeant Lilly?

 2     A.  Sergeant Lilly.  He is Judge McGraw's main

 3  bailiff.  Jimmy Miller may have but I'm not sure of

 4  that.

 5     Q.  And did ever have any conversations with

 6  these bailiffs about --

 7              (Office door buzzer rings.)

 8     A.  Is that all right?

 9          MR. ROBINSON:  Yeah.  Somebody should

10  be here to answer that but it should be fine.

11          THE DEPONENT:  Okay.

12  BY MR. BRYAN:

13     Q.  Did you ever have any conversations with

14  these bailiffs about doing these so-called home

15  views?

16     A.  In what regard?

17     Q.  I mean, in any regard.  Did you give them

18  any rules or policies or procedures to follow when

19  you went to the home of a litigant?

20     A.  It's hard to explain a relationship between

21  a judge and a bailiff.  After any period of time,

22  they are my right hand and they know what I expect.

23          So did I give them any specific

24  conversations?  If we were there and I wanted them
```



1  to do something, I instructed them to do that.  But

2  as far as visits themselves, I will tell you I had

3  a conversation with Sheriff VanMeter because one of

4  my bailiffs was forced to leave and they had to

5  hire, who turned out to be Jeff McPeake because

6  they didn't have enough manpower.

7          And when -- and I was concerned that he

8  would have arrest powers and access to a car and

9  Sheriff VanMeter said, "Why does he need a car?"

10         And I said, "On occasion, I will go to a

11  home to" -- I'm not sure of the exact words, but to

12  help execute transfer of property.

13         And he said, "I will make sure he has a

14  car."

15         But now Sheriff VanMeter never went with

16  me.

17     Q.  Do you recall when that conversation took

18  place?

19     A.  Immediately prior to the hiring of Jeff

20  McPeake.

21     Q.  So when was that?

22     A.  It was September -- what's this year -- '22

23  -- of '19, I believe.

24     Q.  So that's something that took place prior



1  to the incident at Mr. Gibson's home?

2      A.  Correct.

3      Q.  So the sheriff was aware that you had this

4  practice of visiting the homes of litigants.

5      A.  Yes.

6      Q.  It sounds like two different supervisors,

7  sergeant Lilly and Lieutenant Stafford of the

8  sheriff's department, were both aware that you had

9  this practice of visiting litigants' homes.

10     A.  Yes, except I would not characterize

11  Sergeant Lilly as a supervisor.

12     Q.  Okay.  Well, if --

13     A.  The head bailiff was Lieutenant Stafford.

14     Q.  Okay.  And if Deputy McPeake characterized

15  Sergeant Lilly as somebody he went to similar to a

16  supervisor, you --

17     A.  I think he did that when Lieutenant

18  Stafford was not available because he outranked

19  him.

20     Q.  Okay.  So it's your understanding that

21  Stafford really was the supervisor for your

22  bailiff.

23     A.  He's the head bailiff of the judicial

24  annex.  Yes.



1    Q.  And Stafford, himself, had been on one of

2  these trips with you before?

3    A.  At least one, yes.

4    Q.  Possibly multiple.

5    A.  Possibly but I think just one.

6    Q.  Did any of them question to you whether

7  perhaps this is appropriate --

8    A.  No.

9    Q.  -- for you to be traveling to the homes?

10   A.  No.

11   Q.  So how does it work?  I mean, who -- when

12 you have a bailiff who presumably is the one

13 driving you to these places and, as you mentioned,

14 has arrest powers, who does the bailiff take orders

15 from:  You or Lieutenant Stafford or some other

16 supervisor on the sheriff's department?

17   A.  When we are on the scene, me.

18   Q.  Does -- is it your understanding that your

19 bailiff on the scene -- that your bailiff -- would

20 he have the ability to not follow one of your

21 orders?

22   A.  You'd have to ask the bailiff that.

23   Q.  Did you have any sort of written policies

24 or rules that you provided to your bailiffs?



1      A.  No.

2      Q.  It would have been all verbal?

3      A.  Yes.

4      Q.  On any of these visits, including this one,

5  did your bailiffs ever do anything above and beyond

6  just ensuring your safety?

7      A.  They may, on occasion, have -- and I'm

8  thinking specifically of Lieutenant Stafford at

9  this time -- the home that he went with me, there

10  were, what I called, junk car parts there, and one

11  of them was heavy and the man who was retrieving --

12  we were retrieving the car parts for, one of them

13  was a transmission maybe.  Something that's heavy.

14  And Lieutenant Stafford actually helped this man's

15  brother pick up the transmission, or whatever it

16  was, and put it in the car -- in the back of the

17  truck.

18      Q.  Do you remember about when that was?

19      A.  No.  It would've been after -- I'm fairly

20  certain it would've been after Sergeant Stump left

21  me.

22      Q.  Do you recall when that was?

23      A.  2016-ish, '17-ish.

24      Q.  And how long --



1      A.   Shortly after VanMeter was elected.

2      Q.   How long was Sergeant Stump with you as a

3  bailiff?

4      A.   10 to 11 years.

5      Q.   Where did you first get the idea to do one

6  of these visits to a litigant's home?

7      A.   Mr. Byron was in a case, and it was the

8  first time I ever did this.

9      Q.   And that's a lawyer?

10     A.   That's a lawyer.  A very good lawyer.  He's

11 retired now.  And I can't for the life of me

12 remember the other lawyer on the other side, and I

13 think it was before Officer Stump worked for me but

14 it may not have been.

15          There was a piece of jewelry that had been

16 handed down to this lady for -- it had great

17 sentimental value to her, and she told me she knew

18 exactly where it was.

19          And Mr. Byron said, "Can we go look for

20 it?"

21          And I said, "Do I have the authority to do

22 that, Mr. Byron?"

23          The other lawyer said, "Judge, you do and

24 let's just go look."  And so we went and looked.



1    Q.  And that was your -- that was the first

2    time?

3    A.  Yes.  I'm sorry.

4    Q.  And prior to that you had never

5    participated in anything like that as a lawyer?

6    A.  As a lawyer?

7    Q.  Yes.

8    A.  No.

9    Q.  So, essentially, at the very beginning, it

10   was Mr. Byron's idea?

11   A.  Correct.  And he indicated, when he said I

12   have the authority, that other family law masters

13   that he had appeared before had done that.  So I

14   may have been a family law master at the time

15   instead of a -- that's all blurry to me.

16   Q.  As we sit here today, are you aware of any

17   other family court judges, other than Judge Shuck,

18   who have visited the homes -- home of a litigant?

19   A.  Yes.

20   Q.  Who else?

21   A.  Judge Clark.  I'll be honest with you, at

22   our last conference I had probably six or seven

23   come and tell me they had done it.  I don't

24   remember their names.



1      Q.   And when you say conference, you mean the

2  Family Court Judges Association?

3      A.   Yes.

4      Q.   And when was that conference?

5      A.   I'm trying to think if it was the spring or

6  the fall.   It must have been the spring of '21.

7      Q.   And was that in Morgantown?

8      A.   It was.

9      Q.   Okay.   So multiple family court judges came

10 up to you and admitted to engaging in the same

11 behavior?

12     A.   I disagree with the term "admitted" but

13 told me that they had done similar things, and they

14 thought I had the authority to do it.

15     Q.   And how many -- how many judges did you

16 say?

17     A.   I'd say six or seven.

18     Q.   And you don't recall the name of even one

19 of them?

20     A.   No.   You must remember it was a very

21 emotional time for me and I was just grateful for

22 the support I received.

23     Q.   Did you exchange any e-mail correspondence

24 or text message correspondence with any other



1  family court judges about visiting the home of a

2  litigant?

3      A.  Not to my recollection.

4      Q.  Did any of these six or seven family court

5  judges ever send you any e-mail correspondence?

6      A.  No.

7      Q.  How do you generally communicate with these

8  other family court judges who are also members of

9  this judicial association?

10      A.  I generally don't communicate with very

11  many.  There's very few that I'm close to.

12      Q.  Did you have --

13      A.  And I don't -- that doesn't mean I'm

14  enemies of the other ones.  Just naturally in a

15  group of however many of us there are, there are

16  several that I'm very close to.  The others I don't

17  generally communicate with.

18      Q.  Which ones are you close to?

19      A.  Close to that I talk to about this, or just

20  generally close to?

21      Q.  Just as you just referred to them.  There

22  are a few of them who you're close to.

23      A.  Mary Ellen Griffith.  Deanna Rock.  Dave

24  Greenberg.  Jim Douglas.  I would say Lera



1   VanMeter.  And that's probably about it that are

2   currently serving.

3       Q.  Out of the judges that you mentioned -

4   Griffith, Rock, Greenberg, Douglas, and VanMeter -

5   were any of those individuals one of the six or so

6   judges who came up to you and said that they had

7   done similar things?

8       A.  No.  I don't think so.  I -- it's not a

9   hard no but I don't think so.

10      Q.  Well, you're close to those judges, right?

11  Right?

12      A.  Yes.  I'm sorry.

13      Q.  And you would likely remember the name of

14  one of those judges had they been one of the ones

15  who came up to you.

16      A.  Correct.  I can tell you that they were

17  very supportive of what I had done.

18      Q.  Well, did any family court judge tell you

19  that they -- he or she was not supportive of what

20  you had done?

21      A.  Family court judges?  Not directly.  It was

22  evident to me from the occurrences at the Family

23  Court Conference that Trish Keller didn't think I

24  could do what I did.



LOUISE GOLDSTON                                        March 01, 2022
GIBSON V GOLDSTON                                                 41

1       Q.  Did you have any conversations with Judge

2   Stotler?

3       A.  At the conference or before?

4       Q.  Let me -- let me clarify that question.

5           Have you had any conversations with Judge

6   Stotler about the incident at Mr. Gibson's home?

7       A.  Not before the judicial board hearing memo

8   came out.

9       Q.  Okay.  After -- after the Judicial Hearing

10  Board hearing, did you have any communications with

11  Judge Stotler about the Gibson incident?

12      A.  We talked generally about it at the

13  conference.

14      Q.  And this was the same conference that we've

15  been discussing?

16      A.  Correct.

17      Q.  Okay.  And what did Judge Stotler

18  communicate to you?

19      A.  Mainly, he was glad it was over.

20      Q.  Anything else?

21      A.  He made it clear that he didn't think I had

22  done anything wrong but we both discussed the fact

23  that we didn't think there was anything wrong with

24  us talking about it now because his role on the



1   Judicial Hearing Board was complete.

2       Q.  But -- but you hadn't had any

3   communications with him prior to the Judicial

4   Hearing Board hearing?

5       A.  Absolutely not.

6       Q.  At some point, Judge Stotler sent a letter

7   to the Supreme Court and multiple politicians

8   regarding Judicial Disciplinary Counsel.  Have you

9   seen that?

10      A.  I have seen that.

11      Q.  Were you aware of that letter prior to it

