IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2021 Term

No. 20-0742

**FILED**
**November 18, 2021**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN THE MATTER OF:

THE HONORABLE LOUISE E. GOLDSTON,
JUDGE OF THE THIRTEENTH
FAMILY COURT CIRCUIT

JUDICIAL DISCIPLINARY PROCEEDING
No. 30-2020
No. 33-2020

PUBLIC CENSURE AND FINE

Submitted: September 15, 2021
Filed: November 18, 2021

Teresa A. Tarr, Esq.
Brian J. Lanham, Esq.
Judicial Disciplinary Counsel
Charleston, West Virginia
Attorneys for West Virginia Judicial
Investigation Commission

Andrew S. Nason, Esq.
Pepper & Nason
Charleston, West Virginia
Attorney for Respondent Goldston

Susan Shelton Perry, Esq.
Logan, West Virginia
Attorney for Amicus Curiae, Family
Judicial Association

JUSTICE ARMSTEAD delivered the Opinion of the Court.

JUSTICE WOOTON dissents and reserves the right to file a separate Opinion.



EXHIBIT
I
Goldston
3/1/2022    BC

JUSTICE HUTCHISON deeming himself disqualified, did not participate in the decision of this case.

JUDGE JENNIFER P. DENT, sitting by temporary assignment.

## SYLLABUS BY THE COURT

1.    "The purpose of judicial disciplinary proceedings is the preservation and enhancement of public confidence in the honor, integrity, dignity, and efficiency of the members of the judiciary and the system of justice." Syl. Pt. 1, in part, *In re Cruickshanks*, 220 W. Va. 513, 648 S.E.2d 19 (2007).

2.    The West Virginia Constitution forbids a judicial officer to participate in a search because a search is an exercise of executive power.    W. Va. Const. art. 5, § 1.

3.    "Under [Rule 4.5 of the West Virginia Rules of Disciplinary Procedure], the allegations of a complaint in a judicial disciplinary proceeding must be proved by clear and convincing evidence." Syl. Pt. 2, in part, *Matter of Ferguson*, 242 W. Va. 691, 841 S.E.2d 887 (2020) (internal quotation marks omitted).

4.    "Stipulations or agreements made in open court by the parties in the trial of a case and acted upon are binding and a judgment founded thereon will not be reversed." Syl. Pt. 3, in part, *Matter of Starcher*, 202 W. Va. 55, 501 S.E.2d 772 (1998).

5.    "In a disciplinary proceeding against a judge, in which the burden of proof is by clear and convincing evidence, where the parties enter into stipulations of fact, the facts so stipulated will be considered to have been proven as if the party bearing the burden of proof has produced clear and convincing evidence to prove the facts so stipulated." Syl. Pt. 4, *Matter of Starcher*, 202 W. Va. 55, 501 S.E.2d 772 (1998).

6.    In determining what sanction or sanctions, if any, to impose under Rule 4.12 of the West Virginia Rules of Judicial Disciplinary Procedure [eff. 2019], this

Court will consider various factors, including, but not limited to, (1) whether the charges of misconduct are directly related to the administration of justice or the public's perception of the administration of justice, (2) whether the circumstances underlying the charges of misconduct are entirely personal in nature or whether they relate to the judicial officer's public persona, (3) whether the charges of misconduct involve violence or a callous disregard for our system of justice, (4) whether the judicial officer has been criminally indicted, and (5) any mitigating or compounding factors which might exist.

**Armstead, Justice:**

In this judicial disciplinary proceeding, a family court judge searched a self-represented party's home for marital property. When the homeowner protested, the judge responded to the homeowner's resistance by threatening to jail him for contempt. This interaction was recorded, and the recording soon appeared on the internet.

The judge was reported to the West Virginia Judicial Investigation Commission, and after investigation, the Judicial Investigation Commission charged the judge with violating the West Virginia Code of Judicial Conduct ("Code of Judicial Conduct"). The judge professed remorse and entered into a settlement agreement with Judicial Disciplinary Counsel. Under the agreement, the judge admitted to both the conduct in question and to the fact that it violated the Code of Judicial Conduct; both parties agreed to recommend that the judge be censured and fined $5,000. The Judicial Hearing Board, however, rejected the parties' recommendation. The Hearing Board recommended that the judge be *admonished* and fined $1,000, and—believing that a judge's "inherent authority" to conduct "judicial views" is "uncertain"—requested guidance from this Court.

Both Judicial Disciplinary Counsel and the judge object to the Judicial Hearing Board's recommendation. Seizing on the Judicial Hearing Board's uncertainty about "judicial views," the judge now attempts to persuade us that her search of the residence was lawful—even as she professes to remain bound by the settlement agreement.

1

After considering the record and the parties' written[1] and oral arguments, we reject the judge's attempt to reframe her conduct. We find that she led a *search* of the homeowner's residence, not a "judicial view," and that, in so doing, she exercised executive powers forbidden to her under the West Virginia Constitution. We find, further, that the judge compounded her error by the manner in which she conducted the search. Accordingly, we disagree with the Judicial Hearing Board and publicly censure the judge for her serious misconduct. In addition, we order the judge to pay a total fine of $1,000.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Honorable Louise E. Goldston is a family court judge who presides in Raleigh, Summers, and Wyoming Counties. She has served since 1994,[2] and until now, she has never been disciplined for judicial misconduct.

Judge Goldston admits that she had a 20-year practice of going to parties' homes "to either determine if certain disputed marital property was present and/or to supervise the transfer of disputed property." In almost every instance, these searches were requested by counsel and were performed without objection. In most cases, the search followed counsel's request immediately, indeed while the hearing was taking place.

---

[1] We acknowledge the contribution of the Family Judicial Association, which filed a brief in this case as amicus curiae. We value the Family Judicial Association's participation and have considered the Family Judicial Association's brief in conjunction with the parties' arguments.

[2] Judge Goldston began her career as a "family law master." In 2001, the Legislature made several changes to the law governing family court proceedings, including changing the title of "family law master" to "family court judge." W. Va. Code § 51-2A-23(c) (2001).

2

The search that led to this disciplinary matter happened on March 4, 2020, in the context of a contempt hearing. One of the parties, an ex-wife, claimed that her former husband had damaged items of property and had refused to turn over other items of sentimental value that she was entitled to receive.

For this proceeding the ex-wife was represented by counsel. The ex-husband was not represented by counsel. During the ex-wife's testimony, Judge Goldston asked the ex-husband for his address. Upon learning his address, Judge Goldston stopped the hearing, *sua sponte*, and ordered the parties to meet her in ten minutes at the ex-husband's house. Judge Goldston admits that she failed to tell the ex-husband why the parties were going to his home and that she gave the ex-husband no opportunity to object.

Judge Goldston's intent became clear, however, when everyone arrived at the residence. The ex-husband voiced his objections, requesting that Judge Goldston recuse herself because she had placed herself in a "witness capacity." Judge Goldston denied his request as not timely filed.

After the ex-husband stated that he needed a search warrant to allow Judge Goldston to enter his house, Judge Goldston told the ex-husband that he was either going to let her in the house or her bailiff, who had accompanied her to the house, was going to arrest the ex-husband. Judge Goldston also asked the ex-husband if he was recording her attempt to enter his home and when he confirmed that he was, she directed that he stop recording and told him (and apparently his girlfriend who was also attempting to record their conversation) to turn off their phones. Judge Goldston also indicated that if they did

3

not turn off their phones and stop recording she would take the ex-husband, or perhaps both he and his girlfriend, to jail. Although the conversation between Judge Goldston and the ex-husband was not transcribed, the recording of the conversation appears to include Judge Goldston stating: "I am the judge *trying to effect equitable distribution.* We're having a hearing. Now, you let me in that house or he [the bailiff] is going to arrest you for being in direct contempt of court."

Faced with these threats, the ex-husband relented, and Judge Goldston agrees that the ex-husband felt he had no choice to do otherwise. Judge Goldston brought with her into the house the bailiff, the ex-wife, and the ex-wife's attorney and personally supervised the search for and recovery of items. Several items were located and recovered, including photographs, yearbooks, DVDs, recipes, and a chainsaw. While the home was being searched, a dispute emerged about an umbrella stand. After a brief colloquy with the ex-husband, the judge awarded the stand to the ex-wife, who removed it from the home with the other items.

Judge Goldston, herself, made no arrangement to record what went on inside the home (or outside the home). Indeed, when she found out afterward that her bailiff had made his own cell-phone recording of the search inside the home, she believed that making the recording was improper and told him not to do it again.

After the search, the parties reconvened in the courtroom. On the record, Judge Goldston listed the items that had been recovered and some items that remained to

4

be exchanged. However, no written order was entered regarding either the search of the home or the items recovered.

Though Judge Goldston may have stopped the ex-husband (and a bystander) from recording what went on outside the home, she did not order the recordings destroyed. Audio and video footage of what took place was uploaded to the internet. Some online comments were deeply critical of the judge and her conduct.

Judicial Disciplinary Counsel became aware of these matters, and on March 11, 2020, Judicial Disciplinary Counsel filed a complaint with the Judicial Investigation Commission.[3] Judge Goldston responded to the complaint on March 18, 2020. In her letter, she explained that, during the March 4, 2020 hearing, the ex-wife showed that the ex-husband had left the ex-wife's property outside in the rain, causing it to be damaged, and, further, that the ex-husband admitted that certain items awarded to the ex-wife remained in the house. Judge Goldston went on to explain that

> [a]t that point, because of the alleged damage to the other items, I felt it imperative *to secure those remaining items* before they were either damaged or ruined. It was at that time that I informed the parties we would meet at the residence *to effectuate the return of the remaining items.* The situation was volatile[,] and I didn't want either party to decide between themselves or *place the burden on a Law Enforcement Officer* of determining what was the [ex-wife]'s and what was not.

(Emphasis added.)

---

[3] Judicial Disciplinary Counsel's filing was designated Complaint No. 30-2020. A week later, the ex-husband filed a second complaint regarding the same incident and regarding other incidents that are not relevant to the matter before the Court. This filing was designated Complaint No. 33-2020.

5

On July 22, 2020, Judge Goldston provided a sworn statement to Judicial Disciplinary Counsel. In her statement, Judge Goldston likened the search to a "jury view," explaining that she was both "judge and jury," yet she claimed that she "never took any testimony." Though she agreed that such proceedings were a "continuation" of the court matter and should have been recorded, she admitted that she had not done so and that her failure to record these searches had "always been a concern[.]" She also agreed that in "some cases, probably" she was "enforcing an order, a contempt order[.]" Nevertheless, she could not remember a single time when she had found someone in contempt before she went to the home "because [she] wasn't sure if they were in contempt." Ultimately, her guiding rationale seems to have been that going to a party's home, searching for items of personal property, and seizing them was "necessary to preserve the marital assets" from destruction, particularly irreplaceable items of "sentimental" value. "I guess it comes down to me thinking if we don't go, they're not going to get it back." With respect to the March 4, 2020 search, she explained:

> And so what made me do it was I just thought, well, if we go now and *get the stuff*, he admits that is there, then that— those assets are preserved. She can't claim he ruined them. He can't claim she ruined them, and I guess judicial economy was that was the easiest and quickest way to get *to retrieve those assets.*

(Emphasis added.)

Judge Goldston agreed that the task of enforcing her orders is an "executive branch" function, and she knew that she could dispatch law enforcement to search for and

6

seize property that a party retained in violation of her order. She simply believed that this method was ineffective:

> I have been told by every sheriff that I've worked with over the 26 years that that's not something they do [i.e., sending law enforcement, or a party accompanied by law enforcement, to look for property], that they're not going for more than 15 minutes to anything, to do anything.

In this particular instance, she explained, "I knew that law enforcement wouldn't know what to do with the [umbrella] stand. I just—wrongly or rightly, I thought it was important for me to be there and make sure that stuff was safely gathered and not damaged."

On September 18, 2020, the Judicial Investigation Commission issued a formal statement of charges. The statement of charges described Judge Goldston's longstanding "practice of visiting homes of litigants" and the events that occurred on March 4, 2020. Significantly, the statement of charges alleged that Judge Goldston "could provide no statute, rule, or case that gave her the authority to conduct home visits"; "acknowledged that there was nothing in the contempt powers that gave her the authority to conduct a home visit"; and "confessed that she never held anyone in contempt prior to going to the home[.]" The statement of charges further alleged that Judge Goldston "confessed . . . that she failed to enter any order subsequent to the visit reflecting what had happened at the residence"; "admitted that she never had any clear or written procedures for conducting a home visit"; and "acknowledged that she never took a court reporter to the scene." Finally, the statement of charges alleged Judge Goldston "agreed that the practice could make her a potential witness to a future proceeding which could then result in her disqualification";

7

and "admitted to improperly putting herself in the role of litigant [i.e., a litigant who had the burden of proof in a contempt proceeding]."

On September 30, 2020, Judge Goldston signed an agreement with Judicial Disciplinary Counsel. Pursuant to the agreement, she admitted the allegations of fact set forth in the formal statement of charges. She further admitted that, by engaging in such conduct, she had violated the following Rules of the Code of Judicial Conduct:

(a) Rule 1.1, which states that "[a] judge shall comply with the law, including the West Virginia Code of Judicial Conduct";

(b) Rule 1.2, which states that "[a] judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety";

(c) Rule 1.3, which states that "[a] judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so";

(d) Rule 2.2, which states that "[a] judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially";

(e) Rule 2.4(A), which states that "[a] judge shall not be swayed by public clamor or fear of criticism";

(f) Rule 2.4(B), which states that "[a] judge shall not permit family, social, political, financial, or other interests or relationships to influence the judge's judicial conduct or judgment"; and

8

(g) Rule 2.5, which states that "[a] judge shall perform judicial and administrative duties, competently and diligently . . . [and] shall cooperate with other judges and court officials in the administration of court business."

In addition, Judge Goldston agreed to join Judicial Disciplinary Counsel's recommendation that she be censured and fined $5,000.[4] Both sides agreed, however, that "the decision to accept the recommendation concerning discipline rests solely within the purview of the Judicial Hearing Board and the State Supreme Court."

