**In the Matter of:**

MATTHEW GIBSON

vs

LOUISE E. GOLDSTON

JEFF MCPEAKE

*February 23, 2022*



5010 Dempsey Drive
Cross Lanes WV 25313
304-415-1122

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY


MATTHEW GIBSON,

       Plaintiff,


 -vs-      Civil Action No. 5:21-cv-00181


LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision,
JEFF MCPEAKE, individually,
BRIAN WHITE, individually,
BOBBY STUMP, individually,
KYLE LUSK, individually,

       Defendants.



DEPOSITION OF JEFF McPEAKE

_____

    The deposition of Jeff McPeake was
taken on February 23, 2022, at 1:36 p.m.,
at 252 George Street, Beckley, West
Virginia.

_____




ELITE COURT REPORTING, LLC
5010 Dempsey Drive
Cross Lanes, West Virginia  25313
(304) 415-1122


Tara Arthur, CCR

Page 2

1              A P P E A R A N C E S

2    John H. Bryan
     Attorney at Law
3    Edwin Morgan
     Law Office of John H. Bryan
4    P.O. Box 366
     Union, West Virginia  24983
5
     Kevin J. Robinson
6    Attorney at Law
     Pullin Fowler Flanagan Brown & Poe
7    252 George Street
     Beckley, West Virginia  25801
8
     Jennifer E. Tully
9    Attorney at Law
     Bailey & Wyant, PLLC
10   P.O. Box 3710
     Charleston, West Virginia  25337-3710
11
     Also Present:  Louise E. Goldston
12                  Matthew Gibson

13

14

15

16

17

18

19

20

21

22

23

24

Page 3

```
1                   I  N  D  E  X

2        WITNESS

3             Jeff McPeake

4        EXAMINATION

5             by Mr. Bryan          Page 04

6        EXHIBITS

7             None

8

9

10

11

12

13

14

15

16

17

18   Reporter's Certificate:      Page 67
     Errata Sheet/Signature Page:   Enclosed
19

20

21

22

23

24
```

Page 4

```
1                    JEFF McPEAKE,

2  called as a witness, first being duly sworn

3  by the Court Reporter/Notary Public,

4  testified as follows, to wit:

5                    EXAMINATION

6  BY MR. BRYAN:

7       Q.  Hi.  I am John Bryan.  I will be

8  asking you the questions here.  I am the

9  plaintiff's lawyer in this case.  I represent

10 Matthew Gibson.

11           Please state your name.

12      A.  Jeffrey McPeake.

13      Q.  And I will note for the record that

14 you are wearing a law enforcement uniform

15 here today; is that right?

16      A.  Yes.

17      Q.  Okay.  Who is your employer?

18      A.  Raleigh County Sheriff's

19 Department.

20      Q.  And are you a sheriff's deputy?

21      A.  I am.

22      Q.  And how long have you been in that

23 job title?

24      A.  Just over two years.
```

1        Q.  All right.  And as far as the

2   uniform you are wearing here today, that's

3   the Raleigh County Sheriff's Department

4   uniform?

5        A.  Yes.

6        Q.  We are here about a search that

7   took place on March 4, 2020.  Do you recall

8   that day?

9        A.  I remember that day, yes.

10        Q.  Were you wearing the same type of

11   uniform then?

12        A.  Yes.

13        Q.  And were you employed by the

14   Raleigh County Sheriff's Department then?

15        A.  Yes.

16        Q.  And were you wearing the same type

17   of uniform that day?

18        A.  Yes.

19        Q.  Do you carry a gun?

20        A.  Yes.

21        Q.  Do you have one on you today?

22        A.  Yes.

23        Q.  Did you have one on you on March 4,

24   2020?

1          A.  Yes.

2          Q.  All right.  How long had you --

3    well, strike that.

              Do you work as a bailiff now?

5          A.  I do.

6          Q.  And did I already ask you how long

7    you have been doing that?

8          A.  Yes.  Just over two years.

9          Q.  Two years.  All right.

10              What did you do before that,

11   two years ago?

12         A.  I was retired from the Beckley

13   Police Department.

14         Q.  Were you working at all?

15         A.  Prior to coming here, no.  No.

16   Retired for a couple of years.

17         Q.  So when did you leave the Beckley

18   Police Department?

19         A.  2017.

20         Q.  And how long had you been employed

21   there?

22         A.  Twenty years.

23         Q.  So had you ever worked as a bailiff

24   before?

1        A.  No.

2        Q.  So before two years ago, you hadn't

3   worked as a bailiff?

4        A.  Correct.

5        Q.  So about when was it that you

6   started as a bailiff?

7        A.  September of '19.

8        Q.  So roughly six months or so before

9   this incident took place, you started as a

10  bailiff?

11       A.  Correct.

12       Q.  And you have been working in that

13  job position ever since?

14       A.  Yes.

15       Q.  Who is your -- do you have a

16  supervisor?

17       A.  I do.  It is Lieutenant Stafford.

18       Q.  Okay.  So who -- I mean, who is

19  your -- who do you take orders from?  Would

20  it be the judge or your -- someone in -- you

21  know, Lieutenant Stafford, or both?

22       A.  I don't see Lieutenant Stafford on

23  a regular basis.  There may be days where we

24  don't see each other in the courthouse.  We

Page 8

1    work at different levels, different floors.

2    When the judge needs me, she will say, we are

3    ready for a hearing, and I will go out and

4    get the parties and escort them into the room

5    -- to the courtroom.

6         Q.  Okay.  So, I mean, if you have a

7    policy or procedure question, something like

8    that, do you go to the judge, or do you go to

9    some --

10        A.  I would go to Lieutenant Stafford

11   with something like that.

12        Q.  Do you still work as a bailiff for

13   Judge Goldston?

14        A.  Yes.

15        Q.  Have you ever worked as a bailiff

16   for any other judge?

17        A.  I do.  I have worked for all of the

18   judges that are currently judges in the

19   courthouse now at one time or another as a

20   fill-in if someone is sick or can't be there

21   for some reason or --

22        Q.  Both circuit court and family

23   court?

24        A.  Correct.

1          Q.  But would you say that primarily

2    you are the bailiff for Judge Goldston?

3          A.  That's my primary position, yes.

4          Q.  Did you prior to becoming a bailiff

5    or even after becoming a bailiff undergo any

6    specific training to be a bailiff, you know,

7    that the other deputies wouldn't necessarily

8    receive?

9          A.  Not prior to becoming a bailiff.

10   However, I did go to a class in Charleston on

11   courthouse security for some in-service

12   hours.  And as I recall, that was about --

13   about three days of classroom instruction.

14         Q.  Do you recall where that -- where

15   that took place?

16         A.  The Marriott in Charleston.

17         Q.  Was that by the LEPS subcommittee?

18         A.  I believe it was, yes, LEPS.

19         Q.  Do you recall about when that was?

20         A.  I do not.

21         Q.  Where --

22         A.  It was roughly -- after I -- after

23   I was hired, I needed to get some in-service

24   hours fairly quickly.  So I am thinking it

Page 10

1    was in the winter of '19.

2         Q.  So it sounds like it was probably

3    before this incident took place?

4         A.  Yes.

5         Q.  Was that something that your

6    employer sent you for?

7         A.  Yes.

8         Q.  Or was that something that you had

9    found in --

10        A.  No.

11        Q.  Okay.  So your employer came to you

12   and said, this is training we are sending you

13   for, you have to do it?

14        A.  Sent me and Officer Johnson who

15   worked as a bailiff.  We both went down

16   together.

17        Q.  Do you recall whether there was any

18   written materials that you received during

19   that?

20        A.  There may have been handouts.  It

21   was mostly overheads.

22        Q.  All right.  Do you still have --

23        A.  No.

24        Q.  -- have that?

Page 11

1          A.  No.

2          Q.  During the time that you had been a

3    bailiff for Judge Goldston, had you traveled

4    with her to the home of any other litigant

5    other than my client?

6          A.  No.

7          Q.  So this was the only time that you

8    went with Judge Goldston to somebody's house?

9          A.  Yes.

10         Q.  Do you know of any other bailiffs

11   who traveled with Judge Goldston to the home

12   of a litigant?

13         A.  Not while I have been working

14   there.

15         Q.  Did you know of any other bailiff

16   prior to you working there?

17         A.  Going with her -- I had never

18   asked.  I had gone with another judge,

19   another family court judge.  And I asked the

20   guy that works on my floor, which is Sergeant

21   Lilly, if it is okay if we do this.  And he

22   told me affirmative that we could do that.

23         Q.  When you say you went with another

24   judge, do you mean to the home of a litigant?

Page 12

1       A.  Yes.

2       Q.  Which judge was that?

3       A.  Judge Shuck.

4       Q.  Okay.  So you traveled to the home

5   of a litigant when you were acting as a

6   bailiff for Judge Shuck?

7       A.  Correct.

8       Q.  How often did you act as a bailiff

9   for Judge Shuck?

10      A.  Weekly.  We have three family court

11  judges on the floor, and we have two

12  bailiffs.  So if Judge Goldston is off, I

13  will bailiff for Judge Shuck.

14      Q.  And when you went to talk to

15  Sergeant Lilly, was that after this event had

16  already occurred, or was this before?

17      A.  This was before the Judge Goldston

18  visit.

19      Q.  Was it after the visit with Judge

20  Shuck that you participated?

21      A.  I don't understand your question.

22      Q.  All right.  You said that you

23  traveled with Judge Shuck to the home of a

24  litigant in a case before Judge Shuck?

Page 13

1        A.   Two cases actually.

2        Q.   Two cases.   Okay.

3             Well, the first of those two cases,

4   that is the one where you had the

5   conversation with Sergeant Lilly?

6        A.   Correct.

7        Q.   When you had the conversation with

8   Sergeant Lilly, was that before or after the

9   first Shuck incident took place?

10       A.   Before any incident -- anytime I

11  left the courthouse, I said, is it okay if we

12  go?  And he goes, yeah, we do that from time

13  to time.

14       Q.   Okay.   What's Sergeant Lilly's

15  first name?

16       A.   Aaron.

17       Q.   Is he still with the sheriff's

18  department?

19       A.   He is.

20       Q.   And so why did you ask Sergeant

21  Lilly?

22       A.   He is the only other officer on my

23  floor.  He is the only other family court

24  bailiff.

Page 14

1          Q.  Was he higher in rank than you at

2     the time?

3          A.  Yes.

4          Q.  Was he in the role of a supervisor

5     for you at that time?

