1        IN THE UNITED STATES DISTRICT COURT FOR THE

2            SOUTHERN DISTRICT OF WEST VIRGINIA

3                      AT BECKLEY

4
    * * * * * * * * * * * * * * * * * * * * * * * *
5
    MATTHEW GIBSON,
6
            Plaintiff,
7
    vs.                                CIVIL ACTION NO.
8                                      5:21-cv-00181
    LOUISE E. GOLDSTON, Individually,
9   COUNTY COMMISSION OF RALEIGH
    COUNTY, a political subdivision,
10  JEFF MCPEAKE, Individually,
    BRIAN WHITE, Individually,
11  BOBBY STUMP, Individually,
    KYLE LUSK, Individually,
12
            Defendants.
13
    * * * * * * * * * * * * * * * * * * * * * * * *
14

15

16          Deposition of BOBBY STUMP taken by the
    Plaintiff under the Federal Rules of Civil
17  Procedure in the above-entitled action, pursuant to
    notice, before Bradford L. Cooper, a Notary Public,
18  at Pullin, Fowler, Flanagan, Brown, and Poe, PLLC,
    252 George Street, Beckley, West Virginia, on the
19  1st day of March, 2022.

20

21          REALTIME REPORTERS, a Huseby Company
        BRADFORD L. (Brad) COOPER, Notary Public
22                  713 Lee Street
                Charleston, WV  25301
23                  (304) 344-8463
                realtimereporters.net
24



800.211.DEPO (3376)
EsquireSolutions.com

```
 1              APPEARANCES:

 2
     APPEARING FOR THE PLAINTIFF:
 3
              John H. Bryan, Esquire
 4            JOHN H. BRYAN, ATTORNEYS AT LAW
              411 Main Street
 5            P.O. Box 366
              Union, West Virginia 24983
 6            jhb@johnbryanlaw.com

 7
     APPEARING FOR THE DEFENDANTS STUMP, MCPEAKE, AND
 8   WHITE:

 9            Kevin J. Robinson, Esquire
              PULLIN, FOWLER, FLANAGAN, BROWN,
10             AND POE, PLLC
              252 George Street
11            Beckley, West Virginia 25801

12
     APPEARING FOR THE DEFENDANT, LOUISE E. GOLDSTON:
13
              Jennifer E. Tully, Esquire
14            BAILEY & WYANT, PLLC
              500 Virginia Street East, Suite 600
15            P.O. Box 3710
              Charleston, West Virginia 25337-3710
16

17   APPEARING FOR THE SUPREME COURT OF APPEALS OF WEST
     VIRGINIA:
18
              Bradley Schmalzer, Esquire (via telephone)
19            Julianne Wisman, Esquire (via telephone)

20
     ALSO PRESENT:
21
              Louise Goldston, Defendant
22            Matthew Gibson, Plaintiff
              J.R. Morgan
23

24
```



```
 1                  EXAMINATION INDEX

 2

 3          BY MR. BRYAN                        5

 4

 5

 6

 7

 8

 9

10

11                  OBJECTION INDEX

12   BY MR. ROBINSON                        21
     BY MR. ROBINSON                        25
13   BY MR. ROBINSON                        26
     BY MR. ROBINSON                        27
14   BY MR. ROBINSON                        28
     BY MR. ROBINSON                        30
15   BY MR. ROBINSON                        44
     BY MR. ROBINSON                        46
16   BY MR. ROBINSON                        57
     BY MS. TULLY                           59
17   BY MR. ROBINSON                        59

18

19

20

21

22

23

24
```



```
 1              P R O C E E D I N G S
 2              COURT REPORTER:  This is the
 3   deposition of Bobby Stump in the matter of Matthew
 4   Gibson versus Louise E. Goldston, et al., taking
 5   place at the offices of Pullin, Fowler, Flanagan,
 6   Brown, and Poe in Beckley, West Virginia on this
 7   1st day of March, 2022.  The time is 12:57 p.m.  We
 8   are now on the record.
 9              This case is venued in the United
10   States District Court for the Southern District of
11   West Virginia at Beckley, being Civil Action No.
12   5:21-cv-00181.
13              My name is Brad Cooper on behalf of
14   Realtime Reporters, located at 713 Lee Street in
15   Charleston, West Virginia.  I am your court
16   reporter and a Notary Public.
17              At this time, would counsel please
18   state their appearances and whom they represent and
19   then I'll swear in the witness.
20              MR. ROBINSON:  Kevin Robinson on
21   behalf of Defendants Stump, White, and McPeake.
22              MS. TULLY:  Jennifer Tully on behalf
23   of Defendant Judge Louise Goldston.
24              MR. BRYAN:  John Bryan on behalf of
```



```
 1   the Plaintiff, Matthew Gibson.
 2            MR. SCHMALZER:  Bradley Schmalzer and
 3   Julianne Wisman with the Supreme Court of Appeals
 4   of West Virginia.
 5            (The witness was sworn.)
 6             B O B B Y   S T U M P
 7   was called as a witness by the Plaintiff, pursuant
 8   to notice, and having been first duly sworn,
 9   testified as follows:
10                     EXAMINATION
11   BY MR. BRYAN:
12       Q.  Please state your name.
13       A.  Bobby Stump.
14       Q.  And how are you employed?
15       A.  Raleigh County Sheriff's Office.
16       Q.  And you're still employed there?
17       A.  Correct.
18       Q.  As a sworn law enforcement officer?
19       A.  Correct.
20       Q.  A deputy, basically?
21       A.  Correct.
22       Q.  And what sort of work do you do right now?
23       A.  I'm a sergeant.  I'm a supervisor and I'm
24   in charge of the K-9 Narcotic and Apprehension.
```



1  K-9s.

2      Q.  And for the record, you were in the room

3  for the deposition of Judge Goldston here this

4  morning?

5      A.  Correct.

6      Q.  And you listened to the questioning and the

7  answer session that took place in that deposition?

8      A.  Correct.

9      Q.  So at some point, as Judge Goldston

10  testified, you had served as her bailiff.

11      A.  Correct.

12      Q.  Do you recall how many years?

13      A.  Ten-ish.  Around ten, give or take a little

14  bit.

15      Q.  And when did you -- when did you last work

16  as a bailiff for Judge Goldston?

17      A.  I'm not for sure.  Three or four years ago.

18  I'm not for sure.

19      Q.  She testified that you had been present

20  with her on at least one prior visit to the home of

21  a litigant.  Do you recall that?

22      A.  Numerous times I've been with Judge

23  Goldston.  Yes.

24      Q.  Okay.  So numerous times you have gone with



1  Judge Goldston to the homes of litigants?

2       A.  Correct.

3       Q.  In cases presiding in front of her.

4       A.  Correct.

5       Q.  Do you have any estimation about how many

6  times?

7       A.  I was Judge Goldston's primary bailiff for

8  ten years but I also worked with Judge Lazenby,

9  Judge McGraw, Judge Shuck, and numerous other

10  judges that filled in, so -- and all the judges

11  have sent me to homes to get children, four-

12  wheelers, vehicles throughout; over 1,000 divorces.

13          So there's no possible way to put my finger

14  on how many.  It'd be total speculation.

15       Q.  All right.  Well, we're talking about a

16  judge personally going somewhere, not ordering a

17  deputy to go somewhere.

18       A.  Correct.

19       Q.  How many prior occasions, to your

20  recollection, did you, personally, go with or

21  observe a judge go into the home of a litigant?

22       A.  There's no way I could -- over thousands of

23  divorce cases, I don't remember the litigants'

24  names.  There's no way I could give you an accurate



1  number.  I mean, I have no idea.

2      Q.  Did you ever go to the home of a litigant

3  with any judge other than Judge Goldston?

