**In the Matter of:**

MATTHEW GIBSON

vs

LOUISE E. GOLDSTON

MATTHEW GIBSON

*February 23, 2022*



5010 Dempsey Drive
Cross Lanes WV 25313
304-415-1122

```
        IN THE UNITED STATES DISTRICT COURT
   FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                  AT BECKLEY


MATTHEW GIBSON,

          Plaintiff,


  -vs-      Civil Action No. 5:21-cv-00181


LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision,
JEFF MCPEAKE, individually,
BRIAN WHITE, individually,
BOBBY STUMP, individually,
KYLE LUSK, individually,

          Defendants.



        DEPOSITION OF MATTHEW GIBSON
_____

   The deposition of Matthew Gibson was
taken on February 23, 2022, at 10:00 a.m.,
at 252 George Street, Beckley, West
Virginia.
_____



       ELITE COURT REPORTING, LLC
            5010 Dempsey Drive
      Cross Lanes, West Virginia  25313
            (304) 415-1122


          Tara Arthur, CCR
```

Page 2

```
 1        A P P E A R A N C E S
 2  John H. Bryan
    Attorney at Law
 3  Edwin Morgan
    Law Office of John H. Bryan
 4  P.O. Box 366
    Union, West Virginia  24983
 5
    Kevin J. Robinson
 6  Attorney at Law
    Pullin Fowler Flanagan Brown & Poe
 7  252 George Street
    Beckley, West Virginia  25801
 8
    Jennifer E. Tully
 9  Attorney at Law
    Bailey & Wyant, PLLC
10  P.O. Box 3710
    Charleston, West Virginia  25337-3710
11
    Also Present:  Louise E. Goldston
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1          I N D E X
 2  WITNESS
 3     Matthew Gibson
 4  EXAMINATION
 5     by Ms. Tully        Page 04
       by Mr. Robinson     Page 56
 6     By Mr. Bryan        Page 170
       by Ms. Tully        Page 184
 7     by Mr. Robinson     Page 188
       by Ms. Tully        Page 189
 8
 9  EXHIBITS
10     Number 1            Page 19
       Number 2            Page 19
11     Number 3            Page 121
       Number 4            Page 121
12     Number 5            Page 162
       Number 6            Page 167
13
14
15
16
17
18
19
20
21
22  Reporter's Certificate:    Page 191
    Errata Sheet/Signature Page:  Enclosed
23
24
```

Page 4

1       MATTHEW GIBSON,
2  called as a witness, first being duly sworn
3  by the Court Reporter/Notary Public,
4  testified as follows, to wit:
5            EXAMINATION
6  BY MS. TULLY:
7     Q.  Could you please state your name
8  for the record?
9     A.  My name is Matthew Aaron Gibson.
10    Q.  How do you spell Aaron, A-A-R-O-N?
11    A.  A-A-R-O-N.
12    Q.  Mr. Gibson, my name is Jennifer
13  Tully.  I represent Judge Goldston in the
14  lawsuit that you through your attorney have
15  filed against her and a couple of deputies as
16  a result of the incident on March 4, 2020.
17  So I have some questions for you today.
18        Have you ever had a deposition
19  taken before?
20    A.  No, ma'am.
21    Q.  All right.  I am sure your attorney
22  has kind of told you what to expect, but I am
23  going to go over kind of what I call
24  deposition ground rules.  That way you and I

Page 5

1  make sure we are on the same page.
2        Tara here is taking everything down
3  that we say.  She is typing it up -- she is
4  going to eventually type it up into a
5  transcript.  So we need to both make sure
6  that we give vocal answers, keep our voices
7  up because she is also recording it.
8        Also, if you can, say yes or no as
9  opposed to uh-huh or huh-uh.  This will
10  become very conversational, and it will be
11  easy to flow into uh-huh that happened, or
12  shrugging your head --
13    A.  Yes, ma'am.
14    Q.  -- you know, shoulders.  That just
15  makes it easier when you go back and try to
16  read the transcript if it is a yes or no
17  answer as opposed to uh-huh or huh-uh.
18        If you don't understand a question
19  that I ask you -- because lawyers can get
20  real longwinded with their questions -- just
21  let me know, you know, I have no idea what
22  you just asked me.  And I am happy to
23  rephrase it.  If you need to take a break,
24  you let me know.  I don't think this will

Page 6

1 take too super long. But we are here at
2 your convenience. So you let me know and we
3 can take a break. The only thing I would
4 ask is that if there's a question pending,
5 you answer that question prior to taking a
6 break. Okay?
7 A. Yes, ma'am.
8 Q. All right. Can you give me your
9 date of birth, please?
10 A. It's January 10, 1977.
11 Q. And what's your current address?
12 A. It is 113 Quiet Oak Street,
13 three words, Beaver, West Virginia 25813.
14 Q. And is that the home that you
15 shared with your ex-wife?
16 A. Yes, ma'am.
17 Q. Okay. And what's her name?
18 A. It is Carrie Gibson.
19 Q. All right. It is my understanding
20 that you and Ms. Gibson have two children?
21 A. Yes, ma'am.
22 Q. What are their names?
23 A. Brooklyn Gibson, Skyler Gibson.
24 Q. Okay. How old is Brooklyn?

Page 7

1 A. Brooklyn is 18.
2 Q. How old is Skyler?
3 A. Skyler is 12, turns 13 March 31st.
4 Q. Okay. Do either of those girls
5 live with you on a full-time basis?
6 A. Yes, ma'am.
7 Q. Both or --
8 A. Brooklyn Gibson.
9 Q. Okay. And Skyler, does she split
10 her time between you and her mother?
11 A. Yes, ma'am. Every other week.
12 Q. Do you have any other children
13 besides Brooklyn and Skyler?
14 A. No, ma'am.
15 Q. Have you ever been married prior --
16 before or after being married to Carrie
17 Gibson?
18 A. No, ma'am.
19 Q. Who currently besides Brooklyn, and
20 every other week Skyler, lives with you at
21 113 Quiet Oak Street?
22 A. Nobody, ma'am.
23 Q. Okay. How long have you lived in
24 this address?

Page 8

1 A. To my recollection, it would be
2 2005 -- say summer of 2005.
3 Q. And is this a home that you and
4 your ex-wife purchased together?
5 A. Yes, ma'am.
6 Q. Okay. And in the divorce, I assume
7 you were either awarded the property or you
8 bought Ms. Gibson out of her share?
9 A. Yes, ma'am.
10 Q. Okay. All right. Can you -- I
11 don't need to go back to elementary school.
12 But can you give me your educational
13 background, please? When did you graduate
14 high school?
15 A. 1995.
16 Q. Where was that from?
17 A. Independence High School.
18 Q. And that's here in Beckley,
19 correct?
20 A. Yes, ma'am.
21 Q. Did you go to college?
22 A. One year, ma'am.
23 Q. Where was that?
24 A. Bluefield State, which was here in

Page 9

1 Beckley.
2 Q. Did you obtain any kind of
3 certificate from Bluefield State?
4 A. No, ma'am.
5 Q. Okay. How about since attending
6 that year at Bluefield State, have you done
7 any trade schools, obtained certificates,
8 certifications, any kind of -- anything?
9 A. Probably through my work, I have
10 obtained some certificates, I am sure.
11 Q. Okay. And where are you currently
12 employed?
13 A. I work at the federal prison in
14 Beckley, West Virginia.
15 Q. And what's your position there?
16 A. I am a foreman.
17 Q. Can you tell me what that means?
18 A. I basically teach inmates how to
19 build a chair.
20 Q. Okay. So you are not a
21 correctional officer; is that correct?
22 A. No, ma'am.
23 Q. How long have you been employed as
24 a foreman through the federal penitentiary?

Page 10

1     A. 2018, approximately.
2        Q. And where did you work prior to
3 that?
4     A. I worked in the receiving and
5 discharge unit at the same place of course.
6        Q. Okay.
7     A. Everything I tell you -- I have
8 been there 22 years. So I have had several
9 jobs.
10       Q. Okay. So you were in the receiving
11 and discharge. What did that entail?
12    A. Bringing new inmates in and
13 releasing inmates to the street.
14       Q. Okay. So you were the first and
15 last face they saw, huh?
16    A. Yes, ma'am.
17       Q. All right. In terms of social
18 organizations -- do you belong to a church or
19 do you belong to anything like that?
20    A. I was a member of New Prospect.
21 And I guess I still am because I haven't
22 rescinded that. A Baptist church, to the
23 best of my recollection, around 20 years.
24       Q. Okay. Sounds like you don't attend

Page 11

1 anymore?
2     A. I go to I Heart church now.
3        Q. Okay. Are you on any kind of
4 medication today that would affect your
5 ability to testify?
6     A. No, ma'am.
7        Q. Are you on any medication at all?
8     A. No, ma'am.
9        Q. All right. When did you and Ms.
10 Gibson marry?
11    A. December 11, 1995.
12       Q. It is my understanding that --
13 well, actually, I don't have an
14 understanding. When did you and your ex-wife
15 begin divorce proceedings?
16    A. Separation?
17       Q. Yes.
18    A. September 30th, 2017.
19       Q. All right. That's when you
20 separated?
21    A. Yes, ma'am.
22       Q. Who filed for divorce?
23    A. She did, ma'am.
24       Q. She did. And do you know when she

Page 12

1 did that? Would it have been around the
2 September of 2017 date?
3     A. I am going to say at the end of
4 2017, to the best of my recollection.
5        Q. That's fine.
6        All right. And your divorce
7 proceedings, they occurred here in Raleigh
8 County?
9     A. Yes, ma'am.
10       Q. And that was in the family court?
11    A. Yes, ma'am.
12       Q. And Judge Louise Goldston was the
13 presiding judge at that point; is that
14 correct?
15    A. Yes, ma'am.
16       Q. Did you have an attorney for your
17 divorce proceedings?
18    A. Yes, ma'am.
19       Q. And who was that?
20    A. Brandon Johnson.
21       Q. Did you hire Mr. Johnson at the
22 beginning of the proceedings?
23    A. Yes, ma'am.
24       Q. And how long did he continue to

Page 13

1 represent you?
2     A. Probably, to the best of my
3 recollection, March of 2019.
4        Q. Okay. Now, while I don't want to
5 know about any conversations that you had
6 with Mr. Johnson, it appears to be at some
7 point you all had a parting of the ways?
8     A. Yes, ma'am.
9        Q. Can you give me any indication as
10 to why? Did you just decide you wanted to go
11 out on your own?
12    A. You know, to the best of my
13 recollection, I just felt that the big
14 battles were over and, you know, I think it
15 was time to part ways.
16       Q. Okay. Did Mr. Johnson assist you
17 in reaching an agreement with your ex-wife
18 through her attorney, Mr. Lusk, regarding the
19 distribution of property?
20    A. Yes, ma'am.
21       Q. And can you explain to me how that
22 occurred? I mean, did you all sit down in a
23 conference room and hash it out?
24    A. We sat down in the courtroom. Of

Page 14

1  course no one was in the courtroom.  The
2  judge was gone and the bailiff was not there
3  also.  So yes.
4      Q.  And the four of you sat in there
5  and talked about all of the property?
6      A.  Yes, ma'am.
7      Q.  How did you develop your list of
8  property to be divided?
9      A.  I didn't develop it.  Either her or
10  Mr. Lusk developed a list.
11      Q.  So they approached you with this
12  list and said, here is a list of property, we
13  need to divide this up?
14      A.  And it was the first time I seen
15  that list, when it was presented to me,
16  September 18, 2018.
17      Q.  Did you have any objections to the
18  property that was on that list?
19      A.  Yes, ma'am.
20      Q.  Okay.  And what were those?
21      A.  To the best of my recollection -- I
22  would have to go back and look at it, the
23  property form.
24      Q.  Okay.

Page 15

1      A.  I don't remember.
2      Q.  But you know you didn't agree with
3  all of the property that was listed on there?
4      A.  No, ma'am.
5      Q.  But you don't remember why?
6      A.  There were things listed on the
7  property form that were my daughter's that I
8  have full custody of.  So on that property
9  form, her items were listed.
10      Q.  Okay.
11      A.  And we never went over those items
12  to pick to and from on who got those items.
13      Q.  Okay.
14      A.  So my belief was the kids' items
15  never should have been on the property list.
16      Q.  Okay.  Okay.  All right.  After you
17  all went through this property list and --
18  you I guess came to an agreement, is that
19  fair, as to who was going to take what?
20      A.  The agreement never really did --
21  there was a form entered into the record, but
22  it never was corrected.  So there was two
23  property forms that -- one was called Joint
24  Exhibit 1 that is in the file.  And one was

Page 16

1  called Exhibit 1.  That's the one that I
2  referred to as an altered property form.
3  Things were added.  They caught additional
4  items.  There were mistakes -- like two leaf
5  blowers.
6          On Exhibit 1 that Mr. Lusk
7  presented to Judge Goldston during the
8  hearing, there was a leaf blower scratched
9  out.  Well, that's not -- it doesn't
10  accurately reflect what was on Joint
11  Exhibit 1, the copy that was in the file.
12          Also, guns was a mistake.  And
13  guns, I was -- I was to pay a thousand
14  dollars for the guns.  Again, my daughter
15  that I have full custody of, her property, if
16  you would look at it, looks like that --
17  where it wasn't circled, that the ex-wife got
18  my daughter's furniture.  And that's not the
19  case.  I have full custody of.  So there were
20  some things on there that wasn't accurately
21  reflected.
22      Q.  Okay.
23      A.  So if they were attached to the
24  final order, I would absolutely object to

Page 17

1  that part.
2      Q.  Okay.  When they were entered into
3  evidence at the hearing, this property --
4  this property list --
5      A.  Yes, ma'am.
6      Q.  -- were you still represented by
7  Mr. Johnson?
8      A.  Yes, ma'am.
9      Q.  Did he note any kind of an
10  objection to this property list?
11      A.  So there was a discussion between
12  him and Mr. Lusk.  And Mr. Lusk was supposed
13  to make those annotations.
14      Q.  Okay.  And do you know if that
15  happened?
16      A.  Do what?
17      Q.  Do you know if that happened?
18      A.  Absolutely not.
19      Q.  It did not happen?  Or you do not
20  know?
21      A.  It did not happen.  Those changes
22  were not made as guns were not taken off.
23  Can I refer to Joint Exhibit 1?
24      Q.  Yeah.  Pull it out.  Let's see it.

Page 18

1    A. Joint Exhibit 1.
2    **Q. Okay.**
3    A. That's the one that you attached, I
4    believe, to your-all's --
5    **Q. To my request for admissions?**
6    A. Yes, ma'am.
7    **Q. Okay.**
8    A. This is Exhibit 1
9        **Q. Okay. So you say that this --**
10       MS. TULLY: Can we get some
11   copies made of this?
12       MR. ROBINSON: Yeah.
13       MS. TULLY: Do you mind if we
14   make copies?
15       THE WITNESS: Absolutely. It is
16   all part of the record.
17       (A discussion was held off the
18   record.)
19   BY MS. TULLY:
20       **Q. Mr. Gibson, if you don't mind to**
21   **hand me the two copies of Exhibit 1 and**
22   **Joint Exhibit 1 that I handed you, I am going**
23   **to give them to the court reporter, and we**
24   **are going to mark them as Exhibit 1 again to**

Page 19

1    **your deposition. That way we can make this**
2    **as confusing as possible.**
3        MS. TULLY: Why don't we mark
4    Petitioner's Exhibit 1 as Exhibit 1 and Joint
5    Exhibit 1 as Exhibit 2. That way --
6        THE WITNESS: As long as you all
7    have got them together --
8        (Exhibit 1 was marked.)
9        (Exhibit 2 was marked.)
10       **Q. So Petitioner's Exhibit 1 that has**
11   **the Raleigh County clerk's timestamp on it --**
12   **okay?**
13   A. Yeah.
14       **Q. -- is Exhibit 1 to your deposition.**
15   A. Got it.
16       **Q. And then what you have called Joint**
17   **Exhibit 1 -- and it says admitted on it -- is**
18   **going to be marked as Exhibit 2 to your**
19   **deposition.**
20       **All right. So I am going to -- you**
21   **can't write on these. Sorry. They're now**
22   **exhibits to your deposition. But they're**
23   **marked here. So that way you can see --**
24   A. Okay.

Page 20

1        **Q. -- okay -- what we're talking**
2    **about.**
3    A. Okay.
4        **Q. All right. So now tell me, which**
5    of these -- and I am now going to call them
6    Exhibit 1 and Exhibit 2 -- do you say is the
7    correct property distribution?
8    A. Neither one of those are correct.
9        **Q. Okay.**
10   A. There is one that was entered into
11   the court file that was not corrected by
12   Mr. Lusk that is referred to as your Exhibit
13   Number 2 --
14       **Q. Okay.**
15   A. -- which is called Joint Exhibit 1
16       **Q. All right. And you say that this**
17   one was admitted into the court file?
18   A. Yes, ma'am.
19       **Q. All right. And it looks to me like**
20   that was done on September 19, 2018, based
21   upon this timestamped copy?
22   A. Yes, ma'am.
23       **Q. Okay. Was that the date of the**
24   hearing of the property distribution?

Page 21

1    A. I am thinking it was the 18th.
2        **Q. Sometimes it takes a day or so,**
3    **yeah. Okay.**
4        **All right. Now, this though is the**
5    **list that you all went down through -- when**
6    **I say "you all," you, your attorney, Ms.**
7    **Gibson and Kyle Lusk went down through to**
8    **divide up the property; is that correct?**
9    A. Uh-huh. That was the list that he
10   was supposed to correct.
11       **Q. Okay. But this is the list that**
12   **you all looked at?**
13   A. Yes, ma'am.
14       **Q. Okay. And the things that are**
15   **circled on it, based upon the key up here,**
16   **says the circles equals husband; is that**
17   **correct?**
18   A. Yes, ma'am.
19       **Q. All right. And so looking at this**
20   **-- if you flip over, there are some things**
21   **that say Sky's Bedroom and Brooklyn's Room.**
22   **And it looks to me like that is on page 3 of**
23   **this property list?**
24   A. Yes, ma'am.

Page 22

1    Q.  And these were things that you do
2  not believe should have been divided?
3    A.  Well, I mean, especially my
4  daughter that I have full custody of, her
5  bedroom furniture shouldn't go to the
6  ex-wife.
7    Q.  Okay.
8    A.  Their toys.
9    Q.  Okay.
10    A.  Their movies.
11    Q.  All right.  Okay.
12    A.  So I can go down if you want me to
13  -- but was you going to ask me -- go ahead.
14  Ask your question.  Sorry.
15    Q.  All right.  What I want to ask you
16  about is with Exhibit 1 there is a lot of
17  writing on here.
18    A.  Yes, ma'am.
19    Q.  Do you know whose handwriting this
20  is?
21    A.  I don't have a clue, ma'am.
22    Q.  Okay.  So this is not your
23  handwriting?
24    A.  No, ma'am.

Page 23

1    Q.  All right.  So at some point
2  Exhibit 2 called Joint Exhibit 1 Admitted,
3  was admitted into evidence at a hearing -- a
4  divorce hearing?
5    A.  Yes, ma'am.
6    Q.  So this was the property
7  distribution that was recognized by the
8  court?  Is that your understanding?
9    A.  Yes.  But just like with the final
10  order, there had to be a lot of mistakes --
11  or there had to be a lot of corrections made
12  to the final order.  Again, if he would have
13  submitted this with the final order, I would
14  have notated a list of things that needed to
15  be corrected due to the agreement.
16    Q.  Okay.  And you believe that your
17  attorney did voice an objection to this Joint
18  Exhibit 1 which is Exhibit 2 to your
19  deposition at that hearing?
20    A.  Not during the hearing.  Verbally
21  he spoke with Mr. Lusk -- just like the
22  photos that were seized off my walls.  Those
23  were ordered by Judge Goldston to be copied,
24  which I did.

Page 24

1    Q.  Okay.
2    A.  Okay.  And that's -- that was her
3  verbal order in the April of 2018 hearing.
4    Q.  Okay.  What are you reading from
5  there?
6    A.  Would you like a copy of this also?
7  This is notes.
8    Q.  Are these notes that you developed
9  yourself?
10    A.  This is -- more than likely, you
11  probably got those maybe.
12      MR. ROBINSON:  You might want to
13  run it by your attorney first.
14      MR. BRYAN:  I already looked at
15  it.  This is his own notes.
16      MR. ROBINSON:  Oh, okay.
17      MR. BRYAN:  If he wants to share
18  it, it is fine with me.
19      MS. TULLY:  Okay.
20      MR. BRYAN:  I think it is to
21  refresh his own recollection.  I don't have
22  any objection to you seeing it or copying it.
23    Q.  Let me just ask -- so that we don't
24  have to go through this page by page.  This

Page 25

1  entire file that you have in front of you
2  today, are these your notes and your photos
3  and things that you have?  Or are these
4  things that you have gotten from your
5  attorney?
6      MR. BRYAN:  I can answer that.
7  That is not -- that's not from me.  That's
8  his own stuff so that he can most accurately
9  answer questions.
10      MS. TULLY:  All right.
11    Q.  Do you mind if I take a look
12  through there?
13    A.  Absolutely.
14    Q.  For the record, your absolutely was
15  absolutely --
16    A.  Yes, ma'am.
17    Q.  -- I do not mind?
18    A.  Yes, ma'am.  And the rest of those
19  behind that was everything that was typed up.
20    Q.  Okay.  So there's some stapled
21  documents here that are just -- they are
22  pleadings within this lawsuit?
23    A.  Yes, ma'am.  That should be stuff
24  that you all received.

Page 26

1    Q. Okay.
2    A. The only thing -- probably from
3 that picture up.
4    Q. All right. So we have two pages
5 here that looks like notes regarding a
6 property list. A timeline for picking up
7 property. And then this is a picture of your
8 ex-wife, I am assuming?
9    A. That is a picture of Judge Goldston
10 inside of my house holding Exhibit 1 the
11 altered property form.
12    Q. Okay.
13    A. That one -- that is not the
14 original.
15    Q. Who took this picture?
16    A. That's off your evidence from
17 Mr. McPeake -- Mr. McPeake's evidence.
18    Q. Okay. So that's off --
19    A. The video.
20    Q. -- of the video?
21    A. Yes, ma'am.
22    MS. TULLY: Why don't we just go
23 ahead and make copies of all --
24    Q. Okay. Do you have any objection to

Page 27

1 us having a copy of all of this?
2    A. No, ma'am.
3    Q. Okay. I think that's easier than
4 us piecemealing here.
5    (A discussion was held off the
6 record.)
7 BY MS. TULLY:
8    Q. Now, I don't want to continue
9 belaboring the point with these property
10 lists. What I want to get to is -- Exhibit 2
11 is dated September 19, 2020, by the clerk's
12 timestamp?
13    A. Yes, ma'am.
14    Q. All right. Then it looks like
15 Exhibit 1 by the clerk's timestamp is dated
16 March 4, 2020?
17    A. Yes, ma'am.
18    Q. So it appeared that on March 4th,
19 there was a contempt hearing; is that
20 correct?
21    A. Yes, ma'am.
22    Q. All right. It would appear to me
23 that this Exhibit 1 was entered at that
24 point?

Page 28

1    A. Yes, ma'am. It was introduced
2 December 4, 2019.
3    Q. Okay.
4    A. But it wasn't entered in until
5 March 4th.
6    Q. All right. Well, let's talk about
7 this Exhibit 2 dated with the timestamp of
8 September 19, 2018.
9    A. Okay.
10    Q. Did you provide to your ex-wife the
11 property off of this property distribution
12 list --
13    A. No, ma'am.
14    Q. -- that she had been awarded?
15    A. No, ma'am.
16    Q. Why not?
17    A. I didn't know I had to. I had an
18 attorney. He guided me on what to do and
19 what not to. So that's my answer. I didn't
20 know that I had to.
21    Q. You didn't know you had to give her
22 the property that she was awarded through the
23 divorce hearing?
24    A. At that point, ma'am, I didn't know

Page 29

1 how many more hearings -- we already had
2 four. Her personal property was picked up on
3 March of 2018.
4    Q. And you are looking at this --
5    A. Timeline for picking up property.
6    Q. -- time for picking up property?
7    A. So her personal property was picked
8 up March of 2018. I let her go through the
9 house and get whatever she wanted.
10    Q. Okay.
11    A. She was well over an hour there.
12 So as far as the distribution of property, I
13 would have done exactly what my attorney
14 asked me to do.
15    Q. Okay. Now, I understand that at
16 some point -- and I believe maybe it was
17 November of '18 -- she was supposed to come
18 and pick up some property from your home?
19    A. Yes, ma'am.
20    Q. And that was property that was on
21 this Exhibit 2 property list, is that --
22    A. It is going to closely match that.
23 But I also -- to what the -- to what the
24 order, like the photos -- Judge Goldston

Page 30

1 ordered me to copy photos. And to what the
2 attorneys agreed to before -- this property
3 form, it was supposed to be corrected. So I
4 went by exactly -- I didn't give her my guns
5 as you can see in -- on Joint Exhibit 1
6 which is your Exhibit 2
7     Q. Uh-huh.
8     A. I didn't give her my guns because I
9 paid her a thousand dollars for the guns. It
10 is going to be under workout room --
11    Q. Okay.
12    A. -- third page. It is circled for
13 hers. No, it's circled for me. Sorry. But
14 it is -- again, it never should have been on
15 the property form.
16    Q. Gun safe, $250, was circled for
17 you?
18    A. Yes.
19    Q. Guns -- two AR-15's, three pistols
20 and ammo, $3,000 -- that was not circled?
21    A. Right.
22    Q. But you paid her the $3,000 for
23 that?
24    A. I paid her a thousand dollars for

Page 31

1 that.
2     Q. Okay. A thousand dollars?
3     A. Yes, ma'am.
4     Q. And was that a price that you all
5 came to an agreement on?
6     A. Yes, ma'am.
7     Q. Okay.
8     A. And that happened during the
9 property exchange that we are -- you know,
10 between Mr. Lusk and Mr. Johnson and me and
11 my ex-wife.
12    Q. Okay.
13    A. That should have been took off. It
14 looks here that she would have had that. But
15 it is not so.
16    Q. Okay. How about under master
17 bedroom, this TV, $100?
18    A. Yes, ma'am.
19    Q. Did you pay her for that TV? Or
20 did you give her that --
21    A. That's hers. The TV is not
22 circled. So that's hers.
23    Q. Okay. So that is circled. Did she
24 have to give you money for that?

Page 32

1     A. No, ma'am.
2     Q. All right. So some of these that
3 have dollar amounts, it wasn't because
4 somebody was paying for them, it was just the
5 general value that you all assigned?
6     A. It was a value that whoever came up
7 with this property form - Mr. Lusk or Ms.
8 Gibson - put down.
9     Q. Okay. All right. So she got her
10 initial personal property in March of 2018?
11    A. Yes, ma'am.
12    Q. Is that like her clothes?
13    A. It was clothes and whatever that
14 was hers. She had forgot some items after
15 that and texted me, and I give them to her;
16 Social Security card, birth certificate, high
17 school graduation, her softball glove. So
18 March, she come and picked up all of her
19 clothes and whatever else. It was -- her and
20 her dad were there.
21    Q. Okay.
22    A. So I let them in. I sat on the
23 couch. And they picked it up.
24    Q. Okay. And then sometime

Page 33

1 thereafter, you all went through and divided
2 up the remaining property?
3     A. Yes, ma'am.
4     Q. And then in November of 2018,
5 that's when she was to pick the remaining
6 property up?
7     A. Yes, ma'am.
8     Q. Did you allow her to come into your
9 home then?
10    A. No, ma'am.
11    Q. Why not?
12    A. There had been a lot of allegations
13 throughout the divorce of abuse and so on.
14 And the one thing I have learned is, I am not
15 going to allow you -- I am not going to put
16 myself in this situation to get a DVP put on
17 myself. Her dad was threatening, so I just
18 -- it was just best -- as my recording
19 showed, it was not raining when I set it out.
20 My whole goal was to keep it right there
21 together so they can just get it at the edge
22 of my property and they could leave.
23    Q. And you recorded that?
24    A. Yes, ma'am.

Page 34

1    Q.  Okay.  Have you provided that
2  recording to your attorney?
3         MR. ROBINSON:  We haven't seen
4  it.
5         MR. BRYAN:  I'm sorry.  Which
6  recording?
7         MS. TULLY:  The recording of him
8  putting the property out at the edge of his
9  property in November of 2018.
10        MR. BRYAN:  I don't recall.
11   A.  I can't recall.
12   Q.  Do you still have that recording?
13   A.  I can't recall.  I would have to
14  look at it.  I know the family court may have
15  it.
16   Q.  Okay.
17        MR. BRYAN:  Audio recording or
18  video?
19        THE WITNESS:  It is a video.
20        MR. BRYAN:  I don't think I have
21  seen it.
22   Q.  All right.  But it was raining by
23  the time she picked the property up; is that
24  correct?

Page 35

1    A.  No, ma'am.  No, ma'am.
2    Q.  It was not?
3    A.  No, ma'am.
4    Q.  Okay.
5    A.  On the record, Judge Clark, who was
6  over my case -- I submitted that video while
7  Judge Goldston was over my hearing.  So she
8  probably has it on the record.  It is on
9  record somewhere.  But Judge Clark said in
10  her own words -- I can't paraphrase her.  But
11  she said, it looks like mist or heavy dew.
12  And I took pictures of cardboard boxes that
13  remained dry.
14   Q.  All right.  Now, my understanding
15  is though what you put out in November of
16  2018 -- there still remained items in your
17  home that Ms. Gibson had been awarded?
18   A.  No, ma'am.  No, ma'am.
19   Q.  So you gave her everything?
20   A.  I give her everything that was
21  court ordered.
22   Q.  Okay.  Now, I understand there is a
23  disagreement between whether you were
24  supposed to provide her with pictures or

Page 36

1  copies of pictures; is that correct?
2    A.  It is on the court record of Judge
3  Goldston.
4    Q.  Is that correct, there's a
5  disagreement?
6    A.  What was the question?  Can you
7  rephrase it?
8    Q.  As to whether or not you were to
9  provide her with the actual pictures hanging
10  on the walls or copies of those pictures.
11   A.  So you said is there a
12  disagreement?
13   Q.  Is there a dis- -- was there a
14  disagreement about that?  You did not provide
15  those pictures; is that correct?
16   A.  Yes, ma'am, I did not provide
17  those.
18   Q.  Okay.  It is your belief that you
19  were to provide copies of those pictures?
20   A.  Yes, ma'am.
21   Q.  Did you take any steps to make
22  copies of those pictures?
23   A.  I did provide copies.
24   Q.  And when was that?

