## LAWYER DISCIPLINARY BOARD
## INVESTIGATIVE PANEL CLOSING

**I.D. No.:** 21-03-139
21-03-140

**Date Complaint Received:** April 8, 2021

**COMPLAINANT:** **Office of Disciplinary Counsel**
City Center East, Suite 1200 C
Charleston, West Virginia 25304

**RESPONDENTS:** **Teresa A. Tarr, Esquire**       **Bar No.:** 5631
Chief Judicial Disciplinary Counsel
Judicial Investigation Commission
City Center East, Suite 1200 A
Charleston, West Virginia 25304

**Brian J. Lanham, Esquire**       **Bar. No.** 7736
Deputy Judicial Disciplinary Counsel
Judicial Investigation Commission
City Center East, Suite 1200 A
Charleston, West Virginia 25304

**THE INVESTIGATION OF THESE MATTERS** having been completed and a report having been made to the Investigative Panel of the Lawyer Disciplinary Board, the Panel orders that these complaints be closed for the following reasons:

### STATEMENT OF FACTS

On or about April 12, 2021, Judge Alan D. Moats, Chairperson of the Judicial Investigation Commission, provided to the Office of Lawyer Disciplinary Counsel (hereinafter "ODC") a March 25, 2021 letter addressed to the Chief Justice of the Supreme Court of Appeals[1]

---

[1] Supreme Court Justice Walker, Supreme Court Justice Armstead, Supreme Court Justice Hutchison, Supreme Court Justice Wooton, Charles S. Trump, IV, Esquire, Chairman, Senate Judiciary Committee, Moore Capito, Esquire, Chairman, House Judiciary Committee, Lisa A. Tackett, Director, Administrative Office, Joseph Armstrong,

1

and signed by the Honorable Family Court Judge (FCJ) Glen R. Stotler of the Twenty-Third Family Court Circuit (hereinafter referred to as "Stotler letter")[2]. FCJ Stotler alleged that Chief Judicial Disciplinary Counsel and Deputy Judicial Disciplinary Counsel engaged in serious misconduct during the investigation and prosecution of two Family Court Judges. In his letter to the Chief Justice, FCJ Stotler, in his capacity as a member of the Judicial Hearing Board stated that it was his "observation" that the conduct and practices of JDC in both cases was questionable and concerning and it was "evident to [him]" that JDC is abusing power and authority in the way that they deceive and intimidate judges into entering into agreements with the threat that if they fail to do so, the judges will be subject to far more severe penalties and consequences. He further alleged that JDC requests judges to appear at their office under the "disguise of just being a friendly interview and, once there, the judges are sworn in and interrogated." He further alleged that when Judges inquire of JDC if they should have an attorney to represent them, they are advised they do not need an attorney. Further, he alleged that the judges have "no idea of what they are being subjected to and therefore are given no opportunity to be prepared to address the issues and interrogation to which they are subjected." FCJ Stotler further asserted that "[i]t is evident that during the interrogation that the JDC actually misrepresents the law to coerce judges into agreements." He further alleged that "[i]t is evident the JDC misstates the facts to achieve their goal." He stated "[i]t is evident the JDC does not believe they are answerable to anyone for their actions, their conduct, or their practices." FCJ

---

Administrative Director, and FCJ Deanna Rock, President of the Family Court Judicial Association are all carbon copied on FCJ Stotler's letter.

[2] Neither the Chair of the Judicial Hearing Board, nor the Chair of the Judicial Investigation Commission are copied on the letter. By letter dated April 2, 2021, FCJ Stotler apologized to the Chair of the JIC for the oversight and forwarded a copy of the March 25, 2021 letter.

A0063803 - rlfc

Stotler requested that Chief Counsel and Deputy Counsel be investigated, seriously reprimanded and/or terminated from their respective positions.

As a result of Chairperson Moats providing the Stotler letter to ODC, it opened these complaints against Respondent Teresa A. Tarr, and Respondent Brian J. Lanham, both licensed members of the West Virginia State Bar.

## GOLDSTON MATTER

FCJ Goldston's judicial disciplinary matter is presently pending before the Supreme Court. It originates from In re Gibson, Raleigh County Civil Case No. 17-D-655-G, which was filed on or about November 20, 2017, by wife Ms. Gibson in Raleigh County, West Virginia. FCJ Goldston was the presiding family court judge. The husband was initially represented by Brandon Johnson who made a notice of appearance on December 18, 2017. The wife's counsel Kyle Lusk made a notice of appearance on December 26, 2017.

On or about April 23, 2019, a Final Order was entered. On June 7, 2019, a Second Amended Corrected Final Order, Residential Schedule was entered by the Court. On or about June 19, 2019, a Qualified Domestic Relations Order was entered. The Order noted in relevant part:

> The parties divided their household furnishings by agreement which is represented by a four-page exhibit entered before the Court and attached hereto. Each page is initialed and dated by the parties. The circled items are Respondents [Matt Gibson]. The items not circled are the Petitioners [Carrie Gibson]. The parties shall cooperate to set a time and date for the Petitioner to pick up said items. The Petitioner may bring others to help her move the items.

On or about September 26, 2019, Ms. Gibson filed a Petition for Contempt against her husband. Ms. Gibson was still represented by Kyle Lusk. Mr. Gibson filed an Answer and Motion to Dismiss the contempt petition on October 17, 2019. Mr. Gibson's attorney moved to

withdraw as counsel on or about January 6, 2020. Ms. Gibson's attorney filed Petitioner's disclosure of witnesses for the contempt hearing on February 27, 2020.

On or about March 4, 2020, the parties appeared before FCJ Goldson. Ms. Gibson with counsel, Kyle Lusk, and Mr. Gibson, *pro se*. There was a discussion at the outset of the contempt about whether Mr. Gibson is entitled to apply for a court appointed attorney because "jail time" is at issue. FCJ Goldston stated "well, you're not going to get jail time." Mr. Gibson nonetheless indicated his desire to seek a court appointed attorney. FCJ Goldson advised that he could fill out the application for appointed counsel on recess. Mr. Gibson declined and proceeded with a motion to dismiss the petition based on the grounds that he didn't receive the disclosures by Lusk until February 27, 2020—4 days before the hearing. There is no dispute the disclosures were late, but FCJ Goldston declined to dismiss. However, she stated she would reschedule if he wanted additional time to prepare. Mr. Gibson stated his objection, but also said he was ready to proceed. FCJ Goldston noted his objection to her ruling denying the motion to dismiss, but also noted his waiver of the opportunity to request a continuance. Mr. Gibson was also asked to waive his right to seek the appointment of counsel. He stated he would obtain counsel should he wish to file an appeal, but that he would waive for purposes of "today."

With regard to the property, Mr. Gibson argued that the exchange took place November 30, 2018, but the Order was not entered until April 23, 2019. He argued that he did not have the final order on the date of the exchange and therefore could not be held in contempt. In response, on page 10 of the March 4, 2020 hearing transcript, FCJ Goldston says in response to Mr. Gibson's arguments to dismiss that "once I speak it, it's the order." On page 63 of the hearing

transcript[3] there were several exchanges between Mr. Gibson and FCJ Goldston wherein Mr. Gibson believed that he complied with what the court recorded audio of the distribution hearing said, to which FCJ Goldston replied "I don't care what the audio says. I want to know what the order said." Ultimately, FCJ Goldston asked where Mr. Gibson lived and said "All right. We're all going to meet there in ten minutes. Have you got anybody that's got a truck." Then, the transcript indicated OFF THE RECORD.

A cell phone recording by Mr. Gibson from the March 4, 2020 "home view" was reviewed. In that video, which took place outside of the Gibson home, at the 1:34 mark, Mr. Gibson asked FCJ Goldston to recuse herself because she was putting herself in a witness capacity. He noted there was no search warrant and there was not a list of what he was being ordered to produce. FCJ Goldston replied there was an Order entered, to which Mr. Gibson replied "not for today's search." FCJ Goldston denied his motion as not timely filed.  Mr. Gibson said "you won't get in my house without a search warrant" to which FCJ Goldston responded "oh yeah I will." Thereafter, she and the deputy proceeded to inspect part of the subject property, specifically, the outside swing. At the 2:40 mark, after Mr. Gibson objected to a woman on his property,[4] FCJ Goldston said "now you are either going to let me in that house or he is going to arrest you for direct…. Are you recording this?" Mr. Gibson replied in the affirmative. FCJ Goldston ordered the deputy to take Mr. Gibson's phone. The video cuts out, but the audio continued and FCJ Goldston states at the 2:55 mark "turn off your phone. I will take you to jail if you don't turn it off. Do you understand that?" "put it up" "give him the phone or you're going

---

[3] A transcript of the March 4, 2020 contempt hearing was prepared and admitted into evidence by the Judicial Hearing Board in the Matter of The Honorable Louise E. Goldston, Judge of the 13th Family Court Circuit, Supreme Court No. 20-0742.
[4] Mr. Gibson noted in an April 10, 2020, To Whom it May Concern letter sent to the Judicial Disciplinary Counsel that the judge noted that she was having a hearing at his house, but he noted that domestic hearings are private, and Ms. Gibson brought her father, her boyfriend, and her brother to Mr. Gibson's house.

to be arrested." Mr. Gibson argued that he was permitted to record on this land to which FCJ Goldston replied at the 3:07 mark "I am the judge trying to effect equitable distribution. We are having a hearing. Now, you let me in that house or he is going to arrest you for being in direct contempt of court." The audio stopped at the 3:45 mark. FCJ Goldston, the parties, and law enforcement then entered Mr. Gibson's home.

In the course of this investigation, Chief Counsel reviewed FCJ Goldston's bailiff's cell phone recording of the "home view" that occurred inside of Mr. Gibson's home.

The contempt hearing transcript reflected ON THE RECORD at line 15 of page 63. FCJ Goldston stated "we did a home view of the marital property, the marital real estate that was awarded to Mr. Gibson in the divorce..." FCJ Goldston listed the items obtained that were awarded to Ms. Gibson in the final order. FCJ Goldston noted there were additional items that were not retrieved and ordered Mr. Gibson to bring the items to the court house by Friday. [Tr. P 65]. FCJ Goldston stated that Mr. Gibson made a motion to recuse her at the scene and she noted she disagreed because "I do this probably two or three times a year and we have jury views all the time." She further noted if he wanted to follow up on the motion he needed to do so at least 20 days before the next hearing. FCJ Goldston also explained she would then send his motion as well as her thoughts regarding why she did not believe she was prejudiced to the Supreme Court. Mr. Gibson advised FCJ Goldston he intended to file to have her recused and he intended to file a complaint with JIC. FCJ Goldston noted that a JIC complaint was not grounds to have her disqualified. The contempt hearing was ultimately continued to determine if FCJ Goldston could further hear the case. There was not an order entered by FCJ Goldston from this contempt hearing.

6

On or about March 16, 2020, Mr. Gibson filed a motion to disqualify FCJ Goldston. On or about April 3, 2020, the Gibson domestic matter was temporarily assigned to FCJ Dorsey. On or about July 28, 2020, the matter was assigned to FCJ Clark. As of today's date, the domestic matter remains pending before FCJ Clark.

Pursuant to its authority in Rule 2.2 of the Rules of Judicial Disciplinary Procedure, on March 11, 2020, JDC opened Complaint No. 30-2020 against FCJ Goldston. The official complaint form of the JIC was utilized by JDC, identifying the person making the complaint was JDC. The complaint form stated details of the incident in question; included a link to a video at Youtube; and specified specific rules of which FCJ's Goldston's conduct was possibly in violation. Also included was an Admonishment of another member of the judiciary referenced and attached. Additionally, there was a letter on JIC letterhead dated March 11, 2020, wherein Respondent Tarr advised FCJ Goldston that a complaint had been opened by JIC against her and again reiterated the March 4th incident details known to JIC. Respondent Tarr cited to the relevant judicial canons and finally advised FCJ Goldston that pursuant to Rule 2.3 of the Rules of Judicial Disciplinary Procedure, a written response was required within 10 days of receipt, but indicated she may seek an extension in writing for good cause.[5] She further reminded FCJ Goldston of the obligations to cooperate and not retaliate against any lawyer or litigant who files disciplinary complaints. Respondent Tarr's letter also indicates that the rules can be found in the State Code and provides a link to the rules and the Canons.

