IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

MATTHEW GIBSON,

        Plaintiff,

vs.                                    Civil Action No. 5:21-cv-00181
                                       Honorable Frank W. Volk

LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision,
JEFF MCPEAKE, individually,
BRIAN WHITE, individually,
BOBBY STUMP, individually,

        Defendant.

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT LOUISE E. GOLDSTON

A.      JUDICIAL IMMUNITY

**1.      Defendant Goldston is ineligible for judicial immunity as a matter of law.**

The WVSCA opinion in <u>In the matter of Goldston</u>, No. 20-0742 (2021) operates to prohibit Defendant Goldston from the application of judicial immunity in defense of the same underlying facts. <u>Goldston</u> is a final adjudication on identical issues facts and law, censuring Defendant for an "egregious abuse of process."[1] Despite Defendant's refusal to describe her conduct as a "search," the WVSCA held otherwise, specifically holding that she performed a search of the Plaintiff's residence:

_____

[1] <u>Goldston</u> at 23.

> We begin with a threshold question: Did Judge Goldston view the ex-
> husband's home, or did she search it? We find that she searched it…. Accordingly, we
> find that Judge Goldston's actions at the residence were
> not a view.[2]

The Court rendered a final adjudication on Judge Goldston's argument that a West Virginia

family court judge possesses state-law authority to engage in her actions of March 4, 2020:

> Under our system of government, judges may not exercise executive powers . . . . In light
> of these clear prohibitions, we hold that the West Virginia Constitution forbids a judicial
> officer to participate in a search because a search is an exercise of executive power. W.
> Va. Const. art. 5 § 1. Because Judge Goldston plainly engaged in such a search, we find
> that the so- called "view" was improper.[3]

Defendant Goldston may not now assert judicial immunity, but rather is bound by the WVSCA's

final adjudication of the matter. Defendant cannot dispute that she performed a search, rather

than a view, and that performing a search of Plaintiff's home, as a matter of law, falls outside the

protections of judicial immunity.[4]

On November 18, 2021, the WVSCA issued their published opinion in the case of In the

matter of Goldston, No. 20-0742 (2021), censuring and fining Defendant Goldston. The central

issue in both Goldston and the § 1983 action currently *sub judice*, is the allegation that a family

court judge, under color of law, personally engaged in a search and seizure of the Plaintiff's

residence, forcing Plaintiff to stop documenting the incident, under threat of arrest, in violation

of state law and federal constitutional rights. The Court in Goldston established conclusively and

categorically that the Defendant's conduct was, as a matter of law, "*executive*" in nature, and

---

[2] Id. at 13-15.

[3] Id. at 17-18.

[4] Plaintiff has already briefed the issue of judicial immunity in his supplementary brief discussing the
effect of In the matter of Goldston, No. 20-0742 (2021) on Defendant Goldston's claim of judicial
immunity. In the interest of judicial economy, the Plaintiff hereby incorporates the supplementary brief by
reference as though fully restated herein.

expressly not "*judicial*." Syllabus Point 2 held that, "The West Virginia Constitution forbids a judicial officer to participate in a search because a search is an exercise of executive power…." and, Syllabus Point 3 held that the underlying findings against Defendant were proven by clear and convincing evidence.

Defendant admits that "searches" are executive in nature and that anyone who participates in one acts, not as a judicial officer, but rather as a law enforcement officer. However, she continues to deny that she was involved in a *search* of the Plaintiff's residence.[5] Rather than a *search*, Defendant instead characterizes her actions of March 4, 2020 as only a "seizure," illogically arguing that, although she cannot *search*, that she may instead engage in a *seizure*, as if there were a material difference between the two.[6] To the contrary, Defendant did perform a search. She attempts to justify her actions by re-defining the word *search*, though simultaneously admitting to the underlying activity held by the WVSCA to consist of a *search*, such as the fact that she entered Plaintiff's home to "locate" and "recover" items of personal property, including "photographs, yearbooks, DVDs, recipes, and a chainsaw."[7]

Defendant claims that she didn't personally "look" for the items, but rather that she allowed Plaintiff's ex-wife to enter the home, along with her bailiff and the ex-wife's attorney, to look for the items:

> **A. . . . I did not go there to locate [items of personal property]. I went there to allow Mrs. Gibson to retrieve the items she had been awarded . . . .**

> Q. Okay. But you - you didn't know where they were inside his house, did you?

