IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

MATTHEW GIBSON,

        Plaintiff,

vs.                                Civil Action No. 5:21-cv-00181
                                    Honorable Frank W. Volk
LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision,
JEFF MCPEAKE, individually,
BRIAN WHITE, individually,
BOBBY STUMP, individually,

        Defendant.

**PLAINTIFF'S RESPONSE IN OPPOSITION TO RALEIGH
COUNTY  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

The outrageous actions of Defendant Goldston on March 4, 2020 in personally engaging

in a warrantless search and seizure of the Plaintiff's home did not occur in a vacuum. Rather, it

was enabled and assisted by the Raleigh County Sheriff's Office, as described by Defendant

Goldston's long-time bailiff, Defendant Bobby Stump, who described a long-time practice of

unlawful judicial searches of the homes, ultimately leading to what happened on March 4, 2020.

The West Virginia Supreme Court of Appeals made clear that a search took place on March 4,

2020, rather than a lawful judicial proceeding. Defendants McPeake and Stump[1] were personally

involved in the March 4, 2020 search as law enforcement officers. The Raleigh County

---

[1] After deposing Defendant Brian White, Plaintiff has no objection to his being dismissed as a defendant
herein, based on the fact that Defendant White appears to have had limited involvement or participation in
the events of March 4, 2020.

Commission, via the sheriff's office, enabled this behavior through their long-established policies and procedures, and apparently continues to do so.

## FACTS

Here, it's undisputed that Defendant Goldston entered Plaintiff's residence on March 4, 2020 accompanied by a uniformed sworn law enforcement officer, without a warrant, for purposes of performing a search and seizure therein Yet another sworn law enforcement officer, Defendant Stump, arrived shortly thereafter and joined in the search and seizure. As portrayed in the video footage of the beginning of the encounter, the Plaintiff informed Defendant Goldston that she wasn't going inside his house without a search warrant, to which Defendant replied, "*oh, yes, I will.*" (Goldston Dep. at 75:16-19; Stump at 46:10-22; McPeake at 19:9-24).[2] Defendant cannot justify her presumptively unconstitutional entry with an exception. In fact, Defendant doesn't dispute that her entry into Plaintiff's residence was made in the absence of Plaintiff's consent. (Goldston Dep. at 76:2-22; 77:1-5; McPeake at 26:7-24; 27:1-24; 28:1-22). The WVSCA found that Defendant said to the Plaintiff, "*let me in that house or [the bailiff] is going to arrest you for being in direct contempt of court,*" and that Plaintiff felt he had no choice but to let her and others into his home.[3] Defendant admitted to threatening Plaintiff with arrest, should he refuse to allow her, and others, into his home. (Goldston Dep. at 16:8-13; 62:4-24; 63:1-5; 68:24; 69:1-14). Additionally, bailiff Jeff McPeake testified that he witnessed Defendant Goldston threaten Plaintiff with arrest, and that as a sworn on-duty police officer with arrest

---

[2] *See also* video footage at Exhibit 7 of Goldston Deposition; Note that all cited deposition transcripts are attached as exhibits to Plaintiff's Motion for Summary Judgment against Defendant Goldston.

[3] Goldston at 4.

powers, he would have been the individual to effect the arrest, as threatened by the Defendant. (McPeake at 26:24; 27:1-7; 45:16-18).

The WVSCA directly held that Judge Goldston's actions at the Plaintiff's residence "were not a view" as Defendant claimed in her disciplinary proceedings, but rather that she "searched" Plaintiff's home, admittedly with the intention to "locate and seize certain of its contents . . . ."[4] The WVSCA went so far as to expressly "reject the [Defendant's] attempt to reframe her conduct" and found that she "led a search of the homeowner's residence, not a 'judicial view,'" and that regarding the "threshold" question of whether the Defendant searched Plaintiff's residence or viewed it, "[w]e find that she searched it."[5] "The record is clear that Judge Goldston went to the property to locate things, not simply to observe them."[6] The Court further found that Defendant not only searched Plaintiff's residence, but that in so doing, items so located during the search were removed from the residence, at the Defendant's direction.[7] These items included photographs, yearbooks, DVDs, recipes and a chainsaw.[8] This activity was law enforcement in nature, and only made possible by the joint participation of the defendant law enforcement officers and their employer.

