

**In the Matter of:**

MATTHEW GIBSON

vs

LOUISE E. GOLDSTON

MATTHEW GIBSON

*February 23, 2022*

Page 50

1 Q. Were you there when your ex-wife
2 Carrie Gibson showed up to actually pick up
3 the property?
4 A. Yes, ma'am.
5 Q. Was Ms. Masual there?
6 A. Yes, ma'am.
7 Q. How about Mr. Black?
8 A. He'd done left by then, ma'am.
9 Q. Have you discussed this incident
10 from March 4, 2020, with Ms. Masual?
11 A. She was there. She took the video.
12 Q. I know. But have you discussed it
13 since then?
14 A. Oh, sure.
15 Q. Okay.
16 A. Yes, ma'am.
17 Q. What have you-all discussed about
18 it?
19 A. I mean, that's my girlfriend. So
20 we have talked from A to Z probably on a
21 daily basis.
22 Q. Okay. Is this something that you
23 talk about daily?
24 A. Probably.

Page 51

1 Q. How about Mr. Black, have you
2 talked to him about the March 4, 2020
3 incident?
4 A. I haven't in a while.
5 Q. You did initially?
6 A. Oh, yes, ma'am.
7 Q. And what did you tell Mr. Black?
8 A. I don't -- I can't recall.
9 Q. Who is Tommy Carter?
10 A. He is a co-worker of mine.
11 Q. Is he a neighbor?
12 A. He is a neighbor.
13 Q. What would Mr. Carter know with
14 regard to the March 4, 2020 --
15 A. I don't know what he would know. I
16 don't know what he would know.
17 Q. Okay. Well, you have him listed as
18 somebody who would have information.
19 A. So he was at the bottom of the
20 driveway -- not my driveway, the bottom of
21 the road -- whenever we were exchanging
22 property. And the road was blocked. So he
23 can verify what the weather was also that
24 night.

Page 52

1 Q. So that was from the November 2018
2 property exchange?
3 A. Yes, ma'am.
4 Q. Okay. So he doesn't have any
5 information regarding anything that happened
6 on March 4th?
7 A. He was in the driveway -- I'm
8 sorry. I misunderstood your question. He
9 was also in the driveway on March 4th, 2020.
10 Q. Did he come up onto your property
11 to see what was going on?
12 A. Mr. Black and Mr. Carter -- which I
13 don't know if you can see it on the video or
14 not. When we get out of the truck, there's
15 two guys standing there. That's them two at
16 the top of my driveway.
17 Q. Okay.
18 A. Along with Sharon Masual.
19 Q. Did they stay the entire time?
20 A. Yes, ma'am. Until Bailiff Stump
21 made them leave -- or Deputy Stump.
22 Q. And Brooklyn Gibson, that's your
23 daughter; is that correct?
24 A. Yes, ma'am.

Page 53

1 Q. Have you discussed this with
2 Brooklyn?
3 A. Only what I had to because it was
4 on the news. So if she gets questioned at
5 school -- when it hits the news, what
6 happened?
7 Q. Okay.
8 A. She wasn't there that day.
9 Q. How did this get to the news
10 station?
11 A. I can't answer that.
12 Q. You have no idea?
13     MR. BRYAN: If you know --
14     THE WITNESS: Huh?
15     MR. BRYAN: If you know, answer
16 the question.
17 Q. I believe they have showed the
18 video on the news; is that correct?
19 A. They have, right.
20 Q. How did they obtain the video that
21 your girlfriend took?
22     THE WITNESS: I believe I give it
23 to you, John, right?
24     LOUISE GOLDSTON: You can't --

Elite Court Reporting, LLC
MATTHEW GIBSON, 02/23/2022

Page 54

1  the judge in me. I'm sorry.
2          MR. BRYAN: Don't testify as to,
3  you know, our confidential communications.
4  But if you recall how the news ended up with
5  the video, then you can answer the question.
6  You don't have to say anything we've
7  discussed.
8      A. So by that time, I done retained
9  Mr. Bryan. And I am assuming Mr. Bryan
10 turned it over to the news station.
11     Q. How quickly did you retain Mr.
12 Bryan?
13     A. I'd say -- I can't recall. But it
14 is middle of March maybe, first week of
15 March. Somewhere in that line.
16     Q. So within weeks?
17     A. Yes, ma'am.
18     Q. All right. To have this shown on
19 the news and to have this video on YouTube
20 for anybody and everybody to see, has that
21 caused you any kind of anxiety or emotional
22 distress?
23     A. Absolutely.
24     Q. But that was something done by you

Page 55

1  and your attorney; is that correct?
2      A. Yes.
3      Q. Have you received comments or
4  anything with regard to --
5      A. Yes, ma'am.
6      Q. -- this video?
7          Who have you received comments
8  from?
9      A. I don't know who. There has been
10 positive and some negative.
11     Q. Your co-workers said anything to
12 you?
13     A. Sure.
14     Q. What kinds of things have your
15 co-workers said?
16     A. I can't recall. But it's more off
17 the cuff like, I can't believe it. Are you
18 kidding me, kind of stuff. Stuff like that.
19         MS. TULLY: All right. Give me
20 just a couple of minutes, and I might be
21 finished. Okay?
22         THE WITNESS: Okay.
23         (Break in proceedings.)
24         MS. TULLY: Mr. Gibson, I think

