## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BECKLEY

**MATTHEW GIBSON,**

    **Plaintiff,**

**v.**                                         **Civil Action No. 5:21-cv-00181**
                                                 **Honorable Frank W. Volk**

**LOUISE E. GOLDSTON, individually,**
**COUNTY COMMISSION OF RALEIGH**
**COUNTY, a political subdivision, JEFF**
**MCPEAKE, individually, BRIAN WHITE,**
**individually, BOBBY STUMP,**
**individually,**

    **Defendants.**

## PARTIES' INTEGRATED PRETRIAL ORDER

Now comes the Plaintiff, Matthew Gibson, and the Defendants, Louise E. Goldston, Jeff

McPeake, Brian White, Bobby Stump, and the Raleigh County Commission, by the undersigned

counsel, pursuant to the Court's scheduling order, and submits the following Proposed Integrated

Pretrial Order.

**I.**    **Pre-Trial Disclosures Required by Fed. R. Civ. P. 26(a)(3).**
       **PLAINTIFF:**

    **A.**    **Plaintiff's Witnesses**

        **Names of witnesses expected to be presented by the plaintiff:**

            1.    Matthew Gibson
                   c/o Plaintiff's counsel

            2.    Sharon Masula
                   c/o Plaintiff's counsel

            3.    Louise E. Goldston
                   c/o Bailey & Wyant

4.      Jeff McPeake
        c/o Pullin Fowler Flanagan, Brown & Poe

5.      Bobby Stump
        c/o Pullin Fowler Flanagan, Brown & Poe

**Names of witness Plaintiff may call if the need arises:**

6.      Teresa A. Tarr
        Judicial Disciplinary Counsel
        City Center East, Suite 1200A
        4700 MacCorkle Avenue SE
        Charleston, WV 25304
        (304) 558-0169

7.      Brian J. Lanham
        Judicial Disciplinary Counsel
        City Center East, Suite 1200A
        4700 MacCorkle Avenue SE
        Charleston, WV 25304
        (304) 558-0169

8.      Brandon Johnson, Esq. (Plaintiff's counsel in
        Raleigh County Family Court Case No. 17-D-655-G)
        Wooten, Davis, Hussell & Johnson, PLLC
        914 Jefferson Street N
        PO Box 1668
        Lewisburg, WV 24901

9.      Gail Camp Ray
        (Prior litigant threatened with a home search)
        1186 Hinton Road
        White Oak, WV 25989
        304-923-4339

10.     Doug Black
        Witness at the scene

11.     Tommy Carter
        Witness at the scene

12.     Kyle Lusk
        c/o Dinsmore & Shohl, LLP

**B.     Plaintiff's Expert Witnesses**

1.     None.

**C.     Plaintiff's Witnesses by Deposition**

1.     None.

**D.     Plaintiff's Identification of Documents / Exhibits**

**Exhibits expected to be presented by the Plaintiff:**

1.     Video footage of incident (by Sharon Masula);

2.     Audio recording of incident (by Plaintiff);

3.     Voice mail from Kyle Lusk to Plaintiff;

4.     Audio recording of Kyle Lusk threatening a home search;

5.     March 25, 2021 Stotler Letter by Glen R. Stotler;

6.     ODC Investigation Report, Complaint Nos. 21-03-139
        and 21-03-140;

7.     September 30, 2020 "Agreement" in West Virginia Supreme
        Court Case No. 20-0742, In re: the matter of The Honorable
        Louise E. Goldston, Judge of the 13th Family Court Circuit;

8.     Formal Statement of Charges in West Virginia Supreme
        Court Case No. 20-0742, In re: the matter of The Honorable
        Louise E. Goldston, Judge of the 13th Family Court Circuit;

9.     Public Admonishment of the Honorable Eric Shuck,
        Judge of the 13th Family Court Circuit;

10.    Video Clip from April 19, 2018 hearing in Raleigh County
        Family Court Case No. 17-D-655-G, attached as
        Exhibit 8 to the Goldston Deposition;

11.    Opinion in West Virginia Supreme Court Case
No. 20-0742, In re: the matter of The Honorable Louise E.
Goldston, Judge of the 13th Family Court Circuit;

**Exhibits Plaintiff may utilize at Trial:**

12.    Plaintiff reserves the right to use any document or item
identified and produced in Defendants 'Rule 26(a)(3)
Disclosures;

13.    Any and all photographs or documents exchanged by any
and all parties during the course of litigation;

14.    Documents of record in West Virginia Supreme Court Case
No. 20-0742, In re: the matter of The Honorable Louise E.
Goldston, Judge of the 13th Family Court Circuit;

15.    Documents of record in Raleigh County Family Court
Case No. 17-D-655-G.

**DEFENDANT LOUISE GOLDSTON:**

A.    **Defendants' Expect to Call the Following Fact Witnesses at the Trial of this
Matter:**

1.    Louise E. Goldston
c/o Bailey & Wyant, PLLC

2.    Matthew Gibson, Plaintiff;
c/o John Bryan

3.    Jeff McPeake, Defendant
c/o Pullin Fowler Flanigan Brown & Poe, PLLC

4.    Brian White, Defendant
c/o Pullin Fowler Flanigan Brown & Poe, PLLC

5.    Bobby Stump, Defendant
c/o Pullin Fowler Flanigan Brown & Poe, PLLC

B.    **Defendants May Call the Following Witnesses if the Need Arises:**

1.    Carrie Gibson

2.      John Bryan, Esq.

**C.      Defendants Expect to Call the Following Expert Witnesses at the Trial of this Matter:**

1.      None.

**D.      Defendants' Designation of Those Witnesses Whose Testimony these Defendants Intend to Present by Deposition:**

1.      None.

**E.      Defendants' Exhibits which Defendants Expect to Offer at Trial:**

1.      Property Form time stamped March 4, 2020.

2.      Property Form time stamped September 19, 2020.

3.      Video recordings of home inspection.

4.      Facebook, Youtube, and other social media posts by Plaintiff and/or Plaintiff's counsel regarding the home inspection.

5.      Any and all deposition transcripts taken in this matter.

## DEFENDANTS MCPEAK AND STUMP:

**A.      Defendants' Expect to Call the Following Fact Witnesses at the Trial of this Matter:**

### POTENTIAL WITNESSES

1.      Matthew Gibson
c/o John H. Bryan, Attorney at Law
411 Main Street
Union, WV 24983

2.      Deputy Jeff McPeake
c/o Pullin, Fowler, Flanagan, Brown & Poe, PLLC
252 George Street
Beckley, WV  25801
(304) 254-9300

3.      Sgt. Bobby Stump
c/o Pullin, Fowler, Flanagan, Brown & Poe, PLLC

252 George Street
Beckley, WV  25801
(304) 254-9300

4.   Cpl. Brian White
c/o Pullin, Fowler, Flanagan, Brown & Poe, PLLC
252 George Street
Beckley, WV  25801
(304) 254-9300

5.   Judge Louise E. Goldston
c/o Bailey & Wyant
500 Virginia Street East
Charleston, WV  25337
(304) 345-4222

6.   Kyle G. Lusk, Esq.
c/o Dinsmore & Shohl, LLP
707 Virginia St. E
Suite 1300
Charleston, WV  25301
(304) 357-0900

7.   Teresa Tarr
Judicial Disciplinary Counsel
City Center East, Suite 1200A
4700 MacCorkle Avenue SE
Charleston, WV  25304
(304) 558-0169

8.   Brian Lanham
Judicial Disciplinary Counsel
City Center East, Suite 1200A
4700 MacCorkle Avenue SE
Charleston, WV  25304
(304) 558-0169

9.   Carrie Gibson

10.   Paul Payne

11.   Jeff Presley

12.   Sharon Masula

13.     Doug Black

14.     Tommy Carter

15.     Representatives of the Raleigh County Commission
        c/o Pullin, Fowler, Flanagan, Brown & Poe, PLLC
        600 Neville Street, Suite 201
        Beckley, WV  25801
        (304) 254-9300

16.     Representatives of the Raleigh County Sheriff's Department
        c/o Pullin, Fowler, Flanagan, Brown & Poe, PLLC
        600 Neville Street, Suite 201
        Beckley, WV  25801
        (304) 254-9300

**B.     Defendants May Call the Following Witnesses if the Need Arises:**

1.     None.

**C.     Defendants Expect to Call the Following Expert Witnesses at the Trial of this Matter:**

1.     None.

**D.     Defendants' Designation of Those Witnesses Whose Testimony these Defendants Intend to Present by Deposition:**

1.     None.

**E.     Defendants' Exhibits which Defendants Expect to Offer at Trial:**

1.     Recording of Deputy Jeff McPeake's 911 call on the day of the incident.

2.     Deposition Transcript of Matthew Gibson including all documents attached as Exhibits thereto.

3.     Deposition Transcript of Judge Louise Goldston including all documents attached as Exhibits thereto.

4.     Deposition Transcript of Deputy Jeff McPeake including all documents attached as Exhibits thereto.

5.     Deposition Transcript of Sgt. Bobby Stump including all documents attached as Exhibits thereto.

6.      Deposition Transcript of Cpl. Brian White including all documents attached as Exhibits thereto.

7.      Plaintiff's Answers to Discovery Requests including all documents attached thereto.

8.      Defendant Judge Louis Goldston's Answers to Discovery Requests including all documents attached thereto.

9.      All of the Plaintiff's medical records.

10.     All pleadings and motions filed with the court in this matter including all exhibits attached thereto.

11.     These Defendants reserve the right to supplement this list of potential exhibits.

12.     These Defendants reserve the right to designate as exhibits any and all exhibits, documents, or other tangible items identified in any disclosure, discovery response, or supplement/amendment thereto filed, submitted or disclosed by any other party to the above-styled civil action.


