Page 178

1  A. I mean, lose my job. I'd lose
2  everything that I have built if I got
3  arrested.
4  Q. So did you voluntarily consent to
5  the search of your house that day?
6  A. No, sir. Under duress and threats.
7  Q. In fact, did you demand a search
8  warrant?
9  A. Yes, sir.
10  Q. What was the response?
11  A. I don't need a search warrant.
12  Q. At some point, was your phone
13  seized?
14  A. Yes, sir.
15  Q. And who seized your phone?
16  A. Bailiff McPeake.
17  Q. Did you voluntarily give your phone
18  to Bailiff McPeake?
19  A. No, sir.
20  Q. Why did you do so?
21  A. Under threat of arrest.
22  Q. Did you voluntarily stop recording
23  on your phone that day?
24  A. No, sir.

Page 179

1  Q. Why did you stop doing so?
2  A. I was scared of going to jail under
3  threat of arrest.
4  Q. Was Sharon Masual, your girlfriend,
5  threatened with arrest --
6  A. Yes, sir.
7  Q. -- that day?
8  A. Yes, sir.
9  Q. Was she told to stop recording
10  under the threat of arrest?
11  A. Yes, sir.
12  Q. And who made that threat?
13  A. Judge Goldston.
14  Q. Was Deputy McPeake present at the
15  -- when that threat was made?
16  A. Yes, sir.
17  Q. Was he in uniform?
18  A. Yes, sir.
19  Q. Was he there on the property in a
20  marked police cruiser?
21  A. Yes, sir.
22  Q. And you testified earlier that you
23  had parted ways with your prior attorney,
24  Brandon Johnson. Did that occur after your

Page 180

1  divorce was finalized?
2  A. Yes, sir.
3  Q. So the case was over, right?
4  A. Yes, sir.
5  Q. After Judge Goldston was
6  disqualified from presiding over the contempt
7  action that was pending in family court, I
8  think you said Judge Lisa Clark eventually
9  began to preside over the action?
10  A. Yes, sir.
11  Q. So just to -- just to be clear, the
12  ultimate disposition or the ultimate
13  adjudication of this contempt petition that
14  we are -- we have talked about here today was
15  that it was dismissed without a finding that
16  you were in contempt; is that right?
17  A. Yes, sir. She said on the record
18  she is letting the case go.
19  Q. And that was said when?
20  A. Tuesday, February 15th, 2022.
21  Q. Has a written order been entered to
22  your knowledge that memorializes that?
23  A. No, sir. She said she is going to
24  prepare it. And I have got the court

Page 181

1  recorded audio.
2  Q. But you do have a copy of the court
3  audio where she said -- Judge Clark says that
4  the contempt petition is being dismissed
5  without a finding of holding you in contempt?
6  A. Yes.
7  Q. Regarding the video being out
8  there, whether on the news or elsewhere, was
9  it important to you that other people know
10  about what happened to you?
11  A. I think it was very important to
12  get my story out because it has been
13  happening to people for 20 years as Judge
14  Goldston admitted to. So it is -- it is
15  important because the judge is supposed to
16  have the utmost integrity if anybody is
17  supposed to have it. You guys are all
18  officers of the court. You are supposed to
19  have integrity. The judges must have the
20  utmost integrity. It is important to know
21  what our deputies are doing with that search
22  warrant. It's important to know what our
23  judges are doing behind the scenes. When you
24  go to court for divorce, it should be just

Page 182

1 divorce. All of these other games should not
2 be played.
3 Q. If only you knew about it or only
4 you and your lawyer knew about it, do you
5 believe as we sit here today that that would
6 have caused you less anxiety or less
7 emotional trauma than you actually suffered?
8 A. Can you say that question again?
9 Q. Well, the insinuation is, is that
10 you say that you suffered emotional trauma
11 because everybody had seen the video. And if
12 you yourself consented to putting the video
13 out there or put the video out there, then,
14 you know, the suggestion or the insinuation
15 is, is that you -- you know, you chose to
16 make that happen.
17     So my question is, is had you made
18 a different choice or had you not put the
19 video out there, do you believe that you
20 would have suffered any less?
21     MS. TULLY: I am going to object
22 to the use of the word insinuation. I mean,
23 he testified that it being out there causes
24 him stress and anxiety.

Page 183

1     MR. BRYAN: I'm sorry. I
2 completely butchered that question. Let me
3 try to rephrase this.
4 Q. Do you believe that you would have
5 suffered any less if the video hadn't been in
6 the news or on social media?
7 A. I suffered regardless because my --
8 my lack of faith in the way a judge is
9 supposed to act and the police officer is
10 supposed to act happened. You couldn't take
11 that from my memory. Now, I do believe that
12 I suffered more when the video come out. But
13 I -- you know, I had to to get justice.
14 There was only one way of getting justice,
15 was to put it out there. I mean, again, for
16 20 years, people were scared to speak up.
17 Q. So, in effect, did you feel that
18 that was an important step that you were
19 forced to take?
20 A. Yes, sir. It was -- it was either
21 that or swept under the rug as it has been
22 for 20 years.
23     MR. BRYAN: All right. Can I
24 have just a minute? I think I'm probably

Page 184

1 done. I'd just like to talk to Matt real
2 quick.
3     (Break in proceedings.)
4     MR. BRYAN: I don't have any
5 other questions again.
6     MS. TULLY: I just have a couple.
7     RE-EXAMINATION
8 BY MS. TULLY:
9 Q. Judge Goldston never carried
10 anything out of your home; is that correct?
11 A. Not that I know of.
12 Q. Okay. You say you contacted --
13 again, I don't want to know what you all
14 talked about. But you think you contacted
15 Mr. Bryan sometime within a couple of weeks
16 of this happening?
17 A. I am going to say within a week.
18 Q. Okay. So if this video was on the
19 news on March 5th of 2020 -- were you the one
20 that provided the video to the news?
21 A. No. I contacted him -- I probably
22 contacted him the same day. Matter of fact,
23 I'm pretty sure I contacted him March 4th.
24 Q. So you contacted him immediately?

Page 185

1 A. Yes.
2 Q. And you don't believe that without
3 putting that video out there, anything could
4 have happened?
5 A. Yeah.
6 Q. Like we wouldn't be sitting here
7 today had you not put that video out on --
8 A. For 20 years, she had been
9 searching houses. For 20 years, it has been
10 going on. For 20 years, people didn't feel
11 like they had a voice. For 20 years, they
12 haven't.
13 Q. So you are being the savior of all
14 of these --
15 A. There is no savior. I hate it. I
16 hate that it ever happened.
17 Q. What's your ultimate goal with this
18 lawsuit?
19 A. I want justice, ma'am.
20 Q. So you want her to stop being able
21 to perform these searches, is that --
22 A. Absolutely.
23 Q. Okay. Do you believe that has
24 happened through the hearing --