

# EXHIBIT 1

**In the Matter of:**

# MATTHEW GIBSON

vs

# LOUISE E. GOLDSTON

# MATTHEW GIBSON

*February 23, 2022*

Page 42

1  counseling as a result of this?
2      A. Yes, ma'am.
3      Q. And when did you begin seeing a
4  counselor?
5      A. To the best of my recollection,
6  around the middle of March.
7      Q. Had you seen a counselor prior to
8  the middle of March of 2020?
9      A. Not for the same issue. But yes.
10     Q. So you were currently seeing a
11 counselor; is that correct?
12     A. No, I was not.
13     Q. Okay.
14     A. I hadn't seen a counselor -- sorry.
15     Q. No. Go ahead.
16     A. I probably hadn't seen him, I don't
17 know, six, eight months, a year maybe.
18     Q. Why did you initially start seeing
19 a counselor?
20     A. Marriage counseling.
21     Q. Was that something that you did
22 with your ex-wife?
23     A. No, ma'am. That is something I did
24 for myself.

Page 43

1      Q. Okay. You started doing that after
2  you-all had already separated?
3      A. No, ma'am. I did it before.
4      Q. Okay. Who was that counselor?
5      A. His name was Jason Moore.
6      Q. And who is he with?
7      A. Life Strategies.
8      Q. Is this the same counselor that you
9  went to after March 4, 2020?
10     A. Yes, ma'am.
11     Q. What caused you to go back to him?
12     A. Just the -- you know, talking after
13 this incident?
14     Q. Yes.
15     A. Just the anxiety of not really
16 believing what just happened. Again, I can't
17 hardly put it in words. It just -- you know,
18 I got a judge who -- I didn't even get a
19 chance to defend myself. This could have
20 been easily fixed if she let me defend and
21 explain my property form, here is the issues.
22 And, I mean, it would have been easy to
23 talk -- ma'am, you ordered me to do photos --
24 copy photos. And I had to copy a thousand

Page 44

1  other photos. What's the difference between
2  those eight on the wall? Do you know what
3  I mean? So if I was able to present my
4  defense --
5          Any court that I have ever been
6  involved with, you are allowed some kind of
7  due process. And it was just trampled on
8  that day. That bothered me. To say that I
9  have my faith in the justice system -- it
10 went down a notch, you know.
11     Q. Okay. How often -- do you still
12 see Mr. Moore?
13     A. Yeah. I am still under his care.
14     Q. What are you seeing him for
15 currently?
16     A. The same issue.
17     Q. This same issue?
18     A. Yes, ma'am.
19     Q. So almost two years later, you are
20 still seeking counseling?
21     A. Anytime that we do this, it
22 inflames it. Anytime I get a deposition --
23 you know, I have been in family court since I
24 seen Judge Goldston. Maybe seven times, I

Page 45

1  have been back to court. So this inflames
2  it.
3      Q. How often do you see Mr. Moore?
4      A. At one point, I was seeing him
5  weekly. Then he went bi-weekly. And so now
6  it is whenever I need --
7      Q. Okay.
8      A. -- I need to go back. I have my
9  daughters' basketball schedule. I've got two
10 of them playing, so ...
11     Q. When is the last time that you saw
12 him?
13     A. I can't recall.
14     Q. Do you have a current appointment
15 set?
16     A. No, ma'am.
17     Q. In terms of -- has this had an
18 impact on your daily life?
19     A. Like I said, it inflames it. But
20 as far as daily life, no, I am able to go to
21 work and stuff. But I will say it is -- you
22 know, sometimes I may take a day off for
23 stress, anytime that I have court or Kyle
24 files a case or -- my contempt hearing went

```
                                                      Page 46
 1   on for a year, almost two years.
 2       Q.  Uh-huh.
 3       A.  So anytime there was a continuance
 4   or so on, it just inflamed it.
 5       Q.  What was the ultimate response of
 6   your contempt hearing?
 7       A.  As of last Tuesday, Judge Clark
 8   said she is going to dismiss the case against
 9   me.
10       Q.  Okay.  You keep telling me that it
11   inflames you.  I need to have a better
12   understanding of --
13       A.  I can't really put it in words,
14   ma'am.  It is a feeling of disbelief, maybe a
15   little bit of anger.  Sad that when I see a
16   Raleigh County Sheriff's Department -- you
17   know, I know a lot of them guys.  And a lot
18   of them -- you know, I see them driving down
19   the road.  Are they going to go search
20   somebody else's house illegally?  I mean, it
21   has been done for 20 years.  I can't believe
22   that my only crime was I went through a
23   divorce.  It was a nasty divorce evidently.
24   So, you know -- it is hard to put it in

                                                      Page 47
 1   words, ma'am.
 2       Q.  Okay.  If this matter goes to
 3   trial, are you going to be able to find the
 4   words to explain to the jury the impact this
 5   has had on you?
 6       A.  That's a good question, ma'am.
 7       Q.  Well, because if you are going to
 8   be able to find them then, I would like you
 9   to try to find them today to explain to me.
10       A.  Sure.  It is hard to put my
11   emotions in words.  So I'm sorry that I don't
12   have the words for you.  But my emotions are
13   hard to explain.
14       Q.  Okay.  Other than Jason Moore, have
15   you ever sought any kind of medical treatment
16   as a result of this?
17       A.  No, ma'am.
18       Q.  Are you on any kind of medication?
19       A.  No, ma'am.
20       Q.  So you don't take any kind of
21   anxiety medication?
22       A.  No, ma'am.
23       Q.  Okay.  And you are able to continue
24   functioning and going to work?

                                                      Page 48
 1       A.  Yes, ma'am.
 2       Q.  You say you sometimes have to take
 3   a day off.  Is that for hearings?
 4       A.  Yes, ma'am.  It is for hearings.
 5   Just prepping.  Anytime that I have a
 6   hearing, it -- I had a hearing last week.  It
 7   is like it is a mountain when you are pro se.
 8   You are an attorney.
 9       Q.  I am, yes.
10       A.  I am not.  I have to study tenfold.
11   You went to school.
12       Q.  So you're still representing
13   yourself in your divorce hearing?
14       A.  Well, I should be done now other
15   than child support cases.  So yes.
16       Q.  Okay.  Okay.  So then you take a
17   day off to prepare for your hearings and
18   attend the hearing?
19       A.  No.  Sometimes after, I take it off
20   for stress.  I have to decompress.
21       Q.  Okay.  But you don't interact
22   anymore with Judge Goldston?
23       A.  No, ma'am.
24       Q.  Okay.  And in fact you have not

                                                      Page 49
 1   since March 4, 2020; is that correct?
 2       A.  Yes, ma'am.
 3       Q.  Can you tell me who Doug Black is?
 4       A.  He is a co-worker of mine, ma'am.
 5       Q.  What would Mr. Black know about
 6   this incident?
 7       A.  He was there.  He was in the
 8   driveway on the video.  He was one of the
 9   guys that was standing in the driveway.
10       Q.  Okay.  Why was Mr. Black there?
11       A.  He was a witness to the property
12   exchange.  He helped me place the items at
13   the bottom of my driveway.
14       Q.  All right.  What were you going to
15   call Sharon -- how do you say your
16   girlfriend's last name?
17       A.  Masual.
18       Q.  Masual.  What were you going to
19   call her as a witness to testify to?
20       A.  She was there that night that we
21   exchanged property on November 30, 2018.  She
22   can testify what the weather was.  The
23   cardboard boxes were dry.  I took care of
24   what I could.
```