UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

MATTHEW GIBSON,

       Plaintiff,

v.                                          CIVIL ACTION NO. 5:21-cv-00181

LOUISE E. GOLDSTON, *individually*;
COUNTY COMMISSION OF RALEIGH
COUNTY, *a political subdivision*; JEFF
MCPEAKE, *individually*; BRIAN WHITE,
*individually*; and BOBBY STUMP, *individually*;

       Defendants.

## MEMORANDUM OPINION AND ORDER

Pending are cross motions for summary judgment as to Defendant Louise Goldston

[Docs. 65, 67] and a motion for summary judgment filed by the Raleigh County Commission, Jeff

McPeake, Brian White, and Bobby Stump[1] (collectively, the "Raleigh County Defendants") [Doc.

63]. The matter is ready for adjudication.

## I.

On September 18, 2018, Mr. Gibson appeared before Family Court Judge Louise

Goldston in his divorce action. Judge Goldston granted the parties' divorce and adopted their

property settlement agreement. [Doc. 67-5 at 13:16–23:16 (hereinafter "Gibson at ____")].

On September 26, 2019, Kyle Lusk, the attorney for Mr. Gibson's soon-to-be-ex-

wife, filed a Petition for Contempt, alleging defects in the property disbursement. [Gibson at

---

[1] Mr. Gibson does not oppose Deputy White's dismissal. [Doc. 73 at 1 n.1]. The Court
thus **GRANTS IN PART** the Motion for Summary Judgment [**Doc. 63**] as to Deputy White.

37:12–16]. On March 4, 2020, a hearing was held on this contempt petition. Judge Goldston *sua sponte* halted the hearing, requested Mr. Gibson's home address, and ordered the parties to reconvene at Mr. Gibson's home in ten minutes without explanation as to why the home visit was necessary. [Doc. 67-1 at 58:21–59:8 (hereinafter "Goldston at ____")].

On the approximately ten-minute drive from the courthouse to Mr. Gibson's home, Mr. Gibson and his girlfriend, Sharon Masual, researched how to move to disqualify Judge Goldston. [Gibson at 105:24–107:2]. Upon arrival at the home, Mr. Gibson and Ms. Masual began video recording. [Doc. 67-3 at 32:13–33:24 (hereinafter "McPeake at ____"); Gibson at 130:14–21; 178:12–179:13; Goldston at 64:1–11]. Mr. Gibson then immediately approached Judge Goldston and moved to disqualify her on the grounds she had become a potential witness. [Goldston at 60:13–61:16; *see also* Doc. 65-4 at 1:30–1:50 (hereinafter "Video Recording at ____")]. Judge Goldston denied the motion as untimely. [McPeake at 19:1–8].

Mr. Gibson informed Judge Goldston that she was not going inside his house without a search warrant; she replied, "oh, yes, I will." [Goldston at 75:16-19; McPeake at 19:9–24; Doc. 67-4 at 46:10–22 (hereinafter "Stump at ___")]. Judge Goldston continued, "let me in that house or [the bailiff] is going to arrest you for being in direct contempt of court." *In re Goldston*, 246 W. Va. 61, 866 S.E.2d 126, 130 (2021). Judge Goldston admitted to threatening Mr. Gibson with arrest if he refused to allow her and others into his home. [Goldston at 16:8–13; 62:4–24; 63:1–5; 68:24; 69:1–14]. Additionally, Bailiff McPeake testified that he witnessed Judge Goldston threaten Mr. Gibson with arrest, and that as a sworn, on-duty police officer with arrest powers, he would have been obliged to effect the arrest. [McPeake at 26:24; 27:1–7; 45:16–18].

