**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 22-1757

MATTHEW GIBSON,

        Plaintiff – Appellee,

v.

LOUISE E. GOLDSTON, individually,

        Defendant – Appellant,

and

COUNTY COMMISSION OF RALEIGH COUNTY, a political subdivision; JEFF MCPEAKE, individually; BOBBY STUMP, individually; BRIAN WHITE, individually,

        Defendants.

Appeal from the United States District Court for the Southern District of West Virginia, at Beckley.  Frank W. Volk, District Judge.  (5:21-cv-00181)

Argued:  September 20, 2023                Decided:  October 30, 2023

Before WILKINSON and GREGORY, Circuit Judges, and MOTZ, Senior Circuit Judge.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Gregory and Senior Judge Motz joined.

**ARGUED:**  Jennifer E. Tully, BAILEY & WYANT, PLLC, Charleston, West Virginia, for Appellant.  Patrick M. Jaicomo, INSTITUTE FOR JUSTICE, Arlington, Virginia, for Appellee.  **ON BRIEF:**  John P. Fuller, Adam K. Strider, BAILEY & WYANT, PLLC, Charleston, West Virginia, for Appellant.  Victoria Clark, Austin, Texas, Anya Bidwell, INSTITUTE FOR JUSTICE, Arlington, Virginia; John Bryan, JOHN H. BRYAN, ATTORNEY AT LAW, Union, West Virginia, for Appellee.

———————————

WILKINSON, Circuit Judge:

We consider in this appeal whether a judge who participates in the search of a litigant's home is entitled to judicial immunity for actions related to the search. Judge Louise Goldston went to Matthew Gibson's residence to look for items he had failed to turn over to his ex-wife after their divorce. She entered his home over his objections after threatening him with arrest should he try to stop her. She then supervised the seizure of designated items in the house. The only question before us is whether judicial immunity shields these acts. We hold it does not. Judicial immunity protects only judicial acts. It does not shield the conduct of judges who step outside their judicial role, as Judge Goldston did when searching Gibson's home.

I.

A.

The search in this case occurred in the aftermath of Gibson's divorce from his ex-wife. The divorce decree was granted by Judge Goldston. As part of those proceedings, Judge Goldston approved a property-distribution settlement that listed various items Gibson agreed to turn over to his ex-wife, including sentimental items like family photographs and recipes. More than a year later, Gibson's ex-wife returned to Judge Goldston's chambers with a Petition for Contempt, complaining that Gibson had failed to turn over some of the promised items and had damaged others before returning them.

On March 4, 2020, the parties gathered before Judge Goldston in her West Virginia courtroom for a hearing on the petition. Gibson's ex-wife was represented by counsel; Gibson appeared *pro se*. The ex-wife was asked to testify about her grievances. In the

3

middle of her testimony, Judge Goldston interrupted to ask Gibson for his address, which he gave her. She then recessed the hearing and ordered the parties to meet her at Gibson's home. She did not explain the sudden change of venue and gave Gibson no opportunity to object before leaving the courtroom.

Judge Goldston, the bailiff, Gibson, his ex-wife, and her attorney all piled into their cars for the ten-minute drive over. Gibson rode with his new girlfriend, and the two spent the drive researching the procedure for disqualifying a judge. They were the first to arrive. Upon doing so, Gibson started an audio recording on his phone and his girlfriend started a video recording on hers while they waited outside for the others.

Judge Goldston and the bailiff arrived last. As they made their way up the lawn, Gibson asked for Judge Goldston's attention and made an oral motion to disqualify her on the ground that she had become a witness in the case. Standing in Gibson's front yard, Judge Goldston denied the motion as untimely. Gibson quickly protested that Judge Goldston "[wouldn't] get in [his] house without a search warrant." She responded laconically, "Oh yeah I will."

The above exchange was caught on video, but Judge Goldston soon realized that she was being recorded. She ordered Gibson to stop the recordings on the ground that parties may not record family court proceedings. She told everyone to turn off their phones, warning, "I'll take you to jail if you don't turn them off." When Gibson failed to comply, she ordered him to turn his phone over to the bailiff and again threatened him with arrest. Before the recording stops, Judge Goldston can be heard saying, "I am the judge trying to

4

effect equitable distribution. We're having a hearing. Now you let me in that house or he [the bailiff] is going to arrest you for being in direct contempt of court."

During the brouhaha over the recordings, the bailiff had radioed the local sheriff's department to ask for backup law enforcement. But Judge Goldston did not wait for the sheriff's department to arrive. Instead, she, the bailiff, the ex-wife, and the ex-wife's attorney all entered Gibson's home to look for the contested items.