12  being sent?

13      A.  No.

14      Q.  Did you ever have any conversations with

15  Judge Stotler about the accusations that he made in

16  the letter?

17      A.  No.

18      Q.  Did you -- did any of your communications

19  with Judge Stotler about this matter take place

20  prior to that letter being sent?

21      A.  No.

22      Q.  So the first time that you talked to Judge

23  Stotler was after he sent that letter?

24      A.  As far as I know.  I'm not real familiar of



 1  when he sent it.

 2              THE DEPONENT:  I hate to ask but could

 3  I have a bathroom break?

 4              MS. TULLY:  I was actually just

 5  getting ready to say we've been going about an

 6  hour.  Can we take a break?

 7              MR. BRYAN:  Sorry.

 8              COURT REPORTER:  The time is

 9  11:03 a.m.  We're off the record.

10              (A short break was taken after which

11              the proceedings continued as follows:)

12              COURT REPORTER:  The time is

13  11:18 a.m.  We're on the record.

14         GOLDSTON DEPOSITION EXHIBIT NO. 3

15              (Louise Goldston Judicial Disciplinary

16              Counsel Agreement was marked for

17              identification purposes as Goldston

18              Exhibit No. 3.)

19  BY MR. BRYAN:

20     Q.  All right.  I'm going to show you what's

21  been marked as Exhibit 3 to this deposition, and

22  that is an agreement.

23              On September 30th of 2020, you signed an

24  agreement with Judicial Disciplinary Counsel in



1  your pending judicial disciplinary case.  Is that

2  right?

3      A.  Yes.

4      Q.  And Exhibit 3, is that a copy of that

5  document?

6      A.  It appears to be.

7      Q.  And you signed that agreement?

8      A.  I did.

9      Q.  Pursuant to that agreement, you admitted

10 the allegations of facts set forth in the formal

11 statement of charges against you.  Is that right?

12     A.  That's correct.

13         GOLDSTON DEPOSITION EXHIBIT NO. 4

14             (Formal Statement of Charges was

15             marked for identification purposes as

16             Goldston Exhibit No. 4.)

17     Q.  And I have that document here as well.

18 That's marked as Exhibit No. 4.  That's the formal

19 statement of charges.  You've reviewed that before.

20 Correct?

21     A.  Oh yes.

22     Q.  Okay.  So it's true that you admitted the

23 allegations of fact that were set forth against you

24 in that Formal Statement of Charges?



1        A.   As a result of a negotiated agreement, yes.

2        Q.   So, yes, you did agree to the allegations

3    of fact in the Formal Statement of Charges?

4              MS. TULLY:   Asked and answered.

5              MR. BRYAN:   Well, she qualified her

6    answer, so --

7        A.   My answer would be the same.

8        Q.   Okay.   So the -- the allegations of fact

9    set forth in the Formal Statement of Charges are

10   true?

11       A.   Let me look at them real quick.   I think

12   that they are, because they were negotiated and we

13   worked on them.

14            Yes, they are true and I will -- I would

15   like to note that nowhere in this Formal Statement

16   of Charges, nor in the agreement, does the word

17   "search" appear.

18       Q.   But you would agree with me that the West

19   Virginia Supreme Court of Appeals made it extremely

20   clear that they believe that you conducted a search

21   and not a mere view.   Correct?

22            MS. TULLY:   Objection.   Asked and

23   answered.

24       A.   Correct again.



1    Q.  That agreement also admitted that by

2    engaging in such conduct that you had violated

3    numerous rules of the Code of Judicial Conduct.

4    Correct?

5    A.  That's correct.

6    Q.  Do you recall what those code of conduct

7    rules are?

8    A.  I don't.  I can tell you that I attempted

9    to sign it without admitting the violations and

10   they would not take the deal without me admitting

11   those and said that I did.

12   Q.  Are you saying that you didn't voluntarily

13   agree to that agreement?

14   A.  I'm saying I voluntarily agreed to it

15   because I was told that if I did not agree to it I

16   would be suspended from the bench, and as a 28-year

17   public servant, I could not afford that, either

18   financially or mentally.

19   Q.  Okay.  You had -- you had the advice of

20   counsel prior to signing that agreement, right?

21   A.  Immediately prior, yes.  It was not

22   negotiated with counsel.

23   Q.  Okay.  At the time that you signed it, you

24   had counsel.



1      A.  I had counsel.

2      Q.  And the Supreme Court, in their Opinion,

3  mentions the existence of this agreement.

4      A.  Correct.

5      Q.  And the Supreme Court accepted the

6  agreement as valid.

7      A.  Correct.

8      Q.  And I don't believe at any point that you

9  or your counsel made the argument to the Supreme

10  Court that your signature on that document was

11  obtained involuntarily.

12      A.  I don't think that -- that was our

13  argument.  I think our argument was that I now had

14  a clearer understanding of the law after doing

15  extensive research and no longer thought that I had

16  violated those canons, which, admittedly, the

17  Supreme Court rejected.

18      Q.  Okay.  So, at one time, you admitted that

19  you violated these rules and the Code of Judicial

20  Conduct, and then changed your mind?

21      A.  At one time, I signed it, I believe, under

22  duress.  Once the Judicial Hearing Board issued

23  questions that we were to answer and I did the

24  research they requested, I came to believe from



1 that research that I had not violated the canons

2 and I had not committed misconduct, as set forth in

3 my argument to the -- to the -- in my questions to

4 the hearing board.

5        And it was not until that time, I believe,

6 because the JDC could not find any law to the

7 contrary on the questions that were asked, the

8 issue of search came up for the very first time.

9    Q.  Okay.  Well, you signed that document in

10 September -- September 30th of 2020, right?

11   A.  If you -- I don't doubt that date.

12   Q.  Well, let me make sure.

13   A.  Yes.

14   Q.  And when were the Formal Statement of

15 Charges issued?  In other words, how long had they

16 been pending before you signed the agreement?

17   A.  They were contemporaneously -- I mean, it

18 was -- they -- they particularly wanted one

19 document to come out and the next document to come

20 out either a day or two later.  They did not want

21 them to be entered simultaneously.

22        So this shows the 23rd of September.  So

23 one week later.  But I had seen them.  I mean, it

24 was all one package deal and they determined how



1  they would be released.

2      Q.  Okay.  It all points, throughout that

3  process -- I mean, you had the ability to not come

4  to an agreement and to proceed forward with your

5  due process, didn't you?

6      A.  I did.  I received a call from Teresa Tarr

7  that she characterized as her --  "This is my

8  'bully call', and if you do not sign the agreement,

9  I will do my job, I do it well, and you know well

10 that the Commission is seeking your suspension."

11         And that was before I had retained counsel.

12 And, quite frankly, because I received that call, I

13 retained counsel.

14     Q.  Are you aware of the fact that the

15 allegations made by Judge Stotler against the

16 Judicial Disciplinary Counsel were investigated by

17 the Office of Disciplinary Counsel for lawyers?

18     A.  Can you repeat that?  I'm sorry.

19     Q.  Are you aware of the fact that the Office

20 of Disciplinary Counsel for lawyers investigated

21 the allegations made by Judge Stotler about the

22 Judicial Disciplinary Counsel?

23     A.  Yes.  I testified.

24     Q.  Did you -- did you review the report or



1  ever see the report that --

2     A.  I saw it.  I did not read it page-by-page.

3     Q.  Okay.  You're aware of the fact that there

4  was an investigation and a subsequent report by the

5  ODC.

6     A.  Right, and I found it insulting, that it

7  took the word over two lawyers over -- took the

8  word of two lawyers over the words of two sworn

9  long-serving judges.

10    Q.  Okay.  So the allegations from you about

11 alleged duress in the process, which mirror the

12 allegations made by Judge Stotler, were

13 investigated by the ODC and found to be untrue.  Is

14 that fair?

15    A.  That is what they found and, again, I'd

16 like to point out the ODC and the JDC share the

17 same office suite.

18    Q.  And --

19    A.  And the same receptionist.

20    Q.  And why would you like to point that out?

21    A.  Because I think it stinks.

22    Q.  Why?

23    A.  I'm not going to say anything further than

24 that.  It's obvious.  They share a suite.



1    Q.  Are you accusing the ODC of being biased or

2  impartial?

3    A.  I am saying that it has the look,

4  appearance, of impropriety.

5    Q.  Well, you said that you didn't even read

6  their conclusions though.

7    A.  I didn't say I didn't read their

8  conclusions.  I said I didn't read the report

9  through.

10    Q.  You read some of it?

11    A.  I read the conclusions.

12    Q.  Okay.  You read the conclusions but you

13  didn't read the whole report.

14    A.  Not word-for-word, no.

15    Q.  Okay.  Having read it myself and recalling

16  that it was pretty specific and contained a lot of

17  detail, are you able to, as we sit here today, tell

18  me any -- any of the substance of that report that

19  is untrue or mischaracterizes what happened?

20         MS. TULLY:  Objection.  She's already

21  said she didn't read -- read it word-for-word.  You

22  can answer, if you know.

23    A.  I know that they took the words of Brian

24  Lanham and Terri Tarr over the words of Judge



1  Stotler and myself, and I find that to be

2  offensive.

3      Q.  Well, Judge Stotler wasn't involved in this

4  though, was he?

5      A.  He was the subject of the Complaint.

6      Q.  Right.  But Judge Stotler was relaying what

7  -- what he believed happened to you, right?

8              MS. TULLY:  Objection.  Calls for

9  speculation.

10     A.  I don't know what he testified to.

11     Q.  Okay.  Well, Judge Stotler -- Judge Stotler

12  was not involved in the investigation by the JDC

13  against you.

14             MS. TULLY:  Objection.  Calls for

15  speculation.

16     Q.  Right?

17     A.  He was not involved in the investigation.

18  He sat on the hearing board that heard the --

19     Q.  Judge Stotler had made complaints about the

20  way you were allegedly treated by the JDC.

21     A.  That's -- yes.

22     Q.  Okay.  How did Judge Stotler have any

23  personal knowledge about how you were treated?

24     A.  From the pleadings.



1      Q.  From the pleadings.  You didn't communicate
2  any information to him?
3      A.  Again, no.
4      Q.  So, in other words, he was not a fact
5  witness to any of the events surrounding your
6  investigation by the JDC, right?
7              MS. TULLY:  Objection.  Calls for
8  speculation.  Answer, if you know.
9      A.  I don't understand the question.
10      Q.  Let me -- let me rephrase that.  You just
11  testified that the only thing the judge knew --
12  Judge Stotler knew was what he read in your
13  pleadings in your disciplinary case.
14      A.  Correct.
15      Q.  Other than what your lawyer drafted, Judge
16  Stotler had no personal information, to your
17  knowledge, about what the JDC did or did not do in
18  your investigation.
19              MS. TULLY:  Again, calls for
20  speculation.