Judge Goldston appeared before the Judicial Hearing Board on January 15, 2021, and ratified the agreement under oath. One Judicial Hearing Board member,[5] however, expressed doubt about the charges, suggesting that a power to conduct "views" falls within the family court's inherent powers or its express statutory authority to seize

---

[4] The agreement also required Judge Goldston to pay costs resulting from the investigation and prosecution of the complaints against her, but the agreement further stipulated that Judicial Disciplinary Counsel and the Judicial Investigation Commission had not incurred any costs.

[5] In its brief to this Court, Judicial Disciplinary Counsel contends that the member's comments and subsequent actions "are an extreme example of bias" and that the member should have disqualified himself from this matter. The Judicial Hearing Board member, however, is not presently before this Court; therefore, we decline to address this argument.

9

property[6] and supervise the production of evidence.[7]  Judicial Disciplinary Counsel responded that the question was "whether [Judge Goldston] followed an appropriate procedure or not."  Judge Goldston's counsel appeared to agree, stating, "[T]he procedures and the due process is the problem that she is admitting to."

The Judicial Hearing Board requested post-hearing briefs, which were filed, and on March 15, 2021, the Judicial Hearing Board issued its recommended decision.  The Judicial Hearing Board adopted the parties' stipulations but chose to recommend that Judge Goldston "be admonished and fined $1,000 as an appropriate sanction for her stipulated violations of the Code of Judicial Conduct."  In support of this recommendation, the Judicial Hearing Board invoked Judge Goldston's "unblemished disciplinary record and cooperation[,]" and "the absence of any aggravating factors" and the "extensive record" Judge Goldston made "after the incident as to what had occurred at the complainant's residence."[8]  The Judicial Hearing Board further cited the fact that another judge, in an

---

[6] *See* W. Va. Code § 51-2A-9(b) (eff. 2012) ("A family court judge may enforce compliance with his or her lawful orders with remedial or coercive sanctions designed to compensate a complainant for losses sustained and to coerce obedience for the benefit of the complainant. . . .  Sanctions may include, but are not limited to, seizure or impoundment of property to secure compliance with a prior order.").

[7] *See* W. Va. Code § 51-2A-7(a) (eff. 2013) ("[T]he family court judge has the authority to . . . (4) Compel and supervise the production of evidence . . . .").

[8] Because no written order was entered regarding the search, we assume that the Hearing Board is referring to what Judge Goldston put on the record when the parties returned to the courtroom.

10

unrelated disciplinary action,[9] had been admonished for accompanying law enforcement to a litigant's residence to execute a warrant of seizure, but acknowledged the uncertainty regarding "the scope of a judicial officer's inherent authority relative to judicial views[,]" and the need for "guidance to judicial officers from the Supreme Court of Appeals through rule-making or otherwise regarding the proper scope of conducting judicial views[.]"

Both Judicial Disciplinary Counsel and Judge Goldston filed objections to the Judicial Hearing Board's recommended decision. Despite her admissions under oath, Judge Goldston now argues that "[i]t is inexplicable . . . how she could be fined or sanctioned for violating ethical canons when the Hearing Board itself found that the law is unclear regarding [her] inherent authority to conduct a judicial view." Nevertheless, she claims that she "is not seeking to abrogate her agreement."

## II. STANDARD OF REVIEW

The standard of review in this matter flows from our "inherent rule-making power" to "promulgate and amend rules prescribing a judicial code of ethics" and "to censure or temporarily suspend any justice, judge[,] or magistrate having the judicial power of the state . . . for any violation of any such code of ethics[.]" W. Va. Const. art. VIII, § 8.[10] This power to sanction is "exclusive." Syl. Pt. 5, in part, *State ex rel. Workman v. Carmichael*, 241 W. Va. 105, 819 S.E.2d 251 (2018). Therefore, our review is "plenary"

---

[9] *See In the Matter of Aboulhosn*, JIC Complaint No. 91-2013.

[10] Family court judges were created and placed under our "general supervisory control" in 2000. W. Va. Const. art. VIII, § 16.

11

and "independent." *Matter of Starcher*, 202 W. Va. 55, 60, 501 S.E.2d 772, 777 (1998). The standard of proof is clear and convincing evidence. Syl. Pt. 2, *Matter of Ferguson*, 242 W. Va. 691, 841 S.E.2d 887 (2020).

Our constitutional power to sanction necessarily includes the power to select the particular form of lawful discipline that we will impose. Accordingly, we have "the right to accept or reject the disciplinary sanction recommended by the [Judicial Hearing] Board." *Matter of Crislip*, 182 W. Va. 637, 638, 391 S.E.2d 84, 85 (1990). In all such cases, our goal and "[t]he purpose of judicial disciplinary proceedings is the preservation and enhancement of public confidence in the honor, integrity, dignity, and efficiency of the members of the judiciary and the system of justice." Syl. Pt. 1, in part, *In re Cruickshanks*, 220 W. Va. 513, 648 S.E.2d 19 (2007).

With these principles in mind, we will consider Judge Goldston's alleged violations of the Code of Judicial Conduct and what discipline, if any, is appropriate.

## III. ANALYSIS

Judicial Disciplinary Counsel argues that Judge Goldston is bound by the findings of fact and conclusions of law set forth in her agreement, namely that Judge Goldston's "view" of the home was unlawful, unconstitutional, and unethical; and that the Court should impose the censure and fine that the parties agreed to recommend.

For her part, Judge Goldston agrees that she remains bound by her prior statements of fact, yet she contends that "what constitutes a violation, and the effect of a violation, w[ere] always to be reviewed by the [Judicial Hearing Board] and this Court."

12

Accordingly, she contends that the parties remain free to "argue questions of law[.]" She denies that the Judicial Investigation Commission ever charged her with, or that she has ever confessed to, any constitutional violations. On the contrary, she contends that "[s]ubsequent research . . . revealed a body of law that supports" her actions. In particular, she claims that she had "inherent authority to conduct an onsite visit" and that "view[ing] the division of property" allowed the ex-husband to "purge his contempt." She contends that, "[u]nlike the execution of a search warrant, the view was conducted with judicial oversight. Therefore, it was not *per se* unreasonable." Ultimately, Judge Goldston believes that her conduct was lawful and that, if she is mistaken, her mistake was error, not an ethical violation. She urges the Court to "clarify the law and either affirm the ruling of the [Judicial Hearing Board] or as the final arbiter conclude that there [wa]s no wrongdoing[.]"

## A. Judge Goldston Searched the Ex-Husband's Home.

We begin with a threshold question: Did Judge Goldston view the ex-husband's home, or did she search it? We find that she searched it. A "view" is "the act or proceeding by which a tribunal goes to *observe* an object that *cannot be produced in court because it is immovable or inconvenient to remove*." *View*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added); *accord Barron v. United States*, 818 A.2d 987, 990 (D.C. 2003) ("A jury view is proper when 'an object in question cannot be produced in court because it is immovable or inconvenient' and, therefore, it is necessary for the fact-finder 'to go to the object in its place and there observe it.' *Dailey v. District of Columbia*, 554 A.2d 339, 340–41 (D.C.1989) (quoting IV WIGMORE ON EVIDENCE

13

§ 1162 at 362 (1972 & 1988 Supp.)).”); *State v. Pauline*, 100 Haw. 356, 374, 60 P.3d 306, 324 (2002) *overruled on other grounds as stated in State v. Abdon*, 134 Haw. 114, 334 P.3d 777 (Ct. App. 2014), *as corrected* (Oct. 27, 2014), *aff’d*, 137 Haw. 19, 364 P.3d 917 (2016) (“The very definition of a view favors treating it as evidence. *Black’s Law Dictionary* defines a ‘view’ as ‘the act or proceeding by which [a] tribunal goes to an object which cannot be produced in court because it is immovable or inconvenient to remove, and there observes it.’ *Black’s Law Dictionary* 1568 (6th ed.1990).”); § 219. *Views*, 2 MCCORMICK ON EVID. § 219 (8th ed.) (“Courts have sensibly recognized that if a thing cannot be brought to the observer, the observer must go to the thing. Venturing forth to observe places or objects that are material to litigation but which cannot feasibly be brought, or satisfactorily reproduced, within the courtroom, is termed a ‘view.’”); *see, e.g., State v. Thomas*, 179 W. Va. 811, 374 S.E.2d 719 (1988) (view of parking lot); *Bennett v. Walton*, 170 W. Va. 283, 294 S.E.2d 85 (1982) (view of roadway); *State Rd. Comm’n v. Bowling*, 152 W. Va. 688, 166 S.E.2d 119 (1969) (view of land acquired for highway); *Moore, Kelly & Reddish, Inc. v. Shannondale, Inc.*, 152 W. Va. 549, 165 S.E.2d 113 (1968) (view of swimming pool).

We agree that the ex-husband’s home was “immovable” and certainly “inconvenient” to produce in court. *View*, BLACK’S LAW DICTIONARY (11th ed. 2019). However, Judge Goldston did not go to the property to *observe* the ex-husband’s house; she went there to locate and seize certain of its contents—pictures, DVDs, and other items of personal property. These items of personal property were not “immovable or

14

inconvenient to remove" from the home. *Ibid.* In fact, the ex-wife removed many of these items during the so-called "view." Accordingly, we find that Judge Goldston's actions at the residence were not a view. [11]

On the contrary, the record is clear that Judge Goldston went to the property to *locate* things, not simply to observe them. Her own words support this conclusion. When the ex-husband demanded a list of what she was seeking, she appeared to reply, "[y]ou have a list of everything [unintelligible] attached to the order." When the ex-husband professed not to "know where some of it's at[,]" she replied, "Well, *we're gonna find it*." (Emphasis added.)

Looking for things is a "search" by any sensible definition of the term. As the United States Supreme Court stated in *Terry v. Ohio*, 392 U.S. 1, 16 (1968), "it is nothing less than sheer torture of the English language to suggest that a careful *exploration* of the outer surfaces of a person's clothing all over his or her body *in an attempt to find* weapons is not a 'search'" (emphasis added). *Accord Kyllo v. United States*, 533 U.S. 27, 32 n.1 (2001) ("When the Fourth Amendment was adopted, as now, to 'search' meant '[t]o look over or through for the purpose of finding something; to explore; to examine by inspection; as, to *search* the house for a book; to *search* the wood for a thief.' N. Webster,

_____

[11] Because we find that Judge Goldston's conduct at the residence was a search, not a view, we refuse to decide whether a family court judge, or other judicial officer, has the inherent or other authority to conduct a true view under different circumstances. We are not in the business of "making advisory decrees or resolving academic disputes." Syl. Pt. 1, in part, *State ex. rel. Perdue v. McCuskey*, 242 W. Va. 474, 836 S.E.2d 441 (2019) (quoting Syl. Pt. 2, in part, *Harshbarger v. Gainer*, 184 W. Va. 656, 403 S.E.2d 399 (1991)).

15

An American Dictionary of the English Language 66 (1828) (reprint 6th ed.1989)."); *Doe v. Heck*, 327 F.3d 492, 510 (7th Cir. 2003), *as amended on denial of reh'g* (May 15, 2003) ("[T]he defendants went to the school *for the specific purpose of gathering information*, an activity that most certainly constitutes a search under the Fourth Amendment." (emphasis added)); *§ 2.1(a) Definition of "searches" and "seizures,"* 1 SEARCH & SEIZURE § 2.1(a) (6th ed.) ("Under the traditional approach, the term 'search' is said to imply 'some exploratory investigation, or an invasion and quest, a looking for or seeking out.'" (quoting C.J.S., *Searches and Seizures* § 1 (1952)).

Searches are an activity of the executive department. *State ex rel. Parma Cmty. Gen. Hosp. v. O'Donnell*, 2013-Ohio-2923, ¶ 7 (stating that "searches are executive in nature."). "Indeed, searches are so quintessentially executive in nature that even a judge who participates in one acts 'not * * * as a judicial officer, but as an adjunct law enforcement officer.'" *State ex rel. Hensley v. Nowak*, 52 Ohio St. 3d 98, 99, 556 N.E.2d 171, 173 (1990) (per curiam) (quoting *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 327 (1979)) (holding that a writ of prohibition would not issue to restrain administrative searches because they are neither judicial nor quasi-judicial acts).

To say that searches are an executive activity is to announce no new principle of law. The United States Supreme Court assumed as much in 1979 when it rejected a conviction resulting from a search led by a town justice. According to the Supreme Court, the town justice in question "allowed himself to become a member, if not the leader, of the search party *which was essentially a police operation*." *Lo-Ji Sales, Inc.* at 327 (emphasis

16

added). The Supreme Court found that, in doing so, the town justice "*was not acting as a judicial officer* but as an adjunct law enforcement officer[,]" *ibid.*, and that "[i]t [wa]s difficult to discern when he was acting as a 'neutral and detached' judicial officer and when he was one with the police and prosecutors *in the executive seizure,*" *id.* at 328 (emphasis added). Other courts, often following *Lo-Ji Sales*, routinely assume that searching is a law enforcement activity. *United States v. Barnes*, 895 F.3d 1194, 1202 (9th Cir. 2018) (noting that "*Lo-Ji Sales* was an extreme case where the judicial officer allowed himself to become a member, if not the leader, of the search party which was essentially a police operation." (internal quotation marks removed)); *United States v. Clyburn*, 806 F. Supp. 1247, 1252 (D.S.C. 1992), *aff'd*, 24 F.3d 613 (4th Cir. 1994) (noting that, "[i]n *Lo Ji Sales*, the Court held that the judge who issued the warrant did not manifest that neutrality and detachment demanded of a judicial officer because the judge took an active law enforcement type role in conducting the search" (internal quotation marks removed)).

Under our system of government, judges may not exercise executive powers. The West Virginia Constitution declares that "[t]he legislative, executive and judicial departments *shall be separate and distinct*[.]" W. Va. Const. art. V, § 1 (emphasis added). The Constitution further specifies, in unmistakable terms, that no department "shall exercise the powers properly belonging to either of the others" and forbids "any person [to] exercise the powers of more than one of them at the same time[.]" *Ibid.*[12] In light of these

---

[12] Article V, Section 1 provides a single exception for justices of the peace, who may serve in the Legislature. *Ibid.* "Justices of the peace" are now called "magistrates." W. Va. Code § 50-1-17 (eff. 1976).

clear prohibitions, we hold that the West Virginia Constitution forbids a judicial officer to participate in a search because a search is an exercise of executive power. W. Va. Const. art. 5, § 1. Because Judge Goldston plainly engaged in such a search, we find that the so-called "view" was improper.