6          A.  Yes.

7          Q.  So if you -- you know, he is the

8     type of person if you did have a question

9     like that, you felt like you could go to him?

10         A.  Correct.

11         Q.  Did he have the ability to issue

12    you orders that you had to -- you were

13    compelled to follow?

14         A.  He does have that ability, yes.

15         Q.  But would it be fair to say that he

16    wasn't your direct supervisor at that time?

17         A.  He was not the supervisor at the

18    courthouse at that time.

19         Q.  Prior to the first time doing this

20    with Judge Shuck, had you heard of these

21    sorts of incidents taking place?

22         A.  No.

23         Q.  So when the first one was about to

24    happen, I guess you -- it seemed unusual --

Page 15

1    it must have seemed unusual enough to you to

2    ask Sergeant Lilly?

3         A.  Well, the lawyers that were

4    involved seemed to be -- it wasn't unusual

5    for them, it appeared.  They said, okay,

6    let's go look and see.  And so it appeared to

7    me as if it was something that occurred on a

8    fairly regular basis.

9         Q.  Do you recall who those lawyers

10   were?

11        A.  I am not sure.  I think it was Jim

12   Keenan and Kyle Lusk, I believe.  One of

13   those two on the first visit.

14        Q.  And do you recall about when that

15   was?

16        A.  I don't.

17        Q.  But it was prior to the incident we

18   are here about today?

19        A.  Yes.

20        Q.  What about the second -- the second

21   time, was that also prior to --

22        A.  Yes.

23        Q.  -- this incident?

24             Do you recall when that was

1    approximately?

2         A.  I don't.

3         Q.  Do you recall who the lawyers were

4    who were involved in the second one?

5         A.  I am thinking Todd Kirby may have

6    been one, but I'm -- I may -- may not be

7    right on that.

8         Q.  And did you have any conversations

9    with any supervisors or other deputies about

10   the second Shuck incident?

11        A.  No.  No.

12        Q.  Do you have an independent

13   recollection of this incident that we are

14   here about today before we start talking

15   about it?

16        A.  Yes.

17        Q.  I mean, do you recall it in your

18   mind?  Or are you going to be testifying and

19   answering questions about what you have

20   reviewed?

21        A.  I haven't reviewed anything.

22   Actually, it is all --

23        Q.  So whatever I ask you about and you

24   answer, this is just your recollection?

```
 1        A.  Correct.

 2        Q.  Okay.  Good.

 3            When you arrived at Matthew

 4   Gibson's house on March 4, 2020, you were

 5   driving a marked police cruiser; is that

 6   right?

 7        A.  Yes.

 8        Q.  And that said, what, Raleigh County

 9   Sheriff's Department on it?

10        A.  Yes.

11        Q.  And was anyone else in the vehicle

12   with you?

13        A.  Judge Goldston.

14        Q.  Okay.  And why did you -- did you

15   know what was happening, or did you know why

16   you were going to Matthew Gibson's house?

17        A.  Yes.

18        Q.  Had you been in the hearing --

19        A.  Yes.

20        Q.  -- that took place immediately

21   prior to that?

22        A.  I had, yes.

23        Q.  So you had heard the conversations

24   that were taking place in the courtroom?
```

1        A.  That's correct.

2        Q.  So what is your recollection was

3    the reason that you were traveling with Judge

4    Goldston to Mr. Gibson's home?

5        A.  It appeared that there had been a

6    previous hearing that his wife -- ex-wife had

7    been awarded some items that she didn't

8    receive.  And he indicated that he did have

9    the items.  And it seems that one of the

10   lawyers said, well, let's go get them or -- I

11   may be getting that confused with another

12   case.

13          But it just seemed like -- I knew

14   we were going to the residence to retrieve

15   specific items that were not provided.  As I

16   recall, it was a contempt case.  And those

17   specific items were what we were going to

18   retrieve or attempt to retrieve.

19       Q.  After you arrived on the property

20   with Judge Goldston, Mr. Gibson verbally

21   voiced objections to you and the judge being

22   there on his property, isn't that true?

23       A.  He approached the judge and spoke

24   with her, yes.

1          Q.  Okay.  He asked her to recuse

2    herself because he said she had placed

3    herself in a witness capacity, I believe,

4    right?

5          A.  Something along those lines, yes.

6          Q.  And then Judge Goldston denied his

7    request saying that it wasn't timely filed?

8          A.  Yes.

9          Q.  Do you recall Mr. Gibson demanding

10   a search warrant before he allowed anyone in

11   his home?

12         A.  Yes.

13         Q.  You were aware of the fact that

14   there was no search warrant, right?

15         A.  Correct.

16         Q.  Okay.  So you knew at the time that

17   you did not have a search warrant?

18         A.  Correct.

19         Q.  You knew that Judge Goldston did

20   not have a search warrant?

21         A.  Correct.

22         Q.  You knew what a search warrant was,

23   right?

24         A.  I do.

Page 20

 1          Q.  And how long did you work for the
 2     Beckley Police Department?
 3          A.  Twenty years.
 4          Q.  During that 20 years, did you ever
 5     seek and obtain a search warrant?
 6          A.  Yes.
 7          Q.  Did you ever execute a search
 8     warrant?
 9          A.  Yes.
10          Q.  Are you able to give me some
11     approximation of how many search warrants you
12     participated -- participated in executing
13     during the time you worked for Beckley?
14          A.  Me personally filing the paperwork
15     for the search warrant, I would say roughly
16     20.
17          Q.  What about participating in the
18     execution of a search warrant?
19          A.  I did many of those -- as my
20     capacity -- I eventually made the deputy
21     chief of police.  So I was over the drug
22     units and drug -- the detective bureau.  So I
23     would accompany those guys on occasion --
24          Q.  So you were --

Page 21

1        A.  -- in a supervisory capacity.

2        Q.  So you were supervising other

3   officers who were investigating drug cases?

4        A.  Correct.

5        Q.  Would you agree with me that in

6   drug cases, it's extremely common to obtain

7   and execute search warrants?

8        A.  Yes.

9        Q.  So you are familiar -- I mean, you

10  are familiar with what -- you know what a

11  search warrant is?

12       A.  Yes.

13       Q.  You are familiar with the process

14  of how they can be obtained?

15       A.  I am.

16       Q.  Right?

17       A.  I am.

18       Q.  You are familiar with the process

19  of executing search warrants?

20       A.  Yes.

21       Q.  And to be clear, there was no

22  question in your mind on March 4, 2020, that

23  there was no search warrant which had been

24  issued or even requested to be able to search

```
 1   Mr. Gibson's home?

 2        A.  Correct.

 3        Q.  Also on March 4, 2020, you were

 4   aware of the fact that Judge Goldston was not

 5   a law enforcement officer, right?

 6        A.  Correct.

 7        Q.  You were aware at all times that

 8   she was in fact a family court judge?

 9        A.  Correct.

10        Q.  You were also aware of the fact on

11   March 4, 2020, that -- you were aware that

12   judges don't search homes, right?

13        A.  No.  I was not aware of that.

14        Q.  Okay.  So on March 4, 2020, you

15   were not aware that judges do not search

16   homes?

17        A.  That's correct.

18        Q.  Okay.  At some point did you become

19   aware that judges do not search homes?

20        A.  After this case was brought up -- I

21   had no idea if family court judges could go

22   in homes or not.  The process of obtaining a

23   search warrant, as far as my history as a

24   police officer goes, is if we need a search
```

Page 23

1   warrant, we go to a judge, they issue the

2   search warrant and then we go back to home.

3   So with the judge being with me, I felt as if

4   that base had been covered so to speak.

5        Q.  Okay.  But you did not request that

6   Judge Goldston issue a search warrant for

7   Mr. Gibson's home, right?

8        A.  I did not.

9        Q.  I mean, you weren't involved in

10  that process at all?  You were just the

11  bailiff?

12       A.  Correct.

13       Q.  So you accompanied her on that day

14  to Mr. Gibson's home because she told you to?

15       A.  Right.

16       Q.  During your time at the Beckley

17  Police Department, including supervising

18  other police officers, did you ever

19  experience a judge personally searching any

20  property?

21       A.  No.  I was always involved with

22  criminal cases, never civil cases.

23       Q.  But you were aware of the fact that

24  on March 4, 2020, that the process that you

1    were familiar with -- in your experience as

2    far as obtaining search warrants and

3    executing search warrants -- there was no

4    process like that followed on March 4, 2020?

5          A.  No.  I had -- like I said, this was

6    a civil case that I had no experience in.

7          Q.  Okay.  So you were confused or

8    unsure about what the law with family court

9    as opposed to a criminal investigation; is

10   that right?

11         A.  Yes.  By having the judge with

12   me -- I didn't feel it necessary for me to go

13   to a judge and get a search warrant if I had

14   a judge with me.

15         Q.  In your law enforcement career, did

16   you ever in lieu of getting a search warrant

17   just take a judge with you to the property?

18         A.  No.

19         Q.  Had you ever heard of anyone else

20   doing that?

21         A.  No.

22         Q.  But it was just your assumption at

23   the time that it might be okay because the

24   judge was with you?

Page 25

1          A.  I felt as if we recessed from the

2    courtroom and re-adjourned at the home.

3    Therefore, I -- I didn't need another judge

4    -- I mean, the judge was there.

5          Q.  There was no emergency situation

6    occurring inside Mr. Gibson's home on

7    March 4, 2020, right?

8          A.  Correct.

9          Q.  So the reason that the judge wanted

10   inside was solely to search for property?

11               MS. TULLY:  Objection.

12         Q.  If that's your recollection?

13         A.  I don't remember us going there to

14   search.  I remember us going there to

15   retrieve items that were agreed that were

16   going to be taken from him and given to her.

17         Q.  You were going in his house to look

18   for items?

19         A.  To obtain what he said he did have

20   and was going to provide her.