4      A.  I'm thinking yes but I -- there again --

5  and over ten years, I've done so many things of

6  being a bailiff in Family Court and been to so many

7  jury views through Circuit Court that, you know,

8  it'd be speculation for me to guess.

9      Q.  Well, I'm not asking you about jury views

10  in Circuit Court.

11      A.  I understand that.

12      Q.  That's not what we're here about today.

13  I'm talking about you working as a bailiff in

14  Family Court.

15      A.  Exactly.  Yeah.  I understand and I'm

16  telling you that with the numerous family court

17  judges that I worked with, yes, it's a possibility

18  but I can't remember if it's -- you know, if it was

19  just Judge Goldston every time or other judges.

20  I'm not 100-percent sure if I went with any other

21  judges.

22      Q.  Well, you remember, for a fact, that you

23  went to -- went with Judge Goldston on one of these

24  visits.



1    A.   Numerous.  Yes.

2    Q.   But you can't recall for a fact the

3  identification of any other judge that you went to

4  the home of a litigant personally with?

5    A.   I can't think of anything off the top of my

6  head but I am not saying that I have not been to a

7  home with another judge because that's a very

8  distinct possibility.

9    Q.   Did you -- did you ever serve as a bailiff

10 for Judge Shuck?

11    A.   Yes.

12    Q.   And did you ever -- do you recall ever

13 going with Judge Shuck to the home of a litigant?

14    A.   Not off the top of my head but it's a

15 distinct possibility that I could have.  But, there

16 again, I've set through thousands of these hearings

17 so I don't remember exactly if I have or not but

18 there's a possibility I have.

19    Q.   All right.  What is your job description

20 when you're serving as a bailiff?

21    A.   My only job description, which is how I

22 trained all the people that worked under me, is the

23 three rules of being a bailiff:  Safety, safety,

24 safety.  And that's the judge's safety.



1        That's my only -- of course, keeping

2   control of the courtroom but my No. 1, No. 2, and

3   No. 3 top rules was the judge's safety and I took

4   pride in that, and that's my No. 1 goal and what I

5   teach everyone is the judge's safety.

6        Q.  Okay.  So your No. 1 priority when you're

7   serving as a bailiff is to protect the physical

8   safety of the judge.

9        A.  Correct.

10       Q.  And, in fact, you not only have served as a

11  bailiff for a long time but you had trained other

12  law enforcement officers to work as a bailiff.

13       A.  Correct.  I was the stable for 10-ish

14  years.  I was the stable one there.  They would

15  send me new ones every six months, a year, two

16  years.  I went through a plethora of different

17  deputies and civilians that were bailiffs.  So I

18  was the stable there for many years.

19       Q.  And do you recall giving other bailiffs or

20  trainees any sort of instructions or guidance on

21  traveling to the home of a -- of a litigant?

22       A.  Pretty simple.  If the judge tells you to

23  do it, you do it and you don't ask questions.

24       Q.  So if there's -- say if there's a variance



1  between your policies or your rules as a deputy and

2  what the judge tells you to do, who -- I mean, who

3  wins?

4      A.   The judge always wins.  The judge is the

5  boss.  The judge is the supervisor.  Whatever the

6  judge says, you do.

7      Q.   Okay.  So if the -- if the -- if your

8  supervisor, your sheriff at the Sheriff's

9  Department, tells you not to go with the judge

10 somewhere and the judge tells you to go with her

11 somewhere, you listen to the judge?

12     A.   Hypothetically, if the sheriff come and

13 said, "Don't do this," then the judge would -- any

14 judge would never put me in that situation.

15          But the sheriff, when you're a bailiff, the

16 first thing to do -- one of the first things they

17 tell you is to do what the judge tells you, you're

18 in -- the judge is your boss.

19          So from every sheriff I've ever worked with

20 - there's been three or four - that, you know, the

21 judge is -- the judge is the one in charge.

22     Q.   But your employer, technically, at all

23 times, was the Raleigh County Sheriff's Office.

24     A.   Correct.



1    Q.  Is it Office or Department?

2    A.  Whichever.  It's about 50/50, really.

3    Q.  So you follow the judge's instructions but

4  she's not your employer, the Sheriff's Department

5  is.

6    A.  Yes.  The Sheriff's Office is the one that

7  signs my paycheck.  Yes.  But I work for the judge,

8  no matter which judge it is.

9    Q.  Do you recall having any conversations with

10  Judge Goldston about going to the homes of

11  litigants in cases before her?

12    A.  Yes.  Yes.  Numerous.  Like I said, we've

13  been there numerous times.

14    Q.  What types of conversations?

15    A.  We're going -- well, I would be in the

16  hearing so I would know that we were going to the

17  home and, really, when I say conversations, I don't

18  want to sound arrogant but Judge Goldston and I

19  didn't have to have conversations in the courtroom,

20  we didn't have to have conversations at

21  Mr. Gibson's house because she knew I would do my

22  job and I knew what to do.

23        And she didn't have to have conversations

24  and instruct me because I would have it done before



1  she even thought about it and she knew that.  We

2  worked very, very, very, very well together.

3      Q.  So you -- it sounds like you -- you did

4  more than just ensure her physical safety.  You

5  helped her with other things.

6      A.  That is very safe to say.  Yes, sir.

7  Numerous things.  Yes.  We've been through a lot.

8      Q.  So when -- when she would go to the home of

9  a litigant, you would drive her there?

10     A.  Yes.  She always rode with me.

11     Q.  And you had, like, a police cruiser?

12     A.  Correct.

13     Q.  That would say Raleigh County Sheriff's

14  Department on it?

15     A.  Correct.  Most of the time it was a marked

16  cruiser.  Correct.

17     Q.  Okay.  And then you would be in uniform?

18     A.  Correct.

19     Q.  And did you have arrest powers and a gun?

20     A.  I've always -- yes, sir.  Ever since I was

21  sworn in, I've had arrest powers and a gun.

22     Q.  Do you recall ever actually arresting

23  somebody when you were with Judge Goldston?

24     A.  I've arrested dozens of people when I was



1  with Judge Goldston.  What are you referring to as

2  being with -- I mean I've arrested people out of

3  the courtroom, in the hallway.  I mean, I've

4  arrested dozens and dozens and dozens of people

5  with Ms. Goldston.

6      Q.  Okay.  What about at the home -- at

7  somebody's house?

8          At the home of a litigant, do you recall

9  ever making an arrest?

10     A.  No.  But, there again, in ten years with

11 thousands of cases in the ten years, hundreds of

12 arrest, you know, it's hard to recall every time

13 I've arrested someone.

14     Q.  Have you ever observed Judge Goldston in

15 somebody's house actually searching for items of

16 personal property?

17     A.  No.  No.  When --

18     Q.  What --

19     A.  I'm sorry.

20     Q.  What was she generally doing when you -- I

21 mean, you -- well, let me back that up to be fair.

22         Have you ever observed Judge Goldston

23 actually in somebody's house?

24     A.  Yes.  We've been there.  Yes.



1    Q.  All right.  So, to your recollection, what

2  was -- what was the judge doing inside these homes?

3    A.  I was most -- when I went, I would be the

4  organizer and we would have the list and there'd

5  mostly be, you know, attorneys on each side or

6  sometimes they would be pro se -- very rarely.

7         And I would have the list and it was

8  equitable distribution, which has already been

9  worked out in court.  And it'd say, hey, the wife

10  gets this, the husband gets this, and I would have

11  the list and I would say, "Okay.  I found the

12  chainsaw," and the wife would get the chainsaw.  I

13  found the dishes and the husband would get the

14  dishes.

15         So I was the one that usually orchestrated

16  -- I didn't orchestrate that.  Judge Goldston

17  always orchestrated everything but I would be the

18  one that would have the list and mark it off and

19  let her know that I -- or that the litigant had

20  found whatever they were looking for.