Page 37

1    A.  I submitted them to her March 4th.
2    Q.  And when you say her, you
3  pointed --
4    A.  I'm sorry.  Judge Goldston.
5         And I also submitted them to Judge
6  Clark.  I got them copied at Staples.  And I
7  sent them via e-mail and over a thumb drive.
8  There's thousands of photos that I was
9  supposed to copy.  So I did both.  It is on
10  the thumb drive.  And the pictures on the
11  walls, I submitted via e-mail.
12   Q.  Okay.  All right.  So at some point
13  though there was a motion for contempt filed
14  against you with regard to the property
15  distribution; is that correct?
16   A.  Yes, ma'am.
17   Q.  All right.  And there was a hearing
18  regarding this motion on March 4, 2020?
19   A.  (Nods head.)
20   Q.  Yes?
21   A.  Yes, ma'am.  Sorry.
22   Q.  Okay.  Were you still represented
23  by your attorney at that point?
24   A.  No, ma'am.

Page 38

1    Q. All right. So you handled that
2  hearing pro se?
3    A. Yes, ma'am.
4    Q. Okay.
5    A. Sorry.
6    Q. And that hearing began in the
7  courtroom, correct?
8    A. Yes, ma'am.
9    Q. All right. And at some point
10  during that hearing, the judge ordered you
11  all to appear at your house on Quiet Street?
12    A. Yes, ma'am.
13    Q. Okay.
14    A. Quiet Oak, yes, ma'am.
15    Q. Did you call anyone from the time
16  that you left the courthouse till the time
17  you arrived at your property?
18    A. I can't recall, ma'am. I can't
19  recall.
20    Q. You don't know if you called an
21  attorney?
22    A. No, ma'am.
23    Q. All right. I am going to show you
24  -- okay. Hold on just a second. All right.

Page 39

1  I am going to show you a video.
2    (Video played.)
3    Q. Can you tell me who is taking this
4  video?
5    A. My girlfriend, ma'am.
6    Q. What's her name?
7    A. Sharon Masual, M-A-S-U-A-L.
8    MR. BRYAN: Are you going to mark
9  this as an exhibit?
10    MS. TULLY: I plan to.
11    Q. All right. This video you say was
12  taken by your girlfriend, Sharon Masual?
13    A. Yes, ma'am.
14    Q. Does she live with you at your
15  home?
16    A. No, ma'am.
17    Q. Okay. Why was she there that day?
18    A. She was a witness that I was going
19  to call for that hearing.
20    Q. So she was at the hearing initially
21  at the courthouse?
22    A. Yes, ma'am.
23    Q. And then she traveled with you to
24  your home?

Page 40

1    A. Yes, ma'am.
2    Q. Does this video accurately reflect
3  what occurred outside of your home on
4  March 4, 2020?
5    A. As far as I can tell, yes, ma'am.
6    Q. And this is the same video taken by
7  your girlfriend? It has not been altered in
8  any way to your knowledge?
9    A. I would have to go back and look --
10  listen to the words and everything to match
11  what I have. But it seemed like it is right.
12    Q. I believe I received this video
13  from your attorney.
14    A. If you received it from him, it is
15  the right one, ma'am.
16    Q. All right. And then after this --
17  after everything was finished at your home,
18  then you all returned to Judge Goldston's
19  courtroom, correct?
20    A. Yes, ma'am.
21    Q. All right. And concluded the
22  hearing?
23    A. Concluded -- I guess continued on
24  to another date. Does that sound right?

Page 41

1    Q. Okay.
2    A. So concluded, yes, I guess.
3    Q. Okay. Okay. All right. It is my
4  understanding from your discovery responses
5  that what occurred at your home on March 4,
6  2020, has caused you some emotional distress;
7  is that fair?
8    A. That's fair, ma'am.
9    Q. All right. And can you explain to
10  me what kind of distress that caused you?
11    A. You know, I have been in law
12  enforcement since 1996 in some form, some
13  fashion. And I've always been taught when
14  you raise your right hand to the oath of the
15  constitution that you would abide by people's
16  rights.
17    Little did I ever know that this
18  could or should happen. You know, some of
19  the guys that I have known in law
20  enforcement, it is just -- it just -- it is
21  wrong, ma'am. That's all I can tell you. I
22  can't even really put it in words. It's just
23  wrong.
24    Q. Have you sought any kind of

1  counseling as a result of this?

2      A.  Yes, ma'am.

3      **Q.  And when did you begin seeing a**

4  **counselor?**

5      A.  To the best of my recollection,

6  around the middle of March.

7      **Q.  Had you seen a counselor prior to**

8  **the middle of March of 2020?**

9      A.  Not for the same issue.  But yes.

10     **Q.  So you were currently seeing a**

11 **counselor; is that correct?**

12     A.  No, I was not.

13     **Q.  Okay.**

14     A.  I hadn't seen a counselor -- sorry.

15     **Q.  No.  Go ahead.**

16     A.  I probably hadn't seen him, I don't

17 know, six, eight months, a year maybe.

18     **Q.  Why did you initially start seeing**

19 **a counselor?**

20     A.  Marriage counseling.

21     **Q.  Was that something that you did**

22 **with your ex-wife?**

23     A.  No, ma'am.  That is something I did

24 for myself.

1      **Q.  Okay.  You started doing that after**

2  **you-all had already separated?**

3      A.  No, ma'am.  I did it before.

4      **Q.  Okay.  Who was that counselor?**

5      A.  His name was Jason Moore.

6      **Q.  And who is he with?**

7      A.  Life Strategies.

8      **Q.  Is this the same counselor that you**

9  **went to after March 4, 2020?**

10     A.  Yes, ma'am.

11     **Q.  What caused you to go back to him?**

12     A.  Just the -- you know, talking after

13 this incident?

14     **Q.  Yes.**

15     A.  Just the anxiety of not really

16 believing what just happened.  Again, I can't

17 hardly put it in words.  It just -- you know,

18 I got a judge who -- I didn't even get a

19 chance to defend myself.  This could have

20 been easily fixed if she let me defend and

21 explain my property form, here is the issues.

22 And, I mean, it would have been easy to

23 talk -- ma'am, you ordered me to do photos --

24 copy photos.  And I had to copy a thousand

1  other photos.  What's the difference between

2  those eight on the wall?  Do you know what

3  I mean?  So if I was able to present my

4  defense --

5      Any court that I have ever been

6  involved with, you are allowed some kind of

7  due process.  And it was just trampled on

8  that day.  That bothered me.  To say that I

9  have my faith in the justice system -- it

10 went down a notch, you know.

11     **Q.  Okay.  How often -- do you still**

12 **see Mr. Moore?**

13     A.  Yeah.  I am still under his care.

14     **Q.  What are you seeing him for**

15 **currently?**

16     A.  The same issue.

17     **Q.  This same issue?**

18     A.  Yes, ma'am.

19     **Q.  So almost two years later, you are**

20 **still seeking counseling?**

21     A.  Anytime that we do this, it

22 inflames it.  Anytime I get a deposition --

23 you know, I have been in family court since I

24 seen Judge Goldston.  Maybe seven times, I

1  have been back to court.  So this inflames

2  it.

3      **Q.  How often do you see Mr. Moore?**

4      A.  At one point, I was seeing him

5  weekly.  Then he went bi-weekly.  And so now

6  it is whenever I need --

7      **Q.  Okay.**

8      A.  -- I need to go back.  I have my

9  daughters' basketball schedule.  I've got two

10 of them playing, so ...

11     **Q.  When is the last time that you saw**

12 **him?**

13     A.  I can't recall.

14     **Q.  Do you have a current appointment**

15 **set?**

16     A.  No, ma'am.

17     **Q.  In terms of -- has this had an**

18 **impact on your daily life?**

19     A.  Like I said, it inflames it.  But

20 as far as daily life, no, I am able to go to

21 work and stuff.  But I will say it is -- you

22 know, sometimes I may take a day off for

23 stress, anytime that I have court or Kyle

24 files a case or -- my contempt hearing went

Page 46

1  on for a year, almost two years.
2      Q.  Uh-huh.
3      A.  So anytime there was a continuance
4  or so on, it just inflamed it.
5      Q.  What was the ultimate response of
6  your contempt hearing?
7      A.  As of last Tuesday, Judge Clark
8  said she is going to dismiss the case against
9  me.
10     Q.  Okay.  You keep telling me that it
11 inflames you.  I need to have a better
12 understanding of --
13     A.  I can't really put it in words,
14 ma'am.  It is a feeling of disbelief, maybe a
15 little bit of anger.  Sad that when I see a
16 Raleigh County Sheriff's Department -- you
17 know, I know a lot of them guys.  And a lot
18 of them -- you know, I see them driving down
19 the road.  Are they going to go search
20 somebody else's house illegally?  I mean, it
21 has been done for 20 years.  I can't believe
22 that my only crime was I went through a
23 divorce.  It was a nasty divorce evidently.
24 So, you know -- it is hard to put it in

Page 47

1  words, ma'am.
2      Q.  Okay.  If this matter goes to
3  trial, are you going to be able to find the
4  words to explain to the jury the impact this
5  has had on you?
6      A.  That's a good question, ma'am.
7      Q.  Well, because if you are going to
8  be able to find them then, I would like you
9  to try to find them today to explain to me.
10     A.  Sure.  It is hard to put my
11 emotions in words.  So I'm sorry that I don't
12 have the words for you.  But my emotions are
13 hard to explain.
14     Q.  Okay.  Other than Jason Moore, have
15 you ever sought any kind of medical treatment
16 as a result of this?
17     A.  No, ma'am.
18     Q.  Are you on any kind of medication?
19     A.  No, ma'am.
20     Q.  So you don't take any kind of
21 anxiety medication?
22     A.  No, ma'am.
23     Q.  Okay.  And you are able to continue
24 functioning and going to work?

Page 48

1      A.  Yes, ma'am.
2      Q.  You say you sometimes have to take
3  a day off.  Is that for hearings?
4      A.  Yes, ma'am.  It is for hearings.
5  Just prepping.  Anytime that I have a
6  hearing, it -- I had a hearing last week.  It
7  is like it is a mountain when you are pro se.
8  You are an attorney.
9      Q.  I am, yes.
10     A.  I am not.  I have to study tenfold.
11 You went to school.
12     Q.  So you're still representing
13 yourself in your divorce hearing?
14     A.  Well, I should be done now other
15 than child support cases.  So yes.
16     Q.  Okay.  Okay.  So then you take a
17 day off to prepare for your hearings and
18 attend the hearing?
19     A.  No.  Sometimes after, I take it off
20 for stress.  I have to decompress.
21     Q.  Okay.  But you don't interact
22 anymore with Judge Goldston?
23     A.  No, ma'am.
24     Q.  Okay.  And in fact you have not

Page 49

1  since March 4, 2020; is that correct?
2      A.  Yes, ma'am.
3      Q.  Can you tell me who Doug Black is?
4      A.  He is a co-worker of mine, ma'am.
5      Q.  What would Mr. Black know about
6  this incident?
7      A.  He was there.  He was in the
8  driveway on the video.  He was one of the
9  guys that was standing in the driveway.
10     Q.  Okay.  Why was Mr. Black there?
11     A.  He was a witness to the property
12 exchange.  He helped me place the items at
13 the bottom of my driveway.
14     Q.  All right.  What were you going to
15 call Sharon -- how do you say your
16 girlfriend's last name?
17     A.  Masual.
18     Q.  Masual.  What were you going to
19 call her as a witness to testify to?
20     A.  She was there that night that we
21 exchanged property on November 30, 2018.  She
22 can testify what the weather was.  The
23 cardboard boxes were dry.  I took care of
24 what I could.

1    Q.  Were you there when your ex-wife
2  Carrie Gibson showed up to actually pick up
3  the property?
4    A.  Yes, ma'am.
5    Q.  Was Ms. Masual there?
6    A.  Yes, ma'am.
7    Q.  How about Mr. Black?
8    A.  He'd done left by then, ma'am.
9    Q.  Have you discussed this incident
10  from March 4, 2020, with Ms. Masual?
11    A.  She was there.  She took the video.
12    Q.  I know.  But have you discussed it
13  since then?
14    A.  Oh, sure.
15    Q.  Okay.
16    A.  Yes, ma'am.
17    Q.  What have you-all discussed about
18  it?
19    A.  I mean, that's my girlfriend.  So
20  we have talked from A to Z probably on a
21  daily basis.
22    Q.  Okay.  Is this something that you
23  talk about daily?
24    A.  Probably.

1    Q.  How about Mr. Black, have you
2  talked to him about the March 4, 2020
3  incident?
4    A.  I haven't in a while.
5    Q.  You did initially?
6    A.  Oh, yes, ma'am.
7    Q.  And what did you tell Mr. Black?
8    A.  I don't -- I can't recall.
9    Q.  Who is Tommy Carter?
10    A.  He is a co-worker of mine.
11    Q.  Is he a neighbor?
12    A.  He is a neighbor.
13    Q.  What would Mr. Carter know with
14  regard to the March 4, 2020 --
15    A.  I don't know what he would know.  I
16  don't know what he would know.
17    Q.  Okay.  Well, you have him listed as
18  somebody who would have information.
19    A.  So he was at the bottom of the
20  driveway -- not my driveway, the bottom of
21  the road -- whenever we were exchanging
22  property.  And the road was blocked.  So he
23  can verify what the weather was also that
24  night.

1    Q.  So that was from the November 2018
2  property exchange?
3    A.  Yes, ma'am.
4    Q.  Okay.  So he doesn't have any
5  information regarding anything that happened
6  on March 4th?
7    A.  He was in the driveway -- I'm
8  sorry.  I misunderstood your question.  He
9  was also in the driveway on March 4th, 2020.
10    Q.  Did he come up onto your property
11  to see what was going on?
12    A.  Mr. Black and Mr. Carter -- which I
13  don't know if you can see it on the video or
14  not.  When we get out of the truck, there's
15  two guys standing there.  That's them two at
16  the top of my driveway.
17    Q.  Okay.
18    A.  Along with Sharon Masual.
19    Q.  Did they stay the entire time?
20    A.  Yes, ma'am.  Until Bailiff Stump
21  made them leave -- or Deputy Stump.
22    Q.  And Brooklyn Gibson, that's your
23  daughter; is that correct?
24    A.  Yes, ma'am.

1    Q.  Have you discussed this with
2  Brooklyn?
3    A.  Only what I had to because it was
4  on the news.  So if she gets questioned at
5  school -- when it hits the news, what
6  happened?
7    Q.  Okay.
8    A.  She wasn't there that day.
9    Q.  How did this get to the news
10  station?
11    A.  I can't answer that.
12    Q.  You have no idea?
13    MR. BRYAN:  If you know --
14    THE WITNESS:  Huh?
15    MR. BRYAN:  If you know, answer
16  the question.
17    Q.  I believe they have showed the
18  video on the news; is that correct?
19    A.  They have, right.
20    Q.  How did they obtain the video that
21  your girlfriend took?
22    THE WITNESS:  I believe I give it
23  to you, John, right?
24    LOUISE GOLDSTON:  You can't --

1 the judge in me.  I'm sorry.
2        MR. BRYAN:  Don't testify as to,
3 you know, our confidential communications.
4 But if you recall how the news ended up with
5 the video, then you can answer the question.
6 You don't have to say anything we've
7 discussed.
8    A. So by that time, I done retained
9 Mr. Bryan.  And I am assuming Mr. Bryan
10 turned it over to the news station.
11    Q. How quickly did you retain Mr.
12 Bryan?
13    A. I'd say -- I can't recall.  But it
14 is middle of March maybe, first week of
15 March.  Somewhere in that line.
16    Q. So within weeks?
17    A. Yes, ma'am.
18    Q. All right.  To have this shown on
19 the news and to have this video on YouTube
20 for anybody and everybody to see, has that
21 caused you any kind of anxiety or emotional
22 distress?
23    A. Absolutely.
24    Q. But that was something done by you

1 and your attorney; is that correct?
2    A. Yes.
3    Q. Have you received comments or
4 anything with regard to --
5    A. Yes, ma'am.
6    Q. -- this video?
7        Who have you received comments
8 from?
9    A. I don't know who.  There has been
10 positive and some negative.
11    Q. Your co-workers said anything to
12 you?
13    A. Sure.
14    Q. What kinds of things have your
15 co-workers said?
16    A. I can't recall.  But it's more off
17 the cuff like, I can't believe it.  Are you
18 kidding me, kind of stuff.  Stuff like that.
19        MS. TULLY:  All right.  Give me
20 just a couple of minutes, and I might be
21 finished.  Okay?
22        THE WITNESS:  Okay.
23        (Break in proceedings.)
24        MS. TULLY:  Mr. Gibson, I think

1 that I am good.  I don't think I have any
2 further questions.  Mr. Robinson might have a
3 few.
4        MR. ROBINSON:  Yes.  I have some
5 questions.
6        EXAMINATION
7 BY MR. ROBINSON:
8    Q. My name is Mr. Robinson --
9 Mr. Robinson -- my name is Kevin Robinson.
10        (Laughter.)
11    Q. I represent the deputy in this
12 case.  And I have some questions about the
13 lawsuit that you have filed.
14        Now, I might jump around a little
15 bit.  And I might ask some questions that
16 she asked.  And I understand I talk fast.
17 You can tell me to slow down, and I will try
18 to rephrase it for you.  But other than
19 that, I will get right into it.
20        I want to start out -- your family
21 court case -- your divorce case is in front
22 of what judge now?
23    A. It was in front of -- I am assuming
24 it is still in front of Judge Lisa Clark,

1 Mercer County.
2    Q. Okay.  So it was transferred from
3 Judge Goldston to Judge Clark in Mercer
4 County?
5    A. There was a slight stopping between
6 -- with Brad Dorsey out of Nicholas County.
7 But we never had any sworn testimony.  It was
8 more or less status conference hearings two
9 times.
10    Q. Okay.  Let me make sure I got your
11 testimony correct.  Are you stating that all
12 of the items that you were supposed to turn
13 over to your ex-wife had already been turned
14 over before the contempt hearing?
15    A. Before March 4, 2020, is that what
16 you're asking?
17    Q. Is that the contempt hearing -- the
18 date of the contempt hearing, March 4th?
19    A. Yes.
20    Q. Are you stating that all of the
21 items that you were supposed to -- that you
22 had been ordered to turn over had already
23 been turned over to your ex-wife?
24    A. All court items were turned over

Page 58

1  before that date, yes, sir.
2      Q.  Okay.  I will have some questions
3  about that later, but -- okay.
4          This case was transferred to
5  another judge, correct?
6      A.  Yes, sir.
7      Q.  You said it was Dorsey.  But you
8  didn't have any hearings?
9      A.  No.
10     Q.  It was a status hearing?
11     A.  Status conference hearings.  But
12  there was no sworn testimony.  Nobody raised
13  their hand.
14     Q.  What were the status conference
15  hearings about?
16     A.  Evidence rules as far as I can
17  recall, stuff like that.
18     Q.  Evidence rules regarding what?
19     A.  On what we are going to submit --
20  or discovery -- shall we call it discovery on
21  rules?
22     Q.  Discovery on what?
23     A.  On the contempt hearing.
24     Q.  Okay.  Well, that's my question.

Page 59

1  You said you had already turned over
2  everything.  But there is still a contempt
3  hearing going on, correct?  Because I believe
4  you had not turned over all of the items; is
5  that correct?
6      A.  That was the belief.  But again,
7  when we -- the time I got in front of Judge
8  Lisa Clark, I was able to rectify those
9  items.  She did not allow me to testify on
10  the items that were seized from the house.
11  She didn't want any testimony on that.
12     Q.  What did she take testimony on?
13     A.  Basically the claim of if the items
14  were damaged or not.
15     Q.  Okay.  And how many times did you
16  go before Judge Clark?
17     A.  She had a status conference
18  hearing.  Then we had one -- we are talking
19  about just for contempt, right?
20     Q.  No.  All hearings you had in front
21  of Judge Clark.
22     A.  Child support too, and all of that?
23     Q.  Yes.
24     A.  I believe four would be the proper

Page 60

1  number.
2      Q.  Okay.  Four altogether?
3      A.  Yes.
4      Q.  So you had no hearing -- you didn't
5  have any hearing in front of Judge Clark
6  regarding any property that they claimed you
7  did not turn over?
8      A.  She would not allow if any -- any
9  property that was seized that day, she took
10  zero testimony.  I tried to object to it
11  and --
12     Q.  What do you mean you tried to
13  object to it?  Sorry for interrupting.  But
14  what do you mean you tried to object to it?
15     A.  I objected to it.
16     Q.  Oh, you mean you objected to the
17  property attempt from your home?  That's what
18  you're saying?
19     A.  Yes, sir.
20     Q.  You are saying Judge Clark would
21  not allow any testimony on that?
22     A.  She would not allow it.  She said
23  the proper authorities -- if I am misquoting
24  here -- have already -- or it's under

Page 61

1  investigation, so forth and so on.
2      Q.  Well, you were not ordered to turn
3  over any other property to your ex-wife after
4  the incident --
5      A.  No, sir.
6      Q.  -- that's the subject of this
7  matter?
8      A.  No, sir.
9      Q.  Okay.  And the only testimony that
10  was taken was regarding damaged property?
11     A.  (Nods head.)
12     Q.  Is that a yes or no?
13     A.  Yes, sir.
14     Q.  Sorry.
15          And you are saying you had video of
16  this damaged property?
17     A.  I have no video of no damaged
18  property.
19     Q.  Okay.  I might have misunderstood
20  your testimony earlier.  Did you say you took
21  video of you taking property out and putting
22  it at the end of --
23     A.  I have property of -- I have a
24  video of the property that I sat at the

Page 62

1  bottom of my driveway, yes.
2       Q. What do you mean you have a video
3  of it? You just have a video of the thing
4  that you took? Or do you have a video of you
5  taking it and putting it out front?
6       A. I have video -- we carried it down,
7  myself and Doug Black. And I videoed the
8  condition, the weather, and everything that
9  was sat out.
10      Q. Okay. Did you play that video in
11  court?
12      A. I did for Judge Lisa Clark, yes.
13      Q. Did she take possession of that
14  video?
15      A. Yes, sir.
16      Q. Okay.
17      A. If this will help you -- if you are
18  looking for it, I will help you with it. It
19  was the September 2020 hearing.
20      Q. Was Kyle Lusk there?
21      A. Yes, sir.
22      Q. Okay. And it is your testimony
23  that it did not rain on her property?
24      A. No, ma'am -- or no, sir. Sorry.

Page 63

1       Q. No, ma'am, that's fine.
2       (Laughter.)
3       Q. Okay. You say child support case.
4  Do you have a problem paying child support,
5  or is that just something that is part of the
6  divorce case?
7       A. I don't pay child support, sir.
8       Q. Are you supposed to pay child
9  support?
10      A. No, sir.
11      Q. Why is that?
12      A. Because my wife pays me child
13  support.
14      Q. Okay. But you have custody of
15  Brooklyn?
16      A. Yes, sir.
17      Q. And she has custody of Sky?
18      A. Yes, sir.
19      Q. Okay.
20      A. So I guess indirectly I do pay.
21  But it lowers her amount.
22      Q. Okay. Is Sharon Masual still your
23  girlfriend?
24      A. As far as I know, yes, sir.

Page 64

1       Q. As far as you know?
2       A. Yes, sir.
3       Q. Okay. All right. How long have
4  you two been together?
5       A. This is tape-recorded?
6       Q. Yeah. We won't play it for her if
7  you don't know for sure.
8       (Laughter.)
9       Q. We can redact that part.
10      A. Yeah. Four years, sir.
11      Q. Four years. And you two don't have
12  any children together?
13      A. Thank God. No, sir.
14      Q. You might want to redact all of
15  this.
16          How old is she?
17      A. Forty-five, sir.
18      Q. You don't reside together?
19      A. No, sir.
20      Q. Where does she live?
21      A. She lives on -- she lives in the
22  neighborhood.
23      Q. Okay.
24      A. She lives in the Oaks neighborhood.

Page 65

1       Q. Does she have any children?
2       A. Yes, sir.
3       Q. How many children does she have?
4       A. Two boys.
5       Q. How old are they?
6       A. Twelve and -- I'm sorry -- 13. His
7  birthday just happened. And 14.
8       Q. What are their names?
9       A. Jonas and Gabriel. We call him
10  Gabe. I can't spell it.
11      Q. Masual?
12      A. Yes, sir.
13      Q. The property that is the subject of
14  this litigation -- the home is 113 Quiet Oak
15  Street?
16      A. Quiet Oak Street, yes, sir.
17      Q. And you and your wife bought this
18  property together?
19      A. Yes, sir.
20      Q. But only your name is on the title?
21      A. Yes, sir.
22      Q. Was her name ever on the title?
23      A. It was before -- it was before I
24  was court ordered to remove her from the

Page 66

1  title.
2      Q.  Oh, okay.  Has anybody else ever
3  been on the title of the house?
4      A.  Just the bank.
5      Q.  From looking at video, it has a
6  yard -- it is a large yard, correct?
7      A.  I wouldn't call it -- I mean, it
8  might be a third of an acre.  When I am
9  mowing it, it feels larger.  But keep going.
10     Q.  And how many stories in your home?
11     A.  I would call it a two-story.  Some
12  people think -- they call it tri-level maybe.
13     Q.  Why did you and Ms. Gibson get
14  divorced?
15     A.  Probably -- probably a good
16  question.
17     Q.  Any cheating going on?
18     A.  No.
19     Q.  Any physical abuse?
20     A.  No, sir.
21     Q.  You made reference to it earlier
22  that there may have been some accusation of
23  it.  Did she accuse you of that?
24     A.  I mean, no -- no verbal abuse, no.

Page 67

1  No adultery.  It was -- you know, anytime --
2      Q.  What about physical abuse?
3      A.  No.  No physical abuse, no.
4      Q.  Okay.  Because you also said
5  something about her father got upset about
6  something.  What did her father get upset
7  about?
8      A.  Anytime through a divorce, they are
9  going to get her back regardless.  So he
10  always wants to confront.  So I just really
11  stay out of the way.  At ball games, I will
12  sit to the furthest end of the gym from him.
13  I want zero trouble.
14     Q.  Confront you about what?
15     A.  Just whatever.  I mean, I don't
16  know what they are mad about.  I don't know.
17     Q.  What's her father's name?
18     A.  Paul Payne.
19     Q.  Payne?
20     A.  P-A-Y-N-E.
21     Q.  And he was there on the day of the
22  incident, correct?
23     A.  Yes, sir.  So was her brother, and
24  I believe it was her boyfriend.  There was --

Page 68

1      Q.  What's her boyfriend's name?
2      A.  Jeff.
3      Q.  What's his last name?
4      A.  Presley, I believe.
5      Q.  Jeff Presley.  Do you know how long
6  they have been together?
7      A.  I don't.  It is more than a couple
8  years, I would say.
9      Q.  How long did you -- how long after
10  you got divorced from your wife did you start
11  dating your current girlfriend?
12     A.  After I got divorced?  I was dating
13  her throughout the proceedings.
14     Q.  Okay.  So you were with her
15  throughout the court proceedings.
16     A.  I think I started dating her in
17  June.  My final was in September.  So June of
18  '18 would sound right.  So it is almost
19  four years.
20     Q.  So you were dating her before you
21  were physically divorced; is that correct?
22     A.  Yes, sir.
23     Q.  You're currently employed with the
24  Federal Bureau of Prisons, correct?

Page 69

1      A.  Yes, sir.
2      Q.  Is that the one that is in like
3  Beaver?
4      A.  Yes, sir.
5      Q.  You say your job there is a
6  foreman?
7      A.  Yes, sir.
8      Q.  And you also -- I think you said
9  earlier you had been in law enforcement since
10  1996?
11     A.  Yes, sir.
12     Q.  Have you been at the Federal Bureau
13  of Prisons since 1996?
14     A.  2001, sir.
15     Q.  2001.  Okay.
16          And what type of law enforcement
17  job did you have before 2001?
18     A.  I was an Air Force police officer.
19     Q.  Okay.  My dad was in the Air Force
20  too.
21     A.  Good man.
22     Q.  What was your first job at the
23  Federal Bureau of Prisons?
24     A.  I was a corrections officer, sir.

1    Q.  So you do have correction officer's
2  training then, correct?
3    A.  You know, it probably doesn't
4  matter to you guys.  But everybody in the
5  Federal Bureau of Prisons is considered a
6  corrections officer first.  We don't have --
7  when something kicks off, everybody responds.
8  Everybody is supposed to know what to do,
9  whether it be a secretary, a foreman, a
10  facilities guy, a food dude.  Everybody is
11  supposed to know.  That way you ain't got
12  half the people standing around looking
13  around.
14    Q.  What do you mean when something
15  kicks off?
16    A.  When there is a disturbance or a
17  fight or any major incident -- sorry.  I am
18  talking prison to you.
19    Q.  No.  Well, my dad retired from
20  there -- not from federal, but from the
21  state.  So I know a little bit about all of
22  this.
23    A.  So the state, the difference is --
24  there is custody and non-custody.  And

1  non-custody stands there and watches while
2  things go down.  You may be outmanned.  And
3  they basically don't help.
4    Q.  Okay.  So do you have any training
5  to be a corrections officer?
6    A.  Every year we take it, sir.
7    Q.  Okay.  That's everybody in the
8  Federal Bureau of Prisons?
9    A.  Yes, sir.
10    Q.  Okay.  So they give you training on
11  following orders, correct?
12    A.  Yes, sir.
13    Q.  Following judicial orders?
14    A.  (Nods head.)
15    Q.  Yes?
16    A.  I mean, judicial orders, I can't
17  say that they train us in that.  So the
18  answer is no, I don't have any specific
19  training on that.
20    Q.  Well, I would guess you were
21  intake, and you said out-take?
22    A.  I was receiving a discharge.
23    Q.  Okay.  I would assume you would get
24  an order from the federal court releasing

1  somebody, correct?
2    A.  You know what, yes, sir.  Okay.
3  Yeah.  Sorry.  I misinterpreted the question.
4    Q.  That's all right.  So they send you
5  an order to release somebody, you can't say,
6  no, I am not going to release them?
7    A.  No.  You'd better do it.
8    Q.  Okay.  You served in the Air Force,
9  correct?
10    A.  Yes, sir.
11    Q.  How long?
12    A.  About a year of active duty.
13    Q.  Where were you stationed?
14    A.  Seymour Johnson Air Force Base.
15    Q.  Where is that located?
16    A.  Goldsboro, North Carolina.
17    Q.  Where did you do your training?
18    A.  Lackland Air Force Base.  And then
19  Camp Bullis, which is the Army there
20  connected to Lackland.
21    Q.  Did you receive an honorable
22  discharge or a dishonorable discharge?
23    A.  Honorable.
24    Q.  Okay.  And when was that?