The complaint and letter were sent by email at 12:37p.m. on March 11, 2020, by Respondent Tarr to FCJ Goldston. The email was marked "high importance" and the email message indicated there was a complaint attached and a letter requesting a response. Respondent

---

[5] Respondent Tarr testified that in her nearly ten years as Chief Judicial Counsel it was the customary office policy to grant requests for extensions to answer judicial complaints.

Tarr advised FCJ Goldston she may call with any questions. Respondent Tarr also included a live link to the Youtube video referenced in the complaint. Respondent Tarr received a delivery confirmation email at 12:37 p.m, on the same date. The March 11, 2020 letter and complaint complied with written notice of the complaint to the Judge as required by the Rules of Judicial Disciplinary Procedure.

On March 18, 2020, Mr. Gibson filed Complaint No. 33-2020 against FCJ Goldston. His complaint raised the same allegations as Complaint No. 30-2020 opened by JIC. On the same date, the JIC Executive Assistant advised Mr. Gibson by letter that his complaint was received and indicated it would be reviewed by the commission and he would be notified of any action.

FCJ Goldston filed her written response to Complaint No. 30-2020 on or about March 18, 2020. As evidenced by an email from FCJ Goldston to Respondent Tarr on March 25, 2020, at 2:09 p.m., the response was not delivered to the JIC until a later date by mail, but Respondent Tarr received a PDF of Goldston's response. The email referenced that FCJ Goldston spoke to The Honorable John S. Hrko, former Judge of the Circuit Court of Wyoming County and current Senior Status Judge, about the subject ethics complaint and she was aware that Senior Status Judge Hrko spoke to Respondent Tarr about the same. FCJ Goldston also disclosed to Respondent Tarr that her bailiff made a recording inside of the Gibson home and she intended to provide the same in an effort to be transparent.

FCJ Goldston Complaints No. 30-2020 and 33-2020, along with the Responses were presented by JDC and reviewed at the April 24, 2020 JIC meeting. Respondent Tarr testified during her sworn statement to ODC that it was customary procedure to upload all of the

investigation documents to the JIC's secure server for the members review and confirmed that practice was followed at the April 24, 2020 meeting.

By letter dated April 27, 2020, Respondent Lanham advised FCJ Goldston that the two complaints were presented at the April 24th meeting. Pursuant to the JIC's directive, Respondent Lanham asked the following questions and requested any and all documentation and supporting evidence to support her answers:

1. How long have you been conducting "home visits" to litigant's homes?
2. How many total times have you conducted home visits to litigant's homes?
3. What are the case names and numbers of the cases of the home visits?
4. Please include any audio/video recordings of the home visits.
5. Please include any audio/video recordings of any hearings that took place surrounding any home visit.
6. At any time did you ask for advice on conducting home visits?
    A. If so, from whom did you ask?
    B. What was the advice?
    C. Please include any documentation of the advice or request.

An email reflects that Respondent Lanham had a telephone conversation with FCJ Goldston regarding the substance of the email, and he made clear that she did not need to file an additional written response to the Gibson complaint because the allegations mirrored the JIC complaint. He further indicated that she could call him on his cell phone (and he provided the number) or email him if she had any questions.

By email dated April 30, 2020, at 11:00 a.m., FCJ Goldston's office sent Respondent Lanham a PDF of a letter from FCJ Goldston that is responsive to the April 27, 2020 inquiry. The email reflects a hard copy of the letter and a disc with audio recordings would follow.

On July 8, 2020, at 4:46 p.m., FCJ Goldston wrote to Respondent Lanham and said "I had a crazy day. I apologize for the lateness of this email. We looked and there are three total recordings from that day. We mailed them out today because the files are too big to email. Please excuse my lateness in getting in touch. And I apologize for my unprofessional emotions

yesterday. This is just all very upsetting…" Respondent Lanham responded by email the following day at 8:41a.m and said "thank you for finding and sending the videos. you owe me no apology. I appreciate your kindness."

At some point in the investigation, it was determined that a sworn statement was necessary and Respondent Lanham contacted FCJ Goldston by telephone to arrange for the same.[6] Respondent Tarr testified that it was customary to permit judges to voluntarily submit to a sworn statement rather to issue a subpoena compelling attendance. Respondent Tarr testified that unless the allegations were as a result of extraordinary complaint filed by the Administrative Director[7] that this professional courtesy was extended to the judicial officers so as to not interfere with their dockets and to allow the judicial officers to demonstrate cooperation in the disciplinary proceedings. The evidence reflected that the sworn statement was arranged and scheduled directly with FCJ Goldston and that she was aware of the substance and significance[8] of the statement in advance.[9] The evidence reflected that FCJ Goldston had the opportunity to confer with counsel prior to filing a written response to the ethics complaint, and was aware[10] she could consult with counsel. The sworn statement was voluntary and arranged to accommodate FCJ's Goldston's schedule. As judges are required to respond to and cooperate in ethics inquiries, JDC could have easily compelled her appearance at the sworn statement by investigative subpoena, taking no regard for FCJ Goldston's docket or personal schedule. Moreover, allowing FCJ Goldston to voluntarily submit to the sworn statement afforded her the

---

[6] Respondent Lanham testified in his sworn statement to ODC that he customarily uses the term "sworn statement" when making arrangements with judicial officers to take a statement under oath.

[7] See Rule 2.14 of the Rules of Judicial Disciplinary Procedure. Extraordinary proceedings.

[8] Respondent Tarr and Respondent Lanham each recalled that FCJ Goldston was very emotional and audibly distressed during many, if not all, of the conversations/emails about the investigation.

[9] Emails reflect that Respondent Lanham and FCJ Goldston were continuously working cooperatively to address COVID concerns that had arisen in or around the Raleigh County Court House that resulted in the time of the sworn statement being changed to accommodate FCJ Goldston.

[10] In addition to being a jurist for twenty-seven years, FCJ Goldston has been a member of the West Virginia State Bar since May 15, 1984.

benefit evidence of cooperation which was jointly stipulated mitigation in her pending judicial disciplinary case.

FCJ Stotler's letter alleged that when judges inquire whether they should have an attorney to represent them, they are advised they do not need an attorney. Judicial disciplinary proceedings are not criminal in nature. JDC is under no obligation to assess and advise whether members of the judiciary should have counsel. As attorney fees can be awarded in formal cases when a judge prevails, it likely is not prudent for JDC to express any opinion regarding the same. *See* Rule 4.13 of the Rules of Judicial Disciplinary Procedure Attorney fees upon dismissal. In the Matter of Ferguson, the Supreme Court soundly rejected the argument from a magistrate— who did not possess law degree and a license to practice law—that it was a mitigating factor in the disciplinary proceedings because he did not consult with an attorney with respect to the preparation of the written response to the ethics complaint or have counsel present for his sworn statement before JDC. The Supreme Court reasoned "[m]oreover, with or without counsel, a magistrate should certainly know to be truthful when testifying under oath." Matter of Ferguson, 242 W.Va. 691 (2020). Regardless, Respondent Tarr testified that in her nearly ten (10) years as Chief Counsel she has never advised a judicial officer they did not need an attorney and when asked she advises that they may speak to counsel and/or bring counsel to a sworn statement if they so choose. Respondent Lanham's testimony was substantially similar to Respondent Tarr's statements.

The 2:53:16 audio file of FCJ Goldston's sworn statement and the transcript was conducted by Chief Counsel. The transcript of FCJ Goldston's sworn statement to JDC was admitted into evidence at her hearing as Joint Exhibit 6. The transcript reflected that FCJ Goldston's sworn statement occurred on July 22, 2020, regarding complaints No. 30-2020 and

33-2020. Page 4 of the transcript stated "WHEREUPON, THE HONORABLE LOUISE E. GOLDSTON WAS CALLED AS A WITNESS, DULY SWORN AND TESTIFIED AS FOLLOWS". The JIC Executive Assistant, a notary, administered the oath.[11] Line 14 on page 14 the parties made their appearances, Respondent Lanham stated "for the record" and **sworn statement.**" (emphasis added). JDC were professional, courteous and respectful of the judicial officer at all times, and when FCJ Goldston became emotional during questioning, JDC went off the record to allow her to compose herself. JDC reminded FCJ Goldston when going back on the record that she was still under oath.

The transcript of July 22, 2020 reveals that JDC complied with the notice requirements as set forth in the Rules and advised FCJ Goldston of the existence of the ethics complaints. There is no credible evidence to support the Stotler allegation that FCJ Goldston had "no idea" and was given no opportunity to be prepared to address the issues. The scope of the sworn statement was consistent with the complaints that FCJ Goldston had been provided and given an opportunity to respond to in writing. The statutory authority that was discussed was consistent with the raised defenses to the alleged misconduct. Moreover, Judge Stotler alleged that JDC misled FCJ Goldston during her sworn statement by presenting an excerpt taken out of context from Westover Volunteer Fire Dept v. Barker, 142 W.Va. 404, 955 S.E2d 807 (1956) "in which they implied that a judge cannot do a view during a bench trial." This allegation from the Stotler letter is not supported by the evidence. FCJ Goldston stated in her sworn statement before JDC that she considered her home views akin to a jury view. As she raised this as her justification/defense to the home views, it was entirely relevant and permissible for JDC to discuss the statute and case annotations regarding jury views during her sworn statement. Regardless, there is no

---

[11] W.Va. Code 39-4-2(7) and (5) defines a notary public as an individual commission to perform a notarial act, such as administering an oath or affirmation.

characterization or implication of the <u>Westover</u> case by Respondent Lanham. In fact, the record reflects *only* that Respondent Lanham requested that she read the annotation to the jury view statute[12] and she did so on the record.

Pursuant to Rule 2.6 of the Rules of Judicial Disciplinary Procedure, Counsel's report along with multiple exhibits and FCJ Goldston's sworn statement was presented to the Commission at its August 21, 2020 Meeting. After a thorough review of all evidence, pursuant to Rule 2.7(a) and Rule 2(d) of the Rules of Judicial Disciplinary Procedure, the Commission found probable cause and voted to issue a one-count formal statement of charges against FCJ Goldston charging her with violating Rules 1.1, 1.2, 1.3, 2.2, 2.4(B), 2.5 and Rules 3.1(A), (B) and (D) of the Code of Judicial Conduct.

By email dated August 27, 2020, Respondent Lanham provided FCJ Goldston with a summary of the relevant facts of her complaints and a list of rules "that we discussed this morning." Lanham invited her to contact him further if he could be of any assistance. By email dated September 16, 2020, Respondent Lanham provided FCJ Goldston with a proposed draft of the Statement of Charges and stated "[a]s discussed, attached is copy of our final draft of the Statement of Charges. If you would like to make any suggestions we will consider them but as we have discussed, any decision will be up to us." By email dated September 16, 2020, at 3:04 p.m. FCJ Goldston replied "I have received and reviewed the draft. The only wording change I suggest is on page 4 on the first line after "contempt powers that" the word "specifically" be inserted. I rely on your discretion whether that could be added of course. I think the statement of charges is fair and accurate".

---

[12] Respondent Lanham testified that he asked her to review the statute at the sworn statement and asked her to read the <u>Westover</u> annotation in an effort to determine *if* she had actually read the referenced statute she was now using to justify going into Gibson's home.

By email dated September 18, 2020, Respondent Lanham sent the proposed statement of charges to the Chair of the JIC for review and stated "[i]f it meets with your approval please sign and return at your convenience." On September 23, 2020, the 14-paragraph formal statement of charges signed by the Chairperson of the JIC on September 18, 2020, was filed by JDC against FCJ Goldston with the Clerk of Court. On the same day, in compliance with Rule 2.8 of the Rules of Judicial Disciplinary Procedure, FCJ Goldston was notified of the filing of the statement of charges and provided with a copy of the same. The statement of charges also notified FCJ Goldston of her right to file responsive pleadings pursuant to Rule 2.9 of the Rules of Judicial Disciplinary Procedure.