---

[5] Goldston Dep. at 22:2-18.

[6] Goldston Dep. at 22:19-24; 23:1-19.

[7] Goldston Dep. at 17:7-18.

**A. I did not, and I did not look.**

Q. So they - somebody had to locate the inside the house.

**A. That's correct.**

Q. … And nobody asked Mr. Gibson to go in his house and bring the items outside.

**A. No.**

Q. You went in, right?

**A. I did.**

Q. And the bailiff - your bailiff went in.

**A. He did.**

Q. Mrs. Gibson went in.

**A. She did.**

Q. To locate the items.

**A. Yes. I would say retrieve the items but -**

Q. In fact, the Supreme Court noted in their Opinion that when Mr. Gibson demanded a list of what you were seeking, you replied, "You have a list of everything attached to the order." And when he professed not to know where some of it's at, you replied, "Well, we're going to find it."

**A. I did.**

Q. … So as the Supreme Court noted, you told Mr. Gibson that you would be going inside his house to find items.

**A. Correct.**

Q. But you disagree with the categorization of that is a search.

**A. That that is a search by me, yes.**[8]

---

[8] Goldston Dep. at 11:3-24; 12:1-19.

Defendant's testimony demonstrates the absence of any factual dispute surrounding her conduct on March 4, 2020. The WVSCA correctly found her behavior to consist of personally directing a search and seizure inside Plaintiff's home. Whether Defendant agrees with the WVSCA's definition of the word *search* is irrelevant. She was provided the opportunity to litigate her position in the disciplinary matter, and the WVSCA declined to adopt her position, as had the Judicial Hearing Board and the Judicial Investigation Commission previously.

Ultimately, the WVSCA opinion in <u>Goldston</u> established, as a matter of law, that the Defendant "led a *search* of the [Plaintiff's] residence, not a 'judicial view,' and that, in so doing, she exercised executive powers forbidden to her under the West Virginia Constitution." <u>Id</u>. at 2 (emphasis original). The Court also took issue with the "manner in which [Judge Goldston] conducted the search," labeling her actions "serious misconduct," ordering that she be publicly censured and fined $1,000. <u>Id</u>. The Court expressly rejected Defendant's "attempt to reframe her conduct" as judicial in nature.[9] The WVSCA explicitly condemned Defendant Goldston for her actions in traveling to Plaintiff's home and searching it on March 4, 2020:

> As we have stated herein, Judge Goldston's conduct constituted a search, rather than a mere view, of the ex-husband's home. The parties appeared in court for a hearing before Judge Goldston. Undoubtedly, the ex-husband could not have anticipated that the hearing would proceed to an unannounced invasion of the sanctity and privacy of his home. Regardless of whether the ex-husband had failed to provide belongings he was previously directed to provide, Judge Goldston failed to use the appropriate tools available to her under the law to address such failure because she felt such procedures were ineffective. Instead, she, along with her bailiff, the ex-wife, and the ex-wife's attorney, proceeded to enter the ex-husband's home, over his strenuous objections, directed that he stop recording the incident, and began searching for items on the list of items he was to produce. Such an invasion of the ex-husband's home was an egregious abuse of process.

---

[9] <u>Id</u>. at 2 ("After considering the record and the parties' written and oral arguments, we reject the judge's attempt to reframe her conduct.").

Moreover, Judge Goldston clearly left her role as an impartial judicial officer and participated in an executive function when she entered the ex-husband's home to oversee the search….[10]

The fact that Defendant remains defiant of the censure she received from the WVSCA is alarming, as is the fact that she testified as to other family court judges having allegedly approached her and admitted to engaging in the same or similar misconduct. When asked under oath at her deposition if she recalled the names of those judges, she testified that she couldn't remember a single one. Defendant responded, "*I'll be honest with you, at our last conference[11] I had probably six or seven [family court judges] come and tell me they had done it*."[12] When asked, "[a]nd you don't recall the name of even one of them," she replied that she didn't.[13] However, Defendant had previously testified in a sworn statement to investigators that two other family court judges, Family Court Judge Rock and Family Court Judge Greenberg, spoke to her about her case and "aided her with research for her brief."[14]

One family court judge in particular, who has expressed public and private support of Defendant's actions, is former Judicial Hearing Board member, Family Court Judge Glen R. Stotler of the Twenty-Third Family Court Circuit. Judge Stotler wrote a letter, dated March 25, 2021, to the Chief Justice of the WVSCA asserting various allegations of misconduct by the Judicial Disciplinary Counsel ("JDC") related to their alleged treatment of the Defendant, as well

---

[10] Goldston at 23.