Bailiff Jeff McPeake, testified that he was standing with Judge Goldston and the Plaintiff in Plaintiff's front yard near the gazebo when Judge Goldston ordered him to take possession of Plaintiff's cell phone, due to the fact that Plaintiff was attempting to record audio. (McPeake at

---

[4] Goldston at 13, 14, 15.

[5] Goldston at 2, 13.

[6] Id. at 15.

[7] Id. at 15.

[8] Id. at 4.

32:6-24). Even though Plaintiff was standing in his own front yard and attempting to record Defendant Goldston's actions, he was told by Defendant to stop recording, and then forced to give his cell phone to Bailiff McPeake. (McPeake at 33:1-24). At the time, McPeake was on-duty as a law enforcement officer and was in uniform. (McPeake at 34:9-17). Plaintiff did not consent to the seizure of his cell phone by Defendant Goldston and McPeake. (McPeake at 35:11-15). Ironically, Bailiff McPeake subsequently began filming the subsequent search of Plaintiff's residence using his personal cell phone, "for the protection of everyone involved," including at one point filming the interior of Plaintiff's gun safe. (McPeake at 36:4-24; 37:1; 44:3-5).

Defendant Bobby Stump, who arrived shortly after the search and seizure began, testified that he served as Defendant Goldston's bailiff for approximately ten years, and that during that time, he went with her to the homes of litigants "numerous times." (Stump at 6:12-14, 19-24; 7:1-4). When asked to estimate the number, Stump stated, "There's no way I could - over thousands of divorce cases . . . . There's no way I could give you an accurate number. I mean, I have no idea." (Stump at 7:19-24; 8:1). Stump explained that he had numerous conversations with Defendant Goldston about going into the homes of litigants in cases before her, and that when they were inside the Plaintiff's home, "we didn't have to have conversations . . . because she knew I would do my job and I knew what to do." (Stump at 12:9-22). "And she didn't have to have conversations and instruct me because I would have it done before she even thought about it and she knew that." (Stump at 12:23-24; 13:1). Stump helped Goldston with many other things, other than just ensuring her physical safety in the courtroom. For instance, when she would go to the home of a litigant, Stump would drive her to the location. They would arrive in a police cruiser marked, Raleigh County Sherriff's Department, along with the bailiff wearing a

Raleigh County Sherriff's Department uniform, who had arrest powers and a gun. (Stump at 13:3-21). According to Defendant Stump, the arrest powers were utilized often while serving as Defendant Goldston's bailiff. Stump testified that he's arrested "dozens and dozens and dozens of people with Ms. Goldston." (Stump at 13:22-24; 14:1-5).

> Stump described how Defendant Goldston's home searches were practiced:
>
> I would be the organizer and we would have the list . . . . [a]nd I'd say, hey, the wife gets this, the husband gets this, and I would have the list and I would say, "Okay. I found the chainsaw,' and the wife would get the chainsaw. I found the dishes and the husband would get the dishes. So I was the one that usually orchestrated - I didn't orchestrate that. Judge Goldston always orchestrated everything but I would be the one that would have the list and mark it off and let her know that I - or that the litigant had found whatever they were looking for.

(Stump at 15:1-20. ). Stump testified that he personally looked for items in the home of a litigant "numerous times," explaining, "[a]ll the judges sent me out to look for items" and that, "[i]n the middle of a court hearing they would send me out to look for items at a home." Stump estimated this occurred dozens of times. (Stump 16:4-12). Stump further testified that he didn't record these interactions at the homes of litigants, nor did he allow anyone else to do so, other than the judge, because "the judge is the only one that records a hearing." Yet Stump never observed the judge actually doing so. (Stump at 17:6-21; 18:15-23). Nor was there ever a court reporter present during the so-called hearings at the homes of litigants. (Stump at 18:20-24; 19:1-3).

Stump described himself as the "stable" bailiff over a ten year period, who provided training to other bailiffs who would rotate in-and-out of the position. (Stump at 10:10-18). He described his instructions to other bailiffs as, "Pretty simple. If the judge tells you to do it, you do it and you don't ask questions." (Stump at 10:19-23). Stump further explained that, "The judge always wins. The judge is the boss." (Stump at 11:4-5). Though Stump admits that his

employer, even when acting in the position of bailiff, has always been the Raleigh County Sheriff's Office. (Stump at 11:22-24). Stump explained that he usually had a supervisor in the sheriff's department chain of command, during the time in which he served as Defendant Goldston's bailiff. However, he claims that "[i]t was none of their business" what he was doing; "If the judge told me to do it, I was doing it. I didn't care," - even if it chain of command told him not to do it. (Stump at 32: 12-22).