Page 56

1  that I am good. I don't think I have any
2  further questions. Mr. Robinson might have a
3  few.
4          MR. ROBINSON: Yes. I have some
5  questions.
6          EXAMINATION
7  BY MR. ROBINSON:
8      Q. My name is Mr. Robinson --
9  Mr. Robinson -- my name is Kevin Robinson.
10         (Laughter.)
11     Q. I represent the deputy in this
12 case. And I have some questions about the
13 lawsuit that you have filed.
14         Now, I might jump around a little
15 bit. And I might ask some questions that
16 she asked. And I understand I talk fast.
17 You can tell me to slow down, and I will try
18 to rephrase it for you. But other than
19 that, I will get right into it.
20         I want to start out -- your family
21 court case -- your divorce case is in front
22 of what judge now?
23     A. It was in front of -- I am assuming
24 it is still in front of Judge Lisa Clark,

Page 57

1  Mercer County.
2      Q. Okay. So it was transferred from
3  Judge Goldston to Judge Clark in Mercer
4  County?
5      A. There was a slight stopping between
6  -- with Brad Dorsey out of Nicholas County.
7  But we never had any sworn testimony. It was
8  more or less status conference hearings two
9  times.
10     Q. Okay. Let me make sure I got your
11 testimony correct. Are you stating that all
12 of the items that you were supposed to turn
13 over to your ex-wife had already been turned
14 over before the contempt hearing?
15     A. Before March 4, 2020, is that what
16 you're asking?
17     Q. Is that the contempt hearing -- the
18 date of the contempt hearing, March 4th?
19     A. Yes.
20     Q. Are you stating that all of the
21 items that you were supposed to -- that you
22 had been ordered to turn over had already
23 been turned over to your ex-wife?
24     A. All court items were turned over

Page 166

1 moving for divorce. He is feeling very
2 emotional about it. Said his wife accused
3 him of physical abuse.
4     A. Oh, yeah, yeah. Hold on. Yes.
5 Yeah. When she came to my house and -- about
6 four or five days after, she had told my
7 daughter that I was an abusive man and
8 basically -- so I called my pastor. You can
9 have his name too. And --
10    Q. What's his name?
11    A. Pastor Gary Williams.
12    Q. Where is he a pastor at?
13    A. New Prospect Baptist.
14    Q. Where is that located?
15    A. That's in North Sand Branch --
16 Sweeneysburg.
17    Q. Sweeneysburg. Okay.
18    A. Okay. So he was -- he was doing
19 marriage counseling for us. And after I seen
20 that they were going to accuse some kind of
21 abuse, I called them. And he was doing
22 marriage counseling. And I asked them, I
23 said, hey, did she ever accuse me of abuse?
24 He says no. And I said, will you testify for

Page 167

1 me? He said yeah.
2     So after I hired Brandon Johnson, I
3 seen abuse wasn't going to be a dispute of
4 fact, I didn't call him for testimony. But
5 after she told my daughter that I was
6 abusive, you know, that's when the trust on
7 our side stopped. So yes, that happened.
8     Q. All right. And of course you
9 allege it never happened?
10    A. Of course not.
11        MR. ROBINSON: We can make the
12 psychotherapy note dated October 9, 2017 as
13 Exhibit 6.
14        (Exhibit 6 was marked.)
15    Q. It looks like you went -- the first
16 time you went for therapy after the incident
17 that's the subject of this litigation was
18 March 17, 2017?
19    A. Okay.
20    Q. I'm sorry. 2018.
21    A. Say that again.
22    Q. I think it is March 17, 2018. Does
23 that sound correct?
24    A. That should be March 2020.

Page 168

1    Q. 2020?
2    A. After.
3    Q. Okay. I'm sorry.
4       It looks like you went there -- it
5 says, Things are pretty crazy right now. I
6 had a video go viral about some legal things
7 going on from him in his divorce.
8       Now, none of the defendants in this
9 case posted that video online, did they?
10    A. No.
11    Q. Okay. That video was posted by
12 who? Your attorney?
13    A. Yes, sir.
14    Q. Okay. And you are saying your
15 anxiety came from the video going viral?
16    A. Sure. Because at this point,
17 everybody is looking at you whether you are
18 guilty or not guilty. This went on for
19 two years.
20    Q. People would not have done that had
21 your attorney not posted that video online,
22 correct?
23    A. Well, if I didn't do that, then I
24 know that they would sweep the judge

Page 169

1 searching the house -- because she's been
2 doing it for 20 years -- under a rug. And I
3 knew I would get no action. So I had to put
4 my life's events out there to get some
5 action, to get the investigation going.
6     Q. So you put it out there. Okay.
7     A. My attorney did, sir.
8     Q. I think you also said Paul Payne,
9 Chris Payne, Jeff Presley came up to your
10 property and insisted on removing things from
11 your home. They actually came into your home
12 and removed things?
13    A. They didn't come inside, no.
14    Q. They were all outside?
15    A. Yes, sir.
16    Q. Have you seen McPeake since the
17 incident?
18    A. I can't recall.
19    Q. Have you seen Stump since the
20 incident?
21    A. No. I can't recall that either.
22    Q. Have you seen White since the
23 incident?
24    A. No, sir. Not that I can recall.