## DEFENDANT RALEIGH COUNTY COMMISSION:

**A.      Defendants' Expect to Call the Following Fact Witnesses at the Trial of this Matter:**

1.      Same witnesses as Defendants McPeake and Stump.

**B.      Defendants May Call the Following Witnesses if the Need Arises:**

1.      Same witnesses as Defendants McPeake and Stump.


**C.      Defendants Expect to Call the Following Expert Witnesses at the Trial of this Matter:**

1.      None.


**D.      Defendants' Designation of Those Witnesses Whose Testimony these Defendants Intend to Present by Deposition:**

1.      Same witnesses as Defendants McPeake and Stump.

**E.**     **Defendants' Exhibits which Defendants Expect to Offer at Trial:**

1.     Same witnesses as Defendants McPeake and Stump.

**II.**     **Contested Issues of Law Requiring a Ruling Before Trial.**

1.     *Defendant Louise E. Goldston's Motion for Summary Judgment*

2.     *Plaintiff's Motion for Summary Judgment Against Defendant Louise E. Goldston*

3.     *Defendants County Commission of Raleigh County, Jeff McPeake, Brian White, and Bobby Stump's Motion for Summary Judgement*

4.     *Louise E. Goldston's Motion in Limine to Preclude the Testimony Of Teresa Tarr And Brian Lanham*

5.     *Defendant Louise E. Goldston's Motion in Limine to Preclude the Introduction of Undisclosed Evidence Of Damages*

6.     *Motion In Limine to Preclude the Introduction Of The Letter From The Hon. Glen R. Stotler, Admonishment Of The Hon. Eric Shuck, And Testimony Of Gail Camp Ray*

7.     *Defendant Louise E. Goldston's Motion in Limine To Preclude The Introduction Of Orders, Findings, And Other Filings Of The Judicial Investigatory Commission And West Virginia Supreme Court Of Appeals In In Re: Goldston*

8.     *Defendants' Raleigh County Commission, Jeff McPeake, Brian White and Bobby Stump's Motion in Limine To Exclude Lay Opinion Testimony*

9.     *Defendants' Raleigh County Commission, Jeff McPeake, Brian White and Bobby Stump's Omnibus Motion in Limine*

10.     *Plaintiff's Motion in Limine Regarding Underlying Contempt Allegations*

11.     *Plaintiff's Motion in Limine Regarding Defendant Goldston's State Supreme Court Adjudication*

12.     *Plaintiff's Motion to Strike Notice of Non-Party Fault*

III.   **Plaintiff's Brief Statement of Essential Elements Which Must be Proven, and the Damages or Relief Sought.**

1.   **Search and Seizure in Violation of the Fourth Amendment Under 42 U.S.C. 1983**

Plaintiff has pled a claim for violation of civil rights under color of law pursuant to 42 U.S.C. § 1983.  To prevail the Plaintiff will need to prove that the Plaintiff was deprived of a guaranteed right by the Defendant under color of law. (1) that the defendant was acting under color of state law, (2) that the defendant engaged in actions that deprived the plaintiff of his constitutional right not to be subject to an unreasonable search and seizure, and (3) that the defendant's acts were the proximate cause of the injuries claimed by the plaintiff).  Plaintiff asserts that the defendant police officers violated his Fourth Amendment rights to be free from unreasonable search and seizure when he was subjected to an investigatory stop without reasonable suspicion, as alleged in the complaint.

2.   **Violation of the First Amendment Under 42 U.S.C. 1983**

Plaintiff has pled a claim for violation of civil rights under color of law pursuant to 42 U.S.C. § 1983. To prevail the Plaintiff will need to prove that the Plaintiff was deprived of a guaranteed right by the Defendant under color of law. (1) that the defendant was acting under color of state law, (2) that the defendant engaged in actions that deprived the plaintiff of his First Amendment right to engage in the protected activity of video and audio recording government officials attempting to enter and search his home, and (3) that the defendant's acts were the proximate cause of the injuries claimed by the plaintiff).  Plaintiff asserts that the defendant government officers violated his First Amendment rights to film, while standing on his own private property, audio and video footage of government officials in the process of entering and searching his home, as alleged in the complaint.

3.     **Monell Claim Under 42 U.S.C. 1983**

Plaintiff has pled a claim for violation of civil rights under color of law pursuant to 42 U.S.C.

§ 1983, including a claim under Monell, of the existence of an official policy or unofficial custom.

To prevail the Plaintiff will need to prove that (1) the Plaintiff was deprived of a guaranteed right by

the Defendant under color of law; and (2) that the deprivation of the Plaintiff's constitutional rights

directly resulted from either a written policy of the Defendant or an unofficial custom; and (3) as a

direct result, the Plaintiff was injured; and (4) the Defendant was acting under color of state law. *See*

8th Circuit Pattern Jury Instruction for Municipal Liability; *citing* Monell v. Dep't of Social Services

of New York, 436 U.S. 658, 691 (1978), and City of Canton, Ohio v. Harris, 489 U.S. 378, 388

(1989)).

The Fourth Circuit Court of Appeals has clarified that:

[a] policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (*quoting* Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999)).

4.     **Fourteenth Amendment Due Process Violation Under 42 U.S.C. 1983**

Plaintiff has pled a claim for violation of civil rights under color of law pursuant to 42 U.S.C.

§ 1983. To prevail the Plaintiff will need to prove that the Plaintiff was deprived of a guaranteed

right by the Defendant under color of law. (1) that the defendant was acting under color of state law,

(2) that the defendant engaged in actions that deprived the plaintiff of his Fourteenth Amendment

right to Due Process, and (3) that the defendant's acts were the proximate cause of the injuries

claimed by the plaintiff).   Plaintiff asserts that the defendant government officers violated his Fourteenth Amendment right to Due Process of law, as alleged in the complaint.

The U.S. Constitution, the Supreme Law of the Land, prohibits government from depriving the plaintiffs of their life, liberty and property interests, without due process of law. The plaintiffs and their constituents owned protected liberty interests in the right to live without arbitrary governmental interference with his liberty and property interests. County of Sacramento v. Lewis, 523 U.S. 833, 845 (1988). Liberty "denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized ... as essential to the orderly pursuit of happiness by free men." Board of Regents of State Colleges v. Roth, 408 U.S. 564, 572 (1972).

Likewise, Article III, § 10 of the West Virginia Constitution provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers. In Syl. pt., Crone v. Crone, 180 W. Va. 184, 375 S.E.2d 816 (1988), the State Supreme Court stated that "[t]he due process of law guaranteed by the State and Federal Constitutions, when applied to procedure in the courts of the land, requires both notice and the right to be heard." *See* Crone at 185-186, 375 S.E.2d at 817-818; *see also* Henry v. Johnson, 192 W. Va. 82, 450 S.E.2d 779 (1994) ("Divorce and custody proceedings are subject to traditional standards of procedural and substantive due process….").

"[T]here can be no doubt that at a minimum [procedural due process] require[s] that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S.

306, 313 (1950). "A fair trial in a fair tribunal is a basic requirement of due process." In re Murchison, 349 U.S. 133, 136 (1955).

**5.** **Fourteenth Amendment Equal Protection Violation Under 42 U.S.C. 1983**

Plaintiff has pled a claim for violation of civil rights under color of law pursuant to 42 U.S.C. § 1983. To prevail the Plaintiff will need to prove that the Plaintiff was deprived of a guaranteed right by the Defendant under color of law. (1) that the defendant was acting under color of state law, (2) that the defendant engaged in actions that deprived the plaintiff of his Fourteenth Amendment right to Equal Protection, and (3) that the defendant's acts were the proximate cause of the injuries claimed by the plaintiff). Plaintiff asserts that the defendant government officers violated his Fourteenth Amendment right to Equal Protection of law, as alleged in the complaint.

The Equal Protection Clause of the Fourteenth Amendment forbids the states to "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. 14th Amend. Where a plaintiff in an equal protection claim does not allege that distinctions were made on the basis of a suspect classification such as race, nationality, gender or religion, the claim arises under the "class of one" theory. Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000). To prevail on such a claim, the plaintiff must demonstrate: 1) the defendant treated him differently than others similarly situated, 2) the defendant did so intentionally, and 3) there was no rational basis for the difference in treatment. Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d. Cir. 2006). As explained above, the rational basis test is forgiving, but not without limits in its deference. Distinctions cannot be arbitrary or irrational and pass scrutiny. "The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 446 (1985).

6.     **Damages Sought**

Plaintiff is seeking actual, nominal and punitive damages.

Actual Damages: Plaintiff seeks a jury determination on damages incurred from the violation of Plaintiff's constitutional rights for the mental and emotional suffering Plaintiff experienced as a result of having his civil rights violated by the defendant government officials.

Nominal Damages: In the event a verdict is returned finding that Plaintiff has failed to prove by a preponderance of the evidence that he suffered any actual damages, Plaintiff seeks nominal damages. The mere fact that a constitutional deprivation occurred is an injury to the person entitled to enjoy that right, even when no actual damages flow from the deprivation.  Therefore, if the jury finds that the Plaintiff has suffered no injury as a result of the defendants' conduct other than the fact of a constitutional deprivation, the jury must award nominal damages not to exceed one dollar.[1]

Punitive Damages: Plaintiff seeks a jury determination on the issue of the imposition of punitive damages against Defendants. If the jury returns a verdict in favor of the Plaintiff and it has been proved that the conduct of the defendant was malicious or recklessly indifferent to the Plaintiff's constitutional rights, then the jury may, but is not required to, award the plaintiff an additional amount of money as punitive damages for the purposes of punishing the defendant for engaging in misconduct and deterring the defendant and others from engaging in similar misconduct in the future.[2]

IV.     **Defendants' Brief Statement of Essential Elements Which Must be Proven to**

---

[1] Carey v. Piphus, 435 U.S. 247, 98 S. Ct. 1042, 55 L. Ed. 2d 252 (1978).

[2] Smith v. Wade, 461 U.S. 30 (1983) (punitive damages may be awarded "when the defendant's conduct involves reckless or callous indifference to the plaintiff's federally protected rights, as well as when it is motivated by evil motive or intent."). See Schaub v. VonWald, 638 F.3d 905, 922-24 (8th Cir. 2011) (the threshold inquiry for award of punitive damages is whether the evidence supports that the conduct involved was reckless or callous indifference). See also Kolstad v. American Dental Ass'n, 527 U.S. 526, 535, 536 (1999), and Canny v. Dr. Pepper/Seven-Up Bottling Group, Inc., 439 F.3d 894, 903 (8th Cir. 2006), discussing the meaning of "malice" and "reckless indifference."