Judge Goldston realized that Mr. Gibson was attempting to record the interaction; she ordered the recording ceased on the grounds that family court proceedings may not be

recorded. [*See* Video Recording at 2:50–3:45; Goldston at 67:23–68:1]. Bailiff McPeake testified that he was standing with Judge Goldston and Mr. Gibson in the front yard near the gazebo when Judge Goldston ordered him to take possession of Mr. Gibson's cell phone based upon her belief he was yet attempting to record audio. [McPeake at 32:6–24]. Judge Goldston told Mr. Gibson to stop recording and directed him to surrender his cell phone to Bailiff McPeake. [McPeake at 33:1–24]. Mr. Gibson did not consent to the seizure of his cell phone. [McPeake at 35:11–15]. Bailiff McPeake nevertheless filmed the search of Mr. Gibson's residence using his personal cell phone "for the protection of everyone involved," including at one point filming the interior of Mr. Gibson's gun safe. [McPeake at 36:4–24; 37:1; 44:3–5]. Judge Goldston was unaware until after this incident that Bailiff McPeake was recording. After he disclosed to Judge Goldston that he had recorded the incident, Judge Goldston told him that recording was improper, and he should not do it again. [Goldston at 19:8–20:19].

Before seizing Mr. Gibson's cell phone, Bailiff McPeake radioed for backup law enforcement assistance. [McPeake at 34:18–23; Stump at 53:7–10; Gibson at 136:16–137:7]. Before the backup arrived, Judge Goldston, Bailiff McPeake, Mr. Lusk, and Mr. Gibson's ex-wife entered Mr. Gibson's residence and began searching. [Goldston at 7:15–20; 12:22–13:1]. Deputy Bobby Stump also aided in the search and seizure of the disputed property at the direction of Judge Goldston once he arrived at Mr. Gibson's residence. [Stump at 45:17–24; Gibson at 156:24–157:7; McPeake at 56:15–59:9]. The search lasted approximately twenty (20) to thirty (30) minutes and involved various parts of the house. [Gibson at 149:1–3; McPeake 36:1–3]. Many different items of personal property were seized from Mr. Gibson's residence without his consent, only some of which were later returned. [Gibson at 158:20–159:1; 178:4–21]. Law enforcement created no contemporaneous inventory of the items taken or any police report. [Stump at 55:10–21].

When a small portion of video footage of the aforementioned events was publicized, the Judicial Disciplinary Counsel received two complaints against Judge Goldston. [Doc. 67-2 at 38 (hereinafter "Goldston Disciplinary Proceeding at _____")]. On September 18, 2020, the West Virginia Judicial Investigation Commission issued a Formal Statement of Charges, filed with the Supreme Court of Appeals of West Virginia, which revealed Judge Goldston admitted to conducting similar "home visits" in her capacity as Family Court Judge on at least eleven (11) separate occasions. [Goldston Disciplinary Proceeding at 11, 39]. She ultimately reached a settlement with the Judicial Disciplinary Counsel, "'admitted her wrongdoing,' and agreed to recommend to the Judicial Hearing Board and the Supreme Court of Appeals that she be censured and fined $5,000 as an appropriate sanction for her violations." [Goldston Disciplinary Proceeding at 36, 54:24–55:7].

On March 22, 2021, Mr. Gibson initiated this action against Judge Goldston, Bailiff McPeake, Deputies White and Stump, Mr. Lusk, and the Raleigh County Commission pursuant to 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments to the United States Constitution. He asserts that (1) the search and seizure of suspected marital property violated his Fourth Amendment right against unreasonable search and seizure [Doc. 1 ¶ 46–62]; (2) the restriction of Mr. Gibson and Ms. Masual's recordings and the seizure of Mr. Gibson's cell phone to prevent further recording violated his First Amendment right to free speech and access to information about officials' public activities [*Id.* ¶ 63–75]; (3) the assistance provided to Judge Goldston by the Raleigh County Sheriff's Office in the search and seizure constituted an official policy, custom, and practice of the Raleigh County Commission [*Id.* ¶ 76–78]; (4) the search and seizure of Mr. Gibson's property deprived him of his due process rights under the Fourteenth Amendment and West Virginia state law [*Id.* ¶ 79–88]; (5) Judge Goldston's home search policy

disadvantaged *pro se* litigants like Mr. Gibson in violation of the Equal Protection Clause of the Fourteenth Amendment and West Virginia state law [*Id.* ¶ 89–100]; and (6) the long-term practice, agreement, relationship, and understanding between Mr. Lusk and Judge Goldston related to searches and seizures of marital property in contempt proceedings constituted a conspiracy or concerted action under color of state law to deprive Mr. Gibson of his federally protected rights [*Id.* ¶ 101–109]. Mr. Gibson requests compensatory and punitive damages, as well as reasonable attorney fees and costs, injunctive and declaratory relief, and any other relief that this Court deems is just and fair. [*Id.* ¶ 37–38].