We need not speculate as to what went on after the court's entry into Gibson's home. Unbeknownst to Judge Goldston, her bailiff recorded the first part of the search. The video painted a striking picture. Judge Goldston, her list of unproduced assets in hand, directed proceedings. When the ex-wife identified some photos hanging on the wall as being on the list, Judge Goldston told her to "take 'em." When the ex-wife opened a closet to reveal some yearbooks, Judge Goldston said, "Get 'em." And when the ex-wife said that their old DVD collection was downstairs, Judge Goldston accompanied her down and told her to "go in there and pick the ones you want." The ex-wife sifted through the DVDs as Judge Goldston sat in a rocking chair, shoes off, supervising and giving orders.

We lack a record of everything that happened. The bailiff recorded only seven minutes of the twenty-or-thirty-minute search. No one made a contemporaneous record of all that was taken. No police report describing the search was ever filed, even though the backup sheriff's deputy eventually arrived, entered the home, and helped with the search. After the search, the parties reconvened in the courtroom, where Judge Goldston listed the items that had been recovered for the record. But no written order was ever entered describing or authorizing the search itself.

B.

Disciplinary proceedings were lodged against Judge Goldston after the audio and video footage taken by Gibson and his girlfriend were uploaded to the internet. As part of those proceedings, Judge Goldston signed an agreement in which she admitted to having engaged in numerous such "home visits" and conceded that she could not identify any legal authority to support them. She acknowledged that she could have ordered law enforcement officers to conduct searches, but asserted that the officers would not have done a good enough job, saying that she had "been told by every sheriff that [she'd] worked with . . . that [looking for property in divorce disputes is] not something they do, that they're not going for more than fifteen minutes . . . to do anything." *Matter of Goldston*, 866 S.E.2d 126, 131 (W. Va. 2021).

The disciplinary proceedings culminated when the West Virginia Supreme Court of Appeals censured Judge Goldston for her "serious misconduct" and ordered her to pay a $1,000 fine. *Id.* at 129. It considered sanctions appropriate because Judge Goldston had "exercised executive powers forbidden to her under the West Virginia Constitution" when she conducted the search of Gibson's residence and that she had compounded that error by "[going] about the search in a highhanded and procedurally flawed manner." *Id.* at 129, 137.

In finding that Judge Goldston overstepped her authority, the West Virginia Supreme Court of Appeals declined Judge Goldston's invitation to see her visit to Gibson's home not as a search but as a "judicial view." It noted that "the record [was] clear that Judge Goldston went to the property to *locate* things, not simply to observe them." *Id.* at

6

135 (emphasis in original). "Looking for things," the court reasoned, "is a 'search' by any sensible definition of the term." *Id.*

C.

While the West Virginia disciplinary proceedings were pending, Gibson filed suit in federal district court against Judge Goldston and others present at the search. *See Gibson v. Goldston*, No. 5:21-cv-00181, 2022 WL 2719725 (S.D. W. Va. July 13, 2022). Gibson claimed that the warrantless search and seizure of his property violated his Fourth and Fourteenth Amendment rights, that the restrictions on recording the incident violated the First Amendment, and that Judge Goldston's practice of conducting "home visits" violated the Equal Protection Clause by disadvantaging *pro se* litigants like himself. *Id.* at *2. He sought compensatory and punitive damages under 42 U.S.C. § 1983, as well as attorney's fees and injunctive and declaratory relief.

Judge Goldston moved for summary judgment, claiming she was entitled to absolute judicial immunity. The district court denied her motion because it found that the search of Gibson's home and seizure of his property were nonjudicial acts to which judicial immunity did not attach. *Id.* at *6. The court reasoned that Judge Goldston's conduct was nonjudicial because conducting searches and seizures was a "quintessentially executive" function not normally performed by judges. *Id.* at *4–5.

Judge Goldston appealed the denial of judicial immunity. We have jurisdiction over this interlocutory appeal because it concerns a denial of absolute immunity involving an issue that can be resolved purely as a matter of law. *See Al Shimari v. CACI Intern., Inc.*, 679 F.3d 205, 221–22 (4th Cir. 2012). The only question before us at this stage is whether

7

Judge Goldston is entitled to judicial immunity, a question appellate courts review de novo. *See, e.g.*, *Turner v. Houma Mun. Fire & Police Civil Serv. Bd.*, 229 F.3d 478, 482 (5th Cir. 2000); *Malik v. Arapahoe Cnty. Dep't of Soc. Servs.*, 191 F.3d 1306, 1313 (10th Cir. 1999); *Jones v. Cannon*, 174 F.3d 1271, 1281 (11th Cir. 1999).

## II.

Judicial immunity is strong medicine. When it applies it is absolute. It not only protects judges from ultimate liability in a case, but also serves as a complete bar to suit. *Mireles v. Waco*, 502 U.S. 9, 11 (1991) (per curiam). It applies even to judicial acts "flawed by the commission of grave procedural errors," *Stump v. Sparkman*, 435 U.S. 349, 359 (1978), and protects even actions "alleged to have been done maliciously or corruptly," *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 351 (1872).