21      A.  He read the pleadings.
22      Q.  So if the ODC -- when you say that the ODC
23  is not -- had chosen not to take the words of you
24  and Judge Stotler, really what you're complaining



1    about is the ODC not -- just not believing you.

2                    MS. TULLY:  Objection.

3        A.  Let me just say that Judge Stotler knows me

4    and knows my reputation and my character, and would

5    have absolutely no reason to doubt what I had put

6    in the pleadings.

7        Q.  So Judge Stotler believed you but the ODC

8    did not believe you.

9                    MS. TULLY:  Objection.

10       A.  Again, I don't know.

11       Q.  Well, the only reason I bring it up is

12   because you said that they chose not to believe two

13   family court judges, and my point is it's really

14   only one family court judge and that's you.

15       A.  I'm not going to argue with you.

16       Q.  But I'm not wrong, am I?

17                    MS. TULLY:  We've been through this.

18   She's answered your questions.

19       Q.  At some point, there was a hearing before

20   the Judicial Hearing Board, right?

21       A.  In my case?

22       Q.  In your case.

23       A.  Yes.

24       Q.  And at that time, Judge Stotler was serving



1  as a member of the Judicial Hearing Board.

2       A.  Yes.

3       Q.  And at the time of that hearing, you and he

4  were already friends.  Is that true?

5       A.  Acquaintances, yes.  We're fellow family

6  court judges.

7       Q.  But wasn't he one of the list of judges

8  that you said you were close to --

9       A.  I don't think so.

10      Q.  -- or was he not?  Okay.  Did you know him

11  before?

12      A.  Yeah, sure.

13      Q.  Okay.  During the Judicial Hearing Board

14  hearing on January 15th, 2021, you provided

15  testimony.  Is that true?

16      A.  Correct.

17      Q.  And during that hearing, the agreement -

18  which we've marked as an exhibit - was admitted

19  into evidence, right?

20      A.  As far as I can remember, yes.

21      Q.  And during that hearing, you were

22  questioned about whether or not you signed that

23  agreement.  Do you recall that?

24      A.  Yes.



1      Q.  Do you recall being asked when you signed

2   that agreement:  "Did you sign it knowingly,

3   voluntarily, and intelligently?"

4          Do you recall being asked that?

5      A.  Not specifically but I'm sure I was.

6              MR. BRYAN:  Let me go ahead and have

7   this marked, please.  I think we're on 5.

8              COURT REPORTER:   5

9          GOLDSTON DEPOSITION EXHIBIT NO. 5

10             (Transcript of Judicial Board Hearing

11             of Louise Goldston dated January 15,

12             2021 was marked for identification

13             purposes as Goldston Exhibit No. 5.)

14     Q.  All right.  I'm going to -- I'm going to

15  show you what's been marked as Exhibit No. 5 to

16  this deposition.  Let me direct your attention to

17  Page 7 specifically.  Take all the time you would

18  like.

19     A.  Where on Page 7?

20     Q.  Towards the top.  So let me ask the

21  question again.  Hopefully, that will refresh your

22  recollection.

23         Do you recall being asked whether your

24  signature on this agreement was knowing and



1  voluntary?

2       A.  Yes.

3       Q.  And what was your answer --

4       A.  Yes.

5       Q.  -- during that hearing?

6       A.  Yes.

7       Q.  Okay.  Do you recall whether that testimony

8  was taken under oath?

9       A.  To my knowledge, it was.  Yes.

10       Q.  And was your testimony truthful that day?

11       A.  Yes.

12            MS. TULLY:  She's not denied that this

13  is her signature on the agreement.

14            MR. BRYAN:  Right.  But she's denied

15  that -- she says she was coerced and she testified

16  during that hearing that she voluntarily entered

17  that agreement, knowingly.

18       A.  With the knowledge that I had at the time,

19  yes.

20  BY MR. BRYAN:

21       Q.  Okay.  So at the time you entered the

22  agreement, you did so knowingly, voluntarily, and

23  intelligently, right?

24            MS. TULLY:  Objection.  Asked and



1  answered.

2      Q.  But later changed your mind.

3      A.  I didn't change my mind.  I learned more

4  about the law and realized that some of those

5  canons I do not believe were violated.

6      Q.  Of course, the Supreme Court rejected your

7  --

8              MS. TULLY:  Objection.

9      Q.  -- your belief, right?

10     A.  Obviously.

11     Q.  Okay.  So rather than saying you were

12  coerced, wouldn't it be more accurate to say that

13  you had regret?

14     A.  I think it would be more accurate to say

15  that I think I made a mistake.

16     Q.  As we sit here today, do you believe that

17  you made any mistakes on March 4th, 2020 when you

18  visited Mr. Gibson's home?

19     A.  Yes.

20     Q.  And what -- what mistakes did you make?

21     A.  One mistake I think I made was I should

22  have informed Mr. Gibson before we left, while we

23  were going to his house.  I could not imagine at

24  the time that he did not know why we were going to



1  the house, in that we were talking about stuff that

2  he testified under oath were still at the house.

3        But if I had to do it again, I would say,

4  "We are going to your house to get those items."

5        And, quite frankly, I would have made it

6  more clear to him that I was not doing it

7  punitively to him, but I did not want to put

8  Mr. Gibson in jail for not returning those items.

9        He's a corrections officer.  I did not

10  think he would be treated well if he went to jail,

11  and in my mind, if we could just go get those items

12  that he admitted were there, that he admitted she

13  was awarded, then that would solve everybody's

14  problem.

15        He would not be able to say that Ms. Gibson

16  destroyed the items after she got them.  Ms. Gibson

17  would not then be able to say that he destroyed or

18  he damaged the items after we retrieved them.  It

19  was the -- in my mind, it was the fairest, most

20  efficient way to resolve the case.

21     Q.  So what was your mistake?

22     A.  Not setting forth that clearly on the

23  record.

24     Q.  Is that it?



1      A.   My mistake?   That's all I can think of.   I

2   think -- well, I'm not going to volunteer.

3      Q.   No, that's okay.   What?

4      A.   I think if I'd had a more experienced

5   bailiff -- I can think of another mistake I made.

6   If I'd had a more experienced bailiff that had done

7   this with me before, that that bailiff would not

8   have called for backup.

9           I had not known Deputy McPeake had called

10  for backup.   I knew he had said something on the

11  radio.   I always kind of assume they're saying

12  they're out of their vehicle or whatever.

13          The other mistake I made was when I arrived

14  there -- and I'm not saying he did it intentionally

15  but Mr. Gibson immediately came toward me, making

16  his motions, which he certainly was entitled to do

17  but it rattled me a little bit and I did not notice

18  all the other cars that were there.

19          And had I had the chance to get my

20  bearings, I would've had all those cars leave and

21  all those people leave because, as you know, Family

22  Court hearings are confidential, no one is allowed

23  in the hearing except the parties and any

24  witnesses.   None of those other people had been



1 called as witnesses.

2      I did tell Ms. Gibson as we were leaving,

3 if she had a vehicle that she did not believe she

4 could fit the items that Mr. Gibson had admitted

5 were there that her father could come for the sole

6 purpose of hauling the items, but I would've

7 immediately had my bailiff clear out all the other

8 people because my experience is the more people you

9 have there, the more dangerous and out of hand it

10 can get.

11      But I did not do that because I was

12 immediately confronted with all these other

13 motions, which I was happy to rule on but it did

14 not give me the time I needed to assess the

15 situation and do the safety things I normally -- or

16 my bailiff normally would have done.

17      Q.  You would agree with me that your physical

18 safety was never in jeopardy at any point at

19 Mr. Gibson's house.

20      A.  I did not feel threatened.  No.  But as far

21 as speculating what could've happened, I don't

22 know.

23      Q.  Okay.  Mr. Gibson never threatened you in

24 any way, did he?



1    A.  No.  As I said, he approached me quickly

2  when I got out of the vehicle and that rattled me.

3       Did it scare me?  No.

4    Q.  And, to the contrary, you threatened

5  Mr. Gibson with arrest, even though you knew he was

6  a federal correctional officer.

7            MS. TULLY:  Object to form.

8    A.  Again, I did not just threaten him with

9  arrest.  I told him that I was instructing him to

10  let us in the house so that we could retrieve the

11  items and that that was an order of the Court.  If

12  he refused to do that, he would be held in contempt

13  and one of the remedies for direct contempt of a

14  court order is arrest.

15    Q.  And Deputy McPeake was present as your

16  bailiff when you made these statements to

17  Mr. Gibson.

18    A.  Correct.

19    Q.  Okay.  And you were here when he testified

20  a few days ago during his deposition.

21    A.  I was.

22    Q.  Okay.  And I believe that he testified that

23  he heard you threaten to arrest Mr. Gibson.

24    A.  I just said that I -- what I said, which I



1  am sure can be perceived as a threat.

2      Q.  And had you ordered the arrest of

3  Mr. Gibson, it would've been Deputy McPeake that

4  made the arrest, right?

5      A.  I assume so, yes.

6      Q.  And, in fact, you wanted to make sure that

7  bailiffs who traveled with you to the home -- homes

8  of litigants had arrest powers.

9      A.  That's a misstatement.  When I asked --

10  because Deputy McPeake is a retired bailiff and

11  came in under this statute, they had been supplying

12  me with officers who were not certified.

13         I asked -- one of my requirements, as I am

14  entitled under the code, is to have a deputy with

15  arrest powers.  I have never arrested anybody at a

16  scene.  I have had people arrested in the courtroom

17  or outside the courtroom for direct contempt of

18  court.  So I wanted a bailiff that if the courtroom

19  got out of control, that person could effect an

20  arrest.  The two requests were not related.

21      Q.  At some point in Mr. Gibson's front yard,

22  did you threaten to arrest any other third party,

23  other than Mr. Gibson?

24      A.  Not to my memory, and I know what you're



1  talking about.  Mr. Lusk pointed out to me that

2  Mister -- and I didn't know she was his girlfriend

3  -- that there was a woman at the top of the

4  driveway recording.

5         My memory is I said, "Stop recording.

6  You're not allowed to record."

7         I do not believe I threatened to arrest

8  her.

9     Q.  She was at the top of Mr. Gibson's

10  driveway.

11     A.  Correct.

12     Q.  And you're aware that that was somebody who

13  was with Mr. Gibson.

14     A.  I assume so.  I had never laid eyes on her

15  before.

16     Q.  All right.  Let me play some audio.

17              MR. BRYAN:  Which I have some

18  electronic exhibits on this thumb drive and I'll

19  provide that to the court reporter.

20              MS. TULLY:  Okay.

21     Q.  I think this would be Exhibit 6.  If I

22  click the right button here, this would be, I

23  believe, the audio recorded by Mr. Gibson

24  personally.