## B. Judge Goldston Violated the Code of Judicial Conduct.

Having resolved the threshold question, we turn to the question of whether Judge Goldston violated the Code of Judicial Conduct. "Under [Rule 4.5 of the West Virginia Rules of Disciplinary Procedure], the allegations of a complaint in a judicial disciplinary proceeding must be proved by clear and convincing evidence." *Ferguson*, 242 W. Va. at ___, 841 S.E.2d at 888, syl. pt. 2, in part (internal quotation marks removed). However, we note that Judge Goldston has admitted, under oath, the allegations of fact set forth in the formal statement of charges. Under oath, she has further admitted that those facts are clear and convincing evidence that she violated Rules 1.1, 1.2, 1.3, 2.2. 2.4(A), 2.4(B), and 2.5 of the Code of Judicial Conduct and that she did, *in fact*, violate those rules.

We have held that "[s]tipulations or agreements made in open court by the parties in the trial of a case and acted upon are binding and a judgment founded thereon will not be reversed." Syl. Pt. 3, in part, *Matter of Starcher*, 202 W. Va. 55, 501 S.E.2d 772 (1998). We have further held that

> [i]n a disciplinary proceeding against a judge, in which the burden of proof is by clear and convincing evidence, where the parties enter into stipulations of fact, the facts so stipulated will be considered to have been proven as if the party bearing the burden of proof has produced clear and convincing evidence to prove the facts so stipulated.

18

*Id.* at 56-57, 501 S.E.2d at 773-74, syl. pt. 4. Based on our review of the record in this matter, we agree that the above-mentioned violations have been proven by clear and convincing evidence, and we see no reason, in the context of our plenary review, to reject or qualify Judge Goldston's admissions. *Law. Disciplinary Bd. v. Sidiropolis*, 241 W. Va. 777, 785, 828 S.E.2d 839, 847 (2019) ("Because the relevant facts underlying this disciplinary proceeding are not disputed and Mr. Sidiropolis has voluntarily stipulated to his violation of Rule 8.4(b), we focus our analysis of this matter on the proper sanctions to be imposed.").

## C. Judge Goldston's Misconduct Warrants Censure and a Fine.

The question now becomes what sanction or sanctions, if any, we should impose. Rule 4.12 of the West Virginia Rules of Judicial Disciplinary Procedure [eff. 2019] authorizes us to "impose *any one or more* of the following sanctions for a violation of the Code of Judicial Conduct: (1) admonishment; (2) reprimand; (3) censure; (4) suspension without pay for up to one year; (5) a fine of up to $5,000; or (6) involuntary retirement" (emphasis added);[13] *see also* Syl. Pt. 5, in part, *In re Toler*, 218 W. Va. 653, 625 S.E.2d 731 (2005) (holding that "it is clearly within this Court's power and discretion to impose multiple sanctions . . . for separate and distinct violations"). Rule 4.12 further explains that "[a]n admonishment constitutes *advice or caution* to a judge to refrain from

---

[13] Involuntary retirement may only be imposed in the case of "a judge . . . of advancing years and attendant physical or mental incapacity . . . who is eligible to receive retirement benefits under the judges' retirement system or public employees retirement system." *Ibid.*

19

engaging in similar conduct which is deemed to constitute a violation of the Code of

Judicial Conduct"; "[a] censure constitutes *formal condemnation*" for such a violation. W.

Va. R. Jud. Disc. P. 4.12 (emphasis added).

> We have held that
>
> > in determining *whether to suspend a judicial officer with or without pay*, [we] should consider various factors, including, but not limited to, (1) whether the charges of misconduct are directly related to the administration of justice or the public's perception of the administration of justice, (2) whether the circumstances underlying the charges of misconduct are entirely personal in nature or whether they relate to the judicial officer's public persona, (3) whether the charges of misconduct involve violence or a callous disregard for our system of justice, (4) whether the judicial officer has been criminally indicted, and (5) any mitigating or compounding factors which might exist.

Syl. Pt. 3, in part, *In re Cruickshanks*, 220 W. Va. 513, 648 S.E.2d 19 (2007) (emphasis

added). Though *Cruickshanks* speaks in terms of suspension, we believe that *Cruickshanks*

provides an appropriate guide that may be applied whenever we contemplate imposing

sanctions under Rule 4.12. Accordingly, we hold that in determining what sanction or

sanctions, if any, to impose under Rule 4.12 of the West Virginia Rules of Judicial

Disciplinary Procedure [eff. 2019], this Court will consider various factors, including, but

not limited to, (1) whether the charges of misconduct are directly related to the

administration of justice or the public's perception of the administration of justice, (2)

whether the circumstances underlying the charges of misconduct are entirely personal in

nature or whether they relate to the judicial officer's public persona, (3) whether the

charges of misconduct involve violence or a callous disregard for our system of justice, (4)

20

whether the judicial officer has been criminally indicted, and (5) any mitigating or compounding factors which might exist.

In this case, the parties have agreed to recommend a *censure* and a $5,000 fine. The Judicial Hearing Board recommended an *admonishment* and a $1,000 fine. Neither recommendation binds us. Rather, applying *Cruickshanks* as a guide, we note the following.

*First*, Judge Goldston's misconduct was directly related to the administration of justice. She forced her way into the ex-husband's home—over his reasonable objections—by threatening to jail him for contempt. She said, "I am the judge trying to effect equitable distribution. We're having a hearing. Now, you let me in that house or he [the bailiff] is going to arrest you for being in direct contempt of court."

*Second*, Judge Goldston's misconduct was carried out in her public persona and seriously undermined the public's perception of the administration of justice. Public comments show that many who viewed her conduct on the internet were justly and deeply offended. Without question, Judge Goldston's conduct cast doubt in the minds of the citizens who viewed the recording of the incident as to whether the parties were being treated with justice and fairness.

*Third*, Judge Goldston's misconduct displayed a callous disregard for our system of justice. Even setting aside the inappropriateness of the search, Judge Goldston went about the search in a highhanded and procedurally flawed manner. Instead of receiving both sides' testimony and evidence and rendering a decision, she interrupted the

21

ex-wife's testimony and directed the parties to meet her at the ex-husband's residence, affording the ex-husband no explanation and no opportunity to object until she arrived at the scene. Though she claimed she was "having a hearing[,]" she made no attempt of any kind to contemporaneously record what transpired. Indeed, she forbade others to make a recording, at risk of incarceration. Failing to record what transpired made her a potential witness. Most significantly, though she seems to have been well-aware of the lawful procedures at her disposal to enforce her order,[14] she chose not to use them because she deemed them ineffective.

*Fourth*, weighing in her favor, Judge Goldston's actions do not entail any criminal action for which she has been indicted.

*Fifth*, as mitigating factors, we note that Judge Goldston has been forthright about her conduct and that, in her twenty-seven years on the bench, this is the first time she has been disciplined. In addition, we find that Judge Goldston has shown some degree of remorse for her conduct.

Weighing the factors set forth in *Cruickshanks*, we find that the seriousness of Judge Goldston's conduct, coupled with the manner in which such conduct was carried out, has undermined the public's confidence in the administration of justice and justifies imposition of a censure in this matter. As set forth in Rule 4.12 of the West Virginia Rules

---

[14] *See, e.g.*, W. Va. Code § 48-1-304(b) (eff. 2001) (authorizing a family court to incarcerate a person who "fails or refuses to purge himself [or herself] of contempt"); W. Va. Code § 51-2A-9(b) (eff. 2012) (authorizing a family court judge to impose "remedial or coercive sanctions" including "seizure or impoundment of property").

22

of Judicial Disciplinary Procedure, an admonishment, as recommended by the Judicial Hearing Board, merely constitutes "advice or caution" to refrain from further violations, while a censure constitutes "formal condemnation" for such conduct. We find that the nature of the conduct clearly warrants such condemnation by this Court.

As we have stated herein, Judge Goldston's conduct constituted a search, rather than a mere view, of the ex-husband's home. The parties appeared in court for a hearing before Judge Goldston. Undoubtedly, the ex-husband could not have anticipated that the hearing would proceed to an unannounced invasion of the sanctity and privacy of his home. Regardless of whether the ex-husband had failed to provide belongings he was previously directed to provide, Judge Goldston failed to use the appropriate tools available to her under the law to address such failure because she felt such procedures were ineffective. Instead, she, along with her bailiff, the ex-wife, and the ex-wife's attorney, proceeded to enter the ex-husband's home, over his strenuous objections, directed that he stop recording the incident, and began searching for items on the list of items he was to produce. Such an invasion of the ex-husband's home was an egregious abuse of process.

Moreover, Judge Goldston clearly left her role as an impartial judicial officer and participated in an executive function when she entered the ex-husband's home to oversee the search. As we have previously held:

> A Judge is not expected to and should not summarily step from his judicial function and become an investigator, prosecutor, arresting officer, or instigator of legal actions, for when he does, he lessens the public confidence in the impartiality of his office. It is important that the Judge not only actually maintain integrity and impartiality, but that he must

23

> also give the appearance of such. No Judge should take unto
> himself activities or functions which are delegated to other
> branches of the government.

*W. Va. Jud. Inquiry Comm'n v. Dostert*, 165 W. Va. 233, 237, 271 S.E.2d 427, 429–30

(1980) (quoting West Virginia Judicial Review Board findings).

Finally, we find that the parties' previous stipulations in this matter, while

not binding on our decision, are nonetheless relevant to our determination. Judge Goldston

clearly agreed with the Judicial Disciplinary Counsel's recommendation that she be

censured and fined $5,000. Admittedly, however, such agreement was made with the

acknowledgment that "the decision to accept the recommendation concerning discipline

rests solely within the purview of the Judicial Hearing Board and the State Supreme Court."

Ultimately, the decision as to the proper sanction to be imposed rests with

this Court, and we may "accept or reject the disciplinary sanction" recommended by the

Judicial Hearing Board. *Crislip*, 182 W. Va. at 638, 391 S.E.2d at 85. We find that the

facts of this case warrant a censure, as was stipulated by the parties, and to the extent that

the Judicial Hearing Board determined otherwise, we reject such recommendation. An

admonishment is insufficient to address the seriousness of Judge Goldston's conduct and

the impact such violations have on the public's confidence in the judiciary.

However, further exercising our authority to accept or reject the

recommendation of the Judicial Hearing Board, we accept the Board's recommendation

that Judge Goldston be fined $1,000. We believe that the imposition of a censure, rather

than an admonishment, adequately recognizes the seriousness of Judge Goldston's

24

conduct. Such sanction, coupled with the $1,000 fine, will fulfill the disciplinary goals of preserving and enhancing the public's confidence in the "honor, integrity, dignity, and efficiency of the members of the judiciary and the system of justice." *Cruickshanks*, 220 W. Va. at 514, 648 S.E.2d at 20, syl. pt. 1, in part.

Based upon the facts and circumstances of this case, and taking into account the mitigating factors present, as well as the parties' previous stipulations in this matter, we impose a censure and a fine of $1,000.

## IV. CONCLUSION

For the foregoing reasons, the Court orders that Judge Goldston is **censured** and ordered to pay a **fine of $1,000**.

Censure and fine ordered.

25

**BEFORE THE JUDICIAL INVESTIGATION COMMISSION OF WEST VIRGINIA**

IN THE MATTER OF,                                  **COMPLAINT NO. 56-2020**
THE HONORABLE ERIC SHUCK, JUDGE
OF THE 13TH FAMILY COURT CIRCUIT

## PUBLIC ADMONISHMENT OF THE HONORABLE ERIC SHUCK, JUDGE OF THE 13TH FAMILY COURT CIRCUIT

The matter is before the Judicial Investigation Commission ("JIC") upon a complaint filed

by Judicial Disciplinary Counsel setting forth certain allegations against the Honorable Eric Shuck,

Judge of the 13th Family Court Circuit ("Respondent"). An investigation was conducted pursuant

to the Rules of Judicial Disciplinary Procedure ("RJDP"). After a review of the complaint, the

Judge's written response, the information and documents obtained from the investigation and the

pertinent Rules contained in the Code of Judicial Conduct, the JIC found probable cause that Judge

Shuck violated Rules 1.1, 1.2, 1.3, and 2.5(A) of the Code of Judicial Conduct at a recent meeting

and ordered that he be publicly admonished pursuant to RJDP 1.11 and 2.7(c) as set forth in the

following statement of facts and conclusions found by the Commission.

### STATEMENT OF FACTS

Respondent successfully ran for Family Court Judge in the May 2016 election and took

office on January 1, 2017. He has served continuously in that position since that time. At all times

relevant to the instant complaint, Respondent was serving in his capacity as a Family Court Judge.

On or about June 16, 2020, Judicial Disciplinary Counsel opened a complaint against

Respondent. The gravamen of the complaint was that Respondent was going to the homes of

litigants to determine if certain disputed marital personal property was in the possession of the

occupant and/or to supervise the transfer of said items. By reply dated July 8, 2020, Respondent

admitted to taking such action in two separate cases in September and November 2019. In each

1


EXHIBIT
2
Goldston
3/1/2022    BC

case, the Respondent stated that both parties were represented by attorneys; one attorney requested the home visit to "see if property which w[as] to be provided to [his/her client] was still located at the home;" "the marital home and the property were still under the jurisdiction of the Court;" and there was no objection by the other lawyer.

On July 24, 2020, Judicial Disciplinary Counsel took Respondent's sworn statement. Respondent opined that he believed it was proper to visit litigants' homes because a colleague had engaged in the same practice for several years.[1] Respondent also stated that no one objected to the home visit. He stated that had one party raised an objection in either case, he would have denied the home visit. Respondent likened the practice to a jury view or similar continuation of the court proceeding and stated that as a finder of fact it was necessary to determine whether a party could be held in contempt for not turning over personal property as previously ordered by the Court.