21         Q.  So you were going inside Mr.

22   Gibson's house to retrieve items, correct?

23         A.  Correct.

24         Q.  And not to -- not because there was

Page 26

```
1   some emergency occurring inside?

2        A.  Correct.

3        Q.  There was no choking baby inside?

4        A.  Correct.

5        Q.  There was no 911 caller inside?

6        A.  Correct.

7        Q.  Now, would it be fair to say -- or

8   would you agree with me that Mr. Gibson did

9   not voluntarily consent to you and the judge

10  entering his house?

11       A.  When we got on the property, he did

12  voluntarily object to us going in the house.

13       Q.  So he did not consent -- Mr. Gibson

14  did not consent to a search of his house, is

15  what I am asking?

16       A.  At first, yes.

17       Q.  Okay.  He did not consent at any

18  point, did he?

19       A.  I think as we went along, he said

20  okay.

21       Q.  And he only went along with it

22  after he was threatened with arrest, right?

23       A.  I can't answer for him.

24       Q.  All right.  Do you recall Mr.
```

1    Gibson being threatened with arrest?

2        A.  Yes.

3        Q.  And who made that threat?

4        A.  The judge.

5        Q.  And who would have arrested him if

6    she followed through with that threat?

7        A.  I would have.

8        Q.  So at the beginning, you were the

9    only law enforcement officer there, right?

10       A.  Yes.

11       Q.  And you were a sworn law

12   enforcement officer on March 4, 2020?

13       A.  Yes.

14       Q.  You had handcuffs with you?

15       A.  I did.

16       Q.  You had a police cruiser?

17       A.  Yes.

18       Q.  You had a gun?

19       A.  Uh-huh.

20       Q.  You had a radio?

21       A.  Yes.

22       Q.  You had arrest powers?

23       A.  Yes.

24       Q.  And had Judge Goldston instructed

Page 28

1    you to arrest Mr. Gibson for not letting her

2    inside his house, you would have done so?

3            A.  I would have checked with my

4    supervisor before arresting him, yes.

5            Q.  Okay.  You didn't tell Mr. Gibson

6    that at the time though, did you?

7            A.  He and I really didn't talk.

8            Q.  Okay.  Well, you were present when

9    the judge looked at him and said you will be

10   arrested if you don't let us in your house?

11           A.  Yes.

12           Q.  And you didn't speak up and say,

13   well --

14           A.  No.

15           Q.  -- let me check with my supervisor

16   first?

17           A.  No, I did not.

18           Q.  So would it be fair to say that

19   Mr. Gibson was under the impression that he

20   would be arrested by you if he chose not to

21   allow you in his house?

22           A.  Yes.  I would say yes.

23           Q.  And at some point before you went

24   in the house, didn't you call for a response

Page 29

1   by other deputies?

2           A.   Yes.

3           Q.   And how did that occur?

4           A.   Well, when we are in the courtroom

5   -- the plaintiff and respondent, their

6   attorneys, the judge and myself are in the

7   courtroom.  It is a very small courtroom.

8   And when we were going to go to the home --

9   we were probably the last people to get to

10  the home.  I didn't realize there were

11  witnesses involved for both parties.  And

12  once we pulled in, I realized how many people

13  were there.  And then I became a little

14  nervous about it.  I didn't know who was with

15  whom, and who should be there, who shouldn't.

16            And we got out of the car pretty

17  quickly as I recall, and we started walking

18  over toward the gazebo with a swing.  And

19  then he talked to the judge about getting a

20  search warrant --

21          Q.   Who was "he"?

22          A.   The --

23          Q.   Mr. Gibson?

24          A.   Mr. Gibson.

Page 30

```
 1                -- about getting a search warrant.
 2      And then it became a little what I would call
 3      contentious back and forth.  And I went ahead
 4      and called for a backup officer at that
 5      point.  And typically I do that as I pull
 6      into a restaurant -- or a restaurant -- or a
 7      residence.  Can you tell it is lunch time?
 8                When I pull into a residence -- I
 9      should have gone out on the radio and
10      informed EOC that I was at a residence with
11      the judge.
12           Q.  Which is not -- hang on.  Which is
13      not something that you would do in a hearing
14      at the courthouse?
15           A.  Right.  Correct.
16           Q.  Okay.  So at some point you called
17      for other officers.  And why?  What is the
18      reason that you would want other police
19      officers?
20           A.  There were a lot of people there.
21      And it is a smart thing to do, I think, to
22      get other officers there.
23           Q.  At that point --
24           A.  Anytime you have people disagreeing
```

1    over certain things, you want -- you know, I

2    want EOC to know I am there.  And if there is

3    somebody available, they can send a backup

4    officer.

5          Q.  And who is EOC?

6          A.  The emergency operations center.

7          Q.  So at some point, did additional

8    officers show up?

9          A.  Yes.

10         Q.  And who was that that showed up?

11         A.  Stump and Brian White, I believe.

12         Q.  But you didn't call them right when

13   you showed up at the property?  You called

14   them well into the interaction, right?

15         A.  Correct.  I called EOC, and EOC

16   called them.  It wasn't like me calling them

17   directly.

18         Q.  So you requested additional police

19   officers to be at the scene via EOC?

20         A.  Correct.

21         Q.  And you did that after Mr. Gibson

22   voiced objections to you and Judge Goldston

23   being on his property?

24         A.  Correct.

Page 32

1        Q.  In fact, you did that after you
2    seized Mr. Gibson's cell phone?
3        A.  I didn't seize Mr. Gibson's cell
4    phone.
5        Q.  All right.  Well, let's talk about
6    that.  At some point, did you come into
7    possession of Mr. Gibson's cell phone?
8        A.  I did.
9        Q.  Well, how did Mr. Gibson's cell
10   phone get into your possession?
11       A.  He handed it to me, and I stuck it
12   in my shirt pocket.
13       Q.  And why did Mr. Gibson hand you
14   Mr. Gibson's cell phone?
15       A.  The judge told him that it was
16   against the law to record a court hearing,
17   and we were in the middle of a court hearing.
18       Q.  And when this took place, as you
19   say in the middle of a court hearing,
20   physically where were you standing at that
21   time?
22       A.  On the gazebo, as I recall.
23       Q.  And where was the gazebo located?
24       A.  In the front yard of his home.

Page 33

1        Q.  So you were standing in the front

2   yard of Mr. Gibson's home at the time that

3   his cell phone was handed to you?

4        A.  Correct.

5        Q.  And Mr. Gibson handed you his cell

6   phone because the judge ordered him to,

7   right?

8        A.  Correct.

9        Q.  And the judge ordered him to

10   because Mr. Gibson had been attempting to

11   record what was happening, right?

12        A.  Correct.

13        Q.  And he was told by the judge that

14   he could not record what was happening --

15        A.  Yes.

16        Q.  -- right?

17             And so he had to give over his cell

18   phone to you?

19        A.  Yes.

20        Q.  He had to stop recording?

21        A.  Yes.

22        Q.  Even though he was standing on his

23   own property?

24        A.  Yes.

Page 34

```
 1          Q.  Now, there were other people there
 2   recording as well, correct?
 3          A.  I wasn't aware of it, no.
 4          Q.  Do you recall anyone else being
 5   told to turn off --
 6          A.  No.
 7          Q.  -- recordings?
 8          A.  No.
 9          Q.  And at the time that the cell phone
10   was handed to you and you put it in your
11   pocket, again, you were on duty as a law
12   enforcement officer, right?
13          A.  Yes.
14          Q.  You were on the clock?
15          A.  Yes.
16          Q.  And you were in uniform?
17          A.  Yes.
18          Q.  Had you already called for backup
19   at that time?
20          A.  I am not sure if I had or not.
21          Q.  But it was about that time that you
22   radioed for more officers to arrive?
23          A.  Yes.
24          Q.  Would you agree with me that Matt
```

Page 35

1    Gibson did not consent to giving you his cell

2    phone?  I mean, you know what consent is,

3    right?  You deal with consent in your career

4    as a police officer?

5         A.  Right.

6         Q.  You obtain consent before you

7    search someone's car for instance, right?

8         A.  Right.

9         Q.  So you know what consent is?

10        A.  I do.

11        Q.  My question to you is, in your

12   opinion, being an eyewitness there, do you

13   think Mr. Gibson consented to handing you his

14   cell phone?

15        A.  No.

16        Q.  Do you recall how long the search

17   of Mr. Gibson's home lasted?

18        A.  I would guess -- no.  I don't

19   recall.  I would --

20        Q.  You were there the entire time?

21        A.  Yes.

22        Q.  So the entire time that the judge

23   was there, you were there?

24        A.  I was.

Page 36

1          Q.  Okay.  Do you think it was at least

2    20 minutes long?

3          A.  Yes.

4          Q.  At some point, you began to record

5    what was happening inside the house, right?

6          A.  I think I started to record before

7    we went in -- in the home.  But I am not

8    sure.

9          Q.  Well, we have a recording that you

10   took of inside the house during the search.

11         A.  Okay.

12         Q.  Right?

13         A.  We should have.

14         Q.  I mean, that -- that was a

15   recording that you took?

16         A.  Uh-huh.

17         Q.  Yes or no?

18         A.  Yes.

19         Q.  Was that taken on your personal

20   cell phone?

21         A.  Yes.

22         Q.  Why did you -- why did you start

23   recording inside Mr. Gibson's house?

24         A.  For the protection of everyone

1    involved.

2         Q.  Now, you had been on two of these

3    before with Judge Shuck, right?

4         A.  Yes.

5         Q.  During either of the searches with

6    Judge Shuck or whatever -- whatever occurred,

7    did you record what took place in either of

8    those two prior instances?

9         A.  Yes.

10        Q.  Do you still have those videos?

11        A.  No.

12        Q.  What did you do with them?

13        A.  They were deleted.

14        Q.  Were they given to anybody before

15   they were deleted?

16        A.  In this incident, I gave it to our

17   case coordinator.  And then it was deleted.

18        Q.  And in the incident that we are

19   here about today?

20        A.  Right.

21        Q.  In either of the two Shuck

22   incidents, did you do anything with the

23   videos?

24        A.  They were actually photos of guns,

Page 38

1    firearms that we took when the video just --

2    individual photos.

3           Q.  And what did you do with those

4    photos?

5           A.  They were deleted.

6           Q.  Before being deleted, were they

7    provided to anybody?

8           A.  No.  That case settled quickly.

9    And I was told we didn't need them.

10          Q.  Do you recall whether there were

11   any search warrants involved in those?

12          A.  There were not.

13          Q.  After this incident, did you ever

14   have any additional conversations with any of

15   your supervisors about whether it was

16   appropriate or within your employer's

17   policies to accompany judges outside of the

18   courthouse?

19          A.  Yes.

20          Q.  And tell me about that.  Who did

21   you have a conversation with?