21    Q.  Well, you said that you found.  It sounds

22  like you were saying that you were actually finding

23  these items.

24    A.  No.  I would have the list and the litigant



1  would looked for whatever was on the list and I

2  would mark it on the list, and I would usually keep

3  track of that.

4      Q.  Okay.  Did you ever actually do any of the

5  looking for items yourself?

6      A.  Yes.  Numerous times.  All the judges sent

7  me out to look for items.  In the middle of a court

8  hearing they would send me out to look for items at

9  a home.  I mean, in the middle of court hearings

10 I've been sent out of the hearing to go get kids in

11 in the middle of the hearing, to look for kids, to

12 track down kids.  That's happened dozens of times.

13          So, yes, I've looked for items right in the

14 middle of a court hearing to be sent to someone's

15 home.

16     Q.  Have you ever observed Judge Goldston

17 actually looking for items inside someone's house?

18     A.  No.  She was the organizer of the hearings

19 and in charge of the hearings.

20     Q.  What does that mean?

21     A.  It means usually she would sit with the two

22 attorneys and I would be with the litigants, and I

23 would have a list, the attorney would have a list

24 -- both attorneys and the judge would have a list,



1  and they would say he gets this, she gets that, and

2  I would make sure that when they found something,

3  that, "Hey, they found this," and mark it off the

4  list, and I would report it to the judge and report

5  it to both attorneys.

6      Q.  Did you ever film or record?

7      A.  I would never do that.

8      Q.  Did you ever -- do you ever recall that

9  coming up?  Like anyone trying to or asking to or

10 --

11     A.  I would not have let that happen.

12     Q.  Why not?

13     A.  Because the judge is the only one that

14 records a hearing.  That's -- that's a big no-no

15 and that's just not something that I would've

16 treaded on.

17     Q.   So did the judge record any of those

18 so-called hearings?

19     A.   Not that I'm aware of.  There was really no

20 way to record hearings because the only way we

21 could do it was on the video in the courtroom.

22     Q.  Okay.  And did anyone have cellphones?

23     A.  Correct.  Yes.

24     Q.  But they -- they -- you're saying they



1   couldn't have used their cellphones to record?

2       A.   I'm sure they could've but if I seen

3   someone doing that - an attorney or anyone else

4   besides the judge - I would've took their cellphone

5   immediately.

6       Q.   You didn't -- you didn't hear the judge

7   allow it?

8       A.   No.  We didn't even have to speak about

9   that because I knew that wasn't allowed, since day

10  one, so that was a big thing.  We even had people

11  in our courtrooms trying to -- at different times

12  trying to record the hearings when judges -- one of

13  the judges was having hearings and I would take

14  their phones.

15          So, no, that was a basic 101.  No

16  recordings allowed.

17      Q.   But those hearings were recorded already.

18      A.   From the judge.  Correct.  The judge is the

19  only one that can record hearings.

20      Q.   But when these hearings went to inside

21  people's houses, no recordings were being made, to

22  your recollection.

23      A.   Not to -- no.  Not to my knowledge.

24      Q.   There was no court reporter there or



1  anything like that.

2      A.  In Family Court, we've never had a court

3  reporter.

4      Q.  Did you train Bailiff McPeake?

5      A.  No.  When I left the Family Court, he was

6  hired under grant money as a retired Beckley city

7  officer, so I did not train McPeake.

8      Q.  So when he came on, do you know -- I mean,

9  would there have been some sort of written handbook

10 or anything like that?

11     A.  No.  No.  He would've shadowed another

12 deputy -- another bailiff, and that bailiff

13 would've trained him, just like I had done numerous

14 times before.

15     Q.  Did you ever have any conversations with

16 Deputy -- or -- yeah -- Deputy McPeake about

17 working as a bailiff?

18     A.  Yeah.  I called him when he got the job and

19 congratulated him and told him what I thought of

20 Judge Goldston and what I expected of him, and

21 that, you know, he needs to take good care of her.

22         So, absolutely.  Everybody she had after

23 me, I'd always call and give them the same speech.

24 I never told her that but, you know, that was just



 1   me.

 2      Q.   And did you ever have any discussions with

 3   McPeake about the judge going out to people's

 4   homes?

 5      A.   No.   I didn't train him.   If I trained him,

 6   I would have.

 7      Q.   And what would you have said?

 8      A.   If the judge says go, go.   You don't call a

 9   supervisor.   You don't do anything.   The judge is

10   in charge.   And, I mean, I would have done things a

11   whole lot differently than McPeake did.   I'm not

12   casting stones at McPeake but half of this wouldn't

13   have been an issue if I would've been the bailiff.

14      Q.   Okay.   What do you mean?   What would you

15   have done differently?

16      A.   When we arrived, Judge Goldston knows when

17   I was there, I wouldn't have let her out of the car

18   until I secured the area.   No one would be out of

19   their vehicles until I secured the area.   I

20   would've gotten rid of every single person there,

21   except for Mister -- your -- the Defendant and his

22   wife -- or the Plaintiff and his wife, and that

23   would've been the only two people there besides the

24   attorneys.



1        I would not have allowed -- the second I

2   arrived on scene, I evacuate everybody because the

3   first three rules:  Safety, safety, safety of the

4   judge.

5        Q.  Well, the judge just testified earlier that

6   she didn't feel that her physical safety was

7   compromised on March 4th, 2020.  So what was the

8   problem with how Deputy McPeake handled it?

9             MR. ROBINSON:  Object to the form.

10  You can go ahead and answer.

11       A.  I'm not saying there was a problem.  I'm

12  not trying to throw stones at Deputy McPeake.  I

13  would have just handled it differently and Judge

14  Goldston knows I would've handled it differently.

15            For the safety of the judge, I can only

16  keep my eyes on so many people, so I would not have

17  allowed anyone there and when Mr. Gibson's attitude

18  with his sense of anger, I would have pulled him to

19  the side and took care of that well before he ever

20  approached the judge.  He would not have been

21  allowed to approach the judge at all until I made

22  sure he was calm.

23       Q.  Okay.  Now, you weren't -- you didn't

24  witness -- what you're telling me about right now,



1  you were not there to witness.  Correct?

2      A.  Oh, I witnessed his anger.  Certainly I

3  did.  As soon as I walked in the door of the house,

4  he come straight to me.

5      Q.  Of his house.

6      A.  Of his house.  Correct.

7      Q.  Okay.  You weren't there.  You're telling

8  that you wouldn't have let Mr. Gibson approach the

9  judge.

10     A.  No, sir.

11     Q.  You weren't there when he first approached

12  the judge in his front yard.

13     A.  No, sir.  I was not.

14     Q.  Just make sure you let me finish the

15  question --

16     A.  Yes, sir.

17     Q.  -- and I'll give you time to answer

18  because, remember, there's a court reporter.

19     A.  Yes, sir.

20     Q.  So what you're telling me about and your,

21  sort of, critique of Deputy McPeake, this is based

22  on the video footage?

23     A.  Video footage and all that I've learned and

24  investigated through what had happened.  And I'm



1  not critiquing Deputy McPeake.  I'm just stating I

2  would have done things a little different.

3       Q.  All right.  So when you watched the video

4  footage that showed Mr. Gibson approach the judge

5  as we see on the video, which you've seen, you

6  wouldn't have allowed that to happen.  You wouldn't

7  have allowed Mr. Gibson to approach Judge Goldston.

8       A.   Not in that matter, no, I wouldn't have.

9  I've arrested people in the courtroom and took them

10 down for a lot lesser approaching the judges of

11 standing up in your chair and -- you know, in the

12 middle of the courtroom and I just -- I would not

13 have let that happen.