1    A.  19 -- June of '96 through March of
2  1997 was my active duty time.
3    Q.  You weren't in there very long
4  then, were you?
5    A.  No.  I got out under a humanitarian
6  discharge, which is honorable.  My dad got
7  sick, and I had to take care of him.
8    Q.  All right.  Ever been convicted of
9  a crime?
10    A.  Oh, yeah.
11    Q.  You have?  Yeah?
12    A.  No.  I didn't hear you.  What was
13  your question?
14    Q.  Have you ever been convicted of a
15  crime?
16    A.  No, sir.
17    Q.  Okay.  You just had a failure to
18  yield in 1999?
19    A.  Yes, sir.
20    Q.  And speeding and illegal window
21  tint, correct?
22    A.  Yes, sir.
23    Sheww.  Sorry.
24    Q.  Have you ever been charged with a

Page 74

1  crime?
2      A.  You know, I had a reckless driving
3  before I went in the Air Force.
4      Q.  Oh, okay.
5      A.  But it was dropped.  So 1995-ish.
6  But it was dropped.
7      Q.  Was that for driving too fast or
8  drunk driving?
9      A.  No.  I don't even drink.  I am
10 assuming it was driving too fast.
11     Q.  You are assuming it was driving too
12 fast?
13     A.  Yes, sir.
14     Q.  You don't know why he pulled you
15 over for reckless driving?
16     A.  1995, on prom night, a buddy of
17 mine was going like this through Crab
18 Orchard.
19     Q.  You and your buddy were racing?
20     A.  No, sir.
21     Q.  It was on prom night?
22     A.  Yes, sir.
23     Q.  Okay.  Got somebody in the car with
24 you at the time?

Page 75

1      A.  Yes, sir.
2      Q.  I am assuming it was your prom
3  date?
4      A.  Yes, sir.
5      Q.  Okay.  Ever sued anybody else
6  before?
7      A.  No, sir.
8      Q.  Okay.  Have you ever filed for
9  Social Security disability?
10     A.  No, sir.
11     Q.  Not taking any medications right
12 now?
13     A.  No, sir.
14     Q.  All right.  Never been on Medicaid
15 or anything like that?
16     A.  Medicaid?
17     Q.  Yeah.
18     A.  No, sir.
19     Q.  Or Medicare?
20     A.  No, sir.
21     Q.  You might have answered this
22 before.  Who initiated the divorce between
23 you and your wife?
24     A.  The wife, sir.

Page 76

1      Q.  I think it was filed around 2017?
2      A.  Yes, sir.
3      Q.  And you hired Brandon Johnson?
4      A.  Yes, sir.
5      Q.  Okay.  Was he referred to you, or
6  was he somebody you picked out of the phone
7  book?
8      A.  No.  He was referred to me.
9      Q.  Okay.  And your wife has always had
10 Kyle Lusk?
11     A.  As far as I know, sir.
12     Q.  When did she move out of the
13 113 Quiet Oak Street residence?
14     A.  I am assuming it was the date of
15 separation.  I think it was September 30,
16 2017.
17     Q.  She just decided to up and leave?
18 Or was she court ordered to leave?
19     A.  No.  She left, sir.
20     Q.  Okay.  Where did she go?
21     A.  I believe she lived with her mom.
22     Q.  Okay.  Are her parents married?
23     A.  Yes, sir.
24     Q.  Did she move out before or after

Page 77

1  the divorce petition was filed?
2      A.  Before, sir.
3      Q.  And then did she take anything from
4  the house when she moved out?
5      A.  Yes, sir.
6      Q.  What did she take?
7      A.  I can't recall.  She took some
8  personal property that day.  I let her have a
9  key up until the April 2018 hearing.  So she
10 was in and out of the house, you know,
11 several times.
12     Q.  Okay.
13     A.  And then the official come get your
14 stuff was March of 2018.
15     Q.  She was in and out of the house
16 several times in between then, you said?
17     A.  Yes, sir.  She pulled some stuff
18 off of the computer, I do recall that.
19     Q.  What do you mean she pulled some
20 stuff off of the computer?
21     A.  She had some forms or something.
22     Q.  Was she ever there when you weren't
23 there?
24     A.  Yes, sir.

Page 78

1    Q.  There are a lot of docs I had to go
2  through over here.  You said there was a time
3  when she officially came and got a bunch of
4  stuff?
5    A.  Right.  After the January hearing,
6  I do believe that -- I think it was brought
7  up that she should be allowed to go back to
8  the house and collect her items.  So we set a
9  date, which was March -- March of 2018.  Her
10  and her father come and retrieved those
11  items.
12    Q.  What items were those?
13    A.  Her personal property.
14    Q.  All of the ones that is on this
15  property list?
16    A.  No, sir.  That was the marital
17  items right there.  That was what was
18  divided.  Her personal items, she picked up
19  prior.
20    Q.  I don't do a whole lot of family
21  law stuff.  So that's why I'm trying to
22  figure out all of this stuff.
23    A.  I can tell you what I seen.  She
24  carried her clothes out.  She took a computer

Page 79

1  screen because she works from home --
2  computer screen.  Clothing.  She ran through
3  all of the closets, all of the doors and all
4  of that to get whatever she needed.
5    Q.  You were there when all of this
6  took place?
7    A.  Yes, sir.
8    Q.  Okay.  So when she moves out, she
9  takes her personal property; is that correct?
10    A.  Yes, sir.
11    Q.  Was anybody with her when she moved
12  out and taking her personal property?
13    A.  No.  She just -- she moved out at
14  that point with several suitcases.
15    Q.  Did she have a car, a vehicle?
16    A.  Yes, sir.
17    Q.  What kind of vehicle did she have?
18    A.  She had a Yukon Denali 2015 at that
19  time.
20    Q.  You can't recall what all she took
21  out of there at that time?
22    A.  I didn't inventory it.  She had
23  several suitcases, maybe a trash bag or so.
24  A handful of stuff.

Page 80

1    Q.  Okay.  And then I guess the next
2  time she picks up -- I guess -- are there
3  other times -- strike that.
4    She moves out of the home.  And
5  when was that?
6    A.  September 30th of 2017.
7    Q.  Okay.  When was the stuff laid out
8  at the bottom of your driveway?
9    A.  November 30 of 2018.
10    Q.  Did she come into your home at any
11  point in time to remove things?
12    A.  Yes, sir.
13    Q.  Do you know what she removed out of
14  the home?
15    A.  Yes, sir.  She come back for the
16  March of 2018 property pickup with her dad.
17  So that's a few months later.
18    Q.  Okay.
19    A.  She picked up the rest of her
20  clothing and items -- her personal items.
21    Q.  Did she say, hey, I am coming back
22  for other stuff at that time?
23    A.  After March, there was a text
24  message or two, hey, I've forgotten my birth

Page 81

1  certificate and softball glove, will you
2  bring it to me?  I said, sure.
3    Q.  And you brought it to her?
4    A.  Yes, sir.
5    Q.  Okay.  My question is, why was her
6  stuff put out at the bottom of the driveway?
7  Why can't you just sit there and wait for her
8  to come pick it up?
9    A.  At that point, the -- you know,
10  family court in my opinion allows a lot of
11  dissension that doesn't need to be when you
12  start making claims of abuse and this and
13  that.  And people's -- you know, when you go
14  through a divorce, in my opinion, it is
15  highly contentious.  And it can be, or it
16  shouldn't be.  At that point, I didn't feel
17  it would be smart to let her in my house.
18    Q.  Did she make a claim of abuse
19  against you in open court in front of Judge
20  Goldston?
21    A.  Yes.  Her attorney did.
22    Q.  Her attorney did.  What did Judge
23  Goldston do?
24    A.  Nothing.

Page 82

1    Q. Do you recall what hearing this
2 was?
3    A. I don't.  January.  It might have
4 been April.  I don't know.  Matter of fact,
5 Kyle Lusk just did the same thing in Judge
6 Lisa Clark's courtroom in September -- or I'm
7 sorry -- last week.
8    Q. Claim of physical abuse or what?
9    A. No.  No.  Verbal.
10    Q. Oh, just verbal abuse?
11    A. Uh-huh.
12    Q. Oh, okay.  So the abuse you said
13 that she alleged in front of Judge Goldston
14 was just verbal abuse?
15    A. Verbal.
16    Q. What kind of verbal abuse is it?
17    A. I don't know.
18    Q. Well, I mean --
19    A. At this point --
20    Q. What did she allege?
21    A. It never was elaborated.  Just, you
22 know, he -- I think Kyle Lusk said he was
23 verbally abusive, a controlling man,
24 da-da-da.

Page 83

1       MR. ROBINSON:  Do ya'll know if
2 we have any transcripts or not?
3       MS. TULLY:  Family court cases
4 are sealed.
5       MR. ROBINSON:  I am saying do we
6 have them?
7       MS. TULLY:  No.  Because --
8    A. Just on an aside here, as Judge
9 Lisa Clark said, the ship has sailed.  I just
10 hope to get on it and buy a ticket.
11    Q. Okay.  So she's claiming there were
12 allegations of verbal abuse is the reason you
13 set all of her stuff out and into the
14 driveway?
15    A. I mean, I live on the top of a
16 hill.  And you can't sit it at the top of the
17 driveway.
18    Q. Why can't you?
19    A. Because it would roll.  It is very
20 steep.
21    Q. What would roll?
22    A. There was stuff that was on a
23 trailer.  And again, I didn't want them in my
24 garage.  This is something that was talked

Page 84

1 about during the property exchange between
2 Mr. Lusk and Mr. Johnson and me and my
3 ex-wife.
4       My tree stand is still on their
5 property.  And they wouldn't give it to me.
6 So there was no way I was going to let them
7 in my garage.  If they are going to take my
8 tree stand, I am not going to let them in my
9 garage.  And I put it down at the bottom of
10 the driveway for the least amount of
11 resistance.  I didn't want no issues.
12    Q. Okay.  Clarify something.  Who got
13 your tree stand?  You said your ex-wife had
14 your tree stand?
15    A. Ex-wife's dad and brother.
16    Q. So they came in there and took it
17 one day?
18    A. No.  He was on our hunting lease.
19 And when I asked for them to get it back,
20 they wouldn't give it back.
21    Q. Okay.  I might be a little confused
22 here.  You said it is on some hunting
23 property?
24    A. Hunting lease, yes, sir.

Page 85

1    Q. Oh, okay.  All right.  Where is the
2 hunting property located?
3    A. It's in Dawson, West Virginia.
4    Q. I don't know where that is.
5    A. Towards Lewisburg.  It is the exit
6 to the right.
7    Q. And you claim that their tree stand
8 is on --
9    A. My tree stand --
10    Q. -- is on --
11    A. -- is on a hunting lease.  And I
12 asked to go retrieve it.  And they said no.
13 So it just wasn't worth the argument.  It's
14 not worth the couple hundred dollars.
15    Q. Did you bring that in front of
16 Judge Goldston?
17    A. No.
18    Q. Okay.
19    A. At some point, I am not going to
20 argue over everything.
21       (A discussion was held off the
22 record.)
23 BY MR. ROBINSON:
24    Q. I think we were talking about a

Page 86

1  tree stand on some hunting property, correct?
2      A.  Yes, sir.
3      Q.  I think you said there was some
4  property that was on a trailer.  And that's
5  the reason why you didn't want to put it at
6  the top, and then make it roll down I guess
7  the hill or something like that?
8      A.  Yes, sir.
9      Q.  How big is this trailer?
10     A.  It's a five-by-eight trailer.
11     Q.  Okay.
12     A.  It was big items -- I mean, I
13  carried them out of the house -- a couch, a
14  treadmill.
15     Q.  Did Doug Black help you carry it
16  out?
17     A.  Yes, sir.
18     Q.  And it was a couch, a treadmill?
19     A.  A few other odds and ends.
20     Q.  Okay.  And when was this done?
21  What time of the year?
22     A.  November -- we placed it on the
23  trailer in November of 2018.
24     Q.  It probably would have been cold

Page 87

1  around that time, correct?
2      A.  It was the fall weather.
3      Q.  Did you put it out in the morning
4  or at night?
5      A.  Her property?
6      Q.  Yes.
7      A.  It was about 30 minutes before they
8  picked it up.
9      Q.  Okay.  So you say it probably was
10  only sitting there for 30 minutes before she
11  came and picked it up?
12     A.  No more than an hour.  Thirty
13  minutes to an hour.
14     Q.  Okay.  And you said it had not
15  rained, correct?
16     A.  No, sir.
17     Q.  But you --
18     A.  The day of.
19     Q.  The day of?  It had rained the day
20  of?
21     A.  Right.  So when I got home, it
22  wasn't raining.  So I made the decision just
23  to keep peace, to put it at the bottom.
24     Q.  Now, was it wet outside?

Page 88

1      A.  The ground was wet, yes.
2      Q.  You set the couch on the wet
3  ground?
4      A.  No, no, no.  Couch was on the
5  trailer.
6      Q.  Was the trailer wet?
7      A.  No.  Trailer was stored in the
8  garage.
9      Q.  Okay.  And you say she came and
10  picked it up 30 minutes later?
11     A.  Yes, sir.
12     Q.  But did you say that Judge Clark
13  believed that it came from like mist or dew?
14     A.  Her exact words were, it looks like
15  mist or heavy dew.
16     Q.  Okay.
17     A.  Again, my video will show that the
18  boxes were dry.
19     Q.  But you don't have that video
20  anymore?
21     A.  I would have to see it.  It is on
22  court record.  I turned it in to Judge Clark.
23     Q.  Judge Clark?
24     A.  It should be September 20th, I

Page 89

1  think.
2      Q.  September 20.  We will try to get
3  it.  But if everything is sealed ...
4          All right.  So you believe that
5  when you put all of her stuff out front of
6  your residence for her to pick up, that was
7  all of the items that she was ordered --
8  that you were ordered to turn over, correct?
9      A.  Yes, sir.
10     Q.  Therefore, after that, you didn't
11  have to turn over any other items?
12     A.  No, sir.
13     Q.  Was Brandon Johnson still your
14  attorney at the time?
15     A.  I am going to correct this.  When I
16  went back to the hearing, Judge Goldston
17  ordered me to turn over one more picture.
18     Q.  Okay.
19     A.  But yes, after March 4th, I was not
20  ordered by anybody else to turn anything else
21  over.
22     Q.  Okay.  But Kyle Lusk at some point
23  filed a contempt charge against you, correct,
24  alleging that you didn't -- had not turned

1 over everything; is that correct?
2     A.  That was the hearing -- that was
3 the -- it started off December 4th, 2019.
4 And then it carried over to March 4th, the
5 day of the incident.
6     Q.  What happened at the December 4th
7 hearing?  What happened at that hearing?
8     A.  Mr. Lusk was ordered to turn over
9 discovery by a certain time, and he didn't.
10 And so Judge Goldston, I do believe, give me
11 a continuance until March 4th.
12     Q.  What was Kyle Lusk required to turn
13 over?
14     A.  Their video, their witness list,
15 some other documents I can't recall.
16     Q.  Okay.
17     A.  But the main thing was a witness
18 list and video so I could actually review it
19 and look at it.
20     Q.  And then you say Judge Goldston
21 continued that hearing, correct --
22     A.  Yes, sir.
23     Q.  -- in order for Kyle Lusk to give
24 you those items?

1     A.  Yes, sir.
2     Q.  Okay.  The next hearing is the
3 contempt hearing?
4     A.  March 4, 2020.
5     Q.  Okay.  Did you have -- were you
6 still being represented by Brandon Johnson at
7 that time?
8     A.  No, sir.
9     Q.  Did you have any discussions with
10 Kyle Lusk in between that December hearing
11 and the March hearing regarding property that
12 had not been turned over?
13     A.  He called the house on March 3rd of
14 2020 to the message -- again, I am -- I am
15 going to paraphrase.  He offered me a
16 settlement of $5,000.  He said he'd talk to
17 the courts.  He later said he didn't.  Saying
18 that $5,000, he would let me out of the case
19 basically.  Again, I am paraphrasing.  I
20 don't have the --
21     Q.  Okay.  He said -- I'm assuming at
22 some point he had to say, hey, you have not
23 turned over all of these items.  Did he ever
24 tell you that?

1     A.  I'm assuming he said -- I don't
2 know what he said.  I cannot recall.  I mean,
3 we had hearings.  So he might have said it in
4 the December 4th hearing.
5     Q.  Okay.  But my question is -- I
6 mean, somebody at some point had to say, hey,
7 you haven't turned over all of these items,
8 you need to turn them over.  My question is,
9 did you say to somebody, I don't know what
10 you're talking about, I thought we turned
11 over everything?
12     A.  I tried saying it March 4th, but I
13 was never able --
14     Q.  March 4th was the contempt hearing,
15 correct?  Okay.  Talking about before that.
16     A.  Other than December 4th -- he did
17 the complaint at whatever date.  So up until
18 December 4th, I don't think I even spoke.  If
19 I did speak -- I don't remember December 4th.
20     Q.  How do you know there was a
21 contempt hearing on March 4th?
22     A.  Because Judge Goldston rescheduled
23 me on March 4th.
24     Q.  Do you know when she sent out this

1 notice of the hearing?
2     A.  No, sir.
3     Q.  Okay.
4     A.  She might have told me on the
5 December 4th hearing.
6     Q.  Okay.
7     A.  But there was a notice sent out
8 too -- they don't always do that.
9     Q.  They don't always send out notices
10 of hearings?
11     A.  Yeah.  They normally do.
12     Q.  Okay.  And you say your girlfriend
13 never lived at your house?
14     A.  No, sir.
15     Q.  Okay.  Hold on.  I'm going over
16 some of this stuff I think you've already
17 gone over.
18         At any time between December 4,
19 2019, and March 4, 2020, did you try to give
20 your wife back any other items?
21     A.  Could you repeat your question?
22     Q.  At any time between December 4,
23 2019 -- which is the -- I guess the hearing
24 where you requested Kyle to turn over

Page 94

1  discovery; is that correct?
2      A. Yes, sir.
3      Q. -- until March 4, 2020, when I
4  believe is the contempt hearing, did you try
5  to give your wife back any of her items?
6      A. No, sir. Because I give her all of
7  the court-ordered items, sir.
8      Q. Okay. I believe you said you gave
9  your wife copies of pictures. What do you
10  mean by copies? Do you mean like
11  photocopies? Or are they actually --
12      A. I was ordered -- during the April
13  of 2018 hearing that I had in front of Judge
14  Goldston, the debate came over pictures, on
15  how we were going to put them on. So my
16  ex-wife said that she would supply me with
17  DVDs or a thumb drive. So it was decided
18  then that I would do digital copies that she
19  could print, however she wanted, and we'd
20  split the cost if that would be the case.
21      Q. Oh, okay. That's what you did, was
22  digital copies?
23      A. Digital copies.
24      Q. Oh, okay.

Page 95

1      A. So I took it to Staples and got it
2  professionally --
3      Q. Oh, okay. All right.
4          How did you tell her to come pick
5  her property up at the bottom of the
6  driveway? Did you text her or call her?
7      A. I texted her.
8      Q. Do you still have a copy of that
9  text?
10      A. I don't know. I changed phones. I
11  would have to look for it.
12      Q. Who was your phone carrier at the
13  time?
14      A. At the time was -- going to be
15  Sprint. Yeah. That's the one over beside
16  Food Lion, right? Sprint?
17      Q. I guess.
18      A. Mobile, TG Mobile, Sprint.
19      Q. Do you remember your phone number
20  at the time?
21      A. Yeah. The same as it is now.
22      Q. What is it?
23      A. 304-673-2986.
24      Q. And that wasn't some type of --

Page 96

1  they call them burner phones. That wasn't
2  some type of like prepaid phone or anything
3  like that, was it?
4      A. No, sir.
5      Q. Were your kids at home when you
6  left the items at the bottom of the driveway?
7      A. Yes, sir.
8      Q. Both Brooklyn and Skyler?
9      A. Yes, sir.
10      Q. How old are they now?
11      A. Skyler is 12, turns 13 in March.
12  Brooklyn turned 18 in December.
13      Q. Okay. I will direct your attention
14  to March 4, 2020. That's the day of the
15  incident, the subject of this litigation.
16  How did you get to the courthouse that day?
17      A. March 4th, I drove, sir.
18      Q. Okay. Was anybody riding with you?
19      A. Sharon Masual.
20      Q. Had she stayed the night with you
21  at your house?
22      A. No, sir.
23      Q. Did you go pick her up, or did she
24  walk down there?

Page 97

1      A. I think she drove to my house.
2      Q. Did you say she lives near you?
3      A. Yes, sir.
4      Q. Okay. Did you bring any witnesses
5  to the courthouse?
6      A. They drove in their own cars.
7      Q. Who were they?
8      A. Doug Black and Tommy Carter.
9      Q. I think you said -- did they both
10  work with you?
11      A. Yeah. Doug is retired. Tommy
12  still works with me.
13      Q. Okay. What does Tommy do?
14      A. Tommy is a case manager
15  coordinator.
16      Q. Okay. And is Doug Black still
17  around?
18      A. He is retired. He is somewhere.
19      Q. In Raleigh County?
20      A. I believe. But he travels a lot.
21      Q. Okay. Doug Black, what is he going
22  to testify to?
23      A. For the --
24      Q. At the hearing. At that March 4,

Page 98

1  2020 hearing, what would he have testified
2  to?
3      A. He is going to say that -- or I
4  can't tell you what he is going to say. But
5  he helped me carry the property down. And
6  how the weather was when he left. He left
7  about 30 minutes or an hour prior to.
8      Q. He left 30 or an hour prior to
9  what?
10     A. To the actual pickup.
11     Q. Okay. But you said that the stuff
12 was only out there for 30 minutes, correct?
13     A. Yes, sir. I said 30 minutes, no
14 more than an hour. But yes, sir.
15     Q. What was no more than an hour? The
16 stuff laying out there --
17     A. Yes, sir.
18     Q. -- Or the time he left?
19     So the stuff wasn't out there no
20 more than an hour?
21     A. After we carried it down, he left.
22 So it is going to be between 30 minutes to an
23 hour window.
24     Q. Okay. What's Tommy Carter going to

Page 99

1  testify to?
2      A. He was trying -- he just lives a
3  few houses up from me. So he was trying to
4  get through. And they were still loading the
5  property in the middle of the road because it
6  is at the bottom. So they had a U-Haul
7  parked in the road. So he can testify what
8  the weather was at that point in time.
9      Q. So what time of day would they have
10 picked it up?
11     A. Evening time. Don't quote me. It
12 is dark. So November. 5:00 p.m. to 6:00
13 p.m., say.
14     Q. Okay. When you got to the
15 courthouse that day -- family court is on the
16 second floor. So when you arrived there, who
17 all was -- strike that.
18     When you arrived at the courthouse,
19 where did you go? Did you go straight to
20 the courtroom or --
21     A. No, sir. There is an interview
22 room, I guess it is what it is called --
23 conference room or --
24     Q. Right outside?

Page 100

1      A. Yes, sir.
2      Q. When you went there, you went out
3  to that conference room, correct?
4      A. Yes, sir.
5      Q. Who all was there when you got
6  there?
7      A. Inside the conference room?
8      Q. Yes, sir.
9      A. I am thinking me, Tommy, Doug and
10 Sharon all walked in at the same time. But I
11 don't remember.
12     Q. Okay. Was your ex-wife there?
13     A. I don't know.
14     Q. Was her father there?
15     A. I can't recall who was there.
16     Q. Okay. All right. So you
17 eventually go into the courtroom, correct?
18     A. Yes, sir.
19     Q. Was your ex-wife waiting in the
20 courtroom?
21     A. When they call us, they call us
22 together. So when the bailiff -- Bailiff
23 McPeake at that time was the bailiff. He
24 called us. And we walked in. The parties

Page 101

1  walk in together.
2      Q. Okay. So when you are sitting out
3  there waiting to be called, you are not
4  sitting there with your ex-wife, correct?
5      A. No. You know, I try not to.
6  Again, she is in one waiting room. I am in
7  the conference room.
8      Q. Okay. So when you go into the
9  courtroom, it is just you and your ex-wife?
10     A. It is going to be me and the
11 ex-wife and the attorneys.
12     Q. So it would have been you, your
13 ex-wife, Kyle Lusk, McPeake, who was the
14 deputy --
15     A. Yes, sir.
16     Q. -- and Judge Goldston, correct?
17     A. And Brandon Johnson.
18     Q. Is that the contempt hearing?
19     A. Yes, sir.
20     Q. Okay.
21     A. No. Don't -- shoot. I'm sorry.
22 No. Brandon wasn't there. Sorry. Just me.
23 You are right. I'm sorry.
24     Q. All right. And all the witnesses

Page 102

1  are still sitting outside, correct?
2      A. Yes, sir.
3          MR. BRYAN:  Kevin, can I take a
4  bathroom break?  I'm sorry.
5          (Break in proceedings.)
6  BY MR. ROBINSON:
7      Q. When you got to this hearing, you
8  admitted you failed to follow through on
9  court-ordered counseling for one of your
10  children, correct?
11      A. Say that again.
12      Q. When you got to the hearing on
13  March 4th, you admitted during this hearing
14  that you failed to follow through on court-
15  ordered counseling for one of your children?
16      A. No.  March 4th was the contempt
17  only.
18      Q. But that wasn't brought up at any
19  time?
20      A. I think -- they were contesting.
21  But at that time the counselor had already
22  released her.
23      Q. Okay.  So if the transcripts say
24  you failed to follow through on that, that

Page 103

1  would be incorrect?
2      A. I can't recall.  I do know that at
3  that time part of my evidence was she had
4  already been released.
5      Q. All right.  So at no time during
6  this hearing, this March 4th, 2020 hearing
7  did you say to the court, hey, I have already
8  turned over all of this stuff, I don't know
9  what you all are talking about?
10      A. You know, in words, I -- I believe
11  I tried to tell Judge Goldston.  And she
12  said, what does the order say?  And I was
13  just trying to explain to her that the photos
14  were ordered to be copied, which I did.  And
15  I never could -- I mean, I never could
16  present my defense or evidence.  I mean, I
17  tried.
18      Q. I believe I saw where the court
19  went off record at 10:34 a.m.  I guess that's
20  when you all went to your house.  After the
21  court went off record at 10:34 a.m., what did
22  you do?
23      A. I ran to the interview room, and I
24  told Doug Black, Sharon Masual and Tommy, I

Page 104

1  said, hey, I think they are coming to my
2  house, we need to get back to my house.
3      Q. What did they say?
4      A. What?  You are kidding me.  I am
5  like, no.
6      Q. That's it?  You all got --
7      A. Got and go.  She give me 10 minutes
8  to get there.  And that's about how far it
9  is.
10      Q. So you drove to -- from the
11  courthouse to your house in your vehicle.
12  And was Sharon Masual with you?
13      A. Yes, sir.
14      Q. And I guess Doug Black and Tommy
15  Carter went in separate vehicles?
16      A. Yes, sir.
17      Q. And did it take you ten minutes to
18  get to your house?
19      A. I can't recall.
20      Q. Do you recall what you and your
21  wife were talking about as you were driving
22  to your house?
23      A. My girlfriend?
24      Q. Oh, yeah, your girlfriend.

Page 105

1      A. Oh, man.  Probably what should I
2  do, how this is going to go, what.  How do I
3  -- how do I stop, you know, them from coming
4  on my property?  Just random thoughts.
5      Q. So you were thinking how to stop
6  them from coming onto your property during
7  that drive -- strike that.
8          You are driving, correct?
9      A. Yes, sir.
10      Q. How long were you in the interview
11  room before you went down to your house --
12  went down to your car to drive to your house?
13      A. Less than a minute for sure.
14      Q. All right.  So you drive to your
15  home at 113 Quiet Oak Street.  How long are
16  you there before any other witnesses arrive
17  at the house?
18      A. As soon as we got out of the
19  driveway.  I mean, we basically almost had
20  the audio and video going.
21      Q. Okay.
22      A. So real close.  I don't know, maybe
23  a minute.
24      Q. From looking at the video, it

Page 106

1 seemed like you were reading from something
2 on your phone, correct?
3    A. Uh-huh.
4    Q. Okay. Where did you get that
5 information from?
6    A. Talking to Sharon -- she is a real
7 smart lady. But we were kind of discussing
8 how I was going to get her to recuse herself.
9 I learned that that is wrong. It is called
10 disqualify.
11    Q. Where did you learn that?
12    A. You know, throughout the process, I
13 learned that it is not a motion -- Judge
14 Goldston actually told me it is not a motion
15 to recuse, it is a motion to disqualify.
16 And, you know, I just learned that. I mean,
17 I --
18    Q. You learned that all in the
19 10 minutes it took you to drive from the
20 courthouse to your home?
21    A. Sure.
22    Q. Did you look it up, or did your
23 girlfriend look it up?
24    A. I mean, I can't. I am driving.

Page 107

1    Q. So your girlfriend looked it up?
2    A. I am assuming.
3    Q. Okay. It wasn't her phone -- did
4 she just look it up on your phone?
5    A. I can't recall how -- how it all
6 came together. At this 10-minute ride, it is
7 -- my mind is spinning.
8    Q. Were you reading off of your phone?
9    A. I was. Because we were trying to
10 get words together. And she actually helped
11 -- got my phone and did a voice text.
12    Q. Who did a voice text, your
13 girlfriend?
14    A. My girlfriend.
15    Q. Okay. Did you get to your home
16 before Doug Black and Tommy Carter?
17    A. I think they got there before I
18 did. Because I -- yeah, I am parked behind
19 one of them. So maybe behind Doug.
20    Q. Why did they go to your house
21 instead of going home?
22    A. Because I told them to.
23    Q. Oh, you told them to go to your
24 house?