By email dated September 23, 2020, Respondent Lanham stated "[p]er our conversations, I have attached a copy of the agreement.[13] Please take your time and review it. If it meets with your approval please print it, sign it, scan it, email it and mail the original back to us by Friday, October 2, 2020. As always if you have any questions or concerns please do not hesitate to contact me. Also per your request, the code for Jury views is covered in WV Code 56-6-17. The case we discussed based on that statute was Westover Fire Dept. v. Barker, 142 wv 404, 95 SE2d 807. Also, I tracked down the list of people on the Hearing Board" and he provided her a list of the current Judicial Hearing Board members.[14]

After the September 23, 2020, email but before September 25, 2020, FCJ Goldston[15] retained counsel Andy Nason, Esquire.[16] It was Respondent Tarr's recollection during her sworn

---

[13] This draft agreement has admissions of violations of Judicial Canon 3.1.

[14] Rule 3.1 of the Rules of Judicial Disciplinary Procedure states in relevant part "[t]he [Judicial Hearing] Board shall consist of nine members: three circuit judges, one magistrate, one family court judge, one mental hygiene commissioner, juvenile referee, special commissioner, special master, or former judge or justice, state or federal, and three members of the public."

[15] FCJ Goldston testified in her sworn statement to Chief Counsel in the investigation of this matter that Respondent Tarr contacted her via telephone and said she was calling to "strongarm" her into reaching an

statement that Respondent Lanham advised her that Attorney Nason did not want FCJ Goldston to admit to any Rule 3.1 violations because of the possibility of a lawsuit. By email dated September 25, 2020, at 3:24 p.m., Respondent Lanham sent Attorney Nason an email entitled "modified agreement" and stated "attached is the modified draft agreement. Please let me know your thoughts. Thank you." Attorney Nason responded with his client FCJ Goldston cc'd on the September 30, 2020, 10:40 a.m. email and stated "Proposed agreement/ please advise." Within the hour, Respondent Lanham advised Respondent Tarr by email that he "Just talked to Mr. Nason and got this email. They proposed changing the language in paragraph 4.(f)." Respondent Lanham's email to Respondent Tarr indicated he found the proposal to be acceptable. By email dated September 30, 2020, at 12:19 p.m. Respondent Lanham advised Attorney Nason "We are ok with the changes. If you could print this agreement out, sign it, have Judge Goldston sign it, scan it, email it and mail the original to me, then I will get this to the Hearing Board and ask for an expedited hearing."

On or about September 30, 2020, FCJ Goldston and her counsel entered into a written agreement with the JDC whereby she would admit to (1) all of the facts contained in paragraphs 1 through 14 of the formal statement of charges; and (2) violating Rules 1.1, 1.2, 1.3, 2.2(A), 2.4(B) and 2.5 of the Code of Judicial Conduct for her behavior set forth therein. The parties set forth factors in mitigation. The parties further agreed to recommend sanctions of a censure, a $5,000.00 fine and the payment of costs. The agreement was signed by FCJ Golston and her Counsel Andy Nason on September 30, 2020, and by Respondent Tarr and Respondent Lanham on October 5, 2020. Despite being charged in the Statement of Charges, there are no violations

---

agreement. [Goldston Statement at 58] Respondent Tarr testified that she did not recall any such conversation with FCJ Goldston about the resolution of the disciplinary case. Respondent Tarr denied using the term "strongarm call" in her practice. Respondent Lanham also testified he did not ever recall Respondent Tarr using that term.
[16] The WVSB records indicate Andy Nason, Esquire has been a member of the Bar since April 29, 1980.

A0063803 - rlfc

of Rule 3.1(a), (b) or (d) of the Code of Judicial Conduct included in the Agreement which appeared to support that the parties negotiated the terms of the agreement. There is no credible evidence to support the allegation that JDC used abusive tactics to intimidate FCJ Goldston into signing an agreement.

By email dated October 6, 2020, Respondent Lanham sent Ancil Ramey, Clerk for the Judicial Hearing Board, a copy of the Statement of Charges against FCJ Goldston and the signed agreement between the parties relating to the Statement of Charges. Respondent Lanham stated "if it meets with your approval, both parties would like to see if it is possible to get an early hearing date on the agreement. Mr. Nason is representing Judge Goldston." Attorney Nason is copied on the email. By email dated October 6, 2020 at 3:21 p.m., Ramey advised the parties the JHB had another hearing matter previously set for January 15, 2021, and inquired if that date was too far in the future. On October 7, 2020, Respondent Lanham replied "Mr. Nason, it was my understanding that your client was in a hurry to get this heard as soon as possible. We are willing to help in that endeavor.  If she has changed her mind, January 15th works for us." A scheduling order was signed by Judge Lorensen on October 16, 2020, setting the relevant dates for the hearing.

On or about October 14, 2020, the JDC received three support letters from Family Court Judges.  All of the letters were written on the FCJs' official court letterhead. The letters bear the address of City Center East and one is addressed to "Mr. Brian Lanham, Assistant Counsel"; one is addressed to "Judicial Investigation Commission" and one addressed to "Brian J. Lanham, Judicial Investigation Commission." At its October 16, 2020 meeting, the JIC found the letters to be inappropriate and ordered Respondent Lanham to advise the judges of the same. On the same date, Respondent Lanham telephoned the FCJs to advise of the JIC's determination. By emails

dated October 21 and 22, 2020, Respondent Lanham sent drafts of the letters to Judge Moats for his review and approval. Per the JIC's directive, after Judge Moats approved the same, on or about October 22, 2020, Respondent Lanham sent the warning letters to the three judges.[17] Specifically, the letter stated in relevant part "after reviewing your letter in its entirety the Commission was of the opinion that your letter violated several rules of the Code of Judicial Conduct." The letters set forth the code violations and ultimately the judges were warned, but not sanctioned and complaints were not initiated.

An Advisory Opinion 2020-25 was issued by the JIC on October 21, 2020, and concentrated on the question of whether a judge may voluntarily write letters of support on behalf of litigants in any civil or criminal matter. As per procedure, the Advisory Opinion was published to the Supreme Court's website and it was sent by PDF to all judges.[18]

As customary with the practices of the office, there was an update on the pending FCJ Goldston matter provided by Judicial Disciplinary Counsel at the December 11, 2020 JIC Meeting.

In October 2020, an order was entered scheduling FCJ Goldston's judicial disciplinary hearing for January 1, 2021. By email dated January 4, 2021, Respondent Lanham wrote to Attorney Ramey "Attached are digital copies of the evidence book that we will present at the hearing.  Please let me know if you have any questions or I can help in any way." By email Wednesday, January 6, 2021 9:17a.m. Respondent Lanham wrote to Attorney Ramey "Here are

---

[17] Judge Moats, in his capacity as Chair of the JIC, advised Chief Counsel that there was no instance to his knowledge that either Respondent Tarr or Respondent Lanham has exceeded the scope of their authority as JDC. He further noted that he was not aware of any instance where either Respondent Tarr or Respondent Lanham have failed to follow the directives of JIC.

[18] This practice was adopted by JIC in early 2020 in an attempt to keep judicial officers informed as to Advisory Opinions.

digital copies of the documents that will be introduced at the Goldston hearing. There will also be jump drives with 2 videos as listed. They appear to be too large to send over email. Please if you would like them before the hearing and I'll arrange to get them to you. Thanks." Ultimately, the emails reflect two jump drives overnighted to Attorney Ramey. Attorney Nason is copied on all emails.

By email dated January 5, 2021, Attorney Ramey provided the parties with a draft recommended decision based on the parties previously signed agreement. He noted this did not reflect any decision by the Judicial Hearing Board but was solely a quality control check on his interpretation of the parties' agreement. By email dated the same date, Attorney Nason advised the documents had been reviewed by FCJ Goldston and counsel and there were no objections.

FCJ Goldston's hearing[19] was held on January 15, 2021. The Judicial Hearing Board Chair, the Honorable Michael D. Lorensen, Judge of the 23rd Judicial Circuit, presided. In attendance were the following JHB members: (1) The Honorable Paul T. Farrell, Judge of the 6th Judicial Circuit; (2) The Honorable Richard G. Postalwait, Magistrate of Calhoun County; and (3) The Honorable Glen Stotler, Judge of the 23rd Family Court Circuit.

The hearing transcript reflected that FCJ Goldston, appeared in person and with Attorney Nason.[20] [Hearing Transcript at 5] Respondent Lanham examined FCJ Goldston and the agreement was discussed and FCJ Goldston testified that she signed the agreement and she did so knowingly, voluntarily, and intelligently. [Hearing Transcript at 7 lines 4-10] FCJ Goldston acknowledged and admitted to the facts as alleged in the Statement of Charges, paragraphs 1-14,

---

[19] Because of COVID 19 at Attorney Ramey's request and, with no party voicing an objection, the JHB members appeared via Microsoft Teams.
[20] FCJ Goldston and Attorney Nason were both over audio without video, but FCJ Goldston confirmed she was physically present with her counsel during the judicial hearing. [Hearing Transcript at 2]

A0063803 - rlfc

and stated she now understood her actions violated certain rules. [Hearing Transcript at 7-8] Respondent Lanham proffers her mitigation evidence and she acknowledged the recommended sanction made by the parties. [Hearing Transcript at 8 line 15 through 9 line 11]. FCJ Goldston's statements to the Judicial Hearing Board were all made under oath and in the presence of her counsel.

FCJ Stotler's letter also alleged that JDC misstated the facts to "achieve their goal" and he contended the JDC representations in the January hearing support this allegation. Specifically, he alleged that JDC represented that after FCJ Goldston conducted the home view that she never took any action, but FCJ Stotler contends in his letter that FCJ Goldston in fact did take action because she returned to the court room and went back on the record. The only statements relevant to this claim are during the January hearing wherein Respondent Tarr stated in relevant part:

> **Ms. Tarr:**     If, Your Honor, if I can just interject one thing. I think you have to look at the specific factors, which is why it was that we have asked to have it warranted, in that the – even if you were going to allow a view, she did not follow a procedure that was appropriate. And the procedure that was appropriate was to tell him ahead of time, before they went to the house, why they were going to the house, give him an opportunity to object, and then she never put anything on the record afterward. There is no order that set forth any of this.
>
> And so I think, if—if I understand what you were saying, I am in agreement that what you need to look at are the particular facts of this particular case, and whether she followed an appropriate procedure or not. And all parties agree did not follow an appropriate procedure, from beginning to end.

[Hearing Transcript at 22 line 15 through 23 line 7] Respondent Tarr's statements as a whole [*See Also* Hearing Transcript 17-20] reflect JDC's repeated position that even if a view were appropriate, FCJ Goldston still failed to follow procedure for a view and Respondent Tarr

concluded by making clear there was no order[21] regarding the issue of the view entered after the contempt hearing. Attorney Nason stated that although an order had not been entered by FCJ Golston after the view, she did come back on the record and made findings. [Hearing Transcript at 25] He stated she was recused shortly thereafter and had no further ability to do anything on the case, including entering any Order. JDC did not dispute this representation by Attorney Nason. FCJ Goldston took issue with the statement that she "did nothing else to preserve the record." [Hearing Transcript at 26] She stated the parties went back on the record, and she stated she set forth on the record everything that happened during the visit. She stated she gave the parties the right to object and advised Mr. Gibson of the procedure to seek her recusal. JDC did not dispute the representations by FCJ Goldston. FCJ Goldston concluded her testimony by again acknowledging "mistakes were made" and that she accepted responsibility for the errors. [Hearing Transcript at 26]

The evidence establishes that FCJ Goldston was provided with notice and opportunity to be respond to the complaint, both in writing and during her sworn statement, consistent with the Rules of Judicial Disciplinary Procedure. FCJ Goldston was able to participate in the drafting of the Statement of Charges filed by the JIC. FCJ Goldston secured counsel in September of 2020 who negotiated stipulations with JDC. FCJ Goldston's counsel and JDC submitted Joint Exhibits to the JHB. It is critical to note that there were no allegations that Respondent Tarr or Respondent Lanham had engaged in any misconduct made at or before the January 2021 hearing before the JHB.