[11] The Spring, 2021 conference of the Family Court Judicial Association; see Goldston at 38:1-6.

[12] Goldston Dep. at 37:21-24.

[13] Goldston Dep. at 38:18-20.

[14] *See* ODC Report, discussed *supra*, at 34.

as her colleague, FCJ Shuck.[15] Following the submission and media publication[16] of the Stotler letter, the Office of Disciplinary Counsel ("ODC") conducted an investigation into the allegations, during which Defendant was compelled to provide yet another sworn statement.[17]

The Lawyer Disciplinary Board Investigative Panel Closing report released following the ODC investigation revealed Stotler's allegations, including those pertaining to allegations of misconduct towards the Defendant, to be false.[18] The Investigative Panel expressed shock at the actions of Judges Stotler and Goldston:

> It is shocking that a long-standing member of the judiciary bestowed with the honor of being part of the system designed to protect and preserve the integrity of two members of the West Virginia State Bar. It does not appear that FCJ Stotler conducted any factual investigation into the allegations regarding JDC before regurgitating the untimely, unsupported allegations made by FCJ Goldston and sending *an ex parte* communication, written on his official court letterhead, to the Supreme Court.[19]

When asked if she saw the ODC report, the Defendant responded that she "*found it insulting*" that the ODC "*took the word of two lawyers over the words of two sworn long-serving judges.*"[20] However, Defendant failed to explain how the ODC could take the word of Judge Stotler, given the fact that, according to her, Stotler had no personal knowledge of the investigation into the Defendant, other than what he read in her pleadings submitted in the disciplinary action, given the fact that Defendant claims she had no communication with Stotler

---

[15] *See* Stotler Letter, attached hereto as an exhibit.

[16] https://wvrecord.com/stories/585253911-family-court-judge-chastises-judicial-disciplinary-counsel-says-they-abuse-power

[17] Goldston Dep. at 49:14-24.

[18] *See* ODC Report, attached hereto as an exhibit.

[19] Id. at 50-51 (emphasis original).

[20] Goldston Dep. at 50:2-9.

about his allegations prior to the submission of his March, 2021 letter.[21] In her sworn statement to the ODC, Defendant Goldston testified that nobody had ever asked her about her interactions with JDC prior to the ODC interview, and "that she had not spoken or communicated with FCJ Stotler since the last seminar they both attended."[22] To the contrary however, during her subsequent deposition testimony, Defendant was asked if she has had any conversations with Judge Stotler about the March 4, 2020 incident. She responded, "*[n]ot before the judicial board hearing memo came out*." When asked whether she had any communications with Judge Stotler about the Gibson incident *after* the JHB hearing, she responded, "*We talked generally about it at the conference* [in Spring of 2021]."[23] When asked about the content of their discussions, Defendant stated that Judge Stotler told her that he was "*glad it was over*," and "*[h]e made it clear that he didn't think I had done anything wrong but we both discussed the fact that we didn't think there was anything wrong with us talking about it now because his role on the Judicial Hearing Board was complete*."[24] Defendant thus testified to to ODC investigators that she had *never* discussed her interactions with JDC with Judge Stotler, and then subsequently testified at her deposition that she *had* discussed her interactions with JDC with Judge Stotler.[25]

---

[21] Goldston Dep. at 52:3-24; 53:1-3.

[22] ODC Report at 34.

[23] Goldston Dep. at 41:1-16.

[24] Goldston Dep. at 41:17-24; 42:1.

[25] Defendant admits that she was an acquaintance of Judge Stotler, even before her JHB hearing, stating that "*he knows me and knows my reputation and my character, and would have absolutely no reason to doubt what I had put in the pleadings*." Goldston at 54:1-6; 55:3-6.