Defendant Stump testified that he would have "done things a whole lot differently than McPeake did [at Plaintiff's home]" and that, "half of this wouldn't have been an issue if [he] would've been bailiff [on March 4, 2020]." When asked to elaborate on what he would have done differently, Stump testified that he wouldn't have let Judge Goldston out of the police cruiser until he secured the area. He described a scenario where he could have prevented Plaintiff from documenting the serious misconduct in which Defendant Goldston was engaged:

> For the safety of the judge, I can only keep my eyes on so many people, so I would not have allowed anyone there and when Mr. Gibson's attitude with his sense of anger, I would have pulled him to the side and took care of that well before he ever approached the judge. He would not have been allowed to approach the judge at all until I made sure he was calm.

(Stump at 20:14-24; 21:1-22). Stump explained that he's "arrested people in the courtroom and took them down for a lot lesser [sic]…," and that he would have prevented Plaintiff from approaching the judge on March 4, despite the fact that she was standing in Plaintiff's front yard at the time. (Stump at 23:3-16). Ironically, Stump claims that, had he been bailiff on March 4, 2020, "there wouldn't have been no one invading her private zone approaching her the way [Plaintiff] did," referring to Plaintiff's front yard as Goldston's "private zone." (Stump at 25:20-24; 26:1-4).

6

Defendant Stump makes clear that there would have been no recording of Judge Goldston engaging in misconduct on March 4, 2020, had he been bailiff, because he never would have allowed video footage to be captured. "That would have been the first thing I'd done is secure the cellphones and make sure nobody was recording." He explained, "That's how I did it in every single hearing I've ever been in with Judge Goldston and every Family Court Judge. (Stump at 29:17-21). He explained that as bailiff, sheriff's department policy for bailiffs is whatever policy a judge told him - "no questions asked," even where as in the Plaintiff's home, the judge made no effort to officially make a record of the event. (Stump at 31:3-18). Bailiff McPeake, on the other hand, testified that he took a more active role:

> My role there is protecting the judge as I stated. And all of our hearings, all of them, 100 percent of them, are videotaped. I felt as if we were still in a courtroom setting. So I felt that it would be a good idea to video as much as I could. My battery was low. And I would have videotaped start to end.

(McPeake 46:16-23). He explained that, "I was documenting what people were saying and what people were taking as much as I could," which admittedly goes beyond merely ensuring the physical safety of the judge. (McPeake 47:3-4, 22-24; 48:1-3).

During his deposition, Stump recalled that on March 4, 2020, he was dispatched to assist "a family court judge" at a private residence. He wasn't aware that Judge Goldston was the subject judge until after arriving at the scene. (Stump 33:3-18). At the scene, Stump walked in the Plaintiff's home, whereupon Plaintiff attempted to approach him, but was told to "hold on" by Stump, who proceeded into the home. (Stump 34: 19-24; 34:1-2). Despite the fact that Bailiff McPeake was the party who called for his assistance, Stump chose not to speak with McPeake, instead speaking directly to Defendant Goldston. (Stump 35:2-7, 15-24). Instead of speaking to

the officer who requested assistance, as would normally be the case, when Stumped walked in and saw Judge Goldston, his testimony is that he didn't need to speak with Bailiff McPeake because, "I don't have to ask because I know what's going on because I've been there, done that, many, many, many, many times." (Stump 53:17-24). Indeed, Stump never had any discussion with McPeake about why he called for assistance. (Stump 53:19-22).