**Establish any Meritorious Defenses.**

    **A.**    **Defendant Goldston's Brief Statement of Essential Elements Which Must be Proven to Establish any Meritorious Defenses.**

    **1.**    **Plaintiff has failed to establish that Defendant Louise E. Goldston is not entitled to judicial immunity and therefore she is entitled to summary judgment.**

It is well-settled that "judges are absolutely immune from suit for a deprivation of civil rights brought under 42 U.S.C. § 1983" even if such acts were allegedly done maliciously, corruptly, or in bad faith and no matter "how erroneous the act may have been, and however injurious in its consequences [the judicial act] may have proved to the plaintiff." *King v. Myers*, 973 F.2d 354, 356 (4th Cir. 1992) (citations omitted); *Plotzker v. Lamberth*, No. 3:08-cv-00027, 2008 U.S. Dist. LEXIS 86198, 2008 WL 4706255, at *4 (W.D. Va. Oct. 22, 2008) (citations omitted). As stated, "[j]udicial immunity is an absolute immunity: it does not merely protect a defendant from assessment of damages, but also protects a judge from damages suits entirely." *Lemon v. Hong*, No. CV ELH-16-979, 2016 U.S. Dist. LEXIS 71756, 2016 WL 3087451, at *4 (D. Md. June 2, 2016) (citing *Mireles v. Waco*, 502 U.S. 9, 11, 112 S. Ct. 286, 116 L. Ed. 2d 9 (1991)). This long-standing common law doctrine is "for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." *Pierson v. Ray*, 386 U.S. 547, 554, 87 S. Ct. 1213, 18 L. Ed. 2d 288 (1967). Judicial immunity ensures that while a judge's actions are "subject to correction on appeal or other authorized review," they do "not expose him to a claim for damages in a private action, or put him to the trouble and expense of defending such an action." *Chu v. Griffith*, 771 F.2d 79, 81 (4th Cir. 1985). *Black v. West Virginia*, No. 3:19-cv-00561, 2019 U.S. Dist. LEXIS 172020, at *12-13 (S.D. W. Va. Sep. 11, 2019).

    **2.**    **Defendant Goldston did not violate Plaintiff's Fourth Amendment Rights of Search and Seizure under 42 U.S.C. §1983.**

Plaintiff has pled a claim for violation of civil rights under color of law pursuant to 42 U.S.C. § 1983.  To prevail the Plaintiff will need to prove that the Plaintiff was deprived of a guaranteed right by the Defendant under color of law: (1) that the defendant was acting under color of state law, (2) that the defendant engaged in actions that deprived the plaintiff of his constitutional right not to be subject to an unreasonable search and seizure, and (3) that the defendant's acts were the proximate cause of the injuries claimed by the plaintiff).  Plaintiff has failed to establish that Defendant Goldston actually searched or seized any items in his home.  Regardless, the Plaintiff's claims herein against Judge Goldston are subject to dismissal due to the application of judicial immunity.  As stated above, judges are generally absolutely immune from suits for money damages. See, e.g., *Mireles v. Waco*, 502 U.S. 9, 9, 112 S. Ct. 286, 116 L. Ed. 2d 9 (1991).  "Although unfairness and injustice to a litigant may result on occasion, it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself." *Id.* (quoting *Bradley v. Fisher*, 80 U.S. 335, 13 Wall. 335, 347, 20 L. Ed. 646 (1872)) (internal quotation marks omitted).

3.      **Defendant Goldston did not violate Plaintiff's First Amendment Right Under 42 U.S.C. 1983.**

"The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000) (citing *ACLU v. Wicomico County*, Md., 999 F.2d 780, 785 (4th Cir. 1993) ("Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights.")).

The test for establishing a First Amendment retaliation claim is a three-element test, expressed as follows by the Fourth Circuit in *Suarez*:

> [A] § 1983 retaliation plaintiff must establish three elements in order to prove a First Amendment § 1983 retaliation claim. First, the plaintiff must demonstrate that his or her speech was protected. See Huang v. Board of Governors, 902 F.2d 1134, 1140 (4th Cir. 1990). Second, the plaintiff must demonstrate that the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech. See Wicomico County, 999 F.2d at 785 (stating that "a showing of adversity is essential to any retaliation claim"). Third, the plaintiff must demonstrate that a causal relationship exists between its speech and the defendant's retaliatory action. See *Huang*, 902 F.2d at 1140.

*Suarez* at 685-686.  However, not every reaction made in response to an individual's exercise of his First Amendment right to free speech is actionable retaliation. See *DiMeglio v. Haines*, 45 F.3d 790, 806 (4th Cir. 1995) ("Not every restriction is sufficient to chill the exercise of First Amendment rights, nor is every restriction actionable, even if retaliatory."). Rather, a § 1983 retaliation plaintiff must demonstrate that the defendant's actions had some adverse impact on the exercise of the plaintiff's constitutional rights. See *Wicomico County*, 999 F.2d at 785 ("In order to state a retaliation claim, Appellees are required to show that [the defendants'] actions adversely impacted these First Amendment rights.").  Further, speech which operates to obstruct legitimate government activity is not protected, such as in the case of *United States v. Twinn*, wherein a person's statements 'outing' an undercover officer with the intended purpose of undermining his investigation were held to be unprotected.  See *United States v. Twinn*, 369 F. Supp. 2d 721, 724-725 (E.D.Va. 2005).

Again, the Plaintiff's claims herein against Judge Goldston are subject to dismissal due to the application of judicial immunity.  As stated above, judges are generally absolutely immune from suits for money damages.  See, e.g., *Mireles v. Waco*, 502 U.S. 9, 9, 112 S. Ct. 286, 116 L. Ed. 2d 9 (1991).  "Although unfairness and injustice to a litigant may result on occasion, it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in

exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself." *Id.* (quoting *Bradley v. Fisher*, 80 U.S. 335, 13 Wall. 335, 347, 20 L. Ed. 646 (1872)) (internal quotation marks omitted).

### 4. Plaintiff's Third Count of a Monell Claim Under 42 U.S.C. §1983

This claim is against the Raleigh County Commission Defendants and therefore does not need to be addressed by Defendant Goldston.

### 5. Defendant Goldston did not violate Plaintiff's Fourteenth Amendment Due Process Violation Under 42 U.S.C. 1983

Plaintiff has pled a claim for violation of civil rights under color of law pursuant to 42 U.S.C. § 1983. To prevail the Plaintiff will need to prove he was denied both notice and the right to be heard in this matter. Plaintiff cannot establish evidence that he was denied either of those. Plaintiff's claims herein against Judge Goldston are subject to dismissal due to the application of judicial immunity. As stated above, judges are generally absolutely immune from suits for money damages. See, e.g., *Mireles v. Waco*, 502 U.S. 9, 9, 112 S. Ct. 286, 116 L. Ed. 2d 9 (1991). "Although unfairness and injustice to a litigant may result on occasion, it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself." *Id*. (quoting *Bradley v. Fisher*, 80 U.S. 335, 13 Wall. 335, 347, 20 L. Ed. 646 (1872)) (internal quotation marks omitted).

### 6. Defendant Goldston did not violate Plaintiff's Fourteenth Amendment Equal Protection Violation Under 42 U.S.C. 1983

Plaintiff has alleged violations of the Equal Protection Clause of the Fourteenth Amendment via his claims that Judge Goldston's practice of home inspections disadvantaged *pro se* litigants. To prevail on such a claim, the plaintiff must demonstrate: 1) the defendant treated him differently than

others similarly situated, 2) the defendant did so intentionally, and 3) there was no rational basis for the difference in treatment. *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d. Cir. 2006). The Plaintiff has failed to establish evidence that Judge Goldston treated him differently than any other party in her Courtroom.   Again, Plaintiff's claims herein against Judge Goldston are subject to dismissal due to the application of judicial immunity.   As stated above, judges are generally absolutely immune from suits for money damages.  See, e.g., *Mireles v. Waco*, 502 U.S. 9, 9, 112 S. Ct. 286, 116 L. Ed. 2d 9 (1991).  "Although unfairness and injustice to a litigant may result on occasion, it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself."  *Id.* (quoting *Bradley v. Fisher*, 80 U.S. 335, 13 Wall. 335, 347, 20 L. Ed. 646 (1872)) (internal quotation marks omitted).

**B.** **Defendants McPeake and Stump's Brief Statement of Essential Elements Which Must be Proven to Establish any Meritorious Defenses.**

1.      "A police officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information could have believed that his conduct was lawful." *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)); see also *McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994).  The calculus of reasonableness must embody allowances for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain and rapidly evolving – about the amount of force that is necessary in particular situation.  *Sigman v. Chapel Hill*, 161 F.3d 782 (4th Cir. 1998).

2.      Qualified Immunity protects police officers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The doctrine provides public officials "breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011).

3.     "For a plaintiff to defeat a claim of qualified immunity, the contours of the constitutional right 'must be sufficiently clear that a reasonable person would understand that what he is doing violates that right.'" *Id*. at 391 (Quotation omitted.).

4.     "Police officers sued in their individual capacities… have qualified immunity with respect to official actions taken in good faith." *Hughes v. Blankenship*, 672 F.2d 403, 406 (4th Cir. 1982).

5.     "Individual liability for actions in the performance of official duties arises only when an officer knew or reasonably should have known that the action he took within the sphere of official responsibility would violate the constitutional rights of the … individuals affected, or if he took the action with the malicious intention to cause deprivation of constitutional rights or injury…" *Id*. at 406 (Quotation omitted).