On April 19, 2021, all Defendants moved to dismiss. [Docs. 9, 11, 13]. Thereafter the Supreme Court of Appeals concluded Judge Goldston exceeded her judicial powers in searching Mr. Gibson's residence in violation of the *Code of Judicial Conduct*. *See In re Goldston*, 246 W. Va. 61, 866 S.E.2d 126. A censure and fine resulted. *Id.* The Undersigned ordered supplemental briefing by Judge Goldston and Mr. Gibson as to any effect the ruling might have on these proceedings [Doc. 39]. They each filed a supplemental memorandum on December 17, 2021. [Docs. 42, 43].

The parties thereafter moved for summary judgment. [Docs. 63, 64, 65, 66, 67, 68, 69]. The Court denied all motions to dismiss except that Defendant Kyle Lusk was dismissed by stipulation. [Docs. 62, 70, 71].

## II.

*Federal Rule of Civil Procedure* 56 provides that summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the nonmoving party to show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby*,

5

*Inc.*, 477 U.S. 242, 246 (1986). "The nonmoving party must do so by offering 'sufficient proof in the form of admissible evidence' rather than relying solely on the allegations of her pleadings." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993)). The Court must "view the evidence in the light most favorable to the [nonmoving] party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (internal quotation marks and citation omitted); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018).

When faced with cross-motions for summary judgment, the Court applies the above standard and must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted). "The court . . . cannot weigh the evidence or make credibility determinations." *Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *see Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). In general, if "an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate" Fed. R. Civ. P. 56 advisory committee's note to 1963 amendment.

## III.

### A.   *Defendant Goldston's Motion for Summary Judgment*

Mr. Gibson pled five counts against Judge Goldston, all pursuant to 42 U.S.C. § 1983. Judge Goldston moved for summary judgment, claiming judicial immunity. Mr. Gibson contends her actions herein constitute a "nonjudicial act" for which no absolute immunity applies.[2]

---

[2] Mr. Gibson also asserts that the Supreme Court of Appeal's holdings in *In re Goldston* are res judicata. [Doc. 68]. The Court need not reach the contention.

Judicial immunity is a form of absolute immunity. *Stump v. Sparkman*, 435 U.S. 349, 359 (1978); *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976); *Pierson v. Ray*, 386 U.S. 547, 554–55 (1967); *Bradley v. Fisher*, 80 U.S. 335, 353–54 (1871); *Randall v. Brigham*, 74 U.S. 523, 535–36 (1869). "Like other forms of official immunity, judicial immunity is an immunity from suit, not just from ultimate assessment of damages." *Mireles v. Waco*, 502 U.S. 9, 11 (1991) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)); *see Randall*, 74 U.S. at 535; *Bradley*, 80 U.S. at 351; *Ayala v. United States*, 982 F.3d 209, 217 (4th Cir. 2020); *Mullins v. Oakley*, 437 F.2d 1217 (4th Cir. 1971). "Although unfairness and injustice to a litigant may result on occasion, it is 'a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself.'" *Mireles*, 502 U.S. at 10 (quoting *Bradley*, 80 U.S. at 347); *see Pierson*, 386 U.S. at 554; *Imbler*, 424 U.S. at 435–36; *Stump*, 435 U.S. at 355; *King v. Myers*, 973 F.2d 354, 359 (4th Cir. 1992). "[J]udicial immunity is not overcome by allegations of bad faith or malice, the existence of which ordinarily cannot be resolved without engaging in discovery and eventual trial." *Mireles*, 502 U.S. at 11 (citing *Pierson*, 386 U.S. at 554); *see Stump*, 435 U.S. at 356–57; *King*, 973 F.2d at 356.