Such potent medicine is justified by the gravity of the illness it is meant to guard against—namely, a judiciary composed of judges afraid to act on their convictions. Early in our country's history, the Supreme Court recognized that it was "a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself." *Id.* at 347. Such a freedom would be illusory if judges could be haled into court by every disappointed litigant. "The resulting timidity would be hard to detect or control, and it would manifestly detract from independent and impartial adjudication." *Forrester v. White*, 484 U.S. 219, 227 (1988). Even more insidiously, judges might be tempted to rule in favor of the party they deemed more likely (or more able) to lodge a civil suit against them.

8

But the medicine's potency cautions against its indiscriminate prescription. And so there are limitations. Judicial immunity does not protect *judges* so much as it protects the judicial acts they undertake as part of their public service; it is "defined by the *functions* it protects and serves, not by the person to whom it attaches." *Id.* (emphasis in original). As such, judges are not protected if they act in the "clear absence of all jurisdiction over the subject-matter" or when they engage in nonjudicial acts. *Bradley*, 80 U.S. (13 Wall.) at 351; *Stump*, 435 U.S. at 360. We rest our holding that Judge Goldston is not so protected on the fact that she engaged in a nonjudicial act. Our decision is not grounded in any absence of jurisdiction. Rather, it is based on the fact that the judge clearly exceeded the most common understandings of the proper judicial role.

III.

Judge Goldston argues that she is entitled to judicial immunity because she went to Gibson's house in service of the "resolution of a family court matter" pending before her and "acted as a judge throughout the proceedings." *See* Opening Br. of Appellant at 10. She points out that as a West Virginia family court judge, she has the express statutory authority to ensure that parties comply with marital property distribution agreements by ordering that property be located and seized. Her mere "presence at the home" and "interaction with the parties" during the search, she contends, was not so far afield of that lawful power that judicial immunity should be denied. Rather, she urges us to see this as a case of "a power lawfully possessed wrongly exercised," *id.* at 20 (quoting *King v. Myers*, 973 F.2d 354, 357 (4th Cir. 1992), and thus to swathe her actions in judicial immunity's embrace.

9

We decline to do so. Judge Goldston can enjoy such protection only when engaged in a judicial act within her jurisdiction. But Judge Goldston stepped outside of her judicial role when she personally participated in the search of Gibson's home. The search of someone's home and the seizure of its contents are executive acts, not judicial ones. We thus hold that her activities are not eligible for the protections of judicial immunity.

A.

The Constitution establishes a basic division of labor, distributing the tasks of governance among three branches. Each branch's power is circumscribed to ensure that no one branch dominates. The judiciary is no exception. It "has no influence over either the sword or the purse" and "must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments." *Federalist No. 78* (Alexander Hamilton).

It is basic to our system that the one who issues the order is not the one to enforce it. Issuing an order is a judicial function; carrying that order out is an executive one. Courts, as a general matter, do not enforce their own orders. After granting an injunction, the judge does not go out and enforce it; the executive branch does. *See Cooper v. Aaron,* 358 U.S. 1, 12 (1958) (noting that the federal troops were dispatched by the president to enforce a desegregation injunction). Likewise, searches and seizures are typically undertaken by the executive branch, whether they be in service of enforcing a judicial decree or in conjunction with the investigative efforts that are part and parcel of the law enforcement function. *See Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 327 (1979) (holding that a judge who participated in a search was acting as an "adjunct law enforcement officer" rather than a "judicial officer").

10

This basic paradigm was violated and compromised by Judge Goldston's actions. She stepped out of the judicial role in a variety of ways, which made plain in combination that she was engaged in an extrajudicial function.

At the outset, we note that Judge Goldston's visit to Gibson's home had none of the usual trappings of a judicial proceeding. She was not in a courtroom, nor was she wearing a robe. For much of the interaction she wasn't even wearing shoes. Such a lack of judicial trappings, however, is not dispositive in judicial immunity cases. *See Stump*, 435 U.S. at 360. There have been instances where judicial immunity has been conferred even though a judge was not wearing a robe and even when a judge was not in a courthouse. *See McAlester v. Brown*, 469 F.2d 1280, 1282 (5th Cir. 1972) (granting immunity for the act of ordering a litigant arrested even though the judge was not wearing a robe); *Lopez v. Vanderwater*, 620 F.2d 1229, 1235 (7th Cir. 1980) (granting immunity for the acts of arraigning, convicting, and sentencing an ex-tenant even though the judge was not at the courthouse). Judges often entertain emergency stay applications without robes and preside over naturalization ceremonies outside a courtroom. Both proceedings are thought far more consonant with the judicial function than the search undertaken here. On the other side of the coin, judicial immunity is sometimes withheld from judges even for actions taken inside their courtroom. *See Gregory v. Thompson*, 500 F.2d 59, 63 (9th Cir. 1974) (denying immunity when a judge personally removed someone from his courtroom using excessive force).