```
 1              GOLDSTON DEPOSITION EXHIBIT NO. 6
 2                    (Audio Recording Recorded by Plaintiff
 3                    Matthew Gibson was marked for
 4                    identification purposes as Goldston
 5                    Exhibit No. 6.)
 6                    MR. BRYAN:  I'm going to fast-forward
 7  it some towards the end.
 8                    (An excerpt of exhibit 6 was played.)
 9  BY MR. BRYAN:
10      Q.  All right.  Could you hear that?
11      A.  Yes.
12      Q.  All right.  And so you threatened somebody
13  with being taken to jail if they don't turn off
14  their phones and their recordings, right?
15      A.  Yes.
16      Q.  And then you can hear somebody respond.
17      A.  Yes.
18      Q.  Is that the individual you were just
19  talking about --
20      A.  I don't know.
21      Q.  -- standing at the top of the driveway?
22      A.  I don't know.
23      Q.  Okay.  That wasn't Mr. Gibson you were
24  talking to?
```



1      A.   No, because he was not recording it

2  visually, so far as I knew.  I do know that he told

3  Mr. Lusk he had turned it off.

4          When I told him to give it to Mister -- to

5  Officer McPeake, I said -- and Mr. Gibson says,

6  "Yes.  It's off."

7          When he gave it to Deputy McPeake, I said,

8  "Is it off?" and it, in fact, was not.  In fact,

9  you can hear Mr. Gibson talking after he gave it to

10 Officer McPeake.

11     Q.   Okay.  So --

12     A.   And that's why I thought it was important

13 for Mr. McPeake to keep it, because he had kept

14 recording after -- not only after I'd told him not

15 to but after he said he had.

16     Q.   Okay.  So the recording that we were --

17 part of what we just listened to, that was the

18 recording that Matt Gibson was taking off of his

19 phone, the audio?

20     A.   Correct.

21     Q.   And --

22     A.   So far as I know.  I am not an audio

23 person.

24     Q.   And this conversation took place in



1   Mr. Gibson's front yard?

2       A.   At the gazebo, as I recall.

3       Q.   Okay.   Which is on Mr. Gibson's property,

4   right?

5       A.   Right.

6       Q.   And during that conversation, Mr. Lusk

7   points out that Matt Gibson was recording with his

8   phone.

9       A.   Right.

10      Q.   And you told him to stop recording, right?

11      A.   And he did not.

12      Q.   And then you threatened him with being

13  arrested by your bailiff if he did not, right?

14      A.   That's not my memory.

15      Q.   Or did you --

16      A.   I said -- I said, "Give the phone to the

17  bailiff," and then I asked the bailiff, "Is it

18  still recording," because he had told me he had

19  turned it off.

20           And Officer McPeake said, "It is still

21  recording."

22           I said, "Turn it off."

23      Q.   You instructed a bailiff to seize

24  Mr. Gibson's cellphone to stop it from recording.



1      A.  Yes.

2      Q.  And then --

3      A.  Because Rule 8 does not allow recordings of

4   court hearings, other than done by me.

5      Q.  But this is on Mr. Gibson's property.

6      A.  Right, which was a continuation of a

7   hearing, as is evidenced that he referred to me as

8   Judge during the hearing, he made motions to me

9   during the hearing which I ruled on.  So it was the

10  continuation of my hearing.

11     Q.  Okay.  And then you -- you told other third

12  parties who were on Mr. Gibson's property to stop

13  recording or else go to jail, right?

14     A.  Yes, and they should have not been there.

15  They were not allowed to be in a hearing.

16     Q.  Okay.  But you -- this was Mr. Gibson's

17  home.

18     A.  It was.

19     Q.  Right.  And this was not in a courtroom.

20     A.  It was not.

21     Q.  Let's continue.

22            (An excerpt of Exhibit 6 was played.)

23  BY MR. BRYAN:

24     Q.  So we can hear on the recording, standing



1  in Mr. Gibson's yard, you threaten to arrest

2  Mr. Gibson if he didn't let you in his house.

3      A.  For being in direct contempt of a court

4  order.  Yes.

5      Q.  Okay.  Well, regardless of what you say the

6  reason was, you said -- you threatened Mr. Gibson

7  with being arrested by your bailiff if he did not

8  let you in his house, right?

9      A.  Yes, but again, saying "regardless of the

10 reason" is silly.

11     Q.  Okay.  Well, he hadn't been found in

12 contempt at that point, had he?

13     A.  He would have been found in direct contempt

14 had he not let me in the house.

15     Q.  Okay.  Well, he hadn't even -- he hadn't

16 been found in contempt yet because he hadn't even

17 had an opportunity to tell his side of the story,

18 did he?

19     A.  He testified, and he, in fact, testified

20 that the items that we went to get were, in fact,

21 in the house.

22         So did I find him in contempt before I

23 left?  No.

24         Did he admit it under oath?  Yes.



1        Could anybody who listened to that tape

2   determine that he was in contempt?  Yes.

3        Q.  Looking back at the West Virginia Supreme

4   Court Opinion, and this is referencing Page 21, if

5   you want to verify this.

6        The Supreme Court noted in their Opinion,

7   again on Page 21, that you forced your "way into

8   the ex-husband's home - over his reasonable

9   objections - by threatening to jail him for

10  contempt.

11       She said, 'I am the judge trying to effect

12  equitable distribution.  We're having a hearing.

13  Now, you let me in that house or [the bailiff] is

14  going to arrest you for being in direct contempt of

15  court.'"  Is that true?

16       A.  That's what it says.  Yes.

17       Q.  And, in fact, that's what we can hear on

18  the audio as well, right?

19       A.  The quote, yes.

20       Q.  Okay.  And just following that, the Supreme

21  Court says that:  "Judge Goldston's misconduct

22  displayed a callous disregard for our system of

23  justice."  Did you read that?

24       A.  Can you say that again?  Oh.  It does say



1  that.

2      Q.   And the Court said that:  "Even setting

3  aside the inappropriateness of the search, Judge

4  Goldston went about the search in a highhanded and

5  procedurally flawed manner."

6      A.   I see that.

7      Q.   Okay.  Do you agree with that?

8      A.   No.

9      Q.   The Court continued:  "Instead of receiving

10 both sides' testimony and evidence and rendering a

11 decision, she interrupted the ex-wife's testimony

12 and directed the parties to meet her at the

13 ex-husband's residence, affording the ex-husband no

14 explanation and no opportunity to object until she

15 arrived at the scene."  Is that true?

16     A.   That's what it says.

17     Q.   But you disagree?

18     A.   Yes.  The ex-husband, while we were time-

19 constrained and he was not allowed to put on his

20 entire case, he did, in fact, testify and he did,

21 in fact, admit contempt on the record under oath.

22     Q.   Okay.  But that's not what the Supreme

23 Court said, is it?

24     A.   No.



1      Q.  Also, in that Supreme Court decision,

2  around the bottom of Page 21 and continuing to 22,

3  the Court held:  "Though she claimed she was

4  'having a hearing', she made no attempt of any kind

5  to contemporaneously record what transpired.

6  Indeed, she forbade others to make a recording, at

7  risk of incarceration."  Is that true?

8      A.  I don't see that.

9            MS. TULLY:  Where does that start?

10            MR. BRYAN:  I believe it's from the

11  bottom of 21, going on to 22.

12            MS. TULLY:  Here.  It's on Page 22.

13            THE DEPONENT:  Oh okay.

14  BY MR. BRYAN:

15      A.  That's what it says.

16      Q.  Okay.  And I take it you disagree with the

17  Supreme Court?

18      A.  I agree with that statement but I -- I

19  would like to add that they did not refer to, in

20  any way, Rule 8, which forbids anybody else to

21  record it.

22      Q.  I mean, you -- to be fair, would you agree

23  that the -- these issued were briefed, at length,

24  in the record in your disciplinary case?

1       A.  Yes.

2       Q.  I mean, both the JDC and your lawyer and

3    the Family Court Judicial Association all briefed

4    these issues and discussed this ad nauseum.

5       A.  Yes.

6       Q.  The Supreme Court ruled -- or reviewed that

7    record before issuing this Opinion.

8       A.  Right.  Can I ask you a question?

9       Q.  Sure.

10      A.  Do you agree with every Supreme Court

11   decision that's issued?

12      Q.  That's -- that's a fair point.  No.  But I

13   agree that the lawyers representing people have the

14   opportunity in the underlying litigation to make