When asked, Respondent could provide no statute, rule or case that gave him the authority to conduct home visits. Respondent also acknowledged that there was nothing in the contempt powers that gave him the authority to conduct a home visit. Respondent confessed that he never held anyone in contempt prior to going to the home and that he failed to enter any order subsequent to the visit reflecting what had happened at the residence, whether any items had been secured and/or whether or not a party was in contempt. Respondent admitted that he never had any clear or written procedures for conducting a home visit, including but not limited to, when the proceeding should be utilized and how the process should take place. He also acknowledged that he never took a court reporter to the scene and that he only recorded one of the two visits. Upon

---

[1] The colleague, who is also the subject of a judicial disciplinary proceeding, recently engaged in a visit to a litigant ex-husband's home to search for marital property that had been the focus of a contempt proceeding. The ex-husband was not represented by a lawyer and was not advised of the purpose of the visit prior to the judge, his ex-wife and her lawyer going to the home. Once there, the ex-husband moved to disqualify the judge but was told the motion was not timely and would have to be submitted in writing.

2

reflection, Respondent agreed that the practice could make him a potential witness to a future proceeding which could then result in his disqualification.

## CONCLUSIONS

The Commission unanimously[2] found that probable cause exists in the matters set forth above to find that the Honorable Eric Shuck, Judge of the 13th Family Court Circuit, violated Rules 1.1, 1.2, 1.3 and 2.5(A) of the Code of Judicial Conduct as set forth below:

### 1.1 – Compliance With the Law

A judge shall comply with the law, including the West Virginia Code of Judicial Conduct.

### 1.2 – Confidence in the Judiciary

A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.

### 1.3 – Avoiding Abuse of the Prestige of Judicial Office

A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so.

### 2.5 – Competence, Diligence and Cooperation

(A)     A judge shall perform judicial and administrative duties, competently and diligently.

The Commission further found that formal discipline was not essential as Respondent had no prior disciplinary actions and had been led astray, in part, by another colleague's actions. However, the Commission found that the violations were serious enough to warrant a public admonishment.

The Preamble to the Code of Judicial Conduct provides:

Our legal system is based on the principle that an independent, fair and competent judiciary will interpret and apply the laws that govern us. The

---

[2] The vote was 8-0. The Honorable H.L. Kirkpatrick, III, Judge of the 10th Judicial Circuit recused himself.

role of the judiciary is central to the American concepts of justice and the rule of law. Intrinsic to all sections of this Code are the precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and strive to enhance and maintain confidence in our legal system. The judge is an arbiter of facts and law for the resolution of disputes and a highly visible symbol of government under the rule of law. . . . Good judgment and adherence to high moral and personal standards are also important.

Home visits by a Family Court Judge to locate and/or secure personal property in a contempt proceeding are ill-advised and inappropriate. Such visits are not authorized by any statute, rule or case law, and a family court judge runs the risk of disqualification if he/she were to become a witness in a subsequent proceeding pertaining thereto. Judges have a duty to preside over cases whenever possible and should limit their activity so as to avoid the risk of disqualification. The risk is clearly more likely when a judge fails to document proceedings either by transcription, recordation, or order.

The burden of proof in a contempt proceeding rests with the moving party. In other words, it is the moving party's responsibility to provide evidence in support of their contention that the other side has failed to produce the items in question. When a judge goes to a scene to gather evidence, he/she places himself/herself in the stead of the moving party and ceases to serve as a factfinder. More importantly, when a judge goes to a home to help enforce a prior court order, he abrogates his responsibility as a judge in favor of some nonexistent role in the the executive branch.

Therefore, it is the decision of the Judicial Investigation Commission that the Honorable Eric Shuck, Judge of the 13th Family Court Circuit, be disciplined by this Admonishment. Accordingly, the Judicial Investigation Commission hereby publicly admonishes Judge Shuck for his conduct as fully set forth in the matters asserted herein.

\*\*\*\*\*

4

Pursuant to Rule 2.7(c) of the Rules of Judicial Disciplinary Procedure, the Respondent has fourteen (14) days after receipt of the public admonishment to file a written objection to the contents thereof. If the Respondent timely files an objection, the Judicial Investigation Commission shall, pursuant to the Rule, file formal charges with the Clerk of the Supreme Court of Appeals of West Virginia.

The Honorable Alan D. Moats Chairperson
Judicial Investigation Commission

08/25/2020
Date

ADM/tat

5

## IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

IN THE MATTER OF:                                          SUPREME COURT No. _____
THE HONORABLE LOUISE E. GOLDSTON,        JIC COMPLAINT Nos. 30-2020 & 33-2020
JUDGE OF THE 13ᵗʰ FAMILY COURT CIRCUIT

## AGREEMENT

COMES NOW the Honorable Louise E. Goldston, Judge of the 13ᵗʰ Family Court Circuit, ("Respondent" or "Judge Goldston") and Teresa A. Tarr and Brian J. Lanham, Judicial Disciplinary Counsel, and hereby enter into this Agreement consisting of the following terms:

1.  Respondent has served as a Family Law Master/Family Court Judge for 26 years. At all times relevant to the charges set forth below Respondent was serving in her capacity as a Family Court Judge;

2.  On March 11, 2020, Judicial Disciplinary Counsel opened Complaint 30-2020 and on March 18, 2020, Matthew Gibson filed Complaint 33-2020. The two complaints involved the same conduct;

3.  The Judicial Investigation Commission ("JIC") immediately began an investigation into the complaint. On September 23, 2020, the JIC filed a one-count formal statement of charges against Respondent;

4.  Accordingly, the parties understand, acknowledge and agree to the following:

    a.  "[A]greements made in open court by the parties in the trial of a case and acted upon are binding and a judgment founded thereon will not be reversed. . . ." Syl. pt.3, *In the Matter of Starcher*, 202 W. Va. 55, 501 S.E.2d 772 (1998);

    b.  The burden of proof in judicial disciplinary cases is clear and convincing evidence. *Id.*;

1

EXHIBIT
3
Goldston
3/1/2022          BC

c. Respondent admits the allegations contained in Paragraph Nos. 1 through 14 of the Formal Statement of Charges in their entirety;

d. Respondent admits that all the facts contained in Paragraph Nos. 1 through 14 of the Formal Statement of Charges contain clear and convincing evidence that she violated Rules 1.1, 1.2, 1.3, 2.2, 2.4(A), 2.4(B) and 2.5 of the Code of Judicial Conduct.

e. Respondent also admits to violating Rules 1.1, 1.2, 1.3, 2.2, 2.4(A), 2.4(B) and 2.5 of the Code of Judicial Conduct for engaging in the conduct set forth in Paragraph Nos. 1 through 14 of the Formal Statement of Charges.

f. In exchange for the admissions set forth above Judicial Disciplinary Counsel agrees not to pursue any other possible alleged violations of the Code of Judicial Conduct.

g. As mitigation, both parties acknowledge and agree that Respondent has never been subject to judicial discipline, was completely cooperative during the investigation of the instant complaint and admitted her wrongdoing;

h. Judicial Disciplinary Counsel and Respondent agree to jointly recommend to the Judicial Hearing Board and the State Supreme Court that Respondent be censured and fined $5,000 as an appropriate sanction for the foregoing violations of the Code of Judicial Conduct;

i. Judicial Disciplinary Counsel and Respondent agree that Respondent will be responsible for costs incurred as a result of the investigation and prosecution of the complaints;

2

j.    Both parties understand, acknowledge, and agree that the decision to
accept the recommendation concerning discipline rests solely within
the purview of the Judicial Hearing Board and the State Supreme
Court. The parties understand, acknowledge and agree that the
Judicial Hearing Board and the State Supreme Court may award more
or less severe discipline than what is recommended by the parties and
that the parties are bound by the decisions;

k.    Both parties acknowledge and agree that neither the Judicial
Investigation Commission nor Judicial Disciplinary Counsel incurred
any costs as a result of the investigation into the disciplinary charges;
and

Respondent understands, acknowledges, and agrees that he is entering into this agreement
because it is in her best interest and that no other inducements have been promised other than what
is contained within the four corners of this document. All parties agree to do everything necessary
to ensure that the foregoing terms of this agreement take effect.

**AGREED:**

Judge Louise E. Goldston, Respondent

Counsel for Respondent Andrew S Nason (WVBar #2707) Date

Teresa A. Tarr, Esquire
Judiciary Disciplinary Counsel

Brian J. Lanham
Judicial Disciplinary Counsel

$9/30/2080$

$9/30/2020$

$10/5/2020$

$10-5-2028$

3

IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

IN THE MATTER OF:
THE HONORABLE LOUISE E. GOLDSTON,
JUDGE OF THE 13th FAMILY COURT CIRCUIT

SUPREME COURT No. 20-0742
JIC COMPLAINT NOS. 30 & 33-2020

## FORMAL STATEMENT OF CHARGES

The West Virginia Judicial Investigation Commission, pursuant to Rules 2.7 (a) and (d) and 2.8 of the Rules of Judicial Disciplinary Procedure, has determined that probable cause does exist to formally charge the Honorable Louise E. Goldston, Judge of the 13th Family Court Circuit ("Respondent" or "Judge Goldston"), with violations of the Code of Judicial Conduct and that formal discipline is appropriate:

Respondent has served as a Family Law Master/Family Court Judge for approximately 26 years. At all times relevant to the charges set forth below Respondent was serving in her capacity as a Family Court Judge.

On March 11, 2020, Judicial Disciplinary Counsel opened Complaint No. 30-2020 and on March 18, 2020, Matthew Gibson filed Complaint No. 33-2020. The two complaints alleged the same misconduct.

After investigating and evaluating the Complaints, the Judicial Investigation Commission finds that there is probable cause to make the following CHARGES and FINDINGS:

FAMILY COURT JUDGE GOLDSTON violated Rule 1.1 (compliance with the law), Rule 1.2 (confidence in the judiciary), Rule 1.3 (avoiding abuse of prestige of office), Rule 2.2 (impartiality and fairness), Rule 2.4(B) (external influences), Rule 2.5 (competence, diligence and cooperation) and Rule 3.1(A), (B), (D) (extrajudicial activities in general) of the Code of Judicial Conduct as set forth in the attached Appendix when she committed the following acts:

1


EXHIBIT
4
Goldston
3/1/2022    BC

1.  Over the past twenty years as a Family Court Judge, Respondent has been engaging in the practice of visiting homes of litigants appearing in front of her. Respondent went to the litigants' homes to either determine if certain disputed marital property was present and/or to supervise the transfer of disputed property. Respondent admitted to conducting these home visits in her capacity as a Family Court Judge on eleven separate occasions in different cases.

2.  In every instance except Mr. Gibson's case, all of Respondent's home visits were prompted by a motion by a litigant's attorney and not objected to by the opposing party and with full knowledge of the purpose therein. Most of the Respondent's home visits occurred during a court hearing in the case. A party's attorney would move the Court to leave directly from the bench and accompany the parties to the home. After granting the motion, Respondent would meet the parties at the home.

3.  On March 4, 2020, during a contempt hearing in the Matthew Gibson divorce case, there was an allegation that Mr. Gibson negligently damaged marital property he was ordered to turn over to the opposing property. The opposing party further alleged that Mr. Gibson failed to turn over several items of sentimental value as previously ordered by the Court.

4.  During the hearing, Respondent suddenly and without explanation asked Mr. Gibson, who was representing himself *pro se*, for his address. Respondent *sua sponte* stopped the hearing and ordered the parties to meet her at Mr. Gibson's house in ten minutes again without any explanation. Because of Respondent's failure to explain the reason for the home visit, Mr. Gibson was unable to raise any objection while still at the hearing.

2

5. Once everyone arrived at Mr. Gibson's home and the purpose of the visit became clear, Mr. Gibson moved to recuse Respondent on the ground that she had become a potential witness in the case. Respondent denied the motion as untimely.

6. Mr. Gibson then verbally refused to allow Respondent or anyone else in his house without a search warrant. Respondent threatened to put Mr. Gibson in jail if he denied them entry into his house. Mr. Gibson felt he had no choice but to relent.

7. Upon Respondent's arrival at Mr. Gibson's property, Mr. Gibson had a bystander video record the initial interactions outside the house between Respondent and the parties. Mr. Gibson also secretly recorded several minutes of audio of the initial interaction on his cell phone.

8. When the video and audio recordings were discovered by Respondent, she ordered both recordings stopped. However, once inside the house, Respondent's bailiff used his phone to record both video and audio of the separation of marital assets.

9. On July 22, 2020, Judicial Disciplinary Counsel took Respondent's sworn statement. Respondent admitted that she failed to inform Mr. Gibson of the purpose of the home visit while the parties were in the courtroom and that she did not give him any opportunity to object thereto until everyone was at his house.

10. Respondent opined that she believed it was proper to visit litigants' homes. Respondent likened the practice to a jury view or similar continuation of the court proceeding and stated that as a finder of fact it was necessary to determine whether a party could be held in contempt for not turning over personal property as previously ordered by the Court.

11. When asked, Respondent could provide no statute, rule or case that gave her the authority to conduct home visits. Respondent also acknowledged that there was nothing in the

3

contempt powers that gave her the authority to conduct a home visit. Respondent confessed that she never held anyone in contempt prior to going to the home and that she failed to enter any order subsequent to the visit reflecting what had happened at the residence, whether any items had been secured and/or whether or not a party was in contempt.

12.     Respondent admitted that she never had any clear or written procedures for conducting a home visit, including but not limited to, when the proceeding should be utilized and how the process should take place. She also acknowledged that she never took a court reporter to the scene.

13.     Upon reflection, Respondent agreed that the practice could make her a potential witness to a future proceeding which could then result in her disqualification. Respondent further agreed that family court judges run the risk of disqualification if he/she were to become a witness in a subsequent proceeding pertaining thereto.

14.     Respondent also agreed that the burden of proof in a contempt proceeding rests not with the Family Court Judge but with the moving party. She agreed that it is the moving party's responsibility to provide evidence in support of his/her contention that the other side has failed to produce the items in question. Respondent admitted to improperly putting herself in the role of litigant.

\*       \*       \*       \*       \*       \*       \*

Respondent is advised that she has the right to file responsive pleadings to the charges made against her not more than 30 days after service of the formal charges upon her by the Clerk of the Supreme Court of Appeals of West Virginia. Rule 2.10 of the Rules of Judicial Disciplinary Procedure provides:

4

The judge may file responsive pleadings as provided in the West Virginia Rules of Civil Procedure. Any such pleadings shall be filed by the judge with the Clerk of the Supreme Court of Appeals and the Office of Disciplinary Counsel not more than thirty (30) days after the date of the formal charges. For good cause shown, the Office of Disciplinary Counsel may extend the time for filing of such pleadings.