22          A.  The guy I work with, which is

23   Sergeant Lilly.

24          Q.  So the same Sergeant Lilly that you

Page 39

```
1    talked to --

2         A.   Uh-huh.

3         Q.   -- before going with Judge Shuck?

4         A.   Yes.

5         Q.   And when did that take place?

6         A.   I think the day that we got back

7    from his home.

8         Q.   From whose home?

9         A.   Mr. Gibson's home.

10        Q.   And did you approach Sergeant

11   Lilly, or did he approach you?

12        A.   Yeah.  I went to him and told him

13   that we had to call and have a backup officer

14   come -- come to the home.  And as I recall,

15   he said he would -- he knew Mr. Gibson or

16   someone at the police department knew Mr.

17   Gibson.  I don't remember who it was.

18        Q.   Was he already aware of the

19   incident?

20        A.   I don't think he was aware of it

21   until I made him aware of it.

22        Q.   So did he say anything else?

23        A.   No.

24        Q.   Did you have any other
```

Page 40

1    conversations about whether you would

2    continue to go on these visits or searches

3    with a judge?

4         A.  Not as I recall.

5         Q.  Were there ever any written

6    policies or procedures with your employer

7    that pertain specifically to bailiff duties?

8         A.  Not that I -- not that I recall.

9              MR. ROBINSON:  Object to the

10   form.  Just -- well, go ahead.

11        Q.  Do you recall what -- was there

12   ever any change in policy after the -- after

13   the incident at Mr. Gibson's house, was there

14   ever any change in policy, whether written or

15   unwritten as you understood it, as to whether

16   or not you were allowed to ever again

17   accompany a judge to a litigant's house?

18        A.  Not as I recall, no.

19        Q.  So you were never told by your

20   employer not to do that again?

21        A.  No.  My job is the judge's safety.

22   So if she or he goes somewhere or feels the

23   need to go somewhere, I would accompany them

24   for their safety.

Page 41

1          Q.  Okay.  I mean, your job is also to

2     protect the safety of any citizen, right?

3          A.  Secondarily.  When I am -- when I

4     am with the judge, she is my primary concern

5     or he, whatever judge is there.  As far as

6     what the petitioners or respondents are

7     doing, that's not really why I'm there.

8          Q.  Okay.  Well, I mean, you are there

9     to protect the petitioners and respondents as

10    well, right?

11         A.  If something happened, I would grab

12    the judge and go and let whatever happened

13    happened.  So I don't know if that answers

14    your question or not.

15         Q.  Well, yeah.  It does.  I mean, is

16    that -- is that something that you were --

17    that is a policy, or that you are taught to

18    do?  Or is that just something you do on your

19    own?

20         A.  Well, all law enforcement officers

21    are there to protect the safety of the good

22    guy and the bad guy.  I mean, I don't want

23    anything to happen to anybody while I am on a

24    scene.

Page 42

```
 1          Q.  Is there some rule somewhere that

 2   says, I mean, your job is to only protect the

 3   judge and not protect anyone else?

 4          A.  No.  And that's not what I am

 5   saying.  I am saying the judge is my primary

 6   responsibility.

 7          Q.  After going inside Mr. Gibson's

 8   house, what did you do inside?

 9          A.  I stood, watched what was happening

10   for the most part.

11          Q.  Did you help to look for anything?

12          A.  No.

13          Q.  Did you ever grab a hold of any

14   item of personal property?

15          A.  No.

16          Q.  But at some point, you did film

17   inside Mr. Gibson's house?

18          A.  Yes.  As I recall, the phone

19   battery was -- typically, I don't keep it

20   charged up well.  It was low.  But I wanted

21   to make sure and get as much recorded -- I

22   don't want someone to say we did this or

23   didn't do this.  I wasn't filming Mr. Gibson

24   or Mrs. Gibson or the judge.  I was filming
```

Page 43

1   overall, as I think it would be appropriate

2   -- any officer with a body camera would have

3   the same footage as what I was filming.

4           Q.  And when you say "we," you are

5   talking about you and the judge?

6           A.  Yeah.  I am not sure what context I

7   said we.  I mean, you could refresh my

8   memory.

9           Q.  Okay.  Well, you had done -- you

10  had done this twice before with Judge Shuck,

11  right?

12          A.  Yes.

13          Q.  And you said that both of those

14  times you either took video or took pictures?

15          A.  Not both of those times.  One --

16  one time.

17          Q.  All right.  Well, one of those

18  times at least you took photographs of some

19  firearms to document what was taken from the

20  residence?

21          A.  Correct.

22          Q.  And when you went to Matthew

23  Gibson's house, you didn't take photos, but

24  you took video to document what was happening

Page 44

1    inside his house?

2         A.  Correct.

3         Q.  And at one point, in fact, you are

4    filming the inside of Mr. Gibson's gun safe?

5         A.  Probably.

6         Q.  You are filming Mr. Lusk and his

7    client walking around inside Mr. Gibson's

8    house?

9         A.  Probably.

10        Q.  You are filming items that are

11   being taken by Mr. Gibson's ex-wife pursuant

12   to the instructions of the judge?

13        A.  Right.  I stayed in the room with

14   the judge until Mr. Gibson approached me and

15   asked me if I would accompany him to look in

16   his gun safe.  At that point, I left.  I

17   asked the judge if she felt comfortable with

18   me doing that.  She told me yes.  We went to

19   the gun safe.  And he actually opened the

20   safe and showed me in the gun safe.

21        Q.  And that was after you had already

22   been filming?

23        A.  Correct.

24        Q.  And that was after the search was

Page 45

1    already under way?

2         A.  Correct.

3              MS. TULLY:  Object to the use of

4    the term "search."

5         But go ahead.

6              MR. BRYAN:  I could read the

7    Supreme Court's holding if you want me to.

8              MS. TULLY:  And I can still

9    object.  Go right ahead.

10             MR. BRYAN:  Your objection is

11   noted.

12        Q.  The search was under way at the

13   time that Mr. Gibson first mentioned -- or

14   showed you the inside of his gun safe, right?

15        A.  Yes.

16        Q.  And Mr. Gibson had already been

17   threatened with arrest prior to that, right?

18        A.  Yes.

19        Q.  His cell phone had already been

20   seized prior to that?

21        A.  Yes.

22        Q.  You had already called for

23   additional law enforcement officers to show

24   up to back you up prior to that, right?

Page 46

1          A.  Yes.

2          Q.  Would it be fair to say that you

3     did more inside Mr. Gibson's house than just

4     ensure the judge's safety, but that you to

5     some extent participated jointly with the

6     judge by documenting what was happening

7     inside?

8                    MS. TULLY:  Objection.

9          Q.  Let me -- strike that.  Let me

10    rephrase that question.  It was pretty

11    sloppy.

12                    Would you agree with me that you

13    did more on March 4, 2020, than merely

14    protect the judge's safety or guard the judge

15    inside Mr. Gibson's house?

16         A.  My role there is protecting the

17    judge as I stated.  And all of our hearings,

18    all of them, 100 percent of them, are

19    videotaped.  I felt as if we were still in a

20    courtroom setting.  So I felt that it would

21    be a good idea to video as much as I could.

22    My battery was low.  And I would have

23    videotaped start to end.

24         Q.  But you weren't -- you weren't just

Page 47

1    taking surveillance footage, you were

2    documenting --

3         A.  I was -- I was documenting what

4    people were saying and what people were

5    taking as much as I could.

6         Q.  Okay.  But when you are acting as a

7    bailiff in the courtroom, I mean, you're not

8    getting out your cell phone and

9    documenting --

10        A.  Did not.

11        Q.  -- exhibits or anything like that?

12        A.  No.  The courtroom facilities do

13   that for me.  I don't have -- I am not.

14        Q.  And that -- I mean, that, to be

15   fair, doesn't have anything to do with Judge

16   Goldston's safety -- personal safety, does

17   it?

18                 MR. ROBINSON:  Object to the

19   form.

20         Do you understand the question?

21        A.  If you could rephrase it maybe.

22        Q.  Your actions in documenting with

23   your personal cell phone the inside of

24   Mr. Gibson's house, that goes beyond just

Page 48

1    guarding Judge Goldston's personal safety,

2    right?

3          A.  I would say yes.

4          Q.  I mean, that is more akin to

5    helping Judge Goldston locate and retrieve

6    items of personal property inside Mr.

7    Gibson's house?

8          A.  No.

9               MS. TULLY:  Objection.

10         A.  I would not agree with that, no.

11         Q.  You were documenting items of

12   personal property inside Mr. Gibson's house

13   that was being retrieved by other people?

14         A.  More of recording what was being

15   said or not said, taken or not taken.  Trying

16   to keep an accurate record of what was going

17   on inside the home.

18         Q.  When you took photographs with your

19   personal cell phone of firearms during a

20   prior incident with Judge Shuck, that was not

21   done in the interest of Judge Shuck's safety,

22   was it?

23         A.  It was not.

24         Q.  Taking photographs of somebody's

Page 49

1    firearms had absolutely nothing to do with

2    ensuring or protecting Judge Shuck's safety?

3         A.   Correct.

4         Q.   In fact, it was literally

5    documenting what was being taken out of that

6    residence?

7         A.   Correct.

8         Q.   And that's the same thing that you

9    were doing inside Matthew Gibson's house by

10   recording video, right?

11                  MR. ROBINSON:  Object to the

12   form.

13              You can answer it.

14        A.   I may have recorded a television at

15   one point as I am recording.  That doesn't

16   mean that the television was taken.  I am not

17   -- I am not documenting -- I am not --

18   everything that I am recording is not being

19   taken.  I don't know how else to say that.

20        Q.   What did you do with the recording

21   after the search was over?  Did you provide

22   it to Judge Goldston?

23        A.   I provided it to Debra, which is

24   our case coordinator -- or Donzetta.  I can't

Page 50

```
 1    remember.  One of the two that work in our
 2    office.  I said, there it is, put it in the
 3    file, whatever you need to do with it.  And
 4    then I immediately deleted it from my phone.
 5         Q.  What are their names?
 6         A.  Donzetta Roush and Debra Johnson.
 7         Q.  And they are case coordinators?
 8         A.  They work in -- one of them is a
 9    coordinator, and one is a clerical secretary.
10         Q.  For the sheriff's department?
11         A.  For the judge -- judge's office.
12         Q.  For the family court?
13         A.  Uh-huh.
14         Q.  So you provided the family court --
15    somebody inside the family court with a copy
16    of the video that you took inside the
17    plaintiff's house?
18         A.  Correct.
19         Q.  And then you deleted it off your
20    phone?
21         A.  Correct.
22         Q.  And so you didn't keep a copy of
23    it?
24         A.  No.  Absolutely not.
```

Page 51

1           Q.  Did you ever have any conversations

2    with Judge Goldston about the video footage

3    that you took inside Mr. Gibson's house?