14      Q.  But they weren't in a courtroom.  They were

15 in Mr. Gibson's front yard.  Correct?

16      A.   Correct.  Yes, sir.

17      Q.  Okay.  So you think that Mr. Gibson never

18 should have approached the judge in the first

19 place?

20      A.   I didn't say that.  I said if I'd have been

21 there, he wouldn't have approached the judge in

22 that manner.

23      Q.  Okay.  And what else -- what else would be

24 different if you were the bailiff instead of



1  McPeake?

2     A.  I would've secured the scene before anyone

3  got out of the vehicle and, like I said, there

4  would only have been four people there - five

5  people, counting me.

6     Q.  "Secure the scene."  What does that mean?

7     A.  Secure the scene meaning all the people

8  that were there - the correctional officers, prison

9  guards that were there on his behalf, the

10  girlfriend that was there, the Payne family that

11  was there -- they, before the judge got out of the

12  vehicle, they would have been forced to leave, and

13  the only people on that property when my judge got

14  out of the vehicle, no matter who it was -

15  especially Judge Goldston - would have been the

16  judge, the attorney, the husband and wife, and the

17  bailiff.

18     Q.  And how would that have changed things?

19     A.  How would it have changed things not having

20  8 or 10 people there arguing and just having the

21  Plaintiff and the Defendant there?  Is that what

22  you're asking me?

23        Because I wouldn't have had to keep an eye

24  on two prison guards that were there on your -- on



1  his behalf, and then I wouldn't have to keep an eye

2  on the Payne family that was there on their

3  daughter's and their sister's behalf, and watching

4  all these people.  I could have focused on my judge

5  and my judge only, with the attorney and the two

6  litigants.  That's how that would have been.

7      Q.  And how would that -- how would that have

8  -- how would that have changed the result of what

9  happened that day?

10     A.  I didn't say -- you asked me how it would

11  have changed the result of her safety.  That's what

12  I took it as.  I have nothing to do with the result

13  of the hearing.  I don't care about the results of

14  hearings.  I care about my judge's safety.

15     Q.  Well, there was no safety problem, was

16  there?

17             MR. ROBINSON:  Object to the form.

18  You can answer.

19     A.  Yes.  In my opinion, there was.

20     Q.  All right.  What was the safety problem?

21     A.  When I got there, the judge being

22  surrounded by people that didn't have no business

23  being in a hearing and your client's attitude --

24  forthcoming attitude, approaching the judge in her



1  comfort judge, in my comfort zone, that, if I

2  would've been in charge, there wouldn't have been o

3  one invading her private zone or approaching her in

4  the way he did.

5     Q.  All right.  Well, let's separate what you

6  saw on the video with what you actually observed

7  that day.

8     A.  Okay.

9     Q.  All right?  Because I know you showed up at

10 some point.

11    A.  Correct.

12    Q.  So I don't want to conflate those two

13 things.

14    A.  Yes, sir.

15    Q.  And we'll get to -- we'll get to what you

16 observed when you got there but, to be clear, it

17 sounds like you're saying to me that had you been

18 the bailiff rather than McPeake, there wouldn't

19 have ever been this video showing Mr. Gibson

20 confronting the judge in his front yard and asking

21 for a search warrant.

22          MR. ROBINSON:  Object to the form.  If

23 you understand the question.

24    Q.  Do you understand what I'm saying?



1    A.  No clue.

2    Q.  Let me rephrase that.  The judge said she

3 didn't think there was a safety problem there.  You

4 sound like, in my words, you were being critical of

5 her bailiff for how it went down.

6       My take on what you're saying is that had

7 you been that bailiff, we'd never have this video

8 showing Mr. Gibson confronting the judge about

9 going inside his house.

10          MR. ROBINSON:  My question is:  Are

11 you asking him whether or not Mr. Gibson would have

12 confronted Judge Goldston or whether or not there

13 would have actually been a video being taken?

14 That's my objection to the form of it.

15          MR. BRYAN:  Yeah.  All right.  Well,

16 fair enough.

17 BY MR. BRYAN:

18    Q.  When you watched -- let me back that up

19 some.  When you watched the video showing what

20 happened in the front yard, you didn't like what

21 you saw, did you?

22    A.  No.  At to be a little more -- break it

23 down a little bit more, I wouldn't even let my

24 judge walk out into the waiting room or to the



1  other courthouse without me.  When she was in that

2  courthouse - courtroom - she wasn't -- and she'll

3  tell you this -- she wasn't -- I would freak out if

4  she would just walk in the waiting room to talk to

5  an attorney.

6        So I went overboard a little bit when it

7  come to protecting my judges but I had zero

8  instances where she was ever in danger.  So I'm not

9  critiquing McPeake and saying he did anything

10  wrong.  I'm just saying I would have done things

11  differently for the safety of my judge.

12  Q.  So perhaps this is a better way to ask what

13  I'm trying to ask here.

14        Had you been the bailiff, it sounds to me

15  like we wouldn't have any video footage of -- let

16  me finish -- we wouldn't have any video footage of

17  Mr. Gibson going up to the judge and asking her to

18  recuse herself.

19            MR. ROBINSON:  Object to the form but

20  you may answer it.

21  A.  That would've been the first thing I'd done

22  is secure the cellphones and make sure nobody was

23  recording, and she wouldn't have had to told me

24  that she knows she wouldn't have had to told me



1  that because that's how we conducted all of our

2  hearings.

3        So, yes, the first thing I'd have done is

4  take all the cellphones and make sure nobody was

5  recording before anyone ever even got out of their

6  vehicle.

7     Q.  In which case, even the Supreme Court,

8  nobody would be able to look at any sort of

9  recording, any sort of video footage, in order to

10  see what happened that day and what didn't happen.

11     A.  I guess if there's no recording, no one

12  could look at a recording.  I mean, if they didn't

13  record, they couldn't look at the recording that

14  wasn't recorded.

15     Q.  And that's how you would've done it?

16     A.  Correct.  Yes, sir.

17     Q.  And that's how you did it in the past as

18  bailiff for Judge Goldston?

19     A.  That's how I did it in every single hearing

20  I've ever been in with Judge Goldston and every

21  Family Court judge.

22     Q.  So all those prior visits to the homes of

23  litigants that you went with Judge Goldston to,

24  there are -- there's no recordings that anyone



1  could look at, including disciplinary authorities

2  or the Supreme Court or whomever, to see what

3  happened or what did not happen?

4          MR. ROBINSON:  Object to the form.

5  Also, lacks the proper foundation as you have not

6  asked him whether or not anybody ever tried to

7  record other hearings.

8          You understand why I'm objecting your

9  form?  I'm not understanding what your questions --

10          MR. BRYAN:  I understand.  You're

11  keeping me -- you're keeping me logical here.

12          MR. ROBINSON:  Okay.

13          MR. BRYAN:  Let me back it up.

14          MR. ROBINSON:  Can you understand me

15  with that mask on?

16          COURT REPORTER:  Sure.

17          MR. ROBINSON:  Okay.  Just wanted to

18  make sure.

19  BY MR. BRYAN:

20     Q.  During the -- during the time period in

21  which you served with -- for Judge Goldston --

22     A.  Yes, sir.

23     Q.  -- during these home visits that you've

24  testified about, there were no recordings



1   documenting what happened during those home visits.

2       A.   To my knowledge, there was no recordings.

3       Q.   And, in fact, it was your -- your policy,

4   your practice, to make sure that there were no

5   recordings.

6       A.   It was not my policy.  It was the Family

7   Court rules policy and Judge Staton informed me of

8   that Day 1 -- I'm sorry -- forgive me.  Judge

9   Goldston --

10              MS. GOLDSTON:  You used to be right.

11      A.   -- informed me, you know, that was Bailiff

12  101.  So it wasn't my policy.  It was the Family

13  Court's policy.  So, therefore, it was their

14  policy.  I was going to enforce whatever policy any

15  of my judges told me.  No questions asked.