Page 108

1    A. They are my witnesses.
2    Q. So you thought the hearing was
3 continuing too then, correct?
4    A. No. I knew it wasn't proper. I
5 mean, that's why I asked her to recuse
6 herself. I knew that I had never heard of a
7 judge searching a house, ever.
8    Q. You get there.
9       MR. ROBINSON: You know what, can
10 we fire that up again if there is no
11 objection from counsel?
12       MS. TULLY: Sure.
13    Q. Before we start the video -- you
14 are standing -- let the record reflect on the
15 video, the plaintiff is standing there in it
16 looks like a blue button-down shirt?
17    A. That's me.
18    Q. And khakis?
19    A. That's me.
20    Q. And had sunglasses on. You have
21 something in -- is that your left hand?
22    A. That's my phone, sir.
23    Q. That's your phone. And there is a
24 vehicle right in front of you, looked like a

Page 109

1 pickup truck. Whose vehicle was that?
2    A. It's either Tommy or Doug's.
3    Q. And there is a --
4    A. That's a Yukon Denali.
5    Q. -- Yukon Denali behind it. Whose
6 vehicle is that?
7    A. That was my ex-wife's at the time.
8    Q. Okay. So she's already there --
9    A. Yes.
10    Q. -- at this point?
11    A. Yes, sir.
12    Q. Okay. We will go ahead and press
13 play.
14       (Video played.)
15    Q. Okay. Stop. Sorry. Go back.
16    A. Go ahead. I got you.
17    Q. Who was the guy in that royal blue?
18    A. That's Tommy Carter.
19    Q. Who was the guy that was next --
20    A. No, no. That's Doug Black. Sorry.
21    Q. That's Doug Black. Who was this
22 person right here?
23    A. That's Tommy Carter.
24    Q. This video was actually -- this

1  audio is actually really good to be taken on
2  a cell phone.  Did you have a microphone on?
3      A.  No, sir.
4      Q.  Okay.  So all of this audio is
5  coming from a -- is it your cell phone?
6      A.  She is running a cell phone.  I am
7  running an audio.
8      Q.  You are running audio off of your
9  phone?
10     A.  Yes, sir.
11     Q.  The same time you are reading off
12  of --
13     A.  Yeah.  You can do it at the same
14  time.  Different apps.
15         (Video played.)
16     Q.  And that looks like that is Kyle
17  Lusk walking.  Okay.  Hold on.  Go back.
18  Let's stop.
19         Did you just tell her to turn on
20  the audio?
21     A.  I wanted to make sure she had the
22  camera rolling.
23     Q.  Well, it sounded like you said,
24  make sure the audio is going.

1      A.  There is no other audio footage.
2  If you are trying to get at that, the answer
3  is no.
4          MR. ROBINSON:  Play it back just
5  a little bit, please, just a little bit.
6          MS. TULLY:  Now, listen, you've
7  got a bad technical assistant here.  I'll do
8  what I can.
9          MR. ROBINSON:  That's okay.  I
10  couldn't do any better.
11         (Video played.)
12     A.  I might have told her I am turning
13  my audio on.
14     Q.  All right.  Keep going.
15         And coming up here, it looks like
16  the sheriff's deputy vehicle, SUV?
17     A.  And Judge Goldston.
18     Q.  Okay.  Is that your wife -- your
19  girlfriend talking?
20     A.  That's my girlfriend, sir.
21     Q.  Who was that walking over there by
22  that flag -- what's that, a gazebo?
23     A.  Yeah.  That's my ex-wife's dad.  He
24  decided he would go on the property whenever

1  he wants.
2      Q.  Is that Kyle with the gray suit on?
3      A.  It is Kyle, him.
4      Q.  Okay.  Go ahead.
5          (Video played.)
6      Q.  Right there you're telling
7  everybody to get off of your property except
8  the judge and the deputy?
9      A.  I am at this point.  I didn't want
10  the whole posse to come with them.  I never
11  heard that a whole posse comes with you.  So,
12  for lack of better words, I didn't want other
13  people on my land.
14     Q.  Other than your witnesses?
15     A.  Right.
16     Q.  Okay.  Go ahead.
17         (Video played.)
18     Q.  She said you have a list of
19  everything.  But you said you never got a
20  list of anything?
21     A.  That's where -- the disagreement
22  between Exhibit 1 and Joint Exhibit 1.  I
23  turned over everything that was court
24  ordered.  And, you know, my understanding of

1  how the search warrant works is, with a
2  search warrant, you've got to have what you
3  are coming for specifically.  So I needed to
4  know what she was coming for specifically,
5  not just coming to my house looking for
6  things.  Again, this is before I got to
7  provide my defense and exhibits and so forth
8  and so on.
9      Q.  But you had been provided a list of
10  items that they believed you had not turned
11  over, correct?
12     A.  That's what they believed, sir.
13     Q.  That's what they believed --
14     A.  Yes, sir.
15     Q.  -- that you had not turned over
16  items, correct?
17     A.  Yes.
18     Q.  Okay.  That's a fairly big yard.
19  Maybe because I grew up in the city.  I don't
20  know.
21     A.  Yeah.  It is really not that big.
22  It feels like it when you mow it though.
23     Q.  That's what I'm going to say, you
24  mow it.

Page 114

1    A. The hill is a beast.
2    **Q. Yeah.**
3       MR. ROBINSON: That's enough.
4 All right. Thanks.
5       MS. TULLY: No problem. I am
6 here to serve you, Kevin.
7    **Q. When you were driving from the**
8 **courthouse to your house, you didn't make any**
9 **stops along the way?**
10   A. No, sir.
11   **Q. I think I might have asked you this**
12 **before. But you were not the first to get to**
13 **your house, correct?**
14   A. It don't look like it. My truck is
15 parked behind somebody. So it is either Doug
16 Black or Tommy. I don't know which one.
17   **Q. All right. When you were driving**
18 **from the courthouse to your house, did you**
19 **attempt to contact anyone? Did you try to**
20 **call like anyone at all?**
21   A. Not that I can recall.
22   **Q. Okay. Did you send any texts to**
23 **anyone?**
24   A. No. I was driving.

Page 115

1    **Q. Okay. It looks like from that**
2 **video -- you said that that was her father**
3 **that walked up to the gazebo. Had he arrived**
4 **before you arrived?**
5    A. I can't recall.
6       (A discussion was held off the
7 record.)
8 BY MR. ROBINSON:
9    **Q. It looks like Kyle might have**
10 **already been there too. Does that sound**
11 **right?**
12   A. It is possible. I don't know how
13 he even got there. He might have rode with
14 him. I don't even know. Again, it is a
15 blur, some of it is.
16   **Q. It looks like in your driveway that**
17 **there was a pickup truck in front of you.**
18 **You believe that was whose vehicle?**
19   A. It is either Tommy's or Doug's.
20   **Q. Was there a vehicle in front of**
21 **that?**
22   A. No.
23   **Q. Okay. And then there was your**
24 **vehicle -- or was that your ex-wife's?**

Page 116

1    A. It is going to be a vehicle, my
2 truck. The ex-wife pulled up. Maybe
3 somebody told her to move. So by then -- you
4 are right, maybe it was Kyle or her dad had
5 told her to move so the judge could pull in
6 or something -- somebody said something.
7    **Q. That's my question. Where was --**
8 **here, we can do that now. Why don't you draw**
9 **-- you don't have to be artistic. You don't**
10 **have to be -- what's his name -- Bob Ross?**
11 **What's that guy's name? You don't have to**
12 **be -- why don't you draw a picture of your**
13 **house and your property. And I want you to**
14 **mark where each vehicle was located if you**
15 **can remember.**
16   A. Man.
17   **Q. Can you remember?**
18   A. I am going to give you what I know.
19 How is that?
20   **Q. Okay. All right.**
21       MR. ROBINSON: If there's no
22 objection from counsel?
23       MR. BRYAN: No objection. Every
24 case needs a good diagram off scale.

Page 117

1       (A discussion was held off the
2 record.)
3       (Witness draws diagram.)
4       MR. ROBINSON: Back on the
5 record. What I have here is a diagram that
6 the plaintiff has drawn. He has drawn --
7    **Q. I believe this box up here is your**
8 **house?**
9    A. Yes, sir.
10   **Q. Can you write "house" in there?**
11   A. (Complies.)
12   **Q. And then next is truck. That's**
13 **whose truck?**
14   A. I don't know if it is a truck. It
15 is a vehicle.
16   **Q. Well, it looks like -- well, in the**
17 **video, it was a pickup truck. Is that the**
18 **same pickup truck?**
19   A. If it is -- if the video shows a
20 truck, then it was a truck.
21   **Q. Then behind that was an SUV?**
22   A. No. My truck.
23   **Q. Your truck.**
24   A. I think you might be looking at my

Page 118

1  truck.  I don't know in the video that you
2  can see this.
3      **Q.  Okay.**
4      A.  But I know where my truck was
5  parked -- that I was parked behind somebody.
6  Because my truck would go all the way up to
7  the garage.
8      **Q.  And then that's when the sheriff's**
9  **department's vehicle comes up?**
10     A.  Yes, sir.
11     **Q.  And then your ex-wife's vehicle was**
12 **parked past the driveway?**
13     A.  I can't swear to this one.  But I
14 can -- I seen this one on the video.  There
15 was a black truck.  And that was the
16 ex-wife's brother.
17     **Q.  Okay.  Now, where you have the**
18 **ex-wife marked on here, is that still**
19 **considered part of your property?**
20     A.  Where her car was parked at?
21     **Q.  Yes.**
22     A.  The answer is no.
23     **Q.  Okay.  Where the brother is parked,**
24 **is that still considered part of your**

Page 119

1  **property?**
2      A.  No.
3      **Q.  Does that say Dad?**
4      A.  Yes.
5      **Q.  Now, that's not your dad, correct?**
6      A.  No.  No.  It was the ex-wife's
7  brother, dad and Mr. Lusk.
8      **Q.  That's where the dad's vehicle was**
9  **parked?**
10     A.  I think it was her brother's truck.
11     **Q.  Okay.  So did they all come in the**
12 **same vehicle?**
13     A.  Maybe.  Probably.  Because I didn't
14 see no other vehicles.  But again, by the
15 time I went inside -- I don't know how
16 things --
17     **Q.  All right.  You also believe that**
18 **her boyfriend was there, correct?**
19     A.  Yes, sir.
20     **Q.  Do you think they all rode**
21 **together?**
22     A.  I think that he rode in her car.
23     **Q.  In her car.  I'm sorry.  You said**
24 **ex.  Okay.  Her brother didn't bring anybody**

Page 120

1  **-- well, other than her father?**
2      A.  The brother brought Dad and Lusk.
3      **Q.  He didn't have like a -- the**
4  **brother didn't have like a girlfriend or**
5  **anything there, did he?**
6      A.  I don't think so.
7      **Q.  Okay.  All right.  We can mark this**
8  **as Exhibit --**
9          MR. ROBINSON:  Where are we at?
10         THE COURT REPORTER:  Three --
11 well, four actually because of the flash
12 drive.  Do you want the flash drive as three?
13         MS. TULLY:  Yeah.  We will mark
14 -- do you want to do the other?  The flash
15 drive, we can mark as Exhibit 3.  It has two
16 videos on it.  We just haven't dealt with the
17 other video yet.  Do you have any objection
18 to that?
19         MR. BRYAN:  No.  Is it the Stump
20 video you're talking about?
21         MS. TULLY:  The bailiff video.
22         THE WITNESS:  McPeake.
23         MS. TULLY:  McPeake.  Whoever it
24 was.  We will explore that.

Page 121

1          MR. BRYAN:  The inside video?
2          MS. TULLY:  The inside video,
3  yes.
4          THE WITNESS:  That's McPeake's.
5          MR. ROBINSON:  We can mark it as
6  Exhibit 4
7          (Exhibit 3 was marked.)
8          (Exhibit 4 was marked.)
9      **Q.  Do you got something to say?  I**
10 **will mark it.**
11     A.  This here was not their property.
12 But I had to ask them to get off of my
13 property.
14     **Q.  All right.**
15     A.  Go ahead.
16     **Q.  All right.  This is marked as**
17 **Exhibit 4  And this was a drawing that you**
18 **made to the best of your recollection,**
19 **correct?  It is a drawing you made to the**
20 **best of your recollection?**
21     A.  Yes, sir.
22     **Q.  Before I begin, you said you know**
23 **people from the sheriff's department.  What**
24 **deputies do you know from the Raleigh County**

1 Sheriff's Department?
2      A. I know some that retired.
3      Q. Like who?
4      A. Jimmy Miller. Sheww. The one that
5 had the mustache.
6      Q. They all got mustaches.
7      A. Mark McCray.
8      Q. McCray, yes. He had a beard
9 though, I thought.
10     A. Big monster. But I know some that
11 currently work. You know, Aaron Lilly. I
12 know Bobby.
13     Q. You know Stump, don't you?
14     A. Yes, sir.
15        Jason Redden.
16     Q. Yeah. Which one?
17     A. The lieutenant. Not the -- not the
18 K-9, but the bigger one.
19     Q. The one that does all the DUI
20 stops?
21     A. That's probably him.
22     Q. Yeah. Okay.
23        (A discussion was held off the
24 record.)

1        THE WITNESS: I know quite a few.
2 BY MR. ROBINSON:
3      Q. Know any judges?
4      A. No.
5      Q. Okay. Did you tell your girlfriend
6 to record the incident, or did she just do it
7 on her own?
8      A. I told her to. I told her to, sir.
9 Sorry.
10     Q. Okay. It looks like when the video
11 ended, you all are standing at -- did you
12 call that the gazebo?
13     A. Yes.
14     Q. What were you looking at over
15 there?
16     A. You know, I had testified that that
17 was -- it was -- when I built that, it was
18 attached. And I did that because we had that
19 derecho. And everything I had got blowed
20 away. So I learned to build things to
21 withstand as much wind as it can. So they
22 were looking to see if it was actually bolted
23 down or not.
24     Q. The whole gazebo?

1      A. The swing carrier.
2      Q. Okay. Why would they be looking at
3 that?
4      A. She was awarded the swing. And on
5 the property form that they prepared, she got
6 the swing. I give her the swing. Those are
7 two separate purchases. You can buy a swing.
8 You can buy a swing carrier. I bought two
9 different times. I had to go get the swing
10 and the swing carrier.
11     Q. Hold on. What were they looking at
12 over there?
13     A. The swing carrier. It is going to
14 be on the back.
15     Q. Okay. Hold on. What was she
16 awarded?
17        MS. TULLY: I'm sorry. I took
18 these exhibits from you.
19     A. Let's see. Joint Exhibit 1 --
20 let's go to the back page.
21     Q. I am a little confused myself.
22     A. You can look at Joint Exhibit 1.
23 It would make it just as easy. Sorry.
24        MR. BRYAN: Exhibit 2, right?

1        THE WITNESS: Sorry. Exhibit 2.
2      Q. Where it says swing, front yard?
3      A. Yes, sir.
4      Q. Okay. And you are alleging that
5 she was not allowed to take that swing?
6      A. No. I give her the swing.
7      Q. Okay. And what were they looking
8 at when they went over there?
9      A. They were seeing if the holder --
10 the swing holder was bolted down or not, that
11 I testified that it was.
12     Q. And when did you testify that it
13 was bolted down?
14     A. I think it was March 4, 2020.
15     Q. Okay. So you spoke -- so you all
16 did talk about some property?
17     A. It was only yes or no, not -- not
18 here's your defense. Not present your
19 evidence. It was yes or no. Is it yes or
20 no?
21     Q. But you did talk about property
22 that had not been turned over, correct?
23     A. No. There was a question. Did you
24 give her the pictures? Yes or no? Yes or

Page 126

1  no?
2      Q.  Okay.  You just said about the
3  pictures, yes.  But they also asked you about
4  the swing, didn't they?
5      A.  I believe so, yes.
6      Q.  Okay.  I don't -- I don't want to
7  do this, but I might go get the transcript
8  and go through it as well.
9      A.  Okay.  It is on record.
10      Q.  Is there anything else you talked
11  about there that -- any other property you
12  talked about at that March 4th hearing?
13      A.  Photos.
14      Q.  Photos?
15      A.  A swing.
16      Q.  When they asked you about the
17  photos, what did they ask you?
18      A.  They said, did you give her the
19  photos?  Yes or no?  And I said, no, because
20  I was ordered to copy.  What does the order
21  say?  I said to Judge Goldston -- she says --
22  you will get your chance was the words she
23  said.
24      Q.  And the order says copies?

Page 127

1      A.  That's not what the order says.
2      Q.  What did you give her?
3      A.  The order says copies.  I give her
4  copies.  The property form that was never
5  corrected said that she got photos.  It
6  was --
7      Q.  Okay.  Are we talking about two
8  different --
9      A.  No, we are not.  There was --
10      Q.  You said the order form says what?
11      A.  The 2018 -- April 2018 order, Judge
12  Goldston verbally -- and it was generally put
13  by Mr. Lusk on the order that I was copy
14  -- her words were Mr. Gibson will make copies
15  of the photos, as I did.  Okay?
16      So when we sat down with the
17  property exchange between Lusk and Johnson
18  and myself and the ex, they asked for the
19  photos.  And Mr. Johnson said that these
20  photos are off because I looked at the audio
21  and he is supposed to make copies.  And so
22  the photos were supposed to be taken off of
23  the property form.
24      Q.  Okay.  So you go down there and you

Page 128

1  look at the swing I guess to see if it was
2  still bolted down?
3      A.  The swing carrier, not the swing.
4      Q.  Swing carrier.  Okay.  Why does it
5  matter if it was bolted down or not?
6      A.  Because she was arguing that the
7  swing and the swing carrier go together.
8      Q.  Do they go together?
9      A.  No.  They were two separate
10  purchases.
11      Q.  Who purchased them?
12      A.  We purchased them.
13      Q.  Okay.  Can the swing operate
14  without the swing carrier?
15      A.  It is two separate purchases.
16      Q.  Can it operate without the swing
17  carrier?
18      A.  Sure you can.  You can hang it from
19  a tree.
20      Q.  Would you want the kids swinging on
21  there without that on there?
22      A.  It is not a swing for that.  But
23  Judge Goldston backed me --
24      Q.  Is it safe for your kids to operate

Page 129

1  that swing without the swing carrier?
2      A.  It's not that kind of swing, sir.
3  It's a relaxing swing you sit in the front
4  yard.
5      Q.  Why the carrier?
6      A.  I call it a carrier.  It is a swing
7  stand that the swing hangs from.
8      Q.  Okay.  All right.  So you look at
9  the swing carrier that you have there I guess
10  just because you just want it.  It is bolted
11  down.  What does the judge say at that time?
12      A.  The judge says she will have to
13  look at it because it is bolted down,
14  paraphrasing.
15      Q.  But you can remove it, can't you?
16      A.  No.
17      Q.  Why?
18      A.  I would have to tear down the
19  bottom of the gazebo, take boards off and --
20  because the bolts are put in from the bottom.
21      Q.  Okay.  At that -- okay.  When you
22  all added the gazebo -- how long were you
23  standing at the gazebo?
24      A.  A minute or two.

Page 130

1    Q. Okay. McPeake, does he search
2 anything at the gazebo?
3    A. He is just standing there as far as
4 I know watching.
5    Q. He is just standing there, correct?
6    A. I believe so.
7    Q. After you leave the gazebo, where
8 do you go?
9    A. At the gazebo when Mr. McPeake
10 seizes my phone, we went to my garage.
11    Q. Let's go back and talk about the
12 phone. You said McPeake seized your phone?
13    A. Yes, sir.
14    Q. Why did he seize your phone?
15    A. Because -- I don't know. I mean, I
16 am assuming Judge Goldston told him -- asked
17 if I was recording. And I said, yes, ma'am.
18 And she asked them to seize the phone.
19    Q. And your phone at the time, it
20 still had the audio on it?
21    A. Yes.
22    Q. So it was still on after he seized
23 it, correct?
24    A. Yes.

Page 131

1    Q. Okay.
2    A. It was still on until Mr. Lusk let
3 Judge Goldston know that the audio was still
4 on.
5    Q. Okay.
6    A. And then the ex-wife let Judge
7 Goldston know that my girlfriend was videoing
8 too.
9    Q. Who turned off the phone?
10    A. What phone?
11    Q. The phone that you gave to Judge --
12 to --
13       MR. BRYAN: Objection.
14    Q. -- Deputy McPeake?
15       MR. BRYAN: Objection to form.
16    Q. You can answer.
17    A. I turned it over under the order of
18 being arrested.
19    Q. So there was no audio after that?
20    A. No, sir.
21    Q. You are at the gazebo. It is you,
22 the judge, McPeake and Kyle Lusk?
23    A. Yes, sir.
24    Q. And is your ex-wife there?

Page 132

1    A. Yes, sir.
2    Q. Okay. Are there any other -- did
3 anybody else come over to the gazebo?
4    A. No, sir. Not that I am aware of.
5    Q. No other deputies came to the
6 gazebo?
7    A. No, sir.
8    Q. Okay. And then after you are there
9 at the garage -- I mean, after you are at the
10 gazebo, then you go to the garage?
11    A. Yes, sir. We went to the garage.
12    Q. Okay. And where is the entrance to
13 the garage located?
14    A. Where the cars are parked, they are
15 going to be right in front of the -- at the
16 neck of the driveway.
17    Q. Okay. So you have to walk across
18 the yard again to get down there?
19    A. Yes, sir.
20    Q. Okay. Who all went down to your
21 garage?
22    A. Judge Goldston, Bailiff McPeake, my
23 ex-wife, Kyle Lusk and myself.
24    Q. And what was down there in the

Page 133

1 garage? Well, I will rephrase that. What do
2 you allege was taken from the garage?
3    A. There was a chainsaw taken.
4    Q. Okay. Who does that chainsaw
5 belong to?
6    A. She was -- she was ordered to get a
7 chainsaw. We had two. That's another part
8 of the property form that was not corrected.
9 And she got one chainsaw. She didn't want
10 that one. She wanted the other one.
11    Q. Before that, did she ever tell you
12 she wanted the other chainsaw?
13    A. No, sir.
14    Q. Who said to go down to the garage?
15    A. Judge Goldston. She said, are you
16 going to let me in, or are you going to jail?
17    Q. Why would -- who said to go to the
18 garage? Why would you go to the garage
19 instead of going back to the house? Do you
20 understand what I'm saying? Why would you go
21 to the garage instead of to the front door?
22    A. Because I don't want to go in my
23 front door because I try to keep as much dirt
24 and stuff out of my house as I can. So there

1 was a rug there that you can dry your feet
2 off. I most all of the time go in my house
3 through the garage.
4     **Q. So you let them through the garage?**
5     A. Under duress, yes, sir.
6     **Q. And what happened to that chainsaw?**
7 **Did you get it back?**
8     A. No, sir.
9     **Q. You let her keep it?**
10     A. She -- I am assuming the court
11 still has one and she has one.
12     **Q. Okay. Did McPeake -- Deputy**
13 **McPeake ever search for this chainsaw?**
14     A. He was with them. So yes.
15     **Q. He was just with them. Did he ever**
16 **pick up the chainsaw?**
17     A. I can't recall.
18     **Q. When you went down there to get the**
19 **chainsaw, did your ex-wife say, hey, that's**
20 **my chainsaw?**
21     A. No.
22     **Q. How did that all occur?**
23     A. I don't know what she said.
24     **Q. But Deputies White and Stump**

1 weren't out there when the chainsaw was
2 taken, were they?
3     A. No, sir.
4     **Q. After you left the garage, where**
5 **did you go?**
6     A. We went into I guess what we would
7 call the family room/living room.
8     **Q. Who all went into the living room?**
9     A. Everybody -- the same people that
10 was in the garage - Mr. Lusk, Judge Goldston,
11 the ex-wife and myself.
12     **Q. White and Stump weren't out there**
13 **yet, correct?**
14     A. No, sir.
15     **Q. Do you recall what happened when he**
16 **-- when everybody went into the living room?**
17     A. I do remember the photos being
18 taken off the wall. I tried to explain to
19 her once again. She said, I am not going to
20 argue with you. So I basically shut down
21 then. If I can't speak in my own house --
22     **Q. Tried to explain to who?**
23     A. To Judge Goldston that the pictures
24 were ordered to be copied.

1     **Q. Let's go back for a minute. You**
2 **allege that Judge Goldston threatened your ex**
3 **-- threatened your girlfriend with jail time**
4 **if she didn't stop recording?**
5     A. Yes.
6     **Q. What did she do? Did she yell**
7 **across the yard or something?**
8     A. Absolutely.
9     **Q. Okay.**
10     A. Yes, sir.
11     **Q. And that's when your girlfriend**
12 **shut off the video?**
13     A. Yes, sir.
14     **Q. Stopped the recording?**
15     A. Yes.
16     **Q. Okay. I'm still going to the time**
17 **you are outside the gazebo. Sorry. You**
18 **allege McPeake then called for backup at that**
19 **time?**
20     A. Yes, sir.
21     **Q. How did he call for backup?**
22     A. Via radio.
23     **Q. Did he have a radio on his --**
24     A. Yes, sir.

1     **Q. -- shoulder or --**
2     A. Yeah. He had a mike on his left
3 shoulder.
4     **Q. Do you remember how he called? Do**
5 **you remember what he said when he called?**
6     A. I just knew when you call for
7 assistance, it ain't for fun. So yeah.
8     **Q. You said all of the pictures were**
9 **taken off your wall. Who took them off your**
10 **wall?**
11     A. My ex-wife.
12     **Q. Okay. McPeake didn't take any**
13 **pictures off of the wall, did he?**
14     A. I can't recall.
15     **Q. You didn't see McPeake order**
16 **anybody to take any pictures off of the wall,**
17 **did he?**
18     A. I can't recall.
19     **Q. Judge Goldston didn't order anybody**
20 **to take pictures off of the wall, did she?**
21     A. Of course, yes.
22     **Q. She said to take the pictures off**
23 **of the wall?**
24     A. Yes.

Page 138

1    Q. Judge Goldston said that?
2    A. I do believe.
3    Q. She said to take all of the
4  pictures off the wall?
5    A. I believe so.
6    Q. Did your ex-wife take all the
7  pictures off the wall?
8    A. Yes, sir.
9    Q. After you were in the family room
10  -- living room, did you then go to the family
11  room?
12    A. Which is downstairs.
13    Q. Okay.  Is that right next to the
14  living room?
15    A. Yeah.  I don't know what you call
16  these rooms.  The first room, you walk in
17  where the pictures were at.  Our next stop, I
18  think we went downstairs to the living room
19  or whatever you want to call it.
20    Q. What do you allege happened when
21  you proceed down to the family room?
22    A. The downstairs living room, is that
23  the one we're talking about?
24    Q. Well, I think we are in the living

Page 139

1  room.  We left the -- hold on.  I think we've
2  left the living room now.  Let's go back.
3    We came from the garage, correct?
4  You left -- the only thing that was seized
5  from the garage was --
6    A. A chainsaw.
7    Q. Chainsaw.  Then you go into the
8  living room, correct?
9    A. I believe so.
10    Q. Okay.  What do you believe was
11  seized out of the living room?
12    A. The living room would be pictures
13  on the wall.
14    Q. And that was it?
15    A. As far as I can recall.
16    Q. Then next you go into the family
17  room?
18    A. Downstairs.
19    Q. Okay.  What all do you allege was
20  seized from the family room?
21    A. You know, my kids -- again, I have
22  full custody of one and half the other.  They
23  have their DVDs.  So there was 35, 40 movies
24  of theirs that I wasn't able -- anytime I

Page 140

1  would say anything -- you'll get your chance.
2  You know, don't talk.  I am not arguing with
3  you.  Same kind of thing would go.  You know,
4  there was movies taken - Spiderman, Ice Age,
5  stuff like that.
6    Q. And those all belonged to your
7  kids?
8    A. Yes, sir.
9    Q. Who purchased them?
10    A. We purchased them.
11    Q. You and your wife, correct?
12    A. Uh-huh.
13    Q. All right.
14    A. But some of those were gifts from
15  Christmas.
16    Q. From who?
17    A. From us.
18    Q. From you and your wife?
19    A. Right.  I have full custody of my
20  oldest one.
21    Q. You have full custody of one of
22  them?
23    A. Of one of them.
24    Q. She has full custody of the other

Page 141

1  one, correct?
2    A. No.  We have 50/50 of the other
3  one.
4    Q. But she does have custody of the
5  other one?
6    A. Yes.
7    Q. And does Brooklyn ever go to her
8  mother's house?
9    A. Some.
10    Q. Some.  Like how often?
11    A. I don't know.
12    Q. Does she stay during the weekends
13  once a month?
14    A. No.
15    Q. How often does she stay over at
16  your ex-wife's house?
17    A. She doesn't.
18    Q. Not at all?
19    A. No.
20    Q. She doesn't like your ex-wife?
21    A. No.  They get along fine.
22    Q. Okay.  Any reason why she doesn't
23  stay over there?
24    A. I don't know how -- I mean, it is

Page 142

1  -- you've got a boyfriend involved, and
2  there's certain things that may be a family
3  court issue.  So I am not even going to bring
4  it up.
5      Q.  How old is she?
6      A.  She is 18.
7      Q.  Oh, okay.  In the family room, as
8  you allege, the movies were taken that
9  belonged to your children?
10     A.  Yes, sir.
11     Q.  And one was your girlfriend's?
12     A.  Yes, sir.
13     Q.  Which one was that?
14     A.  It was -- that was quick.  I Can
15  Only Imagine.
16     Q.  That's the name of the movie, I Can
17  Only Imagine?
18     A.  Yes, sir.
19     Q.  Then you made another allegation
20  that Deputy McPeake led you into another room
21  and forced you to open up your locked gun
22  safe?
23     A.  He followed me in there.
24     Q.  Okay.