---

[21] Respondent Tarr testified that courts speak through their orders and there was no Order arising from the contempt hearing.

A0063803 - rlfc

The allegations lodged in FCJ Stotler's letter also claimed that JDC failed to disclose relevant evidence as to the existence of a recording of the subsequent hearing to the Judicial Hearing Board. This allegation is also not supported by the record. The parties had entered into an agreement and had agreed upon joint exhibits for the hearing. The Hearing Examiner asked if Respondent Lanham wished to move for the admission of the Joint Exhibits. [Hearing Transcript at 9 line 18] Respondent Lanham affirmed and the Hearing Examiner inquired if there were any objections. There were no objections and the Joint Exhibits were admitted. The Joint Exhibits were pre-marked and Joint Exhibit #5 was entitled "Courtroom video from the morning of March 4, 2020." Judge Lorensen noted that he did not receive a video of the second part of the hearing on March 4. [Hearing Transcript at 27] Respondent Lanham acknowledged a second video and expressed no issue with providing the same but indicated there may be some issue with sending the video electronically because of its size. [Hearing Transcript at 27]

It is noted there is no pleading or evidence wherein JDC represents to the JHB that there is not a second part of the Gibson March 4th contempt hearing, nor is there any evidence that JDC failed to disclose the video. Indeed, the only portion of the contempt hearing that was provided by the parties to the JHB was the morning portion prior to the view and the Joint Exhibit log specifically states it is the MORNING hearing. The post home view portion of the March 4th contempt hearing was in the possession of Attorney Nason as his client provided it to JDC. Attorney Nason agreed to the Joint Exhibit and made no objection to the Joint Exhibits when invited by the Hearing Examiner. When Judge Lorenson asked about it, Respondent Lanham agreed to provide it to the JHB.

21

Respondent Lanham testified during his sworn statement that he did not include the post home view portion of the contempt hearing[22] as he did not believe it was relevant to his case in chief as the prosecution. This is supported by a review of the Statement of Charges as the enumerated 1-14 paragraphs only address the conduct leading up to and including the home view.[23] The disciplinary matter[24] was concluded after JDC rested and Attorney Nason expressed satisfaction that the record was complete. [Hearing Transcript at 28]

On January 20, 2020, JDC filed a Motion to Disqualify Judge Stotler from the judicial disciplinary matter. By Order entered January 22, 2020, Judge Stotler declined to disqualify himself. On the same day, JDC received an Order signed by Judge Lorensen, Chairperson of the Judicial Hearing Board, requiring post hearing briefs by the parties addressing legal issues delineated by questions a-l. The briefs were ordered by February 15, 2021, with any responsive brief filed by March 1, 2021.

Attorney Nason filed a Response to the Judicial Hearing Board Questions on or about February 12, 2021. On or about February 16, 2021, JDC filed its post-hearing brief. Along with the brief, Respondent Tarr sought the admission of two additional exhibits -- one was a copy of the transcript of the March 4, 2020 contempt hearing which was prepared by a Court reporter on January 28, 2021, at Respondent Tarr's request, and the second was the cell phone video taken

---

[22] Although the parties later jointly moved for its admission post hearing, the Statement of Charges did not specifically allege facts that required JDC to seek to admit the bailiff's video recording of inside of Gibson's home during their case in chief.

[23] The only factual reference made to conduct that occurred *after* the home view in the Statement of Charges is found in paragraph 11 which states in relevant part "she failed to enter any order subsequent to the visit reflecting what had happened at the residence, whether any items had been secured and/or whether or not a party was in contempt." *See* Goldston Statement of Charges, paragraph 11, pages 3-4.

[24] Judge Lorensen noted both JDC and FCJ Stotler's respective objections on the record. [Hearing Transcript at 23-24]

inside of Gibson's home by FCJ Goldston's bailiff. Attorney Nason had no objection to the additional exhibits.

On February 16, 2021, an amicus brief was filed by Mr. Gibson's attorney, John Bryan and the same was ordered filed by order entered by the JHB on February 19, 2021. An order was entered on February 19, 2021, by the JHB that reflected a JOINT request was made by the parties and was granted by the Board admitting additional exhibits. As customary, JDC provided JIC with an update on FCJ Goldson matter at its February 19, 2021 JIC Meeting. Attorney Nason filed a corrective brief on February 22, 2021.[25] Attorney Nason also filed a Response Brief with the JHB on or about March 1, 2021.

On or about March 16, 2021, JDC received the recommended decision of the JHB. The recommendation was an admonishment and a $1,000.00 fine. The decision reflected that two JHB members wanted a censure, with the reduced fine. FCJ Stotler dissented because in his opinion there was no clear and convincing evidence that FCJ Goldston violated any provision of the Code.[26] On or about March 23, 2021, Respondent Tarr filed her objections to the recommended decision which included a challenge to FCJ Stotler presiding over the case at the

---

[25] It is noted that Attorney Nason's original and subsequent corrective February 22, 2021 brief at page 2 third full paragraph is the first instance wherein it is claimed that "Respondent agreed to the admission of the violation of the Canons because the JIC took the position she had violated them; she respected that position. She believed from what she was told by discussion with the JIC that if she disputed the matter the JIC may seek her suspension from the bench."

Attorney Nason's March 1, 2021 Response Brief Page 4, paragraph 4 – "In this regard, the Respondent admits that she was ill prepared for the meeting with JIC counsel on July 22, 2020. The Respondent was told the meeting would be an interview. Respondent specifically asked if she needed an attorney and was told no. When the Respondent Judge Goldston arrived, she was put under oath, recorded, shown portions of various statutes, rules and cases for which she did not have time to research, and told she could be suspended from the bench. Proceeding with what she had believed was just an interview was a mistake. Other Courts of record should not suffer the ramifications of that mistake." Page 5, paragraph 1 – "Respondent Judge Goldston was shown a portion of the Westover case, which is cited in the respondent's initial brief. The portion suggested the view resulted in a reversal and was not permitted. In fact, a full reading of the Westover case leads to the conclusion that views are allowed.

[26] FCJ Stotler's dissenting opinion fails to address or reconcile FCJ Goldston's knowing, voluntary admission to violating thirteen separate rules of the Code of Judicial Conduct.

23

JHB level. Attorney Nason also filed an objection to the recommended decision. The matter is pending before the Supreme Court of Appeals and is set for Rule 19 oral argument on September 15, 2021.

FCJ Stotler's letter to the Chief Justice stated he found it disturbing the JDC does not apparently believe anyone, and especially a member of the JHB, has the right to question their actions. However, the record reflects that FCJ Stotler did question JDC as he begins his questions of Respondent Lanham by stating the "complaint in this matter disturbs me, and the applications of this case concern me about the precedence that's being established here." [Hearing Transcript at 16] He stated that "it appears that the JDC and the JIC have taken the position that Family Court and maybe Magistrate Court or Circuit Courts do not have the power to view." He questioned what authority JDC relied upon to determine that she didn't have the power to do what she did. Respondent Lanham replied by stating "that there is no statute, no rule, nothing that we could find that allows Judge Goldston to go and continue her court hearing at a participant's house." [Hearing Transcript 16 at line 16] FCJ Stotler questioned why that would not fall within the inherent authority of the Court. As FCJ Stotler's questions continued, Respondent Tarr replied "I am not sure why we're being questioned when all the parties agree to both the facts and the violations." [Hearing Transcript at 20]

FCJ Stotler stated in his letter to the Chief Justice of the Supreme Court that it was apparent to him that the JDC was of the opinion that they should "rubber stamp" what they had done. He further stated that "the mere fact that the parties have entered into an agreement in this matter in no way compels the JHB to accept their recommendation without question." He also stated that it was his understanding that the "JHB has the authority to accept, reject and modify any agreement the JIC would recommend to the Judicial Hearing Board."

24

It is noted that the applicable law regarding stipulations by parties states that "[s]tipulations or agreements made in open court by the parties in the trial of a case and acted upon are binding and a judgment founded thereon will not be reversed." Syl. Pt. 3, Matter of Starcher, 202 W.Va. 55, 501 S.E.2d 772(1998) *citing* Syllabus Point 1, Butler v. Smith's Transfer Corporation, 147 W.Va. 402, 128 S.E.2d 32 (1962). "In a disciplinary proceeding against a judge, in which the burden of proof is by clear and convincing evidence, where the parties enter into stipulations of fact, the facts so stipulated will be considered to have been proven as if the party bearing the burden of proof has produced clear and convincing evidence to prove the facts so stipulated." Syl. Pt. 4, Matter of Starcher, 202 W. Va. 55, 501 S.E.2d 772 (1998). The Court has noted that the same rule would apply to pre-trial stipulations. Matter of Starcher, 202 W. Va. 55, 61, 501 S.E.2d 772, 778 (1998). The facts and violations of the Code of Judicial Conduct were stipulated both by a pre-trial agreement and in open court in this case. Additionally, the evidence submitted in the record supports the stipulations made by the parties. The agreement executed by the parties as well as the applicable law make clear that the stipulations would be binding, but the JHB is not bound by the party recommendations as to the sanctions. Moreover, the Rules of Judicial Disciplinary Procedure make clear that the Judicial Hearing Board's responsibility[27] is to make a record and a recommendation for the Supreme Court's review. *See* Rule 4.8 of the Rules of Judicial Disciplinary Procedure Recommended Disposition by Board. The JHB can (and most certainly has) accepted, rejected, and modified recommendations as to

---

[27] During the January 15, 2021 hearing FCJ Stotler, while addressing Judge Lorensen, notes JIC's objection to FCJ Stotler's questions and says "well, I guess my question Mr. –Judge Lorenson, is, if that is true, and there's questions that need to be answered in regards to the process, who are those questions posed to then?" [Hearing Transcript at 23] Judge Lorensen responded "The Supreme Court. I mean, we make a recommendation of what think it ought to be based upon the allegations in the context of this specific complaint, and the Supreme Court – you know they – they're – not going to just rubberstamp what we do. They're going to give it an independent evaluation..." [Hearing Transcript at 23-24]

A0063803 - rlfc

sanctions that the parties have recommended in disciplinary matters.[28] It is well established law that the Supreme Court of Appeals of West Virginia will conduct an independent review of the record and is the final arbiter in all disciplinary matters. *See* In re Browning, 192 W.Va. 231, 452 S.E.2d 34 (1994) and Syl. Pt. 3, Committee on Legal Ethics v. Blair, 174 W.Va. 494, 327 S.E.2d 671 (1984).

During the course of these ODC investigations, Chief Counsel took the sworn statement of FCJ Goldston[29] who appeared pursuant to a confidential investigative subpoena,[30] with Attorney Nason, who represents her in the pending judicial disciplinary matter and Attorney Jennifer Tully, who represents FCJ Goldston in the federal action that was filed by Mr. Gibson.

FCJ Goldston testified that when the Youtube video outside of the Gibson home "hit the press" she contacted the press office for the Supreme Court to confirm that she could not comment and was advised she (Goldston) should self-report to Respondent Tarr. [Goldston Statement at 53] FCJ Goldston said she called Respondent Tarr who advised she was filing a complaint against her.[31] FCJ Goldston testified that Respondent Tarr[32] told her that "if you

---

[28] The parties' rights to consent or object to the recommended disposition of the JHB are delineated in Rules 4.10 and 4.11 of the Rules of Judicial Disciplinary Procedure.

[29] FCJ Stotler's letter stated in order to "verify and substantiate" the allegations, he "highly recommend[ed] and request[ed]" that FCJ Goldston be interviewed.

[30] Despite conferring with two attorneys about her judicial ethics case, FCJ Goldston claims she believed she was effectively muzzled by JDC during her investigation. However, it is noted that FCJ Goldston testified she spoke to the Director of the Division of Court Services about the sworn statement she was subpoenaed to give in the instant confidential ethics investigations. She stated the conversation took place prior to reviewing the language in the subpoena.