Despite tiptoeing around her connection to the Stotler letter, Defendant brazenly, and without explanation,[26] implied during her deposition that the entire disciplinary system, for both judges and lawyers, had conspired against her in the issuance of the report:

Q. So the allegations from you about alleged duress in the process, which mirrors the allegations made by Judge Stotler, were investigated by the ODC and found to be untrue. Is that fair?

**A. That is what they found and, again, I'd like to point out the ODC and the JDC share the same office suite.**

Q. And -

**A. And the same receptionist.**

Q. And why would you like to point that out?

**A. Because I think it stinks.**

Q. Why?

**A. I'm not going to say anything further than that. It's obvious. They share a suite.**[27]

But it wasn't just her, as FCJ Shuck was publicly admonished for engaging in the same behavior. The Shuck Admonishment notes that on a July 24, 2020 sworn statement, FCJ Shuck "opined that he believed it was proper to visit litigants' homes because a colleague had engaged in the same practice for several years."[28] When asked during her deposition whether the "colleague" referenced was her, Defendant Goldston adamantly refused knowing who the colleague was, despite knowing full-well that she was the colleague referenced, who was

---

[26] When asked for specifics, Defendant Goldston replied only that, "I know that they took the words of Brian Lanham and Terri Tarr over the words of Judge Stotler and myself, and I find that to be offensive." Goldston Dep. at 51:15-24; 52:1-2.

[27] Goldston Dep. at 50:10-24.

[28] *See* Shuck Admonishment at page 2; *see also* Goldston Dep. at 24:4-17.

described as being "also the subject of a judicial disciplinary proceeding" involving "a visit to a litigant ex-husband's home.…"[29] As the ODC report made clear, Defendant was, not-surprisingly, indeed the colleague referenced in the Shuck Admonishment.[30] In fact, FCJ Shuck apparently testified to the ODC that he first found out about the Stotler Letter because Defendant Goldston told him about it.[31] Much like her association to the Stotler Letter, Defendant refuses to acknowledge the truth surrounding her actions. The Shuck Admonishment, like the disciplinary findings against the Defendant, expressly state that so-called "home visits" by a Family Court Judge are not authorized by any statute, rule or case law, and that when a judge goes to a scene to gather evidence, she places herself in the stead of the moving party and ceases to serve as a fact finder. More importantly, the Shuck Admonishment notes, when a judge goes to a home to help enforce a prior court order, she abrogates her responsibility as a judge in favor of some nonexistent role in the executive branch.[32]

Defendant Goldston's allegations of unfair treatment in the disciplinary process - however they made it into Judge Stotler's letter - were examined in great detail in the ODC investigation report and exposed as complete falsehoods. The report demonstrates the extent to which Defendant Goldston has already been provided with every opportunity to vindicate herself, but yet failed at every level. The report noted that Defendant Goldston was provided notice of the complaint against her, given an opportunity to respond in writing, prior to giving a sworn statement, and then after due consideration, voluntarily attended and provided a sworn

---

[29] Goldston Dep. at 24:8-24; 25:1-24; 26:1-24; 27:1-24.

[30] ODC Report at 41, FN 50.

[31] ODC Report at 45, FN 58.

[32] Shuck Admonishment at 4.

statement to the JDC.[33] When asked whether she understood that she did not have to admit or agree to anything, and that the JDC bears the burden of proof in judicial disciplinary cases, Defendant blamed an alleged intimidating atmosphere at past continuing legal education seminars, as the reason she felt coerced. This too, was exposed in the ODC report as completely baseless.[34] After all, as the report pointed out, a member of the judiciary should have an understanding of the law, in the first place:

> It is disingenuous for a member of the judiciary to assert that they did not appreciate the significance of providing a statement to the JDC, sworn or not. It is presumed that members of the Bar and members of the judiciary, as they are officers of the court, would provide the same testimony under oath or not. FCJ Goldston now alleges that it was unfair to discuss the law that pertains to the issues within the scope of the judicial ethics investigation - particularly when the law in question was raised as a defense by the judicial officer.