At the time Stump entered Plaintiff's home, there had been no allegations that any individual had committed a criminal act. All he knew was that another police officer had asked for backup "at a Family Court hearing" at someone's residence. (Stump 36:9-21; 37:4-6). Stump walked into Plaintiff's garage, where he encountered Plaintiff's ex-wife holding a chainsaw, who told him that hey were there "to split their assets." (Stump 36:16-24; 35:1; 37:19-24; 38:11-24; 39:1-24; 40:1-4). After entering Plaintiff's house, Stump understood that Judge Goldston was in the process of conducting a family court hearing inside Plaintiff's home. (Stump 42:8-13). After talking to Judge Goldston, Defendant Stump "just took charge, because . . . that was my job as a supervisor." Stump then told McPeake, "Stay right here. I'm going to go out here and get everyone out that's on the property that's not part of the case - or part of this hearing." (Stump 40:5-12). Stump then went back inside Plaintiff's home and "conducted the rest of the hearing with Judge Goldston," as if he then took over Goldston's bailiff duties. (Stump 40:14-16). Stump recalled that Plaintiff "did not like it" when he told him that he was going outside to tell everyone, including Plaintiff's girlfriend and friends, to leave his property. (Stump 41:18-24). Stump then decided that he would allow each party to keep one person present with them inside Plaintiff's house. (Stump 42:14-24; 43:1-4). Even though he didn't start out as bailiff, because "bailiffs are usually lower rank," Stump was "essentially" now the bailiff. (Stump 43:14-18). "I

was the one in charge . . . . That's just my personality. Anytime we was in a hearing or anything, I always took charge." (Stump 43:19-24). In fact, Stump described that he and Judge Goldston knew each other so well, that when they went into the homes of litigants, "she didn't have to tell me anything . . . she could just give a look and I would know what to do." (Stump 51:4-12).

Now being in charge of the scene, based on his experience as Judge Goldston's bailiff, having entered the homes of litigants numerous times before, Stump knew that items of personal property were going to be located inside the house and given to either party. (Stump 44:1-5). After making sure everyone left the property, as he ordered, Stump went back inside Plaintiff's home and stood beside Defendant Goldston. He was then present when additional items of personal property were located and removed from Plaintiff's home. (Stump 45:2-24). Stump was on duty and in uniform at the time the search and seizure occurred inside Plaintiff's home. He had no knowledge of whether a search warrant had been entered authorizing the search and seizure. (Stump 46:5-22). He had no indication that any crime had been committed; nor that there was any sort of emergency taking place at the scene. (Stump 49:3-9). He never observed anyone committing a crime, or making any threats to anyone's safety. Nor did Judge Goldston communicate any complaints about Plaintiff's conduct to Defendant Stump during the incident. (Stump 50:4-24; 51:4-7). Stump noted that he never completed a report about the incident, because, according to him, "it was what we call non-reportable" under sheriff's office policy, meaning that, "there was no crime . . . nothing happened . . . . I was just assisting in a family court hearing." (Stump 55:8-21).

Defendant Stump remains employed as a police officer with the Raleigh County Sheriff's Office. He noted that, even after the March 4, 2020 incident, there has been no policy change

within the department about bailiffs going to the homes of litigants. Indeed, Stump asserts that,

"if Judge Goldston told me today to go to the house, I'd be the first one there." (Stump 56:1-6).

Even after the WVSCA declared that Judge Goldston engaged in an unlawful search of

Plaintiff's residence on March 4, 2020, Defendant Stump boldly declared, "I've never had a

judge to ask me to come remotely [close] to breaking the law." When asked whether he would

violate the Constitution, if asked to do so by a judge, Stump responded, "I know without a doubt,

no judge that I ever worked for would ever ask me to violate the law, so I've never been in that

predicament and I can safely say I never will." (Stump 58:19-23). Even in the context of a

criminal case, Defendant Stump testified that he would perform a warrantless search of a

defendant's home, if asked to do so by a judge, despite his decades of knowledge and experience

with the search warrant requirement under the Fourth Amendment. This same blind allegiance, or

ignorance, is what guided Stump on March 4, 2020. (Stump 60:2-21). McPeake likewise

subjectively believes that a warrant is not required in order to perform a search of a litigant's

home, at the direction of a family court judge, based on the fact that the judge is personally

present and directing their conduct. (McPeake 22:18-24; 23:1-4; 24:5-14, 22-24; 25:1-3).

        Bailiff McPeake testified that sometime after March 4, he personally received a call from

someone at the West Virginia Supreme Court, instructig him that he shouldn't have filmed with

his cell phone inside Plaintiff's home. (McPeake 53:1-24; 54:1-14). However, his supervisor, Lt.