6.     As the Fourth Circuit Court of Appeals has stated: "We *do not expect sheriffs to be judges* and to have the training to sort through every intricacy of case law that is hardly a model of clarity." *Bland v. Roberts*, 730 F.3d 368, 394 (4th Cir. 2013). (Quotation omitted) (Emphasis added). "[P]olice officers are not expected to parse code language as though they were participating in a law school seminar."" *Id*. at 394. Rather, in considering whether constitutional rights were clearly established for qualified immunity purposes, [the Fourth Circuit Court of Appeals] views the issue from 'the layman's perspective … recognizing that '[particularity with regard to legal conclusions, *lay officers obviously cannot be expected to perform at the level achievable by those*

*trained in the law*.'"  *Id*. at 394 (Quotations omitted)(emphasis added).

7.      Courts use a two-part test to determine whether qualified immunity applies:  (1) whether the facts alleged by the plaintiff make out a violation of a constitutional right; and, if so, (2) whether the right was clearly established at the time of the alleged violation. *MacDonald v. Town of Eastham*, 745 F.3d 8, 12 (1sr Cir. 2014).

8.      The Plaintiff, Matthew Gibson, seeks actual damages pursuant to the provisions of 42 U.S.C. §1983, including damages for his attorney's fees and costs, and damages for his mental and emotional distress, and the violation of his constitutional rights and privileges. 42 U.S.C. §1983. The Plaintiff may be entitled to punitive damages against the defendants for their deliberate, reckless and callous indifference to his constitutional rights. Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978); Smith v. Wade, 461 U.S. 30, 56 (1983); Memphis Community School District v. Stachura, 477 U.S. 299 (1986); Smith v. Wade, 461 U.S. 30 (1983); City of Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981); Carlson v. Green, 446 U.S. 14 (1980); Carey v. Piphus, 435 U.S. 247(1978).

### C.      Defendant RCC's Brief Statement of Essential Elements Which Must be Proven to Establish any Meritorious Defenses.

1.      "[A] municipality cannot be held liable solely because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (U.S. 1978).  Local government, therefore, may not be sued under 1983 solely on a respondeat theory, but rather only when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury for which the government as an entity is responsible under § 1983.  *Id*. at 694; See also *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. W.Va.

1999)(holding plaintiffs seeking to impose liability on a municipality must adequately plead and prove existence of an official policy or custom that is fairly attributed to the municipality and that proximately caused the deprivation of their civil rights).

2. "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-824 (U.S. 1985); See also *Semple*, F.3d at 713-14 (proof of single incident of the unconstitutional activity charged is not sufficient to prove the existence of a municipal custom).

3. Municipal entities cannot be held liable under section 1983 solely because they employed a tortfeasor. Rather, when a municipal entity is sued-directly or in an official-capacity suit-the plaintiff must plausibly allege that a "policy or custom" attributable to the municipal entity caused the violation of the plaintiff's federally protected rights. See *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L. Ed. 626 (1997); *Hafer*, 502 U.S. at 25 (1991); *Graham*, 473 U.S. at 166; *Monell*, 436 U.S. 658, 690-94, 98 S.Ct. 2018, 56 L. Ed. 2d 611 (1978); *King v. Rubenstein*, 825 F.3d 206, 223 (4th Cir. 2016); *Santos*, 725 F.3d at 469-70; *Carter v. Morris*, 164 F.3d 215, 218-19 (4th Cir. 1999). A violation results from a municipal entity's "policy or custom" if the violation resulted from "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690-91, 694; see *St. Louis v. Praprontnik*, 485 U.S. 112, 121, 108 S.Ct. 915, 99 L. Ed. 2d 107 (188).

4. Not every municipal official's action or inaction represents municipal policy. Rather, the inquiry focuses on whether the municipal official possessed final policy making authority under state law concerning the action or inaction. See, e.g. *McMillian v. Monroe Cty.*, 520 U.S. 781, 785-

86, 117 S.Ct. 1734, 138 L. Ed. 2d 1 (1997); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L. Ed. 2d 452 (1986); *Riddick v. Sch.Bd.*, 238 F.3d 518, 523 (4th Cir. 2000). Furthermore, even if a section 1983 plaintiff can identify the requisite final policy making authority under state law, a municipality is not liable simply because a section 1983 plaintiff "is able to identify conduct attributable to the municipality." *Riddick*, 238 F.3d at 524.  Instead, a section 1983 "plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Brown*, 520 U.S. at 404.

5.      West Virginia state law establishes the duty of the sheriff to provide bailiff services to judges within the state of West Virginia.  W.Va. § 51-3-5.

## V.      <u>Brief Statement of Material Facts and Theories of Liability</u>.

### A.      <u>PLAINTIFF</u>:

**Plaintiff's Brief Statement of Material Facts**

On November 18, 2021, the WVSCA issued their published opinion in the case of <u>In the matter of Goldston</u>, No. 20-0742 (2021), censuring and fining Defendant Goldston. The central issue in both <u>Goldston</u> and the § 1983 action currently *sub judice*, is the allegation that a family court judge, under color of law, personally engaged in a search and seizure of the Plaintiff's residence, forcing Plaintiff to stop documenting the incident, under threat of arrest, in violation of state law and federal constitutional rights. The Court in <u>Goldston</u> established conclusively and categorically that the Defendant's conduct was, as a matter of law, "*executive*" in nature, and expressly not "*judicial*." Syllabus Point 2 held that, "The West Virginia Constitution forbids a judicial officer to participate in a search because a search is an exercise of executive power…." and, Syllabus Point 3 held that the underlying findings against Defendant were proven by clear and convincing evidence.

Ultimately, the WVSCA opinion in <u>Goldston</u> established, as a matter of law, that the Defendant "led a *search* of the [Plaintiff's] residence, not a 'judicial view,' and that, in so doing, she exercised executive powers forbidden to her under the West Virginia Constitution." <u>Id</u>. at 2 (emphasis original). The Court also took issue with the "manner in which [Judge Goldston] conducted the search," labeling her actions "serious misconduct," ordering that she be publicly censured and fined $1,000. <u>Id</u>. The Court expressly rejected Defendant's "attempt to reframe her conduct" as judicial in nature.[3] The WVSCA explicitly condemned Defendant Goldston for her actions in traveling to Plaintiff's home and searching it on March 4, 2020:

> As we have stated herein, Judge Goldston's conduct constituted a search, rather than a mere view, of the ex-husband's home. The parties appeared in court for a hearing before Judge Goldston. Undoubtedly, the ex-husband could not have anticipated that the hearing would proceed to an unannounced invasion of the sanctity and privacy of his home. Regardless of whether the ex-husband had failed to provide belongings he was previously directed to provide, Judge Goldston failed to use the appropriate tools available to her under the law to address such failure because she felt such procedures were ineffective. Instead, she, along with her bailiff, the ex-wife, and the ex-wife's attorney, proceeded to enter the ex-husband's home, over his strenuous objections, directed that he stop recording the incident, and began searching for items on the list of items he was to produce. Such an invasion of the ex-husband's home was an egregious abuse of process.
>
> Moreover, Judge Goldston clearly left her role as an impartial judicial officer and participated in an executive function when she entered the ex-husband's home to oversee the search….[4]

Furthermore, it's undisputed that Defendant Goldston entered Plaintiff's residence on March 4, 2020 accompanied by a uniformed sworn law enforcement officer, without a warrant, for purposes of performing a search and seizure therein Yet another sworn law enforcement officer, Defendant Stump, arrived shortly thereafter and joined in the search and seizure. As portrayed in the video footage of the beginning of the encounter, the Plaintiff informed Defendant Goldston that she wasn't

---

[3] <u>Id</u>. at 2 ("After considering the record and the parties 'written and oral arguments, we reject the judge's attempt to reframe her conduct.").

going inside his house without a search warrant, to which Defendant replied, "*oh, yes, I will*." (Goldston Dep. at 75:16-19; Stump at 46:10-22; McPeake at 19:9-24).[5] Defendant cannot justify her presumptively unconstitutional entry with an exception. In fact, Defendant doesn't dispute that her entry into Plaintiff's residence was made in the absence of Plaintiff's consent. (Goldston Dep. at 76:2-22; 77:1-5; McPeake at 26:7-24; 27:1-24; 28:1-22). The WVSCA found that Defendant said to the Plaintiff, "*let me in that house or [the bailiff] is going to arrest you for being in direct contempt of court*," and that Plaintiff felt he had no choice but to let her and others into his home.[6] Defendant admitted to threatening Plaintiff with arrest, should he refuse to allow her, and others, into his home. (Goldston Dep. at 16:8-13; 62:4-24; 63:1-5; 68:24; 69:1-14). Additionally, bailiff Jeff McPeake testified that he witnessed Defendant Goldston threaten Plaintiff with arrest, and that as a sworn on-duty police officer with arrest powers, he would have been the individual to effect the arrest, as threatened by the Defendant. (McPeake at 26:24; 27:1-7; 45:16-18).

Bailiff Jeff McPeake, testified that he was standing with Judge Goldston and the Plaintiff in Plaintiff's front yard near the gazebo when Judge Goldston ordered him to take possession of Plaintiff's cell phone, due to the fact that Plaintiff was attempting to record audio. (McPeake at 32:6-24). Even though Plaintiff was standing in his own front yard and attempting to record Defendant Goldston's actions, he was told by Defendant to stop recording, and then forced to give his cell phone to Bailiff McPeake. (McPeake at 33:1-24). At the time, McPeake was on-duty as a law enforcement officer and was in uniform. (McPeake at 34:9-17). Plaintiff did not consent to the seizure of his cell phone by Defendant Goldston and McPeake. (McPeake at 35:11-15). Ironically, Bailiff McPeake subsequently began filming the subsequent search of Plaintiff's residence using his

---

[4] Goldston at 23.
[5] *See also* video footage at Exhibit 7 of Goldston Deposition; Note that all cited deposition transcripts are attached as exhibits to Plaintiff's Motion for Summary Judgment against Defendant Goldston.

personal cell phone, "for the protection of everyone involved," including at one point filming the interior of Plaintiff's gun safe. (McPeake at 36:4-24; 37:1; 44:3-5).