Judicial "immunity is justified and defined by the functions it protects and serves, not by the person to whom it attaches." *Forrester v. White*, 484 U.S. 219, 227 (1988); *see Kalina v. Fletcher*, 522 U.S. 118, 127 (1997); *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993); *Nero v. Mosby*, 890 F.3d 106, 118 (4th Cir. 2018); *King*, 973 F.2d at 357–58. A litany of Supreme Court cases establishes that "the immunity is overcome in only two sets of circumstances. First, a judge is not immune from liability for nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity. Second, a judge is not immune for actions, though judicial in nature, taken in the

complete absence of all jurisdiction." *Mireles*, 502 U.S. at 11–12 (citations omitted); *see Forrester*, 484 U.S. at 227–29; *Stump*, 435 U.S. at 356–57; *Pierson*, 386 U.S. at 554; *Bradley*, 80 U.S. at 351; *King*, 973 F.2d at 356.

"[W]hether an act by a judge is a 'judicial' one relate[s] to the nature of the act itself, *i.e.*, whether it is a function normally performed by a judge, and to the expectations of the parties, *i.e.*, whether they dealt with the judge in his judicial capacity." *Stump*, 435 U.S. at 362; *see King*, 973 F.2d at 356. As *Forrester* instructs, it is "the nature of the function performed, not the identity of the actor who performed it, that inform[s] our immunity analysis." 484 U.S. at 229.

Further, it is not "the particular act in question" that is scrutinized, otherwise "any mistake of a judge in excess of his authority would become a 'nonjudicial' act[] because an improper or erroneous act cannot be said to be normally performed by a judge." *Mireles*, 502 U.S. at 12–13; *see Stump*, 435 U.S. at 356–57. For instance, in *Stump*, the Supreme Court determined that a circuit court judge who approved a mother's petition to have a tubal ligation performed on her minor daughter without the daughter's knowledge or consent was entitled to judicial immunity. 435 U.S. at 352–53, 362. The High Court reasoned that judges "not infrequently are called upon in their official capacity to approve petitions relating to the affairs of minors," and Judge Stump was "acting as a county circuit court judge" when he approved the petition. *Id.* at 362.

Similarly, in *Mireles*, a California Superior Court judge was angered when a public defender failed to appear in court on time because he was delayed in a proceeding in another courtroom. 502 U.S. at 10. The judge directed police officers to use excessive force to remove the attorney from the other courtroom and bring the attorney before him. *Id.* In determining that the judge's actions were judicial -- and therefore covered under absolute immunity -- the Supreme Court reasoned that although the judge directing the officers to use excessive force was "in excess

of his authority," the act of directing an officer to bring counsel to court is judicial in nature. *Id.* at 12–13. Thus, in *Mireles*, the particular act in question was the "judge's direction to police officers to carry out a judicial order with excessive force." *Id.* The Supreme Court, however, did not analyze that particular act, but rather analyzed the "particular act's relation to a general function normally performed by a judge, in this case the function of directing police officers to bring counsel in a pending case before the court." *Id.* at 13. The High Court also emphasized that it was of no importance that the judge's "order was carried out by police officers" because it is "the nature of the function performed, not the identity of the actor who performed it, that informs our immunity analysis." *Id.* (internal quotations and citation omitted). The Court determined that the act -- ordering police officers to use excessive force to bring a lawyer before the court -- was a judicial one, and thus judicial immunity applied. *Id.*

The crux of Judge Goldston's argument is that her actions were taken during the course of adjudicating a Family Court dispute. She contends that, assuming she exceeded her authority, her actions were judicial in nature and hence subject to judicial immunity.

As noted, the Court examines the nature of the act and not the actor. The nature of the act was a warrantless search of Mr. Gibson's residence and a warrantless seizure of his property. The twofold inquiry is (1) whether a search of a residence was an act normally performed by a judge, and (2) the expectations of the parties, namely, whether Mr. Gibson was dealing with Judge Goldston in her judicial capacity.  Respecting the first prong, does a judge normally execute a search warrant or personally search a residence? To quote Judge Posner, "[t]o ask the question is pretty much to answer it." *Nelson v. Streeter*, 16 F.3d 145, 148 (7th Cir. 1994). While "the issuance of a search warrant is unquestionably a judicial act," *see Burns v. Reed,* 500 U.S. 478, 492 (1991), the execution of a search and seizure is not. Indeed, searches are so quintessentially