What is dispositive are a judge's actions. The line between "judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by judges" is often

11

a fine one. *Forrester*, 484 U.S. at 227. Whether an act is judicial "relate[s] to the nature of the act itself, *i.e.*, whether it is a function normally performed by a judge." *Stump*, 435 U.S. at 362. And once we consider the functions of the judicial and executive branches, it becomes clear that—on the facts at bar—Judge Goldston engaged in acts not normally performed by judges and in so doing forfeited the protection of judicial immunity.

Judge Goldston's actions instead marked her out as part of the law enforcement team. She put herself in the position of participating not only in the search of a private home over the objection of the homeowner, but in the seizure of that homeowner's property. *See Matter of Goldston*, 866 S.E.2d at 135 (holding that Judge Goldston participated in the search). She demanded that the homeowner cede entrance not only to her but also to his ex-wife and her attorney. While inside, she personally ordered the seizure of various items: photographs, yearbooks, DVDs, recipes, and a chainsaw.

More than just participate, Judge Goldston supervised the whole operation. She controlled the scope of both the search and the seizure. She allowed the ex-wife to sift through DVDs but denied her request to look for pictures of her child's birth. When a dispute emerged over an umbrella stand, Judge Goldston awarded the stand to the ex-wife, who removed it from the home alongside all the other items. Searches, seizures, and their supervision are classic law enforcement functions reserved for the executive branch.

B.

Our unwillingness to extend the protection of judicial immunity to executive acts puts us squarely in line both with Supreme Court precedent and with other circuits that have denied immunity to judges who took law enforcement into their own hands.

12

The Supreme Court has distinguished judges' judicial functions, which are protected by judicial immunity, from their "administrative, executive, or legislative functions," which are not. *Forrester*, 484 U.S. at 227. For example, it has counseled that when judges act in a "legislative capacity" to promulgate a code of conduct for attorneys, legislative immunity is the more appropriate protection. *See Supreme Court of Virginia v. Consumers Union of United States, Inc*., 446 U.S. 719, 731 (1980). And when judges act to enforce such a code, they are engaged in a prosecutorial function and should be treated like prosecutors for immunity purposes. *Id.* Judicial immunity may thus not be the appropriate form of immunity for judges engaged in executive functions that they have been "assigned by law to perform." *Forrester*, 484 U.S. at 227. Judge Goldston's situation is even more tenuous. She was engaged not in an executive function *assigned* to her by law, but in an executive function *forbidden* to her under the West Virginia Constitution. *See Matter of Goldston*, 866 S.E.2d at 135–36.

Our sister circuits have also denied immunity to judges who attempted to undertake law enforcement functions. The Ninth Circuit, as noted, denied immunity to a judge who personally removed someone from his courtroom using physical force. *Gregory*, 500 F.2d at 64. While a judge unquestionably has the right to maintain order in his courtroom by ordering a disruptive individual removed, the proper authority to carry out the removal itself would be a sheriff or bailiff or other court security officer. *Id.* at 64–65. Similarly, the Eighth Circuit denied immunity to a judge who personally escorted three minors to jail when they complained about going with their newly assigned custodial parent. The judge stood by as they surrendered their clothes and belongings and were locked up. He returned

an hour later to set them free. *Rockett as next friend of K.R. v. Eighmy*, 71 F.4th 665, 671 (8th Cir. 2023). While a judge can order someone arrested as part of the contempt power, actually putting them in jail is a job not for a judge but for a jailer. *Id.* at 672.

While Judge Goldston might have had the authority to *order* a search, *see Matter of Goldston*, 866 S.E.2d at 137 & n.14, the proper authority to *conduct* the operation was the local sheriff's department or some other appropriate law enforcement agency. Just as "judges do not do double duty as jailers," *Rockett*, 71 F.4th at 672, so too they do not do double duty as sheriffs. While we understand Judge Goldston's concern that the sheriff would not have executed a warrant with the speed or zeal that she would have liked, the separation of powers was intentional. And while a greater merger of judicial and executive functions might be more efficient, that very efficiency would facilitate abuses of power. The Framers made a tradeoff: they gummed up the gears just a bit in return for protection against tyranny.

We now respect that tradeoff by holding that judges should not take law enforcement into their own hands, no matter the efficiencies such usurpation might provide. While the principles that undergird our holding are broad, the holding itself is narrow. It is governed by the facts revealed by the record. We do not decide whether Judge Goldston might be entitled to some other type of immunity for the search and seizure complained of in Gibson's suit. We hold only that on these facts judicial immunity plainly will not lie.

IV.

The judgment of the district court is hereby affirmed.

14

AFFIRMED