15   those arguments to get that due process.

16      A.  They do, and the Judicial Hearing Board, in

17   fact, found that there was no law guiding this

18   theory of the law and specifically asked the

19   Supreme Court for guidance on these kinds of cases.

20      Q.  And, as you know and the Judicial Hearing

21   Board knows, it's not up to them in the end.  It's

22   up to the Supreme Court, right?

23      A.  That's right.

24      Q.  Also, just to -- to get this in, I would



1 like to just take a look at part of the video that

2 we're here about.

3                    (Video of the incident at the home of

4                    Matthew Gibson was played.)

5      Q.  You've seen this video, right?

6      A.  Which one.  I'm not sure I've seen it all

7 but --

8      Q.  Well, this is the only video footage we

9 have of what occurred in Mr. Gibson's driveway and

10 front yard.

11      A.  The only video I have seen is what was put,

12 I believe by you, on YouTube.

13      Q.  Okay.  Well, this is the same footage.

14          Have you seen -- have you seen this footage

15 before?

16      A.  I don't remember seeing this part right

17 here.

18      Q.  And this was an exhibit to Deputy McPeake's

19 deposition as well, I believe.  Or -- Matt --

20 Mr. Gibson's deposition.

21          All right.  So in that video, Mr. Gibson

22 makes a motion, in his front yard, to recuse you as

23 the presiding family court judge.

24      A.  Correct.



1     Q.   And you denied that motion as untimely.

2     A.   Correct.

3     Q.   And then --

4     A.   The rules require that to recuse me, you

5   must file it -- the -- the motion seven days prior

6   to the hearing.

7     Q.   Okay.  Well, he didn't know seven days

8   prior to the hearing that you would be in his front

9   yard, did he?

10    A.   No.  Which I set forth on the record, after

11  we came back and gave him an opportunity, should he

12  want to do that, to do that and explained to him

13  how to do that.

14    Q.   Okay.  And he did do that, didn't he?

15    A.   He did.

16    Q.   And he said, "You won't get in my house

17  without a search warrant."

18         And you said, "Oh, yes, I will."  Right?

19    A.   Correct.

20    Q.   In hindsight, when we were talking about

21  mistakes -- in hindsight, do you believe that that

22  was a mistake, to respond, "Oh, yes, I will"?

23              MS. TULLY:  Objection.

24    A.   It may have seemed flippant but I intended



1  to go in the house.

2      Q.  Would you agree with me that this video

3  illustrates that Matt Gibson did not voluntarily

4  consent to you or anyone else entering his house on

5  March 4th, 2020?

6              MS. TULLY:  Objection.

7      A.  Can you restate it?  I'm not sure.

8      Q.  Would you agree with me that this video

9  that we just watched illustrates that Matthew

10  Gibson did not voluntarily consent to you going

11  inside his house or bringing his ex-wife and her

12  lawyer in?

13     A.  I don't think I've ever said that he

14  voluntarily let me in.

15     Q.  And I'm not saying that you did but it

16  sometimes can come up, whether there's consent to

17  enter under the Fourth Amendment.

18         I just want to make clear that he did not

19  consent, as this video illustrates, right?

20     A.  There was a point during the exchange,

21  after we talked about the swing, that I said -- he

22  had told me several times he didn't want me in his

23  house.

24         At some point during the swing discussion,



1  I said, "Now, are you going to let me in the

2  house?"

3          And he said, "Sure."

4          Do I contend that was voluntary?  Not

5  necessarily, no.

6              MR. BRYAN:  I need to plug in my

7  laptop.  It's running through the battery faster

8  than I thought.  It may be a good time to take a

9  couple of minutes.

10             MS. TULLY:  Okay.

11             COURT REPORTER:  The time is

12  12:02 p.m.  We're off the record.

13             (A short break was taken after which

14             the proceedings continued as follows:)

15             COURT REPORTER:  The time is

16  12:10 p.m.  We're on the record.

17  BY MR. BRYAN:

18     Q.  I'll try to keep -- try to keep this brief

19  but I just wanted to ask you one more follow-up

20  question about the Judicial Hearing Board

21  transcript that was Exhibit 5.

22     A.  Okay.

23     Q.  I had asked you earlier whether you thought

24  you had made any mistakes and I believe you



1 explained that you felt like you had made a mistake

2 and you explained that.

3        You do recall giving a statement or

4 speaking at the Judicial Hearing Board hearing in

5 your case.

6    A.  Yes.

7    Q.  Okay.  And do you recall saying:  "I am

8 embarrassed.  This Family Court has been my life.

9 And I have strived to perfect it, improve it, for

10 26 and a half years.  And mistakes were made that I

11 am very sorry for, but I do accept the agreement,

12 and I certainly accept my responsibility for the

13 errors that were made that day."

14        Do you recall saying that?

15    A.  I do.

16    Q.  Do you stand by that statement?

17    A.  No.

18    Q.  Why not?

19    A.  Because, since then, I have done research,

20 I have had other people do research, and I don't

21 believe I violated the canons of ethics.

22    Q.  When you say you had other people do

23 research, do you mean your lawyers?

24    A.  Uh-huh.



1      Q.  Did you have anyone else, other than your

2  lawyers, do research?

3      A.  Some other family court judges.

4      Q.  And who were they?

5      A.  Mainly, David Greenberg and my ex-husband,

6  who is not a family court judge.

7      Q.  So, as we sit here today, you do not accept

8  responsibility for errors that were made that day?

9      A.  There were errors that were made that day

10  and I do accept responsibility for those.  I do not

11  believe that I violated the canons of ethics.

12      Q.  But, previously, you admitted that you

13  violated Rules 1.1, 1.2, 1.3, 2.2, 2.4(A), 2.4(B),

14  and 2.5 of the Code of Judicial Conduct.

15              MS. TULLY:  Objection.  We've

16  discussed this ad nauseum today.  But you can

17  answer.

18              MR. BRYAN:  I didn't ask that

19  question.

20  BY MR. BRYAN:

21      Q.  You do --

22      A.  Yes.  I do -- I do admit that I did admit

23  those but I would like to explain.

24              During the entire negotiations, I asked, on



1   several occasions, the Judicial Hearing Board and

2   the Judicial -- not the board -- the Judicial

3   Counsel -- to explain to me, canon-by-canon, how I

4   had violated each canon, and I was refused that

5   opportunity.  I was told they do not do that that

6   way.

7        And again, this is -- was the first time in

8   27 years that I had been called up in front of the

9   Judicial Disciplinary Board and I was, quite

10  frankly, paralyzed with fear.

11       I was petrified, I wanted to do anything I

12  could to cooperate, and again, I was threatened

13  both off the record at the time I gave my statement

14  and at the time we were negotiating that the

15  Judicial Hearing Commission - or the Board -- I

16  don't know what they're called -- the Judicial

17  Investigation Commission would not accept anything

18  less than my suspension from the bench, and I was

19  doing whatever I could to cooperate so that that

20  did not happen.

21  Q.  So the only reason you signed the agreement

22  was because you were afraid of being suspended?

23  A.  And because I believed what they told me.

24  Q.  So once they agreed not to suspend you,



1  then you --

2      A.  That was part of the plea agreement.

3      Q.  -- regretted it.

4      A.  And frankly, until Judge Stotler spoke up

5  at the Judicial Hearing Board and was adamant that

6  I was being mistreated and that that was not the

7  law and that I had not violated the ethics of --

8  the canon of ethics, that I began to believe that

9  something was wrong.

10     Q.  So, as we sit here today, do you think that

11  Judge Stotler was correct or do you think the

12  Judicial Disciplinary Counsel was correct in their

13  opinions on whether your conduct was appropriate?

14     A.  I think Judge Stotler was correct, for all

15  the reasons stated in my briefs to the Supreme

16  Court and to the -- and the answers that I gave to

17  the Judicial Hearing Board that they requested

18  answers to.

19          MR. BRYAN:  For the record, the last

20  video that we watched will be marked as an exhibit.

21  7?

22          COURT REPORTER:  Yes.

23          MR. BRYAN:  Okay.

24          GOLDSTON DEPOSITION EXHIBIT NO. 7