**STATEMENT OF CHARGES** issued this _18th_ day of _September_ 2020.

_____
The Honorable Alan D. Moats, Chairperson
Judicial Investigation Commission

ADM/bjl

5

## APPENDIX

### WEST VIRGINIA CODE OF JUDICIAL CONDUCT

### Rule 1.1 Compliance With the Law

A judge shall comply with the law, including the West Virginia Code of Judicial Conduct.

### Rule 1.2 Confidence in the Judiciary

A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.

### Rule 1.3 Avoiding Abuse of the Prestige of Judicial Office

A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others or allow others to do so.

### Rule 2.2 Impartiality and Fairness

A judge shall uphold and apply the law and shall perform all duties of judicial office fairly and impartially.

### Rule 2.4 External Influences on Judicial Conduct

B.      A judge shall not permit family, social, political, financial, or other interests or relationships to influence the judge's judicial conduct or judgment.

### Rule 2.5 Competence, Diligence, and Cooperation

A.      A judge shall perform judicial and administrative duties, competently and diligently.

### Rule 3.1 Extrajudicial Activities in General

A judge may engage in extrajudicial activities, except as prohibited by law or this Code. However, when engaging in extrajudicial activities, a judge shall not:

6

A.   participate in activities that will interfere with the proper performance of the judge's judicial duties;

B.   participate in activities that will lead to frequent disqualification of the judge; . . . .

D.   engage in conduct that would appear to a reasonable person to be coercive;

IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

IN THE MATTER OF:                           SUPREME COURT No. _____
THE HONORABLE LOUISE E. GOLDSTON,    JIC COMPLAINT Nos. 30-2020 & 33-2020
JUDGE OF THE 13th FAMILY COURT CIRCUIT

## RULE 2.8 NOTICE OF FILING OF
## FORMAL STATEMENT OF CHARGES

Comes now Judicial Disciplinary Counsel pursuant to Rule 2.8 of the Rules of Judicial

Disciplinary Procedure and on behalf of the Judicial Investigation Commission and provides notice

to Louise E. Goldston, Judge of the 13th Family Court Circuit, by email and United States Mail

that on the 23rd day of September 2020, he duly filed the attached Formal Statement of Charges in

the above-captioned matter with the Clerk of the Supreme Court of Appeals of West Virginia by

hand delivering the original and nine copies to the Clerk's Office located at the Capitol Complex,

Building One, Room E-317, 1900 Kanawha Boulevard East, Charleston, West Virginia 25305.

Respectfully submitted,

Brian J. Lanham, Deputy Counsel
WV Bar I.D. No. 7736
Judicial Investigation Commission
City Center East Suite 1200A
4700 MacCorkle Avenue SE
Charleston, WV 25304
(304) 558-0169

IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

IN THE MATTER OF:                         SUPREME COURT No. _____
THE HONORABLE LOUISE E. GOLDSTON,     JIC COMPLAINT Nos. 30-2020 & 33-2020
JUDGE OF THE 13th FAMILY COURT CIRCUIT

## CERTIFICATE OF SERVICE

I, Brian J. Lanham, Deputy Counsel for the Judicial Investigation Commission, do hereby

certify that I served the Notice of Filing and a true and accurate copy of the Formal Statement of

Charges on Respondent by placing the same in the United States mail first-class postage pre-paid and

addressed as follows: Family Court Judge Louise Goldston, Raleigh County Judicial Center, 222 Main

Street, Beckley, WV 25801; and by email to Lou.Goldston@courtswv.gov on this the 23rd day of

September, 2020.

Brian J. Lanham, Deputy Counsel
Judicial Investigation Commission
WV Bar I.D. No. 7736
City Center East, Suite 1200 A
4700 MacCorkle Avenue
Charleston, WV 25304
(304) 558-0169

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON

HEARING
January 15, 2021

BEFORE THE JUDICIAL HEARING BOARD OF WEST VIRGINIA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

In the Matter of:

HONORABLE LOUISE E. GOLDSTON,
JUDGE OF THE 13th FAMILY COURT CIRCUIT
Supreme Court No. 20-0742
JIC Complaint Nos. 30-2020, 33-2020

\* \* \* \* \* \*\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

          Hearing held in the above-entitled matter before
The Honorable Michael D. Lorensen, Hearing Examiner, via
remote video conference, on the 15th day of January, 2021 at
10:30 a.m.; all participants appearing remotely.

CHERYL G. MUNSON, CCR
REALTIME REPORTERS, LLC
713 Lee Street
Charleston, WV  25301
(304) 344-8463
www.realtimereporters.net



EXHIBIT
5
Goldston
3/1/2022   BC

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON

HEARING
January 15, 2021

REMOTE APPEARANCES:

APPEARING FOR THE JUDICIAL HEARING BOARD (via video):
    Ancil Ramey, Esquire
    STEPTOE & JOHNSON
    825 Third Avenue, Suite 400
    Huntington, West Virginia  25701

APPEARING FOR THE JUDICIAL INVESTIGATION COMMISSION
(via video):
    Teresa Tarr, Esquire
    Brian J. Lanham, Esquire
    JUDICIAL INVESTIGATION COMMISSION
    4700 MacCorkle Avenue S.E., Suite 1200A
    Charleston, West Virginia  25304

APPEARING FOR AND WITH RESPONDENT,
HONORABLE LOUISE E. GOLDSTON (via telephone):
    Andrew Nason, Esquire
    PEPPER & NASON
    8 Hale Street
    Charleston, West Virginia  25301

JUDICIAL HEARING BOARD MEMBERS PRESENT:
    Honorable Richard Postalwait (via telephone)
    Honorable Glen Stotler (via video)
    Honorable Paul T. Farrell (via video)

APPEARING ON BEHALF OF MATT GIBSON:
    John Bryan, Esquire (via video)
    ATTORNEY AT LAW
    411 Main Street
    Union, West Virginia  24983

ALSO PRESENT:
    Janet Fink, Judicial Assistant (via video)

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON

INDEX

|  | Page |
|---|---|
| HON. LOUISE E. GOLDSTON | |
| Examination by Mr. Lanham | 6 |

EXHIBITS

|  | Page |
|---|---|
| JOINT EXHIBITS | |
| Joint Exhibit Nos. 1-7 | 10 |
| Exhibit No. 1 | |
| Formal Statement of Charges | |
| Exhibit No. 2 | |
| JIC Complaint 30-2020 | |
| Exhibit No. 3 | |
| JIC Complaint 33-2020 including video | |
| Exhibit No. 4 | |
| Respondent's written response | |
| Exhibit No. 5 | |
| Courtroom video from morning of March 4, 2020 | |
| Exhibit No. 6 | |
| Transcript of Respondent's July 22, 2020 Statement Under Oath | |
| Exhibit No. 7 | |
| Stipulations, agreement and recommended disposition | |
| Post-Hearing Video Exhibit | 29 |
| (Courtroom video March 4, 2020 post home visit) | |
| Court Reporter's Certificate | 30 |

```
1                    P R O C E E D I N G S
2                      (January 15, 2021)
3               HEARING EXAMINER LORENSEN:  Well, we're at
4    the appointed hour, so let's go ahead and undertake and
5    call to order our matter of In Re: Goldston.  It is
6    Supreme Court No. 20-0742, and there are two JIC numbers,
7    30 and 33, both of the year 2020.  So it's 30-2020, 33-
8    2020.
9               Let's see.  So, Mr. Nason, may I go ahead
10   and administer the oath to Judge Goldston, so that we may
11   proceed?
12               MR. NASON:  Yes, Your Honor.
13               HEARING EXAMINER LORENSEN:  All right.  And
14   Judge Goldston, I'm just going to have to use my
15   imagination.  If you would, raise your right hand.
16               (Witness sworn.)
17               HEARING EXAMINER LORENSEN:  All right.  And
18   you might want to get as close to the phone as you can,
19   Judge Goldston, so that the court reporter can hear you,
20   and she'll -- she'll give me -- she'll give me the evil
21   eye if -- if you don't -- if you don't come through loud
22   and clear, and I may -- I may interrupt you, and apologize
23   if I do that.  It is for the purpose of making a clear
24   record.
```

```
 1                     All right --
 2                     THE RESPONDENT:  Is that --
 3                     HEARING EXAMINER LORENSEN:   -- so, Ms. Tarr?
 4                     That's -- I think I heard that.  And I
 5   overtalked you a little bit, so that was me.
 6                     COURT REPORTER:  I did not understand what
 7   she said.
 8                     HEARING EXAMINER LORENSEN:  Okay.  The --
 9                     THE RESPONDENT:  I said -- I said, is that
10   better?
11                     HEARING EXAMINER LORENSEN:  That is.  That
12   -- yes.
13                     COURT REPORTER:  Okay, great.
14                     THE RESPONDENT:  Okay.
15                     HEARING EXAMINER LORENSEN:  Is that one of
16   those things where the very saying it proves it?  Okay.
17   That's -- that's a verbal act, or something like that.  I
18   -- it's been a long time since law school.
19                     All right.  Ms. Tarr or Mr. Lanham, who --
20   who wishes to inquire for the JIC?
21                     MR. LANHAM:  That would be me, Your Honor.
22                     HONORABLE LOUISE GOLDSTON
23   the Respondent herein, having been duly sworn to tell the
24   truth, testified as follows:
```

```
 1                      EXAMINATION
 2   BY MR. LANHAM:
 3       Q.   Judge Goldston, how long have you been a Family
 4   Court judge?
 5       A.   26 -- since -- Family Court Judge or Family Law
 6   Master since July 1st of 1994.
 7       Q.   And at all times relevant to this proceeding and
 8   this statement of charges, were you a family law judge?
 9   Family court judge, sorry.
10       A.   Yes, sir.
11       Q.   Do you happen to have a copy of the joint
12   exhibits in front of you?
13       A.   I could get them real quick.
14              MR. NASON:   I believe we have them
15   available.
16              MR. LANHAM:   If you don't mind, if you
17   could get Joint Exhibit No. 7, which is the agreement.
18       A.   We're getting there.
19            Yes, sir, I have it.
20       Q.   Could you turn to page 3 of the agreement, please?
21       A.   Okay.
22       Q.   Near the bottom, there is a signature line that
23   appears to have the signature of a Louise Goldston, dated
24   September the 30th, 2020.
```

1              Do you see that?

2       A.    I do.

3       Q.    Is that your signature?

4       A.    Well, I will tell you that the copy that I have

5  been handed does not have my signature on it, but I will

6  testify that I have signed an agreement.  And I have

7  signed this agreement.

8       Q.    When you signed it, did you sign it knowingly,

9  voluntarily, and intelligently?

10      A.    Yes.

11      Q.    I have just a few questions about the agreement

12  itself.  You understand -- is your understanding of the

13  agreement that you're going to admit to the allegations

14  contained in paragraphs 1 through 14 of the formal

15  statement of charges?

16      A.    Let me look at those real quick.

17            That is correct.

18      Q.    Is it also your understanding of the agreement

19  that you're going to admit that all the facts contained in

20  paragraphs 1 through 14 of the Formal Statement of Charges

21  show clear and convincing evidence that you violated Rules

22  1.1, 1.2, 1.3, 2.2, 2.4(A), 2.4(B), and 2.5 of the Code of

23  Judicial Conduct?

24      A.    Yes.  Though I would like to state that those

1  violations were not intentional, and that the conduct that

2  is charged was not known to me at the time to be a

3  violation of those ethics, canons.

4      Q.   Do you have a copy of Joint Exhibit No. 1, which

5  is the Formal Statement of Charges, in front of you?

6      A.   I do.

7      Q.   Okay.  As to paragraphs 1 through 14 of the

8  Formal Statement of Charges, do you admit the conduct

9  contained therein?

10     A.   Yes.

11     Q.   Okay.  And do you also admit these rules -- that

12  the conduct that you participated in, violated the rules

13  that were stated?

14     A.   I understand that now.

15     Q.   Okay.  And is your understanding of the

16  agreement also that, as to the investigation, that we both

17  are going to agree, both you and the JIC are going to

18  agree, you've never been subject to judicial discipline

19  before?

20     A.   That's correct.

21     Q.   And that you were completely cooperative

22  throughout the entire investigation?