4           A.  I told her I took video.  And she

5    acknowledged that she saw me with my phone.

6           Q.  When did that conversation take

7    place?

8           A.  Immediately either when we got back

9    in the Jeep or when we got back to the

10   courthouse.

11          Q.  Did she say anything else?

12          A.  No.

13          Q.  Did you ever have any conversations

14   with Judge Goldston about the propriety of

15   you filming inside Mr. Gibson's house?

16          A.  Not as I recall.

17          Q.  Did she ever say to you not to do

18   that again?

19          A.  No.  I did get a call from someone

20   at the Supreme Court that said I shouldn't

21   have done that.

22          Q.  Did you personally receive that

23   call?

24          A.  I did.

Page 52

1          Q.  Do you recall who --

2          A.  I do not.

3          Q.  -- called you?

4          A.  Lieutenant Stafford I think took

5     the call.  I remember going to his office and

6     talking with somebody.  I don't recall if I

7     called them back or they called me at a

8     certain time.  But I remember having the

9     discussion on the phone, and they said to not

10    -- asked why I did it.  And I explained why.

11    They said, that's not a good idea.

12         Q.  Who told you that?

13         A.  Whoever I talked to.  I don't

14    remember who it was.

15         Q.  Was this a lawyer?

16         A.  I don't know.

17         Q.  What's Lieutenant Stafford's first

18    name?

19         A.  David.

20         Q.  And is he a supervisor for you?

21         A.  He is.

22         Q.  Is he over Sergeant Lilly, I

23    presume?

24         A.  He is.

1        Q.  So at some point, Lieutenant

2   Stafford called you into his office, and he

3   had somebody from the Supreme Court on the

4   phone?

5        A.  No.  He told me that someone had

6   called, and I -- like I said, I can't

7   remember if I was supposed to call them back.

8   And that may have been what it was.  I went

9   to his office and he had the phone number

10  there and I called them back or something --

11  something of that nature.

12       Q.  Did you call -- did you call that

13  person back from inside Lieutenant Stafford's

14  office?

15       A.  Yes.

16       Q.  With him present?

17       A.  No.

18       Q.  So he called you into his office,

19  and then he left the room?

20       A.  Correct.

21       Q.  Did Lieutenant Stafford say

22  anything else to you other than about

23  somebody is on the phone?

24       A.  No.  He just told me that someone

Page 54

1    had called from the Supreme Court's office

2    and asked them that I call them back.  And I

3    explained to them the entirety of, you know,

4    what we are going on now.  And he said I

5    probably shouldn't have recorded it.

6        Q.  So somebody from the Supreme Court

7    whose name you don't remember told you while

8    you were sitting in Lieutenant Stafford's

9    office that you probably should not have

10   recorded --

11       A.  Right.

12       Q.  -- recorded inside Mr. Gibson's

13   house?

14       A.  Correct.

15       Q.  Did that individual also tell you

16   that you probably should not or that you

17   should not accompany Judge Goldston to

18   anyone's house in the first place?

19       A.  No.

20       Q.  Did Lieutenant Stafford have any

21   conversations with you about going to the

22   home of a litigant when you are a bailiff?

23       A.  No.

24       Q.  Did Lieutenant Stafford have any

Page 55

1    conversations with you about whether or not

2    you should record inside someone's house?

3         A.  No.

4         Q.  Did you receive any discipline or

5    anything as a result of this incident?

6         A.  No.

7         Q.  Have you ever been disciplined in

8    your capacity as a law enforcement officer?

9         A.  No.

10        Q.  Formally or informally?

11        A.  Not at the sheriff's office.

12        Q.  What about at Beckley?

13        A.  I am sure I was for speeding or

14   whatever.  I drive fast.  That's why I'm a

15   policeman.  If you can't beat them, join

16   them.

17        Q.  Have you ever had your deposition

18   taken before?

19        A.  Not since I have been a policeman

20   that I am aware of.

21        Q.  Have you ever been charged with a

22   crime?

23        A.  No.

24        Q.  When you were inside Mr. Gibson's

Page 56

```
 1    house, did you ever observe Judge Goldston

 2    participating in looking for things?

 3         A.  No.

 4         Q.  What did you -- as -- I probably

 5    should have asked you this first.  What did

 6    you observe Judge Goldston doing inside

 7    Mr. Gibson's house?

 8         A.  As I recall, we went in.  And it

 9    seemed like we go to the left and down the

10    set of stairs, and then to the right into a

11    den with -- DVDs I think were in question.

12    And that was -- I think that was the primary

13    reason for us being there, was to retrieve

14    some DVDs and some photos.

15         Q.  When the other deputies arrived,

16    what did they do?  Did they go inside the

17    house?

18         A.  Yes.  They came down and asked if I

19    needed anything.  And they dispersed the

20    crowd that was outside --

21         Q.  And why?

22         A.  -- as far as I know.  I stayed

23    downstairs.

24         Q.  Well, how do you know that they did
```

Page 57

1    that?

2            A.  He told me that's -- he went up and

3    made sure.

4            Q.  Who is "he"?

5            A.  Officer Stump.

6            Q.  So Officer Stump told you that he

7    dispersed the crowd outside of Mr. Gibson's

8    house?

9            A.  Right.

10           Q.  When did he tell you that?

11           A.  I am not sure.

12           Q.  Do you know who he would be

13   referring to as the crowd?

14           A.  No.  Like I said, initially I --

15   there were people there.  And I am assuming

16   they were from both sides as witnesses or

17   maybe just giving rides to people.  I don't

18   know why they were there.

19           Q.  You knew --

20           A.  But I didn't know there were going

21   to be that many people there when I got

22   there.  I thought it was just going to be the

23   few of us.

24           Q.  Okay.  Well, you knew that Mr.

Page 58

1    Gibson had people with him on his property

2    when you arrived?

3         A.  Yes.  There were several people

4    there.

5         Q.  And it was your understanding that

6    they were there with his permission?

7         A.  I would assume so.

8         Q.  I mean, you saw Mr. Gibson's

9    girlfriend with a phone recording -- video

10   recording you and Judge Goldston?

11        A.  I don't know if -- I didn't see

12   anybody videotaping.

13        Q.  Okay.  So it is your understanding

14   that Officer Stump, once he arrived, made

15   everybody leave Mr. Gibson's property?

16        A.  Right.  He told me he -- he got rid

17   of the crowd, and asked me if I needed

18   anything else.  And I told him we seem to be

19   fine -- everybody seemed to be fine.

20        Q.  When you had that conversation with

21   Mr. Stump, was that inside Mr. Gibson's

22   house?

23        A.  I believe so.

24        Q.  Do you recall where inside the

Page 59

1    house that took place?

2         A.  Probably in the den downstairs.

3         Q.  Did Mr. Gibson ever invite Officer

4    Stump inside his house?

5         A.  No.  I think we were already

6    downstairs when Officer Stump came down.

7         Q.  So Mr. Gibson wasn't even aware

8    that Stump came in?

9         A.  Not that I am aware of, no.

10        Q.  Were you in Mr. Gibson's presence

11   pretty much the whole time during that

12   search?

13        A.  I think so, yes.

14        Q.  I may have asked you.  But did you

15   ever physically pick up any item of property

16   inside Mr. Gibson's house?

17        A.  Not -- unless somebody asked me to

18   help move something.  But I -- I don't think

19   -- I don't remember touching anything, no.

20        Q.  Who else -- what other deputies

21   arrived other than Officer Stump?

22        A.  I think it was Officer White.

23        Q.  And do you recall whether or not he

24   came inside Mr. Gibson's house?

Page 60

1        A.  I believe I did see him downstairs,

2   yes.

3        Q.  Did he come in at the same time as

4   Stump?

5        A.  I don't know who came first.

6        Q.  Did they come in at about the same

7   time?

8        A.  They could have.  I do remember on

9   the radio they were -- there was some mix-up

10  about the address.  And I think -- I don't

11  know if that had anything to do with the

12  order in which they arrived or not.

13       Q.  Do you know whether they knew what

14  they -- what kind of scene they were

15  responding to or why?

16       A.  No.  I got on the radio and said

17  that I am out at whatever -- I don't remember

18  the address -- but whatever road or drive or

19  something with the judge, and I -- if there

20  was an officer available, I needed backup.

21       Q.  So you communicated that you were

22  with the judge inside Mr. Gibson's home?

23       A.  No.  We weren't in the home.

24       Q.  So you were still in the front

Page 61

1    yard --

2         A.   Uh-huh.

3         Q.   -- at that time?

4              So you communicated that you were

5    with the judge --

6         A.   Out at a residence with the judge.

7    And I asked if there was a unit that could

8    come and back me up.

9         Q.   And in either of the prior two

10   times that you visited the home with Judge

11   Shuck, was there any other backup that was

12   involved or any other law enforcement

13   officers that arrived at those incidents?

14        A.   No.

15        Q.   I may have asked you that.

16             Do you have any recollection about

17   what Officer White did inside Mr. Gibson's

18   house?

19        A.   As far as I remember, they just

20   came down and talked, made sure everything

21   was okay and left.

22        Q.   Do you have any idea how long they

23   were inside the house?

24        A.   I don't.  It was very brief.

Page 62

1      Q.  Now, you testified that you gave

2  the video taken inside Mr. Gibson's house to

3  some case coordinators --

4      A.  Right.

5      Q.  -- right?

6      A.  Uh-huh.

7      Q.  Is it your testimony that you did

8  not directly provide this video to Judge

9  Goldston?

10     A.  Yes.

11     Q.  So you are positive you didn't

12  directly give this video to Judge Goldston?

13     A.  That's correct.

14     Q.  So if she got a copy of that video,

15  it wasn't from you?

16     A.  Right.

17     Q.  Not directly?

18     A.  Right.

19     Q.  We played the video that you took

20  here a couple times so far before you came

21  in.  And you can correct me if I am wrong

22  here.  But it is my understanding that on the

23  video, you said -- you said to somebody that

24  you might want to place a limit on the number

Page 63

1    of items taken because it might be too much

2    to carry.  Do you recall -- do you recall

3    that?

4         A.  I don't.

5         Q.  I believe you were talking to the

6    judge about placing a limit on what physical

7    property could be carried out of there?