16      Q.   But the Family Court's policy is that the

17  hearings are recorded.

18      A.   Correct.  By the judge and the judge only.

19      Q.   Okay.  And you knew that these other

20  visits, that the judge was not recording them?

21      A.   I didn't physically see her recording them

22  but I never asked her, "Hey, are you recording this

23  hearing?"  Because I would never question a judge.

24      Q.   Did you -- did you ever -- well, let me ask



1  you first:  During the period of time in which you

2  served as a bailiff for Judge Goldston, did you

3  have a supervisor or were you basically your own

4  supervisor?

5      A.  I was usually the second in charge but,

6  yeah, I usually had a supervisor.

7      Q.  Who was that?

8      A.  Let's see.  Skee Barley.  Jimmy Miller.

9      Q.  Well, rather than going through them --

10     A.  I mean, I just -- I've had so many

11  different --

12     Q.  Hang on.  Rather than going through all

13  those, do you recall ever having any conversations

14  with any of your supervisors about what you should

15  or shouldn't do on these home visits with the

16  judge?

17     A.  No.  It was none of their business what I

18  was doing.  If the judge told me to do it, I was

19  doing it.  I didn't care.  I mean, if they told me

20  not to do it, I'd have done it anyway if the judge

21  directed me to, and she knows that and all my other

22  judges know that.  I work for the judge.

23     Q.  So what do you recall of that, as far as

24  your own personal involvement, on March 4th, 2020?



1      A.   Is that the date of the hearing?

2      Q.   Yes.

3      A.   I was road patrol supervisor and I usually

4   do not get dispatched to 911 calls.  Usually,

5   whoever is working with me that day gets dispatched

6   and I just kind of organize them going to calls.

7          So I don't think I was dispatched but

8   either one of my guys was dispatched or I was

9   dispatched to assist on a -- from a Family Court

10  judge.  So the 911 dispatcher come over the radio

11  and said that the officer wanted some backup, so I

12  went.  I keyed up the radio and I think -- and

13  Corporal White keyed up the radio and said we was

14  on our way, and I think I was the closest one so I

15  beat everybody there.

16         But I was going to back up the officer.  At

17  the time, I had no clue it was Judge Goldston until

18  I arrived on scene.

19     Q.   And when you arrived on scene, what did you

20  observe?

21     A.   Numerous people in the road, numerous

22  people in the driveway, and as soon as I got on the

23  scene I knew that I was going to clear the crowd

24  out.  So I walked in and, as soon as I walked in,



1 Mr. Gibson approached me and I was just -- "Hey,

2 hold on."

3          And he was just complaining that they were

4 there -- that everyone was there.  So I went

5 directly to Judge Goldston and I said, "I don't

6 feel comfortable with the environment and

7 everyone's here.  I'm going to start clearing out

8 people and make everyone leave."

9          And she goes, "I didn't even think about

10 that.  I'm sorry."

11          And I was like, "Well, I'm going to do

12 that."

13          So I went outside and had everyone leave,

14 and then I went back inside and stood beside the

15 judge for the rest of the time.

16     Q.  So when you first got there, you went

17 straight in the house?

18     A.  Yes.  Well, I mean, I looked at everyone

19 and, you know, made sure nobody was armed or

20 anything like that, nothing obvious, and then I

21 walked into the garage and I think Mrs. Gibson had

22 the chainsaw in her hand, and she was making a trip

23 down to her family, down to their vehicle.  Her

24 brother was there, meeting him halfway to get the



 1 | chainsaw.

 2 |     And then I walked on in to another little

 3 | foyer and that's where Mr. Gibson approached me and

 4 | I seen the judge and Officer McPeake and Kyle Lusk.

 5 |     Q.  At what point did you understand what was

 6 | going on there?

 7 |     A.  When I went in and spoke to Judge Goldston.

 8 |     Q.  As far as getting called there, there was

 9 | no 911 call by anybody, right?

10 |     A.  911 call?  I don't understand.

11 |     Q.  Nobody had called 911 asking for police to

12 | arrive at that residence.

13 |     A.  I have no idea whether Officer McPeake

14 | called 911 or whether he -- I know he -- he had to

15 | have called 911.  Yes.  Officer McPeake called 911

16 | because I remember him stating that he couldn't

17 | figure out how to switch his radio, the band, from

18 | the bailiff band to the 911 frequency.

19 |     So, yes, I'm sure Officer McPeake called

20 | 911.

21 |     Q.  Do you recall what he communicated?

22 |     A.  No.  I didn't speak to him about it.  It

23 | was just dispatched that an officer needed backup

24 | on a Family Court hearing, so that's what I --



1  that's what I responded to.

2      Q.  Okay.  So you don't recall any more

3  information other than that?

4      A.  There could've been.  No.  I mean, when you

5  hear the words "officer needs backup", you don't

6  really -- you go, no matter what.  So, I mean, if

7  there was more info, I didn't really listen.  I

8  just turned the blue lights on and went.

9      Q.  So at the time that you arrived, you didn't

10 -- you didn't hear any allegations or receive any

11 allegations that any individual had committed any

12 criminal act?

13     A.  No.

14     Q.  All you -- all you knew was that another

15 police officer had asked for backup?

16     A.  Correct.

17     Q.  At a Family Court hearing.

18     A.  Correct.

19     Q.  And when you arrived there, you saw people

20 outside the house.

21     A.  Correct.  I was familiar with everyone

22 there.

23     Q.  You were familiar?

24     A.  Yeah.  Yes, sir.



1    Q.  Had -- how were you familiar with everyone

2  there?

3    A.  With every person on scene?

4    Q.  Well, let me ask you:  Did you know whose

5  house this was?

6    A.  No.

7    Q.  Okay.  How were you familiar with all the

8  people at the scene?

9    A.  Well, because when I pulled up I seen

10  Mr. Payne.

11       You want me to go into detail of how I know

12  all these people?

13       I mean, I will.  I'm just asking you if you

14  want me to tell how I knew each person.

15    Q.  Every person outside, you had some sort of

16  preexisting relationship, it sounds like.

17    A.  Correct.  Everyone except for the new

18  girlfriend.

19    Q.  All right.  Well, did you put 2 and 2

20  together while you were there or what was going on?

21    A.  I didn't.  I didn't speak to the Paynes

22  until I got in the garage and I seen Carrie Gibson-

23  Payne -- Carrie Payne-Gibson -- and she said that

24  they were here to split their assets, and I said,



1  "Oh okay."

2        So that's when I walked inside and that's

3  when I seen Mr. Gibson approach me.  And then

4  that's when I went and spoke to Judge Goldston and

5  she informed me what was going on.

6    Q.  All right.  Did you know Matt Gibson prior

7  to this?

8    A.  Yes and no.  I mean, yes, but I -- we

9  weren't buddies or anything.  I mean, we're polar

10  opposites.

11    Q.  You knew his ex?

12    A.  I knew of her.  I was friends with her

13  brother in high school and her dad -- her dad and

14  -- Carrie Payne's dad and mother was a victim of a

15  real bad burglary a couple of years earlier and

16  they had called and asked me if I could help them,

17  and I ended up finding everything that was stolen

18  from their house.  So I knew them from there.

19        And then Little League.  I mean, I knew

20  them all from Little League.

21    Q.  When you encountered Carrie Gibson, or

22  Payne, in the garage with the chainsaw, as you

23  said, at that point, did you realize that this was

24  a Family Court hearing?