Page 143

1      A.  Yeah.
2      Q.  Did he force you to open your gun
3  safe?
4      A.  No, sir.
5      Q.  Okay.
6      A.  Now, I will say, I was -- you know,
7  my voice said I am going to --
8      Q.  Your voice said you were going to?
9      A.  I said verbally, sorry, that I
10  would be looking for whatever we were looking
11  for in a safe.  And, you know, I just wanted
12  to kill two birds with one stone.  I wanted
13  everybody out of my house at that point.
14     Q.  During the course of discovery in
15  this case, I would have sent you
16  interrogatories which you would have answered
17  with your attorney?
18     A.  Sure.
19     Q.  Do you recall answering those?
20     A.  Yes, sir.
21     Q.  And I asked you in interrogatory
22  number three, Please provide a chronological
23  description of all events of March 4, 2020,
24  that relates to the occurrence that is the

Page 144

1  subject of this lawsuit.
2      And you gave a pretty lengthy
3  answer in the last few pages?
4      A.  Okay.
5      Q.  In that answer, you state, Bailiff
6  McPeake then led me into the next room where
7  I was forced to open my locked gun safe and
8  allowed him to search it.
9      You told me that statement is
10  incorrect, right?
11     A.  According to my recollection, when
12  we did this complaint -- because I didn't
13  have the video.  My recollection -- that's
14  what I thought.  Because anything that
15  happened inside that house, I was under
16  duress.  And I don't -- my memory didn't
17  serve me as well.
18     Q.  But when you answered this
19  discovery, you had that --
20     A.  I had my recollection.
21     Q.  When you answered discovery -- you
22  now have a copy of the tape?
23     A.  Yeah.  I didn't have a copy of the
24  tape.

Page 145

1      Q.  When you answered discovery, you
2  didn't have a copy of the tape.  When did you
3  receive a copy of the tape from McPeake that
4  McPeake took?
5      A.  It was after that.
6      Q.  When?  Do you know when?
7      MR. BRYAN:  I think it was in a
8  discovery response.  I don't think it was
9  turned over with Rule 26.  So conveniently,
10  no.
11     A.  I definitely didn't have that when
12  I filled that out.
13     Q.  Is there anything else -- I may
14  need to come back.  I can go get you a copy
15  and have you read it through.  But is there
16  anything else in your answer to interrogatory
17  number three that you believe is now
18  incorrect?  Do you have a copy of it?
19     A.  I do.  Hold on a second.  Let me
20  get it.
21     MS. TULLY:  I was going to say, I
22  do.
23     MR. ROBINSON:  Oh, you do?
24     A.  Number three?

1    Q.  While you read that, let me talk to
2  you.
3        MR. ROBINSON:  Let me take a
4  break real quick.
5        (Break in proceedings.)
6  BY MR. ROBINSON:
7    Q.  Did you have a chance to finish
8  reading everything in there?
9    A.  Yeah, I didn't read it fully.
10    Q.  Well, you can go ahead and continue
11  reading it.
12        (Witness reviews document.)
13    A.  I am familiar enough with it I
14  believe.
15    Q.  Is there anything in there that you
16  believe that is now incorrect?
17    A.  No.  I want to say, for the record,
18  you know, as far as the gun safe, if there
19  was no threat of arrest or I was under duress
20  -- or for that matter, one deputy with two
21  deputies en route, no way would I have
22  conceded to the search - I just want to say
23  that - and, you know, to let the search
24  happen, the Supreme Court said so.  So that's

1  kind of where I am at with that.
2    Q.  I am talking about the gun safe.
3    A.  And that was all part of the
4  search, sir.
5    Q.  But you led him to the gun safe,
6  correct?
7    A.  Uh-huh.
8    Q.  He didn't know you had a gun safe,
9  did he?
10    A.  Yes.
11    Q.  You told him you had one?
12    A.  Right.
13    Q.  And you let him in there, correct?
14    A.  Yes.
15    Q.  All right.  He didn't force you
16  there, did he?
17    A.  Every time --
18        MR. BRYAN:  Objection to form.
19  He was there under threat of arrest.
20    Q.  Bailiff McPeake then led me into
21  the next room where I was forced to open my
22  locked gun safe and allowed him to search it.
23  Is that statement accurate?  I think I asked
24  you that before.  That statement is not

1  accurate, is it?
2    A.  The answer, it is not accurate
3  because it is due to my recollection.  I
4  hadn't received --
5    Q.  Let's bring up the video.  Go ahead
6  and answer.
7    A.  I just said it wasn't correct.  I
8  used my memory.  I didn't have the video yet.
9    Q.  What we are getting ready to play
10  here is a video that was taken by my client,
11  Deputy Stump, on his cell phone, is that
12  correct, to your knowledge?
13    A.  No.
14    Q.  It is not correct?
15    A.  Huh-uh.
16    Q.  Who took the video?
17    A.  McPeake.
18    Q.  I'm sorry.  You are correct.  It is
19  McPeake.  He took this video; is that
20  correct?
21    A.  As far as I know.
22    Q.  Okay.  And we are going to play it.
23  I believe it's around seven minutes long.
24  We'll start playing it now.

1    A.  Just for the record, I want to say
2  that the search was probably 20 to 30 minutes
3  long.  That shows seven minutes.
4    Q.  Okay.
5        (Video played.)
6    Q.  You are leaving your garage and now
7  entering your living room; is that correct?
8    A.  Yes, sir.
9    Q.  That was your ex-wife taking the
10  photographs off the wall, correct?
11    A.  Yes, sir.
12    Q.  And that's you carrying the
13  photograph, correct?
14    A.  Under threat of arrest.
15    Q.  And handing it to your wife?
16    A.  Under threat of duress.
17    Q.  Who threatened to arrest you?
18    A.  Judge Goldston.
19    Q.  She told you to get that photograph
20  and give it to her or she was going to arrest
21  you?
22    A.  Yes.
23    Q.  She said those exact -- sorry.  She
24  told you to grab that photograph and give it

1  to her or she was going to arrest you?
2          MR. BRYAN:  Objection to form.
3  That's not what he said.
4      Q. Well, you can still answer.
5      A. The answer is no.
6      Q. She didn't tell you that?
7      A. No.  But there was multiple times
8  beforehand that she threatened me with
9  arrest.  So I'm not arguing with a lady who
10  has already had a bailiff and two deputies en
11  route.  I am not arguing with anybody inside
12  my house when I'm under duress, sir.
13      Q. Where was that photograph located?
14      A. What photograph?
15      Q. That you were carrying in your
16  hands.
17      A. What?  I don't understand your
18  question, sir.
19      Q. That photograph right there --
20      A. Where was it located?
21      Q. Yeah.
22      A. It was on the wall.
23      Q. Where?  In the living room?
24      A. Yeah.  Now, the other photos, the

1  ex-wife took it off the wall with the power
2  of your client.
3      Q. But you took --
4      A. Gun and badge.
5      Q. Repeat that.
6      A. Your client.
7      Q. He had a gun out is what you're
8  saying?
9      A. No, no, no.  He is armed with a
10  badge and gun, the authority to arrest
11  people.  And she threatened me multiple
12  times, are you going to let me in, are you
13  going to let me in, you're going to let me
14  in.  At this point, I am not trying to go to
15  jail.  So I did whatever I had to do inside
16  that house.
17          (Video played.)
18      Q. The judge also said she gave you
19  the lion's share.  She's not going to dispute
20  with you, she just was looking for items that
21  were not turned over to her, correct?
22      A. Again, my understanding was, I'm
23  going to go to jail that day.  What did he
24  call for assistance for, to help with the

1  search?
2          (Video played.)
3      Q. We're walking downstairs.  What
4  room was that?
5      A. I guess we are going to call it the
6  family room.  Take what you want.
7          (Break in proceedings.)
8  BY MR. ROBINSON:
9          (Video played.)
10      Q. You were telling him to go check
11  the safe?
12      A. Under duress, sir.
13      Q. Under duress?
14      A. Absolutely.
15      Q. What did McPeake do there to make
16  you go check the safe?
17      A. He didn't.  Well, what he did was
18  prior to that, which is called for
19  assistance, which tells me he was intending
20  to take me to jail.  You don't call for
21  assistance for anything.  I left them in
22  there so he could search.  Again, he called
23  for assistance.  I am not arguing with
24  nobody.

1      Q. Do you see McPeake search your gun
2  safe at any time in there?  Did he go through
3  and ruffle through?
4      A. I left him at that point.
5      Q. Look at the video.
6      A. You can search visually.
7      Q. Did he go in there and search and
8  moving anything around?
9      A. He searched visually, yes, sir.
10      Q. Was there a gun in there?
11      A. What gun?
12      Q. Was there a gun in there?  That's
13  what I am asking you.
14      A. Inside my gun safe?
15      Q. Yes.  Was there one in there?
16      A. Absolutely.
17      Q. Where is that?
18      A. Well, you see it right there.
19  There's a whole lot of guns.
20      Q. I can't see them.
21      A. I can't either.  To the left,
22  there's guns all in there.
23      Q. And that was you going in and
24  closing it, correct?

Page 154

1  A. Yes, sir.
2  **Q. McPeake didn't close it, did he?**
3  A. No. He was done with the search.
4  (Video played.)
5  **Q. I think that's it.**
6  **Deputy McPeake didn't seize any of**
7  **your movies, did he, personally?**
8  A. Did he carry them personally?
9  **Q. Yes.**
10  A. No.
11  **Q. What time do you recall Deputies**
12  **Stump and White arrive?**
13  A. Soon as the video -- soon as that
14  video ended, that's about what time they got
15  there.
16  **Q. And both of them arrived at the**
17  **same time?**
18  A. I believe so.
19  **Q. Did you speak to either one of**
20  **them?**
21  A. I did.
22  **Q. Which one did you speak to?**
23  A. I spoke to Bobby. You know, he
24  came in and basically asked what is going on

Page 155

1  as far as I know. And he -- I think he asked
2  -- he was going to have my witnesses and her
3  witnesses leave.
4  **Q. He didn't go outside, Stump?**
5  A. No. He was out -- he was inside
6  and outside several times as far as I know.
7  At some point I left the whole search party.
8  I went upstairs. Officer White followed me
9  around, and he detained me basically.
10  **Q. You said that Stump asked you what**
11  **was going on. What did you tell him?**
12  A. I said, you know, you've got the
13  judge here. As far as I can remember, that's
14  what I said, you know. I really don't recall
15  what I said. So you can strike that.
16  Because I don't recall what I said.
17  **Q. You just said that Deputy White**
18  **detained you. How did Deputy White detain**
19  **you?**
20  A. Because I needed to go upstairs to
21  get away.
22  **Q. For what?**
23  A. I needed to go upstairs and get
24  away. I was tired of the stress and, you

Page 156

1  know, the threat of jail. I had to get up
2  and get away from them because they knew what
3  they were going to do -- because they were
4  going to -- anytime I objected to anything,
5  it was no, I am going to do -- we are going
6  to let her take this, take that. There was
7  no sense of watching it.
8  So he went up there. And he was
9  following me around the kitchen. I said,
10  what are you doing, dude? He said, I've got
11  to make sure that, you know, everybody is
12  safe.
13  **Q. But you were free to move around,**
14  **correct?**
15  A. With him by my side, yes.
16  **Q. All right. He didn't place you in**
17  **handcuffs?**
18  A. No, sir.
19  **Q. Did he say you were being detained?**
20  A. I can't remember what he said.
21  **Q. I think after you left the living**
22  **room, you all then went to the kitchen?**
23  A. Yes, sir.
24  **Q. Was everyone -- was it White,**

Page 157

1  **Stump, McPeake?**
2  A. I believe it was everybody.
3  **Q. Everybody? White, Stump, McPeake,**
4  **Lusk, Goldston --**
5  A. Yes, sir.
6  **Q. -- you and your ex-wife?**
7  A. Yes, sir.
8  **Q. And there you allege some recipes**
9  **were taken?**
10  A. Yes, sir.
11  You know, for the record, I --
12  MR. BRYAN: Just let him ask
13  questions, and then you can answer them.
14  Okay?
15  THE WITNESS: Okay.
16  **Q. And after you left the kitchen --**
17  **you all went to the back deck after you**
18  **allege that an umbrella stand was taken?**
19  **Does that sound correct?**
20  A. That's correct.
21  **Q. And you allege that the umbrella**
22  **stand belongs to you?**
23  A. Again, if you -- when you buy a
24  patio set, you've got to buy the umbrella and

1 umbrella stand separately.  She got exactly
2 what she was awarded, which is the chairs,
3 the table and the umbrella.
4     **Q.  During the time that Stump and**
5 **White were in your home, did you see either**
6 **Stump or White take any items out of your**
7 **home?**
8     A.  I can't answer that.  I don't know.
9     **Q.  I guess -- how did your ex-wife**
10 **move her items to -- move the items from the**
11 **house to her vehicle?**
12     A.  There was a laundry basket
13 downstairs.  And I guess she decided to use
14 it.
15     **Q.  Okay.  You never saw Deputy**
16 **McPeake, White or Stump remove any items?**
17     A.  Again, I was away from them at some
18 point in time.  So the answer is, I can't
19 answer that.
20     **Q.  What items do you allege were never**
21 **returned to you?**
22     A.  Some of the movies.  My
23 girlfriend's DVD was taken.  I supplied text
24 messages.  And some of the movies belonged to

1 my kids.
2     **Q.  So your kids never got a way to**
3 **watch those movies?**
4     A.  I mean, unless we buy another DVD.
5 I mean, we can stream it I guess.
6     **Q.  They couldn't watch them over at**
7 **your ex-wife's house?**
8     A.  I mean, should my -- the answer is
9 she could watch them over there.  But my
10 daughter I have full custody of, she should
11 not have her Christmas gifts taken away.
12     **Q.  You said the DVD that belonged to**
13 **your girlfriend was never returned?**
14     A.  No.  No.  It was returned.
15     **Q.  It was returned?**
16     A.  It was.  Her movie was returned,
17 yes.
18     **Q.  Okay.  All right.  Other than the**
19 **contempt hearing that was held in front of**
20 **Judge Goldston, have you ever been a part of**
21 **any other contempt hearing after that?**
22     A.  You mean other than with Judge
23 Dorsey and Lisa Clark -- Judge Clark?
24     **Q.  What was that contempt hearing in**

1 **front of Judge Clark -- what was that about?**
2     A.  Same case.  It is a continuation of
3 the case.
4     **Q.  It was about not returning items?**
5     A.  It was -- never did we talk about
6 not returning.  We never talked about items.
7 She wouldn't let me testify on what was
8 taken, what was objected to.  She didn't hear
9 that testimony.
10     **Q.  What was the contempt hearing**
11 **about?**
12     A.  We talked about this earlier; was
13 whether I damaged items or not.
14     **Q.  It was just about damaged items?**
15     A.  Yes.
16     **Q.  Not about items that were taken?**
17     A.  Right.
18     **Q.  Were you found in contempt?**
19     A.  No.  As of last week, that
20 decision, she said she was going to let go
21 the contempt -- as of last Tuesday, February
22 15th.
23     **Q.  I believe you also allege that you**
24 **sought counseling because of the incident,**

1 **correct?**
2     A.  Yes.
3     **Q.  And you also admit that you had**
4 **sought counseling before that, correct?**
5     A.  Yes.
6     **Q.  And that counseling you sought**
7 **before was because of marital problems you**
8 **were having with your wife?**
9     A.  Yes.
10     **Q.  And it looks like you would have**
11 **started going to Life Strategies around**
12 **September of 2017?**
13     A.  Sounds right.
14     **Q.  Is that correct?**
15     A.  Sounds right.
16     **Q.  For anxiety stemming from issues**
17 **with your wife?**
18     A.  Yes.
19     **Q.  Do you have an anger problem?**
20     A.  No way.  No, sir.
21     **Q.  Do you recall being diagnosed with**
22 **unspecified anxiety and high expressed**
23 **emotion level within the family?  Do you**
24 **recall being diagnosed with that in 2017?**

Page 162

1    A. No, sir. No, sir.
2    Q. I have here a psychotherapy intake
3  note dated September 5, 2017. It says,
4  Diagnosis, unspecified anxiety disorder was
5  high expressed emotional level within the
6  family.
7       Do you see that?
8    A. Okay.
9    Q. Does that diagnosis sound accurate?
10    A. I mean, I was going through a
11  divorce then.
12    Q. Does that diagnosis sound accurate?
13    A. I am not a doctor, sir. I don't
14  know.
15    Q. So you disagree with that
16  diagnosis?
17    A. I was going through a divorce. I
18  was going through a rough time.
19       MR. ROBINSON: We can mark this
20  as Exhibit 5
21       (Exhibit 5 was marked.)
22    Q. 2017, you also had a bad
23  interaction with your aunt that caused you
24  some anxiety?

Page 163

1    A. Yeah. Yes, sir.
2    Q. Okay. So it was more than just
3  with your wife then, correct?
4    A. No. That was all connected. When
5  she filed for divorce, that's when she
6  claimed abuse. And my aunt, I don't really
7  -- I wasn't raised with her. She was raised
8  in the Maryland/Virginia area. I was raised
9  in Oklahoma and West Virginia. So when she
10  called and told her -- after my dad left --
11  there was a divorce happened 50 years ago.
12  So it was, you are just like your dad, he is
13  a piece of crap, all of that. So there was a
14  lot of family issues.
15    Q. How did your aunt find out about
16  it?
17    A. My ex told her.
18    Q. Okay. You say it was just verbal
19  abuse?
20    A. Yes, sir.
21    Q. What's your aunt's name?
22    A. Sandra Lerosa.
23    Q. Where does she live?
24    A. Alexandria, Virginia, the last I

Page 164

1  heard.
2    Q. What's her phone number?
3    A. I don't know. I ain't talked to
4  her in about five years.
5    Q. Not since September of 2017? Does
6  that sound right?
7    A. Yes. Once the harassment started,
8  I was done. She texted my daughter.
9    Q. Who texted your daughter?
10    A. Ms. Lerosa.
11    Q. This is your aunt, correct?
12    A. You can call it that.
13    Q. Is it your aunt? Is she related to
14  you by blood?
15    A. You can call it that, yes, sir.
16    Q. What else would you call it?
17    A. I don't know her. I know you as
18  much as I know her.
19    Q. Is she related -- is she your --
20    A. She is a blood relative, yes, sir.
21    Q. Okay. I just wanted to make sure
22  she's not -- it is your aunt, right? I mean,
23  you're saying you call it that. I don't
24  understand what you mean by that.

Page 165

1    A. It is by relationship status. We
2  were never raised together. So I didn't
3  really look at her as an aunt.
4    Q. Well, I wasn't raised with my aunts
5  and uncles, but they are still my aunts and
6  uncles. Do you understand what I'm saying?
7    A. No. I understand what you're
8  getting at. It's just I never carried her
9  like that because it was always drama.
10    Q. Okay. Yeah.
11       Okay. Are you saying your wife
12  never accused you of any physical abuse?
13    A. No, sir.
14    Q. Then why would you tell your
15  therapist that?
16    A. Maybe it was the best quote of what
17  I told him. I mean, there was never an
18  accusation whatsoever. It was just always
19  verbal or some kind of stuff like that.
20    Q. You said something in the
21  description -- I am reading from a
22  psychotherapy report of October 9, 2017. It
23  says Symptom Description and Subjective
24  Report. It said his wife got paperwork

1 moving for divorce.  He is feeling very
2 emotional about it.  Said his wife accused
3 him of physical abuse.
4      A.  Oh, yeah, yeah.  Hold on.  Yes.
5 Yeah.  When she came to my house and -- about
6 four or five days after, she had told my
7 daughter that I was an abusive man and
8 basically -- so I called my pastor.  You can
9 have his name too.  And --
10      Q.  What's his name?
11      A.  Pastor Gary Williams.
12      Q.  Where is he a pastor at?
13      A.  New Prospect Baptist.
14      Q.  Where is that located?
15      A.  That's in North Sand Branch --
16 Sweeneysburg.
17      Q.  Sweeneysburg.  Okay.
18      A.  Okay.  So he was -- he was doing
19 marriage counseling for us.  And after I seen
20 that they were going to accuse some kind of
21 abuse, I called them.  And he was doing
22 marriage counseling.  And I asked them, I
23 said, hey, did she ever accuse me of abuse?
24 He says no.  And I said, will you testify for

1 me?  He said yeah.
2      So after I hired Brandon Johnson, I
3 seen abuse wasn't going to be a dispute of
4 fact, I didn't call him for testimony.  But
5 after she told my daughter that I was
6 abusive, you know, that's when the trust on
7 our side stopped.  So yes, that happened.
8      Q.  All right.  And of course you
9 allege it never happened?
10      A.  Of course not.
11      MR. ROBINSON:  We can make the
12 psychotherapy note dated October 9, 2017 as
13 Exhibit 6
14      (Exhibit 6 was marked.)
15      Q.  It looks like you went -- the first
16 time you went for therapy after the incident
17 that's the subject of this litigation was
18 March 17, 2017?
19      A.  Okay.
20      Q.  I'm sorry.  2018.
21      A.  Say that again.
22      Q.  I think it is March 17, 2018.  Does
23 that sound correct?
24      A.  That should be March 2020.

1      Q.  2020?
2      A.  After.
3      Q.  Okay.  I'm sorry.
4      It looks like you went there -- it
5 says, Things are pretty crazy right now.  I
6 had a video go viral about some legal things
7 going on from him in his divorce.
8      Now, none of the defendants in this
9 case posted that video online, did they?
10      A.  No.
11      Q.  Okay.  That video was posted by
12 who?  Your attorney?
13      A.  Yes, sir.
14      Q.  Okay.  And you are saying your
15 anxiety came from the video going viral?
16      A.  Sure.  Because at this point,
17 everybody is looking at you whether you are
18 guilty or not guilty.  This went on for
19 two years.
20      Q.  People would not have done that had
21 your attorney not posted that video online,
22 correct?
23      A.  Well, if I didn't do that, then I
24 know that they would sweep the judge

1 searching the house -- because she's been
2 doing it for 20 years -- under a rug.  And I
3 knew I would get no action.  So I had to put
4 my life's events out there to get some
5 action, to get the investigation going.
6      Q.  So you put it out there.  Okay.
7      A.  My attorney did, sir.
8      Q.  I think you also said Paul Payne,
9 Chris Payne, Jeff Presley came up to your
10 property and insisted on removing things from
11 your home.  They actually came into your home
12 and removed things?
13      A.  They didn't come inside, no.
14      Q.  They were all outside?
15      A.  Yes, sir.
16      Q.  Have you seen McPeake since the
17 incident?
18      A.  I can't recall.
19      Q.  Have you seen Stump since the
20 incident?
21      A.  No.  I can't recall that either.
22      Q.  Have you seen White since the
23 incident?
24      A.  No, sir.  Not that I can recall.

Page 170

1     Q. So you can't recall them ever
2 threatening to arrest you after the incident,
3 correct?
4     A. Say that again.
5     Q. None of them have threatened you
6 with arrest after the incident, correct?
7     A. After the incident, no.
8     Q. Okay. Did any deputy from the
9 Raleigh County Sheriff's Department threaten
10 you with arrest after the incident?
11     A. No, sir.
12     Q. You said deputies parked cruisers
13 in your yard?
14     A. Yes, sir.
15     Q. Which ones?
16     A. I don't know who was driving what.
17     Q. Do you have photographs of it?
18     A. I did at one point.
19         MR. ROBINSON: I don't have
20 anything else.
21         MR. BRYAN: I just have a few
22 questions.
23         EXAMINATION
24 BY MR. BRYAN:

Page 171

1     Q. Mr. Gibson, on page 23 of the West
2 Virginia Supreme Court's opinion regarding
3 the search that took place in this case, the
4 court wrote, and I quote, "Regardless of
5 whether the ex-husband had failed to provide
6 belongings he was previously directed to
7 provide, Judge Goldston failed to use the
8 appropriate tools available to her under the
9 law to address such failure because she felt
10 such procedures were ineffective. Instead,
11 she, along with her bailiff, the ex-wife and
12 the ex-wife's attorney proceeded to enter the
13 ex-husband's home" --
14         MR. ROBINSON: I'm going to lodge
15 an objection here. Is this a question?
16         MS. TULLY: Yeah.
17         MR. BRYAN: Please let me finish.
18 I am almost done.
19     Q. -- "the ex-husband's home over his
20 strenuous objections, directed that he stop
21 recording the incident and began searching
22 for items on the list of items he was to
23 produce. Such an invasion of the
24 ex-husband's home was an egregious, abusive

Page 172

1 process."
2         So that was page 23 of the West
3 Virginia Supreme Court's opinion regarding
4 the search that took place at your home.
5         My question is, were you in the
6 middle of this egregious, abusive process
7 when you made the decision to open your gun
8 safe?
9         MR. ROBINSON: Objection to the
10 form.
11         MS. TULLY: Object to form.
12     A. Yes.
13     Q. So that was the context in which
14 you opened your gun safe for Deputy McPeake
15 that we saw in the video?
16     A. Yes, sir.
17     Q. Would you have invited Deputy
18 McPeake into your house and opened up your
19 gun safe for him but for being in the middle
20 of this egregious, abusive process?
21     A. I wouldn't have invited any one of
22 them in. So the answer is no, sir.
23     Q. Would you have invited Deputy
24 McPeake inside your house to film and observe

Page 173

1 the inside of your gun safe except for the
2 fact that you had been threatened with
3 arrest?
4     A. I wouldn't have invited. I didn't
5 authorize him to video inside my house. So
6 no, sir.
7     Q. Was this egregious, abusive process
8 which occurred in your home a traumatic
9 experience?
10         MR. ROBINSON: Objection to the
11 form.
12         MS. TULLY: Object to form.
13         MR. BRYAN: What do you object
14 to? That's the words of the Supreme Court.
15         MS. TULLY: It's an objection
16 that I'm lodging. I don't have to explain my
17 objection. You can continue with your
18 question.
19         MR. ROBINSON: I'm objecting to
20 your use of egregious and abusive process.
21         MS. TULLY: Yeah.
22         MR. ROBINSON: That's my
23 objection.
24         MR. BRYAN: Page 23 of the West

Page 174

1  Virginia Supreme Court, that's what I'm
2  holding.  I mean, I --
3       MR. ROBINSON:  I stand by my
4  objection.  You can ask your question.
5       MR. BRYAN:  I mean, I want to ask
6  a good question.  Let me rephrase my question
7  then with your objection noted.
8       **Q.  Was this egregious, abusive process**
9  **which occurred in your home a traumatic**
10 **experience for you?**
11      MR. ROBINSON:  Object to form.
12      MS. TULLY:  Object to form.
13      MR. ROBINSON:  You can answer.
14      A.  Yes, sir.
15      **Q.  Before watching the video that**
16 **Deputy McPeake took, did your recollection of**
17 **opening the gun safe vary some from what was**
18 **portrayed on the McPeake video?**
19      A.  Yes.
20      MR. ROBINSON:  Object to the
21 form.
22      MR. BRYAN:  I'm sorry.  What's --
23      MR. ROBINSON:  I objected to the
24 form.  He can answer.

Page 175

1       Go ahead.  His recollection of what
2  is on the video, that's what you are asking
3  him?
4       **Q.  Let me repeat my question.**
5       **You said that what occurred in your**
6  **home was a traumatic experience for you,**
7  **right?**
8       A.  Yes, sir.
9       **Q.  At the time that the complaint was**
10 **drafted and filed, you didn't have that video**
11 **in your possession, right?**
12      A.  Correct.  I did not have that video
13 in my possession.
14      **Q.  In fact, you had requested that**
15 **video?**
16      A.  I did, sir.
17      **Q.  You knew it existed?**
18      A.  Yes, sir.
19      **Q.  You saw Deputy McPeake taking a**
20 **video?**
21      A.  I seen him fidgeting around with
22 his phone, yes, sir.
23      **Q.  And you tried multiple times to**
24 **obtain a copy of that video?**

Page 176

1       A.  I sent a FOIA request to the
2  sheriff's department, yes, sir.
3       **Q.  But ultimately you had to assert**
4  **the allegations in the complaint without**
5  **having that video to review first?**
6       A.  Yes, sir.
7       **Q.  So as we sit here today and watch**
8  **the video, there was some factual variance**
9  **from the way that you recalled the event and**
10 **the way that the video shows the events?**
11      MR. ROBINSON:  Object to the
12 form.
13      **Q.  Is that right?**
14      A.  Yes, sir.
15      **Q.  But ultimately it is your testimony**
16 **that you otherwise wouldn't have invited**
17 **Deputy McPeake in your house to look in your**
18 **gun safe but for this search that was**
19 **occurring against your will?**
20      A.  Absolutely.  I would not have
21 invited him in.  If I wasn't threatened with
22 arrest, I would have never let them in my
23 house.
24      **Q.  Was it your understanding that you**

Page 177

1  **had any choice but to comply with the search**
2  **that was taking place in your house once it**
3  **was under way?**
4       A.  Once she threatened me with arrest
5  and he called for assistance, I had no -- no
6  way that I think that I -- I had to let her
7  in.  That's -- that's my thought process.
8       **Q.  Were you threatened with arrest**
9  **multiple times?**
10      A.  Yes, sir.
11      **Q.  Do you recall how many times?**
12      A.  I can't give an exact number.
13 Maybe seven -- six, seven.
14      **Q.  And who would have arrested you, do**
15 **you know?**
16      A.  Bailiff McPeake or the deputies
17 would have arrested me.
18      **Q.  And were you afraid of getting**
19 **arrested?**
20      A.  Absolutely, sir.
21      **Q.  Why?**
22      A.  Because I would lose custody of my
23 kids, what I had.
24      **Q.  Any other reasons?**

1     A.  I mean, lose my job.  I'd lose
2  everything that I have built if I got
3  arrested.
4     Q.  So did you voluntarily consent to
5  the search of your house that day?
6     A.  No, sir.  Under duress and threats.
7     Q.  In fact, did you demand a search
8  warrant?
9     A.  Yes, sir.
10    Q.  What was the response?
11    A.  I don't need a search warrant.
12    Q.  At some point, was your phone
13  seized?
14    A.  Yes, sir.
15    Q.  And who seized your phone?
16    A.  Bailiff McPeake.
17    Q.  Did you voluntarily give your phone
18  to Bailiff McPeake?
19    A.  No, sir.
20    Q.  Why did you do so?
21    A.  Under threat of arrest.
22    Q.  Did you voluntarily stop recording
23  on your phone that day?
24    A.  No, sir.