[31] Respondent Tarr confirmed speaking with FCJ Goldston and advised her that she could not provide her with ethical advice because a complaint had been opened, but she stated she recalled suggesting to FCJ Goldston not to engage in any additional home views until the issues had been resolved.

[32] Respondent Tarr testified that she often cautions judicial officers to be truthful in their statements. Although she had no specific recollection of this conversation, it is not improper for Respondent Tarr to remind judicial officers of potential pitfalls of being less than candid in sworn statements. The Massie Statement of Charges filed by the JIC in October of 2019, dealt with, amongst other allegations, statements to JDC that were lacking in candor. Magistrate Massie resigned from the bench in March of 2020. *See* Matter of The Honorable Stephen D. Massie, Supreme Court No. 19-0915.

26

cooperate, you'll probably get away with an admonishment but if you act like your cohort in Beckley[33] and try to cover things up, it'll get bad." [Goldston Statement at 54]. FCJ Goldston testified that she did not speak to an attorney prior to filing the written response to the disciplinary complaint because she was "told [she] didn't need to" by Respondent Tarr.[34] FCJ Goldston could not recall dates or times, but testified she asked her [Respondent Tarr] on several occasions "when do I need to get an attorney" and she stated Respondent Tarr replied she did not need an attorney unless an agreement could not be worked out. [Goldston Statement at 56-58 and 61-62]. FCJ Goldston testified that her overall conversations were "almost equal" between Respondent Tarr and Respondent Lanham, but prior to her statement they were primarily with Respondent Tarr.[35] [Goldston Statement at 60 and 66].

FCJ Goldston testified that when she came to her sworn statement with JDC she was unaware she would be sworn, and was not told she was coming to give a statement, but thought she was coming to be interviewed. [Goldston Statement at 66]. FCJ Goldston testified that prior to giving her sworn statement that she spoke to, but did not retain Attorney David Kersey. [Goldston Statement at 70] FCJ Goldston testified that she was told by Respondent Tarr and Respondent Lanham that she "couldn't talk to anybody else" that it was "confidential" until the

---

[33] FCJ Goldston explained she interpreted that to be in reference to former Magistrate Massie who was the subject of discipline and resigned. There is only one reference to Magistrate Massie during FCJ Goldston's July 22, 2020 sworn statement before JDC wherein Respondent Lanham asked if FCJ Goldston was familiar with the facts of the case. Specifically, he inquired if she thought if Magistrate Massie showed up at a crime scene that he could make himself a witness in the proceeding and if she thought the conduct was improper. FCJ Goldston stated she didn't know much about the case, but later stated that she thought it was a different situation. [Goldston JDC Statement 43-45]. See Matter of The Honorable Stephen D. Massie, Supreme Court No. 19-0915.
[34] It is noted that FCJ Goldston's March 25, 2020 email to Respondent Tarr referenced that she had spoken to Senior Status Judge Hrko about the matter, and that she was aware that Senior Status Hrko had spoken with Respondent Tarr.
[35] Respondent Tarr testified that she did not recall speaking with FCJ Goldston on more than three occasions and that Respondent Lanham was the person who primarily spoke with her. The emails between the parties also support that the majority of the communications were between FCJ Goldston and Respondent Lanham.

27

statement of charges was filed and that "nobody could talk about it at all."[36] [Goldston Statement at 70] FCJ Goldston testified that she was "surprised" [Goldston Statement at 73] that she sworn in, but did not object, and agreed that the statement remained primarily focused on the Gibson matter. [Goldston Statement at 75] FCJ Goldston characterized the demeanor of Respondent Tarr and Respondent Lanham as "polite" "nice" but "misleading." [Goldston Statement at 77].

Specifically, FCJ Goldston testified to ODC:

[Respondent Lanham] showed me one statement highlighted in a case that said 'There is no statutory authority for judicial view." That's all he showed me of that case. And he said, "were you aware of that?" And, I said, "No, but I can tell you that as a lawyer, I have been on judicial views.

That's not the holding of the case. The holding of that case, I learned later is that the Court found that the judicial view was improper because it was done ex parte, and they specifically found they were not speaking on whether or not judicial views were allowable.

.....

I find that to be misleading. Then Ms. Tarr handed me a statute regarding my contempt powers. I read it. And she said, "Do you see anything in this statute that allows you to do what you can do?" And it did not.

But there are two other statutes that she did not show me, that she did not reference. One of which specifically allows—gives me the power to seize items. And I found that to be misleading.

[Goldston Statement at 77-78]

As it was one of her raised defenses/justifications to permit the home view in Gibson, there was a discussion and reference to the jury view statute during the July 22, 2020 sworn statement. Additionally, there is only one reference to the <u>Westover</u> case during FCJ Goldston's July 22, 2020 sworn statement with JDC.

---

[36] FCJ Goldston had already consulted with two attorneys about the matter, and she testified that JDC did not tell her she couldn't speak with an attorney. [Goldston Statement at 71] FCJ Goldston testified to JDC at her July 22, 2020 sworn statement that she had spoken with her family about the investigation. [Goldston JDC Statement at 113]. Moreover, the restrictions set forth in Rule 2.4 of the Rules of Judicial Disciplinary Procedure Confidentiality binds JDC and the judicial officer is the holder of the confidentiality privilege.

**BY MR. LANHAM:**

**Q.**     I'm going to hand you a copy of the West Virginia Code Chapter 56, Article 6, Section 17, and ask if you could read that, please, out loud.

**A.**     "The jury may in any case at the request of either party be taken to view the premises or place in question or any property, matter or thing relating to the controversy between the parties when it shall appear to the Court that such view is necessary to a just decision. And it such case, the judge presiding at the trial may go with the jury and control the proceedings. And in a felony case, the judge and the clerk shall go with the jury and the jury shall control the proceedings"—and the judge, sorry—"and the accused shall, likewise, be taken with the jury or under recognizance shall attend the view and his recognizance shall be construed to require such attendance. The party making the motion in the civil case shall advance a sum sufficient to defray the expenses of the jury and the officers who attend them in taking the view, which expenses shall be afterwards taxed like other legal costs."

**Q.**     Is it your testimony that – hold onto that for one minute.

**A.**     Okay. Sure. Sorry.

**Q.**     That's okay. It is your testimony that that's the code section that you were following to give you the authority to go view the scene; is that accurate?

**A.**     Yes, but I'll – I mean I'm not going—I'm not sure I ever read that to go by[37]. In my mind, that was the authority that I thought I had.

**Q.**     In the case law—

**A.**     And, again, as in my response, if I don't, I don't. I'm sorry. I won't do it again.

**Q.**     In the case law underneath it, I put a Post-It note by it, there's a *Westover Volunteer Fire Department versus Barker* case.

**A.**     Uh-huh.

**Q.**     Can you read what that says?

**A.**     "There is no statutory authority for a trial judge trying a case in lieu of a jury to take a view." I was not aware of that case, but I can tell you when I was practicing law, I was trying a horrible case over whether or not repairs to a roof were done correctly, and I asked the judge to go and look and he did. And he was mad.

[Goldston JDC Statement 33-35].

As it was a raised defense/justification in her March 18, 2020 written response to the

---

[37] Respondent Lanham testified that it was his intent to fully demonstrate that she had not previously read the statute that she was now arguing gave her the authority to do the home views. She acknowledged on the record that she had not reviewed the statute or the annotations.

A0063803 - rlfc

judicial ethics complaint,[38] there was a discussion about contempt statutes at the July 22, 2020

sworn statement. The following excerpts are from FCJ Goldston's July 22, 2020 sworn statement

before JDC wherein there are references and discussions regarding statutory authority:

**BY MR. LANHAM**

(WHEREUPON, EXHIBIT NUMBER 5

WAS MARKED FOR IDENTIFICATION)

**Q.**     I'm going to hand you what's been marked as Exhibit Number 5. If you could take a moment and read that to yourself.

**A.**     Sure. Okay.

**Q.**     Exhibit Number 5 is a copy of the West Virginia Code Chapter 48, Article 1, Section 304, titled "Proceedings in Contempt." Have you read all of Exhibit 5?

**A.**     Yeah. Yea. I've skimmed it, but yeah, I'm familiar with it.

**Q.**     Is there anything in that section that would give you the power to go to a home visit, as you did in the Gibson matter."

**A.**     I don't see anything that would.

[Goldston JDC Statement at 60]

**BY MR. LANHAM**

(WHEREUPON, EXHIBIT NUMBER 6

WAS MARKED FOR IDENTIFICATION.)

**Q.**     I'll hand you what's been marked Exhibit Number 6. If you could read that to yourself.

**A.**     Okay.

**Q.**     Have you read Exhibit Number 6?

**A.**     I have.

---

[38] Specifically, her March 18, 2020 response says "Not having been aware of the Aboulhosn opinion, I believed that my conduct was allowed under the authority of my contempt power and requirement to ensure that orders are complied with. I believe I have the authority under my contempt powers to aid in effecting the safe and undamaged transfer of equitable distribution." This written response was admitted into evidence in the disciplinary hearing as Joint Exhibit 4.

30

**Q.**    Exhibit Number 6 is a copy of the West Virginia Code, Chapter 51, Article 2(a), Section 9, "Contempt Powers of a Family Court Judge". Do you see anything in that section that would give you the power to go to Mr. Gibson's house?

**A.**    I would say that sanction – in paragraph "B", the next-to-last sentence, "Sanctions may be but are not limited to seizure, impoundment of property to secure compliance with the prior order."

And I'm not—I don't say that that directly says that I can do it, but I –

**Q.**    Would you agree with me that earlier in that same paragraph, it says, "Sanctions must give the contemptor an opportunity to purge himself or herself"?

**A.**    Yes.

**Q.**    How is going to Mr. Gibson's house give him a chance to purge himself? Well first of all, did you even find him in contempt?

**A.**    No.

[Goldston JDC Statement 60-61]

**BY MR. LANHAM**

(WHEREUPON, EXHIBIT NUMBER 7

WAS MARKED FOR IDENTIFICATION.)

**Q.**    I'll show you what's been marked as Exhibit Number 7. If you could read that to yourself.

...

[Golston JDC Statement 62]

Respondent Tarr interrupts Respondent Lanham to inquire additionally about the prior

referenced statute, specifically whether FCJ Goldston gave Gibson the opportunity to purge

himself of the contempt. [Goldston JDC Statement 62-65].

**BY MR. LANHAM**

**Q.**    Exhibit Number 7 is the West Virginia Code, copy of the West Virginia Code, Chapter 61, Article 5, Section 25. Did you see – or the title of it is "Contempt of Court, what constitutes contempt, jury trial and presence of defendant". Did you see anything in that section that would give you the authority to go to the Gibson residence?

**A.**    Before I went, no.

31

**Q.**     I'm sorry, before?

**A.**     Before I went, no. When I got there and there was the discussion that was had, yes.

**Q.**     Okay. Can you explain that to me?

. . . .

[Goldston JDC Statement 65-66].

Although FCJ Goldston testified that Respondent Lanham called her after the JIC meeting and told her that the JIC[39] wanted her suspended, Respondent Lanham denied this allegation and had no recollection of the JIC or JDC expressing any intent to seek her suspension. She agreed that she had an opportunity to review the charges before they were filed [Goldston Statement 89-90] and that Respondent Lanham was willing to allow her to have input the factual findings. [Goldston Statement 91]. FCJ Goldston also testified that Respondent Tarr later called her and tried to "strongarm" her into accepting an agreement[40] right before she retained counsel. [Goldston Statement at 94]. She stated she told Respondent Tarr that she could not agree to violations that could subject her to civil suit. [Goldston Statement 96]. She further alleged that Respondent Tarr said "it's hard for me to strongarm you, but if you don't agree to this, we're going to file charges and we're going to seek suspension[41]." [Goldston Statement 96] FCJ Goldston testified that near the end of the conversation she advised Respondent Tarr that she had spoken with Attorney Nason. She stated that Respondent Tarr was "terse" and stated "well,

---

[39] The Rules of Judicial Disciplinary Procedure provide that once probable cause is found and the Statement of Charges is filed with the Court, the JIC has no role before the Judicial Hearing Board. *See* Section II - Rules 3 - 4.13 of the Rules of Judicial Disciplinary Procedure.