> While after giving [her] sworn statement, the full weight of the seriousness of the allegations may have been felt by [Defendant Goldston], but such belated recognition does not equate to improper, much less, unethical behavior by [the JDC]. The most compelling evidence of the fairness and transparency is evidenced by the fact that, after retaining counsel, FCJ Goldston immediately [entered] into an agreed disposition of the facts and conclusions of law.[35]

Yet again, Defendant Goldston, in her frivolous request for judicial immunity from civil liability, seeks to attempt to reframe, and re-litigate, the issue of whether she performed a "search," and whether her actions were authorized under State law. They unequivocally were not. Defendant has demonstrated that she believes herself to be above-the-law and unrestrained by either the U.S. Constitution, or even the West Virginia Supreme Court of Appeals. As the ODC report points out, Defendant admitted under oath, with the advice and representation of counsel,

---

[33] ODC Report at 49-50.

[34] ODC Report at 33 and FN 43.

[35] Id. at 50.

that she violated numerous codes of judicial conduct,[36] and that prior to her punishment being adjudicated by the WVSCA, she concluded her testimony before the Judicial Hearing Board, by "again acknowledging 'mistakes were made' and that she accepted responsibility for the errors."[37] Only later did Defendant Goldston begin to argue otherwise, including at her deposition, in which she testified that the WVSCA was wrong about almost everything in the published opinion censuring her.[38]

Defendant Goldston's defiance of the law highlights the importance of holding her accountable under Section 1983. She's still serving as a government official and is willing to do it again. When asked at her deposition if she would ever "do it again," she responded, "*I don't know.*"[39] "*Do I think I did anything wrong? No. Do it regret the consequences of it? Absolutely.*" When asked during her deposition whether she regretted threatening Plaintiff with arrest on March 4, 2020, she replied that she did not.[40] Defendant also testified that, *even after the disciplinary proceedings*, she "sent a deputy" to go look for something at a litigant's home, and that since she didn't go personally, "*it was a fiasco and nothing was accomplished.*"[41] When disciplinary sanctions were hanging over her head, Defendant admitted her mistakes, and was apologetic - even willing to testify numerous times under oath that she was wrong and deserved

---

[36] See FN 26 of IDC Report at page 23 ("FCJ Stotler's dissenting opinion fails to address or reconcile FCJ Goldston's knowing, voluntary admission to violating thirteen separate rules of the Code of Judicial Conduct.").

[37] ODC Report at 20.

[38] *See, e.g.*, Goldston Dep. at 8:6-24; 9:1-24; 10-24; 11:1-5; 12:13-21; 17:7-13; 23:11-19; 71:9-24; 72:1-24; 73:1-5.

[39] Goldston Dep. at 100:6-7.

[40] Goldston Dep. at 100:22-24.

[41] Goldston Dep. at 104:10-24; 104:1-2.

discipline. Now that discipline has already been meted out and she no longer faces possible suspension, Defendant openly defies the law, already taking steps towards repeating the misconduct. Defendant Goldston must be denied the application of judicial immunity.

B.    ESTOPPEL / PRECLUSION

**1.    Defendant Goldston is estopped and precluded from asserting immunity and otherwise seeking to attack or contradict the State Supreme Court holdings**

Due to the fact that Defendant Goldston was already provided with a full and fair opportunity to litigate the factual and legal issues arising from her actions of March 4, 2020 in the underlying judicial disciplinary proceedings, she is now categorically barred from further challenging those factual and legal findings litigated therein. The Complaint's allegations, as well as the Defendant's ensuing assertion of judicial immunity in her motion to dismiss, consist of substantially identical factual and legal issues as were decided in the <u>Goldston</u> opinion, and to which the Defendant is now bound.[42] Any attempt by Defendant Goldston to subsequently claim in this civil action, that she did not commit state and federal constitutional violations against the Plaintiff, or that in so doing she was engaging in an alleged judicial act, is effectively an inappropriate collateral attack on the State Supreme Court judgment.

C.    COUNT ONE - SEARCH AND SEIZURE

**1.    As a matter of law, Defendant Goldston violated the Fourth Amendment by engaging in an unreasonable search and seizure under color of law**

Here, it's undisputed that Defendant Goldston entered Plaintiff's residence on March 4, 2020 accompanied by a uniformed sworn law enforcement officer, without a warrant, for

---

[42] Plaintiff has already briefed the issues of estoppel, preclusion, as well as the Rooker-Feldman Doctrine in his supplementary brief discussing the effect of <u>In the matter of Goldston</u>, No. 20-0742 (2021) on Defendant Goldston's claim of judicial immunity. In the interest of judicial economy, the Plaintiff hereby incorporates the supplementary brief by reference as though fully restated herein.