Stafford, did not expressly forbid him from accompanying Judge Goldston to the homes of

litigants. Nor was he the subject of discipline as a result of the March 4, incident. (McPeake

54:24; 55:1-6). McPeake testified that he believed the search was authorized under department

policy due to a conversation with a supervisor, Sergeant Lilly, who told him that it was fine to do

so, because "we do do that from time to time." Thereafter, no supervisor ever told McPeake not

to do so. Moreover, as of the date of his deposition, he wasn't aware of any written policy

changes pertaining to bailiffs or deputies going to the home of a litigant with a judge. Nor have

any of his supervisors proactively told him not to engage in similar conduct in the future, even

though they're aware that he continues to serve as a bailiff for Judge Goldston. Nevertheless,

McPeake noted that his own common sense tells him he shouldn't do it again. (McPeake

13:10-13; 40:11-24; 64:2-23; 65:9-17). It appeared to McPeake, after getting express

authorization from a supervisor to participate in his first home search with a family court judge,

that it seemed to be something that occurred on a regular basis. (McPeake 13:7-13; 15:3-8).


      A.     QUALIFIED IMMUNITY

**   1.    Defendants McPeak and Stump are not entitled to qualified immunity.**

       Defendants McPeake and Stump assert application of the doctrine of qualified

immunity. However, there is perhaps no more clearly established civil rights violation than a

warrantless search of a citizen's home, and therefore qualified immunity is unavailable as a

defense. It's undisputed that a search took place, which was unlawful according to the West

Virginia Supreme Court of Appeals. It's undisputed that there was no search warrant. It's

undisputed that there was no consent by the Plaintiff. It's undisputed that there were no exigent

circumstances to justify the entry and search.  It's further undisputed that

      Qualified immunity is an affirmative defense intended to shield public officials from civil

suits arising out of their performance of job-related duties. *See, e.g.*, Pearson v. Callahan, 555

U.S. 223, 231–32 (2009). Defendants asserting a qualified immunity defense first bear the

burden of "demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties." In re Allen, 106 F.3d 582, 594 (4th Cir. 1997) The defense of qualified immunity is available unless the official "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff...." Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982). Officials are protected even if they make reasonable mistakes of fact or law, so long as they do not violate a clearly established statutory or constitutional right. Pearson, 555 U.S. at 231–32. "A constitutional right is 'clearly established' when its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." Cooper v. Sheehan, 735 F.3d 153, 158 (4th Cir. 2013).

It's well established that qualified immunity is inapplicable where a police officer violates clearly established statutory or constitutional rights of which a reasonable person would have known - *citing* Adams v. Ferguson, 884 F.3d 219, 226 (4th Cir. 2018)). "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." Brigham City v. Stuart, 547 U.S. 398, 403 (2006). The Supreme Court has ruled that no reasonable police officer could claim to be unaware of the basic rule that, absent consent or exigency, a warrantless search of a home is presumptively unconstitutional, and therefore would not be entitled to qualified immunity:

> "[T]he right of a man to retreat into his own home and there be free from unreasonable governmental intrusion' " stands " '[a]t the very core' of the Fourth Amendment," Kyllo v. United States, 533 U. S. 27, 31 (2001), our cases have firmly established the "'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable," Payton v. New York, 445 U. S. 573, 586 (1980). Thus, "absent exigent circumstances, a warrantless entry to search for weapons or contraband is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within." Id., at 587– 588 (footnote omitted). *See* Kyllo, 533 U. S., at 29.

Groh v. Ramirez, 540 U.S. 551, 559 (2004) (citations omitted). These principles are equally applicable to the respondent's search and seizure inside the Plaintiff's home:

> That rule is in keeping with the well-established principle that 'except in certain carefully defined classes of cases, a search of private property without proper consent is "unreasonable" unless it has been authorized by a valid search warrant.' Camara v. Municipal Court, 387 U. S. 523, 528–529 (1967). *See* Steagald v. United States, 451 U. S. 204, 211–212 (1981); Jones v. United States, 357 U. S. 493, 499 (1958)." *Ibid*.

Id. 540 U.S. at 560 (2004).

Following the clearly established precedent of the Supreme Court, the police officer defendants who jointly participated in the warrantless search of Mr. Gibson's home, they cannot be granted qualified immunity under the facts of record. Examining the facts in the light most favorable to the Plaintiff, they demonstrate a warrantless search and seizure with no reasonable factual basis for an exception. The said defendants cannot obtain qualified immunity for the violation of the most fundamental *and clearly established* tenant of the Fourth Amendment:

> **No reasonable officer could claim to be unaware of the basic rule, well established by our cases, that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional**. *See* Payton, 445 U. S., at 586-588. Indeed, as we noted nearly 20 years ago in Sheppard:[9] "The uniformly applied rule is that a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional."