Defendant Bobby Stump, who arrived shortly after the search and seizure began, testified that he served as Defendant Goldston's bailiff for approximately ten years, and that during that time, he went with her to the homes of litigants "numerous times." (Stump at 6:12-14, 19-24; 7:1-4). When asked to estimate the number, Stump stated, "There's no way I could - over thousands of divorce cases . . . . There's no way I could give you an accurate number. I mean, I have no idea." (Stump at 7:19-24; 8:1). Stump explained that he had numerous conversations with Defendant Goldston about going into the homes of litigants in cases before her, and that when they were inside the Plaintiff's home, "we didn't have to have conversations . . . because she knew I would do my job and I knew what to do." (Stump at 12:9-22). "And she didn't have to have conversations and instruct me because I would have it done before she even thought about it and she knew that." (Stump at 12:23-24; 13:1). Stump helped Goldston with many other things, other than just ensuring her physical safety in the courtroom. For instance, when she would go to the home of a litigant, Stump would drive her to the location. They would arrive in a police cruiser marked, Raleigh County Sherriff's Department, along with the bailiff wearing a Raleigh County Sherriff's Department uniform, who had arrest powers and a gun. (Stump at 13:3-21). According to Defendant Stump, the arrest powers were utilized often while serving as Defendant Goldston's bailiff. Stump testified that he's arrested "dozens and dozens and dozens of people with Ms. Goldston." (Stump at 13:22-24; 14:1-5).

Stump described how Defendant Goldston's home searches were practiced:

I would be the organizer and we would have the list . . . . [a]nd I'd say, hey, the wife gets this, the husband gets this, and I would have the list and I would say, "Okay. I found the chainsaw,' and the wife would get the chainsaw. I found the dishes and the husband would

---

[6] Goldston at 4.

get the dishes. So I was the one that usually orchestrated - I didn't orchestrate that. Judge Goldston always orchestrated everything but I would be the one that would have the list and mark it off and let her know that I - or that the litigant had found whatever they were looking for.

(Stump at 15:1-20. ). Stump testified that he personally looked for items in the home of a litigant "numerous times," explaining, "[a]ll the judges sent me out to look for items" and that, "[i]n the middle of a court hearing they would send me out to look for items at a home." Stump estimated this occurred dozens of times. (Stump 16:4-12). Stump further testified that he didn't record these interactions at the homes of litigants, nor did he allow anyone else to do so, other than the judge, because "the judge is the only one that records a hearing." Yet Stump never observed the judge actually doing so. (Stump at 17:6-21; 18:15-23). Nor was there ever a court reporter present during the so-called hearings at the homes of litigants. (Stump at 18:20-24; 19:1-3).

Stump described himself as the "stable" bailiff over a ten year period, who provided training to other bailiffs who would rotate in-and-out of the position. (Stump at 10:10-18). He described his instructions to other bailiffs as, "Pretty simple. If the judge tells you to do it, you do it and you don't ask questions." (Stump at 10:19-23). Stump further explained that, "The judge always wins. The judge is the boss." (Stump at 11:4-5). Though Stump admits that his employer, even when acting in the position of bailiff, has always been the Raleigh County Sherriff's Office. (Stump at 11:22-24). Stump explained that he usually had a supervisor in the sheriff's department chain of command, during the time in which he served as Defendant Goldston's bailiff. However, he claims that "[i]t was none of their business" what he was doing; "If the judge told me to do it, I was doing it. I didn't care," - even if it chain of command told him not to do it. (Stump at 32: 12-22).

Bailiff McPeake testified that sometime after March 4, he personally received a call from someone at the West Virginia Supreme Court, instructig him that he shouldn't have filmed with his

cell phone inside Plaintiff's home. (McPeake 53:1-24; 54:1-14). However, his supervisor, Lt. Stafford, did not expressly forbid him from accompanying Judge Goldston to the homes of litigants. Nor was he the subject of discipline as a result of the March 4, incident. (McPeake 54:24; 55:1-6). McPeake testified that he believed the search was authorized under department policy due to a conversation with a supervisor, Sergeant Lilly, who told him that it was fine to do so, because "we do do that from time to time." Thereafter, no supervisor ever told McPeake not to do so. Moreover, as of the date of his deposition, he wasn't aware of any written policy changes pertaining to bailiffs or deputies going to the home of a litigant with a judge. Nor have any of his supervisors proactively told him not to engage in similar conduct in the future, even though they're aware that he continues to serve as a bailiff for Judge Goldston. Nevertheless, McPeake noted that his own common sense tells him he shouldn't do it again. (McPeake 13:10-13; 40:11-24; 64:2-23; 65:9-17). It appeared to McPeake, after getting express authorization from a supervisor to participate in his first home search with a family court judge, that it seemed to be something that occurred on a regular basis. (McPeake 13:7-13; 15:3-8).

**Plaintiff's Theories of Liability**

1. **<u>DEFENDANT GOLDSTON</u>**

     **Defendant Goldston is ineligible for judicial immunity as a matter of law.**

The WVSCA opinion in <u>In the matter of Goldston</u>, No. 20-0742 (2021) operates to prohibit Defendant Goldston from the application of judicial immunity in defense of the same underlying facts. <u>Goldston</u> is a final adjudication on identical issues facts and law, censuring Defendant for an

"egregious abuse of process."[7] Despite Defendant's refusal to describe her conduct as a "search," the

WVSCA held otherwise, specifically holding that she performed a search of the Plaintiff's residence:

> We begin with a threshold question: Did Judge Goldston view the ex-
> husband's home, or did she search it? We find that she searched it…. Accordingly, we find
> that Judge Goldston's actions at the residence were
> not a view.[8]

The Court rendered a final adjudication on Judge Goldston's argument that a West Virginia family

court judge possesses state-law authority to engage in her actions of March 4, 2020:

> Under our system of government, judges may not exercise executive powers . . . . In light of
> these clear prohibitions, we hold that the West Virginia Constitution forbids a judicial officer
> to participate in a search because a search is an exercise of executive power. W. Va. Const.
> art. 5 § 1. Because Judge Goldston plainly engaged in such a search, we find that the so-
> called "view" was improper.[9]

Defendant Goldston may not now assert judicial immunity, but rather is bound by the WVSCA's

final adjudication of the matter. Defendant cannot dispute that she performed a search, rather than a

view, and that performing a search of Plaintiff's home, as a matter of law, falls outside the

protections of judicial immunity.[10]

### Defendant Goldston is estopped and precluded from asserting immunity and otherwise seeking to attack or contradict the State Supreme Court holdings

Due to the fact that Defendant Goldston was already provided with a full and fair opportunity

to litigate the factual and legal issues arising from her actions of March 4, 2020 in the underlying

judicial disciplinary proceedings, she is now categorically barred from further challenging those

factual and legal findings litigated therein. The Complaint's allegations, as well as the Defendant's

---

[7] Goldston at 23.
[8] Id. at 13-15.
[9] Id. at 17-18.
[10] Plaintiff has already briefed the issue of judicial immunity in his supplementary brief discussing the effect of In the matter of Goldston, No. 20-0742 (2021) on Defendant Goldston's claim of judicial immunity. In the interest of judicial economy, the Plaintiff hereby incorporates the supplementary brief by reference as though fully restated herein.

ensuing assertion of judicial immunity in her motion to dismiss, consist of substantially identical factual and legal issues as were decided in the Goldston opinion, and to which the Defendant is now bound.[11] Any attempt by Defendant Goldston to subsequently claim in this civil action, that she did not commit state and federal constitutional violations against the Plaintiff, or that in so doing she was engaging in an alleged judicial act, is effectively an inappropriate collateral attack on the State Supreme Court judgment.

### As a matter of law, Defendant Goldston violated the Fourth Amendment by engaging in an unreasonable search and seizure under color of law

Here, it's undisputed that Defendant Goldston entered Plaintiff's residence on March 4, 2020 accompanied by a uniformed sworn law enforcement officer, without a warrant, for purposes of performing a search and seizure therein. As portrayed in the video footage of the beginning of the encounter, the Plaintiff informed Defendant Goldston that she wasn't going inside his house without a search warrant, to which Defendant replied, "*oh, yes, I will.*"[12] Defendant cannot justify her presumptively unconstitutional entry with an exception. In fact, Defendant doesn't dispute that her entry into Plaintiff's residence was made in the absence of Plaintiff's consent.[13] The WVSCA found that Defendant said to the Plaintiff, "*let me in that house or [the bailiff] is going to arrest you for being in direct contempt of court*," and that Plaintiff felt he had no choice but to let her and others into his home.[14] Defendant admitted to threatening Plaintiff with arrest, should he refuse to allow

---

[11] Plaintiff has already briefed the issues of estoppel, preclusion, as well as the Rooker-Feldman Doctrine in his supplementary brief discussing the effect of In the matter of Goldston, No. 20-0742 (2021) on Defendant Goldston's claim of judicial immunity. In the interest of judicial economy, the Plaintiff hereby incorporates the supplementary brief by reference as though fully restated herein.

[12] Goldston Dep. at 75:16-19; Stump at 46:10-22; McPeake at 19:9-24; *see also* video footage at Exhibit 7 of Goldston Deposition.

[13] Goldston Dep. at 76:2-22; 77:1-5; McPeake at 26:7-24; 27:1-24; 28:1-22.

[14] Goldston at 4.

her, and others, into his home.[15] Additionally, bailiff Jeff McPeake testified that he witnessed Defendant Goldston threaten Plaintiff with arrest, and that as a sworn on-duty police officer with arrest powers, he would have been the individual to effect the arrest, as threatened by the Defendant.[16]

The WVSCA's adjudication of the Defendant's actions at the Plaintiff's home, which was labeled by the Court as displaying "a callous disregard for our system of justice," establish, as a matter of law, that: (1) Defendant Goldston entered and performed a search of Matthew Gibson's home on March 4, 2020 under color of state law; (2) In so doing, she acted intentionally and in an executive law enforcement capacity, thus rendering her ineligible for a grant of judicial immunity; and (3) Defendant failed to obtain a search warrant for the residence and did not have Plaintiff's consent.[17]

Defendant performed a "search" of Plaintiff's home in the absence of a warrant, and no applicable exception applies, thus the search was unlawful.[18] While acting under color of state law, Defendant Louise Goldston deprived Matthew Gibson of a federal constitutional right, which was his Fourth Amendment to be free from unreasonable search and seizure, as alleged in Count One of the Complaint.[19]

**As a matter of law, Defendant Goldston violated the First Amendment by threatening to arrest Plaintiff and his guests for filming and recording her commission of an unlawful search and seizure on March 4, 2020**

---

[15] Goldston Dep. at 16:8-13; 62:4-24; 63:1-5; 68:24; 69:1-14;

[16] McPeake at 26:24; 27:1-7; 45:16-18.