executive in nature that a judge who participates in one acts "not . . . as a judicial officer, but as an adjunct law enforcement officer." *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 327 (1979). While *Lo-Ji Sales* did not address judicial immunity, the Supreme Court expressed that a judicial officer presiding over a criminal case who personally "conducted a generalized search [of a store] under authority of an invalid [search] warrant . . . was not acting as a judicial officer but as an adjunct law enforcement officer." *Id*. at 327. Judge King observed likewise writing for the panel in *United States v. Servance*, stating "it is elementary that a judge can overstep his responsibilities and compromise his judicial neutrality if, by way of example, he serves as a leader of a search party." 394 F.3d 222, 231 (4th Cir.), *judgment vacated on other grounds*, 544 U.S. 1047 (2005). Judge Goldston was not engaged in an act normally performed by a judge.

Respecting the second prong, Mr. Gibson doubtless dealt with Judge Goldston in her judicial capacity at the outset of the March 4 contempt hearing. The situation changed markedly, however, once the field trip began. Once Judge Goldston invited herself to the residence, began her warrantless search, and then seized private property, the die was cast. Nevertheless, Judge Goldston notes (1) a bailiff was in attendance, (2) the search was recorded much like a judicial proceeding, and (3) Mr. Gibson and his ex-wife made motions during the process. She asserts all of this demonstrates the parties dealt with her as a judge.

The contentions do not withstand minimal scrutiny. Mr. Gibson's motion for disqualification arose out of Judge Goldston acting as a witness rather than a judge. Further, the recording of the search -- which Judge Goldston attempted to halt -- is in no way equivalent factually or legally to an electronically transcribed or recorded judicial proceeding. Judge Goldston recognized as much in her deposition. [Goldston 20:19–22].

Judge Goldston has thus failed to demonstrate either of the two required prongs.

Her protestation that this case is "in the same category as *Mireles*" [Doc. 66 at 10] also misses the mark. In *Mireles*, a judge ordered a bailiff to bring an attorney before him and ordered that excessive force be used in the process. 502 U.S. at 10. In *Mireles*, however, the underlying action of compelling counsel to appear was within the judicial orbit. And while Judge Goldston might similarly have had the authority to order a search of a litigant's home and a seizure of certain items, she could not conduct a search and seizure herself. If the judicial officer in *Mireles* used excessive force himself to bring the attorney before him, a different result might obtain.

A reductive analysis by the United States Court of Appeals for the Sixth Circuit is helpful: "the analytical key . . . between functions for which judicial immunity attaches and those for which it does not is the determination whether the questioned activities are 'truly judicial acts' or 'acts that simply happen to have been done by judges.'" *Archie v. Lanier*, 95 F.3d 438, 441 (6th Cir. 1996) (quoting *Sparks v. Character & Fitness Comm. of Ky.*, 869 F.2d 428, 432 (6th Cir. 1988)); *see Foster v. Walsh*, 864 F.2d 416, 417 (6th Cir. 1988). Judge Goldston's actions fall into the latter category. She performed a nonjudicial act, and she is not entitled to judicial immunity.[3]

---

[3] Moreover, it appears Judge Goldston acted in clear absence of all jurisdiction. As our Court of Appeals observed decades ago, the dividing line between unprotected *usurpations of power* on the one hand, and protected *mistaken exercises of limited power* on the other, is divined by answering a single question: "When a judge exceeds authority, was . . . she entirely devoid of power [and hence deprived of immunity] or was a power lawfully possessed wrongly exercised[, in which case immunity holds]?" *King v. Myers*, 973 F.2d 354, 357 (4th Cir. 1992). In arriving at the answer, the Supreme Court of Appeals' disciplinary ruling against Judge Goldston emphasizes how far she exceeded her warrant. And although the decision necessarily post-dated her actions herein, the Supreme Court of Appeals concluded the restrictive *and textual constitutional* markers were long in place prior to her unlawful actions:

To say that searches are an executive activity is to announce *no new principle of law*. The United States Supreme Court assumed as much in 1979 when it rejected a conviction resulting from a search led by a town justice. According to the Supreme Court, the town justice in question "allowed himself to become a member, if not the leader, of the search party which was essentially a police operation."

Accordingly, the Court **DENIES** Judge Goldston's Motion for Summary Judgment.