```
 1                    (Video of the Incident at the Home of

 2                    Matthew Gibson was marked for

 3                    identification purposes as Goldston

 4                    Exhibit No. 7.)

 5              MS. TULLY:  Now, is that the video and

 6    the audio recording that'll be marked as Exhibit 7?

 7              MR. BRYAN:  The audio recording is a

 8    separate exhibit.

 9              COURT REPORTER:  6.

10              MS. TULLY:  Okay.

11    BY MR. BRYAN:

12       A.  And I want to say that one of the things

13    that threw me off when I got to the scene was that

14    at the hearing Mr. Gibson was very -- he was

15    obviously not happy to be there but he was very

16    respectful of the Court, he was very forthcoming,

17    and the Mr. Gibson that was at his house when I

18    arrived there was a completely different -- had a

19    completely different attitude and demeanor, and

20    that -- that threw me.

21       Q.  Now, there had been a lot of discussion

22    about Mr. Gibson allegedly not turning over

23    photographs that his ex-wife was entitled to.

24       A.  Correct.
```



1     Q.   Isn't it true that the -- that either the

2  agreement or your order, or both, provided that

3  Mr. Gibson was to copy photographs?

4     A.   That was not what the order said.

5          During the hearing, he said, "Before I turn

6  them over, can I make copies of them?"  Which is

7  common.  That does not mean that he could turn the

8  copies over to her, but that, in fact, he could

9  make copies of them to keep before he turned them

10  over to her.

11          And his testimony at the hearing was that

12  he had not -- he had done neither.  He had not made

13  copies because they were -- and I understand this

14  -- they were -- the ones we retrieved that day

15  were, I call them, Olan Mills-type pictures that

16  are not easily copied because a lot of people won't

17  copy them because they're trademarked.

18          But his testimony that day was not only

19  that he had not turned over them but that he had

20  not been able to make copies.

21     Q.   Okay.  I'm going to show you part of that

22  -- part of the discussion at the hearing and

23  perhaps you can tell me what's said here.

24          So let's mark this as Exhibit 8.  I believe



1  -- this is about 22 minutes long.  This is from a

2  hearing on April 19th, 2018 in Mr. Gibson's divorce

3  action.

4         GOLDSTON DEPOSITION EXHIBIT NO. 8

5                    (Divorce Hearing Video dated April 19,

6                    2018 was marked for identification

7                    purposes as Goldston Exhibit No. 8.)

8     A.  And can I -- can I just ask that -- I'm a

9  little nervous about this being put in the record

10  because it is a confidential hearing and not

11  released to the public -- not releaseable to the

12  public.  So I --

13     Q.  If --

14                    MS. TULLY:  I think this needs to be

15  placed under seal.

16                    MR. BRYAN:  All right.  Well --

17                    THE DEPONENT:  I'm nervous about that.

18                    MR. BRYAN:  Why don't we go off the

19  record and play it off the record, and then you can

20  -- then you can --

21                    MS. TULLY:  Well --

22                    MR. BRYAN:  Well, she's already

23  testified about what was said or not said.

24                    MS. TULLY:  Well, but if you're going



1   to rely upon this at some point, I don't want it

2   off the record.  I just think we need to seal the

3   exhibits.

4              MR. BRYAN:  We can seal this -- we can

5   seal this one.

6              MS. TULLY:  This one.  Okay.  That's

7   fine.

8              MR. BRYAN:  And I have just an audio

9   version of it as well but this has the video.

10             THE DEPONENT:  And just so I'm clear,

11  this is the haering when we placed the agreement on

12  the record.  Is that correct?

13             MR. BRYAN:  This is the April 19th,

14  2018 hearing.  I'm not -- I wasn't there.  I'm not

15  sure --

16             MR. GIBSON:  What was your question,

17  ma'am?  I didn't hear it.

18             MR. BRYAN:  The April 19th hearing.

19             THE DEPONENT:  This is when we placed

20  the agreement on the record.

21             MR. GIBSON:  No.  The agreement on the

22  record was September 18th.

23             MR. BRYAN:  Okay.  So --

24             MR. GIBSON:  So this was -- the photos



1  were not part of the agreement.

2              THE DEPONENT:  I'm not going to argue

3  about that.

4              MR. BRYAN:  Are we off the record?

5              MS. TULLY:  No.  We're on the record.

6              COURT REPORTER:  No.  We're on the

7  record.

8              MR. BRYAN:  Do you want to stay on the

9  record?

10             MS. TULLY:  Yes.

11             MR. BRYAN:  Okay.  All right.  I want

12 to play it and then you can tell -- I guess you can

13 --

14             THE DEPONENT:  It says at the top what

15 the date of it was.

16             MR. BRYAN:  Well, let me just play

17 this and then perhaps you can tell me what was said

18 and what that means.

19             (An excerpt of Exhibit 7 was played.)

20             MR. BRYAN:  Let me back it up a little

21 bit.

22             MS. TULLY:  Can you turn the volume

23 up?

24             THE DEPONENT:  I can't hear him.



1            MR. BRYAN:  It's all the way up.

2            (An excerpt of Exhibit 7 was played.)

3            MR. BRYAN:  I can move it closer to

4  you but it's as loud as it will go.

5            THE DEPONENT:  And I really can't see

6  it either.

7            (An excerpt of Exhibit 7 was played.)

8  BY MR. BRYAN:

9      Q.  Did you hear that, what you said?

10     A.  Right.

11     Q.  What did you say?

12         It sounded like you said, "You shall make a

13  copy."

14     A.  I lied.  I didn't hear that.  I was

15  listening to what they were saying.  And so the

16  record is clear, these are not the photos we were

17  talking about at the -- at the contempt hearing.

18     Q.  Okay.  These are different photos?

19     A.  Yeah.  These were ones that were hanging on

20  the wall.

21            MS. TULLY:  That you were talking

22  about at the contempt hearing.

23            THE DEPONENT:  Correct.

24            MS. TULLY:  And what you're talking



1  about at this hearing are separate and apart from

2  those.

3              THE DEPONENT:  Correct.

4              MR. BRYAN:  Okay.  All right.  Let me

5  play a little bit more and I believe it explains.

6              (An excerpt of Exhibit 7 was played.)

7  BY MR. BRYAN:

8     Q.  All right.  So, I mean, I wasn't there.

9  You were there.  But watching that, it looks like

10 the parties are discussing and you're discussing

11 copying marital photographs, including pictures on

12 the wall, right?

13    A.  Right.  They worked out how they were going

14 to do, what I just call, pictures.  You know, not

15 framed pictures on the wall.  They were discussing

16 how they were going to get that.

17         You can't put a picture that's on the wall,

18 hanging, that's in canvas -- and I'm not sure it

19 was canvas but it was like a canvas picture --

20 there's no way to put that on a DVD.

21         So they were, at that time, talking about

22 all of their family pictures.

23    Q.  And so, really, your only order there was

24 -- I think you said, "You shall copy the



1  photographs."

2      A.  Right.

3      Q.  And you were talking to Mr. Gibson.

4      A.  Right.

5      Q.  So, I mean --

6      A.  But we were not talking about the pictures

7  on the walls.

8          She said -- after they said how they'd do

9  it, she said, "But there's also pictures on the

10 wall."

11         And at the contempt hearing, he admitted

12 that he had not made copies of the pictures on the

13 wall because he couldn't find anybody that would do

14 it.

15         And he said, "But Judge, you said I could

16 make copies."

17         And I said, "You can but you've had 18

18 months to do it and you haven't done it."

19     Q.  Let me play some audio here, which I will

20 label as Exhibit 8.

21             MR. BRYAN:  Or 9?

22             COURT REPORTER:  9.

23             MR. BRYAN:  9.

24         GOLDSTON DEPOSITION EXHIBIT NO. 9



1              (Recording of Kyle Lusk at Hearing re:

2              Search was marked for identification

3              purposes as Goldston Exhibit No. 9.)

4      Q.  Exhibit 9.  Hopefully, this will be a

5  little louder.

6      A.  Is it a hearing?

7      Q.  I think it's -- it's from a hearing.  I'm

8  not sure whether you were present at the time or

9  not, but you'll hear it and I'll ask you.

10             MS. TULLY:  Can we agree that any

11  audio or video that you present from a hearing will

12  be sealed, given that these are confidential

13  hearings?

14             MR. BRYAN:  Is that from a hearing?  I

15  think it was during a hearing.

16             MR. GIBSON:  Which one?

17             MR. BRYAN:  The 2018.

18             MR. GIBSON:  No.  That was not during

19  a hearing.

20             MR. BRYAN:  Okay.  I think this -- I

21  don't think this was --

22             MS. TULLY:  Where did this come from

23  then?  Do you know?

24             MR. BRYAN:  This is -- I'm going to



1  play the audio of Kyle Lusk threatening a home

2  search in 2018.

3            MS. TULLY:  Okay.

4            MR. BRYAN:  I believe it was during

5  the negotiations.  I wasn't there.  I don't know.

6            THE DEPONENT:  Was I there?

7            MR. BRYAN:  It doesn't sound to me

8  like you were.

9            MR. GIBSON:  No, you wasn't.

10           MR. BRYAN:  I don't know if it was in

11 a side room or what.

12           THE DEPONENT:  I don't know how I can

13 answer any questions about it but if I wasn't

14 there, go ahead.

15           MR. BRYAN:  If you can, you can.

16           MR. ROBINSON:  I'm going to object to

17 a proper foundation has not been established as to

18 when this was recorded, who recorded, and how it

19 was recorded.

20           MR. BRYAN:  Well, let me play it --

21           MS. TULLY:  Thank you.  You took my

22 next objection out of my mouth.

23           MR. BRYAN:  Let me play it first and

24 we'll see if we can establish that.