23     A.   I believe I was.

24     Q.   And that once you were made aware of the rules

```
 1  violation, that you admitted your wrongdoing promptly?
 2       A.   Yes.
 3       Q.   Okay.  Is it also your understanding of the
 4  agreement that you and the JIC are going to recommend both
 5  to the Hearing Board and to the Supreme Court that the
 6  punishment be a censure and a $5,000 fine?
 7       A.   Yes.
 8       Q.   Is it also your understanding of the agreement
 9  that you'll be responsible for any costs incurred by the
10  JIC for the investigation?
11       A.   Yes.
12            MR. LANHAM:  Your Honor, I have no further
13  questions.
14            MS. TARR:  Judge, you're muted.
15            MR. LANHAM:  You're muted.
16            HEARING EXAMINER LORENSEN:  Here I was
17  trying to make things work better.  Okay.
18            The -- did you wish to move the admission
19  of the joint exhibits?
20            MR. LANHAM:  I do.
21            MR. NASON:  I do, Your Honor.
22            HEARING EXAMINER LORENSEN:  Anybody want to
23  be heard on that?
24            Hearing no objection, the joint exhibits
```

```
 1  are admitted.
 2              JOINT EXHIBITS 1 through 7 inclusive
 3                  (7 items premarked for identification as
 4                  Joint Exhibit Nos. 1 through 7 were
 5                  admitted into evidence.)
 6              HEARING EXAMINER LORENSEN:  Do any of the
 7  Board members wish to inquire of Judge Goldston?  Judge
 8  Farrell?  That's a negative head shake, I understand that
 9  in all languages.  And you're --
10              JUDGE FARRELL:  Yes.
11              HEARING EXAMINER LORENSEN:  And Judge
12  Stotler -- Judge Stotler, did you wish to inquire, sir?
13              JUDGE STOTLER:  Not at this time, but I do
14  have some questions for the JDC.
15              HEARING EXAMINER LORENSEN:  Okay.  Well,
16  we'll have -- we'll have an argument piece that -- that we
17  can address that at, I think, if you wish to just have a
18  discussion with counsel about your views.
19              Let's see.  So Mr. Nason, did you wish to
20  inquire of your client?
21              MR. NASON:  Your Honor, at this time, she
22  would rely on the statement that we submitted to the
23  Judicial Hearing Board.  I believe that she would like to
24  express her embarrassment and contrition briefly.
```

```
 1              HEARING EXAMINER LORENSEN:  I think we're --
 2  we're at this stage where we're just going to -- I tell you
 3  what, Mr. Nason, before we close these out, I offer -- I
 4  offer counsel the opportunity to make their statement, just
 5  so that there's a record.  Your feelings -- just because of
 6  the open nature of what the Board can recommend and what
 7  the Supreme Court can do, I'm pleased to allow -- actually,
 8  you know what, I forgot Magistrate Postalwait.  I
 9  apologize.
10              Magistrate Postalwait, did you wish to
11  inquire?
12              MAGISTRATE POSTALWAIT:  No.  No, I'm fine.
13              HEARING EXAMINER LORENSEN:  All right.
14  Very good.  Okay.  So, let's see.  I just want to make
15  sure I have -- there was a statement, Mr. Nason, I thought
16  I saw it in my materials.  I tried to compile a file
17  before we got to this point, and there's a statement of
18  Judge Goldston that I received that bears a certificate of
19  service dated December 28, 2020.  Is that what you're
20  referring to, sir?
21              MR. NASON:  Yes, Your Honor.
22              HEARING EXAMINER LORENSEN:  All right.  And
23  I have received that, and we'll make sure that that makes
24  -- makes the package of materials that the Board gets, and
```

```
 1  I believe they already have it.  And also that it makes it
 2  into the record for the Supreme Court to consider on its
 3  own.
 4                 Okay.  So I think on my list of
 5  participants, I do have Mr. Bryan, who I know was going to
 6  be given the opportunity to make a -- we're at the stage
 7  now where we're going to discuss -- just have our
 8  discussion in terms of why the Board should accept and
 9  ultimately the Supreme Court should -- or why the Board
10   should recommend, I should say, and the Supreme Court
11   should ultimately accept, the recommendation proposed by
12   the parties.
13                 And Mr. Bryan, if you're online and wish to
14   be heard, this -- this is your opportunity.
15                 All right.
16                 Judge Stotler, did you wish to inquire --
17                 MR. BRYAN:  Hold on.  This is John Bryan.
18   Can -- I think I was muted.  Can you hear me?
19                 HEARING EXAMINER LORENSEN:  I can hear you,
20   yes, sir.
21                 MR. BRYAN:  All right.
22                 HEARING EXAMINER LORENSEN:  Did you wish to
23   say something?
24                 MR. BRYAN:  Yeah.  Is this the appropriate
```

```
 1   time?
 2                   HEARING EXAMINER LORENSEN:   This is the
 3   time, yes, sir.
 4                   MR. BRYAN:   Okay.   Yeah.
 5                   Thank you.   I appreciate you for letting me
 6   be heard here.   I am counsel for Matt Gibson, who was one
 7   of the complainants in the underlying complaint.   And I --
 8   I had an opportunity to speak with my client in order to
 9   make a statement on his behalf here, and as you all know,
10    he wanted to -- to be heard here.
11                   And we have received a copy of the
12   agreement, and, of course, the statement of charges, and --
13   and you know, it's our position, or my client's position,
14   anyways, that the -- the recommended or the agreed result
15   here, if the JIC should -- should recommend it, that it is
16   fair, and we do -- we do also ask that this be accepted.
17                   Judge Goldston has taken responsibility for
18   her actions and her decisions by admitting these
19   paragraphs 1 through 14 in the statement of charges and
20   also by admitting to the violations of the Rules of
21   Judicial Conduct.
22                   And pursuant to Rule 4.12 of the Rules of
23   Judicial Disciplinary Procedure, the parties have agreed
24   that they jointly recommended the highest possible fine in
```

1  this case of $5,000, as well as the highest possible --
2  sort of second highest possible sanction of censure.  The
3  only harsher penalty, of course, being suspension without
4  pay for up to one year.

5            Now, my client recognizes that there are
6  mitigating factors here, including apparently no prior
7  disciplinary history, a long history of service as a
8  Family Court judge, which is, of course, you know, perhaps
9  the most difficult, or one of the most difficult judicial
10  positions in existence.

11            You know, Judge Goldston has, despite what
12  happened to -- and with these charges, you know, she has
13  gained confidence to many of her colleagues and -- who
14  practiced before her and work with her.  Mr. Gibson
15  acknowledges that, so that's why he does believe that this
16  is fair.

17            You know, Family Courts are perhaps the
18  most vulnerable to the dangers of loss of perceived
19  integrity or legitimacy in the eyes of the public.  And
20  one thing that we've realized as a result of Mr. Gibson's
21  situation, is that even many practicing attorneys don't
22  realize that, or fully appreciate the fact, that litigants
23  in a Family Court also have rights, just like in other
24  courts.  And Mr. Gibson certainly felt that way at the

1  time that all of this occurred.

2              But we -- we do ask that the JIC accepts

3  this recommendation and that the Supreme Court accepts it

4  as fair, because this process, you know, it -- it has put

5  a stop to the practice that -- that is described in the

6  statement of charges.

7              And while Mr. Gibson, as many of you have

8  realized through some of the -- this process, he doesn't

9  feel necessarily that he's been completely made whole at

10  this point, he understands that that is not -- is not the

11  purpose of these proceedings, and it's not about him, but

12  rather upholding the -- the integrity and the public

13  confidence in the judicial system.

14              And so on behalf of Mr. Gibson, I want to

15  thank the Judicial Disciplinary Counsel, Brian Lanham, and

16  Teresa Tarr for keeping a close watch on the integrity of

17  the judicial system in West Virginia, and also the

18  Judicial Investigation Commission for taking on, you know,

19  this difficult job in all of these cases, but not only

20  that, but doing so through what was a year of

21  extraordinary difficulties.

22              So we do believe that the agreement is

23  fair, and we ask that it be recommended to the Supreme

24  Court and that the Supreme Court adopt it.  Thank you.

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON

```
 1              HEARING EXAMINER LORENSEN:   Thank you, sir.
 2              All right.   Judge Stotler, did you want to
 3  -- you had some -- just some inquiry to make, for the --
 4              JUDGE STOTLER:   Well, questions of the JDC,
 5  and I guess I've got a different perspective on this whole
 6  thing, and I guess the -- the complaint in this matter
 7  disturbs me, and the applications of this case concerns me
 8  about the precedence that's being established here.
 9              I mean, it appears that the JDC and the JIC
10  have taken the position that Family Court and maybe
11  Magistrate Courts or Circuit Court judges do not have the
12  power to do a view, or as you relate to it as a home
13  visit.
14              And I guess my question to Ms. Tarr and to
15  Mr. Lanham, what authority have they relied on, that they
16  seem to make that determination that a Family Court judge
17  does not have the authority to do what Judge Goldston did?
18              MR. LANHAM:   Your Honor, the -- what Judge
19  Goldston did is not covered, or that power to do what she
20  did, is not provided for in any statute.   It's not a jury
21  view.   So it is not covered by that statute.   There is
22  noth-- there is no statute, there is no rule, there is no
23  -- there's nothing that we could find that allows Judge
24  Goldston to go and continue her court hearing at a
```

```
 1   resident, a participant's residence.
 2              We --
 3              JUDGE STOTLER:  Why would that not fall
 4   within the inherent power of the Court?
 5              MR. LANHAM:  To just go into a person's
 6   house?
 7              JUDGE STOTLER:  Well, let me -- let me ask
 8   this question.  Let me ask this question.
 9              MR. LANHAM:  Yes, sir.
10              JUDGE STOTLER:  It appears that there is no
11   statutory authority of any kind for other judges to do
12   views, but they do them.  It's a common practice for them
13   to do them.  So where's the authority come from for that?
14              MS. TARR:  There is a specific statute for
15   jury views.  And if you look at the specific statute for
16   jury views, even if you liken it to a jury view, she
17   didn't follow the procedure that was set forth in the jury
18   view.  You're supposed to take a court reporter with you.
19   She didn't -- she didn't have any other -- (cross talk)
20              JUDGE STOTLER:  Wait -- a minute, Ms. Tarr.
21   Wait a minute.  We don't have court reporters.
22              MS. TARR:  It's not -- she didn't -- I
23   didn't say -- she -- Mr. -- Judge Stotler, I didn't --
24   what I'm saying is, the closest thing you have is a jury
```

1  view, by statute.  She didn't even follow the procedure

2  for a jury view by statute.  Okay?

3              And first of all, it's not a jury view.

4  There's no jury in a Family Court case.

5              And if you look at what she did, Judge, she

6  -- if you're -- if you're going to -- if you're going to

7  take a step, then you have to announce that step in court,

8  and you have to ask both parties if it's okay.  She didn't

9  do that.  She said, what's your address?  He told her the

10  address.  She said, okay, we'll meet you at your house in

11  10 minutes.  He had no clue why.

12             And then when she showed up, and -- and

13  they wanted to enter the house, she said, you -- help me

14  out here, Brian -- she -- he moved to recuse her.  She --

15  she -- she wouldn't be recused, and then he objected to

16  her going into the house, and she said it was untimely.

17             And he wanted a search warrant.  She

18  threatened to arrest him.  All of this is totally

19  inappropriate.

20             Now, she said she may not have known it,

21  but the fact of the matter is, with her experience, she

22  should have known it.

23             JUDGE STOTLER:  Well, let me say this.

24  During the time that I practiced law, I participated in

1  several views that were conducted. Of course, what do you

2  do if a magistrate does a view? He doesn't have a court

3  reporter. So what does he or she do?

4           MS. TARR: You're -- you're supposed to

5  follow the jury view statutes there, if there's a hearing

6  there, and --

7           JUDGE STOTLER: Where does it say you're

8  supposed to follow the jury statute? I mean, the jury

9  statute in Chapter -- in Chapter 56, the Family Court

10  operates up to Chapter 51-2A, and derives their authority

11  from that chapter. How does Chapter 56 apply to the

12  Family Court?

13           MR. LANHAM: Your Honor, we're just saying

14  that that is the closest thing that we can make it, to try

15  to give her the authority. She testified to us that she

16  was going there to enforce her contempt order. Instead of

17  writing the contempt order and giving it to law

18  enforcement and having them to enforce the contempt order,

19  she took her court and continued the court proceeding at

20  the defendant's house.

21           And we could find -- we asked, we could

22  find -- we ask Judge Goldston to -- if she had, knew of

23  any that we could find. We could not find any in any

24  research; any statute, any court rule that allowed her to

1  have that authority.

2              MS. TARR:   And -- and she's the one that

3  raised the jury view initially, and we said that it's not

4  applicable.

5              So I -- and I'm not sure why we're being

6  questioned when all parties agree to both the facts and

7  the violations, and she has agreed that the violat-- that

8  she violated the Code of Judicial Conduct, Judge.

9              JUDGE STOTLER:   Well, I guess I'm asking

10 the questions, because the impact of this decision has the

11 impact on the entire Family Court, that basically where a

12 decision is being rendered here, that the Family Court

13 does not have the ability, even to do views.

14              I mean, we derive our authority from

15 Chapter 51-2A.   Chapter 51-2A-7 says that the Family Court

16 judge has the ability to supervise the production of

17 evidence.   It doesn't say that it has to be done in the

18 courtroom.   Chapter 51-2A-9 says that the Family Court

19 judge has to -- has the authority to seize property.   It

20 doesn't say that it has to be done in the courtroom, or

21 that the Family Court judge cannot be present for that.

22              MS. TARR:   Judge, there is also prior

23 precedent, in that in 2013 or 2014, the JIC admonished

24 Circuit Court Judge Aboulhosn for going to somebody's

1  house on a asset forfeiture matter and directing what

2  assets should be taken and should not be taken.

3            JUDGE FARRELL:  This is Judge Farrell.  Can

4  I interject here?

5            HEARING EXAMINER LORENSEN:  Sure.  Well,

6  Mr. -- Judge Stotler, have you asked all the questions you

7  wish to ask, or --

8            JUDGE STOTLER:  Well, I'm not sure -- I'm

9  not sure that I have, but if Judge Farrell wants to

10  interject here, that's fine.

11            MS. TARR:  Well, and -- and without getting

12  in trouble, I would object to these questions.  This --

13  this seems to me to be more something that would be a

14  decision from you all, whether it's appropriate or not,

15  not from -- I mean we've -- we've got both parties saying

16  that what she did violated the Code.

17            HEARING EXAMINER LORENSEN:  Okay.

18            JUDGE FARRELL:  Yeah, my question or

19  injection is, this should be taken up at noontime when the

20  group is talking, and something to discuss amongst

21  ourselves during deliberations, not in the context or

22  within the parameters of this hearing.  That's just my

23  feelings.

24            HEARING EXAMINER LORENSEN:  Well, and it

1  seems that the counsel don't really wish to -- well, and I
2  guess in the spirit of just addressing the concern,
3  because you know it's going to come up, if you -- if --
4  other than the fact that we agree, because I think the
5  issue for Judge Stotler is going to be, if we make a rule
6  that sets out a bright line that prohibits Family Court
7  judges from -- I mean, is it the particulars of this case,
8  or is it the practice at large, that you're -- you know,
9  are you going to set a precedent now, or is it, is the
10  Supreme Court being asked to set a precedent?  Because if
11  they write an opinion on the case, it's going to be --
12  that's not going to be a tool for Family Court judges to
13  evaluate and discern facts relevant to the exercise of
14  their discretion.