8         A.  That's possible.  I don't recall.

9         Q.  Have you watched the video

10   recently?

11        A.  Huh-uh.

12              MR. BRYAN:  Give me one second to

13   talk to them.

14              (Break in proceedings.)

15   BY MR. BRYAN:

16        Q.  Just to clarify -- just so I

17   understand, it is your testimony that your

18   employer has never told you even to this day

19   that you are not to accompany Judge Goldston

20   or any other judge to the home of a litigant

21   ever again as had occurred on March 4, 2020?

22        A.  I don't recall being told directly

23   not to.  But common sense would tell me right

24   now that -- definitely get the clearance

Page 64

1    before I did it again.

2           Q.  Well, to be fair to you, you did --

3    it is your testimony that you did go to

4    Sergeant Lilly before the first Shuck

5    incident, right?

6           A.  Correct.

7           Q.  And Sergeant Lilly told you that it

8    was fine for you to go with Judge Shuck to

9    the home of a litigant?

10          A.  His response is -- was we do do

11   that from time to time.

12          Q.  And if I understand you correctly,

13   at no point after that did any supervisor

14   ever tell you not to do that again?

15          A.  Correct.

16          Q.  And it is your testimony here today

17   that you are not aware of any written policy

18   changes or anything like that pertaining to

19   going to the home of a litigant with a judge?

20          A.  Not that I am aware of, no.

21          Q.  Okay.  It is just your own common

22   sense that tells you not to do that again?

23          A.  Right.

24          Q.  So let me ask you this.  You know,

Page 65

```
 1    if a judge asks you to go with her or him
 2    again to the home of a litigant, would you do
 3    it again?
 4         A.  I would check with Lieutenant
 5    Stafford and say, Judge McGraw or Judge Shuck
 6    or Judge Goldston is requesting to go to a
 7    home.  And if he gave me clearance to do it,
 8    I would do it.
 9         Q.  But as we sit here today, none of
10    your supervisors have proactively come
11    forward to tell you, look, don't do that
12    again?
13         A.  No.  I may have gone to them and
14    said, I won't do it again.
15         Q.  They are aware of the fact that you
16    are still serving as a bailiff?
17         A.  Yes.
18              MR. BRYAN:  I don't think I have
19    any other questions.  Thank you.
20              MR. ROBINSON:  I don't have
21    anything.
22              MS. TULLY:  I don't have
23    anything.
24              MR. ROBINSON:  You can read your
```

Page 66

1    deposition to see if there were any mistakes

2    that were made, or you can waive it.

3              THE WITNESS:  I waive.

4              (Deposition concluded at 2:45

5    p.m.)        * * * * * * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 67

**CERTIFICATE**

1

2

3         I, Tara Arthur, Certified Stenotype

4    Reporter and Notary Public, do hereby

5    certify that the foregoing deposition of the

6    above-named witness, was duly taken by me in

7    machine shorthand, and that the same were

8    accurately written out in full and reduced

9    to computer transcription.

10         I further certify that I am neither

11   attorney or counsel for, nor related to or

12   employed by any of the parties to the action

13   in which this deposition is taken; and

14   furthermore, that I am not a relative or

15   employee of any attorney or counsel employed

16   by the parties hereto or financially

17   interested in the action.

18         My commission expires April 16, 2022.

19

20   _____

     Tara Arthur
21   Certified Court Reporter/Notary Public

22

23

24

**1**

**100** 46:18

**19** 7:7 10:1

**2**

**20** 20:4,16 36:2

**2017** 6:19

**2020** 5:7,24 17:4 21:22 22:3,11,14 23:24 24:4 25:7 27:12 46:13 63:21

**2:45** 66:4

**4**

**4** 5:7,23 17:4 21:22 22:3, 11,14 23:24 24:4 25:7 27:12 46:13 63:21

**9**

**911** 26:5

**A**

**Aaron** 13:16

**ability** 14:11, 14

**absolutely** 49:1 50:24

**accompanied** 23:13

**accompany** 20:23 38:17 40:17,23 44:15 54:17 63:19

**accurate** 48:16

**acknowledged** 51:5

**act** 12:8

**acting** 12:5 47:6

**actions** 47:22

**additional** 31:7,18 38:14 45:23

**address** 60:10,18

**affirmative** 11:22

**agree** 21:5 26:8 34:24 46:12 48:10

**agreed** 25:15

**ahead** 30:3 40:10 45:5,9

**akin** 48:4

**allowed** 19:10 40:16

**answering** 16:19

**answers** 41:13

**anyone's** 54:18

**anytime** 13:10 30:24

**appeared** 15:5,6 18:5

**approach** 39:10,11

**approached** 18:23 44:14

**approximately** 16:1

**approximation** 20:11

**arrest** 26:22 27:1,22 28:1 45:17

**arrested** 27:5 28:10,20

**arresting** 28:4

**arrive** 34:22

**arrived** 17:3 18:19 56:15 58:2,14 59:21 60:12 61:13

**asks** 65:1

**assume** 58:7

**assuming** 57:15

**assumption** 24:22

**attempt** 18:18

**attempting** 33:10

**attorneys** 29:6

**awarded** 18:7

**aware** 19:13 22:4,7,10,11, 13,15,19 23:23 34:3 39:18,20,21 55:20 59:7,9 64:17,20 65:15

**B**

**baby** 26:3

**back** 23:2 30:3 39:6 45:24 51:8,9 52:7 53:7,10, 13 54:2 61:8

**backup** 30:4 31:3 34:18 39:13 60:20 61:11

**bad** 41:22

**bailiff** 6:4,23 7:3,6,10 8:12, 15 9:2,4,5,6,9 10:15 11:3,15 12:6,8,13 13:24 23:11 40:7 47:7 54:22 65:16

**bailiffs** 11:10 12:12

**base** 23:4

**basis** 7:23 15:8

**battery** 42:19 46:22

**beat** 55:15

**Beckley** 6:12, 17 20:2,13 23:16 55:12

**began** 36:4

**beginning** 27:8

**body** 43:2

**break** 63:14

**Brian** 31:11

**brought** 22:20

**Bryan** 4:6,7 45:6,10 63:12,15 65:18

**bureau** 20:22

**C**

**call** 28:24 30:2 31:12 39:13 51:19, 23 52:5 53:7, 12 54:2

**called** 4:2 30:4,16 31:13,15,16 34:18 45:22 52:3,7 53:2,6, 10,18 54:1

**caller** 26:5

**calling** 31:16

**camera** 43:2

**capacity** 19:3
20:20 21:1
55:8

**car** 29:16
35:7

**career** 24:15
35:3

**carried** 63:7

**carry** 5:19
63:2

**case** 4:9
12:24 18:12,
16 22:20 24:6
37:17 38:8
49:24 50:7
62:3

**cases** 13:1,2,
3 21:3,6
23:22

**cell** 32:2,3,7,
9,14 33:3,5,
17 34:9 35:1,
14 36:20
45:19 47:8,23
48:19

**center** 31:6

**change**
40:12,14

**charged**
42:20 55:21

**Charleston**
9:10,16

**check** 28:15
65:4

**checked** 28:3

**chief** 20:21

**choking** 26:3

**chose** 28:20

**circuit** 8:22

**citizen** 41:2

**civil** 23:22
24:6

**clarify** 63:16

**class** 9:10

**classroom**
9:13

**clear** 21:21

**clearance**
63:24 65:7

**clerical** 50:9

**client** 11:5
44:7

**clock** 34:14

**comfortable**
44:17

**common** 21:6
63:23 64:21

**communicate
d** 60:21 61:4

**compelled**
14:13

**concern** 41:4

**concluded**
66:4

**confused**
18:11 24:7

**consent** 26:9,
13,14,17
35:1,2,3,6,9

**consented**
35:13

**contempt**
18:16

**contentious**
30:3

**context** 43:6

**continue** 40:2

**conversation**
13:5,7 38:21
51:6 58:20

**conversation
s** 16:8 17:23
38:14 40:1
51:1,13 54:21
55:1

**coordinator**
37:17 49:24
50:9

**coordinators**
50:7 62:3

**copy** 50:15,
22 62:14

**correct** 7:4,
11 8:24 12:7
13:6 14:10
17:1 18:1
19:15,18,21
21:4 22:2,6,9,
17 23:12
25:8,22,23
26:2,4,6
30:15 31:15,
20,24 33:4,8,
12 34:2 43:21
44:2,23 45:2
49:3,7 50:18,
21 53:20