1      A.   I mean, I don't remember when I realized it

2   was a Family Court hearing.  I may have even known

3   it was a Family Court hearing before I went.  I may

4   have even called EOC.  I'm not for sure when I

5   realized it was a Family Court hearing.

6      Q.   Well, you just testified that -- you said

7   that an officer needs backup at a Family Court

8   hearing.

9      A.   Correct.

10     Q.   And you knew that you were traveling to a

11  residence, not a Family Court.

12     A.   Correct.

13     Q.   Okay.  And you recognize everybody in the

14  yard.

15     A.   Correct.

16     Q.   Then, you encountered Carrie Gibson in the

17  garage.

18     A.   Correct.

19     Q.   And then you walked inside the house from

20  the garage.

21     A.   Correct.

22     Q.   So at what -- what was happening inside

23  when you walked in the house from the garage?  What

24  did you -- what did you observe?



1    A.  I observed Mr. Gibson.  As soon as he seen

2  me, he come towards me and I calmed him down, and

3  then I told him to hang out right there until I

4  came back to talk to him.

5        And then I went over and talked to Judge

6  Goldston and Officer McPeake, and I just took

7  charge, because that's -- I mean, that was my job

8  as a supervisor.

9        I just told McPeake, "Stay right here.  I'm

10  going to go out here and get everyone out that's on

11  the property that's not part of the case -- or part

12  of this hearing."

13    Q.  Well --

14    A.  Then, I did that and then I went back in

15  and conducted the rest of the hearing with Judge

16  Goldston.

17    Q.  You said Mr. Gibson approached you but I

18  want to ask you about where everyone else was at

19  that time.

20        Where was Judge Goldston when you walked

21  in?

22    A.  I call it a foyer but when you go, like, in

23  the garage, there's a door, and I'm thinking there

24  was a kitchen.  But anyway, you go in and there's



1  like, on the right, maybe in the living room foyer

2  -- but her and Kyle - Mr. Lusk - and -- was in

3  there with Officer McPeake.

4       Q.   Doing what?

5       A.   Just standing there.

6       Q.   They weren't doing anything?

7       A.   No.   They were just standing there and I'm

8  assuming they just had given the chainsaw to Carrie

9  Payne -- Carrie Gibson -- and they was sitting

10 there discussing whatever with Mr. Gibson, until he

11 seen me and then he approached me.   I guess he

12 recognized me.

13      Q.   Okay.   And did you observe any -- any sort

14 of arguing or anything like that?

15      A.   He was -- he was a little angry when he

16 approached me and I calmed him down.

17      Q.   What did he say?

18      A.   I don't remember what he said.   He just

19 approached me in an angry manner and I said, "Man,

20 you need to calm down.   You're a little out of

21 control."   And I said, "I'm going to go out here

22 and tell everyone to leave."   And he did not like

23 it when I told him I was going to get everyone to

24 leave.



1        So then, for his sake, I said, "Okay.

2    Here's what I'll do.  I will let one person stay

3    for you and one person stay for Ms. Gibson to be

4    your -- to help you with, you know, whatever you

5    may be getting or whatever, carrying stuff to the

6    vehicle, but everyone else has to leave," because

7    it wasn't a safe environment for the judge.

8        Q.  Okay.  So you knew, at that point, that the

9    judge was conducting a hearing inside Mr. Gibson's

10   house, right?

11       A.  Correct.  As soon as I seen her, yeah.  I

12   mean, if I didn't know beforehand, as soon as I

13   seen her I knew exactly what was going on.  Yes.

14       Q.  Okay.  And so then you told each party that

15   they could keep one person there to --

16       A.  At first I said no one.  Mr. Gibson become

17   angry over his girlfriend, so I kind of bent my own

18   rules and said, "Okay.  One person each can stay."

19       And he wanted his girlfriend to stay and

20   Carrie Gibson wanted her brother to stay.

21       Q.  Okay.  So it was your own rules that

22   decided that you get to say who Mr. Gibson has on

23   his property and not him?

24       A.  It's not my rules.  It's securing the scene



1  and making it safe for my judge -- for the judge,

2  and that's the way I made the scene.  In my

3  opinion, that's the way I secured the scene and

4  made it safe for the judge.  Yes.

5      Q.  You weren't working as a bailiff that day,

6  were you?

7      A.  No, but the second I arrived on scene I was

8  in charge.  I've been there for so long, when I'm

9  on scene I'm usually in charge because, you know --

10  and I'm not trying to be arrogant but everyone is

11  -- you know, that works the road, the bailiffs are

12  usually lower rank.  So when I arrive, I'm the one

13  in charge most of the time.

14      Q.  So you were the bailiff now, basically?

15      A.  I'm not going to say I was the bailiff but,

16  from what I seen, I didn't think the scene was

17  secure so, yes, I took over.  Essentially, I was

18  the bailiff.

19          I'm not going to say I was the bailiff.  I

20  was the one in charge, you know, and that's -- and

21  I took charge.  That's just my personality.

22  Anytime we was in a hearing or anything, I always

23  took charge.

24      Q.  Okay.  So you took charge and, having done



1   this before when you were a bailiff for Judge

2   Goldston, you knew that what was taking place was

3   items of personal property were going to be located

4   and given to either party?

5       A.   Correct.  I did know that.

6       Q.   Okay.  And then you now were presiding over

7   that process taking place in Mr. Gibson's home.

8       A.   No, sir.  Judge Goldston is always

9   presiding.  I'm just there to make sure she's safe

10  and everyone maintains their behavior, but I didn't

11  preside.  She's the one that presides.

12      Q.   Okay.  And then after that point, after you

13  took over the scene, as you call it, what happened

14  next?  Did they continue on, or did you continue

15  on, with locating items and giving them to parties?

16              MR. ROBINSON:  Object to the form.

17  You can answer.

18      Q.   Well, that's why I asked you what happened

19  next.  After you took over --

20      A.   Next after what?

21      Q.   After you got there and you took control of

22  the scene, right?  What next happened inside

23  Mr. Gibson's house?

24      A.   I had everyone to leave.  That took a few



 1  minutes.

 2          And then, by that time, I think Corporal

 3  White arrived on scene, and I told him, "Hey, make

 4  sure nobody comes back in here.  I don't want

 5  anybody on the property."

 6          I went back inside and stood beside the

 7  judge and I think - best I remember - there was a

 8  safe or something that there was some property in,

 9  and Mr. Gibson went with Officer McPeake and got

10  some property out of the safe and they divided that

11  property as well.

12          And they just divided the property and then

13  we left.  I left after the judge left.  And

14  Mr. Gibson had a bunch of questions for me and was

15  asking me some questions but, I mean, I don't

16  remember what they were.

17      Q.  Okay.  After you arrived in the house and

18  you took -- took over for McPeake, you were present

19  while additional items of personal property were

20  located inside Mr. Gibson's house?

21      A.  Correct.

22      Q.  Some of which were then removed from

23  Mr. Gibson's house.

24      A.  Yes, sir.  Like the box of DVDs.  They held



1   a box of DVDs up and he'd pick one, then she'd pick

2   one.  He'd pick one, and she'd pick one.  So they

3   just separated the property that was in the court

4   order.

5       Q.  And you were on duty and in uniform at this

6   time?

7       A.  Correct.

8       Q.  You had a badge and a gun?

9       A.  Correct.

10      Q.  Do you know whether or not a search warrant

11  was ever issued for law enforcement to enter

12  Mr. Gibson's home against his consent?

13      A.  I would -- I've never followed up on that

14  but when I have a judge there that's conducting a

15  hearing, that's my -- I would have went in anyway,

16  without a search warrant.

17      Q.  I understand that.  To your knowledge,

18  there was no search warrant on March 4th, 2020

19  pertaining to Mr. Gibson's house?

20      A.  I didn't do a search warrant and none of

21  the people working with me that day did a search

22  warrant.  But I wasn't searching.