1     Q.  Why did you stop doing so?
2     A.  I was scared of going to jail under
3  threat of arrest.
4     Q.  Was Sharon Masual, your girlfriend,
5  threatened with arrest --
6     A.  Yes, sir.
7     Q.  -- that day?
8     A.  Yes, sir.
9     Q.  Was she told to stop recording
10  under the threat of arrest?
11    A.  Yes, sir.
12    Q.  And who made that threat?
13    A.  Judge Goldston.
14    Q.  Was Deputy McPeake present at the
15  -- when that threat was made?
16    A.  Yes, sir.
17    Q.  Was he in uniform?
18    A.  Yes, sir.
19    Q.  Was he there on the property in a
20  marked police cruiser?
21    A.  Yes, sir.
22    Q.  And you testified earlier that you
23  had parted ways with your prior attorney,
24  Brandon Johnson.  Did that occur after your

1  divorce was finalized?
2     A.  Yes, sir.
3     Q.  So the case was over, right?
4     A.  Yes, sir.
5     Q.  After Judge Goldston was
6  disqualified from presiding over the contempt
7  action that was pending in family court, I
8  think you said Judge Lisa Clark eventually
9  began to preside over the action?
10    A.  Yes, sir.
11    Q.  So just to -- just to be clear, the
12  ultimate disposition or the ultimate
13  adjudication of this contempt petition that
14  we are -- we have talked about here today was
15  that it was dismissed without a finding that
16  you were in contempt; is that right?
17    A.  Yes, sir.  She said on the record
18  she is letting the case go.
19    Q.  And that was said when?
20    A.  Tuesday, February 15th, 2022.
21    Q.  Has a written order been entered to
22  your knowledge that memorializes that?
23    A.  No, sir.  She said she is going to
24  prepare it.  And I have got the court

1  recorded audio.
2     Q.  But you do have a copy of the court
3  audio where she said -- Judge Clark says that
4  the contempt petition is being dismissed
5  without a finding of holding you in contempt?
6     A.  Yes.
7     Q.  Regarding the video being out
8  there, whether on the news or elsewhere, was
9  it important to you that other people know
10  about what happened to you?
11    A.  I think it was very important to
12  get my story out because it has been
13  happening to people for 20 years as Judge
14  Goldston admitted to.  So it is -- it is
15  important because the judge is supposed to
16  have the utmost integrity if anybody is
17  supposed to have it.  You guys are all
18  officers of the court.  You are supposed to
19  have integrity.  The judges must have the
20  utmost integrity.  It is important to know
21  what our deputies are doing with that search
22  warrant.  It's important to know what our
23  judges are doing behind the scenes.  When you
24  go to court for divorce, it should be just

Page 182

1  divorce.  All of these other games should not
2  be played.
3      **Q.  If only you knew about it or only**
4  **you and your lawyer knew about it, do you**
5  **believe as we sit here today that that would**
6  **have caused you less anxiety or less**
7  **emotional trauma than you actually suffered?**
8      A.  Can you say that question again?
9      **Q.  Well, the insinuation is, is that**
10 **you say that you suffered emotional trauma**
11 **because everybody had seen the video.  And if**
12 **you yourself consented to putting the video**
13 **out there or put the video out there, then,**
14 **you know, the suggestion or the insinuation**
15 **is, is that you -- you know, you chose to**
16 **make that happen.**
17      **So my question is, is had you made**
18 **a different choice or had you not put the**
19 **video out there, do you believe that you**
20 **would have suffered any less?**
21      MS. TULLY:  I am going to object
22 to the use of the word insinuation.  I mean,
23 he testified that it being out there causes
24 him stress and anxiety.

Page 183

1      MR. BRYAN:  I'm sorry.  I
2  completely butchered that question.  Let me
3  try to rephrase this.
4      **Q.  Do you believe that you would have**
5  **suffered any less if the video hadn't been in**
6  **the news or on social media?**
7      A.  I suffered regardless because my --
8  my lack of faith in the way a judge is
9  supposed to act and the police officer is
10 supposed to act happened.  You couldn't take
11 that from my memory.  Now, I do believe that
12 I suffered more when the video come out.  But
13 I -- you know, I had to get justice.
14 There was only one way of getting justice,
15 was to put it out there.  I mean, again, for
16 20 years, people were scared to speak up.
17      **Q.  So, in effect, did you feel that**
18 **that was an important step that you were**
19 **forced to take?**
20      A.  Yes, sir.  It was -- it was either
21 that or swept under the rug as it has been
22 for 20 years.
23      MR. BRYAN:  All right.  Can I
24 have just a minute?  I think I'm probably

Page 184

1  done.  I'd just like to talk to Matt real
2  quick.
3      (Break in proceedings.)
4      MR. BRYAN:  I don't have any
5  other questions again.
6      MS. TULLY:  I just have a couple.
7      RE-EXAMINATION
8  BY MS. TULLY:
9      **Q.  Judge Goldston never carried**
10 **anything out of your home; is that correct?**
11      A.  Not that I know of.
12      **Q.  Okay.  You say you contacted --**
13 **again, I don't want to know what you all**
14 **talked about.  But you think you contacted**
15 **Mr. Bryan sometime within a couple of weeks**
16 **of this happening?**
17      A.  I am going to say within a week.
18      **Q.  Okay.  So if this video was on the**
19 **news on March 5th of 2020 -- were you the one**
20 **that provided the video to the news?**
21      A.  No.  I contacted him -- I probably
22 contacted him the same day.  Matter of fact,
23 I'm pretty sure I contacted him March 4th.
24      **Q.  So you contacted him immediately?**

Page 185

1      A.  Yes.
2      **Q.  And you don't believe that without**
3  **putting that video out there, anything could**
4  **have happened?**
5      A.  Yeah.
6      **Q.  Like we wouldn't be sitting here**
7  **today had you not put that video out on --**
8      A.  For 20 years, she had been
9  searching houses.  For 20 years, it has been
10 going on.  For 20 years, people didn't feel
11 like they had a voice.  For 20 years, they
12 haven't.
13      **Q.  So you are being the savior of all**
14 **of these --**
15      A.  There is no savior.  I hate it.  I
16 hate that it ever happened.
17      **Q.  What's your ultimate goal with this**
18 **lawsuit?**
19      A.  I want justice, ma'am.
20      **Q.  So you want her to stop being able**
21 **to perform these searches, is that --**
22      A.  Absolutely.
23      **Q.  Okay.  Do you believe that has**
24 **happened through the hearing --**

Page 186

1    A. I have no faith in family court
2 now.
3        Q. Let me finish my question.
4    A. Sorry, ma'am.
5        Q. Do you believe that that justice
6 has occurred with a result of the West
7 Virginia Supreme Court order?
8    A. Do I believe them -- can you
9 rephrase it maybe so I understand?
10       Q. Do you believe that the justice --
11 which you just told me that to you is that
12 she can no longer do these home visits, do
13 you believe that that justice has occurred?
14   A. No.
15       MR. BRYAN: Objection to the form
16 of the question, characterization of home
17 visits. The Supreme Court said it was a
18 search.
19       MS. TULLY: Okay. Well,
20 regardless.
21       Q. You don't believe that that justice
22 has occurred?
23   A. No, ma'am.
24       Q. Why not?

Page 187

1    A. I just don't think I do. I mean,
2 it is -- she's still practicing. She
3 violated many canons. She violated laws.
4 There is no public trust. When you hear --
5 family court now, it is a joke. The average
6 man would say, oh, yeah, the one searching
7 houses, the one taking kids. The integrity
8 of the system is gone in my opinion.
9        Q. Okay. How do you obtain justice
10 through this lawsuit?
11   A. I think through this -- you know,
12 that's a good question. I'd have to think
13 about it. Because I don't have an answer for
14 you right now.
15       Q. Well, you are the one who wants
16 justice.
17   A. I do.
18       Q. How do you obtain justice through
19 this lawsuit? Because you agree with me that
20 this lawsuit can't take her off the bench,
21 correct?
22   A. As far as I know. I am not too
23 legally on that. But okay.
24       Q. Okay. So what's your justice

Page 188

1 through this?
2    A. So if we go to trial and she is
3 found guilty, then it can take her off of the
4 bench because then she is convicted of a
5 civil penalty. So I don't know. You are
6 asking -- you're asking me the question. I
7 am giving you an answer. If she is found
8 guilty, then there will be some kind of
9 penalty for that.
10       Q. Monetary?
11   A. I guess.
12       MS. TULLY: Okay. I don't think
13 I have anything else.
14       RE-EXAMINATION
15 BY MR. ROBINSON:
16       Q. On this timeline for picking up
17 property, you say March 2018, Mrs. Gibson
18 picked up her personal property from my home,
19 I have audio of her going through the home.
20 Including closets and drawers.
21       Do you still have that audio?
22   A. I don't know. I just switched
23 phones. I may have it on my home drive. I
24 may not. I don't know.

Page 189

1       Q. Did she know that you were
2 recording her?
3    A. Inside my house?
4       Q. Yes.
5    A. The answer is probably not.
6       Q. Okay. Are there any other
7 recordings of her that she doesn't know
8 about?
9    A. No, sir.
10       Q. Are you sure?
11   A. Yes, sir.
12       MR. ROBINSON: That's it. I
13 don't have anything else.
14       MS. TULLY: Actually, I have one
15 more.
16       RE-EXAMINATION
17 BY MS. TULLY:
18       Q. You now remember that you called
19 Mr. Bryan on March 4th, 2020, correct?
20   A. Yes, ma'am.
21       Q. Do you remember if you called him
22 between the time you left the courthouse and
23 got to your home, or if you called him
24 sometime later in the day?

Page 190

```
1        A.  It is going to be later in the day.
2            MS. TULLY:  All right.  I think
3   that's all of the questions that I have.
4            MR. ROBINSON:  Okay.
5            MR. BRYAN:  He will read.
6            (Deposition concluded at 1:30
7   p.m.)
8            * * * * * * * *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 191

```
1              CERTIFICATE

2

3        I, Tara Arthur, Certified Stenotype

4   Reporter and Notary Public, do hereby

5   certify that the foregoing deposition of the

6   above-named witness, was duly taken by me in

7   machine shorthand, and that the same were

8   accurately written out in full and reduced

9   to computer transcription.

10       I further certify that I am neither

11  attorney or counsel for, nor related to or

12  employed by any of the parties to the action

13  in which this deposition is taken; and

14  furthermore, that I am not a relative or

15  employee of any attorney or counsel employed

16  by the parties hereto or financially

17  interested in the action.