[40] The facts alleged in the Statement of Charges were reviewed and agreed to by FCJ Goldston prior to the filing and were easily established by the record.

[41] Respondent Tarr denied this conversation. Even if this conversation did take place, advising a judicial officer of the possibility of seeking a harsher sanction is not a violation of the Rules of Professional Conduct. It is very common in plea and settlement negotiations to advise of the range of possible sanctions available and that to which the attorney is willing to accept and/or seek.

32

you understand if you employ counsel,[42] I can't talk to you anymore?" [Goldston Statement at 103] FCJ Goldston then retained Attorney Nason [Goldston Statement at 104] and FJC Goldston testified that she entered the agreement voluntarily after having an opportunity to review it. [Goldston Statement at 106].

Chief Counsel further inquired of FCJ Goldston, and confirmed that she understood she did not have to admit to or agree to anything [Goldston Statement at 133]; that she understood that JDC bears the burden of proof in judicial disciplinary cases and they would have to prove everything that wasn't admitted; and that the burden was that of clear and convincing evidence before the Judicial Hearing Board. [Goldston Statement at 134] When pressed further, FCJ Goldston tried to explain that despite being aware of the above facts and having counsel, it was still intimidating because of the "culture..it's the way we're taught at our seminars."[43] To illustrate her point the "culture" of "unsurety," FCJ Goldston made reference to conflict with JIC advisory opinions and directives from the Supreme Court [Goldston Statement at 137].[44]

---

[42] *See* Rule 4.2 of the Rules of Professional Conduct.

[43] Based upon this allegation, Chief Counsel reviewed the power point presentations and watched videos of the presentations given to the Family Court Judges by Respondents Tarr and Lanham in 2017 and 2019. The presentations are discussions of hypotheticals, answers, and explanations of the answers by way of reference to Advisory Opinions and caselaw. JDC's rapport with the Family Court Judges is professional, but friendly as evidenced by laughter in the room and the freedom of the audience to inquire of JDC during the presentations. Chief Counsel confirmed with Judicial Education that because of COVID there were no known presentations given by JDC to the Family Court Judges in 2020. To date, there are no known presentations given by JDC to the Family Court Judges in 2021.

Chief Counsel inquired of the current Chair of the JIC who advised that he had observed both Respondent Tarr and Respondent Lanham during teaching sessions before the Circuit Court Judges and the Magistrates and the sessions were extremely informative, entertaining, interactive, and well received by members of the judiciary.

Chief Counsel also inquired of the former Chair of the JIC who served for fifteen years, 10 years as Chair of the JIC that he could speak volumes about Respondent Tarr and Respondent Lanham's ability and character from years of experience with the two attorneys. He did not recall ever receiving any complaints regarding Respondent Tarr or Respondent Lanham's behavior while teaching members of the judiciary. He stated at no time did either Respondent misrepresent the law or attempt to deceive members of the judiciary.

[44] Rule 2.16(d) of the Rules of Judicial Disciplinary Procedure states "An advisory opinion is not binding on the Judicial Hearing Board or the Court, but shall be admissible in any subsequent disciplinary proceeding involving the requesting judge."

33

FCJ Goldston testified that after the Statement of Charges was issued she recalled speaking with FCJ Rock and FCJ Greenberg about her case and she stated they aided her with research for the brief. [Goldston Statement at 123]. When questioned about the allegations made in the March 2021 letter from Judge Stotler, FCJ Goldston testified that she received a copy of Judge Stotler's letter, but testified that Judge Stotler did not contact her before sending the letter and that prior to Chief Counsel nobody had asked her questions about her interactions with Respondent Tarr or Respondent Lanham. [Goldston Statement at 131] When specifically asked by Chief Counsel that "...so no one else has had a discussion with you about your interactions with Mr. Lanham or Ms. Tarr." FCJ Goldston replied "no." [Goldston Statement at 132] When questioned by Chief Counsel the basis for which the allegations that he makes against Respondent Lanham and Respondent Tarr without speaking to her, FCJ Goldston testified that "they're in the brief that was filed," [45] [Goldston Statement at 131] and later testified that she had not spoken or communicated with FCJ Stotler since the last seminar they both attended. [Goldston Statement at 151].

---

[45] FCJ Stotler's letter is dated March 25, 2021. The pleadings filed by Attorney Nason on FCJ Goldston's behalf include: Response to the Judicial Hearing Board Questions filed February 12, 2021, Corrected Response to the Judicial Hearing Board Questions filed on February 22, 2021, which at page 2 third full paragraph claims that "Respondent agreed to the admission of the violation of the Canons because the JIC took the position she had violated them; she respected that position. She believed from what she was told by discussion with the JIC that if she disputed the matter the JIC may seek her suspension from the bench." Attorney Nason's March 1, 2021 Response Brief Page 4, paragraph 4 claimed "[i]n this regard, the Respondent admits that she was ill prepared for the meeting with JIC counsel on July 22, 2020. The Respondent was told the meeting would be an interview. Respondent specifically asked if she needed an attorney and was told no. When the Respondent Judge Goldston arrived, she was put under oath, recorded, shown portions of various statutes, rules and cases for which she did not have time to research, and told she could be suspended from the bench. Proceeding with what she had believed was just an interview was a mistake. Other Courts of record should not suffer the ramifications of that mistake." Page 5, paragraph 1 claimed "Respondent Judge Goldston was shown a portion of the Westover case, which is cited in the respondent's initial brief. The portion suggested the view resulted in a reversal and was not permitted. In fact, a full reading of the Westover case leads to the conclusion that views are allowed."

A0063803 - rlfc

**SHUCK MATTER**

The second referenced case in the Stotler letter is the case which involved Family Court Judge Eric B. Shuck, Complaint No. 56-2020. Pursuant to its authority in Rule 2.2 of the Rules of Judicial Disciplinary Procedure, on June 16, 2020, Judicial Disciplinary Counsel opened Complaint No. 56-2020 on FCJ Shuck. This complaint was opened by Judicial Disciplinary Counsel on or about June 16, 2020, after receiving information during the investigation of FCJ Goldston that FCJ Shuck was also conducting home views.

By email dated July 1, 2020, at 9:49 a.m., Respondent Lanham advised FCJ Shuck that a letter requesting a response to JIC Complaint 56-2020 was attached to the email. Respondent Lanham advised FCJ Shuck that pursuant to the Rules of Judicial Disciplinary Procedure, a response was required within 10 days of receipt. Respondent Lanham requested that FCJ Shuck contact him if he had any questions, needed any help or needed an extension on time. The email is addressed to "Judge Shuck" and is signed "—Brian Deputy Counsel, JIC" The July 1, 2020 email and attached July 1, 2020 complaint letter on JIC letterhead complied with written notice of the complaint to the Judge as required by the Rules of Judicial Disciplinary Procedure.

By email dated July 2, 2020, at 5:33 p.m., FCJ Shuck advised Respondent Lanham to confirm receipt of the email and attachment. He stated he intended to file a response within 10 days. The email is addressed to "Mr. Lanham" and is signed "Eric". By email dated July 8, 2020, FCJ Shuck advised Respondent Lanham that his response was placed in the mail today. The email is addressed to "Mr. Lanham" and is signed "Eric". By email dated July 9, 2020, Respondent Lanham responded "thank you for the heads up" and is signed "-brian. Sent from my iPhone" FCJ Shuck filed a timely response on July 8, 2020. His written response references Judicial Investigation Commission Complaint No. 56-2020 and stated "[p]lease allow this to

serve as my written response to the Complaint filed on June 16, 2020, by the Judicial Disciplinary Counsel."

His answer stated that he conducted "home visits" to litigants' homes on two occasions, on September 18, 2019, and November 6, 2019. On or about September 18, 2019, a hearing was held in Case No. 19-D-191, wherein the attorney for the wife, Kyle Lusk, had previously filed Petition for Contempt and requested a visit to his client's home to determine if assets previously awarded to her were present at the home. FCJ Shuck asserted that the home and the assets were "under the jurisdiction of the Court" and there was no objection to the home visit by the husband's counsel, James Keenan. FCJ Shuck stated that those present at the home visit were himself, his bailiff, both parties, and their counsel. FCJ Shuck included an audio/video recording of the hearing.

In Case No. 15-D-452, a hearing was held on or about November 6, 2019. The wife's attorney, Todd Kirby, requested a visit to the marital home to determine that property previously awarded to his client was still present at the home. FCJ Shuck again asserted that the home and the assets were "still under the jurisdiction of the Court" and that there were no objections from the husband's counsel, Timothy Lafon. FCJ Shuck stated that those present at the home visit were himself, his bailiff, the husband, and counsel for both parties. FCJ Shuck stated the wife traveled to the home, but remained outside in her car during the view. FCJ Shuck provided an audio/video recording of the November 6, 2019 hearing and an audio recording of the home visit.

At some point in the investigation, it was determined that a sworn statement was necessary and Respondent Lanham contacted FCJ Shuck to arrange for the same. Respondent Tarr testified that it was customary to permit judges to voluntarily submit to a sworn statement

rather to issue a subpoena compelling attendance. Respondent Tarr testified that unless the allegations were as a result of extraordinary complaint filed by the Administrative Director that this professional courtesy was extended to the judicial officers so as to not interfere with their dockets and to allow the judicial officers to demonstrate cooperation in the disciplinary proceedings.

The evidence reflects that the sworn statement was arranged and scheduled directly with FCJ Shuck by Respondent Lanham. By email dated July 20, 2020, at 11:24 a.m., Respondent Lanham stated "We would like for you to come up and give a statement concerning your complaint. Would you be available during the last week of July?"  The email is addressed to "Judge Shuck" and signed "—brian" On the same date, by email at 3:55 p.m., FCJ Shuck advised of his upcoming hearing schedule and indicated that he had hearings scheduled every work day until August 7th, but was available on Friday, July 24, 2020.  The email is addressed to "Mr. Lanham" and signed "Eric." On the same date at 4:05 p.m., Respondent Lanham advised they would make Friday the 24th work if it was still open and asked if he would be available at 9am. The email is addressed "Judge" and signed "—brian" FCJ Shuck advised by email at 4:25 p.m. that date and time were fine to which Respondent Lanham responded that it sounded good and would let everyone "here" know and thanked him.

On or about July 24, 2020, FCJ Shuck provided a sworn statement to Judicial Disciplinary Counsel. The sworn statement was voluntary and agreed to by FCJ Shuck and arranged around his schedule. As it was not lawfully compelled, but as judges are required to respond to and cooperate in ethics inquiries, JDC could have easily compelled his appearance at the sworn statement by investigative subpoena, taking no regard for FCJ Shuck's docket or personal schedule. Moreover, allowing FCJ Shuck to voluntarily submit to the sworn statement

37

afforded him the benefit of evidence of cooperation in the judicial disciplinary case. Although the time between the filing of the complaint and the sworn statement is twenty-three days, FCJ Shuck had time to confer with counsel[46] if he so chose.

A review of the 1:48:43 audio file of FCJ Shuck's sworn statement and the transcript was conducted by Chief Counsel. The transcript reflected that FCJ Shuck's sworn statement occurred on July 24, 2020, regarding complaints No. 56-2020. Respondent Tarr, Respondent Lanham, the JIC Investigator and the JIC Executive Assistant were present for all or at least a portion of the sworn statement. FCJ Shuck was duly sworn on the record by the JIC Executive Assistant, a notary.[47] The transcript stated "WHEREUPON, THE HONORABLE ERIC SHUCK WAS CALLED AS A WITNESS, DULY SWORN AND TESTIFIED AS FOLLOWS". [FCJ Shuck JDC Transcript at 4]

FCJ Shuck testified that he was elected as the Raleigh County Family Court Judge on or about May 10, 2016, and assumed office in January 2017[48] FCJ Shuck did not have prior family law experience [FCJ Shuck JDC Transcript at 6] as prior to becoming a family court judge, he worked in the Raleigh County Public Defender's office for nearly fifteen (15) years following his graduation from law school.[49] [FCJ Shuck JDC Transcript at 4-5]

---

[46] FCJ Stotler's letter alleged that when judges inquire whether they should have an attorney to represent them, they are advised they do not need an attorney. Judicial disciplinary proceedings are not criminal in nature. Judicial Disciplinary Counsel is under no obligation to assess whether members of the judiciary should have counsel. As attorney fees can be awarded in formal cases when a judge prevails, it likely is not prudent for counsel to express any opinion regarding the same. *See* Rule 4.13 of the Rules of Judicial Disciplinary Procedure Attorney Fees upon Dismissal. Additionally, FCJ Shuck's testimony did not indicate he inquired of JDC if he needed to retain an attorney or that he was discouraged by JDC in obtaining counsel.