purposes of performing a search and seizure therein. As portrayed in the video footage of the beginning of the encounter, the Plaintiff informed Defendant Goldston that she wasn't going inside his house without a search warrant, to which Defendant replied, "*oh, yes, I will.*"[43] Defendant cannot justify her presumptively unconstitutional entry with an exception. In fact, Defendant doesn't dispute that her entry into Plaintiff's residence was made in the absence of Plaintiff's consent.[44] The WVSCA found that Defendant said to the Plaintiff, "*let me in that house or [the bailiff] is going to arrest you for being in direct contempt of court*," and that Plaintiff felt he had no choice but to let her and others into his home.[45] Defendant admitted to threatening Plaintiff with arrest, should he refuse to allow her, and others, into his home.[46] Additionally, bailiff Jeff McPeake testified that he witnessed Defendant Goldston threaten Plaintiff with arrest, and that as a sworn on-duty police officer with arrest powers, he would have been the individual to effect the arrest, as threatened by the Defendant.[47]

Moreover, the WVSCA directly held that Judge Goldston's actions at the Plaintiff's residence "were not a view" as Defendant claimed in her disciplinary proceedings, but rather that she "searched" Plaintiff's home, admittedly with the intention to "locate and seize certain of its contents . . . ."[48] The WVSCA went so far as to expressly "reject the [Defendant's] attempt to reframe her conduct" and found that she "led a search of the homeowner's residence, not a

---

[43] Goldston Dep. at 75:16-19; Stump at 46:10-22; McPeake at 19:9-24; *see also* video footage at Exhibit 7 of Goldston Deposition.

[44] Goldston Dep. at 76:2-22; 77:1-5; McPeake at 26:7-24; 27:1-24; 28:1-22.

[45] Goldston at 4.

[46] Goldston Dep. at 16:8-13; 62:4-24; 63:1-5; 68:24; 69:1-14;

[47] McPeake at 26:24; 27:1-7; 45:16-18.

[48] Goldston at 13, 14, 15.

'judicial view,'" and that regarding the "threshold" question of whether the Defendant searched

Plaintiff's residence or viewed it, "[w]e find that she searched it."[49] "The record is clear that

Judge Goldston went to the property to locate things, not simply to observe them."[50] The Court

further found that Defendant not only searched Plaintiff's residence, but that in so doing, items

so located during the search were removed from the residence, at the Defendant's direction.[51]

These items included photographs, yearbooks, DVDs, recipes and a chainsaw.[52]

     Therefore, the WVSCA's adjudication of the Defendant's actions at the Plaintiff's home,

which was labeled by the Court as displaying "a callous disregard for our system of justice,"

establish, as a matter of law, that: (1) Defendant Goldston entered and performed a search of

Matthew Gibson's home on March 4, 2020 under color of state law; (2) In so doing, she acted

intentionally and in an executive law enforcement capacity, thus rendering her ineligible for a

grant of judicial immunity; and (3) Defendant failed to obtain a search warrant for the residence

and did not have Plaintiff's consent.[53]

     Defendant performed a "search" of Plaintiff's home in the absence of a warrant, and no

applicable exception applies, thus the search was unlawful.[54] While acting under color of state

law, Defendant Louise Goldston deprived Matthew Gibson of a federal constitutional right,

which was his Fourth Amendment to be free from unreasonable search and seizure, as alleged in

---

[49] Goldston at 2, 13.

[50] Id. at 15.

[51] Id. at 15.

[52] Id. at 4.

[53] *See also* 9th Circuit Model Jury Instructions, 9.15 Particular Rights - Fourth Amendment - Unreasonable Search - Exception to Warrant Requirement - Emergency Circumstances.

[54] Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (footnote omitted).

Count One of the Complaint.[55] There are no genuine issues of material fact to be determined at trial. The only remaining issue for resolution of Count One is damages. Therefore, Plaintiff respectfully requests summary judgment on Count One and for the matter to be set for a jury trial on the issue of damages.