Id., 540 U.S. at 564 (2004) (emphasis added).

Where the facts show a warrantless search or seizure of a home, the respondent can seek to obtain summary judgment only "if [the respondent] can establish as a matter of law that a reasonable officer could have believed that the search comported with the Fourth Amendment

---

[9] Massachusetts v. Sheppard, 468 U.S. 981 (1984) ("[A] warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional").

even though it actually did not." <u>Anderson v. Creighton</u>, 483 U.S. 635 (1987). Thus, the respondent's actions are not "beyond debate." To the contrary, the defendants are required to show, as a matter of law, that their actions justifiably fall within an exception to the presumptive rule. *See* <u>Groh.</u>, 540 U.S. at 564 (2004).

Subjective ignorance of the law does not invoke qualified immunity. Defendant McPeake essentially claims total ignorance as his defense. Despite having a long career in law enforcement, where he gained familiarity and experience with obtaining and executing search warrants, he claims not to have known that judges don't personally perform searches:

Q. Also on March 4, 2020, you were aware fo the fact that Judge Goldston was not a law enforcement officer, right?

**A. Correct.**

Q. You were also aware of the fact on March 4, 2020, that - you were aware that judges don't search homes, right?

**A. No. I was not aware of that.**

Q. Okay. So on March 4, 2020, you were not aware that judges do not search homes?

**A. That's correct.**

(McPeake 22:3-17). Defendant Stump similarly continues to maintain that, contrary to the holding of the WVSCA, that Judge Goldston was authorized to do what she did on March 4, 2020, and that he would assist her in doing so again, despite the fact that Goldston was publicly reprimanded for her actions (Stump 56:1-6: "if Judge Goldston told me today to go to the house, I'd be the first one there.").

The ongoing mistakes of law by Stump and McPeake go well beyond reasonableness. Rather, they openly defy the law, and continue to do so. The WVSCA in <u>In the matter of</u>

Goldston, No. 20-0742 (2021), established conclusively and categorically that the Defendant

Goldston's conduct on March 4, 2020 was, as a matter of law, "*executive*" in nature, and

expressly not "*judicial*." Syllabus Point 2 held that, "The West Virginia Constitution forbids a

judicial officer to participate in a search because a search is an exercise of executive power…."

and, Syllabus Point 3 held that the underlying findings against Defendant were proven by clear

and convincing evidence. The Court further labeled the conduct "serious misconduct" worthy of

public condemnation through censure. Id. at 2. The Court held that the defendants jointly

participated in an "invasion of the [Plaintiff's] home" that "was an egregious abuse of process."

Id. That both McPeake and Stump for whatever reason, fail to acknowledge or accept the

condemnation and declared illegality of their behavior, is difficult to comprehend. However, it

illustrates the inapplicability of qualified immunity to the pending claims against them.

       **B.**       **RALEIGH COUNTY COMMISSION**

       **1.**       **Defendant RCC had, and continues to have, a policy of enabling and**

**supporting the unconstitutional misconduct of Defendant Goldston.**

       Defendant RCC argues that they're entitled to summary judgment because "the record is

devoid of any evidence that that the [RCC] has a policy or custom of violating the Plaintiff's

rights." However, the Facts section above is replete with evidence in the record indicating

otherwise. Moreover, Defendant RCC exaggerates the elements of a successful *Monell* claim.

       In Owens v. Baltimore Attorney's Office, 767 F.3d 379, 403 (4th Cir. 2014), the Fourth

Circuit allowed a claim to survive a motion to dismiss where Plaintiff alleged that "reported and

unreported cases from the period of time before and during the events complained of" establish

that the Baltimore City Police Department had a custom, policy or practice of knowingly and

repeatedly suppressing exculpatory evidence. Further, the plaintiff alleged that "a number of motions were filed and granted during this time period that demonstrate . . . the custom, policy, or practice . . . by condoning it and/or knowingly turning a blind eye to it." Owens, 767 F.3d at 403. Here, the Court is presented with the testimony of two of Defendant Goldston's bailiffs, including her current serving bailiff, as well as a long-time past serving bailiff, who also was involved in the March 4, 2020 event.