[17] *See also* 9th Circuit Model Jury Instructions, 9.15 Particular Rights - Fourth Amendment - Unreasonable Search - Exception to Warrant Requirement - Emergency Circumstances.

[18] Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (footnote omitted).

[19] Third Circuit Model Jury Instructions 4.3 - Section 1983 - Elements of Claim; Gomez v. Toledo, 446 U.S. 635, 640 (1980).

The WVSCA made indisputable findings pertaining to Defendant Goldston's interference and retaliation with Plaintiff's First Amendment rights. <u>In the matter of Goldston</u>, No. 20-0742 (2021) conclusively establishes that Judge Goldston did in-fact prohibit recording, as well as the fact that so doing was an egregious act of misconduct. The Court wrote that, "Judge Goldston . . . indicated that if they did not turn off their phones and stop recording she would take the [Plaintiff], or perhaps both he and his girlfriend, to jail," and that "Judge Goldston, herself, made no arrangements to record what went on inside the home (or outside the home)." <u>Id</u>. at 4. The Court ultimately held that, "over [Plaintiff's] strenuous objections, [Defendant Goldston] directed that he stop recording the incident, and began searching for items on the list of items he was to produce" and that, "[s]uch an invasion of the [Plaintiff's] home was an egregious abuse of process." <u>Id</u>. at 23.

The record thus demonstrates that there are no genuine issues of material fact for determination under Count Two. Plaintiff and his girlfriend, acting pursuant to his direction to record, were situated on Plaintiff's private property at the time the protected First Amendment actions of recording the defendants was taking place. They were subject to no applicable "time, place or manner" restrictions limiting their rights or ability to record the actions of the defendant government officials. Though Defendant Goldston defiantly "disagrees" with the WVSCA about the fact that she was engaging in an "egregious abuse of process," rather than a lawful or routine family court proceeding, the issue has already been adjudicated in <u>Goldston</u>. Whether Defendant chooses to admit it or not, the WVSCA held that, "over [Plaintiff's] strenuous objections, [Defendant Goldston] directed that he stop recording the incident, and began searching for items on the list of items he was to produce" and that, "[s]uch an invasion of the [Plaintiff's] home was an egregious abuse of process." <u>Goldston</u>. at 23.

**As a matter of law, Defendant Goldston violated the Plaintiff's 14th Amendment Due Process rights on March 4, 2020**

As already noted multiple times above, the WVSCA held that Defendant Goldston's actions on March 4, 2020, were an "egregious abuse of process." Goldston at 23. The invasion of the privacy of Plaintiff's home, to which the WVSCA was referring, was performed by Defendant Goldston under the guise of family court contempt proceedings under West Virginia state law. However, Defendant Goldston did not provide the Plaintiff basic due process to which he was entitled under the state contempt laws in the contempt proceedings on March 4, 2020.[20] The deprivation of due process at issue pertain to actions taken by the Defendant during the performance of a "nonexistent" executive branch role, rather than in a judicial capacity.

While acting under color of state law, Defendant Goldston deprived Matthew Gibson of a federal constitutional right, which was his Fourteenth Amendment right to Due Process, as alleged in Count Four of the Complaint.[21] There are no genuine issues of material fact to be determined at trial. The only remaining issue for resolution of Count Four is damages.

**<u>DEFENDANT POLICE OFFICERS</u>**

**Defendants McPeak and Stump are not entitled to qualified immunity.**

Defendants McPeake and Stump assert application of the doctrine of qualified immunity. However, there is perhaps no more clearly established civil rights violation than a warrantless search of a citizen's home, and therefore qualified immunity is unavailable as a defense. It's undisputed that a search took place, which was unlawful according to the West Virginia Supreme Court of Appeals.

---

[20] *See* W. Va. Code §51-2A-9 and W. Va. Code §48-1-304 for contempt provisions applicable to Family Court in West Virginia.

[21] Third Circuit Model Jury Instructions 4.3 - Section 1983 - Elements of Claim; Gomez v. Toledo, 446 U.S. 635, 640 (1980).

It's undisputed that there was no search warrant. It's undisputed that there was no consent by the Plaintiff. It's undisputed that there were no exigent circumstances to justify the entry and search.

Following the clearly established precedent of the Supreme Court, the police officer defendants who jointly participated in the warrantless search of Mr. Gibson's home, they cannot be granted qualified immunity under the facts of record. Examining the facts in the light most favorable to the Plaintiff, they demonstrate a warrantless search and seizure with no reasonable factual basis for an exception. The said defendants cannot obtain qualified immunity for the violation of the most fundamental *and clearly established* tenant of the Fourth Amendment:

> **No reasonable officer could claim to be unaware of the basic rule, well established by our cases, that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional**. *See* <u>Payton</u>, 445 U. S., at 586-588. Indeed, as we noted nearly 20 years ago in <u>Sheppard</u>:[22] "The uniformly applied rule is that a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional."

<u>Id</u>., 540 U.S. at 564 (2004) (emphasis added).

The ongoing mistakes of law by Stump and McPeake go well beyond reasonableness. Rather, they openly defy the law, and continue to do so. The WVSCA in <u>In the matter of Goldston</u>, No. 20-0742 (2021), established conclusively and categorically that the Defendant Goldston's conduct on March 4, 2020 was, as a matter of law, "*executive*" in nature, and expressly not "*judicial*." Syllabus Point 2 held that, "The West Virginia Constitution forbids a judicial officer to participate in a search because a search is an exercise of executive power…." and, Syllabus Point 3 held that the underlying findings against Defendant were proven by clear and convincing evidence. The Court further labeled the conduct "serious misconduct" worthy of public condemnation through censure. <u>Id</u>. at 2. The Court held that the defendants jointly participated in an "invasion of the [Plaintiff's] home" that "was

an egregious abuse of process." Id. That both McPeake and Stump for whatever reason, fail to acknowledge or accept the condemnation and declared illegality of their behavior, is difficult to comprehend. However, it illustrates the inapplicability of qualified immunity to the pending claims against them.

### DEFENDANT RALEIGH COUNTY COMMISSION

**Defendant RCC had, and continues to have, a policy of enabling and supporting the unconstitutional misconduct of Defendant Goldston.**

Defendant RCC argues that they're entitled to summary judgment because "the record is devoid of any evidence that that the [RCC] has a policy or custom of violating the Plaintiff's rights." However, the Facts section above is replete with evidence in the record indicating otherwise. Moreover, Defendant RCC exaggerates the elements of a successful *Monell* claim.

In Owens v. Baltimore Attorney's Office, 767 F.3d 379, 403 (4th Cir. 2014), the Fourth Circuit allowed a claim to survive a motion to dismiss where Plaintiff alleged that "reported and unreported cases from the period of time before and during the events complained of" establish that the Baltimore City Police Department had a custom, policy or practice of knowingly and repeatedly suppressing exculpatory evidence. Further, the plaintiff alleged that "a number of motions were filed and granted during this time period that demonstrate . . . the custom, policy, or practice . . . by condoning it and/or knowingly turning a blind eye to it." Owens, 767 F.3d at 403. Here, the Court is presented with the testimony of two of Defendant Goldston's bailiffs, including her current serving bailiff, as well as a long-time past serving bailiff, who also was involved in the March 4, 2020 event.

Bailiff McPeake sought out a RCC supervisor prior to his first home search as a bailiff in Raleigh County Family Court, seeking assurance that he was within department policy prior to doing

---

[22] Massachusetts v. Sheppard, 468 U.S. 981 (1984) ("[A] warrant that fails to conform to the particularity

so. He was told by Sergeant Lilly that he was authorized to participate, and that they do these things from time-to-time. (McPeake 13:10-13; 40:11-24; 64:2-23; 65:9-17) Even after the March 4, 2020 event, as well as the ensuing litigation and WVSCA opinion, McPeake testified that there had been no policy change. McPeake, who continues to serve as bailiff for Judge Goldston, *has not* been instructed by his supervisor, Lt. Stafford, to refrain from similar conduct in the future. (McPeake 13:10-13; 40:11-24; 64:2-23; 65:9-17).

Defendant Stump, who made very clear during his deposition that he was a supervisor for RCC, testified that he had visited the homes of litigants with Judge Goldston" numerous times." (Stump at 6:12-14, 19-24; 7:1-4). This apparently occurred so many times that he couldn't even estimate the number of times he had participated in them. (Stump at 7:19-24; 8:1). Stump explained that as bailiff, sheriff's department policy for bailiffs is whatever policy a judge told him - "no questions asked . . . ." (Stump at 31:3-18). He noted that, even after the March 4, 2020 incident, there has been no policy change within the department about bailiffs going to the homes of litigants. Indeed, Stump asserts that, "if Judge Goldston told me today to go to the house, I'd be the first one there." (Stump 56:1-6).

The record thus contains sufficient evidence indicating that the Raleigh County Sheriff's Office had a longstanding policy and practice of participating in what the WVSCA held was "serious misconduct" and an "egregious abuse of process" that violated the sanctity and privacy of the Plaintiff's home on March 4, 2020. This policy and practice clearly continues and will happen again, unless the Plaintiff can proceed through trial on the *Monell* claim, in addition to the direct claims.

**<u>Defendant Goldston's Brief Summary Of Material Facts And Theories Of Defense:</u>**

**A.     Objection to the Plaintiff's arguments in the foregoing section.**

requirement of the Fourth Amendment is unconstitutional").