**B.**     *Plaintiff Matthew Gibson's Motion for Summary Judgment as to Judge Goldston*

Mr. Gibson filed his own Motion for Summary Judgment. [Doc. 67]. The Court concludes that genuine issues of material fact are extant. Consequently, Mr. Gibson's Motion for Summary Judgment is **DENIED**.

**C.**     *The Raleigh County Defendants' Motion for Summary Judgment*

**1.**     **The Raleigh County Commission**

Mr. Gibson alleges that the Raleigh County Commission "instituted an official policy, custom, and practice of assisting Judge Goldston with searches and seizures of the homes of litigants appearing before her" pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694 (1978). [Doc. 1 ¶ 76]. In its Motion for Summary Judgment, the Raleigh County Commission asserts that "the record is devoid of any evidence that the Raleigh County Commission has a policy or custom of violating the Plaintiff's rights." [Doc. 64 at 17]. Mr. Gibson responds that the evidence indicates that the Raleigh County Commission "had, and continues to have, a policy of enabling and supporting the unconstitutional misconduct of

---

Under our system of government, judges may not exercise executive powers. The West Virginia Constitution declares that "[t]he legislative, executive and judicial departments shall be separate and distinct." W. Va. Const. art. V, § 1. The Constitution further specifies, *in unmistakable terms*, that no department "shall exercise the powers properly belonging to either of the others" and forbids "any person [to] exercise the powers of more than one of them at the same time." In light of these *clear prohibitions*, we hold that the West Virginia Constitution forbids a judicial officer to participate in a search because a search is an exercise of executive power. W. Va. Const. art. 5, § 1.

*In re Goldston*, 246 W. Va. 61, 69–70, 866 S.E.2d 126, 135–36 (2021) (emphasis added).

Defendant Goldston." [Doc. 73 at 15].

"For the purposes of Section 1983, a municipality is considered a 'person' and thus is subject to suit." *Hunter v. Town of Mocksville*, 897 F.3d 538, 553 (4th Cir. 2018) (citing *Monell*, 436 U.S. at 690). However, a municipality "cannot be held liable unless a municipal policy or custom caused the constitutional injury." *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984); *see Connick v. Thompson*, 563 U.S. 51, 51 (2011); *Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 532–33 (4th Cir. 2022). A municipality may be liable under § 1983 for the violation of a plaintiff's constitutional rights "only where the constitutionally offensive actions of employees are taken in furtherance of some municipal 'policy or custom.'" *Spell v. McDaniel*, 824 F.2d 1380 (4th Cir. 1987); *see Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 470 (4th Cir. 2013) (reasoning that the purpose of this "municipal policy or custom" requirement is to "ensure[] that the municipality is 'responsible' for the alleged violations"). A violation results from a municipal entity's "policy or custom" if the violation resulted from "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690–91, 694. Our Court of Appeals has observed how to prove a *Monell* claim:

> A policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)); *see Starbuck*, 28 F.4th at 533 (citing *L.A. Cnty. v. Humphries*, 562 U.S. 29, 36 (2010)).

Not every municipal official's action or inaction represents municipal policy.

13

Rather, the inquiry focuses on whether the municipal official possessed final policy making authority under state law concerning the action or inaction. *See, e.g.*, *McMillian v. Monroe Cnty.*, 520 U.S. 781, 785–86 (1997); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986); *Riddick v. Sch. Bd. of City of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000). "[T]he touchstone inquiry is whether 'the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'" *Hunter*, 897 F.3d at 554–54 (quoting *Liverman v. City of Petersburg*, 844 F.3d 400, 413 (4th Cir. 2016)); *see Davison v. Randall*, 912 F.3d 666, 689 (4th Cir. 2019). Furthermore, even if a § 1983 plaintiff can identify the requisite final policy making authority under state law, a municipality is not liable simply because a § 1983 plaintiff "is able to identify conduct attributable to the municipality." *Riddick*, 238 F.3d at 524. Instead, a § 1983 "plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Brown*, 520 U.S. at 404; *see King v. Rubenstein*, 825 F.3d 206, 223 (4th Cir. 2016).