```
 1                (Exhibit 9 was played.)
 2       Q.  All right.  So the audio I just played --
 3   just give me a second -- could you hear it all
 4   right?
 5       A.  Yes.  I could hear it.
 6       Q.  Okay.  Did you recognize any voices on it?
 7       A.  Yes.
 8       Q.  All right.  So did you recognize Kyle
 9   Lusk's voice?
10       A.  Yes.
11       Q.  Did you recognize Matt Gibson's voice?
12       A.  Yes.
13       Q.  Okay.  Did you recognize Brandon Johnson's
14   voice?
15       A.  No.
16       Q.  All right.  If I were to represent to you
17   --
18       A.  I would recognize his voice and I didn't
19   hear it, but I'm not --
20       Q.  Do you want me to play it again?
21       A.  If you want to.
22                (Exhibit 9 was played.)
23       A.  Yeah.  That's Brandon right there.
24                (Exhibit 9 was played.)
```



1      A.  I apologize.  I do recognize Brandon

2   Johnson's.

3      Q.  All right.  So if I were to represent to

4   you that this -- this was a conversation between

5   Mr. Gibson and his lawyer and his ex-wife and her

6   lawyer during the final hearing in 2018, would you

7   have any reason to disbelieve that?

8      A.  That was not a conversation that was held

9   during the final hearing.  No.

10      Q.  So you don't recall being present when

11   those words were spoken?

12      A.  I was not present when those words were

13   spoken, and could not have been present.  Those

14   were settlement negotiations that I am not allowed

15   to be a part of --

16      Q.  All right.

17      A.  -- as a judge.

18      Q.  And here's my question and why I played

19   that for you:  At that time in 2018, Defendant --

20   or former Defendant Lusk can be heard to say to

21   Mr. Gibson's lawyer, at that time:  "I'm going to

22   tell you right now, and the judge is big on that.

23   I want Mr. Gibson to say certain things aren't

24   there and we'll get the bailiff and the judge and



1  we'll go there and see."

2       Do you recall hearing that on that

3  recording?

4     A.  I do.

5     Q.  Okay.  And do you have -- do you know what

6  Mr. Lusk meant by saying that you were "big on

7  that"?

8            MS. TULLY:  I'm going to object to

9  this entire line of questioning in that we don't

10  know who recorded this, there's -- we don't have

11  anybody to stipulate to the authenticity of this

12  recording, and then I'm going to further stipulate

13  -- or object to this is asking for speculation on

14  what Mr. Lusk is thinking.

15           MR. BRYAN:  Well, your objections are

16  noted but, fortunately, I am allowed to do that in

17  a deposition, and this was provided --

18           MS. TULLY:  I am not saying she can't

19  answer the question.  I am simply objecting.

20           MR. BRYAN:  This was provided in

21  discovery, so you've had it.

22  BY MR. BRYAN:

23     Q.  I know you don't know what Mr. Lusk was

24  thinking but do you know what he was referring to



1  as "the judge is big on that"?

2      A.  I would never try to speculate on why

3  Mr. Lusk thought anything he thinks.

4      Q.  You previously testified that it was no

5  secret that you did these visits to litigants'

6  homes, right?

7      A.  It was not.

8      Q.  Okay.  So, at this time, having practiced

9  before you for many years, Mr. Lusk would've been

10 aware that you engaged in this practice.

11     A.  I don't know what he was aware of.

12     Q.  Let me play you another recording, which

13 we'll say is Exhibit 10, and this is a voicemail

14 that Mr. Lusk left for Mr. Gibson the night before

15 the March 4th, 2020 hearing.

16         GOLDSTON DEPOSITION EXHIBIT NO. 10

17             (Voicemail Recording of Kyle Lusk was

18             marked for identification purposes as

19             Goldston Exhibit No. 10.)

20             (Exhibit 10 was played.)

21     Q.  Okay.  Could you hear that all right?

22     A.  Yes.

23     Q.  So I'll represent to you that that was a

24 voicemail left by Mr. Lusk on Mr. Gibson's



1  voicemail the night before the March 4th, 2020

2  hearing, where Mr. Lusk called Mr. Gibson and said,

3  "The Court has asked me to convey to you any

4  settlement proposal I may have" - offering $5,000

5  to settle - "Otherwise, we'll see you tomorrow."

6         You heard that, right?

7     A.  I heard that.

8     Q.  By Court, was Mr. Lusk referring to you?

9            MS. TULLY:  Objection.  Calls for

10 speculation.

11    A.  I don't know who he was referring to.

12    Q.  Okay.  You were the presiding Family Court

13 judge in the case --

14    A.  I was.

15    Q.  -- that Mr. Lusk was calling about.

16    A.  I was.

17    Q.  Okay.  So is there any other judge that

18 Mr. Lusk could be referring to as the Court?

19    A.  Again, I don't know what Mr. Lusk was

20 referring to.

21    Q.  Okay.  Did you ask Mr. Lusk to convey a

22 settlement offer to Mr. Gibson?

23    A.  No.

24    Q.  So you have no idea what Mr. Lusk was



1  talking about?

2      A.  I know why he may have made the call.

3      Q.  Why is that?

4      A.  Because when we have contempt hearings, or

5  any hearings, the rules require that the parties

6  attempt a settlement before going to trial.

7          And that is one of the issues that I

8  consider when deciding whether to award attorney

9  fees is whether or not an attempt has been made to

10  settle the case.

11          So I assume that's why that call was made.

12  I do not know.

13      Q.  But you heard Mr. Lusk say, "The Court has

14  asked me to convey to you..."  Right?

15      A.  Yes.

16      Q.  And it's your testimony that you did not

17  ask Mr. Lusk to convey a settlement offer to

18  Mr. Gibson.

19      A.  I did not, and I think if you ask Mr. Lusk

20  he would tell you the same thing.

21      Q.  But that's not what he said, is it?

22      A.  It is not what he said.

23      Q.  Just briefly, back to what happened in

24  Mr. Gibson's yard on March 4th, 2020.  As we



1 | watched in the video and listened to the audio,
2 | while you were standing in Mr. Gibson's yard, you
3 | had threatened to have other individuals arrested
4 | who were filming, right?  I believe you already
5 | admitted that.
6 |          MS. TULLY:  Objection.  Asked and
7 | answered.
8 |     A.  One other individual.
9 |     Q.  Okay.  And that was Mr. Gibson's
10 | girlfriend, who was filming the video.
11 |    A.  It was who was filming the video.  I don't
12 | know whether that's Mr. Gibson's girlfriend or not.
13 |    Q.  And the reason I bring this up again is --
14 | but I forgot to ask you before -- as a family court
15 | judge in that situation, do you believe that you
16 | had any jurisdiction over that individual that you
17 | threatened with arrest?
18 |    A.  I think that person had no authority or
19 | right to be at a hearing, and I think that
20 | individuals that violate rules in front of a judge
21 | are subject to finding of contempt.
22 |         Would I have arrested her?  Probably not,
23 | but I wanted to make it clear to her that she was
24 | not allowed, No. 1, to be there, or to film.



1      Q.  So she was not a litigant before you, was

2   she?

3      A.  She was not.

4      Q.  And she was on Mr. Gibson's property at

5   that time, right?

6            MS. TULLY:  Objection.  Asked and

7   answered.

8      A.  I think so.  I'm not sure exactly where she

9   was standing.

10     Q.  You said -- well, you said, at one point,

11  she was at the top of the driveway.

12     A.  Correct.  But she was behind a car.  I

13  don't know if she was actually on his property or

14  on the driveway.  She was in the direct area.

15     Q.  Well, did you ever communicate to her, or

16  anyone else, that you were in the process of

17  conducting a judicial hearing?

18     A.  Certainly.  I said we are conducting a

19  hearing.  Mr. Gibson obviously knew it was a

20  hearing.  He was making motions before the Judge,

21  that the Judge was ruling on, and that can only be

22  done orally in a hearing before a Judge.

23     Q.  Following this incident, have you developed

24  or implemented any sort of written policies or