15          MS. TARR:  If, Your Honor, if I can just
16  interject one thing.  I think you have to look at the
17  specific factors, which is why it was that we have asked
18  to have it warranted, in that the -- even if you were
19  going to allow a view, she did not follow a procedure that
20  was appropriate.  And the procedure that was appropriate
21  was to tell him ahead of time, before they went to the
22  house, why they were going to the house, give him an
23  opportunity to object, and then she never put anything on
24  record afterward.  There is no order that was entered that

```
 1   set forth any of this.
 2                   And so I think, if -- if I understand what
 3   you were saying, I am in agreement that what you need to
 4   look at are the particular facts of this particular case,
 5   and whether she followed an appropriate procedure or not.
 6   And all parties agree she did not follow an appropriate
 7   procedure, from beginning to end.
 8                   HEARING EXAMINER LORENSEN:  And you're not
 9   -- you're -- the import of your complaint is no broader
10    than that; is that what I'm hearing?
11                   MS. TARR:  That's correct.
12                   HEARING EXAMINER LORENSEN:  Okay.
13                   Judge Stotler, I think I'll -- well, I will
14    note JIC's objection to my permitting a Board member to
15    inquire of them during the course of a hearing.  To me --
16    well, just for what it's worth --
17                   JUDGE STOTLER:  Well, I guess my question,
18    Mr. -- Judge Lorensen, is, if that is true, and there's
19    questions that need to be answered in regards to the
20    process, who are those questions posed to, then?
21                   HEARING EXAMINER LORENSEN:  The Supreme
22    Court.  I mean, we make a recommendation of what we think
23    it ought to be, and then, you know, based upon the
24    allegations in the context of this specific complaint, and
```

1   the Supreme Court -- you know, I mean, they -- they're --
2   they're not going to just rubberstamp what we do.  They're
3   going to review it and give it an independent evaluation,
4   although I think they're looking to us to develop a
5   record, so that they have some appendix of proceeding, so
6   that if either party objects to what we do with their
7   complaint and disposition, they have some basis to make a
8   decision.
9               And, of course, factual context often lends
10  clarity to the rule that's being -- and now, especially
11  when it's not, you know, a court rule or statute or other,
12  you know, other -- other guide to appropriate conduct for
13  judges.  So I -- I hear your objection and I -- I'll --
14              JUDGE STOTLER:  Well, I guess, note my
15  objection to the fact that I'm not being allowed to ask my
16  questions.
17              HEARING EXAMINER LORENSEN:  You want to
18  proffer for the record what other questions you would like
19  to ask, Judge Stotler?
20              JUDGE STOTLER:  Well, no, not at this
21  particular point in time, but it appears that, I guess
22  there's nobody else to hold accountable here in regards to
23  the transaction that has taken place here, so no.
24              HEARING EXAMINER LORENSEN:  All right.

```
 1              Well, and to that rocky end, Judge
 2   Goldston, I have your -- your statement.  We have talked
 3   about some things after -- after we last -- last spoke to
 4   you.
 5              Mr. Nason, does -- does Judge Goldston wish
 6   to be heard further on the matter before it is considered
 7   submitted to the Board?
 8              MR. NASON:  Your Honor, I would like to
 9   place a few things on the record.
10              Although there may not have been an order
11   entered after they went to Mr. Gibson's house, they did
12   come back on the record and the judge delineated some of
13   the things that happened at Mr. Gibson's house.  And I
14   believe at that point, the hearing was continued and a
15   motion was filed for her to be recused.  And she was
16   recused.
17              So she had no further hearings, and had no
18   further ability to do anything in the case, because of the
19   recusal order.
20              And I agree with the statement from Ms.
21   Tarr and Mr. Lanham, that the problem was the procedure,
22   and there may have been ways for the person who is
23   bringing the contempt action, Mr. Gibson's former wife, to
24   have had an opportunity to view what was there at the
```

1  property, but the procedures and the due process is the
2  problem that she is admitting to.

3          THE RESPONDENT: And -- and this is Judge
4  Goldston. The only -- only thing I want to say, aside from
5  my statement -- and I want to say a lot of things, but I
6  emotionally can't do that; I'll be honest with you -- but
7  after this procedure was done, the statement that I did
8  nothing else to preserve the record, I disagree with,
9  because we came back on the record, and to the very best of
10  my ability, I set forth on the record everything that had
11  occurred during the visit. I gave counsel and Mr. Gibson
12  an opportunity to object to anything that I had said or
13  supplement anything that I had said. I also was very clear
14  to Mr. Gibson on the fact that he had the right to make a
15  motion to recuse me, gave him specific instructions on how
16  to do that.

17          And again, I am embarrassed. This Family
18  Court has been my life. And I have strived to perfect it,
19  improve it, for twenty-six-and-a-half years. And mistakes
20  were made that I am very sorry for, but I do accept the
21  agreement, and I certainly accept my responsibility for
22  the errors that were made that day.

23          HEARING EXAMINER LORENSEN: All right.
24          MR. NASON: Thank you, Your Honor.

```
 1                   HEARING EXAMINER LORENSEN:   Thank you, Mr.
 2   Nason and Ms. -- Judge Goldston.
 3                   For -- for the investigatory counsel, I did
 4   what I hope was a complete review of all the materials
 5   submitted with the -- with the joint appendix.  I saw the
 6   hearing up to the point where she said, see you at -- at
 7   Mr. Gibson's house in ten minutes.
 8                   Did we get the video record that's from the
 9   hearing that followed this proceeding?
10                   MR. LANHAM:   No, Your Honor.  That wasn't
11   contemplated, but we have it, if you -- if -- I don't
12   know.  It's too big to email, so I don't know how I could
13   get it to you before your meeting at noon.
14                   HEARING EXAMINER LORENSEN:   Can -- can you
15   send it in parts, or can you get it to a place where I
16   could download it?
17                   MR. LANHAM:   If someone could tell me how
18   to do that, I will.
19                   MS. TARR:   Do -- do you have a -- Judge,
20   the problem is, is we're limited to five megabytes on what
21   we can send.  Perhaps if we try sending it from our
22   personal email to your personal email, we might be able to
23   do that.  If you, off the record, want to email us your
24   personal email, then we can email it from our personal
```

```
 1  email and see if we can bypass the system.

 2              HEARING EXAMINER LORENSEN:  Maybe Steptoe

 3  and Johnson has a fix.  You all have a site we can

 4  download from, don't you?

 5              MR. RAMEY:  Yeah, we do.  Terri, just email

 6  it to me, ancil@ancil.net, A-N-C-I-L at ancil.net.  And

 7  then I can -- once I get an email, I can upload it to

 8  ShareFile, and then anybody who wants to access it, can

 9  access it through ShareFile.

10              MS. TARR:  Okay.

11              HEARING EXAMINER LORENSEN:  By the way,

12  that's incredibly cool email address, Mr. Ramey.  All

13  right.

14              MR. RAMEY:  I was an early adopter of email.

15              HEARING EXAMINER LORENSEN:  Well, and Judge

16  Goldston, for the record, was a family law judge before

17  family law judging was a thing.  So there's that too.

18              So anything else then, before we close our

19  proceeding and consider the matter submitted, Mr. Lanham?

20              MR. LANHAM:  No, Your Honor.

21              HEARING EXAMINER LORENSEN:  All right.

22              And Mr. Nason, are you satisfied we've made

23  our record?

24              MR. NASON:  Yes, Your Honor.  Thank you.
```

```
 1                    HEARING EXAMINER LORENSEN:  All right.
 2   Very well.
 3                    Anybody object, before I close it, to us
 4   receiving the hear -- the follow-on hearing after the
 5   meeting out at Mr. Gibson's house?
 6                    MR. NASON:  None from the Respondent, Your
 7   Honor.  Andrew Nason.
 8                    HEARING EXAMINER LORENSEN:  Anything from
 9   Counsel?  The investigative counsel?
10                    MR. LANHAM:  No, Your Honor.  No.
11                    HEARING EXAMINER LORENSEN:  All right.
12   Very good.  Thank you.  So we'll consider that a
13   supplement to the agreed-upon exhibits.
14                    All right.  If there's nothing further,
15   think you.  Appreciate -- I appreciate -- I appreciate
16   everybody's cooperation in getting the matter heard and
17   submitted.
18                    All right.  We'll be adjourned.
19                    (Whereupon, the hearing was adjourned.)
20
21
22
23
24
```

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON

HEARING
January 15, 2021

STATE OF WEST VIRGINIA,

To-wit:

I, Cheryl Munson, a Notary Public and Certified Court Reporter within and for the State aforesaid, duly commissioned and qualified, do hereby certify that the foregoing proceedings were duly taken by me and before me via remote videoconferencing at the time and place and for the purpose specified in the caption hereof.

I do further certify that said proceedings were correctly taken by me in voice writing, and accurately written out in full and reduced to typewriting by means of computer-aided transcription.

I further certify that I am neither attorney nor counsel for, nor related to or employed by, any of the parties to the action in which these proceedings were had; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action, and that the attached transcript meets the requirements set forth within Article 27, Chapter 47 of the West Virginia Code.

My commission expires the 24th day of February, 2023. Given under my hand this 21st day of January, 2021.

Cheryl G Munson
Notary Public

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON

**Exhibits**

GoldstonJointExhibit1 3:0 8:4

GoldstonJointExhibit2 3:0

GoldstonJointExhibit3 3:0

GoldstonJointExhibit4 3:0

GoldstonJointExhibit6 3:0

GoldstonJointExhibit7 3:0 6:17

**$**

$5,000 9:6 14:1

**1**

1 7:14,20 8:4,7 10:2,4 13:19

1.1 7:22

1.2 7:22

1.3 7:22

10 18:11

14 7:14,20 8:7 13:19

15 4:2

1994 6:6

1st 6:6

**2**

2.2 7:22

2.4(A) 7:22

2.4(B) 7:22

2.5 7:22

20-0742 4:6

2013 20:23

2014 20:23

2020 4:7,8 6:24 11:19

2021 4:2

26 6:5

28 11:19

**3**

3 6:20

30 4:7

30-2020 4:7

30th 6:24

33 4:7

33- 4:7

**4**

4.12 13:22

**5**

51-2A 19:10 20:15

51-2A-7 20:15

51-2A-9 20:18

56 19:9,11

**7**

7 6:17 10:2,3,4

**A**

ability 20:13,16 25:18 26:10

Aboulhosn 20:24

accept 12:8,11 26:20,21

accepted 13:16

accepts 15:2,3

accountable 24:22

acknowledges 14:15

act 5:17

action 25:23

actions 13:18

address 10:17 18:9,10

addressing 22:2

administer 4:10

admission 9:18

admit 7:13,19 8:8,11

admitted 9:1 10:1,5

admitting 13:18, 20 26:2

admonished 20:23

adopt 15:24

afterward 22:24

agree 8:17,18 20:6 22:4 23:6 25:20

agreed 13:14,23 20:7

agreement 6:17, 20 7:6,7,11,13,18 8:16 9:4,8 13:12 15:22 23:3 26:21

ahead 4:4,9 22:21

allegations 7:13 23:24

allowed 19:24 24:15

announce 18:7

apologize 4:22 11:9

apparently 14:6

appears 6:23 16:9 17:10 24:21

appendix 24:5 27:5

applicable 20:4

applications 16:7

apply 19:11

appointed 4:4

argument 10:16

arrest 18:18

asset 21:1

assets 21:2

attorneys 14:21

authority 16:15,17 17:11,13 19:10,15 20:1,14,19

aware 8:24

**B**

back 25:12 26:9

based 23:23

basically 20:11

basis 24:7

bears 11:18

beginning 23:7

behalf 13:9 15:14

big 27:12

bit 5:5

Board 9:5 10:7,23 11:6,24 12:8,9 23:14 25:7

bottom 6:22

announce 18:7

Brian 15:15 18:14

briefly 10:24

bright 22:6

bringing 25:23

broader 23:9

Bryan 12:5,13,17, 21,24 13:4

**C**

call 4:5

canons 8:3

case 14:1 16:7 18:4 22:7,11 23:4 25:18

cases 15:19

censure 9:6 14:2

certificate 11:18

chapter 19:9,10,11 20:15,18

charged 8:2

charges 6:8 7:15, 20 8:5,8 13:12,19 14:12 15:6

Circuit 16:11 20:24

clarity 24:10

clear 4:22,23 7:21 26:13

client 10:20 13:8 14:5

client's 13:13

close 4:18 11:3 15:16

closest 17:24 19:14

clue 18:11

Code 7:22 20:8 21:16

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON

colleagues 14:13

**Commission** 15:18

common 17:12

compile 11:16

complainants 13:7

complaint 13:7 16:6 23:9,24 24:7

complete 27:4

completely 8:21 15:9

concern 22:2

concerns 16:7

conduct 7:23 8:1, 8,12 13:21 20:8 24:12

conducted 19:1

confidence 14:13 15:13

considered 25:6

contained 7:14,19 8:9

contemplated 27:11

contempt 19:16, 17,18 25:23

context 21:21 23:24 24:9

continue 16:24

continued 19:19 25:14

contrition 10:24

convincing 7:21

cooperative 8:21

copy 6:11 7:4 8:4 13:11

correct 7:17 8:20 23:11

costs 9:9

counsel 10:18 11:4 13:6 15:15 22:1 26:11 27:3

court 4:6,19 5:6,13 6:4,5,9 9:5 11:7 12:2,9,10 14:8,23 15:3,24 16:10,11, 16,24 17:4,18,21 18:4,7 19:2,9,12, 19,24 20:11,12,15, 18,21,24 22:6,10, 12 23:22 24:1,11 26:18

courtroom 20:18, 20

courts 14:17,24 16:11

covered 16:19,21

cross 17:19

**D**

dangers 14:18

dated 6:23 11:19

day 26:22

December 11:19

decision 20:10,12 21:14 24:8

decisions 13:18

defendant's 19:20

deliberations 21:21

delineated 25:12

derive 20:14

derives 19:10

determination 16:16

develop 24:4

difficult 14:9 15:19

difficulties 15:21

directing 21:1

disagree 26:8

discern 22:13

disciplinary 13:23 14:7 15:15

discipline 8:18

discretion 22:14

discuss 12:7 21:20

discussion 10:18 12:8

disposition 24:7

disturbs 16:7

download 27:16

due 26:1

duly 5:23

**E**

email 27:12,22,23, 24

embarrassed 26:17

embarrassment 10:24

emotionally 26:6

end 23:7 25:1

enforce 19:16,18

enforcement 19:18

enter 18:13

entered 22:24 25:11

entire 8:22 20:11

errors 26:22

established 16:8

ethics 8:3

evaluate 22:13

evaluation 24:3

evidence 7:21 10:5 20:17

evil 4:20

**EXAMINATION** 6:1

**EXAMINER** 4:3, 13,17 5:3,8,11,15 9:16,22 10:6,11,15 11:1,13,22 12:19, 22 13:2 16:1 21:5, 17,24 23:8,12,21 24:17,24 26:23 27:1,14

exercise 22:13

**Exhibit** 6:17 8:4 10:4

exhibits 6:12 9:19, 24 10:2

existence 14:10

experience 18:21

express 10:24

extraordinary 15:21

eye 4:21

eyes 14:19

**F**

fact 14:22 18:21 22:4 24:15 26:14

factors 14:6 22:17

facts 7:19 20:6 22:13 23:4

factual 24:9

fair 13:16 14:16 15:4,23

fall 17:3

family 6:3,5,8,9 14:8,17,23 16:10, 16 18:4 19:9,12 20:11,12,15,18,21 22:6,12 26:17