54:14 62:13,
21 64:6,15

**correctly**
64:12

**County** 4:18
5:3,14 17:8

**couple** 6:16
62:20

**court** 4:3
8:22,23 11:19
12:10 13:23
22:8,21 24:8
32:16,17,19
50:12,14,15
51:20 53:3
54:6

**Court's** 45:7
54:1

**courthouse**
7:24 8:19
9:11 13:11
14:18 30:14
38:18 51:10

**courtroom**
8:5 17:24
25:2 29:4,7
46:20 47:7,12

**covered** 23:4

**crime** 55:22

**criminal**
23:22 24:9

**crowd** 56:20
57:7,13 58:17

**cruiser** 17:5
27:16

_____

**D**

**David** 52:19

**day** 5:8,9,17
23:13 39:6
63:18

**days** 7:23
9:13

**deal** 35:3

**Debra** 49:23
50:6

**deleted**
37:13,15,17
38:5,6 50:4,
19

**demanding**
19:9

**den** 56:11
59:2

**denied** 19:6

**department**
4:19 5:3,14
6:13,18 13:18
17:9 20:2
23:17 39:16
50:10

**deposition**
55:17 66:1,4

**deputies** 9:7
16:9 29:1
56:15 59:20

**deputy** 4:20
20:20

**detective**
20:22

direct 14:16

directly 31:17 62:8,12,17 63:22

disagreeing 30:24

discipline 55:4

disciplined 55:7

discussion 52:9

dispersed 56:19 57:7

document 43:19,24

documenting 46:6 47:2,3,9, 22 48:11 49:5,17

Donzetta 49:24 50:6

downstairs 56:23 59:2,6 60:1

drive 55:14 60:18

driving 17:5

drug 20:21,22 21:3,6

duly 4:2

duties 40:7

duty 34:11

DVDS 56:11, 14

**E**

emergency 25:5 26:1 31:6

employed 5:13 6:20

employer 4:17 10:6,11 40:6,20 63:18

employer's 38:16

end 46:23

enforcement 4:14 22:5 24:15 27:9,12 34:12 41:20 45:23 55:8 61:12

ensure 46:4

ensuring 49:2

entering 26:10

entire 35:20, 22

entirety 54:3

EOC 30:10 31:2,5,15,19

escort 8:4

event 12:15

eventually 20:20

ex-wife 18:6 44:11

EXAMINATIO N 4:5

execute 20:7 21:7

executing 20:12 21:19 24:3

execution 20:18

exhibits 47:11

experience 23:19 24:1,6

explained 52:10 54:3

extent 46:5

extremely 21:6

eyewitness 35:12

**F**

facilities 47:12

fact 19:13 22:4,8,10 23:23 32:1 44:3 49:4 65:15

fair 14:15 26:7 28:18 46:2 47:15 64:2

fairly 9:24 15:8

familiar 21:9, 10,13,18 24:1

family 8:22 11:19 12:10 13:23 22:8,21 24:8 50:12, 14,15

fast 55:14

feel 24:12

feels 40:22

felt 14:9 23:3 25:1 44:17 46:19,20

file 50:3

filed 19:7

filing 20:14

fill-in 8:20

film 42:16

filming 42:23, 24 43:3 44:4, 6,10,22 51:15

fine 58:19 64:8

firearms 38:1 43:19 48:19 49:1

floor 11:20 12:11 13:23

floors 8:1

follow 14:13

footage 43:3 47:1 51:2

form 40:10 47:19 49:12

Formally 55:10

forward 65:11

found 10:9

front 32:24 33:1 60:24

**G**

gave 37:16 62:1 65:7

gazebo 29:18 32:22,23

Gibson 4:10 18:20 19:9 26:8,13 27:1 28:1,5,19 29:23,24 31:21 32:13 33:5,10 35:1, 13 39:15,17 42:23,24 44:14 45:13, 16 58:1 59:3, 7

Gibson's 17:4,16 18:4 22:1 23:7,14 25:6,22 32:2, 3,7,9,14 33:2 35:17 36:23 39:9 40:13 42:7,17 43:23 44:4,7,11 46:3,15 47:24 48:7,12 49:9 51:3,15 54:12 55:24 56:7 57:7 58:8,15,

21 59:10,16,
24 60:22
61:17 62:2

**girlfriend**
58:9

**give** 20:10
33:17 62:12
63:12

**giving** 35:1
57:17

**Goldston**
8:13 9:2 11:3,
8,11 12:12,17
17:13 18:4,20
19:6,19 22:4
23:6 27:24
31:22 48:5
49:22 51:2,14
54:17 56:1,6
58:10 62:9,12
63:19 65:6

**Goldston's**
47:16 48:1

**good** 17:2
41:21 46:21
52:11

**grab** 41:11
42:13

**guard** 46:14

**guarding**
48:1

**guess** 14:24
35:18

**gun** 5:19
27:18 44:4,
16,19,20
45:14

**guns** 37:24

**guy** 11:20
38:22 41:22

**guys** 20:23

---

**H**

**hand** 32:13

**handcuffs**
27:14

**handed** 32:11
33:3,5 34:10

**handing**
35:13

**handouts**
10:20

**hang** 30:12

**happen** 14:24
41:23

**happened**
41:11,12,13

**happening**
17:15 33:11,
14 36:5 42:9
43:24 46:6

**heard** 14:20
17:23 24:19

**hearing** 8:3
17:18 18:6
30:13 32:16,
17,19

**hearings**
46:17

**helping** 48:5

**higher** 14:1

**hired** 9:23

**history** 22:23

**hold** 42:13

**holding** 45:7

**home** 11:4,
11,24 12:4,23
18:4 19:11
22:1 23:2,7,
14 25:2,6
29:8,10 32:24
33:2 35:17
36:7 39:7,8,9,
14 48:17
54:22 60:22,
23 61:10
63:20 64:9,19
65:2,7

**homes** 22:12,
16,19,22

**hours** 9:12,24

**house** 11:8
17:4,16
25:17,22
26:10,12,14
28:2,10,21,24
36:5,10,23
40:13,17
42:8,17 43:23
44:1,8 46:3,
15 47:24
48:7,12 49:9
50:17 51:3,15
54:13,18 55:2
56:1,7,17
57:8 58:22
59:1,4,16,24
61:18,23 62:2

**Huh-uh** 63:11

---

**I**

**idea** 22:21
46:21 52:11
61:22

**immediately**
17:20 50:4
51:8

**impression**
28:19

**in-service**
9:11,23

**incident** 7:9
10:3 13:9,10
15:17,23
16:10,13
37:16,18
38:13 39:19
40:13 48:20
55:5 64:5

**incidents**
14:21 37:22
61:13

**including**
23:17

**independent**
16:12

**individual**
38:2 54:15

**informally**
55:10

**informed**
30:10

**initially** 57:14

**inside** 25:6,
10,21 26:1,3,
5 28:2 36:5,

10,23 42:7,8,
17 44:1,4,7
45:14 46:3,7,
15 47:23
48:6,12,17
49:9 50:15,16
51:3,15 53:13
54:12 55:2,24
56:6,16
58:21,24
59:4,16,24
60:22 61:17,
23 62:2

**instance** 35:7

**instances**
37:8

**instructed**
27:24

**instruction**
9:13

**instructions**
44:12

**interaction**
31:14

**interest** 48:21

**investigating**
21:3

**investigation**
24:9

**invite** 59:3

**involved** 15:4
16:4 23:9,21
29:11 37:1
38:11 61:12

**issue** 14:11
23:1,6

**issued** 21:24

**item** 42:14 59:15

**items** 18:7,9, 15,17 25:15, 18,22 44:10 48:6,11 63:1

**J**

**Jeep** 51:9

**JEFF** 4:1

**Jeffrey** 4:12

**Jim** 15:11

**job** 4:23 7:13 40:21 41:1 42:2

**John** 4:7

**Johnson** 10:14 50:6

**join** 55:15

**jointly** 46:5

**judge** 7:20 8:2,8,13,16 9:2 11:3,8,11, 18,19,24 12:2,3,6,9,12, 13,17,19,23, 24 14:20 17:13 18:3, 20,21,23 19:6,19 22:4, 8 23:1,3,6,19 24:11,13,14, 17,24 25:3,4, 9 26:9 27:4, 24 28:9 29:6, 19 30:11 31:22 32:15

33:6,9,13 35:22 37:3,6 39:3 40:3,17 41:4,5,12 42:3,5,24 43:5,10 44:12,14,17 46:6,14,17 47:15 48:1,5, 20,21 49:2,22 50:11 51:2,14 54:17 56:1,6 58:10 60:19, 22 61:5,6,10 62:8,12 63:6, 19,20 64:8,19 65:1,5,6

**judge's** 40:21 46:4,14 50:11

**judges** 8:18 12:11 22:12, 15,19,21 38:17

**K**

**Keenan** 15:12

**kind** 60:14

**Kirby** 16:5

**knew** 18:13 19:16,19,22 39:15,16 57:19,24 60:13

**Kyle** 15:12

**L**

**lasted** 35:17

**law** 4:14 22:5 24:8,15 27:9, 11 32:16 34:11 41:20 45:23 55:8 61:12

**lawyer** 4:9 52:15

**lawyers** 15:3, 9 16:3 18:10

**leave** 6:17 58:15

**left** 13:11 44:16 53:19 56:9 61:21

**LEPS** 9:17,18

**letting** 28:1

**levels** 8:1

**lieu** 24:16

**Lieutenant** 7:17,21,22 8:10 52:4,17 53:1,13,21 54:8,20,24 65:4

**Lilly** 11:21 12:15 13:5,8, 21 15:2 38:23,24 39:11 52:22 64:4,7

**Lilly's** 13:14

**limit** 62:24 63:6

**lines** 19:5

**literally** 49:4

**litigant** 11:4, 12,24 12:5,24 54:22 63:20 64:9,19 65:2

**litigant's** 40:17

**locate** 48:5

**located** 32:23

**long** 4:22 6:2, 6,20 20:1 35:16 36:2 61:22

**looked** 28:9

**lot** 30:20

**low** 42:20 46:22

**lunch** 30:7

**Lusk** 15:12 44:6

**M**

**made** 20:20 27:3 39:21 57:3 58:14 61:20 66:2

**make** 42:21

**March** 5:7,23 17:4 21:22 22:3,11,14 23:24 24:4 25:7 27:12 46:13 63:21

**marked** 17:5

**Marriott** 9:16

**materials**

10:18

**Matt** 34:24

**Matthew** 4:10 17:3,16 43:22 49:9

**Mcgraw** 65:5

**Mcpeake** 4:1, 12

**memory** 43:8

**mentioned** 45:13

**middle** 32:17, 19

**mind** 16:18 21:22

**minutes** 36:2

**mistakes** 66:1

**mix-up** 60:9

**months** 7:8

**move** 59:18

**N**

**names** 50:5

**nature** 53:11

**necessarily** 9:7

**needed** 9:23 56:19 58:17 60:20

**nervous** 29:14

**note** 4:13

noted 45:11

number 53:9
62:24

**O**

object 26:12
40:9 45:3,9
47:18 49:11

objection
25:11 45:10
46:8 48:9

objections
18:21 31:22

observe 56:1,
6

obtain 20:5
21:6 25:19
35:6

obtained
21:14

obtaining
22:22 24:2

occasion
20:23

occur 29:3

occurred
12:16 15:7
37:6 63:21

occurring
25:6 26:1

office 50:2,11
52:5 53:2,9,
14,18 54:1,9
55:11

officer 10:14
13:22 22:5,24

27:9,12 30:4
31:4 34:12
35:4 39:13
43:2 55:8
57:5,6 58:14
59:3,6,21,22
60:20 61:17

officers 21:3
23:18 30:17,
19,22 31:8,19
34:22 41:20
45:23 61:13

opened 44:19

operations
31:6

opinion 35:12

opposed 24:9

order 60:12

ordered 33:6,
9

orders 7:19
14:12

overheads
10:21

**P**

p.m. 66:5

paperwork
20:14

part 42:10

participated
12:20 20:12
46:5

participating
20:17 56:2

parties 8:4
29:11

people 29:9,
12 30:20,24
34:1 47:4
48:13 57:15,
17,21 58:1,3

percent 46:18

permission
58:6

person 14:8
53:13

personal
36:19 42:14
47:16,23
48:1,6,12,19

personally
20:14 23:19
51:22

pertain 40:7

pertaining
64:18

petitioners
41:6,9

phone 32:2,4,
7,10,14 33:3,
6,18 34:9
35:2,14 36:20
42:18 45:19
47:8,23 48:19
50:4,20 51:5
52:9 53:4,9,
23 58:9