23      Q.  But you were helping to locate items?

24              MR. ROBINSON:  Object to the form.



1      A.   No.   No, I was not.   I was there for the

2   strict safety of the judge.   Mrs. Gibson and

3   Mr. Gibson were locating the items.   I didn't

4   search for nothing.   There wasn't -- any of the

5   deputies didn't search for anything.

6      Q.   It was clear to you -- you said Mr. Gibson

7   didn't appear to be happy.   It was clear to you

8   that he didn't want these people in his house,

9   wasn't it?

10      A.   He never told me that.

11      Q.   That's why I asked if it was clear to you,

12   because he wasn't happy.   It was clear to you that

13   Mr. Gibson wasn't happy about having these people

14   in his house.

15      A.   I didn't know what he wasn't happy about.

16   I didn't know if he wasn't happy because he was

17   getting divorced or he had to separate his

18   property.   I had no clue why he wasn't happy.   I

19   just calmed him down and told him to chill.

20         But, no, I didn't know why he wasn't happy.

21   I wasn't there for all that.

22      Q.   Well, you knew that he wasn't happy that

23   you asked people to leave his property who were --

24      A.   It --



1      Q.  Let me finish.

2      A.  Sorry.

3      Q.  You knew that he was not happy that you had

4   ordered his guests on his private property to

5   leave, right?

6      A.  Correct.  He was yelling and screaming at

7   the Paynes, telling them to get off his property –

8   which they weren't on his property – and then his

9   jail buddies were there, and his girlfriend were

10  there, and he was not happy when I told them that

11  they had to leave.

12         But I told him I was also going to make the

13  Payne family leave.  It was just not his party that

14  was leaving.  Everyone was leaving the property for

15  the judge's safety.

16     Q.  So on March 4th, 2020, as a law enforcement

17  officer, you were telling Mr. Gibson, the property

18  owner, that his guests have to leave the property,

19  regardless of whether he wants them to stay or not?

20     A.  On March 4th, 2020, I was securing the

21  scene so my judge would be safe.

22     Q.  The scene of a Family Court hearing.

23     A.  Correct.

24     Q.  It wasn't a crime scene, right?



1      A.  Correct.  It was a Family Court hearing.

2   Correct.

3      Q.  You still had not received any sort of

4   allegation or indication that any crime had been

5   committed by anybody?

6      A.  No.  I wasn't aware of any crime.  No.

7      Q.  You weren't aware of any sort of emergency

8   taking place at the scene?

9      A.  Not that I was aware of, no.

10     Q.  You weren't aware that there was any sort

11  of threat to any individual's physical safety at

12  the scene?

13     A.  Yes.  I thought there was a physical threat

14  to my -- to Judge Goldston -- sorry -- Judge

15  Goldston's safety, and that's why I acted in the

16  manner that I did.  I didn't feel the environment

17  was conducive to her -- for her safety, so that's

18  why I cleared the property.

19     Q.  That's just because that's not -- you would

20  have done things differently as a bailiff.  That's

21  not -- that's not because you observed any actual

22  threat to Judge Goldston's safety.

23     A.  That's because there were too many people

24  there for me to watch and they had no business



1  being there at that time, when the judge is having

2  a hearing, and I had them to leave because of the

3  judge's safety.

4      Q.  Okay.  You didn't observe any of those

5  individuals committing any crimes, did you?

6      A.  No.

7      Q.  You didn't observe any of those individuals

8  making any threats to anyone's safety, did you?

9      A.  No.  I didn't give them the opportunity.

10     Q.  It's just your policy, as a longtime

11 bailiff, that you wouldn't put any judge in that

12 position of even having people around in that

13 manner.

14     A.  No, I would not.

15     Q.  Okay.  It wasn't based on any actions by

16 any individuals present that caused the safety

17 issue.

18     A.  Mr. Gibson, where he was irate, I didn't

19 feel safe with him being in the house with her as

20 well.  So, you know, that's why I stood beside her

21 until the hearing was over.

22     Q.  Okay.  But you didn't hear him make any

23 threats, did you?

24     A.  No.  With his demeanor, I didn't feel -- I



1  didn't feel it was safe for her to be anywhere in

2  the house near him, so that's why after they left,

3  I went inside and stood beside the judge.

4      Q.  Okay.  She didn't -- Judge Goldston didn't

5  complain to you that -- about Mr. Gibson's conduct,

6  did she?

7      A.  No.  She didn't.  And there again, Judge

8  Goldston and I, when we went to the homes or we was

9  in the courtroom, she didn't have to tell me

10  anything because we knew each other so well, she

11  could just give me a look and I would know what to

12  do.

13      So when I walked in, I knew that it was an

14  unsafe environment, and so that's why I secured the

15  area.

16      Q.  Did you take any cellphone footage inside

17  Mr. Gibson's house?

18      A.  I would never do that because that's one of

19  the No. 1 rules.  Only the judge films a Family

20  Court hearing -- videos a Family Court hearing.

21      Q.  Did you observe -- did you observe Bailiff

22  McPeake taking any footage inside Mr. Gibson's

23  home?

24      A.  No.  I didn't observe him because if I did,



1  I would have took his phone, too.

2      Q.  Yet, it's your testimony that you saw

3  Mr. Gibson and Bailiff McPeake doing something with

4  Mr. Gibson's safe.

5      A.  They were getting something out, and then

6  they brought a -- I think it was, like, a box or a

7  tote of DVDs or something.

8          Yeah.  The property on the Family Court

9  order, they were going through that property and

10  separating it.  And I think there was the pictures

11  there, too.  And the chainsaw.

12     Q.  About how long were you inside Mr. Gibson's

13  house?

14     A.  I have no idea.  I haven't reviewed

15  anything.  I have no idea.

16     Q.  Did Mr. Gibson ever ask you to leave his

17  house?

18     A.  Ask me?

19     Q.  Yeah.

20     A.  No.

21     Q.  Okay.

22     A.  He didn't ask me to leave.

23     Q.  Did you -- did you overhear him asking

24  anyone else to leave?



1       A.  No.  I never heard him ask anyone to leave.

2       Q.  Did he ever invite you in?

3       A.  No.  I went in.  I was dispatched, so I

4   just went in.  When I went in, that's where he

5   looked at me and I guess he seen a familiar face,

6   and that's when he approached me.

7       Q.  So McPeake had called you to the scene for

8   backup.

9       A.  McPeake called 911 EOC for backup.  He

10  didn't call me.

11      Q.  All right.  Then you were dispatched in

12  response whenever McPeake asked for help.

13      A.  Correct.  Someone was dispatched.  I don't

14  know if I was dispatched.  Someone -- me or one of

15  my coworkers were dispatched but I was the closest

16  there.

17      Q.  All right.  So, generally, one of the first

18  things you would do if an officer asked for help

19  and you arrived at the scene would probably be to

20  talk to that officer, wouldn't it?

21      A.  Well, in a normal situation, but when I

22  walk in and see the judge, I don't have to ask

23  because I know what's going on because I've been

24  there, done that, many, many, many, many times.



1      Q.  So did you talk to McPeake?

2      A.  I don't think so, no.  Yes, I did.  I told

3  him to stand with the judge and I was going to go

4  clear out everyone from the property, and I told

5  him not to leave her side until I got back.

6      Q.  Is that the extend of the conversation

7  between you and McPeake after you got to the scene?

8      A.  We may have spoke but -- I'm not saying we

9  did or we didn't.  I don't remember.  I know I told

10  him to stay with the judge while I cleared the

11  property from the other people.  I'm sure we spoke

12  and talked but I don't recall.

13      Q.  Did you ever ask McPeake why he called for

14  you?