18     My commission expires April 16, 2022.

19

20  _____

    Tara Arthur

21  Certified Court Reporter/Notary Public

22

23

24
```

| | | | | |
|---|---|---|---|---|
| **Exhibits** | **1** | **1995** 8:15 11:11 74:16 | 86:23 94:13 127:11 167:20,22 188:17 | **30th** 11:18 80:6 |

**Exhibits**

**Gibson022322 Ex1** 3:10 15:24 16:1,6,11 17:23 18:1,8, 21,22,24 19:4, 5,8,10,14,17 20:6,15 22:16 23:2,18 26:10 27:15,23 30:5 112:22 124:19,22

**Gibson022322 Ex2** 3:10 19:5, 9,18 20:6,12, 13 23:2,18 27:10 28:7 29:21 30:6 124:24 125:1

**Gibson022322 Ex4** 3:11 121:6,8,17

**Gibson022322 Ex5** 3:12 162:20,21

**Gibson022322 Ex6** 3:12 167:13,14

---

**$**

**$100** 31:17

**$250** 30:16

**$3,000** 30:20, 22

**$5,000** 91:16, 18

---

**1**

**1** 15:24 16:1,6, 11 17:23 18:1, 8,21,22,24 19:4,5,8,10, 14,17 20:6,15 22:16 23:2,18 26:10 27:15, 23 30:5 112:22 124:19,22

**10** 6:10 104:7 106:19

**10-minute** 107:6

**10:34** 103:19, 21

**11** 11:11

**113** 6:12 7:21 65:14 76:13 105:15

**12** 7:3 96:11

**13** 7:3 65:6 96:11

**14** 65:7

**15th** 160:22 180:20

**17** 167:18,22

**18** 7:1 14:16 29:17 68:18 96:12 142:6

**18th** 21:1

**19** 20:20 27:11 28:8 73:1

**1977** 6:10

---

**1995** 8:15 11:11 74:16

**1995-ish** 74:5

**1996** 41:12 69:10,13

**1997** 73:2

**1999** 73:18

**1:30** 190:6

---

**2**

**2** 19:5,9,18 20:6,13 23:2, 18 27:10 28:7 29:21 30:6 124:24 125:1

**20** 10:23 46:21 89:2 149:2 169:2 181:13 183:16,22 185:8,9,10,11

**2001** 69:14,15, 17

**2005** 8:2

**2015** 79:18

**2017** 11:18 12:2,4 76:1,16 80:6 161:12, 24 162:3,22 164:5 165:22 167:12,18

**2018** 10:1 14:16 20:20 24:3 28:8 29:3,8 32:10 33:4 34:9 35:16 49:21 52:1 77:9,14 78:9 80:9,16

---

86:23 94:13 127:11 167:20,22 188:17

**2019** 13:3 28:2 90:3 93:19,23

**2020** 4:16 27:11,16 37:18 40:4 41:6 42:8 43:9 49:1 50:10 51:2,14 52:9 57:15 62:19 91:4,14 93:19 94:3 96:14 98:1 103:6 125:14 143:23 167:24 168:1 184:19 189:19

**2022** 180:20

**20th** 88:24

**22** 10:8

**23** 171:1 172:2 173:24

**25813** 6:13

**26** 145:9

---

**3**

**3** 21:22 120:15 121:7

**30** 49:21 76:15 80:9 87:7,10 88:10 98:7,8, 12,13,22 149:2

**304-673-2986** 95:23

---

**30th** 11:18 80:6

**31st** 7:3

**35** 139:23

**3rd** 91:13

---

**4**

**4** 4:16 27:16 28:2 37:18 40:4 41:5 43:9 49:1 50:10 51:2,14 57:15 91:4 93:18,19, 22 94:3 96:14 97:24 121:6,8, 17 125:14 143:23

**40** 139:23

**4th** 27:18 28:5 37:1 52:6,9 57:18 89:19 90:3,4,6,11 92:4,12,14,16, 18,19,21,23 93:5 96:17 102:13,16 103:6 126:12 184:23 189:19

---

**5**

**5** 162:3,20,21

**50** 163:11

**50/50** 141:2

**5:00** 99:12

**5th** 184:19

**6**

**6** 167:13,14

**6:00** 99:12

**9**

**9** 165:22
167:12

**96** 73:1

**A**

**A-A-R-O-N**
4:10,11

**a.m.** 103:19,21

**Aaron** 4:9,10
122:11

**abide** 41:15

**ability** 11:5

**absolutely**
16:24 17:18
18:15 25:13,
14,15 54:23
136:8 152:14
153:16 176:20
177:20 185:22

**abuse** 33:13
66:19,24 67:2,
3 81:12,18
82:8,10,12,14,
16 83:12
163:6,19
165:12 166:3,
21,23 167:3

**abusive** 82:23
166:7 167:6
171:24 172:6,
20 173:7,20

174:8

**accurate**
147:23 148:1,
2 162:9,12

**accurately**
16:10,20 25:8
40:2

**accusation**
66:22 165:18

**accuse** 66:23
166:20,23

**accused**
165:12 166:2

**acre** 66:8

**act** 183:9,10

**action** 169:3,5
180:7,9

**active** 72:12
73:2

**actual** 36:9
98:10

**added** 16:3
129:22

**additional**
16:3

**address** 6:11
7:24 171:9

**adjudication**
180:13

**admissions**
18:5

**admit** 161:3

**admitted**
19:17 20:17
23:2,3 102:8,
13 181:14

**adultery** 67:1

**affect** 11:4

**afraid** 177:18

**Age** 140:4

**agree** 15:2
187:19

**agreed** 30:2

**agreement**
13:17 15:18,
20 23:15 31:5

**ahead** 22:13
26:23 42:15
109:12,16
112:4,16
121:15 146:10
148:5 175:1

**Air** 69:18,19
72:8,14,18
74:3

**Alexandria**
163:24

**allegation**
142:19

**allegations**
33:12 83:12
176:4

**allege** 82:20
133:2 136:2,
18 138:20
139:19 142:8
157:8,18,21
158:20 160:23
167:9

**alleged** 82:13

**alleging** 89:24
125:4

**allowed** 44:6
78:7 125:5

**adultery** 67:1

**altered** 16:2
26:11 40:7

**altogether**
60:2

**ammo** 30:20

**amount** 63:21
84:10

**amounts** 32:3

**anger** 46:15
161:19

**annotations**
17:13

**answering**
143:19

**answers** 5:6

**anxiety** 43:15
47:21 54:21
161:16,22
162:4,24
168:15 182:6,
24

**anymore** 11:1
48:22 88:20

**anytime** 44:21,
22 45:23 46:3
48:5 67:1,8
139:24 156:4

**appeared**
27:18

**appears** 13:6

**appointment**
45:14

**approached**
14:11

**approximately**
10:1

**apps** 110:14

**April** 24:3 77:9
82:4 94:12
127:11

**AR-15's** 30:19

**area** 163:8

**argue** 85:20
135:20

**arguing** 128:6
140:2 150:9,
11 152:23

**argument**
85:13

**armed** 151:9

**Army** 72:19

**arrest** 146:19
147:19
149:14,17,20
150:1,9
151:10 170:2,
6,10 173:3
176:22 177:4,
8 178:21
179:3,5,10

**arrested**
131:18
177:14,17,19
178:3

**arrive** 105:16
154:12

**arrived** 38:17
99:16,18
115:3,4
154:16

**artistic** 116:9

**assert** 176:3

**assigned** 32:5

**assist** 13:16

**assistance** 137:7 151:24 152:19,21,23 177:5

**assistant** 111:7

**assume** 8:6 71:23

**assuming** 26:8 54:9 56:23 74:10,11 75:2 76:14 91:21 92:1 107:2 130:16 134:10

**attached** 16:23 18:3 123:18

**attempt** 60:17 114:19

**attend** 10:24 48:18

**attending** 9:5

**attention** 96:13

**attorney** 4:14, 21 12:16 13:18 21:6 23:17 24:13 25:5 28:18 29:13 34:2 37:23 38:21 40:13 48:8 55:1 81:21,22 89:14 143:17 168:12,21 169:7 171:12 179:23

**attorneys** 30:2 101:11

**audio** 34:17 105:20 110:1, 4,7,8,20,24 111:1,13 127:20 130:20 131:3,19 181:1,3 188:19,21

**aunt** 162:23 163:6,15 164:11,13,22 165:3

**aunt's** 163:21

**aunts** 165:4,5

**authorities** 60:23

**authority** 151:10

**authorize** 173:5

**average** 187:5

**awarded** 8:7 28:14,22 35:17 124:4, 16 158:2

**aware** 132:4

---

**B**

**back** 5:15 8:11 14:22 40:9 43:11 45:1,8 67:9 78:7 80:15,21 84:19,20 89:16 93:20 94:5 104:2 109:15 110:17 111:4 117:4 124:14,20

130:11 133:19 134:7 136:1 139:2 145:14 157:17

**backed** 128:23

**background** 8:13

**backup** 136:18,21

**bad** 111:7 162:22

**badge** 151:4, 10

**bag** 79:23

**bailiff** 14:2 52:20 100:22, 23 120:21 132:22 144:5 147:20 150:10 171:11 177:16 178:16,18

**ball** 67:11

**bank** 66:4

**Baptist** 10:22 166:13

**Base** 72:14,18

**based** 20:20 21:15

**basically** 9:18 59:13 71:3 91:19 105:19 135:20 154:24 155:9 166:8

**basis** 7:5 50:21

**basket** 158:12

**basketball**

45:9

**bathroom** 102:4

**battles** 13:14

**beard** 122:8

**beast** 114:1

**Beaver** 6:13 69:3

**Beckley** 8:18 9:1,14

**bedroom** 21:21 22:5 31:17

**began** 38:6 171:21 180:9

**begin** 11:15 42:3 121:22

**beginning** 12:22

**belaboring** 27:9

**belief** 15:14 36:18 59:6

**believed** 88:13 113:10,12,13

**believing** 43:16

**belong** 10:18, 19 133:5

**belonged** 140:6 142:9 158:24 159:12

**belongings** 171:6

**belongs** 157:22

**bench** 187:20 188:4

**bi-weekly** 45:5

**big** 13:13 86:9, 12 113:18,21 122:10

**bigger** 122:18

**birds** 143:12

**birth** 6:9 32:16 80:24

**birthday** 65:7

**bit** 46:15 56:15 70:21 111:5

**black** 49:3,5, 10 50:7 51:1,7 52:12 62:7 86:15 97:8,16, 21 103:24 104:14 107:16 109:20,21 114:16 118:15

**blocked** 51:22

**blood** 164:14, 20

**blowed** 123:19

**blower** 16:8

**blowers** 16:5

**blue** 108:16 109:17

**Bluefield** 8:24 9:3,6

**blur** 115:15

**boards** 129:19

**Bob** 116:10

**Bobby** 122:12 154:23

**bolted** 123:22 125:10,13 128:2,5 129:10,13

**bolts** 129:20

**book** 76:7

**bothered** 44:8

**bottom** 49:13 51:19,20 62:1 80:8 81:6 84:9 87:23 95:5 96:6 99:6 129:19,20

**bought** 8:8 65:17 124:8

**box** 117:7

**boxes** 35:12 49:23 88:18

**boyfriend** 67:24 119:18 142:1

**boyfriend's** 68:1

**boys** 65:4

**Brad** 57:6

**Branch** 166:15

**Brandon** 12:20 76:3 89:13 91:6 101:17, 22 167:2 179:24

**break** 5:23 6:3, 6 55:23 102:4, 5 146:4,5 152:7 184:3

**bring** 81:2 85:15 97:4 119:24 142:3

148:5

**Bringing** 10:12

**Brooklyn** 6:23, 24 7:1,8,13,19 52:22 53:2 63:15 96:8,12 141:7

**Brooklyn's** 21:21

**brother** 67:23 84:15 118:16, 23 119:7,24 120:2,4

**brother's** 119:10

**brought** 78:6 81:3 102:18 120:2

**Bryan** 24:14, 17,20 25:6 34:5,10,17,20 39:8 53:13,15 54:2,9,12 102:3 116:23 120:19 121:1 124:24 131:13,15 145:7 147:18 150:2 157:12 170:21,24 171:17 173:13,24 174:5,22 183:1,23 184:4,15 186:15 189:19 190:5

**buddy** 74:16, 19

**build** 9:19

123:20

**built** 123:17 178:2

**Bullis** 72:19

**bunch** 78:3

**Bureau** 68:24 69:12,23 70:5 71:8

**burner** 96:1

**butchered** 183:2

**button-down** 108:16

**buy** 83:10 124:7,8 157:23,24 159:4

---

**C**

**call** 4:23 20:5 38:15 39:19 49:15,19 58:20 65:9 66:7,11,12 95:6 96:1 100:21 114:20 123:12 129:6 135:7 136:21 137:6 138:15, 19 151:24 152:5,20 164:12,15,16, 23 167:4

**called** 4:2 15:23 16:1 19:16 20:15 23:2 38:20 91:13 99:22 100:24 101:3

106:9 136:18 137:4,5 152:18,22 163:10 166:8, 21 177:5 189:18,21,23

**camera** 110:22

**Camp** 72:19

**canons** 187:3

**car** 74:23 79:15 105:12 118:20 119:22,23

**card** 32:16

**cardboard** 35:12 49:23

**care** 44:13 49:23 73:7

**Carolina** 72:16

**Carrie** 6:18 7:16 50:2

**carried** 62:6 78:24 86:13 90:4 98:21 165:8 184:9

**carrier** 95:12 124:1,8,10,13 128:3,4,7,14, 17 129:1,5,6,9

**carry** 86:15 98:5 154:8

**carrying** 149:12 150:15

**cars** 97:6 132:14

**Carter** 51:9,13 52:12 97:8 98:24 104:15

107:16 109:18,23

**case** 16:19 35:6 45:24 46:8 56:12,21 58:4 63:3,6 91:18 94:20 97:14 116:24 143:15 160:2, 3 168:9 171:3 180:3,18

**cases** 48:15 83:3

**caught** 16:3

**caused** 41:6, 10 43:11 54:21 162:23 182:6

**cell** 110:2,5,6 148:11

**certificate** 9:3 32:16 81:1

**certificates** 9:7,10

**certifications** 9:8

**chainsaw** 133:3,4,7,9,12 134:6,13,16, 19,20 135:1 139:6,7

**chair** 9:19

**chairs** 158:2

**chance** 43:19 126:22 140:1 146:7

**changed** 95:10

characterization 186:16

charge 89:23

charged 73:24

cheating 66:17

check 152:10, 16

child 48:15 59:22 63:3,4, 7,8,12

children 6:20 7:12 64:12 65:1,3 102:10, 15 142:9

choice 177:1 182:18

chose 182:15

Chris 169:9

Christmas 140:15 159:11

chronological 143:22

church 10:18, 22 11:2

circled 16:17 21:15 30:12, 13,16,20 31:22,23

circles 21:16

city 113:19

civil 188:5

claim 59:13 81:18 82:8 85:7

claimed 60:6 163:6

claiming 83:11

claims 81:12

Clarify 84:12

Clark 35:5,9 37:6 46:7 56:24 57:3 59:8,16,21 60:5,20 62:12 83:9 88:12,22, 23 159:23 160:1 180:8 181:3

Clark's 82:6

clear 180:11

clerk's 19:11 27:11,15

client 148:10 151:2,6

close 105:22 154:2

closely 29:22

closets 79:3 188:20

closing 153:24

clothes 32:12, 13,19 78:24

clothing 79:2 80:20

clue 22:21

co-worker 49:4 51:10

co-workers 55:11,15

cold 86:24

collect 78:8

college 8:21

comments 55:3,7

communications 54:3

complaint 92:17 144:12 175:9 176:4

completely 183:2

Complies 117:11

comply 177:1

computer 77:18,20 78:24 79:2

conceded 146:22

concluded 40:21,23 41:2 190:6

condition 62:8

conference 13:23 57:8 58:11,14 59:17 99:23 100:3,7 101:7

confidential 54:3

confront 67:10,14

confused 84:21 124:21

confusing 19:2

connected 72:20 163:4

consent 178:4

consented 182:12

considered 70:5 118:19, 24

constitution 41:15

contact 114:19

contacted 184:12,14,21, 22,23,24

contempt 27:19 37:13 45:24 46:6 57:14,17,18 58:23 59:2,19 89:23 91:3 92:14,21 94:4 101:18 102:16 159:19,21,24 160:10,18,21 180:6,13,16 181:4,5

contentious 81:15

contesting 102:20

context 172:13

continuance 46:3 90:11

continuation 160:2

continue 12:24 27:8 47:23 146:10 173:17

continued 40:23 90:21

continuing 108:3

controlling 82:23

convenience 6:2

conveniently 145:9

conversational 5:10

conversations 13:5

convicted 73:8,14 188:4

coordinator 97:15

copied 23:23 37:6 103:14 135:24

copies 18:11, 14,21 26:23 36:1,10,19,22, 23 94:9,10,18, 22,23 126:24 127:3,4,14,21

copy 16:11 20:21 24:6 27:1 30:1 37:9 43:24 95:8 126:20 127:13 144:22,23 145:2,3,14,18 175:24 181:2

copying 24:22

correct 8:19 9:21 12:14 20:7,8 21:8, 10,17 27:20 34:24 36:1,4,

15 37:15 38:7
40:19 42:11
49:1 52:23
53:18 55:1
57:11 58:5
59:3,5 66:6
67:22 68:21,
24 70:2 71:11
72:1,9 73:21
79:9 86:1
87:1,15 89:8,
15,23 90:1,21
92:15 94:1
98:12 100:3,
17 101:4,16
102:1,10
105:8 106:2
108:3 113:11,
16 114:13
119:5,18
121:19 125:22
130:5,23
135:13 139:3,
8 140:11
141:1 147:6,
13 148:7,12,
14,18,20
149:7,10,13
151:21 153:24
156:14
157:19,20
161:1,4,14
163:3 164:11
167:23 168:22
170:3,6
175:12 184:10
187:21 189:19

**corrected**
15:22 20:11
23:15 30:3
127:5 133:8

**correction**
70:1

**correctional**
9:21

**corrections**
23:11 69:24
70:6 71:5

**cost** 94:20

**couch** 32:23
86:13,18 88:2,
4

**counsel**
108:11 116:22

**counseling**
42:1,20 44:20
102:9,15
160:24 161:4,
6 166:19,22

**counselor**
42:4,7,11,14,
19 43:4,8
102:21

**County** 12:8
19:11 46:16
57:1,4,6 97:19
121:24 170:9

**couple** 4:15
55:20 68:7
85:14 184:6,
15

**court** 4:3
12:10 18:23
20:11,17 23:8
34:14 35:21
36:2 44:5,23
45:1,23 56:21
57:24 62:11
65:24 68:15
71:24 76:18
81:10,19 83:3
88:22 99:15
103:7,18,21

112:23 120:10
134:10 142:3
146:24 171:4
173:14 174:1
180:7,24
181:2,18,24
186:1,7,17
187:5

**Court's** 171:2
172:3

**court-** 102:14

**court-ordered**
94:7 102:9

**courthouse**
38:16 39:21
96:16 97:5
99:15,18
104:11 106:20
114:8,18
189:22

**courtroom**
13:24 14:1
38:7 40:19
82:6 99:20
100:17,20
101:9

**courts** 91:17

**Crab** 74:17

**crap** 163:13

**crazy** 168:5

**crime** 46:22
73:9,15 74:1

**cruiser** 179:20

**cruisers**
170:12

**cuff** 55:17

**current** 6:11
45:14 68:11

**custody** 15:8
16:15,19 22:4
63:14,17
70:24 139:22
140:19,21,24
141:4 159:10
177:22

---

**D**

**da-da-da**
82:24

**dad** 32:20
33:17 69:19
70:19 73:6
80:16 84:15
111:23 116:4
119:3,5,7
120:2 163:10,
12

**dad's** 119:8

**daily** 45:18,20
50:21,23

**damaged**
59:14 61:10,
16,17 160:13,
14

**dark** 99:12

**date** 6:9 12:2
20:23 40:24
57:18 58:1
75:3 76:14
78:9 92:17

**dated** 27:11,15
28:7 162:3
167:12

**dating** 68:11,
12,16,20

**daughter**
16:14 22:4

52:23 159:10
164:8,9 166:7
167:5

**daughter's**
15:7 16:18

**daughters'**
45:9

**Dawson** 85:3

**day** 21:2 39:17
44:8 45:22
48:3,17 53:8
60:9 67:21
77:8 84:17
87:18,19 90:5
96:14,16 99:9,
15 151:23
178:5,23
179:7 184:22
189:24 190:1

**days** 166:6

**dealt** 120:16

**debate** 94:14

**December**
11:11 28:2
90:3,6 91:10
92:4,16,18,19
93:5,18,22
96:12

**decide** 13:10

**decided** 76:17
94:17 111:24
158:13

**decision** 87:22
160:20 172:7

**deck** 157:17

**decompress**
48:20

**defend** 43:19,

20

**defendants** 168:8

**defense** 44:4 103:16 113:7 125:18

**demand** 178:7

**Denali** 79:18 109:4,5

**department** 46:16 121:23 122:1 170:9 176:2

**department's** 118:9

**deposition** 4:18,24 19:1, 14,19,22 23:19 44:22 190:6

**deputies** 4:15 121:24 132:5 134:24 146:21 150:10 154:11 170:12 177:16 181:21

**deputy** 52:21 56:11 101:14 111:16 112:8 131:14 134:12 142:20 146:20 148:11 154:6 155:17,18 158:15 170:8 172:14,17,23 174:16 175:19 176:17 179:14

**derecho** 123:19

**description** 143:23 165:21,23

**detain** 155:18

**detained** 155:9,18 156:19

**develop** 14:7,9

**developed** 14:10 24:8

**dew** 35:11 88:13,15

**diagnosed** 161:21,24

**diagnosis** 162:4,9,12,16

**diagram** 116:24 117:3, 5

**difference** 44:1 70:23

**digital** 94:18, 22,23

**direct** 96:13

**directed** 171:6,20

**dirt** 133:23

**dis-** 36:13

**disability** 75:9

**disagree** 162:15

**disagreement** 35:23 36:5,12, 14 112:21

**disbelief** 46:14

**discharge**

10:5,11 71:22 72:22 73:6

**discovery** 41:4 58:20,22 90:9 94:1 143:14 144:19,21 145:1,8

**discussed** 50:9,12,17 53:1 54:7

**discussing** 106:7

**discussion** 17:11 18:17 27:5 85:21 115:6 117:1 122:23

**discussions** 91:9

**dishonorable** 72:22

**dismiss** 46:8

**dismissed** 180:15 181:4

**disorder** 162:4

**disposition** 180:12

**dispute** 151:19 167:3

**disqualified** 180:6

**disqualify** 106:10,15

**dissension** 81:11

**distress** 41:6, 10 54:22

**distribution** 13:19 20:7,24 23:7 28:11 29:12 37:15

**disturbance** 70:16

**divide** 14:13 21:8

**divided** 14:8 22:2 33:1 78:18

**divorce** 8:6 11:15,22 12:6, 17 23:4 28:23 33:13 46:23 48:13 56:21 63:6 67:8 75:22 77:1 81:14 162:11, 17 163:5,11 166:1 168:7 180:1 181:24 182:1

**divorced** 66:14 68:10, 12,21

**docs** 78:1

**doctor** 162:13

**document** 146:12

**documents** 25:21 90:15

**dollar** 32:3

**dollars** 16:14 30:9,24 31:2 85:14

**door** 133:21, 23

**doors** 79:3

**Dorsey** 57:6 58:7 159:23

**Doug** 49:3 62:7 86:15 97:8,11,16,21 100:9 103:24 104:14 107:16,19 109:20,21 114:15

**Doug's** 109:2 115:19

**downstairs** 138:12,18,22 139:18 152:3 158:13

**drafted** 175:10

**drama** 165:9

**draw** 116:8,12

**drawers** 188:20

**drawing** 121:17,19

**drawn** 117:6

**draws** 117:3

**drink** 74:9

**drive** 37:7,10 94:17 105:7, 12,14 106:19 120:12,15 188:23

**driveway** 49:8, 9,13 51:20 52:7,9,16 62:1 80:8 81:6 83:14,17 84:10 95:6

96:6 105:19 115:16 118:12 132:16

**driving** 46:18 74:2,7,8,10, 11,15 104:21 105:8 106:24 114:7,17,24 170:16

**dropped** 74:5, 6

**drove** 96:17 97:1,6 104:10

**drunk** 74:8

**dry** 35:13 49:23 88:18 134:1

**dude** 70:10 156:10

**due** 23:15 44:7 148:3

**DUI** 122:19

**duly** 4:2

**duress** 134:5 144:16 146:19 149:16 150:12 152:12,13 178:6

**duty** 72:12 73:2

**DVD** 158:23 159:4,12

**DVDS** 94:17 139:23

**DVP** 33:16

**E**

**e-mail** 37:7,11

**earlier** 61:20 66:21 69:9 160:12 179:22

**easier** 5:15 27:3

**easily** 43:20

**easy** 5:11 43:22 124:23

**edge** 33:21 34:8

**educational** 8:12

**effect** 183:17

**egregious** 171:24 172:6, 20 173:7,20 174:8

**elaborated** 82:21

**elementary** 8:11

**else's** 46:20

**emotion** 161:23

**emotional** 41:6 54:21 162:5 166:2 182:7,10

**emotions** 47:11,12

**employed** 9:12,23 68:23

**en** 146:21

150:10

**end** 12:3 61:22 67:12

**ended** 54:4 123:11 154:14

**ends** 86:19

**enforcement** 41:12,20 69:9, 16

**entail** 10:11

**enter** 171:12

**entered** 15:21 17:2 20:10 27:23 28:4 180:21

**entering** 149:7

**entire** 25:1 52:19

**entrance** 132:12

**equals** 21:16

**Evening** 99:11

**event** 176:9

**events** 143:23 169:4 176:10

**eventually** 5:4 100:17 180:8

**evidence** 17:3 23:3 26:16,17 58:16,18 103:3,16 125:19

**evidently** 46:23

**ex-husband** 171:5

**ex-husband's** 171:13,19,24

**ex-wife** 6:15 8:4 11:14 13:17 16:17 22:6 26:8 28:10 31:11 42:22 50:1 57:13,23 61:3 84:3,13 94:16 100:12,19 101:4,9,11,13 116:2 118:18 131:6,24 132:23 134:19 135:11 137:11 138:6 141:20 149:9 151:1 157:6 158:9 171:11

**ex-wife's** 84:15 109:7 111:23 115:24 118:11,16 119:6 141:16 159:7 171:12

**exact** 88:14 149:23 177:12

**EXAMINATION** 4:5 56:6 170:23

**exchange** 31:9 49:12 52:2 84:1 127:17

**exchanged** 49:21

**exchanging** 51:21

**exhibit** 15:24 16:1,6,11

17:23 18:1,8, 21,22,24 19:4, 5,8,9,10,14, 17,18 20:6,12, 15 22:16 23:2, 18 26:10 27:10,15,23 28:7 29:21 30:5,6 39:9 112:22 120:8, 15 121:6,7,8, 17 124:19,22, 24 125:1 162:20,21 167:13,14

**exhibits** 19:22 113:7 124:18

**existed** 175:17

**exit** 85:5

**expect** 4:22

**experience** 173:9 174:10 175:6

**explain** 13:21 41:9 43:21 47:4,9,13 103:13 135:18,22 173:16

**explore** 120:24

**expressed** 161:22 162:5

**F**

**face** 10:15

**facilities** 70:10

**fact** 48:24 82:4 167:4 173:2

175:14 178:7
184:22

**factual** 176:8

**failed** 102:8,
14,24 171:5,7

**failure** 73:17
171:9

**fair** 15:19 41:7,
8

**fairly** 113:18

**faith** 44:9
183:8 186:1

**fall** 87:2

**familiar** 146:13

**family** 12:10
34:14 44:23
56:20 78:20
81:10 83:3
99:15 135:7
138:9,10,21
139:16,20
142:2,7 152:6
161:23 162:6
163:14 180:7
186:1 187:5

**fashion** 41:13

**fast** 56:16
74:7,10,12

**father** 67:5,6
78:10 100:14
115:2 120:1

**father's** 67:17

**February**
160:21 180:20

**federal** 9:13,24
68:24 69:12,
23 70:5,20
71:8,24

**feel** 81:16
183:17 185:10

**feeling** 46:14
166:1

**feels** 66:9
113:22

**feet** 134:1

**felt** 13:13
171:9

**fidgeting**
175:21

**fight** 70:17

**figure** 78:22

**file** 15:24
16:11 20:11,
17 25:1

**filed** 4:15
11:22 37:13
56:13 75:8
76:1 77:1
89:23 163:5
175:10

**files** 45:24

**filled** 145:12

**film** 172:24

**final** 16:24
23:9,12,13
68:17

**finalized** 180:1

**find** 47:3,8,9
163:15

**finding** 180:15
181:5

**fine** 12:5 24:18
63:1 141:21

**finish** 146:7

171:17 186:3

**finished** 40:17
55:21

**fire** 108:10

**five-by-eight**
86:10

**fixed** 43:20

**flag** 111:22

**flash** 120:11,
12,14

**flip** 21:20

**floor** 99:16

**flow** 5:11

**FOIA** 176:1

**follow** 102:8,
14,24

**food** 70:10
95:16

**footage** 111:1

**force** 69:18,19
72:8,14,18
74:3 143:2
147:15

**forced** 142:21
144:7 147:21
183:19

**foreman** 9:16,
24 69:6 70:9

**forgot** 32:14

**forgotten**
80:24

**form** 14:23
15:7,9,21 16:2
26:11 30:3,15
32:7 41:12
43:21 124:5

127:4,10,23
131:15 133:8
147:18 150:2
172:10,11
173:11,12
174:11,12,21,
24 176:12
186:15

**forms** 15:23
77:21

**Forty-five**
64:17

**found** 160:18
188:3,7

**free** 156:13

**front** 25:1
56:21,23,24
59:7,20 60:5
62:5 81:19
82:13 85:15
89:5 94:13
108:24
115:17,20
125:2 129:3
132:15
133:21,23
159:19 160:1

**full** 15:8 16:15,
19 22:4
139:22
140:19,21,24
159:10

**full-time** 7:5

**fully** 146:9

**fun** 137:7

**functioning**
47:24

**furniture** 16:18
22:5

**furthest** 67:12

---

**G**

**Gabe** 65:10

**Gabriel** 65:9

**games** 67:11
182:1

**garage** 83:24
84:7,9 88:8
118:7 130:10
132:9,10,11,
13,21 133:1,2,
14,18,21
134:3,4 135:4,
10 139:3,5
149:6

**Gary** 166:11

**gave** 35:19
94:8 131:11
144:2 151:18

**gazebo** 111:22
115:3 123:12,
24 129:19,22,
23 130:2,7,9
131:21 132:3,
6,10 136:17

**general** 32:5

**generally**
127:12

**get along**
141:21

**Gibson** 4:1,9,
12 6:18,20,23
7:8,17 8:8
11:10 18:20
21:7 32:8
35:17 50:2
52:22 55:24

66:13 127:14
171:1 188:17

**gifts** 140:14
159:11

**girlfriend** 39:5,
12 40:7 50:19
53:21 63:23
68:11 93:12
104:23,24
106:23 107:1,
13,14 111:19,
20 120:4
123:5 131:7
136:3,11
159:13 179:4

**girlfriend's**
49:16 142:11
158:23

**girls** 7:4

**give** 5:6 6:8
8:12 13:9
18:23 28:21
30:4,8 31:20,
24 32:15
35:20 53:22
55:19 71:10
84:5,20 90:10,
23 93:19 94:5,
6 104:7
116:18 124:6
125:6,24
126:18 127:2,
3 149:20,24
177:12 178:17

**giving** 188:7

**glove** 32:17
81:1

**goal** 33:20
185:17

**God** 64:13

Goldsboro
72:16

**Goldston** 4:13
12:12 16:7
23:23 26:9
29:24 35:7
36:3 37:4
44:24 48:22
53:24 57:3
81:20,23
82:13 85:16
89:16 90:10,
20 92:22
94:14 101:16
103:11 106:14
111:17 126:21
127:12 128:23
130:16 131:3,
7 132:22
133:15
135:10,23
136:2 137:19
138:1 149:18
157:4 159:20
171:7 179:13
180:5 181:14
184:9

**Goldston's**
40:18

**good** 47:6 56:1
66:15 69:21
110:1 116:24
174:6 187:12

**grab** 149:24

**graduate** 8:13

**graduation**
32:17

**gray** 112:2

**grew** 113:19

**ground** 4:24

88:1,3

**guess** 10:21
15:18 40:23
41:2 63:20
71:20 80:1,2
86:6 93:23
95:17 99:22
103:19 104:14
128:1 129:9
135:6 152:5
158:9,13
159:5 188:11

**guided** 28:18

**guilty** 168:18
188:3,8

**gun** 30:16
142:21 143:2
144:7 146:18
147:2,5,8,22
151:4,7,10
153:1,10,11,
12,14 172:7,
14,19 173:1
174:17 176:18

**guns** 16:12,13,
14 17:22 30:4,
8,9,19 153:19,
22

**guy** 70:10
109:17,19

**guy's** 116:11

**guys** 41:19
46:17 49:9
52:15 70:4
181:17

**gym** 67:12

---

**H**

---

**half** 70:12

139:22

**hand** 18:21
41:14 58:13
108:21

**handcuffs**
156:17

**handed** 18:22

**handful** 79:24

**handing**
149:15

**handled** 38:1

**hands** 150:16

**handwriting**
22:19,23

**hang** 128:18

**hanging** 36:9

**hangs** 129:7

**happen** 17:19,
21 41:18
146:24 182:16

**happened**
5:11 17:15,17
31:8 43:16
52:5 53:6 65:7
90:6,7 134:6
135:15 138:20
144:15 163:11
167:7,9
181:10 183:10
185:4,16,24

**happening**
181:13 184:16

**happy** 5:22

**harassment**
164:7

**hard** 46:24
47:10,13

**hash** 13:23

**hate** 185:15,16

**head** 5:12
37:19 61:11
71:14

**hear** 73:12
160:8 187:4

**heard** 108:6
112:11 164:1

**hearing** 16:8
17:3 20:24
23:3,4,19,20
24:3 27:19
28:23 35:7
37:17 38:2,6,
10 39:19,20
40:22 45:24
46:6 48:6,13,
18 57:14,17,
18 58:10,23
59:3,18 60:4,5
62:19 77:9
78:5 82:1
89:16 90:2,7,
21 91:2,3,10,
11 92:4,14,21
93:1,5,23
94:4,13 97:24
98:1 101:18
102:7,12,13
103:6 108:2
126:12
159:19,21,24
160:10 185:24

**hearings** 29:1
48:3,4,17 57:8
58:8,11,15
59:20 92:3
93:10

**Heart** 11:2

**heavy** 35:11 88:15

**held** 18:17 27:5 85:21 115:6 117:1 122:23 159:19

**helped** 49:12 98:5 107:10

**hey** 80:21,24 91:22 92:6 103:7 104:1 134:19 166:23

**high** 8:14,17 32:16 161:22 162:5

**highly** 81:15

**hill** 83:16 86:7 114:1

**hire** 12:21

**hired** 76:3 167:2

**hits** 53:5

**hold** 38:24 93:15 110:17 124:11,15 139:1 145:19 166:4

**holder** 125:9, 10

**holding** 26:10 174:2 181:5

**home** 6:14 8:3 29:18 33:9 35:17 39:15, 24 40:3,17 41:5 60:17 65:14 66:10 79:1 80:4,10,

14 87:21 96:5 105:15 106:20 107:15,21 158:5,7 169:11 171:13,19,24 172:4 173:8 174:9 175:6 184:10 186:12,16 188:18,19,23 189:23

**honorable** 72:21,23 73:6

**hope** 83:10

**hour** 29:11 87:12,13 98:7, 8,14,15,20,23

**house** 26:10 29:9 38:11 46:20 59:10 66:3 77:4,10, 15 78:8 81:17 86:13 91:13 93:13 96:21 97:1 103:20 104:2,11,18, 22 105:11,12, 17 107:20,24 108:7 113:5 114:8,13,18 116:13 117:8, 10 133:19,24 134:2 135:21 141:8,16 143:13 144:15 150:12 151:16 158:11 159:7 166:5 169:1 172:18,24 173:5 176:17, 23 177:2

178:5 189:3

**houses** 99:3 185:9 187:7

**huh-uh** 5:9,17 148:15

**humanitarian** 73:5

**hundred** 85:14

**hunting** 84:18, 22,24 85:2,11 86:1

**husband** 21:16

---

**I**

**Ice** 140:4

**idea** 5:21 53:12

**illegal** 73:20

**illegally** 46:20

**Imagine** 142:15,17

**immediately** 184:24

**impact** 45:18 47:4

**important** 181:9,11,15, 20,22 183:18

**incident** 4:16 43:13 49:6 50:9 51:3 61:4 67:22 70:17 90:5 96:15 123:6 160:24 167:16 169:17,20,23

170:2,6,7,10 171:21

**Including** 188:20

**incorrect** 103:1 144:10 145:18 146:16

**Independence** 8:17

**indication** 13:9

**indirectly** 63:20

**ineffective** 171:10

**inflamed** 46:4

**inflames** 44:22 45:1,19 46:11

**information** 51:18 52:5 106:5

**initial** 32:10

**initially** 39:20 42:18 51:5

**initiated** 75:22

**inmates** 9:18 10:12,13

**inside** 26:10 100:7 119:15 121:1,2 144:15 150:11 151:15 153:14 155:5 169:13 172:24 173:1, 5 189:3

**insinuation** 182:9,14,22

**insisted** 169:10

**intake** 71:21 162:2

**integrity** 181:16,19,20 187:7

**intending** 152:19

**interact** 48:21

**interaction** 162:23

**interrogatories** 143:16

**interrogatory** 143:21 145:16

**interrupting** 60:13

**interview** 99:21 103:23 105:10

**introduced** 28:1

**invasion** 171:23

**inventory** 79:22

**investigation** 61:1 169:5

**invited** 172:17, 21,23 173:4 176:16,21

**involved** 44:6 142:1

**issue** 42:9 44:16,17 142:3

**issues** 43:21 84:11 161:16 163:14

**items** 15:9,11, 12,14 16:4 32:14 35:16 49:12 57:12, 21,24 59:4,9, 10,13 78:8,11, 12,17,18 80:20 86:12 89:7,11 90:24 91:23 92:7 93:20 94:5,7 96:6 113:10, 16 151:20 158:6,10,16, 20 160:4,6,13, 14,16 171:22

---

**J**

**jail** 133:16 136:3 151:15, 23 152:20 156:1 179:2

**January** 6:10 78:5 82:3

**Jason** 43:5 47:14 122:15

**Jeff** 68:2,5 169:9

**Jennifer** 4:12

**Jimmy** 122:4

**job** 69:5,17,22 178:1

**jobs** 10:9

**John** 53:23

**Johnson**

12:20,21 13:6, 16 17:7 31:10 72:14 76:3 84:2 89:13 91:6 101:17 127:17,19 167:2 179:24

**Joint** 15:23 16:10 17:23 18:1,22 19:4, 16 20:15 23:2, 17 30:5 112:22 124:19,22

**joke** 187:5

**Jonas** 65:9

**judge** 4:13 12:12,13 14:2 16:7 23:23 26:9 29:24 35:5,7,9 36:2 37:4,5 38:10 40:18 43:18 44:24 46:7 48:22 54:1 56:22,24 57:3 58:5 59:7,16, 21 60:5,20 62:12 81:19, 22 82:5,13 83:8 85:16 88:12,22,23 89:16 90:10, 20 92:22 94:13 101:16 103:11 106:13 108:7 111:17 112:8 116:5 126:21 127:11 128:23 129:11,12 130:16 131:3,

6,11,22 132:22 133:15 135:10,23 136:2 137:19 138:1 149:18 151:18 155:13 159:20,22,23 160:1 168:24 171:7 179:13 180:5,8 181:3, 13,15 183:8 184:9

**judges** 123:3 181:19,23

**judicial** 71:13, 16

**jump** 56:14

**June** 68:17 73:1

**jury** 47:4

**justice** 44:9 183:13,14 185:19 186:5, 10,13,21 187:9,16,18, 24

---