[47] *See* footnote 12 infra.

[48] FCJ Shuck has never been disciplined by the JIC or the Supreme Court of Appeals as a judicial officer.

[49] FCJ Shuck became a member of the West Virginia State Bar on September 24, 2002. He has never been disciplined by the Lawyer Disciplinary Board or the Supreme Court of Appeals as a lawyer.

A0063803 - rlfc

FCJ Shuck asserted that in the two cases wherein he conducted the home visits there were difficult litigants and further asserted that he was enforcing previous orders in which the parties were accused of contempt of a court order. [FCJ Shuck JDC Transcript at 10 and 15] Respondent Lanham inquired as to what statute, rule or case law he was relying on that gave him the authority to go to the home. [FCJ Shuck JDC Transcript at 16] FCJ Shuck stated he felt that the home visits were akin to a "jury view." [FCJ Shuck JDC Transcript at 16] The record reflects that Respondent Lanham handed FCJ Shuck W.V. Code Chapter 56, Article 6, Section 17 the code section captioned "jury view." Respondent Lanham asked FCJ Shuck to read the jury view statute to himself and suggested that FCJ Shuck "take [his] time." [FCJ Shuck JDC Transcript at 17].

FCJ Shuck candidly replied to Respondent Lanham that he "didn't look up the code before [he] went, so [he] [was] not going to say that, you know, I looked it up and this was the code that I relied on." [FCJ Shuck JDC Transcript at 18].  FCJ Shuck reasserted that there were no objections to the home visits he conducted and that all parties were represented by counsel. He further stated that, had there been an objection, he would have explored the issue further. [FCJ Shuck JDC Transcript at 18] When asked by Respondent Lanham now that he "thought about it more" what was his "opinion legally," FCJ Shuck replied if "there's anything improper" that it would have been potentially having a hearing outside of the record, as there was no court reporter present at the home visits to make an official record. [FCJ Shuck JDC Transcript at 20] The record reflects that Respondent Tarr briefly inquired further of FCJ Shuck's prior statements [FCJ Shuck JDC Transcript 20 line 15 through 24 line 1], but at the 26:16 mark of the statement Respondent Lanham resumes his questions and returns his inquiry to the jury view statute and requests FCJ Shuck to review a case cited as an annotation to the statute, specifically, Westover

39

Volunteer Fire Dept v. Barker, 142 W.Va. 404, 955 S.E2d 807 (1956). FCJ Shuck reads the annotation "by trying the case in lieu of jury, there's no statutory authority for a trial judge trying a case in lieu of a jury to take a view." Again, FCJ Shuck candidly replied that he was not familiar with the case. Again, despite the allegations in Stotler's letter, Respondent Lanham does not characterize the Westover case, but instead asks him "based on that, do you think you had the authority to go out under that chapter, article and section of the Code." FCJ Shuck stated if he "only read that very small little annotation, then [he] would say no." [FCJ Shuck JDC Transcript 24-25] This is the only reference made by either party to the Westover case in FCJ Shuck's sworn statement.

FCJ Shuck acknowledged that the lack of a court recording of the home visit could potentially make him a witness in the matter. [FCJ Shuck JDC Transcript at 50] FCJ Shuck later noted that he had recorded one of the home visits with a hand-held recording he used for dictation. [FCJ Shuck JDC Transcript at 69] He explained he thought it was a good practice to take it, so that if there was a dispute, he had a recording of what took place." [FCJ Shuck JDC Transcript at 70]

Upon questioning by Respondent Lanham about the lawyer's response to opposing counsel's request for a home view in the second referenced case, FCJ Shuck testified "I'd have to look. I'm sorry. I'm obviously nervous during these things, so your memory- my memory is starting to get a little foggy." To which Respondent Lanham replied "Take your time. You're fine." FCJ Shuck further explained:

> I don't want to misstate anything. I should've watched those last night. I didn't realize that I need- that I would need to be specific. I mean I guess because I provided the hearings—I can't recall. I mean I know when I watched it on that Sunday before I prepared my response, it, to me, confirmed what I thought that there was no opposition to it."

40

Respondent Lanham then attempts to refresh FCJ Shuck's memory as to the details with regard to Attorney LaFon's response to the motion for the home view to which FCJ Shuck replies "Yeah. I do recall that. I do recall that." [FCJ Shuck JDC Transcript at 56-57]

Again, despite the Stotler letter allegations, Judicial Disciplinary Counsel complied with the notice requirements as set forth in the Rules and advised FCJ Shuck of the existence of the ethics complaint. There is no credible evidence to support the allegation in the Stotler letter that FCJ Shuck had "no idea" and was given no opportunity to be prepared to address the issues. The scope of the sworn statement was consistent with the complaint that FCJ Shuck had been provided and was given an opportunity to and did respond to the complaint in writing. The authority, statutory or otherwise,[50] and relevant facts in the cases that were discussed in the sworn statement was consistent with the raised defenses to the alleged misconduct, e.g. jury view, contempt proceedings, and consent by the parties.

Pursuant to Rule 2.6 of the Rules of Judicial Disciplinary Procedure, Counsel presented Complaint No. 56-2020, FCJ Shuck's written response, and the transcript of FCJ Shuck's sworn statement at its August 21, 2020 meeting. Respondent Tarr testified during her sworn statement that it was customary procedure to upload all of the investigation documents to the JIC's secure server for the members review to and confirmed that practice was followed at this meeting. After a thorough review of all evidence, on or about August 25, 2020, the Judicial Investigation

---

[50] When questioned by Respondent Lanham if FCJ Shuck had ever inquired about the authority to conduct home visits from any other judicial officer or court personnel, FCJ Shuck stated that he had learned of the home visits from FCJ Goldston and other attorneys who had appeared in both of their family courts. However, FCJ Shuck stated FCJ Goldston did not specifically tell him to conduct home visits. [FCJ Shuck JDC Transcript at 72-73]. It is further noted that FCJ Shuck is the most junior, both in age and seniority, of the three family court judges in his family court circuit. [FCJ Shuck Statement at 6]

41

Commission found probable cause existed and pursuant to Rule 2.7(c) issued an Admonishment to FCJ Shuck regarding his conduct.

FCJ Shuck was admonished by the JIC for violations of Rules 1.1; 1.2; 1.3; and 2.5(a) of the Code of Judicial Conduct. The JIC noted that formal discipline was not essential as FCJ Shuck had no prior discipline, and he had been "led astray, in part, by another colleague's actions." [Admonishment at 3] The JIC stated that such home visits were not authorized by any statute, rule or case law and that they were "ill-advised and inappropriate." [Admonishment at 4] The JIC further stated:

> The burden of proof in a contempt proceeding rests with the moving party. In other words, it is the moving party's responsibility to provide evidence in support of their contention that the other side has failed to produce the items in question. When a judge goes to a scene to gather evidence, he/she places himself/herself in the stead of the moving party and ceases to serve as the factfinder. More importantly, when a judge goes to a home to help enforce a prior court order, he abrogates his responsibility as a judge in favor of some nonexistent role in the executive branch.

[Admonishment at 4]

By email dated August 26, 2020, Respondent Tarr sent FCJ Shuck the Admonishment from the JIC, and indicated her assistant would mail a copy on Friday. On the same date, FCJ Shuck acknowledged receipt and thanked her for advising him of the outcome in advance. While advised of the right to object within fourteen days after its receipt pursuant to Rule 2.7(c) of the Rules of Judicial Disciplinary Procedure, FCJ Shuck did not object to the Admonishment.

During the course of these ODC investigations, Chief Counsel took the sworn statement of FCJ Shuck[51] and he appeared pursuant to a confidential investigative subpoena. FCJ Shuck testified that he received an email dated July 1, 2020, from Respondent Lanham, requesting a

---

[51] FCJ Stotler's letter also stated in order to "verify and substantiate" the allegations, he "highly recommend[ed] and request[ed]" that FCJ Shuck be interviewed.

response to the attached letter within 10 days and Respondent Lanham indicated if he needed an extension or had questions, please contact him. [FCJ Shuck Statement at 43]. FCJ Shuck stated he contemplated sending JDC an email inquiring if there had been a "written complaint or who filed it... but I did look at their rules and I saw that it said they could open a complaint." [FCJ Shuck Statement at 48]. FCJ Shuck stated he filed a written response, and then "they wanted me to come down and give a **sworn statement**, so—" [FCJ Shuck Statement at 46] (emphasis added). He stated that he primarily dealt with Respondent Lanham who was "very personable" "very how you doing" "signs his name with Brian, so I felt comfortable that this was more of a just go down, say basically say in person **under oath** what I had ...said and that was going to be the end..." [FCJ Shuck Statement at 46-47] (emphasis added)[52]

FCJ Schuck testified that prior to filing a response to the complaint, he did not talk to an attorney because he did not feel he needed to as he did not think he had violated any rules.[53] [FCJ Shuck Statement at 48] FCJ Shuck testified that he called and spoke to Respondent Lanham prior to coming to the sworn statement and he was assured "it probably won't take an hour" and he stated that Respondent Lanham said "it really depends on how much you talk" [FCJ Shuck Statement at 51]. FCJ Shuck stated going into the sworn statement that he felt "comfortable" "a little nervous" but it did not "feel adversarial."

---

[52] Although Respondent Lanham's tone with FCJ Shuck was respectful, kind, and personable, FCJ Shuck's use of the terms "sworn statement" and "under oath" prior to going on the record do not support FCJ Stotler's allegations that JDC requests judges to appear at their office under the "disguise of just being a friendly interview and, once there, the judges are sworn in and interrogated."

[53] FCJ Shuck later testified that had he known JDC were going to interrogate him during the sworn statement, he would have brought counsel. [FCJ Shuck Statement at 59] When asked if he thought Respondent Tarr or Respondent Lanham violated the Rules of Professional Conduct, his response was "I can't say whether they actually violated the Rules of Professional Conduct. Do I think that what they did was appropriate with my case? No, I don't". [FCJ Shuck at 89] FCJ Shuck testified that had he been evasive, uncooperative, or alleged to have committed fraud then it would have been more appropriate to interrogate him that way. [FCJ Shuck at 90].

43

However, he testified that when he got there "and was placed under oath, it was a whole different ball game then." [FCJ Shuck Statement at 51]. FCJ Shuck stated it was like "an interrogation" that it was "intense" and "they were both asking questions." [FCJ Shuck Statement at 54] He further alleged that documents were being shown to him and despite his request, he was refused the chance to review anything and the documents were "jerked away." In fairness to FCJ Shuck, unlike FCJ Goldston he did not have a copy of his JDC statement before the sworn statement with ODC, and he is clear on the record that he did not "want to misstate something and then it be different there." [FCJ Shuck Statement at 56-57] However, the transcript of the July 24, 2020 statement does not support these allegations.

FCJ Shuck testified that "two and a half hours later, I left here feeling sick, head hurting."[54] FCJ Shuck testified that "I felt like it was intimidation" [FCJ Shuck Statement at 55].