        D.      COUNT TWO - FIRST AMENDMENT

        **1.      As a matter of law, Defendant Goldston violated the First Amendment by threatening to arrest Plaintiff and his guests for filming and recording her commission of an unlawful search and seizure on March 4, 2020**

The WVSCA made indisputable findings pertaining to Defendant Goldston's interference and retaliation with Plaintiff's First Amendment rights. In the matter of Goldston, No. 20-0742 (2021) conclusively establishes that Judge Goldston did in-fact prohibit recording, as well as the fact that so doing was an egregious act of misconduct. The Court wrote that, "Judge Goldston . . . indicated that if they did not turn off their phones and stop recording she would take the [Plaintiff], or perhaps both he and his girlfriend, to jail," and that "Judge Goldston, herself, made no arrangements to record what went on inside the home (or outside the home)." Id. at 4. The Court ultimately held that, "over [Plaintiff's] strenuous objections, [Defendant Goldston] directed that he stop recording the incident, and began searching for items on the list of items he was to produce" and that, "[s]uch an invasion of the [Plaintiff's] home was an egregious abuse of process." Id. at 23.

During her deposition, Defendant Goldston repeatedly took issue with the WVSCA's findings and holdings. She was expressly defiant of the censure she received from the WVSCA, and irrationally maintained that, as a Family Court Judge, she possesses the ability to maintain a

---

[55] Third Circuit Model Jury Instructions 4.3 - Section 1983 - Elements of Claim; Gomez v. Toledo, 446 U.S. 635, 640 (1980).

legal position contrary to the WVSCA's express holdings, including the very same incorrect mistakes of law that led to her censured in the first place.[56] Despite being placed under oath, Defendant Goldston initially denied threatening Plaintiff's girlfriend with arrest for attempting to record her actions on Plaintiff's property, only admitting the truth after being confronted with the audio recording of her doing so.[57]

Bailiff Jeff McPeake, testified that he was standing with Judge Goldston and the Plaintiff in Plaintiff's front yard near the gazebo when Judge Goldston ordered him to take possession of Plaintiff's cell phone, due to the fact that Plaintiff was attempting to record audio.[58] Even though Plaintiff was standing in his own front yard and attempting to record Defendant Goldston's actions, he was told by Defendant to stop recording, and then forced to give his cell phone to Bailiff McPeake.[59] At the time, McPeake was on-duty as a law enforcement officer and was in uniform.[60] Plaintiff did not consent to the seizure of his cell phone by Defendant Goldston and McPeake.[61] Ironically, Bailiff McPeake subsequently began filming the subsequent search of Plaintiff's residence using his personal cell phone, "for the protection of everyone involved," including at one point filming the interior of Plaintiff's gun safe.[62]

Lastly, even without eyewitness testimony or WVSCA opinion in Goldston, there could be no doubt that Defendant Goldston forced Plaintiff and his girlfriend to stop filming and

_____

[56] See, e.g., Goldston Dep. at 8:6-24; 9:1-24; 10-24; 11:1-5; 12:13-21.

[57] Goldston Dep. at 63:21-24; 64:1-24; 65:1-15.

[58] McPeake at 32:6-24.

[59] McPeake at 33:1-24.

[60] McPeake at 34:9-17.

[61] McPeake at 35:11-15.

[62] McPeake at 36:4-24; 37:1; 44:3-5.

recording her actions at Plaintiff's residence on March 4, 2020, since it was captured on video and audio. The video footage filmed by Plaintiff's girlfriend shows the beginning of the encounter, to the point where Defendant Goldston forced the video to be turned off, under threat of arrest.[63] The audio recording from Plaintiff's cell phone captured the subsequent audio from the incident, to the point where Defendant Goldston ordered the seizure of Plaintiff's cell phone, thus ending the recording.[64]

The record thus demonstrates that there are no genuine issues of material fact for determination under Count Two. Plaintiff and his girlfriend, acting pursuant to his direction to record, were situated on Plaintiff's private property at the time the protected First Amendment actions of recording the defendants was taking place. They were subject to no applicable "time, place or manner" restrictions limiting their rights or ability to record the actions of the defendant government officials. Though Defendant Goldston defiantly "disagrees" with the WVSCA about the fact that she was engaging in an "egregious abuse of process," rather than a lawful or routine family court proceeding, the issue has already been adjudicated in Goldston. Whether Defendant chooses to admit it or not, the WVSCA held that, "over [Plaintiff's] strenuous objections, [Defendant Goldston] directed that he stop recording the incident, and began searching for items on the list of items he was to produce" and that, "[s]uch an invasion of the [Plaintiff's] home was an egregious abuse of process." Goldston. at 23.