Bailiff McPeake sought out a RCC supervisor prior to his first home search as a bailiff in Raleigh County Family Court, seeking assurance that he was within department policy prior to doing so. He was told by Sergeant Lilly that he was authorized to participate, and that they do these things from time-to-time. (McPeake 13:10-13; 40:11-24; 64:2-23; 65:9-17) Even after the March 4, 2020 event, as well as the ensuing litigation and WVSCA opinion, McPeake testified that there had been no policy change. McPeake, who continues to serve as bailiff for Judge Goldston, *has not* been instructed by his supervisor, Lt. Stafford, to refrain from similar conduct in the future. (McPeake 13:10-13; 40:11-24; 64:2-23; 65:9-17).

Defendant Stump, who made very clear during his deposition that he was a supervisor for RCC, testified that he had visited the homes of litigants with Judge Goldston "numerous times." (Stump at 6:12-14, 19-24; 7:1-4). This apparently occurred so many times that he couldn't even estimate the number of times he had participated in them. (Stump at 7:19-24; 8:1). Stump explained that as bailiff, sheriff's department policy for bailiffs is whatever policy a judge told him - "no questions asked . . . ." (Stump at 31:3-18). He noted that, even after the March 4, 2020 incident, there has been no policy change within the department about bailiffs going to the

16

homes of litigants. Indeed, Stump asserts that, "if Judge Goldston told me today to go to the house, I'd be the first one there." (Stump 56:1-6).

The record thus contains sufficient evidence indicating that the Raleigh County Sheriff's Office had a longstanding policy and practice of participating in what the WVSCA held was "serious misconduct" and an "egregious abuse of process" that violated the sanctity and privacy of the Plaintiff's home on March 4, 2020. This policy and practice clearly continues and will happen again, unless the Plaintiff can proceed through trial on the *Monell* claim, in addition to the direct claims.

CONCLUSION

Whatever the Court's ruling on Defendant Goldston's assertion of judicial immunity, there is no doubt that the defendant police officers cannot similarly assert judicial immunity. They may only seek qualified immunity, which should be denied under the circumstances. They performed a search of the Plaintiff's home on March 4, 2020, in the absence of a search warrant, or applicable exception. Ignorance of the law is not an excuse where such ignorance is unreasonable. The defendant officers have demonstrated their unreasonableness in their insistence that the March 4, 2020 event was a lawful and appropriate family court proceeding, which it undisputedly was not. Wherefore, Plaintiff respectfully requests that this Honorable Court deny the said defendants' motion for summary judgment, and for such other and further relief as this Court deems just and fit.

MATTHEW GIBSON,
By Counsel

/s John H. Bryan
John H. Bryan (WV Bar No. 10259)
JOHN H. BRYAN, ATTORNEY AT LAW
411 Main Street
P.O. Box 366
Union, WV 24983
(304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

MATTHEW GIBSON,

      Plaintiff,

vs.                          Civil Action No. 5:21-cv-00181
                                Honorable Frank W. Volk

LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision,
JEFF MCPEAKE, individually,
BRIAN WHITE, individually,
BOBBY STUMP, individually,

      Defendant.

**<u>CERTIFICATE OF SERVICE</u>**

I, John H. Bryan, do hereby certify that I have delivered a true copy of the foregoing

PLAINTIFF'S RESPONSE IN OPPOSITION TO RALEIGH COUNTY DEFENDANTS'

MOTION FOR SUMMARY JUDGMENT has been served upon counsel of record by using the

CM/ECF System, this the 11th day of April, 2022 and addressed as follows:

Jennifer E. Tully, Esq.               J. Victor Flanagan, Esq.
Adam K. Strider, Esq.                Kevin J. Robinson, Esq.
Bailey & Wyant, PLLC               Pullin Fowler Flanagan, Brown & Poe, PLLC
500 Virginia Street, East, Suite 600    252 George Street
PO Box 3710                      Beckley, WV 25801
Charleston, WV 25337-3710        *Counsel for Raleigh County Defendants*
*Counsel for Louise E. Goldston*

/s John H. Bryan
John H. Bryan (WV Bar No. 10259)
JOHN H. BRYAN, ATTORNEYS AT LAW
411 Main Street
P.O. Box 366
Union, WV 24983
(304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com