The foregoing section is not, as is contemplated by this Pretrial Order, a brief summary of material facts and liability.  Rather, the Plaintiff has used that page space to further respond to the Defendants' Motions for Summary Judgment, and reply to the Defendants' Response to Plaintiff's Motion for Summary Judgment, outside the respective appropriate time frames.  The deadline for a Response was April 11, 2022, and the deadline for a Reply was April 18, 2022.  The Plaintiff has already filed Responses and a Reply and there are no further dates permitted for briefing. Accordingly, the Defendant urges the Court not to consider the above arguments in its consideration of those Motions.

### B.    Brief Summary of Material Facts

The Plaintiff, Matthew Gibson, was a party to a divorce action in the Family Court of Raleigh County, West Virginia, appearing for final hearing in that matter on or about September 18, 2018. Defendant Louise E. Goldston is a Family Court Judge of the 13th Family Court Circuit, based in Beckley, Raleigh County, West Virginia, and presided over the Plaintiff's divorce hearing.  At that hearing, the Court granted the parties a divorce, and adopted a settlement agreement between the parties as to property distribution. *Complaint, ¶ 11.*  The Plaintiff also alleges that, at that hearing, his ex-wife's attorney, Defendant Lusk, advised the Plaintiff against stating that assets are not at his home, because Judge Goldston would go to his house and look. *Complaint, ¶ 17.*

The Plaintiff's ex-wife subsequently filed a Petition for Contempt, alleging that he had not turned over certain items of property as determined in the settlement agreement, or that some items he did turn over were damaged.  *Complaint, ¶ 14.*  A hearing on that Petition was held on March 4, 2020, at which the Plaintiff appeared *pro se.*  See Exhibit A, *Plaintiff Matthew Gibson's Response to Defendant Louise E. Goldston's Request for Admission to Plaintiff* at Request No. 1.  At that hearing, Judge Goldston offered to recess the hearing to give the Plaintiff the opportunity to seek

court-appointed counsel.  See *id*. at Request No. 3.  She also offered for the hearing to be continued in order to give the Plaintiff the opportunity to prepare a response to certain late disclosures by his ex-wife's attorney.  See *id*. at Request No. 4.  The Plaintiff declined these opportunities and elected to proceed *pro se* without a continuance.  See id. at Request No. 5.

In the course of the March 4 hearing, Judge Goldston *sua sponte* recessed the hearing and announced that all parties would reconvene at the Plaintiff's home to determine whether certain disputed items of property were there. *Complaint, ¶ 16.*  On the approximately ten (10) minute drive from the courthouse to Plaintiff's home, he and/or his girlfriend, Sharon Masual, researched how to make a motion to disqualify Judge Goldston.  See Exhibit B, *Depo. of Matthew Gibson* at Pg. 105, Line 24 – Pg. 107, Line 2.  Upon arrival at the Plaintiff's home, the Plaintiff immediately approached Judge Goldston and made the Motion to Disqualify.  See Exhibit C, *Depo. of Louise Goldston* at Pg. 60, Line 13 – Pg. 61, Line 16; see also Exhibit D, *Video Recording* at 1:30-1:50.  Thereafter, Judge Goldston realized that the Plaintiff was attempting to record the interaction, and ordered the recording ceased, noting that this was a hearing, and that family court proceedings may not be recorded.  See Exhibit D at 2:50-3:45.

The Plaintiff verbally refused to permit any persons present to enter his home without a search warrant.  Judge Goldston informed him that if he refused entry or refused to cease recording, he would be in contempt of court and would be taken to jail.  See *id*.  Thereafter, the parties entered the Plaintiff's home, and the Plaintiff's ex-wife was permitted to locate certain items which had been allocated to her in the divorce settlement, but had not been provided to her.  See *Depo. of Louise Goldston* at Pg. 10, Lines 3-18; see also Exhibit E, *Bailiff's Video* at 2:30-3:00.  Ms. Gibson requested to search for certain items, and the Judge denied that request, permitting her only to retrieve items on the list the location of which she knew.  See *Depo. of Louise Goldston* at Pg. 10,

Lines 15-18; Exhibit E at 2:30-3:00.  Ms. Gibson took the items she located which were identified on the property list but not produced.  While the Plaintiff will likely dispute whether certain items of property were properly awarded to Ms. Gibson, such a disagreement is irrelevant to the substance of this Motion.

It was plain through the testimony of substantially all involved parties that the interaction at the Plaintiff's home was approached by all involved as a hearing, and that Judge Goldston was addressed as a judicial officer throughout the entirety of the incident.  In addition to the fact that the Plaintiff and his ex-wife made Motions and accepted the rulings on them, the fact that this was a family court hearing was mutually understood.  As with any court hearing, a bailiff was present. Further, the bailiff took a video recording of the interaction, because it was his understanding that all family court hearings are to be recorded.  Judge Goldston's Bailiff, Deputy McPeake, testified in key part as follows:

Q. Would you agree with me that you did more on March 4, 2020, than merely protect the judge's safety or guard the judge inside Mr. Gibson's house?

A. My role there is protecting the judge as I stated.  And all of our hearings, all of them, 100 percent of them, are videotaped.  I felt as if we were still in a courtroom setting. So I felt that it would be a good idea to video as much as I could.  My battery was low. And I would have videotaped start to end.

Q. But you weren't -- you weren't just taking surveillance footage, you were documenting --

A. I was -- I was documenting what people were saying and what people were taking as much as I could.

Exhibit F, *Depo. of Jeff McPeake* at Pg. 46, Line 12 – Pg. 47, Line 5.  Deputy White, a Raleigh County Deputy Sheriff called in by Deputy McPeake, testified likewise as follows:

Q. At some point, did it become apparent to you that the judge was holding a Family Court proceeding inside Mr. Gibson's house?

A. I didn't know if it was a court proceeding.  I mean, I understood there were people in there were trying to figure out whose property was whose property. I mean, so, you see a judge there, a bailiff there, and then there's parties and they're talking about property, then I figured it was some sort of -- something to do with the Court.

[…]

Q. Okay. You were aware of the fact that you weren't at the Family Court.

A. Was I aware I wasn't at Family Court?

Q. Yeah.

A. Obviously.

Q. Yes. You were at somebody's house.

A. Right.

Q. Somebody's residence.

A. I was.

Q. Did it not seem unusual to you that you -- you're observing what appears to be a Family Court proceeding inside somebody's private residence?

A. It wasn't unusual to me. As far as I was aware, that -- I mean, that's something that they do. I mean, I didn't know.

Exhibit G, *Depo. of Brian White* at Pg. 10, Lines 8-17; Pg. 11, Line 24 – Pg. 12, Line 5.

The record of this case is replete with uncontroverted evidence that she approached the parties to this matter as a judge, and that they approached her as a judge.

The parties convened at the Plaintiff's home in response to an order issued from the bench in an effort to resolve a property dispute in a contested divorce proceeding.  The proceeding was attended by a bailiff, who recorded the interaction while non-court personnel were prohibited from recording in accordance with Family Court Rule 8.  See W. Va. R. Fam. Ct. 8.  Upon arrival, the Plaintiff made a motion to disqualify the Judge and/or for her to recuse herself.  Later in the

proceedings, the Plaintiff's ex-wife made a motion to be permitted to search the home for items she did not know the location of. These motions were denied, and the parties abided by the Judge's ruling. After the interaction at the Plaintiff's home concluded, the parties returned to the Courthouse to continue proceedings, in which the judge discussed what had occurred at the Plaintiff's home on the case record. See *Depo. of Louise Goldston* at Pg. 18, Lines 8-14. Clearly, irrespective of her authority to act as she did, Judge Goldston approached this situation as a judge, and the parties reacted to her as a judge.

C. **Theories of Defense:**

A. **This Defendant is entitled to summary judgment based on the application of absolute judicial immunity.**

It is well-settled that "judges are absolutely immune from suit for a deprivation of civil rights brought under 42 U.S.C. § 1983" even if such acts were allegedly done maliciously, corruptly, or in bad faith and no matter "how erroneous the act may have been, and however injurious in its consequences [the judicial act] may have proved to the plaintiff." *King v. Myers*, 973 F.2d 354, 356 (4th Cir. 1992) (citations omitted); *Plotzker v. Lamberth*, No. 3:08-cv-00027, 2008 U.S. Dist. LEXIS 86198, 2008 WL 4706255, at *4 (W.D. Va. Oct. 22, 2008) (citations omitted). As stated, "[j]udicial immunity is an absolute immunity: it does not merely protect a defendant from assessment of damages, but also protects a judge from damages suits entirely." *Lemon v. Hong*, No. CV ELH-16-979, 2016 U.S. Dist. LEXIS 71756, 2016 WL 3087451, at *4 (D. Md. June 2, 2016) (citing *Mireles v. Waco*, 502 U.S. 9, 11, 112 S. Ct. 286, 116 L. Ed. 2d 9 (1991)). This long-standing common law doctrine is "for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." *Pierson v. Ray*, 386 U.S. 547, 554, 87 S. Ct. 1213, 18 L. Ed. 2d 288 (1967). Judicial immunity ensures that while a

judge's actions are "subject to correction on appeal or other authorized review," they do "not expose him to a claim for damages in a private action, or put him to the trouble and expense of defending such an action." *Chu v. Griffith*, 771 F.2d 79, 81 (4th Cir. 1985). *Black v. West Virginia*, No. 3:19-cv-00561, 2019 U.S. Dist. LEXIS 172020, at *12-13 (S.D. W. Va. Sep. 11, 2019).

The Plaintiff's claims herein against Judge Goldston should be subject to summary judgment based on the application of this immunity principle to the undisputed facts on the record. As stated above, judges are generally absolutely immune from suits for money damages. See, e.g., *Mireles v. Waco*, 502 U.S. 9, 9, 112 S. Ct. 286, 116 L. Ed. 2d 9 (1991). "Although unfairness and injustice to a litigant may result on occasion, it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself." *Id*. (quoting *Bradley v. Fisher*, 80 U.S. 335, 13 Wall. 335, 347, 20 L. Ed. 646 (1872)) (internal quotation marks omitted).