Viewing the evidence in the light most favorable to the nonmoving party, there is a genuine issue of material fact respecting whether the Raleigh County Commission had a policy or custom that caused Mr. Gibson's injuries. For instance, according to the record, Bailiff McPeake sought out a Raleigh County supervisor prior to his first home search as a bailiff in Raleigh County Family Court, seeking assurance that he was within department policy prior to doing so. [McPeake at 13:10–13; 40:11–24; 64:2–23; 65:9–17]. Bailiff McPeake was told by Sergeant Aaron Lilly that he was authorized to participate and that they "do that from time to time." [McPeake at 64:2–15] Even after the March 4, 2020 event, Bailiff McPeake testified that there has been no policy change as to family court judges searching parties' homes. [McPeake at 64:16–20]. Bailiff McPeake, who continues to serve as bailiff for Judge Goldston, has not been instructed by his supervisor,

Lieutenant Dave Stafford, to refrain from similar conduct in the future. [McPeake at 13:10–13; 40:11–24; 64:2–23; 65:9–17].

Additionally, Deputy Stump, who established during his deposition that he was a supervisor for the Raleigh County Commission, testified that he had visited the homes of litigants with Judge Goldston "numerous times." [Stump at 6:12–14; 19–24; 7:1–4]. Deputy Stump explained that the sheriff's department policy for bailiffs is whatever policy a judge told him -- "no questions asked." [Stump at 31:3–18]. He noted that, even after the March 4, 2020 incident, there has been no policy change within the department about bailiffs going to the homes of litigants. Indeed, Deputy Stump asserts that, "if Judge Goldston told me today to go to the house, I'd be the first one there." [Stump at 56:1–6].

The record gives rise to a genuine issue of material fact respecting whether the Raleigh County Commission had the required municipal policy of allowing officers to participate in home searches with family court judges of the type here challenged. The Motion for Summary Judgment as it pertains to the Raleigh County Commission is **DENIED**.

### 2.  Defendants McPeake and Stump

Mr. Gibson has alleged a First Amendment claim against Bailiff McPeake and a Fourth Amendment claim against Bailiff McPeake and Deputy Stump. [Doc. 16]. Bailiff McPeake and Deputy Stump have moved for summary judgment, asserting qualified immunity. [Doc. 63].

#### a.  *First Amendment Claim*

Qualified immunity "shields government officials from liability for civil damages provided their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." *Haze v. Harrison*, 961 F.3d 654, 660 (4th Cir. 2020); *see Meyers v. Balt. Cnty.*, 713 F.3d 723, 731 (4th Cir. 2013). The doctrine "balances two important

interests -- the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The question is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

Courts use a two-step test to ascertain whether qualified immunity applies: "(1) taken in the light most favorable to the party asserting the injury, do the facts alleged show the defendant's conduct violated a constitutional right; and (2) was that right clearly established such that a reasonable person would have known that their conduct was unlawful." *Pearson*, 555 U.S. at 236; *see Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538–39 (4th Cir. 2017). The Supreme Court has since modified this approach "such that lower courts are no longer required to conduct the analysis in th[is] sequence." *Meyers*, 713 F.3d at 731.

Assuming an actionable deprivation of Mr. Gibson's First Amendment rights, the Court applies an objective test to determine whether a right is clearly established, asking whether "a reasonable person in the official's position could have failed to appreciate that his conduct would violate [the] right[]." *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991) (citation omitted); *see Santos*, 725 F.3d at 468. The Supreme Court does not "require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011).

"To determine if the right in question was clearly established, we first look to cases from the Supreme Court, this Court of Appeals, or the highest court of the state in which the action arose." *Thompson v. Commonwealth of Va.*, 878 F.3d 89, 99 (4th Cir. 2017) (citing *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004)). Absent "directly on-point, binding authority,"

courts may also consider whether "the right was clearly established based on general constitutional principles or a consensus of persuasive authority." *Booker*, 855 F.3d at 543; *Owens*, 372 F.3d at 279.