1  procedures regarding visiting the homes of

2  litigants?

3      A.  No.

4      Q.  Have you ever done it again?

5      A.  No.

6      Q.  Do you ever -- would you ever do it again?

7      A.  I don't know.

8      Q.  Is there anything that you would do

9  differently from March 4th, 2020?

10     A.  I would fashion a way that the Court itself

11 could record it -- record the proceeding, and not a

12 biased witness or a party or anything else.

13     Q.  But you don't regret physically going

14 inside Mr. Gibson's home?

15          MS. TULLY:  Objection.  Asked and

16 answered.

17          MR. BRYAN:  I don't think I asked

18 that.

19     A.  Do I think I did anything wrong?  No.

20      Do I regret the consequences of it?

21 Absolutely.

22     Q.  Do you regret threatening Mr. Gibson with

23 arrest?

24     A.  No.  When I'm conducting a hearing, I



1  expect the litigants and the witnesses who are in

2  front of me to do what I ask them to do.  I think

3  that's my role as judge.

4        And, again, I believed I was helping him as

5  much as I was helping her.

6            MR. BRYAN:  Okay.  I don't know that I

7  have much -- anything else.  Let me just talk to my

8  people here --

9            MS. TULLY:  Sure.

10            MR. BRYAN:  -- and maybe we're done.

11            (Off the record at 12:41 p.m.)

12            (A short break was taken after which

13            the proceedings continued as follows:)

14            COURT REPORTER:  The time is

15  12:47 p.m.  We're on the record.

16  BY MR. BRYAN:

17     Q.  When your sworn statement was taken by the

18  Judicial Disciplinary Counsel, I believe you were

19  -- you were asked about the so-called home visits

20  and you said that "the lawyers love that I do this

21  because it enables them to say, you know, 'Be

22  truthful in your disclosure because if you try to

23  hide something, she might go out and look for it.'"

24        Do you recall saying that?



1       A.   Yes.

2       Q.   And do you stand by that?

3       A.   I was told that by different lawyers.

4   Those are their words, not mine.

5       Q.   And you further testified that:

6   "Generally, it's the attorney that asks me to do

7   it."

8       A.   Yes.   An attorney.   One of the attorneys or

9   -- I've since remembered there was a -- and I may

10  have testified about it in my statement, that there

11  was a case where one of the parties was pro se, and

12  they were saying that she had gotten rid of a bunch

13  of Confederate memorabilia and she said, "It's not

14  there.   You're welcome to come and look for it,"

15  and so we did.

16      Q.   So the lawyers knew that you would go to a

17  litigant's home and look for something, but on

18  March 4th, 2020, Mr. Gibson was representing

19  himself pro se.

20      A.   Correct.

21      Q.   Mr. Gibson didn't know that you would do

22  this.

23      A.   Well, according to the -- the tape you just

24  played, he did know because Mr. Lusk had told him



1  that I would -- that I had done that on occasion.

2  So, yes, he did know.

3      Q.  All right.  So could Mr. Gibson have

4  requested you to go to his ex-wife's house to look

5  for something that he didn't get?

6      A.  If there had -- if there had been evidence

7  that it was there, yes.  In this case, there was

8  evidence that the stuff was at his house because he

9  told me it was.

10     Q.  Generally speaking -- generally speaking,

11 pro se litigants before you wouldn't be aware of

12 the fact that they could ask you to go look for

13 something at the other party's house.

14            MS. TULLY:  Objection.  Calls for

15 speculation.

16     A.  I don't know what pro se litigants know.

17     Q.  But you do know that the lawyers know it.

18            MS. TULLY:  Objection.  Calls for

19 speculation.

20     A.  The lawyers that I've done it with know it,

21 and I can tell you that I have, since this

22 proceeding, because the proceeding was ongoing, I

23 had two pro se litigants ask me to go and my mama

24 didn't make no fools, so I sent a deputy, not my



1  bailiff, out to their house and it was a fiasco,

2  and nothing was accomplished.

3       Q.  So you didn't go yourself?

4       A.  No.

5       Q.  You sent law enforcement and it didn't work

6  out well.

7       A.  It did not, because there was a

8  disagreement at the scene about who got what, and

9  the deputy was in no position whatsoever to figure

10  out whose was what, because that's not his job.

11  That's the judge's job.

12       Q.  So it's your opinion that it would be a

13  better process, or more efficient, if you, as the

14  Judge, just went there yourself?

15       A.  In that particular circumstance, yes.  My

16  thought has always been deputies do not make

17  decisions about who gets what, and if I send a

18  deputy to get, in this case, pictures, and

19  Mrs. Gibson has said -- had said, "No, these are

20  the pictures," and Mr. Gibson said, "No, those are

21  not the pictures", what does the deputy do?

22            If I'm there, I can make the decision and

23  we can go on about it.

24            MR. BRYAN:  All right.  Thank you.  I



1  don't have any other questions right now.

2              MR. ROBINSON:  I don't have any

3  questions.

4              MS. TULLY:  I have no questions.

5  Judge, I'm sure I don't have to explain to you the

6  right to read or waive your deposition testimony.

7              THE DEPONENT:  I'll waive.

8              MS. TULLY:  You'll waive?  Okay.  Oh,

9  can we do one more thing on the record?

10             There is a chainsaw that Mrs. Gibson

11 -- we talked about the chainsaw in your deposition

12 last week.  She had gotten one, then a different

13 one was awarded, and the judge had her bring the

14 other chainsaw back to the courtroom that

15 Mr. Gibson is supposed to have.

16             It is still sitting in her chambers.

17             THE DEPONENT:  And so it's clear,

18 Mr. Gibson did come and get that chainsaw but then

19 brought it back and said it wasn't the right one.

20             MS. TULLY:  Okay.

21             THE DEPONENT:  Whatever.

22             MR. BRYAN:  Do you want to pickup the

23 chainsaw?

24             MS. TULLY:  Can you come pickup that



1  chainsaw?

2          MR. GIBSON:  It's not the right one.

3  It wasn't entered on the search warrant.  I don't

4  know which one.

5          MS. TULLY:  The fact of the matter is,

6  though, it's property that belongs to somebody, to

7  one of the Gibsons.

8          THE DEPONENT:  I've been told it

9  doesn't work and it leaks -- it leaks oil on my

10 floor, which I do not appreciate.

11          MR. BRYAN:  Just go get the chainsaw.

12          MR. GIBSON:  Okay.

13          THE DEPONENT:  And whoever's at the

14 window --

15          MR. BRYAN:  He'll get the chainsaw.

16          THE DEPONENT:  -- will provide it to

17 you.  I just don't want it in my chambers anymore.

18          MS. TULLY:  Okay.

19          THE DEPONENT:  If possible.

20          MS. TULLY:  I think we're finished

21 now.

22          COURT REPORTER:  The time is

23 12:55 p.m.  This concludes the deposition.

24              (Having indicated she would like



1   to waive reading and signing of her

2   deposition, further this deponent

3   saith not.)

4         --oOo--



1  STATE OF WEST VIRGINIA,

2  COUNTY OF RALEIGH, to wit:

3         I, Bradford L. Cooper, a Notary Public

4  within and for the County and State aforesaid, duly

5  commissioned and qualified, do hereby certify that

6  the foregoing deposition of LOUISE E. GOLDSTON was

7  duly taken by me and before me at the time and

8  place and for the purpose specified in the caption

9  hereof.

10        I do further certify that the said

11 proceedings were correctly taken by me in shorthand

12 notes, and that the same were accurately written

13 out in full and reduced to typewriting by means of

14 computer-aided transcription.

15        My commission expires May 14, 2023.

16        Given under my hand this 15 day of March,

17 2022.

18        *Bradford L. Cooper*

19 _____

20        BRADFORD L. COOPER, Notary Public

21

22

23

24