**Farrell** 10:8,10 21:3,9,18

feel 15:9

feelings 11:5 21:23

felt 14:24

file 11:16

filed 25:15

find 16:23 19:21, 22,23

fine 9:6 11:12 13:24 21:10

follow 17:17 18:1 19:5,8 22:19 23:6

forfeiture 21:1

forgot 11:8

formal 7:14,20 8:5, 8

front 6:12 8:5

fully 14:22

**G**

gained 14:13

gave 26:11,15

Gibson 13:6 14:14, 24 15:7,14 26:11, 14

Gibson's 14:20 25:11,13,23 27:7

give 4:20 19:15 22:22 24:3

giving 19:17

Goldston 4:5,10, 14,19 5:22 6:3,23

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON

HEARING
January 15, 2021

10:7 11:18 13:17
14:11 16:17,19,24
19:22 25:2,5 26:4
27:2

good 11:14

great 5:13

group 21:20

guess 16:5,6,14
20:9 22:2 23:17
24:14,21

guide 24:12

**H**

hand 4:15

handed 7:5

happen 6:11

happened 14:12
25:13

harsher 14:3

head 10:8

hear 4:19 12:18,19
24:13

heard 5:4 9:23
12:14 13:6,10 25:6

hearing 4:3,13,17
5:3,8,11,15 9:5,16,
22,24 10:6,11,15,
23 11:1,13,22
12:19,22 13:2 16:1,
24 19:5 21:5,17,22,
24 23:8,10,12,15,
21 24:17,24 25:14
26:23 27:1,6,9,14

hearings 25:17

highest 13:24
14:1,2

history 14:7

hold 12:17 24:22

home 16:12

honest 26:6

Honor 4:12 5:21
9:12,21 10:21
11:21 16:18 19:13
22:15 25:8 26:24
27:10

**HONORABLE**
5:22

hope 27:4

hour 4:4

house 17:6 18:10,
13,16 19:20 21:1
22:22 25:11,13
27:7

**I**

identification
10:3

imagination 4:15

impact 20:10,11

import 23:9

improve 26:19

inappropriate
18:19

including 14:6

inclusive 10:2

incurred 9:9

independent 24:3

inherent 17:4

initially 20:3

injection 21:19

inquire 5:20 10:7,
12,20 11:11 12:16
23:15

inquiry 16:3

instructions
26:15

integrity 14:19
15:12,16

intelligently 7:9

intentional 8:1

interject 21:4,10
22:16

interrupt 4:22

investigation
8:16,22 9:10 15:18

investigatory
27:3

issue 22:5

items 10:3

**J**

january 4:2

JDC 10:14 16:4,9

JIC 4:6 5:20 8:17
9:4,10 13:15 15:2
16:9 20:23

JIC's 23:14

job 15:19

John 12:17

joint 6:11,17 8:4
9:19,24 10:2,4 27:5

jointly 13:24

judge 4:10,14,19
6:3,4,5,8,9 9:14
10:7,10,11,12,13
11:18 12:16 13:17
14:8,11 16:2,4,16,
17,18,23 17:3,7,10,
20,23 18:5,23 19:7,
22 20:8,9,16,19,21,
22,24 21:3,6,8,9,18
22:5 23:13,17,18
24:14,19,20 25:1,5,
12 26:3 27:2,19

judges 16:11
17:11 22:7,12
24:13

judicial 7:23 8:18
10:23 13:21,23

intelligently 7:9

14:9 15:13,15,17,
18 20:8

July 6:6

jury 16:20 17:15,
16,17,24 18:2,3,4
19:5,8 20:3

**K**

keeping 15:16

kind 17:11

knew 19:22

knowingly 7:8

**L**

languages 10:9

Lanham 5:19,21
6:2,16 9:12,15,20
15:15 16:15,18
17:5,9 19:13 25:21
27:10,17

large 22:8

law 5:18 6:5,8
18:24 19:17

legitimacy 14:19

lends 24:9

letting 13:5

life 26:18

liken 17:16

limited 27:20

list 12:4

litigants 14:22

long 5:18 6:3 14:7

Lorensen 4:3,13,
17 5:3,8,11,15
9:16,22 10:6,11,15
11:1,13,22 12:19,
22 13:2 16:1 21:5,
17,24 23:8,12,18,

21 24:17,24 26:23
27:1,14

loss 14:18

lot 26:5

loud 4:21

Louise 5:22 6:23

**M**

made 8:24 15:9
26:20,22

magistrate 11:8,
10,12 16:11 19:2

make 9:17 11:4,14,
23 12:6 13:9 16:3,
16 19:14 22:5
23:22 24:7 26:14

makes 11:23,24
12:1

making 4:23

Master 6:6

materials 11:16,24
27:4

Matt 13:6

matter 4:5 16:6
18:21 21:1 25:6

meet 18:10

meeting 27:13

megabytes 27:20

member 23:14

members 10:7

mind 6:16

minute 17:20,21

minutes 18:11
27:7

mistakes 26:19

mitigating 14:6

motion 25:15

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON

26:15

move 9:18

moved 18:14

muted 9:14,15
12:18

**N**

Nason 4:9,12 6:14
9:21 10:19,21 11:3,
15,21 25:5,8 26:24
27:2

nature 11:6

necessarily 15:9

negative 10:8

noon 27:13

noontime 21:19

Nos 10:4

note 23:14 24:14

noth-- 16:22

numbers 4:6

**O**

oath 4:10

object 21:12 22:23
26:12

objected 18:15

objection 9:24
23:14 24:13,15

objects 24:6

occurred 15:1
26:11

offer 11:3,4

online 12:13

open 11:6

operates 19:10

opinion 22:11

opportunity 11:4
12:6,14 13:8 22:23
25:24 26:12

order 4:5 13:8
19:16,17,18 22:24
25:10,19

overtalked 5:5

**P**

package 11:24

paragraphs 7:14,
20 8:7 13:19

parameters 21:22

participant's 17:1

participants 12:5

participated 8:12
18:24

particulars 22:7

parties 12:12
13:23 18:8 20:6
21:15 23:6

parts 27:15

party 24:6

pay 14:4

penalty 14:3

perceived 14:18

perfect 26:18

permitting 23:14

person 25:22

person's 17:5

personal 27:22,24

perspective 16:5

phone 4:18

piece 10:16

place 24:23 25:9
27:15

pleased 11:7

point 11:17 15:10
24:21 25:14 27:6

posed 23:20

position 13:13
16:10

positions 14:10

Postalwait 11:8,
10,12

power 16:12,19
17:4

practice 15:5
17:12 22:8

practiced 14:14
18:24

practicing 14:21

precedence 16:8

precedent 20:23
22:9,10

premarked 10:3

present 20:21

preserve 26:8

prior 14:6 20:22

problem 25:21
26:2 27:20

procedure 13:23
17:17 18:1 22:19,
20 23:5,7 25:21
26:7

procedures 26:1

proceed 4:11

proceeding 6:7
19:19 24:5 27:9

proceedings
15:11

process 15:4,8
23:20 26:1

production 20:16

proffer 24:18

prohibits 22:6

promptly 9:1

property 20:19
26:1

proposed 12:11

proves 5:16

provided 16:20

public 14:19 15:12

punishment 9:6

purpose 4:23
15:11

pursuant 13:22

put 15:4 22:23

**Q**

question 16:14
17:8 21:18 23:17

questioned 20:6

questions 7:11
9:13 10:14 16:4
20:10 21:6,12
23:19,20 24:16,18

quick 6:13 7:16

**R**

raise 4:15

raised 20:3

real 6:13 7:16

realize 14:22

realized 14:20
15:8

received 11:18,23
13:11

recognizes 14:5

recommend 9:4
11:6 12:10 13:15

recommendation
12:11 15:3 23:22

recommended
13:14,24 15:23

record 4:24 11:5
12:2 22:24 24:5,18
25:9,12 26:8,9,10
27:8,23

recusal 25:19

recuse 18:14
26:15

recused 18:15
25:15,16

referring 11:20

relate 16:12

relevant 6:7 22:13

relied 16:15

rely 10:22

rendered 20:12

reporter 4:19 5:6,
13 17:18 19:3

reporters 17:21

research 19:24

residence 17:1

resident 17:1

Respondent 5:2,
9,14,23 26:3

responsibility
13:17 26:21

responsible 9:9

result 13:14 14:20

review 24:3 27:4

rights 14:23

rocky 25:1

rubberstamp 24:2

rule 13:22 16:22
19:24 22:5 24:10,
11

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON

**rules** 7:21 8:11,12, 24 13:20,22

___

**S**

**sanction** 14:2

**school** 5:18

**search** 18:17

**seize** 20:19

**send** 27:15,21

**sending** 27:21

**September** 6:24

**service** 11:19 14:7

**set** 17:17 22:9,10 23:1 26:10

**sets** 22:6

**shake** 10:8

**she'll** 4:20

**show** 7:21

**showed** 18:12

**sign** 7:8

**signature** 6:22,23 7:3,5

**signed** 7:6,7,8

**sir** 6:10,19 10:12 11:20 12:20 13:3 16:1 17:9

**situation** 14:21

**somebody's** 20:24

**sort** 14:2

**speak** 13:8

**specific** 17:14,15 22:17 23:24 26:15

**spirit** 22:2

**spoke** 25:3

**stage** 11:2 12:6

**state** 7:24

**stated** 8:13

**statement** 6:8 7:15,20 8:5,8 10:22 11:4,15,17 13:9,12, 19 15:6 25:2,20 26:5,7

**statute** 16:20,21, 22 17:14,15 18:1,2 19:8,9,24 24:11

**statutes** 19:5

**statutory** 17:11

**step** 18:7

**stop** 15:5

**Stotler** 10:12,13 12:16 16:2,4 17:3, 7,10,20,23 18:23 19:7 20:9 21:6,8 22:5 23:13,17 24:14,19,20

**strived** 26:18

**subject** 8:18

**submitted** 10:22 25:7 27:5

**supervise** 20:16

**supplement** 26:13

**supposed** 17:18 19:4,8

**Supreme** 4:6 9:5 11:7 12:2,9,10 15:3,23,24 22:10 23:21 24:1

**suspension** 14:3

**sworn** 4:16 5:23

**system** 15:13,17

___

**T**

**taking** 15:18

**talk** 17:19

**talked** 25:2

**talking** 21:20

**Tarr** 5:3,19 9:14 15:16 16:14 17:14, 20,22 19:4 20:2,22 21:11 22:15 23:11 25:21 27:19

**ten** 27:7

**Teresa** 15:16

**terms** 12:8

**testified** 5:24 19:15

**testify** 7:6

**thing** 14:20 16:6 17:24 19:14 22:16 26:4

**things** 5:16 9:17 25:3,9,13 26:5

**thought** 11:15

**threatened** 18:18

**time** 5:18 8:2 10:13,21 13:1,3 15:1 18:24 22:21 24:21

**times** 6:7

**told** 18:9

**tool** 22:12

**totally** 18:18

**transaction** 24:23

**trouble** 21:12

**true** 23:18

**truth** 5:24

**turn** 6:20

**twenty-six-and-a-half** 26:19

___

**U**

**ultimately** 12:9,11

**underlying** 13:7

**understand** 5:6 7:12 8:14 10:8 23:2

**understanding** 7:12,18 8:15 9:3,8

**understands** 15:10

**undertake** 4:4

**untimely** 18:16

**upholding** 15:12

___

**V**

**verbal** 5:17

**video** 27:8

**view** 16:12,21 17:16,18 18:1,2,3 19:2,5 20:3 22:19 25:24

**views** 10:18 17:12, 15,16 19:1 20:13

**violat--** 20:7

**violated** 7:21 8:12 20:8 21:16

**violation** 8:3 9:1

**violations** 8:1 13:20 20:7

**Virginia** 15:17

**visit** 16:13 26:11

**voluntarily** 7:9

**vulnerable** 14:18

___

**W**

**Wait** 17:20,21

**wanted** 13:10 18:13,17

**warrant** 18:17

**warranted** 22:18

**watch** 15:16

**ways** 25:22

**West** 15:17

**wife** 25:23

**wishes** 5:20

**work** 9:17 14:14

**worth** 23:16

**write** 22:11

**writing** 19:17

**wrongdoing** 9:1

___

**Y**

**year** 4:7 14:4 15:20

**years** 26:19

# Exhibit Placeholder

Files archived in Box.com

https://esquire.box.com/s/yqy3y2e416zqf2mk3xhbhqz96upaeg6w

EXHIBIT

6

# Exhibit Placeholder

Files archived in Box.com

https://esquire.box.com/s/yqy3y2e416zqf2mk3xhbhqz96upaeg6w

EXHIBIT

7

# Exhibit Placeholder

Files archived in Box.com

https://esquire.box.com/s/yqy3y2e416zqf2mk3xhbhqz96upaeg6w

EXHIBIT
8

# Exhibit Placeholder

Files archived in Box.com

https://esquire.box.com/s/yqy3y2e416zqf2mk3xhbhqz96upaeg6w

EXHIBIT

9

# Exhibit Placeholder

Files archived in Box.com

https://esquire.box.com/s/yqy3y2e416zqf2mk3xhbhqz96upaeg6w

EXHIBIT
**10**