photographs
43:18 48:18,
24

photos 37:24
38:2,4 43:23

56:14

physical 63:6

physically
32:20 59:15

pick 59:15

pictures
43:14

place 5:7 7:9
9:15 10:3
13:9 14:21
17:20,24
32:18 37:7
39:5 51:7
54:18 59:1
62:24

placing 63:6

plaintiff 29:5

plaintiff's 4:9
50:17

played 62:19

pocket 32:12
34:11

point 22:18
26:18 28:23
30:5,16,23
31:7 32:6
36:4 42:16
44:3,16 49:15
53:1 64:13

police 6:13,
18 17:5 20:2,
21 22:24
23:17,18
27:16 30:18
31:18 35:4
39:16

policeman

55:15,19

policies
38:17 40:6

policy 8:7
40:12,14
41:17 64:17

position 7:13
9:3

positive
62:11

possession
32:7,10

powers 27:22

presence
59:10

present 28:8
53:16

presume
52:23

pretty 29:16
46:10 59:11

previous 18:6

primarily 9:1

primary 9:3
41:4 42:5
56:12

prior 6:15
9:4,9 11:16
14:19 15:17,
21 17:21 37:8
45:17,20,24
48:20 61:9

proactively
65:10

procedure
8:7

procedures 40:6

proceedings 63:14

process 21:13,18 22:22 23:10, 24 24:4

property 18:19,22 23:20 24:17 25:10 26:11 31:13,23 33:23 42:14 48:6,12 58:1, 15 59:15 63:7

propriety 51:14

protect 41:2, 9,21 42:2,3 46:14

protecting 46:16 49:2

protection 36:24

provide 25:20 49:21 62:8

provided 18:15 38:7 49:23 50:14

Public 4:3

pull 30:5,8

pulled 29:12

pursuant 44:11

put 34:10 50:2

**Q**

question 8:7 12:21 14:8 21:22 35:11 41:14 46:10 47:20 56:11

questions 4:8 16:19 65:19

quickly 9:24 29:17 38:8

**R**

radio 27:20 30:9 60:9,16

radioed 34:22

Raleigh 4:18 5:3,14 17:8

rank 14:1

re-adjourned 25:2

read 45:6 65:24

ready 8:3

realize 29:10

realized 29:12

reason 8:21 18:3 25:9 30:18 56:13

recall 5:7 9:12,14,19 10:17 15:9, 14,24 16:3,17 18:16 19:9

26:24 29:17 32:22 34:4 35:16,19 38:10 39:14 40:4,8,11,18 42:18 51:16 52:1,6 56:8 58:24 59:23 63:2,8,22

receive 9:8 18:8 51:22 55:4

received 10:18

recently 63:10

recessed 25:1

recollection 16:13,24 18:2 25:12 61:16

record 4:13 32:16 33:11, 14 36:4,6 37:7 48:16 55:2

recorded 42:21 49:14 54:5,10,12

recording 33:20 34:2 36:9,15,23 48:14 49:10, 15,18,20 58:9,10

recordings 34:7

recuse 19:1

referring 57:13

refresh 43:7

regular 7:23 15:8

remember 5:9 25:13,14 39:17 50:1 52:5,8,14 53:7 54:7 59:19 60:8,17 61:19

rephrase 46:10 47:21

Reporter/ notary 4:3

represent 4:9

request 19:7 23:5

requested 21:24 31:18

requesting 65:6

residence 18:14 30:7,8, 10 43:20 49:6 61:6

respondent 29:5

respondents 41:6,9

responding 60:15

response 28:24 64:10

responsibility

42:6

restaurant 30:6

result 55:5

retired 6:12, 16

retrieve 18:14,18 25:15,22 48:5 56:13

retrieved 48:13

reviewed 16:20,21

rid 58:16

rides 57:17

road 60:18

ROBINSON 40:9 47:18 49:11 65:20, 24

role 14:4 46:16

room 8:4 44:13 53:19

roughly 7:8 9:22 20:15

Roush 50:6

rule 42:1

**S**

safe 44:4,16, 19,20 45:14

safety 40:21, 24 41:2,21

46:4,14 47:16 48:1,21 49:2

**scene** 31:19 41:24 60:14

**search** 5:6 19:10,14,17, 20,22 20:5,7, 11,15,18 21:7,11,19, 23,24 22:12, 15,19,23,24 23:2,6 24:2,3, 13,16 25:10, 14 26:14 29:20 30:1 35:7,16 36:10 38:11 44:24 45:4,12 49:21 59:12

**searches** 37:5 40:2

**searching** 23:19

**Secondarily** 41:3

**secretary** 50:9

**security** 9:11

**seek** 20:5

**seize** 32:3

**seized** 32:2 45:20

**send** 31:3

**sending** 10:12

**sense** 63:23 64:22

**September** 7:7

**Sergeant** 11:20 12:15 13:5,8,14,20 15:2 38:23,24 39:10 52:22 64:4,7

**serving** 65:16

**set** 56:10

**setting** 46:20

**settled** 38:8

**sheriff's** 4:18, 20 5:3,14 13:17 17:9 50:10 55:11

**shirt** 32:12

**show** 31:8 45:23

**showed** 31:10,13 44:20 45:14

**Shuck** 12:3,6, 9,13,20,23,24 13:9 14:20 16:10 37:3,6, 21 39:3 43:10 48:20 61:11 64:4,8 65:5

**Shuck's** 48:21 49:2

**sick** 8:20

**sides** 57:16

**sit** 65:9

**sitting** 54:8

**situation** 25:5

**sloppy** 46:11

**small** 29:7

**smart** 30:21

**solely** 25:10

**somebody's** 11:8 48:24

**someone's** 35:7 55:2

**sorts** 14:21

**sounds** 10:2

**speak** 23:4 28:12

**specific** 9:6 18:15,17

**specifically** 40:7

**speeding** 55:13

**spoke** 18:23

**Stafford** 7:17, 21,22 8:10 52:4 53:2,21 54:20,24 65:5

**Stafford's** 52:17 53:13 54:8

**stairs** 56:10

**standing** 32:20 33:1,22

**start** 16:14 36:22 46:23

**started** 7:6,9 29:17 36:6

**state** 4:11

**stated** 46:17

**stayed** 44:13 56:22

**stood** 42:9

**stop** 33:20

**strike** 6:3 46:9

**stuck** 32:11

**Stump** 31:11 57:5,6 58:14, 21 59:4,6,8, 21 60:4

**subcommitte e** 9:17

**supervising** 21:2 23:17

**supervisor** 7:16 14:4,16, 17 28:4,15 52:20 64:13

**supervisors** 16:9 38:15 65:10

**supervisory** 21:1

**supposed** 53:7

**Supreme** 45:7 51:20 53:3 54:1,6

**surveillance** 47:1

**swing** 29:18

**sworn** 4:2 27:11

**T**

**taking** 14:21 17:24 47:1,5 48:24

**talk** 12:14 28:7 32:5 63:13

**talked** 29:19 39:1 52:13 61:20

**talking** 16:14 43:5 52:6 63:5

**taught** 41:17

**television** 49:14,16

**tells** 64:22

**term** 45:4

**testified** 4:4 62:1

**testifying** 16:18

**testimony** 62:7 63:17 64:3,16

**thing** 30:21 49:8

**things** 31:1 56:2

**thinking** 9:24 16:5

**thought** 57:22

**threat** 27:3,6

**threatened**
26:22 27:1
45:17

**time** 8:19
11:2,7 13:12,
13 14:2,5,16,
18,19 15:21
19:16 20:13
23:16 24:23
28:6 30:7
32:21 33:2
34:9,19,21
35:20,22
43:16 45:13
52:8 59:11
60:3,7 61:3
64:11

**timely** 19:7

**times** 22:7
43:14,15,18
61:10 62:20

**title** 4:23

**today** 4:15
5:2,21 15:18
16:14 37:19
64:16 65:9

**Todd** 16:5

**told** 11:22
23:14 32:15
33:13 34:5
38:9 39:12
40:19 44:18
51:4 52:12
53:5,24 54:7
57:2,6 58:16,
18 63:18,22
64:7

**touching**
59:19

**training** 9:6
10:12

**traveled** 11:3,
11 12:4,23

**traveling** 18:3

**true** 18:22

**TULLY** 25:11
45:3,8 46:8
48:9 65:22

**turn** 34:5

**Twenty** 6:22
20:3

**type** 5:10,16
14:8

**typically** 30:5
42:19

**U**

**Uh-huh** 27:19
36:16 39:2
50:13 61:2
62:6

**undergo** 9:5

**understand**
12:21 47:20
63:17 64:12

**understandin
g** 58:5,13
62:22

**understood**
40:15

**uniform** 4:14
5:2,4,11,17
34:16

**unit** 61:7

**units** 20:22

**unsure** 24:8

**unusual**
14:24 15:1,4

**unwritten**
40:15

**V**

**vehicle** 17:11

**verbally**
18:20

**video** 38:1
43:14,24
46:21 49:10
50:16 51:2,4
58:9 62:2,8,
12,14,19,23
63:9

**videos** 37:10,
23

**visit** 12:18,19
15:13

**visited** 61:10

**visits** 40:2

**voiced** 18:21
31:22

**voluntarily**
26:9,12

**W**

**waive** 66:2,3

**walking**
29:17 44:7

**wanted** 25:9
42:20

**warrant**
19:10,14,17,
20,22 20:5,8,
15,18 21:11,
23 22:23
23:1,2,6
24:13,16
29:20 30:1

**warrants**
20:11 21:7,19
24:2,3 38:11

**watched** 42:9
63:9

**wearing** 4:14
5:2,10,16

**Weekly** 12:10

**White** 31:11
59:22 61:17

**wife** 18:6

**winter** 10:1

**wit** 4:4

**witnesses**
29:11 57:16

**work** 6:4 8:1,
12 20:1 38:22
50:1,8

**worked** 6:23
7:3 8:15,17
10:15 20:13

**working** 6:14
7:12 11:13,16

**works** 11:20

**written** 10:18
40:5,14 64:17

**wrong** 62:21

**Y**

**yard** 32:24
33:2 61:1

**years** 4:24
6:8,9,11,16,
22 7:2 20:3,4