15      A.  No.  I didn't need to because when I seen

16  Judge Goldston, I knew why he called for me.  When

17  I went there and seen all those people there, and

18  Mr. Gibson angry, I knew why I was there.

19      Q.  Did McPeake ever tell you why he called for

20  backup?

21      A.  No.  I never asked him about it, never

22  talked to him about it.

23      Q.  And you don't recall how much longer after

24  that that you stayed in the house?



1      A.  I have no idea.  I have no idea.

2      Q.  How did the -- how did this hearing end?

3      A.  Once the equitable distribution was

4  resolved, I walked Judge Staton to her vehicle and

5  they left, and I waited for Mr. Lusk, Judge

6  Goldston, and Mrs. Payne and her brother to leave.

7  And after they left, I was the last one to leave.

8      Q.  Okay.  And then after you left, did you do

9  anything else pertaining to that incident?

10     A.  No.  It was what we call non-reportable, so

11 it was -- I mean, we don't do reports for court

12 hearings, so I just went on to the next call.

13     Q.  Okay.

14     A.  The next 911 call.

15     Q.  That was my next question.  You never

16 filled out any sort of report following that

17 incident?

18     A.  No.  Per our policy at the Sheriff's

19 Office, it's non-reportable.  There was no crime.

20 Nothing happened.  I was just assisting in a family

21 court hearing.

22     Q.  And you're still working for the same

23 employer?

24     A.  Correct.  19 -- going on 19 years.



1     Q.  After this incident, has there been any

2  sort of change in policy about Sheriff's Department

3  bailiffs going to the homes of litigants?

4     A.  No.  My judge -- I'm sorry -- if Judge

5  Goldston told me today to go to the house, I'd be

6  the first one there.

7        Or any judge.  Not only Judge Goldston.

8  Any of the judges.  Circuit Court, Family Court.

9           MR. BRYAN:  I don't believe I have any

10  other questions but let me take a quick bathroom

11  break and, at the same time, let me talk to my

12  people here.

13           COURT REPORTER:  The time is 1:49 p.m.

14  We're off the record.

15           (A short break was taken after which

16           the proceedings continued as follows:)

17           COURT REPORTER:  The time is 1:54 p.m.

18  We're on the record.

19  BY MR. BRYAN:

20     Q.  You testified that even though you're an

21  employee of the Raleigh County Sheriff's Department

22  and a sworn law enforcement officer that you would

23  do what the judge tells you to do.

24     A.  If I was a bailiff.  Correct.



1     Q.  Okay.  Let me ask you this:  What if the

2   judge were to tell you to do something that you

3   thought was against the law?

4     A.  I know we're doing -- you have some

5   propaganda but I can say with 1,000-percent

6   certainty that none of the judges I ever worked

7   with would do that.

8     Q.  All right.  Well, my original line of

9   questioning was for you to help me understand, you

10   know, who's in charge.

11     If a judge would tell you to go rob a bank,

12   would you do it?

13             MR. ROBINSON:  Object to the form.

14   You can -- you can answer that.

15     A.  There again, I've never -- I've worked with

16   dozens of judges and I've never had a judge to ask

17   me to break the law and I'm 1,000-percent confident

18   that I never worked with a judge that ever would

19   ask me to break the law.

20        So of course I'm not going to break the

21   law.  My job is to uphold the law.  But I've never

22   had a judge to ask me to come remotely to breaking

23   the law.

24     Q.  Well, in the end, I mean, you have a higher



1  duty other than just listening to the orders of the
2  judge, right?
3      A.  No.
4      Q.  And that's to obey the law.
5      A.  No.  From a bailiff -- yes, of course I've
6  got to obey the law but, no, my higher duty, if I'm
7  a bailiff, is the judge and the judge is the higher
8  authority.
9          If the judge tells me to do something, I'm
10 doing it and I'm not questioning it.
11     Q.  But aren't you a sworn law enforcement
12 officer first?
13     A.  I am.
14     Q.  Didn't you take an oath?
15     A.  I did.
16     Q.  Okay.  If the judge tells you to do
17 something which violates the Constitution, are you
18 going to do it?
19     A.  There again, the fourth time, I know,
20 without a doubt, no judge that I ever worked for
21 would ever ask me to violate the law, so I've never
22 been in that predicament and I can safely say I
23 never will.
24         No judge is going to tell me to violate the



 1  law.

 2     Q.  And that's why I said "if".  If a judge

 3  told you to violate the law, violate the

 4  Constitution, would you do it?

 5            MS. TULLY:  Objection.  Calls for

 6  speculation.

 7     A.  If they judge asks me to violate the law

 8  and rob a bank, no, I wouldn't rob the bank.  I'd

 9  say, "Judge, I couldn't rob that bank because it's

10  against the law."

11            So, no, I wouldn't rob the bank if the

12  judge told me to go rob the bank.

13     Q.  Okay.  And you said you worked as a bailiff

14  for Circuit Court judges as well, right?

15     A.  Yes.

16     Q.  Okay.  So you've -- as a police officer for

17  so many years, you're familiar with the requirement

18  under the Constitution to obtain -- for law

19  enforcement to obtain a search warrant prior to

20  someone's house.

21            MR. ROBINSON:  Object to the form.

22     A.  Correct.

23     Q.  You're familiar with search warrants.

24     A.  Correct.  My job now is drugs and I do



1  search warrants all the time.

2      Q.  So you're familiar with the -- the Fourth

3  Amendment's requirement that law enforcement

4  generally have a search warrant?

5      A.  Correct.

6      Q.  So if a Circuit Court judge, say in a

7  criminal case, said, "Deputy Stump, I want you to

8  go search this criminal defendant's home.  Don't

9  worry about getting a search warrant.  Just do it.

10  We don't need a search warrant," would you do it?

11      A.  In my training, the words from a judge - a

12  Circuit Court judge - is -- and I've heard this on

13  the record 1,000 times -- just because there's not

14  a court order, when I speak it it's a court order.

15          So if a judge - Circuit Court judge - on

16  the record spoke a court order, yes, I would follow

17  that court order.

18      Q.  Okay.  And that's what you did,

19  essentially, when you worked as a bailiff for Judge

20  Goldston?

21      A.  Correct.

22          MR. BRYAN:  All right.  Thank you.  I

23  don't have any other questions.

24          THE DEPONENT:  Thank you.



1           MR. ROBINSON:  I don't have anything.

2   Do you have anything?

3           MS. TULLY:  I don't have anything.

4           THE DEPONENT:  Thank you.

5           MR. ROBINSON:  Read or waive?  You

6   want to waive?  Waive the reading of your

7   deposition?

8           THE DEPONENT:  Yes, sir.

9           MR. ROBINSON:  Okay.  We'll waive.

10          COURT REPORTER:  The time is 1:59 p.m.

11  This concludes the deposition.

12              (Having indicated he would like

13              to waive reading and signing of

14              his deposition, further this

15              deponent saith not.)

16                  --oOo--

17

18

19

20

21

22

23

24



1   STATE OF WEST VIRGINIA,

2   COUNTY OF RALEIGH, to wit:

3           I, Bradford L. Cooper, a Notary Public

4   within and for the County and State aforesaid, duly

5   commissioned and qualified, do hereby certify that

6   the foregoing deposition of BOBBY STUMP was duly

7   taken by me and before me at the time and place and

8   for the purpose specified in the caption hereof.

9           I do further certify that the said

10  proceedings were correctly taken by me in shorthand

11  notes, and that the same were accurately written

12  out in full and reduced to typewriting by means of

13  computer-aided transcription.

14          My commission expires May 14, 2023.

15          Given under my hand this 15th day of March,

16  2022.

17          _Bradford L Cooper_

18  _____

19          BRADFORD L. COOPER, Notary Public

20

21

22

23

24