**K**

**K-9** 122:18

**Kevin** 56:9 102:3 114:6

**key** 21:15 77:9

**khakis** 108:18

**kicks** 70:7,15

**kidding** 55:18 104:4

**kids** 96:5 128:20,24

139:21 140:7 159:1,2 177:23 187:7

**kids'** 15:14

**kill** 143:12

**kind** 4:22,23 9:2,8 11:3 17:9 41:10,24 44:6 47:15,18, 20 54:21 55:18 79:17 82:16 106:7 129:2 140:3 147:1 165:19 166:20 188:8

**kinds** 55:14

**kitchen** 156:9, 22 157:16

**knew** 108:4,6 137:6 156:2 169:3 175:17 182:3,4

**knowledge** 40:8 148:12 180:22

**Kyle** 21:7 45:23 62:20 76:10 82:5,22 89:22 90:12, 23 91:10 93:24 101:13 110:16 112:2, 3 115:9 116:4 131:22 132:23

---

**L**

**lack** 112:12 183:8

**Lackland** 72:18,20

**lady** 106:7 150:9

**laid** 80:7

**land** 112:13

**large** 66:6

**larger** 66:9

**Laughter** 56:10 63:2 64:8

**laundry** 158:12

**law** 41:11,19 69:9,16 78:21 171:9

**laws** 187:3

**lawsuit** 4:14 25:22 56:13 144:1 185:18 187:10,19,20

**lawyer** 182:4

**lawyers** 5:19

**laying** 98:16

**leaf** 16:4,8

**learn** 106:11

**learned** 33:14 106:9,13,16, 18 123:20

**lease** 84:18,24 85:11

**leave** 33:22 52:21 76:17, 18 130:7 155:3

**leaving** 149:6

**led** 142:20
144:6 147:5,
20

**left** 38:16 50:8
76:19 96:6
98:6,8,18,21
108:21 135:4
137:2 139:1,2,
4 152:21
153:4,21
155:7 156:21
157:16 163:10
189:22

**legal** 168:6

**legally** 187:23

**lengthy** 144:2

**Lerosa** 163:22
164:10

**letting** 180:18

**level** 161:23
162:5

**Lewisburg**
85:5

**lieutenant**
122:17

**life** 43:7 45:18,
20 161:11

**life's** 169:4

**Lilly** 122:11

**Lion** 95:16

**lion's** 151:19

**Lisa** 56:24
59:8 62:12
82:6 83:9
159:23 180:8

**list** 14:7,10,12,
15,18 15:15,

17 17:4,10
21:5,9,11,23
23:14 26:6
28:12 29:21
78:15 90:14,
18 112:18,20
113:9 171:22

**listed** 15:3,6,9
51:17

**listen** 40:10
111:6

**lists** 27:10

**litigation**
65:14 96:15
167:17

**live** 7:5 39:14
64:20 83:15
163:23

**lived** 7:23
76:21 93:13

**lives** 7:20
64:21,24 97:2
99:2

**living** 135:8,16
138:10,14,18,
22,24 139:2,8,
11,12 149:7
150:23 156:21

**loading** 99:4

**located** 72:15
85:2 116:14
132:13
150:13,20
166:14

**locked** 142:21
144:7 147:22

**lodge** 171:14

**lodging**

173:16

**long** 6:1 7:23
9:23 12:24
19:6 64:3
68:5,9 72:11
73:3 105:10,
15 129:22
148:23 149:3

**longer** 186:12

**longwinded**
5:20

**looked** 21:12
24:14 107:1
108:24 127:20

**lose** 177:22
178:1

**lot** 22:16
23:10,11
33:12 46:17
78:1,20 81:10
97:20 153:19
163:14

**Louise** 12:12
53:24

**lowers** 63:21

**Lusk** 13:18
14:10 16:6
17:12 20:12
21:7 23:21
31:10 32:7
62:20 76:10
82:5,22 84:2
89:22 90:8,12,
23 91:10
101:13 110:17
119:7 120:2
127:13,17
131:2,22
132:23 135:10
157:4

## M

**M-A-S-U-A-L**
39:7

**mad** 67:16

**made** 17:22
18:11 23:11
52:21 66:21
87:22 121:18,
19 142:19
172:7 179:12,
15 182:17

**main** 90:17

**major** 70:17

**make** 5:1,5
17:13 18:14
19:1 26:23
36:21 57:10
81:18 86:6
110:21,24
114:8 124:23
127:14,21
152:15 156:11
164:21 167:11
182:16

**makes** 5:15

**making** 81:12

**man** 69:21
82:23 105:1
116:16 166:7
187:6

**manager**
97:14

**March** 4:16 7:3
13:3 27:16,18
28:5 29:3,8
32:10,18 37:1,
18 40:4 41:5
42:6,8 43:9

49:1 50:10
51:2,14 52:6,9
54:14,15
57:15,18 73:1
77:14 78:9
80:16,23
89:19 90:4,11
91:4,11,13
92:12,14,21,
23 93:19 94:3
96:11,14,17
97:24 102:13,
16 103:6
125:14 126:12
143:23
167:18,22,24
184:19,23
188:17 189:19

**marital** 78:16
161:7

**mark** 18:24
19:3 39:8
116:14 120:7,
13,15 121:5,
10 122:7
162:19

**marked** 19:8,9,
18,23 118:18
121:7,8,16
162:21 167:14
179:20

**marriage**
42:20 166:19,
22

**married** 7:15,
16 76:22

**marry** 11:10

**Maryland/
virginia** 163:8

**master** 31:16

**Masual** 39:7, 12 49:17,18 50:5,10 52:18 63:22 65:11 96:19 103:24 104:12 179:4

**match** 29:22 40:10

**Matt** 184:1

**matter** 47:2 61:7 70:4 82:4 128:5 146:20 184:22

**Matthew** 4:1,9

**Mccray** 122:7, 8

**Mcpeake** 26:17 100:23 101:13 120:22,23 130:1,9,12 131:14,22 132:22 134:12,13 136:18 137:12,15 142:20 144:6 145:3,4 147:20 148:17,19 152:15 153:1 154:2,6 157:1, 3 158:16 169:16 172:14,18,24 174:16,18 175:19 176:17 177:16 178:16,18 179:14

**Mcpeake's** 26:17 121:4

**means** 9:17

**media** 183:6

**Medicaid** 75:14,16

**medical** 47:15

**Medicare** 75:19

**medication** 11:4,7 47:18, 21

**medications** 75:11

**member** 10:20

**memorializes** 180:22

**memory** 144:16 148:8 183:11

**Mercer** 57:1,3

**message** 80:24 91:14

**messages** 158:24

**microphone** 110:2

**middle** 42:6,8 54:14 99:5 172:6,19

**mike** 137:2

**Miller** 122:4

**mind** 18:13,20 25:11,17 107:7

**mine** 49:4

51:10 74:17

**minute** 105:13, 23 129:24 136:1 183:24

**minutes** 55:20 87:7,10,13 88:10 98:7,12, 13,22 104:7, 17 106:19 148:23 149:2, 3

**misinterpreted** 72:3

**misquoting** 60:23

**mist** 35:11 88:13,15

**mistake** 16:12

**mistakes** 16:4 23:10

**misunderstood** 52:8 61:19

**Mobile** 95:18

**mom** 76:21

**Monetary** 188:10

**money** 31:24

**monster** 122:10

**month** 141:13

**months** 42:17 80:17

**Moore** 43:5 44:12 45:3 47:14

**morning** 87:3

**mother** 7:10

**mother's** 141:8

**motion** 37:13, 18 106:13,14, 15

**mountain** 48:7

**move** 76:12,24 116:3,5 156:13 158:10

**moved** 77:4 79:11,13

**moves** 79:8 80:4

**movie** 142:16 159:16

**movies** 22:10 139:23 140:4 142:8 154:7 158:22,24 159:3

**moving** 153:8 166:1

**mow** 113:22, 24

**mowing** 66:9

**multiple** 150:7 151:11 175:23 177:9

**mustache** 122:5

**mustaches** 122:6

---

**N**

---

**names** 6:22 65:8

**nasty** 46:23

**neck** 132:16

**needed** 23:14 79:4 113:3 155:20,23

**negative** 55:10

**neighbor** 51:11,12

**neighborhood** 64:22,24

**news** 53:4,5,9, 18 54:4,10,19 181:8 183:6 184:19,20

**Nicholas** 57:6

**night** 49:20 51:24 74:16, 21 87:4 96:20

**nods** 37:19 61:11 71:14

**non-custody** 70:24 71:1

**North** 72:16 166:15

**notated** 23:14

**notch** 44:10

**note** 17:9 162:3 167:12

**noted** 174:7

**notes** 24:7,8, 15 25:2 26:5

**notice** 93:1,7

**notices** 93:9

**November** 29:17 33:4 34:9 35:15

49:21 52:1
80:9 86:22,23
99:12

**number** 20:13
60:1 95:19
143:22
145:17,24
164:2 177:12

---

## O

**Oak** 6:12 7:21
38:14 65:14,
16 76:13
105:15

**Oaks** 64:24

**oath** 41:14

**object** 16:24
60:10,13,14
172:11
173:12,13
174:11,12,20
176:11 182:21

**objected**
60:15,16
156:4 160:8
174:23

**objecting**
173:19

**objection**
17:10 23:17
24:22 26:24
108:11
116:22,23
120:17
131:13,15
147:18 150:2
171:15 172:9
173:10,15,17,
23 174:4,7
186:15

**objections**
14:17 171:20

**observe**
172:24

**obtain** 9:2
53:20 175:24
187:9,18

**obtained** 9:7,
10

**occur** 134:22
179:24

**occurred** 12:7
13:22 40:3
41:5 173:8
174:9 175:5
186:6,13,22

**occurrence**
143:24

**occurring**
176:19

**October**
165:22 167:12

**odds** 86:19

**offered** 91:15

**officer** 9:21
69:18,24 70:6
71:5 155:8
183:9

**officer's** 70:1

**officers**
181:18

**official** 77:13

**officially** 78:3

**Oklahoma**
163:9

**oldest** 140:20

**online** 168:9,
21

**open** 81:19
142:21 143:2
144:7 147:21
172:7

**opened**
172:14,18

**opening**
174:17

**operate**
128:13,16,24

**opinion** 81:10,
14 171:2
172:3 187:8

**opposed** 5:9,
17

**Orchard** 74:18

**order** 16:24
23:10,12,13
24:3 29:24
71:24 72:5
90:23 103:12
126:20,24
127:1,3,10,11,
13 131:17
137:15,19
180:21 186:7

**ordered** 23:23
30:1 35:21
38:10 43:23
57:22 61:2
65:24 76:18
89:7,8,17,20
90:8 94:12
102:15 103:14
112:24 126:20
133:6 135:24

**orders** 71:11,
13,16

**organizations**
10:18

**original** 26:14

**out-take** 71:21

**outmanned**
71:2

---

## P

**P-A-Y-N-E**
67:20

**p.m.** 99:12,13
190:7

**pages** 26:4
144:3

**paid** 30:9,22,
24

**paperwork**
165:24

**paraphrase**
35:10 91:15

**paraphrasing**
91:19 129:14

**parents** 76:22

**parked** 99:7
107:18 114:15
118:5,12,20,
23 119:9
132:14 170:12

**part** 13:15 17:1
18:16 63:5
64:9 103:3
118:19,24
133:7 147:3
159:20

**parted** 179:23

**parties** 100:24

**parting** 13:7

**party** 155:7

**past** 118:12

**pastor** 166:8,
11,12

**patio** 157:24

**Paul** 67:18
169:8

**pay** 16:13
31:19 63:7,8,
20

**paying** 32:4
63:4

**Payne** 67:18,
19 169:8,9

**pays** 63:12

**peace** 87:23

**penalty** 188:5,
9

**pending** 6:4
180:7

**penitentiary**
9:24

**people** 66:12
70:12 112:13
121:23 135:9
151:11 168:20
181:9,13
183:16 185:10

**people's** 41:15
81:13

**perform**
185:21

**person** 109:22

**personal** 29:2,
7 32:10 77:8

78:13,18 79:9,
12 80:20
188:18

**personally**
154:7,8

**petition**  77:1
180:13 181:4

**Petitioner's**
19:4,10

**phone**  76:6
95:12,19 96:2
106:2 107:3,4,
8,11 108:22,
23 110:2,5,6,9
130:10,12,14,
18,19 131:9,
10,11 148:11
164:2 175:22
178:12,15,17,
23

**phones**  95:10
96:1 188:23

**photocopies**
94:11

**photograph**
149:13,19,24
150:13,14,19

**photographs**
149:10 170:17

**photos**  23:22
25:2 29:24
30:1 37:8
43:23,24 44:1
103:13
126:13,14,17,
19 127:5,15,
19,20,22
135:17 150:24

**physical**  66:19
67:2,3 82:8

165:12 166:3

**physically**
68:21

**pick**  15:12
29:18 33:5
50:2 81:8 89:6
95:4 96:23
134:16

**picked**  29:2,7
32:18,23
34:23 76:6
78:18 80:19
87:8,11 88:10
99:10 188:18

**picking**  26:6
29:5,6 188:16

**picks**  80:2

**pickup**  80:16
98:10 109:1
115:17
117:17,18

**picture**  26:3,7,
9,15 89:17
116:12

**pictures**
35:12,24 36:1,
9,10,15,19,22
37:10 94:9,14
125:24 126:3
135:23 137:8,
13,16,20,22
138:4,7,17
139:12

**piece**  163:13

**piecemealing**
27:4

**pistols**  30:19

**place**  10:5
49:12 79:6

156:16 171:3
172:4 177:2

**plaintiff**
108:15 117:6

**plan**  39:10

**play**  62:10
64:6 109:13
111:4 148:9,
22

**played**  39:2
109:14 110:15
111:11 112:5,
17 149:5
151:17 152:2,
9 154:4 182:2

**playing**  45:10
148:24

**pleadings**
25:22

**point**  12:13
13:7 23:1
27:9,24 28:24
29:16 37:12,
23 38:9 45:4
79:14 80:11
81:9,16 82:19
85:19 89:22
91:22 92:6
99:8 109:10
112:9 143:13
151:14 153:4
155:7 158:18
168:16 170:18
178:12

**pointed**  37:3

**police**  69:18
179:20 183:9

**portrayed**
174:18

**position**  9:15

**positive**  55:10

**posse**  112:10,
11

**possession**
62:13 175:11,
13

**posted**  168:9,
11,21

**power**  151:1

**practicing**
187:2

**prepaid**  96:2

**prepare**  48:17
180:24

**prepared**
124:5

**prepping**  48:5

**present**  44:3
103:16 125:18
179:14

**presented**
14:15 16:7

**preside**  180:9

**presiding**
12:13 180:6

**Presley**  68:4,5
169:9

**press**  109:12

**pretty**  144:2
168:5 184:23

**previously**
171:6

**price**  31:4

**print**  94:19

**prior**  6:5 7:15
10:2 42:7
78:19 98:7,8
152:18 179:23

**prison**  9:13
70:18

**Prisons**  68:24
69:13,23 70:5
71:8

**pro**  38:2 48:7

**problem**  63:4
114:5 161:19

**problems**
161:7

**procedures**
171:10

**proceed**
138:21

**proceeded**
171:12

**proceedings**
11:15 12:7,17,
22 55:23
68:13,15
102:5 146:5
152:7 184:3

**process**  44:7
106:12 172:1,
6,20 173:7,20
174:8 177:7

**produce**
171:23

**professionally**
95:2

**prom**  74:16,21
75:2

**proper**  59:24
60:23 108:4

**property** 8:7 13:19 14:5,8, 12,18,23 15:3, 7,8,15,17,23 16:2,15 17:3, 4,10 20:7,24 21:8,23 23:6 26:6,7,11 27:9 28:11,22 29:2, 5,6,7,12,18, 20,21 30:2,15 31:9 32:7,10 33:2,6,22 34:8,9,23 37:14 38:17 43:21 49:11, 21 50:3 51:22 52:2,10 60:6, 9,17 61:3,10, 16,18,21,23, 24 62:23 65:13,18 77:8 78:13,15 79:9, 12 80:16 84:1, 5,23 85:2 86:1,4 87:5 91:11 95:5 98:5 99:5 105:4,6 111:24 112:7 116:13 118:19 119:1 121:11, 13 124:5 125:16,21 126:11 127:4, 17,23 133:8 169:10 179:19 188:17,18

**Prospect** 10:20 166:13

**provide** 28:10 35:24 36:9,14, 16,19,23

113:7 143:22 171:5,7

**provided** 34:1 113:9 184:20

**psychotherapy** 162:2 165:22 167:12

**public** 4:3 187:4

**pull** 17:24 116:5

**pulled** 74:14 77:17,19 116:2

**purchased** 8:4 128:11,12 140:9,10

**purchases** 124:7 128:10, 15

**put** 32:8 33:15, 16 35:15 41:22 43:17 46:13,24 47:10 81:6 84:9 86:5 87:3,23 89:5 94:15 127:12 129:20 169:3, 6 182:13,18 183:15 185:7

**putting** 34:8 61:21 62:5 182:12 185:3

---

**Q**

**question** 5:18 6:4,5 22:14 36:6 47:6 52:8

53:16 54:5 58:24 66:16 72:3 73:13 81:5 92:5,8 93:21 116:7 125:23 150:18 171:15 172:5 173:18 174:4, 6 175:4 182:8, 17 183:2 186:3,16 187:12 188:6

**questioned** 53:4

**questions** 4:17 5:20 25:9 56:2,5,12,15 58:2 157:13 170:22 184:5 190:3

**quick** 142:14 146:4 184:2

**quickly** 54:11

**Quiet** 6:12 7:21 38:11,14 65:14,16 76:13 105:15

**quote** 99:11 165:16 171:4

---

**R**

**racing** 74:19

**radio** 136:22, 23

**rain** 62:23

**rained** 87:15, 19

**raining** 33:19

34:22 87:22

**raise** 41:14

**raised** 58:12 163:7,8 165:2, 4

**Raleigh** 12:7 19:11 46:16 97:19 121:24 170:9

**ran** 79:2 103:23

**random** 105:4

**RE-EXAMINATION** 184:7 188:14 189:16

**reaching** 13:17

**read** 5:16 145:15 146:1, 9 190:5

**reading** 24:4 106:1 107:8 110:11 146:8, 11 165:21

**ready** 148:9

**real** 5:20 105:22 106:6 146:4 184:1

**reason** 83:12 86:5 141:22

**reasons** 177:24

**recall** 34:10, 11,13 38:18, 19 45:13 51:8 54:4,13 55:16 58:17 77:7,18

79:20 82:1 90:15 92:2 100:15 103:2 104:19,20 107:5 114:21 115:5 134:17 135:15 137:14,18 139:15 143:19 154:11 155:14,16 161:21,24 169:18,21,24 170:1 177:11

**recalled** 176:9

**receive** 72:21 145:3

**received** 25:24 40:12,14 55:3, 7 148:4

**receiving** 10:4, 10 71:22

**recipes** 157:8

**reckless** 74:2, 15

**recognized** 23:7

**recollection** 8:1 10:23 12:4 13:3,13 14:21 24:21 42:5 121:18,20 144:11,13,20 148:3 174:16 175:1

**record** 4:8 15:21 18:16, 18 25:14 27:6 35:5,8,9 36:2 85:22 88:22

103:19,21
108:14 115:7
117:2,5
122:24 123:6
126:9 146:17
149:1 157:11
180:17

**recorded**
33:23 181:1

**recording** 5:7
33:18 34:2,6,
7,12,17
130:17 136:4,
14 171:21
178:22 179:9
189:2

**recordings**
189:7

**rectify** 59:8

**recuse** 106:8,
15 108:5

**redact** 64:9,14

**Redden**
122:15

**refer** 17:23

**reference**
66:21

**referred** 16:2
20:12 76:5,8

**reflect** 16:10
40:2 108:14

**reflected**
16:21

**refresh** 24:21

**regard** 37:14
51:14 55:4

**related** 164:13,
19

**relates** 143:24

**relationship**
165:1

**relative** 164:20

**relaxing** 129:3

**release** 72:5,6

**released**
102:22 103:4

**releasing**
10:13 71:24

**remained**
35:13,16

**remaining**
33:2,5

**remember**
15:1,5 92:19
95:19 100:11
116:15,17
135:17 137:4,
5 155:13
156:20
189:18,21

**remove** 65:24
80:11 129:15
158:16

**removed**
80:13 169:12

**removing**
169:10

**repeat** 93:21
151:5 175:4

**rephrase** 5:23
36:7 56:18
133:1 174:6
183:3 186:9

**report** 165:22,
24

**reporter** 18:23
120:10

**Reporter/
notary** 4:3

**represent** 4:13
13:1 56:11

**represented**
17:6 37:22
91:6

**representing**
48:12

**request** 18:5
176:1

**requested**
93:24 175:14

**required** 90:12

**rescheduled**
92:22

**rescinded**
10:22

**reside** 64:18

**residence**
76:13 89:6

**resistance**
84:11

**responds** 70:7

**response** 46:5
145:8 178:10

**responses**
41:4

**rest** 25:18
80:19

**result** 4:16
42:1 47:16
186:6

**retain** 54:11

**retained** 54:8

**retired** 70:19
97:11,18
122:2

**retrieve** 85:12

**retrieved**
78:10

**returned** 40:18
158:21
159:13,14,15,
16

**returning**
160:4,6

**review** 90:18
176:5

**reviews**
146:12

**ride** 107:6

**riding** 96:18

**rights** 41:16

**road** 46:19
51:21,22 99:5,
7

**Robinson**
18:12 24:12,
16 34:3 56:2,
4,7,8,9 83:1,5
85:23 102:6
108:9 111:4,9
114:3 115:8
116:21 117:4
120:9 121:5
123:2 145:23
146:3,6 152:8
162:19 167:11
170:19 171:14
172:9 173:10,
19,22 174:3,
11,13,20,23

176:11 188:15
189:12 190:4

**rode** 115:13
119:20,22

**roll** 83:19,21
86:6

**rolling** 110:22

**room** 13:23
21:21 30:10
99:22,23
100:3,7 101:6,
7 103:23
105:11 135:7,
8,16 138:9,10,
11,14,16,18,
21,22 139:1,2,
8,11,12,17,20
142:7,20
144:6 147:21
149:7 150:23
152:4,6
156:22

**room/living**
135:7

**rooms** 138:16

**Ross** 116:10

**rough** 162:18

**route** 146:21
150:11

**royal** 109:17

**ruffle** 153:3

**rug** 134:1
169:2 183:21

**Rule** 145:9

**rules** 4:24
58:16,18,21

**run** 24:13

**running** 110:6, 7,8

## S

**Sad** 46:15

**safe** 30:16 128:24 142:22 143:3,11 144:7 146:18 147:2,5,8,22 152:11,16 153:2,14 156:12 172:8, 14,19 173:1 174:17 176:18

**sailed** 83:9

**Sand** 166:15

**Sandra** 163:22

**sat** 13:24 14:4 32:22 61:24 62:9 127:16

**savior** 185:13, 15

**scale** 116:24

**scared** 179:2 183:16

**scenes** 181:23

**schedule** 45:9

**school** 8:11, 14,17 32:17 48:11 53:5

**schools** 9:7

**scratched** 16:8

**screen** 79:1,2

**sealed** 83:4

89:3

**search** 46:19 113:1,2 130:1 134:13 144:8 146:22,23 147:4,22 149:2 152:1, 22 153:1,6,7 154:3 155:7 171:3 172:4 176:18 177:1 178:5,7,11 181:21 186:18

**searched** 153:9

**searches** 185:21

**searching** 108:7 169:1 171:21 185:9 187:6

**secretary** 70:9

**Security** 32:16 75:9

**seeking** 44:20

**seize** 130:14, 18 154:6

**seized** 23:22 59:10 60:9 130:12,22 139:4,11,20 178:13,15

**seizes** 130:10

**send** 72:4 93:9 114:22

**sense** 156:7

**separate** 104:15 124:7

128:9,15

**separated** 11:20 43:2

**separately** 158:1

**separation** 11:16 76:15

**September** 11:18 12:2 14:16 20:20 27:11 28:8 62:19 68:17 76:15 80:6 82:6 88:24 89:2 161:12 162:3 164:5

**serve** 114:6 144:17

**served** 72:8

**set** 33:19 45:15 78:8 88:2 157:24

**set all** 83:13

**settlement** 91:16

**Seymour** 72:14

**share** 8:8 24:17 151:19

**shared** 6:15

**Sharon** 39:7, 12 49:15 52:18 63:22 96:19 100:10 103:24 104:12 106:6 179:4

**sheriff's** 46:16 111:16 118:8

121:23 122:1 170:9 176:2

**Sheww** 73:23 122:4

**ship** 83:9

**shirt** 108:16

**shoot** 101:21

**shoulder** 137:1,3

**shoulders** 5:14

**show** 38:23 39:1 88:17

**showed** 33:19 50:2 53:17

**shown** 54:18

**shows** 117:19 149:3 176:10

**shrugging** 5:12

**shut** 135:20 136:12

**sick** 73:7

**side** 156:15 167:7

**sir** 58:1,6 60:19 61:5,8, 13 62:15,21, 24 63:7,10,16, 18,24 64:2,10, 13,17,19 65:2, 12,16,19,21 66:20 67:23 68:22 69:1,4, 7,11,14,24 71:6,9,12 72:2,10 73:16, 19,22 74:13,

20,22 75:1,4, 7,10,13,18,20, 24 76:2,4,11, 19,23 77:2,5, 17,24 78:16 79:7,10,16 80:12,15 81:4 84:24 86:2,8, 17 87:16 88:11 89:9,12 90:22 91:1,8 93:2,14 94:2, 6,7 96:4,7,9, 17,22 97:3 98:13,14,17 99:21 100:1,4, 8,18 101:15, 19 102:2 104:13,16 105:9 108:22 109:11 110:3, 10 111:20 113:12,14 114:10 117:9 118:10 119:19 121:21 122:14 123:8 125:3 129:2 130:13 131:20,23 132:1,4,7,11, 19 133:13 134:5,8 135:3, 14 136:10,13, 20,24 138:8 140:8 142:10, 12,18 143:4, 20 147:4 149:8,11 150:12,18 152:12 153:9 154:1 156:18, 23 157:5,7,10 161:20 162:1, 13 163:1,20

164:15,20
165:13 168:13
169:7,15,24
170:11,14
172:16,22
173:6 174:14
175:8,16,18,
22 176:2,6,14
177:10,20
178:6,9,14,19,
24 179:6,8,11,
16,18,21
180:2,4,10,17,
23 183:20
189:9,11

sit 13:22 67:12
81:7 83:16
129:3 176:7
182:5

sitting 87:10
101:2,4 102:1
185:6

situation
33:16

Sky 63:17

Sky's 21:21

Skyler 6:23
7:2,3,9,13,20
96:8,11

slight 57:5

slow 56:17

smart 81:17
106:7

social 10:17
32:16 75:9
183:6

softball 32:17
81:1

sought 41:24
47:15 160:24
161:4,6

sound 40:24
68:18 115:10
157:19 162:9,
12 164:6
167:23

sounded
110:23

Sounds 10:24
161:13,15

speak 92:19
135:21
154:19,22
183:16

specific 71:18

specifically
113:3,4

speeding
73:20

spell 4:10
65:10

Spiderman
140:4

spinning
107:7

split 7:9 94:20

spoke 23:21
92:18 125:15
154:23

Sprint 95:15,
16,18

stand 84:4,8,
13,14 85:7,9
86:1 129:7
157:18,22
158:1 174:3

standing 49:9
52:15 70:12
108:14,15
123:11 129:23
130:3,5

stands 71:1

stapled 25:20

Staples 37:6
95:1

start 42:18
56:20 68:10
81:12 108:13
148:24

started 43:1
68:16 90:3
161:11 164:7

state 4:7 8:24
9:3,6 70:21,23
144:5

statement
144:9 147:23,
24

stating 57:11,
20

station 53:10
54:10

stationed
72:13

status 57:8
58:10,11,14
59:17 165:1

stay 52:19
67:11 141:12,
15,23

stayed 96:20

steep 83:20

stemming
161:16

step 183:18

steps 36:21

stone 143:12

stop 105:3,5
109:15 110:18
136:4 138:17
171:20 178:22
179:1,9
185:20

stopped
136:14 167:7

stopping 57:5

stops 114:9
122:20

stored 88:7

stories 66:10

story 181:12

straight 99:19

Strategies
43:7 161:11

stream 159:5

street 6:12
7:21 10:13
38:11 65:15,
16 76:13
105:15

strenuous
171:20

stress 45:23
48:20 155:24
182:24

strike 80:3
99:17 105:7
155:15

study 48:10

stuff 25:8,23

45:21 55:18
58:17 77:14,
17,20 78:4,21,
22 79:24 80:7,
22 81:6 83:13,
22 89:5 93:16
98:11,16,19
103:8 133:24
140:5 165:19

Stump 52:20,
21 120:19
122:13 134:24
135:12 148:11
154:12 155:4,
10 157:1,3
158:4,6,16
169:19

subject 61:6
65:13 96:15
144:1 167:17

Subjective
165:23

submit 58:19

submitted
23:13 35:6
37:1,5,11

sued 75:5

suffered
182:7,10,20
183:5,7,12

suggestion
182:14

suit 112:2

suitcases
79:14,23

summer 8:2

sunglasses
108:20

**super** 6:1

**supplied** 158:23

**supply** 94:16

**support** 48:15 59:22 63:3,4, 7,9,13

**supposed** 17:12 21:10 29:17 30:3 35:24 37:9 57:12,21 63:8 70:8,11 127:21,22 181:15,17,18 183:9,10

**Supreme** 146:24 171:2 172:3 173:14 174:1 186:7, 17

**SUV** 111:16 117:21

**swear** 118:13

**Sweeneysburg** 166:16,17

**sweep** 168:24

**swept** 183:21

**swing** 124:1,4, 6,7,8,9,10,13 125:2,5,6,10 126:4,15 128:1,3,4,7, 13,14,16,22 129:1,2,3,6,7, 9

**swinging** 128:20

**switched** 188:22

**sworn** 4:2 57:7 58:12

**Symptom** 165:23

**system** 44:9 187:8

───

**T**

**table** 158:3

**takes** 21:2 79:9

**taking** 5:2 6:5 39:3 61:21 62:5 75:11 79:12 149:9 175:19 177:2 187:7

**talk** 28:6 43:23 50:23 56:16 91:16 125:16, 21 130:11 140:2 146:1 160:5 184:1

**talked** 14:5 50:20 51:2 83:24 126:10, 12 160:6,12 164:3 180:14 184:14

**talking** 20:1 43:12 59:18 70:18 85:24 92:10,15 103:9 104:21 106:6 111:19 120:20 127:7 138:23 147:2

**tape** 144:22,24 145:2,3

**tape-recorded** 64:5

**Tara** 5:2

**taught** 41:13

**teach** 9:18

**tear** 129:18

**technical** 111:7

**telling** 46:10 112:6 152:10

**tells** 152:19

**ten** 104:17

**tenfold** 48:10

**terms** 10:17 45:17

**testified** 4:4 98:1 123:16 125:11 179:22 182:23

**testify** 11:5 49:19,22 54:2 59:9 97:22 99:1,7 125:12 160:7 166:24

**testimony** 57:7,11 58:12 59:11,12 60:10,21 61:9, 20 62:22 160:9 167:4 176:15

**text** 80:23 95:6,9 107:11, 12 158:23

**texted** 32:15

95:7 164:8,9

**texts** 114:22

**TG** 95:18

**therapist** 165:15

**therapy** 167:16

**thing** 6:3 26:2 33:14 62:3 82:5 90:17 139:4 140:3

**things** 15:6 16:3,20 21:14, 20 22:1 23:14 25:3,4 55:14 71:2 80:11 113:6 119:16 123:20 142:2 168:5,6 169:10,12

**thinking** 21:1 100:9 105:5

**Thirty** 87:12

**thought** 92:10 108:2 122:9 144:14 177:7

**thoughts** 105:4

**thousand** 16:13 30:9,24 31:2 43:24

**thousands** 37:8

**threat** 146:19 147:19 149:14,16 156:1 178:21 179:3,10,12,

15

**threaten** 170:9

**threatened** 136:2,3 149:17 150:8 151:11 170:5 173:2 176:21 177:4,8 179:5

**threatening** 33:17 170:2

**threats** 178:6

**thumb** 37:7,10 94:17

**ticket** 83:10

**till** 38:16

**time** 7:10 13:15 14:14 29:6 34:23 38:15,16 45:11 52:19 54:8 59:7 73:2 74:24 78:2 79:19,21 80:2, 11,22 86:21 87:1 89:14 90:9 91:7 93:18,22 95:13,14,20 98:18 99:8,9, 11 100:10,23 102:19,21 103:3,5 109:7 110:11,14 119:15 129:11 130:19 134:2 136:3,16,19 147:17 153:2 154:11,14,17 158:4,18 162:18 167:16

175:9 189:22

**timeline** 26:6
29:5 188:16

**times** 44:24
57:9 59:15
77:11,16 80:3
124:9 150:7
151:12 155:6
175:23 177:9,
11

**timestamp**
19:11 27:12,
15 28:7

**timestamped**
20:21

**tint** 73:21

**tired** 155:24

**title** 65:20,22
66:1,3

**today** 4:17
11:4 25:2 47:9
176:7 180:14
182:5 185:7

**told** 4:22 93:4
103:24 106:14
107:22,23
111:12 116:3,
5 123:8
130:16 144:9
147:11
149:19,24
163:10,17
165:17 166:6
167:5 179:9
186:11

**Tommy** 51:9
97:8,11,13,14
98:24 100:9
103:24 104:14
107:16 109:2,

18,23 114:16

**Tommy's**
115:19

**tools** 171:8

**top** 52:16
83:15,16 86:6

**toys** 22:8

**trade** 9:7

**trailer** 83:23
86:4,9,10,23
88:5,6,7

**train** 71:17

**training** 70:2
71:4,10,19
72:17

**trampled** 44:7

**transcript** 5:5,
16 126:7

**transcripts**
83:2 102:23

**transferred**
57:2 58:4

**trash** 79:23

**trauma** 182:7,
10

**traumatic**
173:8 174:9
175:6

**traveled** 39:23

**travels** 97:20

**treadmill**
86:14,18

**treatment**
47:15

**tree** 84:4,8,13,
14 85:7,9 86:1

128:19

**tri-level** 66:12

**trial** 47:3 188:2

**trouble** 67:13

**truck** 52:14
109:1 114:14
115:17 116:2
117:12,13,14,
17,18,20,22,
23 118:1,4,6,
15 119:10

**trust** 167:6
187:4

**Tuesday** 46:7
160:21 180:20

**Tully** 4:6,13
18:10,13,19
19:3 24:19
25:10 26:22
27:7 34:7
39:10 55:19,
24 83:3,7
108:12 111:6
114:5 120:13,
21,23 121:2
124:17 145:21
171:16 172:11
173:12,15,21
174:12 182:21
184:6,8
186:19 188:12
189:14,17
190:2

**turn** 57:12,22
60:7 61:2
89:8,11,17,20
90:8,12 92:8
93:24 110:19

**turned** 54:10
57:13,23,24

59:1,4 88:22
89:24 91:12,
23 92:7,10
96:12 103:8
112:23
113:10,15
125:22 131:9,
17 145:9
151:21

**turning** 111:12

**turns** 7:3
96:11

**TV** 31:17,19,21

**Twelve** 65:6

**two-story**
66:11

**type** 5:4 69:16
95:24 96:2

**typed** 25:19

**typing** 5:3

———————

**U**

**U-HAUL** 99:6

**uh-huh** 5:9,11,
17 21:9 30:7
46:2 82:11
106:3 140:12
147:7

**ultimate** 46:5
180:12 185:17

**ultimately**
176:3,15

**umbrella**
157:18,21,24
158:1,3

**uncles** 165:5,6

**understand**
5:18 29:15
35:22 56:16
133:20 150:17
164:24 165:6,
7 186:9

**understanding**
6:19 11:12,14
23:8 35:14
41:4 46:12
112:24 151:22
176:24

**uniform**
179:17

**unit** 10:5

**unspecified**
161:22 162:4

**upset** 67:5,6

**upstairs**
155:8,20,23

**utmost**
181:16,20

———————

**V**

**variance** 176:8

**vary** 174:17

**vehicle** 79:15,
17 104:11
108:24 109:1,
6 111:16
115:18,20,24
116:1,14
117:15 118:9,
11 119:8,12
158:11

**vehicles**
104:15 119:14

**verbal** 24:3
66:24 82:9,10,
14,15,16
83:12 163:18
165:19

**verbally** 23:20
82:23 127:12
143:9

**verify** 51:23

**video** 26:19,20
34:18,19 35:6
39:1,2,4,11
40:2,6,12 49:8
50:11 52:13
53:18,20 54:5,
19 55:6 61:15,
17,21,24 62:2,
3,4,6,10,14
66:5 88:17,19
90:14,18
105:20,24
108:13,15
109:14,24
110:15 111:11
112:5,17
115:2 117:17,
19 118:1,14
120:17,20,21
121:1,2
123:10 136:12
144:13 148:5,
8,10,16,19
149:5 151:17
152:2,9 153:5
154:4,13,14
168:6,9,11,15,
21 172:15
173:5 174:15,
18 175:2,10,
12,15,20,24
176:5,8,10
181:7 182:11,
12,13,19

183:5,12
184:18,20
185:3,7

**videoed** 62:7

**videoing** 131:7

**videos** 120:16

**violated** 187:3

**viral** 168:6,15

**Virginia** 6:13
9:14 85:3
163:9,24
171:2 172:3
174:1 186:7

**visits** 186:12,
17

**visually** 153:6,
9

**vocal** 5:6

**voice** 23:17
107:11,12
143:7,8
185:11

**voices** 5:6

**voluntarily**
178:4,17,22

—————

**W**

**wait** 81:7

**waiting** 100:19
101:3,6

**walk** 96:24
101:1 132:17
138:16

**walked**
100:10,24
115:3

**walking**
110:17 111:21
152:3

**wall** 44:2
135:18 137:9,
10,13,16,20,
23 138:4,7
139:13 149:10
150:22 151:1

**walls** 23:22
36:10 37:11

**wanted** 13:10
29:9 94:19
110:21
133:10,12
143:11,12
164:21

**warrant** 113:1,
2 178:8,11
181:22

**watch** 159:3,6,
9 176:7

**watches** 71:1

**watching**
130:4 156:7
174:15

**ways** 13:7,15
179:23

**weather** 49:22
51:23 62:8
87:2 98:6 99:8

**week** 7:11,20
48:6 54:14
82:7 160:19
184:17

**weekends**
141:12

**weekly** 45:5

**weeks** 54:16
184:15

**West** 6:13 9:14
85:3 163:9
171:1 172:2
173:24 186:6

**wet** 87:24
88:1,2,6

**whatsoever**
165:18

**White** 134:24
135:12 154:12
155:8,17,18
156:24 157:3
158:5,6,16
169:22

**wife** 63:12
65:17 68:10
75:23,24 76:9
93:20 94:5,9
104:21 111:18
140:11,18
149:15 161:8,
17 163:3
165:11,24
166:2

**Williams**
166:11

**wind** 123:21

**window** 73:20
98:23

**wit** 4:4

**withstand**
123:21

**witnesses**
97:4 101:24
105:16 108:1
112:14 155:2,
3

**word** 182:22

**words** 6:13
35:10 40:10
41:22 43:17
46:13 47:1,4,
11,12 88:14
103:10 107:10
112:12 126:22
127:14 173:14

**work** 9:9,13
10:2 45:21
47:24 97:10
122:11

**worked** 10:4

**workout** 30:10

**works** 79:1
97:12 113:1

**worth** 85:13,14

**write** 19:21
117:10

**writing** 22:17

**written** 180:21

**wrong** 41:21,
23 106:9

**wrote** 171:4

—————

**Y**

**ya'll** 83:1

**yard** 66:6
113:18 125:2
129:4 132:18
136:7 170:13

**year** 8:22 9:6
42:17 46:1
71:6 72:12
86:21

**years** 10:8,23
44:19 46:1,21
64:10,11 68:8,
19 163:11
164:4 168:19
169:2 181:13
183:16,22
185:8,9,10,11

**yell** 136:6

**yield** 73:18

**you-all** 43:2
50:17

**your-all's** 18:4

**Youtube** 54:19

**Yukon** 79:18
109:4,5