FCJ Shuck testified that JDC mentioned Magistrate Massie before and during the sworn statement. Specifically, FCJ Shuck alleged that prior to going on the record that Respondent Tarr warned him "you don't want to be like Steve Massie. You need to cooperate with us, and you know you need to be honest." [FCJ Shuck Statement at 57] Respondent Tarr testified that she often cautions judicial officers to be truthful in their statements.[55] There is only one reference to Magistrate Massie during FCJ Shuck's July 24, 2020 sworn statement. Respondent Lanham asked if FCJ Shuck was familiar with the facts and prosecution of the case. Specifically, Respondent Lanham inquired if he was aware that Magistrate Massie was alleged to have shown

---

[54] The sworn statement by JDC was 1:48:43.

[55] This allegation is similar to FCJ Goldston's assertion that Respondent Tarr used the Massie case to threaten or intimidate her. It is not improper for Respondent Tarr to remind judicial officers of potential pitfalls of being less than candid in sworn statements. The Massie Statement of Charges filed by the JIC in October of 2019, dealt with, amongst other allegations, statements to JDC that were lacking in candor. Magistrate Massie resigned from the bench in March of 2020.

44

up at crime scene that he could make himself a witness in the proceeding and if the conduct "put up a red flag." [FCJ Shuck JDC Statement 86-87][56]

In relation to FCJ Stotler's allegation about misrepresenting the Westover case, FCJ Shuck testified that JDC "misrepresented what the case said. They said it said I couldn't go out and view or something or go do that. That's not what this case says."[57] [FCJ Shuck Statement at 59-60] In fairness to FCJ Shuck, unlike FCJ Goldston he did not have a copy of his sworn statement given to JDC to review prior to the statement before giving his sworn statement before ODC, however, the transcript of the July 24, 2020 statement does not support these allegations. See Supra at 37-38. As was the case in FCJ Goldston's case, the transcript is clear that Respondent Lanham made no representations about the Westover case, but simply made inquiry of FCJ Shuck if after actually reviewing the statute and a single annotation if he saw any authority that allowed him to conduct the view.

When questioned about the allegations made in the March 2021 letter from Judge Stotler, FCJ Shuck testified that he "had not seen that" letter[58] and while he knew he was referenced in the letter that "he was not consulted" and he confirmed that FCJ Stotler did not contact him before sending the letter, instead, he testified that FCJ Rock contacted him. [FCJ Shuck Statement at 78] FCJ Shuck testified he was upset that he wasn't asked before the Stotler letter was sent. He testified that he didn't "play a role in [the letter]" didn't "suggest" it and he "was [not] consulted about it." [FCJ Shuck Statement at 79] When questioned how the allegations

---

[56] This line of questioning is substantially similar to Respondent Lanham's questions to FCJ Goldston about the Massie case.

[57] Similar to his line of questioning in FCJ Goldston's sworn statement, Respondent Lanham testified that it was his intent to demonstrate that he had not previously read the statute that he was now arguing gave him the authority and he acknowledged the same on the record.

[58] FCJ Shuck took a recess so he could read the Stotler letter. After returning to the record, he testified that was the first time he read the Stotler letter. [FCJ Shuck Statement at 79-80]. He stated he was aware of it because FCJ Goldston mentioned the Stotler letter to him. [FCJ Shuck Statement 80]

about him ended up in the Stotler letter, FCJ Shuck testified that he "spoke to [FCJ] Deanna Rock, who had contacted me… and had asked me about my experience and I shared some of my experience, which was similar to this." [FCJ Shuck Statement at 85] He testified that his conversation with FCJ Rock about his experience was before the Stotler letter, but he denied that she told him she was going to put his statements in the letter. [FCJ Shuck Statement at 86]. FCJ Schuck testified that FCJ Rock said "we don't think this is improper that you go—that judges go out like this, otherwise judges would be nailed to the bench, basically, and never be able to even walk outside and look at a vehicle to see if it was worth, say, seizing the child support." [FCJ Shuck Statement at 86].

## DISCUSSION AND REASONS CLOSED

Rule 1 of the Rules of Judicial Disciplinary Procedure states in relevant part that the ethical conduct of judges is of the highest importance to the people of the State of West Virginia and to the legal profession. Every judge shall observe the highest standards of judicial conduct. In furtherance of this goal, the Supreme Court of Appeals does hereby establish a Judicial Investigation Commission to determine whether probable cause exists to formally charge a judge with a violation of the Code of Judicial Conduct promulgated by the Supreme Court of Appeals to govern the ethical conduct of judges or that a judge. Rule 1.11 of the Rules of Judicial Disciplinary Procedure provides that the Commission shall have the authority to (1) determine whether probable cause exists to formally charge a judge with a violation of the Code of Judicial Conduct; inform the public about the existence and operation of the judicial disciplinary system, the filing of formal charges, and the discipline imposed or recommended on formal charges; delegate, in its discretion, to the Chairperson or Vice-Chairperson, the authority to act for the

Commission on administrative and procedural matters; and engage in such other activities related to judicial discipline as it deems appropriate.

Rule 5 of the Rules of Judicial Disciplinary Procedure states in relevant part that the Supreme Court of Appeals established an Office of Disciplinary Counsel to prosecute violations of the Code of Judicial Conduct. Judicial Disciplinary Counsel shall be primarily responsible for the investigation of complaints of ethical violations by judges. Rule 5.4 of the Rules of Judicial Disciplinary Procedure provides in relevant part that Disciplinary Counsel shall perform all prosecutorial functions and have the authority to receive complaints concerning violations of the Code of Judicial Conduct and the Rules of Professional Conduct; review all complaints concerning violations of the Code of Judicial Conduct and the Rules of Professional Conduct; investigate information concerning violations of the Code of Judicial Conduct and the Rules of Professional Conduct; prosecute violations of the Code of Judicial Conduct and Rules of Professional Conduct before the Lawyer Disciplinary Board, the Judicial Investigation Commission, the Judicial Hearing Board, and the Supreme Court of Appeals; and undertake, pursuant to information provided by the Lawyer Disciplinary Board, Judicial Investigation Commission or the Supreme Court of Appeals, whatever investigations are deemed appropriate.

The current Chair of the JIC advised that until receipt of FCJ Stotler's March 2021 letter, he had never heard complaints of any nature pertaining to Respondent Tarr or Repondent Lanham by any member of the judiciary. He further stated that both Respondent Tarr and Respondent Lanham are a credit to the legal profession. He affirmed that since his time as Chair of the JIC, that Respondent Tarr and Respondent Lanham have consulted him in his capacity as Chair as to every action, and every action taken has been done with his approval and with the consent and approval of the other members of the JIC.

A0063803 - rlfc

The former Chair of the JIC stated he could speak to the abilities and character of Respondent Tarr and Respondent Lanham. He stated as attorneys representing the JIC they have exceedingly difficult jobs as they must not only know the judicial canons but act fearlessly in doing those things as required by their jobs as JDC. The former Chair of the JIC stated that FCJ Stotler's March 2021 letter demonstrates both an ignorance of the system and a willingness to respond to adverse decisions in an irresponsible manner. The former Chair further opined that the reckless letter required FCJ Stotler's removal from further service on the Judicial Hearing Board.

The operation of a fair and efficient court system depends on the quality and integrity of the Bench and the Bar. Systems of accountability, such as the judicial and lawyer disciplinary systems, are necessary to educate its member, to provide deterrence and consequences, and most importantly to protect the public and the rule of law. Lawyers owe one another and judges a duty of courtesy, candor, honesty, diligence, fairness and cooperation. Judges owe to all participants in a legal proceeding courtesy, attentiveness, respect, diligence, punctuality, protection against unjust and improper criticism or attack, and a dedication to the proper administration of the courts. [Preamble of the Standards of Professional Conduct.]

JDC has the unenviable job of prosecuting violations of the Code of Judicial Conduct. This is a position that is fraught with the possibility that some judicial officers are not pleased with the outcome. Respondent Tarr and Respondent Lanham must conduct thorough investigations and engage in diligent preparation for sworn statements in investigations wherein the integrity of a judicial officer is in question and the same is not a violation of the Rules of Professional Conduct. Indeed, the Rules of Professional Conduct provides that "[a] lawyer shall provide competent representation to a client. Competent representation requires the legal

48

knowledge, skill, thoroughness and preparation reasonably necessary for the representation. *See* Rule 1.1 Competence.

Despite JDC's compliance with the Rules of Judicial Disciplinary Procedure, FCJ Stotler's letter essentially alleged "trial by ambush" tactics by JDC. However, a judicial officer should be expected to adequately prepare, be familiar with the applicable rights and controlling procedural rules, and competently assess the significance of a proceeding wherein their own judicial integrity is questioned. Rule 2.5(A) of the Code of Judicial Conduct provides that "a judge shall perform judicial and administrative duties, competently and diligently." Comment [1] Competence is the performance of judicial duties requires the legal knowledge, skill thoroughness, and preparation reasonably necessary to perform a judge's responsibilities of judicial office. Additionally, Rule 2.16 of the Code requires a judge to cooperate and be candid and honest with judicial and lawyer disciplinary agencies. Cooperation with investigations and proceedings of judicial and lawyer discipline agencies, as required in paragraph (A), instills confidence in judges' commitment to the integrity of the judicial system and the protection of the public.

The evidence clearly demonstrates that Respondent Tarr and Respondent Lanham treated the FCJs with respect and professionalism. The evidence clearly demonstrated that both FCJ Goldston and FCJ Shuck were provided notice of the complaints and given an opportunity to respond in writing, prior to their sworn statements. Then, after due consideration was given to their schedules by JDC, they voluntarily attended and provided statements to JDC. It is disingenuous for a member of the judiciary to assert that they did not appreciate the significance of providing a statement to JDC, sworn or not. It is presumed that members of the Bar and members of the judiciary, as they are officers of the court, would provide the same testimony

under oath or not. FCJ Goldston now alleges that it was unfair to discuss the statutory and legal authority that she raised as a defense to her actions at her sworn statement. It is not unfair to expect a member of the judiciary to be able to read and discuss the law that pertains to the issues within the scope of the judicial ethics investigation—particularly when the law in question was raised as a defense by the judicial officer.

While after giving their sworn statements, the full weight of the seriousness of the allegations may have been felt by the FCJs, but such belated recognition does not equate to improper, much less, unethical behavior by Respondent Tarr and Respondent Lanham. The most compelling evidence of the fairness and transparency is evidenced by the fact that, after retaining counsel, FCJ Goldston immediately into an agreed disposition of the facts and conclusions of law. Moreover, no allegations of misconduct by either Respondent Tarr or Respondent Lanham were raised by FCJ Goldston at her January hearing. Respondent Tarr and Lanham answer to and appear before the JIC, which in large part, is comprised of judicial officers. As such, it is reasonable to believe that Respondents are aware of the high level of scrutiny their actions will be subjected. JDC is equally aware that when prosecuting violations of the Code of Judicial Conduct and seeking sanctions against a judicial officer before the Judicial Hearing Board (and ultimately the Supreme Court) their actions as counsel will be reviewed with the same level of scrutiny.

It is shocking that a long-standing member of the judiciary bestowed with the honor of being part of the system designed to protect and preserve the integrity of the judicial system would make such baseless accusations designed solely to impugn the integrity of two members of the West Virginia State Bar. It does not appear that FCJ Stotler conducted any factual investigation into the allegations regarding JDC before regurgitating the untimely, unsupported

allegations made by FCJ Goldston and sending an *ex parte* communication, written on his official court letterhead, to the Supreme Court. Additionally, the Judicial branch of government has the exclusive authority to regulate the practice of law in the State of West Virginia, but FCJ Stotler's letter was also sent to members of the Legislature. The Investigative Panel of the Lawyer Disciplinary Board directs Chief Counsel to provide this disposition to both the Chairperson of the Judicial Investigation Commission and the Administrative Director of the Supreme Court of Appeals.

The law is not an arena wherein we vilify civility, curse thorough preparation, and denigrate skilled, zealous advocacy. The Investigative Panel of the Lawyer Disciplinary Board finds no merit to the allegations made against Respondent Tarr and Respondent Lanham and orders these matters be closed.

**CLOSING ORDERED** on the 13th day of May, 2021, and **ENTERED** this 13th day of May, 2021.

Amy C. Crossan, Chairperson
Investigative Panel
Lawyer Disciplinary Board

A0063803 - rlfc