---

[63] *See* Goldston Deposition Exhibit 7.

[64] *See* Goldston Deposition Exhibit 6.

E.       COUNT FOUR - 14TH AMENDMENT DUE PROCESS[65]

**1.       As a matter of law, Defendant Goldston violated the Plaintiff's 14th Amendment Due Process rights on March 4, 2020**

As already noted multiple times above, the WVSCA held that Defendant Goldston's actions on March 4, 2020, were an "egregious abuse of process." Goldston at 23. The invasion of the privacy of Plaintiff's home, to which the WVSCA was referring, was performed by Defendant Goldston under the guise of family court contempt proceedings under West Virginia state law. However, Defendant Goldston did not provide the Plaintiff basic due process to which he was entitled under the state contempt laws in the contempt proceedings on March 4, 2020.[66] The deprivation of due process at issue pertain to actions taken by the Defendant during the performance of a "nonexistent" executive branch role, rather than in a judicial capacity.

While acting under color of state law, Defendant Goldston deprived Matthew Gibson of a federal constitutional right, which was his Fourteenth Amendment right to Due Process, as alleged in Count Four of the Complaint.[67] There are no genuine issues of material fact to be determined at trial. The only remaining issue for resolution of Count Four is damages. Therefore, Plaintiff respectfully requests summary judgment on Count Four and for the matter to be set for a jury trial on the issue of damages, along with Counts One and Two of the Complaint.

---

[65] Plaintiff declines to proceed on Count Five - 14th Amendment Equal Protection and has no objection to Count Five being dismissed.

[66] See W. Va. Code §51-2A-9 and W. Va. Code §48-1-304 for contempt provisions applicable to Family Court in West Virginia.

[67] Third Circuit Model Jury Instructions 4.3 - Section 1983 - Elements of Claim; Gomez v. Toledo, 446 U.S. 635, 640 (1980).

CONCLUSION

This case has the benefit of having already been adjudicated by the WVSCA on all

material issues, except for damages. Defendant Goldston searched Plaintiff's home and

interfered with his First Amendment right to record the serious misconduct of government

officials from the sanctity of his own private property. In so doing, the Defendant was acting in

an executive, non-judicial, capacity, for which judicial immunity may not be granted. Wherefore,

Plaintiff respectfully requests summary judgment against Defendant Goldston, and for such other

and further relief as this Court deems just and fit.


MATTHEW GIBSON,
By Counsel


/s John H. Bryan
John H. Bryan (WV Bar No. 10259)
JOHN H. BRYAN, ATTORNEY AT LAW
411 Main Street
P.O. Box 366
Union, WV 24983
(304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BECKLEY

MATTHEW GIBSON,

       Plaintiff,

vs.                        Civil Action No. 5:21-cv-00181
                              Honorable Frank W. Volk

LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision,
JEFF MCPEAKE, individually,
BRIAN WHITE, individually,
BOBBY STUMP, individually,

       Defendant.

## **CERTIFICATE OF SERVICE**

    I, John H. Bryan, do hereby certify that I have delivered a true copy of the foregoing

PLAINTIFFS' MEMORANDUM IN SUPPORT OF HIS MOTION FOR SUMMARY

JUDGMENT AGAINST DEFENDANT LOUISE E. GOLDSTON has been served upon counsel

of record by using the CM/ECF System, this the 28th day of March, 2022 and addressed as

follows:

Jennifer E. Tully, Esq.              J. Victor Flanagan, Esq.
Adam K. Strider, Esq.              Kevin J. Robinson, Esq.
Bailey & Wyant, PLLC             Pullin Fowler Flanagan, Brown & Poe, PLLC
500 Virginia Street, East, Suite 600    252 George Street
PO Box 3710                     Beckley, WV 25801
Charleston, WV 25337-3710        *Counsel for Raleigh County Defendants*
*Counsel for Louise E. Goldston*

/s John H. Bryan
John H. Bryan (WV Bar No. 10259)
JOHN H. BRYAN, ATTORNEYS AT LAW
411 Main Street
P.O. Box 366
Union, WV 24983
(304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com