Like other forms of official immunity, judicial immunity is an immunity from suit, not just from ultimate assessment of damages. See *Mitchell v. Forsyth*, 472 U.S. 511, 526, 86 L. Ed. 2d 411, 105 S. Ct. 2806 (1985). Accordingly, judicial immunity is not overcome by allegations of bad faith or malice, the existence of which ordinarily cannot be resolved without engaging in discovery and eventual trial. See *Pierson v. Ray*, 386 U.S. 547, 554, 87 S. Ct. 1213, 18 L. Ed. 2d 288 (1967) ("Immunity applies even when the judge is accused of acting maliciously and corruptly"); see also *Harlow v. Fitzgerald*, 457 U.S. 800, 815-819, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982) (allegations of malice are insufficient to overcome judicial immunity).

**VI.**    **Contested Issues of Fact and Law with Cases and Statutory Citations.**

**A.**    **PLAINTIFF:**

1.    Plaintiff believes there are no contestable issue of fact in regard to liability against Defendant Goldston. Plaintiff asserts, consistent with, and supported by, his memorandum in support of his motion for summary judgment, that the only issue requiring a factual determination is the issue of damages, pursuant to 42 U.S.C. 1983.

2.    Currently pending are contested issues of law pertaining to judicial immunity with regards to Defendant Goldston, which have been fully briefed to the Court.

3.    Also currently pending are contested issues of law pertaining to qualified immunity with regards to Defendants McPeake and Stump, which have been fully briefed to the Court. Defendant RCC may not assert qualified immunity.

4.    Plaintiff believes there is a contestable issue of fact in regard to liability against Defendant RCC under the Monell claim, which has been fully briefed to the Court.

5.    Also at issue, is whether the plaintiff is entitled to seek punitive damages against the defendants. Smith v. Wade, 461 U.S. 30 (1983) (punitive damages may be awarded "when the defendant's conduct involves reckless or callous indifference to the plaintiff's federally protected rights, as well as when it is motivated by evil motive or intent.").

**B.**    **DEFENDANT GOLDSTON:**

1.    As outlined in her Motion for Summary Judgment and accompanying Memorandum of Law, this Defendant does not believe that any material issues of fact are in dispute and that they are entitled to Summary Judgment.

2.    The parties have filed a number of Motions for Summary Judgment and Motions *in Limine* regarding evidentiary issues to be decided by the Court.

**C.**    **DEFENDANT MCPEAKE AND STUMP:**

1.    Whether Defendants McPeake and Stump deprived Plaintiff Matthew Gibson of a federal constitutional right under the Fourth Amendment of the U.S. Constitution.

2.    Whether Defendant McPeake deprived Plaintiff Matthew Gibson of a federal constitutional right under the Frist Amendment of the U.S. Constitution.

3.    Whether or not the Plaintiff's rights were clearly established at the time of the alleged violation?

4.      Whether or not the Defendants are entitled to qualified immunity?

5.      Whether the Plaintiff is entitled to punitive damages.


**D.      DEFENDANT RCC:**

1.      Whether the Raleigh County Commission instituted an official policy, custom, and practice of assisting Defendant Judge Goldston with alleged searches and seizures of home of litigants that appeared before her.


**VII.   Stipulations.**

**A.      Plaintiff's Proposed Stipulations.**

1.      Plaintiff will stipulate as to the authenticity of documents proposed as exhibits.

2.      Plaintiff will stipulate that the defendants were acting under color of law at all relevant times.

3.      Plaintiff will stipulate that Matthew Gibson had a right guaranteed by the Fourth Amendment of the Constitution to be free from unreasonable search and seizure.

4.      Plaintiff will stipulate that Matthew Gibson had a right guaranteed by the First Amendment of the Constitution to video and audio record police officers and government officials on his own property on March 4, 2020.

**B.      Defendant Goldston's Proposed Stipulations.**

This Defendant is willing to meet with all counsel and review specific documents to agree upon stipulation but will not generally stipulate to a category of documents without seeing the specific documents being offered.

**C.      Defendant McPeake/Stump's Proposed Stipulations.**

1.      None.

**D.      Defendant RCC's Proposed Stipulations.**

1.      None.

**VIII.   Suggestions for the Evidence of Unnecessary Proof and Cumulative Evidence.**

**A.      Plaintiff's Suggestions.**

None at this time.

**B.      Defendant Goldston's Suggestions.**

None at this time.

**C.      Defendant McPeake/Stump's Suggestions.**

None at this time.

**D.      Defendant RCC's Suggestions.**

None at this time.

**IX.      <u>Suggestions Concerning Any Need for Adopting Special Procedure for Managing Potentially Difficult or Protracted Aspects of the Trial That May Involve Complex Issues, Multiple Parties, Difficult Legal Questions or Unusual Proof Problems.</u>**

Unknown at this time.

**X.      <u>A List of Special Voir Dire Questions.</u>**

**A.      Plaintiff's Questions:**

1.      Do you know, or are you related to, any attorney involved in this action.

2.      Do you know, or are you related to, any employees of any law firm involved in this action.

3.      Have you ever been a client of any law firm involved in this action.

4.      Do you know any party to this action.

5.      Do you know any person listed on the witness list for either party.

6.      Do you know, or are you related to any police officer or employee of the any law enforcement agency.

7.      Have you served as a law enforcement officer, or are you related to a law enforcement officer.

8.      Have you, or any of your close family members or friends ever worked for a lawyer, or in a law office, or have experience in the legal field or court

system?

9.      This is a case that involves allegations that certain police officers violated the civil rights of the Plaintiff.  The defendants deny the allegations.  Would anyone here have any personal concerns rendering a verdict against a defendant police officer.

10.     Have you ever been a party to a family court proceeding in West Virginia.

11.     Have you ever been a party to a family court proceeding in Raleigh County, West Virginia.

12.     This is a case that involves allegations that a judge violated the civil rights of the Plaintiff.  The defendant judge denies the allegations.  Would anyone here have any personal concerns rendering a verdict against a defendant judge?

**B.      Defendant Goldston's Questions:**

Please refer to Defendants' Proposed Voir Dire, attached hereto as Exhibit A.

**C.      Defendant McPeake / Stump's Questions:**

1.      Do any of you know or are you related to Plaintiff's counsel, John Bryan?

2.      Have you or any of your family members been represented by Attorney John Bryan?

3.      Do any of you or your immediate family know the Plaintiff, Matthew Gibson or any member of the Gibson family?

4.      Have any of you or any person in your immediate family ever been involved in civil litigation or any other dispute with a law enforcement agency?

5.      Have you or any of your immediate family ever alleged to have been injured by a member of the law enforcement community?

6.      Have any of you or your immediate family ever had a confrontation with a law enforcement officer which you deemed the officers' actions to be unfair or inappropriate?

7.      Do any of you believe that you have any problems or bias at all with regard to law enforcement agencies?

8.      Specifically, have any of you ever had any negative interaction with any member of the Raleigh County Sheriff's Department?

9.      Have any of you ever served on a civil or criminal jury before and if so, what was the outcome of the trial?

10.     Do any of you believe that you have any unfair biases toward law enforcement officers or the law enforcement community at large?

11.     Do any of you know of any reason why you believe that you could not fairly serve as an impartial juror on this panel?

12.     Have you ever been a Plaintiff in a lawsuit?

**D.      Defendant RCC's Questions:**

1.      Same as McPeake and Stump.

**XI.      A Statement Setting Forth A Realistic Estimate of the Number of Trial Days Required.**

**A.      Plaintiff.**

Plaintiff expects the trial of this matter to last from two to three days.

**B.      Defendant Goldston**

Defendant Goldston estimates that this trial will take 2-3 days.

**C.      Defendant McPeake / Stump**

Defendants expect the trial to last two to three days.

**D.      Defendant RCC**

Defendants expect the trial to last two to three days.

**XII.      Courtroom Technology Requests For Use At Trial.**

**A.      Plaintiff.**

Plaintiff intends to utilize the court's current courtroom technology in order to play the video and audio of the encounter at issue herein.

**B.      Defendant Goldston**

This party intends to use the Court's technology and will make contact with the Court's technology staff at least seven days before trial.

**C.**     **Defendant McPeake / Stump**

Defendants will contact the Court's technology staff administrator to schedule a time prior to the time to ensure their equipment is compatible with the Court's equipment.

**D.**     **Defendant RCC**

Defendants will contact the Court's technology staff administrator to schedule a time prior to the time to ensure their equipment is compatible with the Court's equipment.

**XIII.**   **<u>Any Other Matters Relevant for Pretrial Discussion or Disposition, Including Those Set Forth in Fed. R. Civ. P. 16.</u>**

**A.**     **Plaintiff:**

None at this time.

**B.**     **Defendant Goldston**

None at this time.

**C.**     **Defendant McPeake / Stump**

None at this time.

**D.**     **Defendant RCC**

None at this time.

/s John H. Bryan (w/permission)
John H. Bryan (WV Bar No. 10259)
JOHN H. BRYAN, ATTORNEY AT LAW
411 Main Street
P.O. Box 366
Union, WV 24983
(304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com
*Counsel for the Plaintiff*


/s/ KEVIN J. ROBINSON (W/PERMISSION)
KEVIN J. ROBINSON, WVSB #10181
PULLIN, FOWLER, FLANAGAN,
BROWN & POE, PLLC
252 GEORGE STREET
BECKLEY, WEST VIRGINIA  25801
(304) 254-9300
krobinson@pffwv.com
*Counsel for McPeake, Stump and
Raleigh County Commission*


/s/ Jennifer E. Tully
Jennifer E. Tully (WV Bar #9356)
Adam K. Strider (WV Bar #12483)
BAILEY & WYANT, PLLC
500 Virginia Street, East, Suite 600
Post Office Box 3710
Charleston, West Virginia 25337-3710
T: 304.345.4222
F: 304.343.3133
jtully@baileywyant.com
astrider@baileywyant.com
*Counsel for Louise E. Goldston*