The majority of circuits have found the First Amendment protects a citizen's right, in general, to record police. *See, e.g.*, *Fields v. City of Phila.*, 862 F.3d 353, 355–56 (3d Cir. 2017) ("[T]he First Amendment protects the act of photographing, filming, or otherwise recording police officers conducting their official duties in public."); *Turner v. Lieutenant Driver*, 848 F.3d 678, 689–90 (5th Cir. 2017) ("We agree with every circuit that has ruled on this question . . . the First Amendment protects the right to record police."); *Gericke v. Begin*, 753 F.3d 1, 8 (1st Cir. 2014) (recognizing a "First Amendment right to film police activity carried out in public"); *ACLU v. Alvarez*, 679 F.3d 583, 595–96 (7th Cir. 2012) ("The act of making an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights . . . ." (emphasis omitted)); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (recognizing plaintiffs had a First Amendment "right to videotape police activities"); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (recognizing a plaintiff who was attempting to videotape a demonstration had a "First Amendment right to film matters of public interest"); *cf. Chestnut v. Wallace*, 947 F.3d 1085, 1090 (8th Cir. 2020) (recognizing the "right to watch police-citizen interactions" as a prerequisite to the right to "record[] police activity"). While the right to record in general may be clearly established, the right must be drawn more specifically.

"In analyzing whether the defendant has violated a constitutional right of the plaintiff, the court should identify the right 'at a high level of particularity.'" *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013) (quotations omitted). In other words, the "clearly established"

inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citation and internal quotation marks omitted). The subject right -- properly framed -- is whether a citizen suffers a First Amendment deprivation when a bailiff, acting on a direct judicial order, seizes that citizen's phone while the citizen is attempting to record what the bailiff perceived as an ongoing court proceeding. A reasonable law enforcement officer in Bailiff McPeake's position could not be expected to have known his conduct violated Mr. Gibson's First Amendment rights. Had Bailiff McPeake not complied with the order, he would doubtless have been held in contempt or dismissed. The qualified immunity doctrine does not require one in Bailiff McPeake's position to make a correct, and somewhat esoteric, on-the-spot legal analysis of whether a judge's order is legally correct. The Court consequently concludes that Bailiff McPeake is entitled to qualified immunity. The Court **GRANTS IN PART** the Raleigh County Defendants' Motion for Summary Judgment as to Mr. Gibson's First Amendment claim against Bailiff McPeake.

### *b. Fourth Amendment Claim*

Again, assuming a deprivation of Mr. Gibson's Fourth Amendment rights, the Court analyzes the situation "in light of the specific context of the case, not as a broad general proposition." *Mullenix*, 577 U.S. at 12 (citation and internal quotation marks omitted). The authorities are legion that, absent a recognized exception, citizens have a clearly established right to be free from warrantless searches and seizures. *See, e.g.*, *Groh v. Ramirez*, 540 U.S. 551, 564 (2004) (holding that "[n]o reasonable officer could claim to be unaware of the basic rule, well established by our cases, that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional"). The Court is unable, however, to find authority analogous to the present situation where officers participate in a warrantless search and seizure when a judge is

physically present and personally directing the effort.

The question again arises whether "a reasonable person in the official's position could have failed to appreciate that his conduct would violate [the] right[]." *Torchinsky*, 942 F.2d at 261 (citation omitted). Further, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. The Court is unable to conclude that reasonable law enforcement officers positioned akin to Bailiff McPeake and Deputy Stump would have known that their conduct -- that is, following Judge Goldston's orders and participating in the search and seizure that she directed -- would violate Mr. Gibson's Fourth Amendment rights.

Bailiff McPeake and Deputy Stump are entitled to qualified immunity. The Court **GRANTS IN PART** the Raleigh County Defendants' Motion for Summary Judgment to that extent.

### IV.

Based on the foregoing discussion and the evidentiary record in its entirety, the Court **ORDERS** as follows:

1.    Judge Goldston's Motion for Summary Judgment [**Doc. 65**] is **DENIED**;

2.    Mr. Gibson's Motion for Summary Judgment [**Doc. 67**] is **DENIED**; and

3.    The Raleigh County Defendant's Motion for Summary Judgment [**Doc. 63**] is **GRANTED IN PART** as to Bailiff McPeake and Deputies Stump and White and **DENIED IN PART** as to the Raleigh County Commission.

The Clerk is directed to send a copy of this written opinion and order to counsel of record and to any unrepresented party.

ENTER:   July 13, 2022

Frank W. Volk
United States District Judge

19